**23-2166, 23-2167, 23-2185**

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE TENTH CIRCUIT

---

WE THE PATRIOTS USA, INC., et al.,

     Plaintiffs - Appellants,

v.

MICHELLE LUJAN GRISHAM, in her
official capacity only, et al.,

     Defendants – Appellees.

No. 23-2166
(D.C. No. 1:23-CV-00773-
DHU-LF) (D.N.M.)

---

ZACHARY FORT, et al.,

     Plaintiffs - Appellants,

v.

MICHELLE LUJAN GRISHAM, in her
official capacity only, et al.,

     Defendants - Appellees.

No. 23-2167
(D.C. No. 1:23-CV-00778-
DHU-LF) (D.N.M.)

---

**ORAL ARGUMENT REQUESTED**

RANDY DONK, et al.,

     Plaintiffs - Appellants,

v.

MICHELLE LUJAN GRISHAM, in her
official capacity only, et al.,

     Defendants - Appellees.

No. 23-2185
(D.C. No. 1:23-CV-00772-
DHU-LF) (D.N.M.)

On Appeal from the United States District Court, District of New Mexico

The Honorable David Herrera Urias

## CORRECTED CONSOLIDATED OPENING BRIEF OF PLAINTIFFS-APPELLANTS

Cameron Lee Atkinson
ATKINSON LAW, LLC
122 Litchfield Road
P.O. Box 340 St. 2
Harwinton, CT 06791
203-677-0782
catkinson@atkinsonlawfirm.com

*Attorney for Plaintiffs We the Patriots USA, Inc. et al.*

Jordon P. George
ARAGON MOSS GEORGE JENKINS, LLP
2201 Menaul Blvd NE
Albuquerque, NM 87107
505-872-3022
jordon@amglaw.com

David H. Thompson
Peter A. Patterson
Kate Hardiman
COOPER & KIRK, PLLC
1523 New Hampshire Ave NW
Washington, D.C. 20036
202-220-9600
dthompson@cooperkirk.com

*Attorneys for Plaintiffs Fort et al.*

Robert J. Olson
WILLIAM J. OLSON, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
(703) 356-5070
wjo@mindspring.com

Stephen Stamboulieh
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

*Attorneys for Plaintiffs Donk et al.*

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

TABLE OF AUTHORITIES.................................................................................. iii

STATEMENT OF RELATED CASES ................................................................x

INTRODUCTION .............................................................................................1

JURISDICTIONAL STATEMENT ...................................................................2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..............................4

STATEMENT OF THE CASE............................................................................4

I.      Factual Background & Procedural History ......................................4

II.     The District Court's Decision ...........................................................7

SUMMARY OF ARGUMENT .................................................................................9

ARGUMENT .....................................................................................................11

I.      STANDARD OF REVIEW ...............................................................11

II.     THE CHALLENGED PROVISIONS VIOLATE PLAINTIFFS'
        SECOND AMENDMENT RIGHTS ....................................................12

        A. The Second Amendment's Plain Text Covers Plaintiffs' Conduct ...........13

        B. Controlling Methodological Considerations Under *Bruen* ......................14

               1.   The Relevant Historical Period Centers on 1791, not 1868 ........14

               2.   A Historical Tradition Requires Proof of Representative,
                    Distinctly Similar Analogues ........................................................21

               3.   Analogies to Other Sensitive Places............................................23

        B.  There Is No Historical Tradition of Barring Carry in Parks....................29

    C. There Is No Historical Tradition of Barring Carry at Playgrounds..........38

III.    OTHER EQUITABLE FACTORS .................................................46

    A. Plaintiffs Are Suffering Continuous Irreparable Injury...........................46

    B. Injunctive Relief Would Not Harm New Mexico or the
       Public Interest ................................................................48

CONCLUSION .....................................................................49

ATTACHMENT A Order on Plaintiffs' Motions for Preliminary Injunction,
    Doc No. 27...........................................................................

ATTACHMENT B Historical Appendix......................................................

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                                              <u>Page</u>

*Antonyuk v. Chiumento*,
    No. 22-2908, 2023 WL 8518003 (2d Cir. Dec. 8, 2023)........................21, 47

*Antonyuk v. Nigrelli*,
    143 S. Ct. 481 (2023)..................................................................................21

*Aposhian v. Barr*,
    958 F.3d 969 (10th Cir. 2020).....................................................................11

*Bradshaw v. Rawlings*,
    612 F.2d 135 (3d Cir. 1979)........................................................................39

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*,
    176 A.3d 632 (Del. 2017) ...............................................................28, 29, 31

*Burke v. Regalado*,
    935 F.3d 960 (10th Cir. 2019).....................................................................21

*DiGiacinto v. Rector & Visitors of George Mason Univ.*,
    704 S.E.2d 365 (Va. 2011).........................................................................32

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)..............................................9, 13, 14, 15, 40, 42

*Duncan v. Bonta*, No. 17-cv-1017,
    2023 WL 6180472 (S.D. Cal. Sept. 22, 2023)......................................18, 19

*Elrod v. Burns*,
    427 U.S. 347 (1976)...................................................................................46

*Espinoza v. Mont. Dep't of Revenue*,
    140 S. Ct. 2246 (2020)...............................................................................18

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011).......................................................................47

*Fish v. Kobach*,
    840 F.3d 710 (10th Cir. 2016)...............................................................11, 12

*Free the Nipple-Fort Collins v. City of Fort Collins*,
    916 F.3d 792 (10th Cir. 2019)...............................................................47, 49

*Gamble v. United States*,
    139 S. Ct. 1960 (2019) ...............................................................................16

*Hardaway v. Nigrelli*,
    636 F. Supp. 3d 329 (W.D.N.Y. 2022)....................................................24, 25

*Hilton v. Braunskill*,
    481 U.S. 770 (1987).................................................................48

*Jones v. Bonta*,
    34 F.4th 704 (9th Cir. 2022)..........................................................47

*Jones v. Bonta*,
    47 F.4th 1124 (9th Cir. 2022).........................................................47

*Koons v. Platkin*,
    No. 22-7464, 2023 WL 3478604
    (D.N.J. May 16, 2023)................................................. 22, 23, 28, 29, 30, 45

*Lara v. Comm'r Pa. State Police*,
    No. 21-1832, 2024 WL 189453 (3d Cir. Jan. 18, 2024)..............18, 20, 21, 33

*Lynch v. Donnelly*,
    465 U.S. 668, 674 (1984) ......................................................... 16, 17

*May v. Bonta*,
    No. 23-cv-1696, 2023 WL 8946212
    (C.D. Cal. Dec. 20, 2023) ............................................ 19, 33, 34, 41, 42, 45

*McCauley v. Univ. of the Virgin Islands*,
    618 F.3d 232 (3d Cir. 2010)..........................................................39

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)...............................................................15, 16, 47, 48

*Md. Shall Issue v. Moore*,
    86 F.4th 1038 (4th Cir. 2023)........................................................34

*Md. Shall Issue v. Moore*,
    No. 21-2017 (L), 2024 WL 124290 (4th Cir. Jan. 11, 2024)........................34

*Morris v. U.S. Army Corps of Eng'rs*,
    60 F. Supp. 3d 1120 (D. Idaho 2014) ............................................31

*Morse v. Frederick*,
    551 U.S. 393 (2007).................................................................39

*Nesbitt v. U.S. Army Corps of Eng'rs*,
    No. 14-36049, 2017 WL 11676289 (9th Cir. Dec. 15, 2017)........................31

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022)................................................... 1, 12, 13, 14, 15, 17, 18, 19, 20, 21, 22, 23, 24, 28, 29, 32, 33, 34, 35, 36, 37, 42, 43, 44, 45, 46, 47

*Nken v. Holder*,
556 U.S. 418 (2009).......................................................................48

*North v. Bd. of Trs. of Univ. of Ill.*,
137 Ill. 296, 27 N.E. 54 (1891)....................................................39

*People v. Chairez*,
104 N.E.3d 1158 (Ill. 2018)..........................................................31

*Planned Parenthood Ass'n of Utah v. Herbert*,
828 F.3d 1245 (10th Cir. 2016)..........................................46, 48, 49

*Ramos v. Louisiana*,
140 S. Ct. 1390 (2020) ............................................................ 16, 20

*Range v. U.S. Att'y Gen.*,
69 F.4th 96 (3d Cir. 2023)............................................................24

*Rocky Mountain Gun Owners v. Polis*,
No. 23-cv-01077, 2023 WL 5017253 (D. Colo. Aug. 7, 2023)....................33

*Solomon v. Cook Cnty. Bd. of Comm'rs*,
559 F. Supp. 3d 675 (N.D. Ill. 2021)........................................31, 32

*Springer v. Grisham*,
No. 1:23-cv-781, 2023 WL 8436312 (D.N.M. Dec. 5, 2023).....19, 29, 33, 37

*State v. Mizner*,
45 Iowa 248 (1876).......................................................................39

*State v. Pendergrass*,
19 N.C. 365 (1837) ......................................................................39

*Timbs v. Indiana*,
139 S. Ct. 682 (2019) ................................................................. 16

*United States v. Ayala*,
No. 8:22-cr-369, 2024 WL 132624 (M.D. Fla. Jan. 12, 2024)....................42

*Virginia v. Moore*,
553 U.S. 164 (2008) ................................................................. 16

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ......................................................................................... 11

*Wolford v. Lopez*,
    No. 23-cv-00265, 2023 WL 5043805 (D. Haw. Aug. 8, 2023) .................... 45

*Worth v. Harrington*,
    No. 21-cv-1348, 2023 WL 2745673 (D. Minn. Mar. 31, 2023) ................... 19

## Constitutional Provisions, Statutes, and Laws

U.S. CONST.
    amend. III ............................................................................................. 13
    amend. IV ............................................................................................. 13

1 THE STATUTES AT LARGE OF VIRGINIA (William Walker Hening ed., 1809) ........ 41

10 PENNSYLVANIA STATUTES AT LARGE
    (William Stanley Ray ed., 1904) .................................................... 25, 26, 27

1 RECORDS OF THE COLONY OF RHODE ISLAND
    (John Russell Bartlett ed., 1856) ............................................................ 41

1 LAWS OF NEW YORK (Websters & Skinner 2d ed. 1807) ..................................... 26

1 LAWS OF NEW YORK (Charles R. & George Webster 1802) ................................ 26

1868 Pa. Sess. Laws § 1 ..................................................................................... 36, 37

1870 Tex. Gen. Laws 63, ch. 46 .............................................................................. 32

1883 Mo. Sess. Laws 76 .......................................................................................... 32

1905 Minn. Gen. Laws, ch. 344 § 53 ........................................................... 32, 34, 35

1917 Wis. Sess. Laws, ch. 668 § 29.57(4) ................................................... 32, 34, 35

1921 N.C. Sess. Laws, ch. 6 §§ 1, 3 ............................................................... 32, 35

2 LAWS OF DELAWARE (Samuel and John Adams eds., 1797) ..................... 25, 26, 27

ARCHIVES OF MARYLAND
    (William Hand Browne ed., Baltimore, Md. Hist. Soc'y 1885) ............. 40, 41

A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA
    (1803) ...................................................................................................... 26

A COMPILATION OF THE LAWS OF GEORGIA
    (Augustine Smith Clayton ed. Augusta, Adams & Duyckinck 1812) ........... 26

A DIGEST OF THE LAWS OF GEORGIA (Robert & George Watkins ed., 1800) ........... 27

A Manual of the Laws of North Carolina
(John Haywood ed., 1814)...................................................................27

Abridgement of the Public Permanent Laws of Virginia
(Augustine Davis ed., 1796) ............................................................27

Acts and Laws of the State of Connecticut
(New London, Timothy Green 1784) .............................................27

Acts and Resolves of Massachusetts (Boston, Adams & Nourse 1893) .........27

Ann. Reports of the City of St. Paul § 6 (1888) ................................36

City of Reading, Pa. Laws & Ordinances, ch. II § 20
(Louis Richards ed., 1897) ...............................................................36

Journal of the House of Delegates of the Commonwealth of Virginia
(Richmond, Thomas W. White 1828).............................................26

Journal of the Votes and Proceedings of the Provincial Congress
of New Jersey (1835)........................................................................26

Laws of New Hampshire (1797)..............................................................27

Laws of New Jersey
(Joseph Bloomfield ed., Trenton, James J. Wilson 1811) ......................26, 27

Laws of Vermont (Randolph, Sereno Wright 1808)......................................26, 27

Md. Const. art. 1 §§ 3, 14 (1776) ...........................................................27

Minutes of Proceedings of the Bd. of Comm'rs of Central Park (1858) .....36

Pa. Acts of Assembly § 21 (Philadelphia, 1870)....................................36

Public Laws of South Carolina
(Philadelphia, R. Aitken & Son 1790)..........................................25, 26, 27, 28

Public Records of the Colony of Connecticut
(Hartford, Brown & Parsons 1850) ...............................................41

Rules & Regulations, Prospect Park, Brooklyn (1868) ................................36

The Laws of Maryland, ch. 25 (1799)....................................................27

The Public Laws of Rhode Island
(Providence, Carter & Wilkinson 1798)..........................................25, 27

## **Other Authorities**

11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2948.1 (3d ed. 2020).............47

vii

Amicus Br. of the Ctr. for Hum. Liberty, *Antonyuk v. Nigrelli*, No. 22-2908
  (2d. Cir. Feb. 9, 2023), Doc. No. 313 ...................................................25, 38

Amici Br. of Citizens Comm. for the Right to Keep and Bear Arms, et al.,
  *Koons v. Platkin*, No. 23-1900 (3d Cir. Aug. 16, 2023), Doc. No. 91...........25

Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and
  Eighteenth-Century Boston, New York, and Philadelphia*,
  40 LANDSCAPE J. 1 (2021) ............................................................................30

Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and
  Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653 (2014).............................40

*Boston Common*, NAT'L PARK SERV., https://bit.ly/3SGumtc
  (last visited Jan. 26, 2024).............................................................................30

Bruce Jacquot, *2 Teens Arrested in Fatal West Ashley Playground Shooting;
  Coroner Identifies Victim*, ABC 4 NEWS (Dec. 22, 2023),
  https://bit.ly/3Ubqu4v.....................................................................................44

Clayton E. Cramer, *Colonial Firearms Regulation*,
  16 J. FIREARMS & PUB. POL'Y 1 (2016).........................................................40

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*,
  13 CHARLESTON L. REV. 204 (2018) ........................................23, 24, 38, 40

Trust for Public Land, *The 150 Largest City Parks*,
  https://bit.ly/47VJw1Q (last visited Jan. 26, 2024)...........................29, 30, 31

*Duane Park Origins*, THE HIST. MARKER DATABASE, https://bit.ly/3S92dt4
  (last visited Jan. 26, 2024).............................................................................30

Exec. Order No. 2023-146, https://bit.ly/4b8pzHT ....................................................7

Exec. Order No. 2024-001, https://bit.ly/4bdCZlU ....................................................7

Jens Ludwig et al., *Gun Control After Heller: Threats and Sideshows From a
  Social Welfare Perspective*, 56 UCLA L. REV. 1041 (2009).........................45

John Adams, Argument for the Defense: 3-4 December 1770, NAT'L ARCHIVES
  FOUNDERS ONLINE, https://bit.ly/35FCuRh.....................................................40

Margaret Walls, *Parks & Recreation in the U.S.: Local Park Systems*,
  RESOURCES FOR THE FUTURE (June 2009), https://bit.ly/42gjo0D...........29, 20

Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, Harv. J. L. & Pub. Pol'y Per Curiam (Dec. 7, 2022), https://bit.ly/3RRRSmD ................................................................. 14

Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders: Understanding the Meaning and Purpose of the Second Amendment's Right to Keep and Bear Arms*, 2020 Pep. L. Rev. 71 (2020) .................................................................41, 46

*New Mexico Concealed Carry Reciprocity Overview*, Concealed Coal., https://bit.ly/3OihPcw (last visited Jan. 26, 2024) ........................................45

Ricardo Wells, *Police Kill Armed Man Near School Playground*, The Tribune (Feb. 13, 2018), https://bit.ly/3vOWcKD .......................................................44

*The Earliest New York City Parks*, N.Y. City Dep't of Parks & Recreation, https://on.nyc.gov/3hBZXfe (last visited Jan. 26, 2024) ..............................30

Thomas Jefferson, Legal Commonplace Book (2019) .....................................41

ix

## STATEMENT OF RELATED CASES

Pursuant to 10th Circuit Rule 28(C)(3), Plaintiffs-Appellants respectfully submit that *Springer v. Grisham*, No. 23-2194, is a related case to these consolidated appeals.

## CORPORATE DISCLOSURE STATEMENT

We The Patriots USA, Inc. is a non-profit, non-stock corporation. It has no parent corporation of subsidiaries, and no publicly held corporation holds 10% or more of its stock.

Firearms Policy Coalition ("FPC") is a non-profit, non-stock corporation. FPC has no parent corporation and no publicly held corporations hold 10% or more of its stock.

New Mexico Shooting Sports Association is a non-profit, non-stock corporation. It has no parent corporation and no publicly held corporations hold 10% or more of its stock.

Second Amendment Foundation ("SAF") is a non-profit, non-stock corporation. SAF has no parent corporation and no publicly held corporations hold 10% or more of its stock.

Gun Owners of America, Inc. ("GOA") is a non-profit, non-stock corporation. GOA has no parent corporation or subsidiaries, and no publicly held corporation holds any stock in GOA.

Gun Owners Foundation ("GOF") is a non-profit, non-stock corporation. GOF has no parent corporation or subsidiaries, and no publicly held corporation holds any stock in GOF.

## INTRODUCTION

In *New York State Rifle & Pistol Association, Inc.*, *v. Bruen*, the Supreme Court confirmed that the Second Amendment protects a "general right to publicly carry arms for self-defense." 597 U.S. 1, 31 (2022). By its plain text, the Second Amendment "presumptively guarantees" an individual's "right to 'bear' arms in public for self-defense," and "a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense." *Id.* at 33 & n.8.

Before *Bruen*, New Mexico permitted firearm carry in all manner of public places, including parks and playgrounds. Following *Bruen*, however, the Governor of New Mexico, acting without any input from the State legislature, has unilaterally decided that those same sorts of locations in Albuquerque and Bernalillo County, the most populous city and county in the State, are suddenly now "sensitive places" where the bearing of arms may be banned. Indeed, the Governor initially barred *all* carry of operable firearms by individuals in Albuquerque and Bernalillo County, only to retreat after the district court issued a temporary restraining order. The Governor continues, however, to enforce her ban on carrying in parks and playgrounds, insisting it to be constitutional.

The Governor is incorrect. Her carry restrictions are fundamentally incompatible with the Second Amendment because they are not supported by

1

widespread, distinctly similar historical laws dating to the Founding era. Indeed, parks and spaces for public recreation have existed since the Colonial era, but there were *zero* corresponding bans on firearm carry there. Under *Bruen*, this means that firearm carry cannot be restricted in such locations today.

The Governor's restrictions are particularly perverse because they prohibit individuals in locations such as parks and playgrounds—that Defendants assert are 'vulnerable'—from arming themselves for their own defense and the defense of their children and grandchildren. That flatly contradicts the Founding-era solution, which was to ensure that all members of "the people" were armed, to protect not only themselves but also the "vulnerable" in society who are incapable of armed self-defense. The Governor's carry restrictions violate the Second Amendment and should be enjoined.

## JURISDICTIONAL STATEMENT

Plaintiffs in these consolidated appeals are three individuals and six membership advocacy organizations. Plaintiffs We the Patriots USA, Inc. and Dennis Smith sued on September 9, 2023 ("Smith Plaintiffs"), Plaintiffs Randy Donk, Gun Owners of America, and Gun Owners Foundation ("Donk Plaintiffs") sued that same day, and Plaintiffs Zachary Fort, New Mexico Shooting Sports Association, Firearms Policy Coalition, and Second Amendment Foundation ("Fort

Plaintiffs")[1] sued on September 11, 2023. The United States District Court for the District of New Mexico had subject matter jurisdiction over these suits under 28 U.S.C. §§ 1331 and 1343. The Smith and Donk Plaintiffs seek to enjoin the Governor's Amended Public Health Order restricting firearm carry in parks and playgrounds in Alburquerque and Bernalillo County as unconstitutional under the Second Amendment and Fourteenth Amendments, while the Fort Plaintiffs' challenge is limited to the restriction on firearm carry in parks. The district court entered an order on October 11, 2023, denying Plaintiffs' motions for a preliminary injunction against the enforcement of the Public Health Order. All Plaintiffs timely noticed appeals from that denial, with the Smith Plaintiffs filing on October 19, 2023, the Fort Plaintiffs filing on October 20, 2023, and the Donk Plaintiffs filing on November 6, 2023. This Court has jurisdiction over the appeal under 28 U.S.C. § 1292(a)(1).

---

[1] References to "individual Plaintiffs" throughout the brief encompass Plaintiffs Smith, Donk, and Fort.

3

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      Whether the district court erred in refusing to enjoin Defendants from banning firearm carry at or within public parks in Alburquerque and Bernalillo County.

2.      Whether the district court erred in refusing to enjoin Defendants from banning firearm carry at or within public playgrounds in Alburquerque and Bernalillo County.

## STATEMENT OF THE CASE

### I.      Factual Background & Procedural History

Citing rising rates of criminal "gun violence," New Mexico Governor Michelle Lujan Grisham issued Executive Order 2023-130 on September 7, 2023, declaring a purported public health emergency. Corrected Consolidated Appendix Volume 1 ("App. Vol. 1") at 29–32. The Executive Order directed the New Mexico State Departments of Public Health, Homeland Security and Emergency Management, and Public Safety to coordinate with the Governor's office to implement the Order. *See id.* New Mexico's Secretary of Health then issued a "Public Health Emergency Order Imposing Temporary Firearm Restrictions, Drug Monitoring and other Public Safety Measures" the next day. App. Vol. 1 at 33–36. As relevant here, the Order temporarily restricted open *and* concealed carry of firearms by any person within cities and counties in New Mexico with specified rates

4

of violent crime and certain numbers of emergency room visits, and on state property, in public schools, and in public parks. *See id.* The Order exempted only law enforcement officers and licensed security guards. *See id.*

Plaintiffs in the three cases consolidated here are three individuals—Dennis Smith, Randy Donk, and Zachary Fort—and six membership advocacy organizations—We the Patriots USA, Inc., Gun Owners of America, Inc., Gun Owners Foundation, New Mexico Shooting Sports Association, Firearms Policy Coalition, Inc., and Second Amendment Foundation. The individual Plaintiffs keep and bear firearms for self-defense and defense of their families in the jurisdictions affected by the Public Health Order. *See, e.g.*, App. Vol. 1 at 61–63; Corrected Consolidated Appendix Volume 2 ("App. Vol. 2") at 24–26; Corrected Consolidated Appendix Volume 3 ("App. Vol. 3") at 23–24. Plaintiffs challenged the constitutionality of the Order under the Second Amendment, initially moving for a temporary restraining order and preliminary injunction against certain provisions. The district court agreed that Defendants' broad firearms restrictions were likely unconstitutional under the Second Amendment and temporarily restrained the Order's prohibition on carry within cities and counties averaging certain rates of violent crime and certain numbers of emergency room visits. App. Vol. 1 at 64–65. The Court also found likely unconstitutional and temporarily restrained the prohibition on carry within state property, public schools, and public parks "to the

extent it imposes additional restrictions on the carrying or possession of firearms that were not already in place prior to its issuance." App. Vol. 1 at 111.

Two days later, the New Mexico Department of Health issued the Amended Public Health Order ("Amended Order"). App. Vol. 1 at 100–04. While the Amended Order is narrower than its predecessor, it prohibited carrying firearms in "public parks and playgrounds, or other public area provided for children to play in" in the City of Albuquerque and Bernalillo County. *See id.* The Amended Order does not apply to designated state parks owned and managed by New Mexico. *See id.* The Amended Order's firearm restrictions were nominally temporary, set to expire on October 6, 2023. *See id.*

The Smith and Donk Plaintiffs moved to preliminarily enjoin the restrictions on carry in parks and playgrounds, while the Fort Plaintiffs moved to preliminarily enjoin the restrictions on carry in parks. The district court consolidated the cases, App. Vol. 1 at 171–76, and held a hearing on the motions for a preliminary injunction on October 3, 2023, App. Vol. 1 at 9.

Before the district court could rule on those motions, the New Mexico Department of Health issued another order on October 6, 2023, which was identical to the Amended Order save for dropping the prohibition on carry in "public areas provided for children to play in." App. Vol. 1 at 162–66 ("Second Amended

Order").[2] While it was set to expire on November 3, 2023, the Governor extended the Public Health Emergency until December 29, 2023, allowing the firearm regulations to persist. App. Vol 1 at 167–70. After Defendants issued the Second Amended Order, the Smith Plaintiffs filed an amended motion for preliminary injunction challenging that Order. The Governor has continued to extend the Order each time its expiration approaches. *See, e.g.*, Exec. Order No. 2023-146, https://bit.ly/4b8pzHT (extending the Public Health Emergency to January 26, 2024); Exec. Order No. 2024-001, https://bit.ly/4bdCZlU (extending the Public Health Emergency to February 23, 2024).

## II.    The District Court's Decision

The district court first evaluated the individual Plaintiffs' standing to sue. The Court held that Plaintiffs Donk and Smith had standing to challenge the Public Health Order's prohibition on carry in parks and playgrounds. App. Vol. 1 at 188–89. Both Plaintiffs stated that they currently carry in parks and playgrounds and intend to do so in the near future. *See id.* Given that the Order could be enforced against Plaintiffs and a "credible threat of prosecution" exists, the district court held that they sufficiently alleged the elements of standing. *See id.* As to Plaintiff Fort,

---

[2] Because the relevant provision of the Amended Public Health Order and Second Amended Public Health Order barring carry in parks and playgrounds are identical, Plaintiffs simply refer to both as "Order" or "Public Health Order" for the remainder of this Brief.

the district court held that he had standing to challenge the prohibition on carry in parks because he "testif[ied] to regularly carrying firearms in parks[.]" App. Vol. 1 at 189.

On the merits, the district court first laid out the test from *Bruen*, which asks whether the Second Amendment's plain text covers an individuals' conduct, and if so, whether restrictions on that conduct are consistent with this Nation's historical tradition. App. Vol. 1 at 190–91. As for the threshold inquiry, the district court found "no dispute" that the text of the Second Amendment covers individual Plaintiffs' conduct. App. Vol. 1 at 191.

Moving on to the historical tradition inquiry, the district court held that "historical sources from the period of the ratification of the Fourteenth Amendment in 1868 are more probative of the scope of the Second Amendment[] right to bear arms than those from the Founding Era." App. Vol. 1 at 192. In so holding, the district court relied on a now-vacated Eleventh Circuit opinion and a District of Maryland opinion. App. Vol. 1 at 192 (citing *NRA v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023), *vacated, reh'g en banc granted*, 2023 WL 4542153 (11th Cir. July 14, 2023), and *Md. Shall Issue, Inc. v. Montgomery Cnty.*, No. TDC-21-1736, 2023 WL 4373260, at *8 (D. Md. July 6, 2023)). The district court then addressed the specific locations at issue. As for parks, it relied on alleged analogues from the Reconstruction Era and the late 19th and early 20th century which established, in its

8

view, a historical tradition of banning carry. App. Vol. 1 at 192–95. For playgrounds, the district court found that they are analogous to schools, which *District of Columbia v. Heller* suggested are "sensitive places" where firearms can be banned. App. Vol. 1 at 88–92 (citing *Heller*, 554 U.S. 570, 626–27 (2008)). Because the district court found that Plaintiffs failed to show a substantial likelihood of success on the merits of their Second Amendment claim, the court did not analyze the remaining injunctive relief factors. The Smith, Donk, and Fort Plaintiffs timely appealed, App. Vol. 1 at 200, 202, 204, and this Court *sua sponte* consolidated the three cases.

In this consolidated appeal, Plaintiffs collectively challenge the denial of a preliminary injunction against the bans on carrying firearms at parks and playgrounds in Albuquerque and Bernalillo County.

## SUMMARY OF ARGUMENT

Carrying firearms in public for self-defense—including at parks and playgrounds—is protected by the plain text of the Second Amendment. Defendants therefore must justify their bans by demonstrating that they fall within the nation's early historical tradition of firearm regulation. Under *Bruen*, Defendants bear the heavy burden to present *distinctly* similar historical laws from the Founding era, which is the only relevant time period when determining the original meaning of the Bill of Rights. Defendants will be unable to prove such a tradition. Plaintiffs are

9

unaware of any historical evidence from the Founding establishing a regulatory tradition of banning carry in parks or playgrounds. Indeed, precisely the opposite is true. At the Founding, firearms were permitted in parks and in other places where people (including allegedly "vulnerable" people) gathered.

The district court erred when it looked past the Founding era, not to *confirm* an earlier tradition, but rather to fabricate a novel "tradition," piecemeal, that was entirely unfamiliar to the generation that adopted the Second Amendment. The Supreme Court has already foreclosed such reliance on post-Founding, contradictory history in decisions spanning several provisions of the Bill of Rights, including the Second Amendment. Moreover, the district court incorrectly relied on laws enacted by an unrepresentative smattering of municipalities and laws from the territories—categories of historical evidence *Bruen* expressly held carry little, if any, weight. Finally, the court erroneously credited lesser, purportedly "relevantly similar" analogues in a case for which essentially identical locations existed at the Founding, and no uniquely modern societal issue justified an expanded analogical approach. In so doing, the court neglected to even analyze *Bruen*'s "how" and "why" analogical metrics, leaving unexplained just *how* Defendants' late-in-time history could be relevant. But most fatally, the district court erred by ignoring the Founding-era evidence permitting—and sometimes expressly *requiring*—carry in places where purportedly vulnerable people gather. This evidence, and the lack of any relevant

10

history supporting Defendants' ban, establishes that Plaintiffs are likely to succeed on the merits of their Second Amendment claim.

While the district court did not address the remaining injunctive relief factors, all favor Plaintiffs. The ongoing denial of a constitutional right is an irreparable injury. And the equities and the public interest—merged in a suit against the government—are not served by Defendants continuing to enforce an unconstitutional restriction.

## ARGUMENT

## I.    STANDARD OF REVIEW

A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The first two factors—likelihood of success on the merits and likelihood of suffering irreparable harm—are "the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). And the "third and fourth factors 'merge' when, like here, the government is the opposing party." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (quoting *Nken*, 556 U.S. at 435).

The standard of review is whether the district court abused its discretion in denying a motion for a preliminary injunction. Abuse of discretion occurs when a decision is "premised on an erroneous conclusion of law." *Fish v. Kobach*, 840 F.3d

710, 723 (10th Cir. 2016). The district court's factual findings are reviewed for clear error and its conclusions of law are reviewed de novo. *See id.* All issues relevant to this appeal are conclusions of law.

## II. THE CHALLENGED PROVISIONS VIOLATE PLAINTIFFS' SECOND AMENDMENT RIGHTS

There is no question that "the Second Amendment guarantees a general right to public carry," meaning Americans are entitled to "'bear' arms in public for self-defense." *Bruen*, 597 U.S. at 33. Any locational restrictions on this "general right to public carry" must comport with the original meaning of the Second Amendment, as understood by the Founding generation. *Id.* To determine whether a government restriction is constitutional, the first question is whether "the Second Amendment's plain text covers an individual's conduct"; if so, "the Constitution presumptively protects that conduct," the challenged restriction is presumed *un*constitutional, and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. It is the government's burden to "affirmatively prove that its firearms regulation is part of th[at] historical tradition," and the Court is "not obliged to sift the historical materials for evidence" itself. *Id.* at 19, 60. If the government fails to satisfy this burden, its restrictions must be enjoined. Defendants' Order fails this test.

**A. The Second Amendment's Plain Text Covers Plaintiffs' Conduct**

The plain text of the Second Amendment protects Plaintiffs' proposed course of conduct, as the district court correctly held. App. Vol. 1 at 191. The Supreme Court has defined the Second Amendment's key terms: "The people" presumptively includes "all Americans"; "Arms" includes "all instruments that constitute bearable arms"; and to "bear" simply means to "carry." *Heller*, 554 U.S. at 580–82, 584 (internal quotations omitted); *Bruen*, 597 U.S. at 28. Moreover, "[n]othing in the Second Amendment's text draws a home/public distinction," *Bruen*, 597 U.S. at 32, or for that matter, any distinction between locations at all. The Second Amendment's textual silence differs from other constitutional amendments that contain locational restrictions. *See* U.S. Const. amend. III ("No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law."); U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"). Thus, as a matter of plain text, the Second Amendment has long been understood to secure for citizens "the right to keep and carry arms wherever they went." *Bruen*, 597 U.S. at 60 (cleaned up).

Individual Plaintiffs here are law-abiding Americans who seek to carry bearable arms in parks and playgrounds for self-defense, including defense of their families, children, and grandchildren. These undisputed facts end the textual inquiry:

"the plain text of the Second Amendment protects [Plaintiffs'] proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 32. Accordingly, "the burden falls on [Defendants] to show that [the challenged bans are] consistent with this Nation's historical tradition of firearm regulation." *Id.* at 33–34.

### B. Controlling Methodological Considerations Under *Bruen*

#### 1. The Relevant Historical Period Centers on 1791, not 1868

*Bruen* was explicit that "not all history is created equal." 597 U.S. at 34; *see also id.* at 36–37 (Sources originating "'75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources.'" (quoting *Heller*, 554 U.S. at 614)). This is so because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them[.]" *Heller*, 554 U.S. at 634–35. The people adopted the Second Amendment in 1791, so the public understanding of the right at that time controls. *Bruen*, 597 U.S. at 37; *see also* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/3RRRSmD. Consequently, evidence that long pre- or post-dates 1791 is less probative. *See Bruen*, 597 U.S. at 35–37. Indeed, post-Founding history serves a merely confirmatory role for traditions "'already … established'" at the Founding. *Id.* at 37 (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1976 (2019)). Laws from the 20th century are categorically entitled to little or

14

no weight. *See id.* at 66 n.28. The district court therefore erred in relying on statutes and ordinances enacted after 1868—some even enacted as late as the 20th century.

The Second Amendment binds the States and the federal government equally. *Bruen* made clear that the "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Id.* at 37. Likewise in *McDonald v. City of Chicago*, the Court held that "incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." 561 U.S. 742, 765 (2010) (cleaned up). And *Heller* established that, as applied against the Federal Government, the Second Amendment has the same scope today as at the Founding. *See* 554 U.S. at 576–77. By elevating evidence from the Reconstruction era and later beyond its secondary, confirmatory role, the district court impermissibly diminished the scope of the Second Amendment's protections against state action.

While *Bruen* acknowledged a "scholarly" debate about the weight that evidence from around the Fourteenth Amendment's ratification in 1868 should carry in the Second Amendment analysis, there is no such debate in the case law. While the Second Amendment extends to the States via the Fourteenth Amendment, that is true of *every* Bill of Rights provision that has been incorporated against the States. To accept the period surrounding 1868 as "more probative" would be contrary to established

precedent incorporating Bill of Rights provisions against the States. *See, e.g.*, *McDonald*, 561 U.S. at 764–65 & nn.12, 13. For example, *Bruen* relied on two recent incorporation decisions that both looked to the Founding era: *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) and *Timbs v. Indiana*, 139 S. Ct. 682 (2019). *Ramos* held that the Sixth Amendment right to a unanimous jury verdict was incorporated against the States and overruled prior precedent that had allowed the States to adopt a different rule under a "dual track" approach to incorporation. The relevant historical benchmark for the Court's analysis was 1791. *See Ramos*, 140 S. Ct. at 1396 (discussing the history in "young American states" and the "backdrop" of the ratification of the Bill of Rights in 1791).

Similarly, in *Timbs*, the Court held that the Excessive Fines provision of the Eighth Amendment was incorporated against the States. 139 S. Ct. at 686–87. The Court once again looked to Founding-era sources to understand the scope of the right as it existed in 1791. *See id.* at 687–88 (discussing "colonial-era provisions" and the "constitutions of eight States"). The Court's other precedents are in accord. *See, e.g.*, *Gamble v. United States*, 139 S. Ct. 1960, 1975 (2019) (explaining that *Heller* sought to determine "the public understanding in 1791 of the right codified by the Second Amendment."); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."); *cf. Lynch v. Donnelly*, 465 U.S. 668, 674 (1984)

("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance."). In short, accepting 1868 as the "more probative era" effectively discards decades of jurisprudence looking to 1791 in addressing the incorporation of Bill of Rights provisions. Thus, when the Second Amendment was incorporated against the states, it carried with it the meaning established by the historical tradition in 1791—"when the people adopted" it. *Bruen*, 597 U.S. at 34 (cleaned up).

*Bruen*'s reasoning also underscores that 1791 carries the most (if not definitive) weight. After initially rejecting "medieval English regulations," *id.* at 40, *Bruen* turned to sources leading up to the ratification of the Second Amendment, including the 1689 English Bill of Rights. *See id.* at 44–45. After finding these sources somewhat probative of the Amendment's *general* original meaning (*i.e.*, that the right to bear arms is an individual, not a collective, right), the Court focused on "the history of the Colonies and early Republic," plus "the first decade after [the Second Amendment's] adoption." *Id.* at 46, 50. And it found that the challenged law had "no historical basis" because no analogue in that relevant historical period supported it. *Id.* at 50. The Court then considered evidence prior to the Fourteenth Amendment's Ratification in 1868 because such evidence could have informed its drafters. *See id.* at 50–59. But it again found no representative or relevant historical analogue. *See id.*

17

Only after canvassing the historical evidence from these three periods did the Court discuss post-1868 sources and the late-19th century. *Id.* at 60–70. But the Court found that much of this later evidence "conflict[s] with the Nation's earlier approach to firearm regulation" and is "most unlikely to reflect 'the origins and continuing significance of the Amendment.'" *Id.* at 67. Thus, the Court declined to rely on such laws and regulations. *See id.* at 66–68; *accord Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258–59 (2020) (holding that "more than 30" provisions of state law enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" when those provisions were not grounded in Founding-era practice.). *Bruen* thus cautioned lower courts to "guard against giving postenactment history more weight than it can rightly bear." 597 U.S. at 35.

In other words, *Bruen*'s reasoning mandates that the Founding era is the benchmark against which historical evidence from later time periods must be measured. *See id.* at 37 (noting that "19th-century evidence [has been] treated as mere confirmation of what the Court thought had already been established." (cleaned up)); *accord Lara v. Comm'r Pa. State Police*, No. 21-1832, 2024 WL 189453, at *7–8 (3d Cir. Jan. 18, 2024) (holding that 1791 is the most probative period when evaluating restrictions on carry by 18-to-20-year-olds); *Duncan v. Bonta*, No. 17-cv-1017, 2023 WL 6180472, at *20 (S.D. Cal. Sept. 22, 2023) ("*Bruen* teaches the most

18

significant historical evidence comes from 1791[.]"); *Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673, at *11 (D. Minn. Mar. 31, 2023) (noting the "rather clear signs that the Supreme Court favors 1791 as the date for determining the historical snapshot of 'the people' whose understanding of the Second Amendment matters"); *May v. Bonta*, No. 23-cv-1696, 2023 WL 8946212, at *5 (C.D. Cal. Dec. 20, 2023) (same)[3]; *Springer v. Grisham*, No. 1:23-cv-781, 2023 WL 8436312, at *7 (D.N.M. Dec. 5, 2023) (admonishing the government for providing "*no* citation to any relevant laws around the time of the enactment of the Second Amendment, and only two citations to laws before or around the enactment of the Fourteenth Amendment").[4] Restrictions on the right to keep and bear arms adopted shortly before and during the Reconstruction era may be confirmatory of earlier legislation but cannot alone provide the historical tradition *Bruen* requires. Only "enduring" and "well-established" restrictions with roots in the Founding era are relevant in assessing whether the challenged restrictions comport with the Second

---

[3] The Ninth Circuit recently declined the government's request to stay the district court's injunction of California's sensitive places law pending appeal and dissolved the administrative stay that had been entered. *See* Order, *May v. Bonta*, No. 23-4356 (Jan. 6, 2024), Doc. No. 20.1.

[4] The *Springer* Court recently rejected the Governor's request for a stay pending appeal, reasoning that she had not made a strong showing that she is likely to succeed on appeal. *See* Order, *Springer v. Grisham*, No. 1:23-cv-00781 (Jan. 22, 2024), Doc. No. 37.

Amendment's "unqualified command." *Bruen*, 597 U.S. at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Even if the Fourteenth Amendment's enactment in 1868 somehow imbued the Bill of Rights with new meaning, laws enacted in the years *preceding* the Fourteenth Amendment's ratification would be most probative of what that new meaning is. *See, e.g.*, *Ramos*, 140 S. Ct. at 1396 (looking to the "backdrop" of many state constitutions against which the Founders drafted and the states ratified the Sixth Amendment). Defendants cannot engage in "freewheeling reliance on historical practice from the mid-to-late 19th century[,]" which cannot establish the Second Amendment's meaning in *either* 1868 or 1791. *Bruen*, 597 U.S. at 83 (Barrett, J., concurring). Indeed, given the political turmoil present in the post-Civil-War South (where several of Defendants' analogues originate), laws from that era and region are unlikely to be probative of the Second or Fourteenth Amendment's original meaning, much less a "national" tradition. In fact, racist and bigoted anti-gun laws like that are precisely what the Second Amendment was designed to prevent.

For all these reasons, the authorities on which the district court relied to find that Reconstruction-era evidence controlled the analysis do not adhere to *Bruen*. App. Vol. 1 at 192 (citing *Bondi*, 61 F.4th at 1322, *vacated, reh'g en banc granted*, *NRA v. Bondi*, 2023 WL 4542153 (11th Cir. July 14, 2023); *Md. Shall Issue*, 2023 WL 4373260, at *8). Nor can they be squared with decades of Supreme Court

precedent about enumerated rights. *See Lara*, 2024 WL 189453, at *8 ("[T]o maintain consistency in our interpretation of constitutional provisions, we hold that the Second Amendment should be understood according to its public meaning in 1791."). It thus comes as no surprise that the Eleventh Circuit's decision in *Bondi* has been vacated pending rehearing en banc, removing any precedential value. *See Burke v. Regalado*, 935 F.3d 960, 1045 n.72 (10th Cir. 2019).[5]

### 2. A Historical Tradition Requires Proof of Representative, Distinctly Similar Analogues

*Bruen* held that forming a historical tradition requires proof of representative, distinctly similar analogues. Analogues may be representative if they are present in many states and therefore affect large swaths of the population. *Bruen*, 597 U.S. at 65 (rejecting restrictions in one state statute and two state court decisions as not representative); *id.* at 46 (doubting that "*three* colonial regulations could suffice to show a tradition of public-carry regulation"); *id.* at 67–68 (rejecting regulations

---

[5] The Second Circuit recently reached the same conclusion that historical evidence postdating the Fourteenth Amendment can illuminate the scope of Second Amendment rights to the exclusion of the Founding era. *See Antonyuk v. Chiumento*, No. 22-2908, 2023 WL 8518003 (2d Cir. Dec. 8, 2023). For all the reasons discussed herein, the Second Circuit's analysis is inconsistent with *Bruen*'s holding and reasoning, and two Supreme Court Justices signaled an interest in future review. *Antonyuk v. Nigrelli*, 143 S. Ct. 481, 481 (2023) (Alito, J., and Thomas, J., respecting denial of application to vacate stay) ("The New York law at issue in this application presents novel and serious questions under both the First and the Second Amendments. . . . Applicants should not be deterred by today's order from again seeking relief . . . .").

applying to only 1% of the population). In other words, laws existing in only a few jurisdictions—historical "outlier[s]"—should be disregarded. *Id.* at 30; *see also Koons v. Platkin*, No. 22-7464, 2023 WL 3478604, at *68, *85 (D.N.J. May 16, 2023) (finding three Reconstruction-era laws non-representative and explaining that one state law and 25 local ordinances, covering less than 10% of the nation's population, were insufficient).[6] Similarly, laws in the territories are afforded "little weight" because they were "localized[,]" "rarely subject to judicial scrutiny," and "short lived." *Bruen*, 597 U.S. at 67–69.

*Bruen* also held that, where the challenged regulation addresses "a general societal problem" of a type also present during the Founding, any historical analogue must be "distinctly similar" to the challenged regulation, measured by "how and why [it] burdens a law-abiding citizen's right to armed self-defense." *Id.* at 26, 29. In other words, the modern regulation must impose a "comparable burden on the right of armed self-defense" as did the historical regulation, and for a similar reason. *Id.* at 29. This requirement means that Founding-era laws, arising in different contexts, and for different reasons, will be inapt comparators. For example, historical poaching and hunting restrictions are generally insufficient to demonstrate the constitutionality of a modern-day restriction on carrying firearms during day-to-day

---

[6] The Third Circuit stayed portions of the *Koons* ruling pending appeal without reasoning. *See* Order, *Koons v. Platkin*, No. 23-1900, (June 20, 2023), Doc. No. 29.

life. Both *how* hunting laws burdened the right to carry firearms for self-defense (when hunting) and *why* they did so (to regulate hunting and reduce the taking of certain animals in certain places during certain seasons) have nothing to do with restricting the right of self-defense in modern-day New Mexico. *See, e.g.*, *Koons*, 2023 WL 3478604, at *64–65. Indeed, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen,* 597 U.S. at 26.

### 3. Analogies to Other Sensitive Places

The Court has not yet had occasion to comprehensively define the scope of the "sensitive places" doctrine. Instead, *Bruen* simply "assume[d]" that carry could be restricted at certain places, in accordance with an assumed but yet-untested historical tradition. But even then, the Court anticipated there might be only three such sorts of locations at the Founding "where weapons were altogether prohibited": legislative assemblies, polling places, and courthouses. *Id.* at 30; *see also* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 204, 289–90 (2018). Accordingly, this Court at most may analogize to "*those* historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new and analogous* sensitive places are constitutionally permissible." *Bruen*, 597 U.S. at 30 (emphases added). But parks and playgrounds are nothing "new." Moreover, the Court cautioned against

overexpansion of sensitive places, lest they become the exception that swallows the rule of "a general right to public carry." *Id.* at 33. Thus, "sensitive places" must remain "few" and "exceptional." *Id.* at 30, 38; *see also Range v. U.S. Att'y Gen.*, 69 F.4th 96, 105 (3d Cir. 2023) ("[H]istorical restrictions on firearms in 'sensitive places' do not empower legislatures to designate any place 'sensitive' and then ban firearms there[.]").

Understanding *why* the three presumptively sensitive places *Bruen* identified were historically deemed sensitive requires analysis of what they have in common.[7] All shared a key characteristic at the Founding: they were enclosed, securable locations protected by government-provided comprehensive security, which lessened the public's need for individual weapons. *See, e.g.*, Kopel & Greenlee at 290 ("When armed guards are present, the government takes the responsibility for

---

[7] Plaintiffs Donk, GOA, and GOF do not join this and the following five paragraphs, which seek to delineate certain boundaries of the sorts of places that constitute "sensitive places." First, the Supreme Court has yet to conclusively identify *any* location as a sensitive place. But even then, the locations listed in *Bruen* are not merely places where the government provides "comprehensive security." Rather, as Judge Sinatra explained in *Hardaway v. Nigrelli*, 636 F. Supp. 3d 329, 346 (W.D.N.Y. 2022), the types of places identified by the Court are "civic locations" that are "sporadically visited in general" and where "key functions of democracy" can be disrupted, and as such are "secured locations" where "uniform lack of firearms is generally a condition of entry." *Id.* Permitting the government to create new "sensitive places" at will, merely by conditioning entry to a place on the public's disarmament, could be expanded to "apply nearly everywhere in public," *id.*, "empower[ing] legislatures to designate any place 'sensitive' and then ban firearms there…," *Range*, 69 F.4th at 105 (cleaned up).  If *any* place is to be a sensitive place, far more than just "comprehensive security" is required.

having armed force at the ready to protect citizens."); Amicus Br. of the Ctr. for Hum. Liberty at 8–17, *Antonyuk v. Nigrelli*, No. 22-2908 (2d. Cir. Feb. 9, 2023), Doc. No. 313 ("Ctr. for Hum. Liberty Br."); Amici Br. of Citizens Comm. for the Right to Keep and Bear Arms, et al. 8–17, *Koons v. Platkin*, No. 23-1900 (3d Cir. Aug. 16, 2023), Doc. No. 91. They also are not places of frequent concourse by typical law-abiding citizens, and "uniform lack of firearms is generally a condition of entry." *Hardaway*, 636 F. Supp. 3d at 346. In other words, based on the relevant historical tradition, comprehensive security *at a minimum* is required for a place to be deemed sensitive.

Founding-era examples of comprehensive security in these locations abound.[8] Start with legislatures. Rhode Island, Delaware, Pennsylvania, South Carolina, New York, Georgia, New Jersey, Virginia, and Vermont all enacted statutes compensating law enforcement to attend and provide security at their legislatures. *See* THE PUBLIC LAWS OF RHODE ISLAND 220, 222 (Providence, Carter & Wilkinson 1798) (providing fees for sheriffs, town sergeants, and constables to attend the general assembly); 2 LAWS OF DELAWARE 1100, 1118 (Samuel and John Adams eds. 1797) (similar); 10 PENNSYLVANIA STATUTES AT LARGE 378 (William Stanley Ray ed., 1904) (referencing sergeant-at-arms and door-keeper for legislature); PUBLIC LAWS OF

---

[8] All primary sources cited herein are appended in Attachment B for the Court's convenience.

SOUTH CAROLINA 426, 427 (Philadelphia, R. Aitken & Son 1790) (providing for payment of door-keepers for the legislature); 1 LAWS OF NEW YORK 532 (Charles R. & George Webster 1802) (similar); A COMPILATION OF THE LAWS OF GEORGIA 373 (Augustine Smith Clayton ed. Augusta, Adams & Duyckinck 1812) (similar); JOURNAL OF THE VOTES AND PROCEEDINGS OF THE PROVINCIAL CONGRESS OF NEW JERSEY 239, 240 (1835) (similar); JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA 77 (Richmond, Thomas W. White 1828) (similar); LAWS OF VERMONT 382, 387 (1808) (similar).

The same was true of courthouses. South Carolina, Virginia, Delaware, New Jersey, New York, and Pennsylvania by statute required law enforcement officials to attend court. *See* PUBLIC LAWS OF SOUTH CAROLINA, *supra*, at 271 ("The Said sheriffs shall by themselves, or their lawful deputies respectively, attend all the courts hereby appointed, or directed to be held, within their respective districts"); A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 69–71 (1803) (similar); 2 LAWS OF DELAWARE, *supra*, at 1088, 1091 (similar); LAWS OF NEW JERSEY 49, 50, 58 (Joseph Bloomfield ed., Trenton, James J. Wilson 1811) (similar); 1 LAWS OF NEW YORK 176 (Websters & Skinner 2d ed. 1807) (requiring during court "all justices of the peace, coroners, bailiffs, and constables within their respective counties, that they be then and there in their own persons. . . . And the said respective sheriffs and their officers shall then and there attend in their own

26

proper persons."); STATUTES AT LARGE OF PENNSYLVANIA 57 (similar). Beyond these statutory requirements, the legislative record in other states indicates that law enforcement officials were compensated for attending judicial proceedings. *See* ACTS AND LAWS OF THE STATE OF CONNECTICUT 63–65 (New London, Timothy Green 1784); A DIGEST OF THE LAWS OF GEORGIA, 471, 473–74, 478 (Robert & George Watkins ed., 1800); THE LAWS OF MARYLAND, ch. 25 (1799) (1799 law); ACTS AND RESOLVES OF MASSACHUSETTS 235 (Boston, Adams & Nourse 1893) (1786 law); LAWS OF NEW HAMPSHIRE 112–16 (1797); A MANUAL OF THE LAWS OF NORTH CAROLINA 190–91, 196 (John Haywood ed., 1814); THE PUBLIC LAWS OF RHODE ISLAND, *supra*, at 220; LAWS OF VERMONT 382, 287 (Randolph, Sereno Wright 1808) (1798 law).

Polling places were similarly secured by government-provided security at the Founding, including in Georgia, Virginia, New Jersey, Maryland, Delaware, and South Carolina. *See* A DIGEST OF THE LAWS OF GEORGIA, *supra* at 611 ("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 325 (Augustine Davis ed., 1796) (similar); MD. CONST. art. 1 §§ 3, 14 (1776) (similar); LAWS OF NEW JERSEY, *supra*, at 36 (providing security at polling places); 2 LAWS OF DELAWARE *supra*, at 984 (similar); THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA, *supra*,

at 386–88 (table of fees includes payment to sheriffs for polling-place-related duties).

In other words, legislative assemblies, polling places, and courthouses were sensitive because the government treated them as such by providing comprehensive security. Their sensitive nature was never a matter of government fiat. The closest thing to the comprehensive security provided at the Founding in legislative assemblies, polling places, and courthouses today is, unsurprisingly, guards and metal detectors at entrances to courthouses or even TSA at the airport. *See Koons*, 2023 WL 3478604 at *90 ("Airports have many security measures such as Transportation Security Administration (TSA) officers, air marshals, police officers, metal detectors, and luggage scanners that all check people and their baggage for weapons and dangerous devices, like explosives."). That the government can prohibit firearms in places it comprehensively secures makes sense. The point of the Second Amendment is ensuring that Americans can be "armed and ready" for "ordinary self-defense needs." *Bruen*, 597 U.S. at 32, 60. But when the government secures a location and protects those in it, there is less of a need for ordinary, law-abiding Americans to be ready to defend themselves.

The problem for Defendants is that parks and playgrounds in Alburquerque and Bernalillo County have none of these features. Visitors are not "screened by security" when they enter a park or a playground, nor do these areas "have controlled

entry points." *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 659 (Del. 2017). Nor does the government otherwise assume responsibility for protecting Plaintiffs (and their children and grandchildren) when visiting such locations. Because parks and playgrounds lack the comprehensive security endemic to sensitive places at the Founding, firearm carry cannot be banned there.

### B. There Is No Historical Tradition of Barring Carry in Parks

*Bruen* reasoned that, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 597 U.S. at 26. There is nothing new about parks, and there is nothing new about potential violence in parks or in public green spaces more generally. And Defendants will be unable to point to any relevant historical tradition from the Founding prohibiting carry in parks. *Accord Koons*, 2023 WL 3478604, at *82–85; *Springer*, 2023 WL 8436312, at *7–8 (enjoining the same Public Health Order here with respect to parks based on the same analogues).

Many parks were created before 1800, including the National Mall in Washington, DC, Boston Common in Massachusetts, Battery and Duane parks in New York, and more. *See* Trust for Public Land, *The 150 Largest City Parks*, https://bit.ly/47VJw1Q (last visited Jan. 26, 2024) ("*Largest City Parks*"); Margaret

Walls, *Parks & Recreation in the U.S.: Local Park Systems*, RESOURCES FOR THE FUTURE (June 2009), https://bit.ly/42gjo0D ("Walls"). And several dozen more parks were created in the years preceding the Fourteenth Amendment's ratification. *See Largest City Parks.*

For example, Boston Common, established in 1634, is considered "the nation's first city park." Walls at 1; *accord Koons*, 2023 WL 3478604, at *83. It was far from a gun-free zone. Indeed, the space was commonly used for militia purposes, including training with firearms. *See* Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1, 3–6 (2021). And "[t]he Common also served as a site for informal socializing and recreation" including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment," and "raucous celebrations." *Id.*; *see also Boston Common*, NAT'L PARK SERV., https://bit.ly/3SGumtc (last visited Jan. 26, 2024) ("[T]he Common was a place for recreation as early as the 1660s."). In New York, City Hall Park began as a "public common" in the 17th century. *The Earliest New York City Parks*, N.Y. CITY DEP'T OF PARKS & RECREATION, https://on.nyc.gov/3hBZXfe (last visited Jan. 26, 2024). And New York's Bowling Green Park was established in 1733. *Id.* Nearby Duane Park was also the first open space purchased "specifically for use as a public park" in 1797. *Duane Park Origins*, THE HIST. MARKER DATABASE, https://bit.ly/3S92dt4 (last visited Jan. 26, 2024).

Other examples abound throughout the colonies and early Republic. *See, e.g.*, *Largest City Parks* at 5–6.

Despite the existence of parks at the Founding, there is no analogous historical tradition of banning firearm carry there by private citizens. Quite to the contrary. In fact, had the colonists left their muskets at home when they mustered on the Lexington Common (also known as the Lexington Battle Green) in April of 1775, we might still be British subjects. Unsurprisingly, then, neither the district court nor Defendants has pointed to a historical tradition of banning firearms at such locations during the Founding era. Indeed, even before *Bruen*, courts had rejected attempts to characterize such locations as "sensitive places." *See, e.g.*, *Small*, 176 A.3d at 658 (holding that State parks and State forests were not "sensitive places" and that the County's ban on firearms in such places was unconstitutional under Delaware's version of the Second Amendment); *People v. Chairez*, 104 N.E.3d 1158, 1176 (Ill. 2018) (holding that an Illinois statute that banned possession of firearms within 1,000 feet of a public park violated the Second Amendment and rejecting argument that that area was a "sensitive" place); *Morris v. U.S. Army Corps of Eng'rs*, 60 F. Supp. 3d 1120, 1123–25 (D. Idaho 2014), *appeal dismissed*, No. 14-36049, 2017 WL 11676289 (9th Cir. Dec. 15, 2017) (rejecting argument that U.S. Army Corps of Engineers' outdoor recreation sites were sensitive places); *Solomon v. Cook Cnty. Bd. of Comm'rs*, 559 F. Supp. 3d 675, 690–96 (N.D. Ill. 2021) (finding that a forest

preserve district was not a "sensitive place"); *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365, 370 (Va. 2011) (contrasting "a public street or park" with sensitive places).

Without any Founding-era evidence, the district court focused exclusively on mid- to late-19th century and 20th-century regulations, identifying only a few state laws. App. Vol. 1 at 192–94. The first, from Texas in 1870, prohibited firearms "in place[s] where persons are assembled for educational, literary, or scientific purposes." 1870 TEX. GEN. LAWS 63, ch. 46. The second, from Missouri in 1883, prohibited firearms for the same reasons as the Texas law, and in public assemblies generally. 1883 MO. SESS. LAWS 76. The third, from Minnesota in 1905, prohibited firearms within a half-mile of state parks. 1905 MINN. GEN. LAWS ch. 344 § 53. The fourth, from Wisconsin in 1917, prohibited bringing firearms into a "wild life refuge, state park, or state fish hatchery lands" unless they were unloaded and in a carrying case. 1917 WIS. SESS. LAWS ch. 668 § 29.57(4). The fifth, from North Carolina in 1921, prohibited the carrying of firearms in both private and public parks without the permission of the owner of the park. 1921 N.C. SESS. LAWS ch. 6 § 3.

The district court erred in finding that these restrictions sufficed to demonstrate a broad and enduring national tradition of restricting carry in parks. A few states' laws far removed from the Founding (most by more than a century) provide not a shred of guidance as to the meaning of the Second Amendment. *See*

*Bruen*, 597 U.S. at 46 (doubting that three state laws sufficed to evince a national tradition); *see also, e.g.*, *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01077, 2023 WL 5017253, at *18 (D. Colo. Aug. 7, 2023) (Absent "any confirmation in the form of founding era regulations," courts cannot give weight to "three pre-Civil War regulations[.]"); *May*, 2023 WL 8946212, at *7–17 (rejecting the government's reasoning that a few laws post-dating the Fourteenth Amendment suffice to create a national tradition of restricting carry); *Lara*, 2024 WL 189453, at *8 (3d Cir. Jan. 18, 2024) (discarding Pennsylvania's "catalogue of statutes from the mid-to-late nineteenth century, as each was enacted at least 50 years after the ratification of the Second Amendment."). Indeed, *Bruen* refused to "address any of the 20th-century historical evidence brought to bear by respondents or their amici" because, like "late-19th-century evidence, the 20th-century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." 597 U.S. at 66 & n.28; *accord Springer*, 2023 WL 8436312, at *7–8 ("Defendants provide *no* evidence illuminating the scope of the Second Amendment right at or around the time it was adopted. . . . The vast majority of Defendants' citations come at least 20 years after the enactment of the Fourteenth Amendment, which the *Bruen* decision only considered to the extent it was consistent with earlier law."). The district court ignored that clear instruction, compounding its mistaken reliance on non-Founding-era sources.

Yet more problematically, the district court did not analyze whether these laws were "relevantly similar" to the challenged provisions in "how" and "why" they burden Second Amendment rights. *Bruen*, 597 U.S. at 29; *cf. Md. Shall Issue v. Moore*, 86 F.4th 1038, 1047–48 (4th Cir. 2023) (applying these metrics to reject various analogues as not relevantly similar), *reh'g en banc granted*, 2024 WL 124290 (4th Cir. Jan. 11, 2024). Even cursory review of the primary sources would have revealed that they are not. Start with the 1870 Texas and 1883 Missouri laws. Neither reference parks specifically, and it is an unfounded assumption that people assemble in parks for educational, literary, or scientific purposes. The opposite inference is equally plausible: people typically frequent parks to *avoid* these pursuits and to pursue recreation and leisure. These analogues thus have a different "how" than the challenged park carry ban. *Cf. May*, 2023 WL 8946212, at *13 (rejecting 1870 Texas law as not relevantly similar to a prohibition on carry in zoos).

Consider next the 20th-century laws from Minnesota, Wisconsin, and North Carolina. Reading them in context reveals that they are part of hunting laws enacted to protect wildlife. The Minnesota law prohibits carrying loaded firearms in conjunction with the taking, catching, or killing of any wild bird or animal within state parks. 1905 MINN. GEN. LAWS, ch. 344 § 53. Similarly, the Wisconsin law bans carrying a "gun or rifle" while hunting or trapping within the boundaries of a wildlife refuge. 1917 WIS. SESS. LAWS, ch. 668 § 29.57(4). And the North Carolina provision

34

bars carrying firearms "in any park or reservation such as is described in section one of this act," and section one refers to hunting, trapping, and killing animals. 1921 N.C. SESS. LAWS, ch. 6 §§ 1, 3. That provision also allows for exceptions—individuals who want to carry can obtain written permission from the owner of the park or reservation. *See id.* § 3.

The titles of these statutes confirm that they are hunting restrictions, not purported public safety measures. The Minnesota law is entitled "An Act for the Preservation, Propagation, Protection, Taking, Use and Transportation of Game and Fish, and Certain Harmless Birds and Animals." 1905 MINN. GEN. LAWS ch. 344 § 53. Similarly, the Wisconsin law is entitled "Wild Animals, and the Regulation of the Enjoyment, Disposition, and Conservation Thereof; General Control and Regulation." 1917 WIS. SESS. LAWS, ch. 668 § 29.57(4). And the North Carolina law is even more clearly entitled "An Act to Protect Animals and Game in Parks and Game Reservations in Either Private or Public Parks Or Places." 1921 N.C. SESS. LAWS, ch. 6 § 3. The "why" of these laws therefore differs from Defendants' ban on carry in parks, insofar as they are geared toward the protection of wildlife. They are not even "relevantly similar," let alone "distinctly similar," to the challenged restrictions. *Bruen*, 597 U.S. at 26, 29.

The district court turned next to local laws, most of which post-date the Fourteenth Amendment's ratification and cover only a smattering of parks across a

few cities. App. Vol. 1 at 192–94. This evidence is also insufficient under *Bruen*. According to the 1900 census, more than 10,000 municipalities existed at the time, so these few local, outlier regulations cannot be probative of "this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. Moreover, these laws sometimes applied only to individual parks, *see, e.g.*, 1868 PA. SESS. LAWS § 1 (referencing Fairmount park); CITY OF READING, PA. LAWS & ORDINANCES ch. II § 20 (Louis Richards ed., 1897) (referencing Penn's Common park), and were often coupled with restrictions on shooting animals, *see, e.g.*, PA. ACTS OF ASSEMBLY § 21 (Philadelphia, 1870) ("No persons shall carry fire-arms, or shoot birds in [Fairmount] Park[.]"); ANN. REPORTS OF THE CITY OF ST. PAUL § 6 (1888) ("No person shall carry firearms or shoot birds in any Park or within fifty yards thereof[.]"). Thus, they are not relevantly similar in "how" and "why" they burden Plaintiffs' Second Amendment rights either.

These municipal laws also deserve skeptical treatment for another reason; they often barred the exercise of other constitutional rights, such as freedom of speech or assembly, rendering them poor models of constitutionality. For example, a regulation restricting firearms in Central Park from 1858 barred "conversing with construction workers." MINUTES OF PROCEEDINGS OF THE BD. OF COMM'RS OF CENTRAL PARK (1858). And Brooklyn's Prospect Park in 1868 restricted "indecent language." RULES & REGULATIONS, PROSPECT PARK, BROOKLYN (1868). A

regulation from the same year governing Fairmount Park in Pennsylvania similarly barred "indecent language" and public gatherings or meetings for political purposes. 1868 PA. SESS. LAWS, *supra*. Just as the Supreme Court rejected various analogues in *Bruen* that were unconstitutional for other reasons, this Court should do the same here. *See Bruen*, 597 U.S. at 127 (rejecting reliance on regulations "designed or enforced in a [racially] discriminatory manner"); *see also id.* at 63 n.26 (rejecting reliance on analogue because it also violated the Constitutional right to a jury trial).

It is also worth noting that a district court judge for the District of New Mexico recently rejected all of the laws Defendants cite here as justifying the restriction on carry in parks. *See Springer*, 2023 WL 8436312, at *5–8. That court noted "several issues that render them irrelevant or unpersuasive in light of *Bruen*." *Id.* at *7. For starters, the analogues arrived too late—most of them were passed "more than two decades after the enactment of the Fourteenth Amendment." *Id.* And several analogues stemmed from the 20th century, "a time period which the *Bruen* decision expressly chose not to consider, as they were not consistent with earlier law." *Id.* Finally, that court rejected analogues from the Western territories because *Bruen* "expressly rejected relying on territorial laws or decisions." *Id.* at 8. Left with no other persuasive analogues—from the Founding era or elsewhere—the district court properly enjoined the same restriction challenged here that bars firearm carry in parks. *See id.*

### C. There Is No Historical Tradition of Barring Carry at Playgrounds

The district court also erred in holding that firearm carry may be restricted on playgrounds in Albuquerque and Bernalillo County. The court reached that conclusion by analogizing playgrounds to schools. App. 196–99 (citing *Heller*, 554 U.S. 570, 626–27 (2008)). This reasoning is flawed for three reasons. First, it pays no heed to the original reason *why* guns were banned around schools, and the narrowness of such bans throughout the Founding era. Second, it flies in the face of the broader Founding-era tradition, which was to permit (indeed, sometimes to require) the bearing of arms in public assemblies where people gathered, including children and other purportedly vulnerable groups. Third, *Bruen* did not recognize schools in its list of presumptive sensitive places.

First, as with the three sensitive places *Bruen* recognized as "presumptively lawful," it is necessary to understand precisely when, why, and how guns were historically banned at schools. Founding-era restrictions that related to schools were limited in how they burdened Second Amendment rights. *See* Kopel & Greenlee at 247–48. Most importantly, they only applied to students, not faculty, staff, or visitors to campus. *See* Ctr. for Hum. Liberty Br., *supra*, at 20–22.[9] Thus, they did not burden

---

[9] Restrictions summarized are (1) the University of Virginia's 1825 ban on student possession in response to students' "spoiled and violent behavior" of previously "fir[ing] guns in the air, and sho[oting] at each other"; (2) Harvard's 1655 ban on students keeping guns; (3) Yale's 1795 ban on students keeping or firing guns; (4) North Carolina's 1799 ban on students keeping and using guns; (5) Rhode Island

Second Amendment rights in the same way as a general prohibition on carry wherever children are gathered, as Defendants' playground restriction does.

Finally, there was a particular reason why schools could legally disarm students in that time period: they exercised *in loco parentis* authority over them. *See, e.g.*, *Morse v. Frederick*, 551 U.S. 393, 413 n.3 (2007); *State v. Pendergrass*, 19 N.C. 365, 366 (1837) (recognizing that the "teacher is the substitute of the parent"); *State v. Mizner*, 45 Iowa 248, 251 (1876); *North v. Bd. of Trs. of Univ. of Ill.*, 137 Ill. 296, 306, 27 N.E. 54, 56 (1891) ("By voluntarily entering the university, or being placed there by those having the right to control him, [the student] necessarily surrenders very many of his individual rights.").[10] Historical exercises of this authority do not support restricting firearm carry by anyone not subject to that sort of authority. It therefore follows that analogies from schools to places such as playgrounds lack any basis. Because Defendants do not have *in loco parentis* authority over law-abiding

---

College (now Brown University)'s 1803 restriction on students keeping guns; (6) the University of Georgia's 1810 restriction on students keeping guns; and (7) Columbian College (now George Washington University)'s ban on students keeping firearms. None of these laws extended to school staff or visitors to campus.

[10] Although colleges and universities were historically understood to possess *in loco parentis* authority over their students, they are no longer understood to have that authority. *See, e.g.*, *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 243 (3d Cir. 2010); *Bradshaw v. Rawlings*, 612 F.2d 135, 139 (3d Cir. 1979). These historical laws would accordingly not justify firearm bans on college students today.

adults who would carry firearms to protect themselves and children at playgrounds, historical restrictions on students carrying in schools carry no weight.

Second, Colonial- and Founding-era laws combine to form a robust tradition of permitting (and sometimes requiring) firearm carry in public assemblies and religious services. *See* Kopel & Greenlee at 232–34 & n.108, 244; Clayton E. Cramer, *Colonial Firearms Regulation*, 16 J. FIREARMS & PUB. POL'Y 1 (2016); Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 697–99 (2014). At one public gathering, now remembered as the Boston Massacre, British soldiers opened fire on a crowd of colonists in 1770. In defending the soldiers at trial, John Adams conceded that, in this country, "every private person is authorized to arm himself, and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence[.]" John Adams, Argument for the Defense: 3-4 December 1770, NAT'L ARCHIVES FOUNDERS ONLINE, https://bit.ly/35FCuRh.

And at least some Founding-era gatherings—replete with firearms—presumably included the presence of children and other vulnerable groups. For example, *Heller* cited a 1770 Georgia law requiring men to carry firearms "to places of public worship." 554 U.S. at 601. Similarly, Maryland in 1642 and Virginia in 1631, 1642, and 1755 required able-bodied men to bear arms while at church. ARCHIVES OF MARYLAND 103 (William Hand Browne ed., Baltimore, Md. Hist.

Soc'y 1885); 1 THE STATUTES AT LARGE OF VIRGINIA 174, 263, 534 (William Walker Hening ed., 1809). And Connecticut in 1639, Massachusetts in 1642, and Rhode Island in 1639 all required individuals to come armed to public meetings. *See* PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 95 (Hartford, Brown & Parsons 1850); 1 RECORDS OF THE COLONY OF RHODE ISLAND 94 (John Russell Bartlett ed. 1856).

In sum, history reveals that the Founding-era tradition was to *require* the bearing of arms around vulnerable people, such as in churches, because disarming the vulnerable and their caretakers makes them *more defenseless*, not less. *See, e.g.*, Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders: Understanding the Meaning and Purpose of the Second Amendment's Right to Keep and Bear Arms*, 2020 PEP. L. REV. 71, 83 (2020) ("*Beccaria's Influence*") (explaining that the Founders were influenced by prominent Enlightenment Thinker Cesare Beccaria who wrote that gun control laws "make things worse for the assaulted and better for the assailants"); *see also* THOMAS JEFFERSON, LEGAL COMMONPLACE BOOK 521 (2019) (quoting this language). At least one federal district court recently concluded as much. *See May*, 2023 WL 8946212, at *11 ("Rather than delivering children to the state (sometimes with armed officers) for protection, at playgrounds parents and caregivers remain responsible for their children's safety without any immediate support[,]" and California's "prohibition on CCW permitholders carrying firearms at playgrounds and youth

centers eviscerates their ability to defend themselves and their children against attack.").

Third, *Bruen* did not include schools on its list of locations where firearms could be "presumptively" banned. *See* 597 U.S. at 31. Rather, it cited as an example of the continuing importance of Second Amendment rights in the Reconstruction Era the *arming of teachers* in Freedmen's Bureau schools. *See id.* at 61. Far from endorsing schools as sensitive places, *Bruen* thus suggested that there is no historical tradition of barring carry in them altogether. While *Bruen* cited *Heller*'s earlier suggestion (in dicta) that "schools and government buildings" potentially could be considered "sensitive places[,]" *Bruen* reiterated firearm regulation only at three specified places and instructed courts to "use analogies to *those* historical regulations of 'sensitive places'" when assessing the constitutionality of firearm restrictions at modern locations. *Id.* at 30 (emphasis added). It makes little sense to say that *Bruen*'s list of three specific types of government buildings is in reality a conclusion that all government buildings are sensitive. *Accord United States v. Ayala*, No. 8:22-cr-369, 2024 WL 132624, at *11 (M.D. Fla. Jan. 12, 2024). Nor is this in any way inconsistent with *Heller*, which did not purport to "clarify the entire field" of Second Amendment rights and stated that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." 554 U.S. at 635. As explained, to the extent firearms

historically were restricted in schools, those restrictions were limited to students over whom the schools had *in loco parentis* authority.

It also defies *Bruen*'s logic to hold—as the district court did—that places with high concentrations of children automatically become sensitive places. Instead, *Bruen* recognized a general right to public carry in many locations where children are undoubtably present, such as sidewalks and "the island of Manhattan." *See, e.g.*, *id.* at 31, 33. Lastly, *Bruen* also cautioned against construing "sensitive places" "too broadly," lest the narrow exception "in effect exempt cities from the Second Amendment and [] eviscerate the general right to publicly carry arms for self-defense[.]" *Id.* at 31. But that is precisely the effect of creating some nebulous category of sensitive place based merely on some undefined concentration of young persons, as it would permit the banning of firearms in all churches with Sunday Schools, at birthday parties, in community centers, and even at backyard barbeques. Of course, there is no historical tradition of any of that.

In sum, the district court erred in holding that firearms may be banned at playgrounds because they are analogous to schools. It is not enough to say, with no limiting principle, that a place is simply "like a school" and thus sensitive because children gather there. Doing so would "eviscerate" the general right to carry for self-defense in public. Carry for self-defense and for defense of the vulnerable is *most* acute at places like playgrounds because vulnerable children are *less* capable of

defending themselves than the average adult. Criminals and mass murderers, including those who target soft targets with vulnerable populations, will not respect Defendants' Public Health Order—and indeed may be emboldened by the knowledge that law-abiding citizens are barred from carrying firearms at playgrounds. Unfortunately, violence in and around playgrounds is far from speculative. *See* Bruce Jacquot, *2 Teens Arrested in Fatal West Ashley Playground Shooting; Coroner Identifies Victim*, ABC 4 NEWS (Dec. 22, 2023), https://bit.ly/3Ubqu4v; Ricardo Wells, *Police Kill Armed Man Near School Playground*, THE TRIBUNE (Feb. 13, 2018), https://bit.ly/3vOWcKD. The Second Amendment guarantees Plaintiffs the right to ensure that they and their families are not similarly victimized.

***

Applying *Bruen* faithfully requires ruling that Plaintiffs are likely to succeed on the merits of their Second Amendment claim. Founding-era traditions of firearm carry existed in both parks and places where children gathered. Thus, even if this Court credits the same Reconstruction-era analogues the district court relied upon (and it should not), these analogues are not persuasive because they contradict the earlier historical tradition. *See Bruen*, 597 U.S. at 65–66 (rejecting analogue as unpersuasive where it "contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense in public" (cleaned up)).

Finally, Defendants' analogues are also unpersuasive because they are not widespread enough and are not relevantly similar in "how" and "why" they burden Second Amendment rights.

One final note. Pre-*Bruen*, New Mexico allowed licensed individuals to carry for self-defense in parks and playgrounds. Indeed, individuals could previously open carry at these locations without a permit or conceal carry with a permit.[11] And more than 48,000 New Mexicans hold concealed carry licenses. *See, e.g.*, *New Mexico Concealed Carry Reciprocity Overview*, CONCEALED COAL., https://bit.ly/3OihPcw (last visited Jan. 26, 2024). The violent crime rates Defendants cite as justification for the Public Health Order cannot be used to curtail the Second Amendment rights of the law-abiding—indeed, to the extent rising crime rates have any relevance, they *underscore* the need for robust Second Amendment rights. For elevated levels of violence often "cause law-abiding citizens to feel the need to carry a gun for self-

---

[11] The overwhelming weight of authority conclusively demonstrates that law-abiding gun owners—the only persons who will obey the Governor's unconstitutional edicts—are not the problem. *See May*, 2023 WL 8946212, at *19 ("Simply put, CCW permitholders are not the gun wielders legislators should fear."); *Wolford v. Lopez*, No. 23-cv-00265, 2023 WL 5043805, at *32 (D. Haw. Aug. 8, 2023) ("the vast majority of conceal carry permit holders are law-abiding."); *Koons*, 2023 WL 3478604, at *108 ("[T]he State has failed to offer any evidence that law-abiding responsible citizens who carry firearms in public for self-defense are responsible for an increase in gun violence."); *see also* Jens Ludwig et al., *Gun Control After Heller: Threats and Sideshows From a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1082 (2009) ("The available data about permit holders also imply that they are at fairly low risk of misusing guns, consistent with the relatively low arrest rates observed to date for permit holders.").

defense." *Bruen*, 597 U.S. at 74 (Alito, J., concurring). The Founders had this in mind, as evidenced by their writings and speeches adopting the arguments of Enlightenment thinker Cesare Beccaria, who recognized that gun control laws "disarm those only who are neither inclined nor determined to commit crimes" and thus "serve rather to encourage than to prevent homicides, for an unarmed man may be attacked with greater confidence than an armed man." *Beccaria's Influence*, *supra*, at 83–84; *see also id.* ("[W]hen guns are outlawed, only outlaws will have guns." (cleaned up)). Carry at parks and playgrounds did not harm New Mexico pre-*Bruen*, and it will not do so now.

## III.    OTHER EQUITABLE FACTORS

Plaintiffs also demonstrate that they have suffered irreparable injury and that the balance of the equities and the public interest favor them.

### A. Plaintiffs Are Suffering Continuous Irreparable Injury

Because Plaintiffs show that they are likely to succeed on the merits of their claim that the Order violates their constitutional rights, they necessarily suffer ongoing, irreparable injury while it remains in force. *See Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1263 (10th Cir. 2016); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (reasoning that the loss of First Amendment rights "for even minimal periods of time, unquestionably constitutes irreparable injury"). Indeed, "[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Herbert*, 828 F.3d at 1263 (cleaned up);

46

*see also* 11A WRIGHT & MILLER, FED. PRAC. & PROC. CIV. § 2948.1 (3d ed. 2020) (collecting cases). After all, what makes an injury irreparable is "the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019). And "[a]ny deprivation of any constitutional right fits that bill." *Id.* Because Plaintiffs are likely to succeed on the merits of their Second Amendment claim, they need not show any further irreparable harm, as numerous courts have recognized. *See, e.g.*, *id.*; *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011); *Jones v. Bonta*, 34 F.4th 704, 732 (9th Cir. 2022), *vacated pending reh'g en banc*, 47 F.4th 1124 (9th Cir. 2022); *cf. Antonyuk,*, 2023 WL 8518003, at *54 (violation of First Amendment rights from ban on firearm carry in churches constitutes irreparable injury).

Defendants may argue that the alleged public safety rationale behind the Governor's firearms restrictions somehow justifies a different irreparable harm analysis. Not so. For starters, the Supreme Court has plainly stated that the Second Amendment is not a second-class right. *See Bruen*, 597 U.S. at 70. Moreover, the Supreme Court rejected such a Second-Amendment-is-different argument in *McDonald*, with the lead opinion noting that it is "not the only constitutional right that has controversial public safety implications." 561 U.S. at 783 (plurality). A majority of the *Bruen* Court reiterated this statement. 597 U.S. at 17 n.3. Indeed, "[a]ll of the constitutional provisions that impose restrictions on law enforcement

and on the prosecution of crimes fall into the same category." *McDonald*, 561 U.S. at 783 (plurality). There is no basis to conclude that a plaintiff's irreparable harm from a violation of his Second Amendment rights is somehow lessened by allegations of a negative effect on public safety. And in any event, the most likely public safety consequence of Defendants' carry ban is to, by disarming the law-abiding, make allegedly vulnerable people more vulnerable. It is hard to imagine any criminal intent on committing heinous crimes being deterred by Defendants' ban, but it is almost inevitable that a disarmed mother will be unable to protect her children from a violent predator intent on doing them harm.

### B. Injunctive Relief Would Not Harm New Mexico or the Public Interest

The balance of the equities and the public interest—merged in a suit against the government—also favor Plaintiffs. Although "[t]he first two factors of the traditional [injunctive relief] standard"—likelihood of success on the merits and irreparable injury—"are the most critical," *Nken*, 556 U.S. at 434, there is also no basis to conclude that the relief sought will "substantially injure" New Mexico or the public at large. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

Because the irreparable injury Plaintiffs suffer arises from the deprivation of a constitutional right, no opposing interest Defendants may claim suffices. For the mere "possibility" of a constitutional right "being irreparably harmed outweighs any opposing interests asserted by" Defendants. *Herbert*, 828 F.3d at 1265. And because

the "citizens of [New Mexico] have an interest in ensuring that their elected public officials do not engage in conduct that violates the constitutional rights of another citizen," the public interest favors Plaintiffs. *See id.* at 1266. In other words, it is "always in the public interest to prevent the violation of a party's constitutional rights." *Free the Nipple-Fort Collins*, 916 F.3d at 807 (cleaned up). The final two equitable factors thus favor Plaintiffs.

## CONCLUSION

For all these reasons, the judgment below should be reversed.

/s/ Cameron L. Atkinson

Dated: January 30, 2024          Cameron Lee Atkinson

ATKINSON LAW, LLC
122 Litchfield Road
P.O. Box 340 St. 2
Harwinton, CT 06791
203-677-0782
catkinson@atkinsonlawfirm.com

*Attorney for Plaintiffs We the Patriots USA, Inc. et al.*

/s/ David H. Thompson

Jordon P. George                  David H. Thompson
ARAGON MOSS GEORGE JENKINS, LLP    Peter A. Patterson
2201 Menaul Blvd NE                Kate Hardiman
Albuquerque, NM 87107             COOPER & KIRK, PLLC
505-872-3022                       1523 New Hampshire Ave NW
jordon@amglaw.com                  Washington, D.C. 20036
                                   202-220-9600
                                   dthompson@cooperkirk.com

*Attorneys for Plaintiffs Fort et al.*

49

Robert J. Olson
WILLIAM J. OLSON, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
(703) 356-5070
wjo@mindspring.com

/s/ Stephen Stamboulieh
Stephen Stamboulieh
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

*Attorneys for Plaintiffs Donk et al.*

**STATEMENT REGARDING ORAL ARGUMENT**

Pursuant to 10th Circuit Rule 28.2(C)(2), Plaintiffs-Appellants respectfully request oral argument in these consolidated cases because this appeal involves a constitutional challenge to a State Order. Oral argument would serve to focus the Court's attention on key methodological considerations under the Supreme Court's recent decision in *New York State Rifle & Pistol Association v. Bruen*, as well as the reasons why this Court should not accept Defendants' historical analogues.

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2024, I served a true and complete copy of the foregoing Consolidated Opening Brief of Appellants upon the following parties by e-filing with the CM/ECF system maintained by the court:

Holly Agajanian
Kyle P. Duffy
Cody R. Rogers
Office of the Governor
490 Sante Fe Trail, Suite 400
Firm: (505) 476-2200
Sante Fe, NM 87501

*Attorneys for Defendants*

/s/ Cameron L. Atkinson

Cameron L. Atkinson

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Brief complies with the type-volume limitations set by Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 11,861 words. This Brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) because it has been prepared in a 14-point Times New Roman, a proportionally spaced typeface.

Dated: January 30, 2024                         /s/ Cameron L. Atkinson

                                                Cameron L. Atkinson