# ATTACHMENT B

# TABLE OF CONTENTS – HISTORICAL LAWS

| Exhibit # | Citation | Page # in Brief |
|:---:|:---|:---:|
| 1. | THE PUBLIC LAWS OF RHODE ISLAND 220, 222 (Providence, Carter & Wilkinson 1798) | 25, 27 |
| 2. | JOURNAL OF THE VOTES AND PROCEEDINGS OF THE PROVINCIAL CONGRESS OF NEW JERSEY 239, 240 (1835) | 26 |
| 3. | JOURNAL OF THE HOUSE OF DELEGATES OF THE COMMONWEALTH OF VIRGINIA 77 (Richmond, Thomas W. White 1828) | 26 |
| 4. | LAWS OF VERMONT 382, 387 (Randolph, Sereno Wright 1808) | 26, 27 |
| 5. | PUBLIC LAWS OF SOUTH CAROLINA 271, 368–88, 426–27 (Philadelphia, R. Aitken & Son 1790)) | 25, 26, 27, 28 |
| 6. | A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 69–71 (1803) | 26 |
| 7. | A COMPILATION OF THE LAWS OF GEORGIA 373 (Augustine Smith Clayton ed. Augusta, Adams & Duyckinck 1812) | 26 |
| 8. | 10 PENNSYLVANIA STATUTES AT LARGE, 57, 378 (William Stanley Ray ed., 1904) | 25, 26, 27 |
| 9. | 1 LAWS OF NEW YORK 176, 532 (Websters & Skinner 2d ed. 1807) | 26 |
| 10. | ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 42, 325 (Augustine Davis ed., 1796) | 27 |
| 11. | ACTS AND LAWS OF THE STATE OF CONNECTICUT 63–65 (New London, Timothy Green 1784) | 27 |
| 12. | THE LAWS OF MARYLAND, ch. 25 (1799) | 27 |
| 13. | ACTS AND RESOLVES OF MASSACHUSETTS 235 (Boston, Adams & Nourse 1893) | 27 |
| 14. | LAWS OF NEW HAMPSHIRE 112–16 (1797) | 27 |
| 15. | A MANUAL OF THE LAWS OF NORTH CAROLINA 190–91, 196 (John Haywood ed., 1814) | 27 |
| 16. | A DIGEST OF THE LAWS OF GEORGIA, 471, 473–74, 478, 611 (Robert & George Watkins ed., 1800) | 27 |
| 17. | MD. CONST. art. 1 §§ 3, 14 (1776) | 27 |
| 18. | 1 LAWS OF NEW JERSEY 36, 49, 50, 58 (Bloomfield ed., 1811) | 26, 27 |

| 19. | 2 LAWS OF DELAWARE 984, 1088, 1091, 1100, 1118 (Samuel & John Adams, eds., 1797) | 25, 26, 27 |
|---|---|---|
| 20. | *The 150 Largest City Parks*, TRUST FOR PUBLIC LAND (Dec. 10, 2010) | 29, 30 |
| 21. | Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1, 3–6 (2021) | 30 |
| 22. | *Duane Park Origins*, THE HIST. MARKER DATABASE, https://bit.ly/3S92dt4 | 30 |
| 23. | 1870 TEX. GEN. LAWS 63, ch. 46 | 32 |
| 24. | 1883 MO. SESS. LAWS 76 | 32 |
| 25. | 1905 MINN. GEN. LAWS ch. 344 § 53 (1905) | 32, 34, 35 |
| 26. | 1917 WIS. SESS. LAWS ch. 668 § 29.57(4) | 32, 34, 35 |
| 27. | 1921 N.C. SESS. LAWS ch. 6 § 3 | 32, 35 |
| 28. | 1868 PA. SESS. LAWS § 1 | 36, 37 |
| 29. | CITY OF READING, PA. LAWS & ORDINANCES ch. II § 20 (Louis Richards ed., 1897) | 36 |
| 30. | PA. ACTS OF ASSEMBLY § 21 (Philadelphia, 1870) | 36 |
| 31. | ANN. REPORTS OF THE CITY OF ST. PAUL § 6 (1888) | 36 |
| 32. | MINUTES OF PROCEEDINGS OF THE BD. OF COMM'RS OF CENTRAL PARK (1858) | 36 |
| 33. | RULES & REGULATIONS, PROSPECT PARK, BROOKLYN (1868) | 36 |
| 34. | Amicus Br. of the Ctr. for Human Liberty at 8–17, *Antonyuk v. Nigrelli*, 2d Cir. 22-2908, Doc. No. 313 (Feb. 9, 2023) | 25, 38 |
| 35. | Amici Br. of Citizens Comm. for the Right to Keep and Bear Arms, et al. 8–17, *Koons v. Platkin*, 3d Cir. No. 23-1900, Doc. No. 91 (Aug. 16, 2023) | 25 |
| 36. | Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. FIREARMS & PUB. POL'Y 1 (2004) | 40 |
| 37. | ARCHIVES OF MARYLAND 103 (William Hand Browne ed., Baltimore, Md. Hist. Soc'y 1885) | 40, 41 |
| 38. | 1 THE STATUTES AT LARGE OF VIRGINIA 174, 263, 534 (William Walker Hening ed., 1808) | 41 |

| | | |
|---|---|---|
| 39. | PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 95 (Hartford, Brown & Parsons 1850) | 41 |
| 40. | 1 RECORDS OF THE COLONY OF RHODE ISLAND 94 (John Bussell Barlett 1856) | 41 |
| 41. | THOMAS JEFFERSON, LEGAL COMMONPLACE BOOK 521 (2019) | 41 |

# EXHIBIT 1

7.2.1.

# THE

# PUBLIC LAWS

OF THE STATE OF

# RHODE-ISLAND

AND

# PROVIDENCE PLANTATIONS,

As revised by a Committee, and finally enacted by
the Honourable GENERAL ASSEMBLY, at their
Session in *January*, 1798.

TO WHICH ARE PREFIXED,

The CHARTER, DECLARATION OF INDEPENDENCE, ARTICLES
OF CONFEDERATION, CONSTITUTION OF THE UNITED
STATES, and PRESIDENT WASHINGTON'S ADDRESS of *September*, 1796.

41259

Published by Authority.

*IGNORANTIA LEGIS NEMINEM EXCUSAT.*
IGNORANCE OF THE LAW IS NO EXCUSE FOR ITS VIOLATION.

Printed at PROVIDENCE, by CARTER and WILKINSON,
and sold at their Book-Store. 1798.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

D. C.

The public Notaries *ſhall be allowed*,

For drawing a proteſt, and regiſter-
ing the ſame,     1 50

For ſwearing witneſſes relative to a
proteſt, for each witneſs,     0 5

For recording all inſtruments, for
every lawful page,     0 10

For taking the acknowledgment of a
letter of attorney, or other inſtru-
ment, and affixing the notarial ſeal
thereto,     0 25

The Sheriffs *ſhall be allowed*,

For ſerving a writ, if not more than
a mile from the court-houſe, or
place of appearance,     0 12

For every mile's travel out beyond a
mile, and the ſame back, the travel
to be computed from the place to
which the writ is returnable, to the
place where it is ſerved,     0 2

For attending a priſoner before com-
mitment, if actually committed,     0 16

For the copy of a writ or warrant, not
to be taxed, unleſs actually given,     0 10

For attending the General Aſſembly,
the Supreme Judicial Court, and
Courts of Common Pleas, by the day,     1 0

For a bail bond in civil actions,     0 6

And where bail is taken by indorſe-
ment on the writ, the ſame fee.

For ſerving all executions where a
party is committed to gaol,     0 70

For ſerving all executions where the
money due thereon is collected, not
exceeding four dollars,     0 30

If above four dollars, and not exceed-
ing ſeven dollars,     0 40

If above ſeven dollars, and not ex-
ceeding twenty dollars,     0 60

If

Digitized by Google     Original from UNIVERSITY OF MICHIGAN

D. C.

ing writs, unlefs the Court to which
fuch warrant or procefs fhall be re-
turnable, fhall deem it reafonable
to make a further allowance for ex-
tra fervices.

*The Coroners fhall be allowed,*

| | | |
|---|---|---|
| For taking every inquifition, | 1 | 0 |
| Befides the above fee, for every day employed therein, | 1 | 0 |
| Each Juror fhall be allowed by the day, | 0 | 50 |

*Town Sergeants and Conftables fhall be al-*
*lowed,*

| | | |
|---|---|---|
| For ferving a writ, if not more than a mile from the place of appearance, | 0 | 12 |
| If more than a mile, | 0 | 8 |
| For every mile's travel out beyond a mile, and the fame back, | 0 | 2 |
| For a bail bond in civil actions, | 0 | 6 |

And where bail is taken by indorfe-
ment on the writ, the fame fee.

| | | |
|---|---|---|
| For a copy of a writ or warrant, | 0 | 10 |

For ferving a fummons and travel,
the fame as the Sheriff.

For attendance upon the General Af-
fembly, the Supreme Judicial Court,
and the Courts of Common Pleas,

| | | |
|---|---|---|
| by the day, | 0 | 75 |

For ferving a warrant or other crimi-
nal procefs, the fame as for ferving
a writ, unlefs the Court to which the
fame fhall be returnable, fhall deem
it reafonable to make a further al-
lowance for extra fervice.

*Other Fees allowed in Court.*

| | | |
|---|---|---|
| For the writ and declaration, | 1 | 0 |
| Attorney's and counfel's fee in the Courts of Common Pleas, | 1 | 0 |
| In the Supreme Judicial Court, | 2 | 0 |

One

Generated on 2024-01-10 15:27 GMT / https://hdl.handle.net/2027/mdp.35112283944848
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

# EXHIBIT 2

TLC

# EXTRACTS

FROM THE

## JOURNAL OF PROCEEDINGS

OF THE

# PROVINCIAL CONGRESS

OF

## *NEW JERSEY.*

HELD AT TRENTON IN THE MONTHS OF MAY, JUNE AND AUGUST, 1775,

PUBLISHED BY ORDER.

*BURLINGTON:*
PRINTED AND SOLD BY ISAAC COLLINS,
M.DCC.LXXV.

46340

WOODBURY, N. J.
REPRINTED BY ORDER.
JOSEPH SAILER, PRINTER.

1835.

surers of this colony, or either of them, are hereby re-
quired to pay, upon certificates duly attested, and agreed to
as aforesaid, under the hand and seal of the chairman of the
committee of the county where such salt shall be made, cer-
tifying, that it hath been proved by the oaths of credible
witnesses, that such salt hath actually been made in some
county of this colony, at some time before the said first day
of November, 1776 ; and that the claimant hath not before
received any bounty for the same , and the receipt of the
chairman endorsed thereon, shall be sufficient vouchers to
the said treasurers, or either of them, for the payment of the
said bounty.

## AN ORDINANCE

### To provide for the payment of incidental charges.

Whereas it is necessary to provide for the payment of such
incidental charges as have accrued during the sittings of this
Congress.

It is therefore resolved and directed, That there be paid
to Samuel Tucker and John Dennis, Esquires, the treasurers
appointed by this Congress, over and above the money allow-
ed by this ordinance for signing the bills of credit, the sum
of thirty pounds proclamation money each, for their services
one year, to commence the first day of March instant.

To each of the signers of said bills of credit, the sum of
ten shillings per thousand, for so many thousand pounds, as
they shall respectively sign.

To the president, and each of the members of this Con-
gress, and committee of safety, the sum of six shillings per
diem, for every day they have, or shall attend, during the
continuance of this Congress, to be certified by Mr. Fisher,
Mr. Hart, Mr. Wetherill, Mr. Clark, and Mr. Elmer, or any
two of them.

To the secretary of this Congress, fourteen shillings per
diem, for each day that he hath or shall attend this Congress,
to be certified as aforesaid.

To each of the muster masters of this colony, the sum of twenty-five shillings for every company he has reviewed, or shall review by order of this Congress.

To the door keeper, the sum of five shillings per diem, for each day that he hath or shall attend this Congress.

To Myndert Voorhees, the sum of fifteen pounds for fire, wood and candles, and for the use of his large room, during the present sitting of this Congress.

And it is further resolved and directed, That there be paid to the commissioners appointed to purchase arms and ammunition, tents and other military stores, such sum or sums of money, as the said commissioners, or any three of them shall agree upon, as necessary to be expended ; whose receipts shall be sufficient vouchers for the payment of the same.

To John Carey, Esq. as a recompence for his services as secretary, during the last sitting of this Congress at Trenton, and for revising and copying the minutes for the press, the sum of eleven pounds four shillings, proclamation money.

To Doctor Moses Scott, the sum of one pound sixteen shillings and three pence, in full of his account, for attending certain sick soldiers in New Brunswick.

To Robert Drummond, Esquire, the sum of nine pounds, three shillings and four pence, in full of his account for removing the treasury, and records in the secretary's office at Perth Amboy, to New Brunswick.

To John Dennis, Esq. the sum of seven pounds, eight shillings and three pence, for sundry expenditures, as per account.

To John Pope, Esq. the sum of three pounds, three shillings, for sundry expenditures, as per account.

To Ellis Cook, Esq. the sum of one pound, six shillings and eight pence, in full of his account, for removing the records in the Surveror General's office at Perth Amboy, to New Brunswick.

To Azariah Dunham, Esquire, the sum of two pounds, for his expences, in going to, and returning from Philadelphia, on a message to the Hon. Continental Congress.

To Abraham Clark, Esquire, for copying and correcting the minutes and ordinances of this session for the press, such

# EXHIBIT 3

# JOURNAL

OF THE

# HOUSE OF DELEGATES

OF THE

## COMMONWEALTH OF VIRGINIA;

### BEGUN AND HELD IN THE TOWN OF RICHMOND,

## In the County of Henrico,

*ON MONDAY, THE SEVENTH DAY OF MAY, IN THE YEAR OF OUR LORD ONE THOUSAND SEVEN HUNDRED AND EIGHTY-ONE.*

———

RICHMOND:

PRINTED BY THOMAS W. WHITE, OPPOSITE THE BELL-TAVERN.

........

1828.

*Ordered*, That Mr. Charles Carter do acquaint the Senate therewith.

An engrossed bill, "concerning the legion under the command of Colonel Dabney;" was read the third time.

*Resolved*, That the bill do pass; and that the title be, "an act, concerning the legion under the command of Colonel Dabney."

*Ordered*, That Mr. Robert Wormeley Carter do carry the bill to the Senate, and desire their concurrence.

A motion was made, that the House do come to the following resolution:

Whereas, much inconvenience doth arise from the mode heretofore adopted by the committee appointed to burn and destroy the paper money, emitted by this State;

*Resolved, therefore*, That the committee appointed to burn the paper money, be directed and empowered to burn the same as it may be paid into the treasury, without any discrimination of the different emissions; and that for their services, each member of the committee attending on this business, shall receive and be paid the sum of ten shillings per day.

And the said resolution being read a second time was, on the question put thereupon, agreed to by the House.

*Ordered*, That Mr. Prentis do carry the resolution to the Senate, and desire their concurrence.

The Speaker laid before the House a letter from the Governor, respecting the accounts of Oliver Pollock, which was read, and ordered to be referred to a committee of the whole House on the state of the Commonwealth.

The Speaker laid before the House a letter from Oliver Pollock, respecting his claim against this State; which was read and ordered to be referred to a committee of the whole House on the state of the Commonwealth.

The Speaker laid before the House a letter from the Solicitor, enclosing a state of the public taxes; which was read and ordered to lie on the table.

A message from the Senate by Mr. Ellzey:

Mr. Speaker,—The Senate have agreed to the bill "concerning the appointment of sheriffs," with an amendment, to which they desire the concurrence of this House. And then he withdrew.

The House proceeded to consider the said amendment; and the same being read, was agreed to.

*Ordered*, That Mr. Mercer do acquaint the Senate therewith.

Mr. Talbot reported, from the committee appointed to examine the treasurer's accounts, that the committee had, according to order, examined and compared the same, and had agreed upon a report thereupon, which he read in his place, and afterwards delivered in at the clerk's table, where the same was again twice read, and agreed to by the House, as followeth:

The committee appointed to examine the accounts of the treasury have, according to order, carefully examined and compared the same with their proper vouchers, from the 13th April, 1782, to the 30th November following, inclusive; by which it appears that Jacquelin Ambler, Esq. treasurer, has received within those periods in specie, specie warrants and certificates and commutable articles, to the amount of 99,048*l.* 5*s.* 6 3-4*d.*, on various accounts; it appears also, that he has disbursed to the amount of 61,583*l.* 8*s.* 5 3-4*d.*, which leaves a balance of 37,464*l.* 17*s.* 1*d.* now resting in the treasury, chiefly in commutable articles, to be carried to the credit of the State in the next account. It also appears, that very considerable sums of paper money have been received and disbursed within the aforesaid periods, and that very large quantities now remain in the treasury; but your committee not having sufficient time for examining the paper money account fully, and ascertaining what still remains in the treasury, have referred the same to a future settlement. The accounts appear to have been fairly and properly stated, and accurately kept; your committee having discovered two inconsiderable errors only, one of four pence against, and one of two pence in favor of the State, which are duly rectified; but for a more clear explanation, your committee beg leave to refer to the general account annexed.

DR.　　*The Public Treasury, from the 13th of April, 1782, to the 30th of November, 1782, both inclusive.*

| | | | | | £ | | |
|---|---|---|---|---|---|---|---|
| To Land Office, per account, | - | - | - | Folio 2, | 314 | 0 | 0 |
| Officers of the customs, 422*l.* 13*s.* 3 1-4*d.* | } | | | | | | |
| Do. by virtue of revenue act, 1,415*l.* 16*s.* 1*d.* | } | | - | 6, | 1,838 | 9 | 4 1-4 |
| Clerks of counties, | - | - | - | 13, | | 4 | 9 |
| Escheators, | - | - | - | 17, | 6,400 | 8 | 2 1-2 |
| Sheriffs, | - | - | - | 27, | 89,210 | 12 | 8 3-4 |
| Inspectors of tobacco, (rents,) 254*l.* 3*s.* 7 1-2*d.* | } | | | | | | |
| Ditto  tax on tobacco exported, 466*l.* 1*s.* 1 3-4*d.* | } | - | - | 31, | 720 | 4 | 9 1-4 |
| Agent for sale of commutables, | - | - | - | 35, | 290 | 11 | 6 |
| Sundries, - | - | - | - | 37, | 273 | 13 | 11 |
| Error in extending folio 26, | - | - | - | | | | 4 |
| | | | | | £ 99,048 | 5 | 6 3-4 |

# EXHIBIT 4

THE

# L A W S

OF

### THE STATE

OF

# V E R M O N T,

DIGESTED AND COMPILED :

INCLUDING THE

## DECLARATION OF INDEPENDENCE,

THE

## CONSTITUTION OF THE UNITED STATES,

AND OF THIS STATE.

*VOLUMES FIRST AND SECOND, COMING DOWN TO, AND INCLUDING THE YEAR MDCCCVII ; WITH AN APPENDIX, CONTAINING TITLES OF LOCAL ACTS ; AND AN INDEX OF THE LAWS IN FORCE.*

———◦●●◦———

*PUBLISHED BY ORDER OF THE LEGISLATURE.*

———●⁚◉⁚⦿———

VOL. II.

*RANDOLPH:*
PRINTED BY SERENO WRIGHT,
PRINTER TO THE STATE.

1808.

# CHAPTER CVII.

### OF FEES.

### N° I.

*An Act, regulating fees.*

SECT. 1. **I**T *is hereby enacted by the General Assembly of the State of Vermont,* That the fees for the several officers, and other persons herein after mentioned, shall be as follow, namely :

### GOVERNOR's FEES.

|  | Dols. | Cts. |
|---|---|---|
| For signing a charter, of land, - - - - | 8 | 0 |
| For every other charter or grant, by him signed, | 8 | 0 |

### LIEUTENANT GOVERNOR's FEES.

| For attendance on council, per day, - - - | 4 | 0 |
|---|---|---|
| Travel per mile, each way, - - - | 0 | 6 |

### COUNCILLORS' FEES.

| For attendance, per day, - - - - | 1 | 50 |
|---|---|---|
| Travel per mile, each way, - - - - | 0 | 6 |

### REPRESENTATIVES' FEES.

| For attendance, per day, - - - - | 1 | 30 |
|---|---|---|
| Travel per mile, each way, - - - | 0 | 6 |
| Speaker of the general assembly's fees, per day, | 2 | 50 |
| Travel per mile, each way, - - - | 0 | 6 |
| Clerk of the general assembly's fees, per day, - | 2 | 50 |
| Travel per mile, each way, - - - | 0 | 6 |
| Engrossing clerk's fees, per day, - - - | 2 | 50 |
| Travel per mile, each way, - - - | 0 | 6 |

### SECRETARY OF STATE's FEES.

| Recording laws, for every hundred words, - | 0 | 7 |
|---|---|---|
| Recording and filing each petition, of a private nature, - - - - - - - | 0 | 11 |

## SHERIFFS', CONSTABLES' AND COLLECTORS' FEES.

|  | Dolls. | Cts. |
|---|---|---|
| Serving every procefs on each defendant by reading, | 0 | 6 |
| If by a copy, | 0 | 17 |
| For taking bail, | 0 | 17 |
| For each mile's travel, for the fervice of all writs and other procefles, to be computed from the place of fervice, to the place of return, | 0 | 6 |
| For levying each execution, amounting to three dollars or under, | 0 | 15 |
| And for each three dollars over, | 0 | 4 |
| For each day's attendance on appraifement, or fale of eftate taken in execution, | 0 | 34 |
| For attending before a juftice's court when required, | 0 | 34 |
| For attending freeholders' courts, per day, | 1 | 0 |
| Copy of an execution extended on lands, and the return thereof to the office, for record, | 0 | 50 |
| For attendance on the general affembly, or fupreme or county court, per day, | 1 | 0 |
| Conftables for the like fervice, | 1 | 0 |

Collectors of taxes, to be allowed the like fees as fheriffs in cafes of execution, when they levy on perfons or eftate, and *one dollar* out of each fifty dollars collected and paid into the state or county treafury.

*Provided,* That no fheriff, conftable or other officer fhall be entitled to any fees for a return of *non eft inventus,* on any civil writ or procefs.

| | Dolls. | Cts. |
|---|---|---|
| For fheriff's, &c. affiftants, per day, | 0 | 67 |
| For half a day, | 0 | 34 |
| For appraifers of real eftate on execution, | 0 | 67 |
| For half a day, | 0 | 34 |

## PARTIES' AND WITNESSES' FEES, IN THE SUPREME AND COUNTY COURTS.

|  | Dolls. | Cts. |
|---|---|---|
| Term fee on abatement, nonfuit or default, in the firft term, | 1 | 0 |
| Term fee in all other cafes, | 1 | 0 |
| And the party recovering fhall be allowed for his attorney, on nonfuit or default, | 1 | 50 |
| For trial of iffue of law or fact, | 3 | 0 |
| Travel for plaintiff or defendant within this ftate, per mile, | 0 | 5 |
| Witneffes' travel per mile, | 0 | 5 |

# EXHIBIT 5



*Edw.d Thomas jr.*
*1798*

THE

# P U B L I C    L A W S

OF THE STATE OF

# SOUTH-CAROLINA,

*FROM ITS FIRST ESTABLISHMENT AS A BRITISH PROVINCE*
*DOWN TO THE YEAR 1790, INCLUSIVE,*

IN WHICH

IS COMPREHENDED SUCH OF THE STATUTES OF GREAT BRITAIN AS WERE MADE OF FORCE BY
THE ACT OF ASSEMBLY OF 1712,

With an Appendix containing such other Statutes as have been enacted or
declared to be of force in this State, either virtually or expresly,

TO WHICH IS ADDED

THE TITLES OF ALL THE LAWS (WITH THEIR RESPECTIVE DATES) WHICH HAVE BEEN PASSED IN
SOUTH-CAROLINA DOWN TO THE PRESENT TIME,

ALSO

The Constitution of the United States with the amendments thereto,

AND LIKEWISE

*THE NEWLY ADOPTED CONSTITUTION OF THE STATE OF SOUTH-CAROLINA,*

TOGETHER WITH A COPIOUS INDEX TO THE WHOLE.

By the Honorable *JOHN FAUCHERAUD GRIMKE, Esq. A. B. & L. L. D. and one of the*
*associate Judges of the Superior Courts in the State of South-Carolina.*

*Majus nervius est, &c. Jus est Vagum aut Incognitum. 4 Inst. 246,332:*

LAW

*P H I L A D E L P H I A:*
PRINTED BY *R. AITKEN & SON,* IN MARKET STREET.
M.DCC.XC.

A. D. 1785. declared incapable of serving in the fame or any other office in this State. And the clerk of
Nᵒ. 1395. the County Court fhall be allowed for recording every inftrument of writing 3d. per copy
fheet, which copy fheet fhall not contain lefs than 90 words, and for every copy of fuch in-
ftrument of writing 2d. per copy fheet, containing not lefs than 90 words.

## TABLES OF FEES.

### County Court Clerk's Fees.

|  | £. | s. | d. |
|---|---|---|---|
| * For the whole fee of a tavern licence and bond | 0 | 9 | 4 |
| For every fearch for any thing above a year's ftanding | 0 | 1 | 0 |
| For fearching and reading, or fhewing to be read, any paper or record filed within the office, whereof a copy is not defired | 0 | 1 | 0 |

### In Actions and other Suits.

|  | £. | s. | d. |
|---|---|---|---|
| For every writ other than fuch as are herein after particularly mentioned | 0 | 2 | 6 |
| For every copy of each writ | 0 | 1 | 6 |
| For every writ of *fieri facias, capias ad fatisfaciendum,* or *fcire facias* | 0 | 2 | 6 |
| For a copy thereof | 0 | 1 | 6 |
| For a writ of attachment in any action | 0 | 2 | 6 |
| For recording the return thereof 3d. per copy fheet. |  |  |  |
| For an attachment granted by the Juftice of Peace returnable to the court, and putting the fame upon the docket | 0 | 2 | 6 |
| For every fummons to fummon any perfon on fuch attachment | 0 | 1 | 6 |
| Filing every bail bond or entering the bail returned | 0 | 1 | 6 |
| For docketing every caufe except by fummons or petition, to be charged but once | 0 | 1 | 0 |
| For a copy of the return of any writ | 0 | 0 | 6 |
| For entering any fpecial bail | 0 | 2 | 0 |
| For entering fecurity for cofts for perfons out of the county | 0 | 2 | 0 |
| For entering the appearance of the defendant or defendants, where there is no attorney, in any fuit except by fummons and petition | 0 | 0 | 6 |
| For entering one or more attornies for each party | 0 | 1 | 0 |
| For every petition, declaration, plea, demurrer, or joinder, &c. except in petitions for debt, detinue, affumpfit, or trover | 0 | 2 | 0 |
| For a copy of any declaration, fpecial pleading, or demurrer | 0 | 2 | 0 |
| For every trial, fwearing the jury and witneffes, filing all papers, and receiving and recording general verdict | 0 | 4 | 8 |
| For every trial where there is a fpecial verdict, or cafe agreed, and recording the fame | 0 | 6 | 0 |
| For fwearing the witneffes in every other caufe where there is no jury, or cafe agreed | 0 | 1 | 0 |
| For filing the papers of each party in every caufe and where there is a jury or cafe agreed | 0 | 2 | 0 |
| For a copy of a fpecial verdict or cafe agreed, and every thing therein fet forth, or for making up a full and complete record of any caufe, for every ninety words | 0 | 0 | 2 |
| For entering every judgment or for a copy thereof | 0 | 1 | 0 |
| For every depofition taken in court or a copy thereof | 0 | 1 | 0 |
| For adminiftering an oath in court not relating to the trial of any caufe there | 0 | 1 | 0 |
| For every recognizance in court | 0 | 2 | 0 |
| For entering the order or orders in any caufe in one court | 0 | 2 | 6 |
| For every order for a witnefs or other perfon's attendance | 0 | 2 | 0 |
| For a copy of any order 2d. per copy fheet |  |  |  |
| For recording the report of a jury in the county before a furveyor, auditor, or viewer | 0 | 3 | 6 |
| For a copy thereof | 0 | 2 | 6 |

For

* See A. A. 1788.

| | £. | s. | d. |
|---|---|---|---|
| For taxing cofts to any judgment, or decree where cofts are recovered, or for a copy of a bill of cofts if required | 0 | 2 | 0 |
| For a copy of an account | 0 | 2 | 0 |
| For entering an appeal and taking bond to profecute it | 0 | 4 | 0 |
| For a copy of the bond | 0 | 1 | 0 |
| For returning appeal and fecurity to the office of clerk of the Supreme Court | 0 | 4 | 8 |
| For returning writ of *fuperfedeas, certiorare,* or *habeas corpus* | 0 | 4 | 6 |
| For a copy of the proceedings of the caufe wherein the appeal is granted, for every 90 words | 0 | 0 | 3 |
| For recording the acknowledgment of the fatisfaction of a judgment | 0 | 2 | 0 |
| For entering each order for a witnefs's attendance, to be charged to the party in whofe behalf the witnefs is fummoned, and taxed in the bill of cofts if fuch party recover | 0 | 1 | 6 |
| For a copy thereof to be taxed and charged in like manner | 0 | 1 | 0 |
| For an attachment thereon to be charged to the party againft whom fuch attachment fhall be iffued | 0 | 1 | 6 |
| For the whole fee chargeable for every fummons and petition for debt, detinue, affumpfit or trover, and all the proceedings therein, including a copy of the judgment and taxing cofts if required, except the refpective fees for fummoning witneffes, entering attornies, for every order for continuance, and for iffuing execution where fuch matters happen | 0 | 10 | 0 |
| For a fummons for feveral witneffes living in 1 county if fummonfes for all be taken out at 1 time | 0 | 2 | 6 |
| For recording any writings not herein particularly mentioned, or for a copy thereof, for every 90 words | 0 | 0 | 3 |
| For all public fervices of the clerk, viz. entering and iffuing copies of orders, for appointing overfeers of high-ways, appointing conftables, grand-juries, drawing juries, iffuing venires, taking lift of taxables, entering guardians accounts and all matters relating thereto, binding out poor orphans and appointing guardians, entering county affeffment and copies thereof, entering and iffuing orders for recommending Sheriffs and Juftices of Peace, and all other public fervices, for which no particular fee is allowed (to be affeffed and levied annually by the Juftices of the county).* | 15 | 0 | 0 |

And where more attornies than 1 fhall be employed in any caufe on 1 fide, if fuch attornies take out more than 1 copy of any thing neceffarily relating to the fuit, yet no more than one copy fhall be allowed in the bill of cofts; neither fhall the clerks tax any fee in the bill of cofts, for entering any more than 1 attorney, although cofts, fhall be adjudged againft the adverfe party; and where any fuiter fhall retain all the attornies practifing at the court wherein fuch fuit is brought, on the petition of the defendant, the court fhall affign 1 of the faid attornies to appear and defend fuch defendant for the legal and accuftomed fees, and fuch attorney fhall be compellable by the court to undertake fuch defence, under the pain of being filenced and disfranchifed in fuch court.

## To the S H E R I F F.

| | £. | s. | d. | |
|---|---|---|---|---|
| For an arreft, bail bond and return | 0 | 4 | 8 | To the fheriff. |
| For returning any procefs *non eft inventus* | 0 | 2 | 0 | |
| For ferving a writ of *fcire facias* | 0 | 2 | 6 | |
| For ferving any perfon with an order of court and making return thereof, to be paid by fuch perfons | 0 | 3 | 6 | |
| For putting any perfon in the pillory | 0 | 4 | 8 | |
| For putting into the ftocks | 0 | 2 | 6 | |
| For putting in prifon, and releafement | 0 | 4 | 8 | |
| For ferving a fub. œna in chancery | 0 | 3 | 6 | |
| For ferving a fummons or petition for debt, detinue, affumpfit or trover | 0 | 3 | 6 | |
| For ferving a fubpœna for a witnefs in any caufe in court, except fummoned in court | 0 | 2 | 6 | |
| For fummoning an appraifer, viewer or witnefs to any deed, will or writing, if required to be fummoned and not elfe | 0 | 2 | 6 | |

For

* Altered by A. A. 1786, to £5.

£. s. d.

| | £ | s. | d. |
|---|---|---|---|
| For summoning and impannelling a jury in every case where a jury shall be sworn | 0 | 2 | 0 |
| For removing every criminal from the County gaol to the District gaol, for every mile in going and returning, to be paid by the public    per mile | 0 | 0 | 3 |
| For removing any person by *habeas corpus* from the County gaol or other confinement to the public gaol, or before any Judge of the Circuit Court, to be paid by the person applying for the same, unless removed by public order, in which case to be paid by the public for every mile going and returning | 0 | 0 | 3 |
| For executing any condemned person and all fees incident | 1 | 0 | 0 |
| For summoning a jury upon any inquisition, survey, writ of dower or partition, if the jury appear | 1 | 10 | 0 |
| For the same if the jury do not appear | 0 | 15 | 0 |
| For making return of any writ of dower or partition | 0 | 7 | 6 |
| For every days attendance upon a jury in the County after they are sworn, or attendance on a survey or when ordered by the Court | 0 | 7 | 6 |
| For serving a writ of *habere facias sessinam*, or *habere facias possessionem* | 0 | 7 | 6 |
| For serving an attachment upon the body | 0 | 5 | 0 |
| For serving declaration in ejectment if against any one tenant | 0 | 4 | 8 |
| And if against more tenants than one, for serving the same on every such tenant | 0 | 3 | 6 |
| For whipping a slave by order of Court, to be paid by the County | 0 | 5 | 0 |
| For serving any execution of a judgment 5 *per cent.* commission on the first £ 100, and 2 *per cent.* for all above | | | |
| For serving an attachment on goods exceeding £ 5 if sold, the same fee as for serving execution where the goods do not exceed that value or are not sold | 0 | 5 | 0 |
| For every person on attachment summoned | 0 | 2 | 6 |
| For serving and returning a writ, summons or order from the Circuit Court, where the same is not comprehended in any of the foregoing articles | 0 | 5 | 0 |
| For keeping and providing a debtor in gaol each day | 0 | 1 | 0 |
| For keeping and providing for a runaway slave or criminal in gaol, the former to be paid by the owner, the latter by the public | 0 | 1 | 0 |
| For serving a warrant of a Justice of peace | 0 | 2 | 6 |
| For summoning witness before a Justice | 0 | 1 | 0 |
| For all public services of the Sheriff, to wit, attending Courts of claims, summoning and empannelling grand juries, publishing writs for electing members to the General Assembly, taking the ballots and returning the writ, serving all public orders of Court, and all other public and county service, for which there is no specified fee, to be annually assessed and levied by the County Courts.* | 0 | 15 | 0 |

### To the C O R O N E R.

| | £ | s. | d. |
|---|---|---|---|
| For taking an Inquisition on a dead body, to be paid out of the deceased's estate if sufficient, if not by the county | 1 | 0 | 0 |
| For all other business done by him, the same fees as are allowed the sheriff for the same services. | | | |

### To the C O N S T A B L E.

| | £ | s. | d. |
|---|---|---|---|
| For serving a warrant | 0 | 2 | 6 |
| For summoning a witness | 0 | 1 | 6 |
| For summoning a Coroner, jury, and witnesses | 0 | 10 | 0 |
| For putting a person in the stocks | 0 | 2 | 6 |
| For serving an execution or attachment returnable to the County Court against the estate of a debtor removing his effects out of the county | 0 | 7 | 6 |
| For whipping a slave by lawful authority, to be paid by the overseer, if no overseer, by the owner | 0 | 2 | 6 |

LIX. None of the fees herein-before mentioned shall be payable by any person whatsoever, until there shall be produced or ready to be produced unto the person owing or chargeable with the same an account in writing, containing the particulars of such fees, signed by the clerk or officer to whom such fees shall be due, or by whom the same shall be chargeable respectively, in which said bill or account is and shall be expressed in words at length, and in the same manner as the fees aforesaid are allowed by this act, every fee for which any money is or shall be demanded.

LX. Every

* Altered to £7 10s. by A. A. 1786.

A. D. 1787.
Nº. 1175.
Perfons fued
may plead the
general iffue,
&c.

VIII. If any perfon or perfons whatfoever fhall be fued, profecuted or molefted for any matter or thing done by virtue of this ordinance, fuch perfon or perfons may plead the general iffue, and give this ordinance and the fpecial matter in evidence; and in cafe the plaintiff or plaintiffs fhall fuffer a difcontinuance, or verdict or judgment fhall pafs againft him or them, the defendant or defendants fhall be allowed his and their double cofts of fuit.

27th March, 1787.

JOHN LLOYD,
*Prefident of the Senate.*

JOHN JULIUS PRINGLE,
*Speaker of the Houfe of Reprefentatives.*

---

No. 1478.

# An Ordinance for repealing Part of an Ordinance, Paffed the 26th Day of March, 1784, relative to Port-Royal Caufeway.

WHEREAS by an ordinance of the General Affembly paffed the 26th day of March, 1784, all the male inhabitants from 16 to 60 years of age, between Pokotaligo bridge and Combahee ferry on the fouth eaft fide of the road leading to Saltcatcher ferry, were made liable to work on the caufeway leading to Port-Royal ferry on the main fide : And whereas fundry inhabitants have by their petition to the Legiflature reprefented that the faid claufe is to them grievous and oppreffive;

*Be it therefore ordained,* That the faid claufe fhall be and is hereby repealed : *Provided,* That the faid inhabitants fhall be ftill liable as formerly to open and keep in repair the public road leading to the faid ferry.

27th March, 1787.

JOHN LLOYD,
*Prefident of the Senate.*

JOHN JULIUS PRINGLE,
*Speaker of the Houfe of Reprefentatives.*

---

Nº. 1482.

# An Act for regulating and fixing the Salaries of feveral Officers, and for other Purpofes therein mentioned.

WHEREAS by reafon of the large debt incurred by the Revolution, and the confequent great diftrefs of the State, it behoves every good citizen to ftep forward in the duty required of him by his country on terms lefsburthenfome to the public than hertofore :

1. *Be it therefore enacted,* That every officer herein-after recited, elected, or to be elected, fhall for the performance of the duties of his office, receive a certain falary, that is to fay,

The Governor of the State, £900 *per annum.*

Affociate Judges £500 *per annum* each.

Attorney-General £200 *per annum.*

Delegates to Congrefs £600 each, to be paid at the feat of Congrefs.

Private Secretary to his Excellency the Governor, who fhall alfo be Clerk of the Privy Council, £150.

Auditor of public accounts £373. 6s. 8d. for 1 year, provided that the faid auditor fhall bring up his books, and have them ready for the infpection of the legiflature at their next meeting.

Commiffioners of the treafury £571. 8s. 8d.

Clerk of the Senate £287 *per annum.*

Clerk of the Houfe of Reprefentatives £287 *per annum.*

Two meffengers, 1 for the Senate, and the other for the Houfe of Reprefentatives £70 each *per annum.* Two

Two Door-keepers £ 50 each *per annum.*
Powder-Inspector and Arsenal-keeper £ 100 *per annum.*
Collector of the Customs for the port of Charleston £ 500 *per annum.*
Collector of the Customs for the port of Georgetown £ 100 *per annum.*
Collector of the Customs for the port of Beaufort £ 100 *per annum.*
Two Waiters of the Customs for the port of Charleston £ 100 each *per annum.*
Waiter of the Customs for the port of Georgetown £ 30 *per annum.*
Waiter of the Customs for the port of Beaufort £ 50 *per annum.*
Searcher to the Customs for the port of Charleston £ 150 *per annum.*

To be paid by commissioners of treasury quarterly.

Which said salaries the commissioners of the treasury are hereby authorised and required to pay to each officer so recited in quarterly payments, any law, usage or custom to the contrary notwithstanding.

II. No officer of the Senate and the House of Representatives shall hereafter take or receive directly or indirectly any fee or perquisite whatsoever, except by order of the House to which he respectively belongs, any usage or custom to the contrary notwithstanding.

No officer of Senate or house of representatives, to receive any fee, &c.

III. No officer heretofore elected or hereafter to be elected to any pecuniary office in this State above £ 150, shall hold any other office of emolument under this or the United States.

Officers not to hold any other office of emolument.

IV. All acts, or clause or clauses of acts, where the salaries of any of the aforesaid officers are fixed, so much of the said act, clause or clauses of acts, as relates thereto, is hereby repealed.

Acts and clauses of acts repealed.

March 27th, 1787.

JOHN LLOYD,
*President of the Senate.*

JOHN JULIUS PRINGLE,
*Speaker of the House of Representatives.*

---

# An Act to restrain particular Persons therein described from obtaining Grants of Land; to make null and void certain Grants of surplus Lands, to prevent located Lands from being passed into Grants until the Purchase Money shall be paid; to compel Persons who have obtained Grants to pay for the same within 6 Months, and for other Purposes therein mentioned.

No. 1487.

WHEREAS the surveyor general and his deputies, the commissioners of locations, and the secretary of the State and his deputy, have great advantages over their fellow citizens, from having it in their power to take up elapsed grants and such other lands as may be vacant within this State, and such advantages being injurious to the repose and well being of the republic:

Preamble.

I. *Be it therefore enacted,* That from and immediately after the passing of this act, it shall not be lawful for the surveyor general, secretary of the State, commissioners of locations, the clerks in the surveyor general and secretary's offices, to take up any elapsed grant, or run out either directly or indirectly in his or their own name or names, or in the name or names of any other person or persons, for his or their use or uses, any lands now vacant within this State, without being subject and liable to the penalty of £ 5000, to be recovered in any court of record in this State, the one half to the use of this State, and the other half to the use of the informer or person suing for the same, and he or they shall also be discharged from his or their respective offices, and for ever rendered incapable of holding any office of trust or emolument in this State.

Not lawful for surveyor-general, &c. to take up any elapsed grant, or run out vacant lands.

Penalty.

And

# EXHIBIT 6

# A
## COLLECTION

*Edm? of Taylor*

OF

ALL SUCH

# ACTS

OF THE

## GENERAL ASSEMBLY

OF

## VIRGINIA,

OF A PUBLIC AND PERMANENT NATURE, AS
ARE NOW IN FORCE;

WITH A

## NEW AND COMPLETE INDEX.

TO WHICH ARE PREFIXED THE DECLARATION OF RIGHTS,
AND CONSTITUTION, OR FORM OF GOVERNMENT.

PUBLISHED PURSUANT TO AN ACT OF THE GENERAL ASSEMBLY,
PASSED ON THE TWENTY-SIXTH DAY OF JANUARY, ONE
THOUSAND EIGHT HUNDRED AND TWO.

RICHMOND,
PRINTED BY SAMUEL PLEASANTS, JUN. AND HENRY PACE.

M,DCCC,III.

fuch cafe, the Judge of the faid High Court of Chancery, either in Term time or in vacation, when a bill praying a review of the proceedings in which a decree fhall have been pronounced by the faid Court, fhall be prefented to him, may upon fuch bill, and the circumftances of the cafe, as the fame fhall appear fatisfactory to him, direct proceedings on fuch decree to be ftayed, until a decree on the faid bill of review fhall be made, or until the further order of the faid Judge ; or the faid Judge may refufe to grant a ftay of proceedings in that cafe, as to him fhall feem right. *Provided,* That the faid Judge of the High Court of Chancery fhall in either of the faid cafes direct fuch fecurity to be given, and in fuch place as is ufual in the cafes of appeal and injunction, or fuch other fecurity as to him fhall feem to be reafonable.

LXI. ALL Acts and parts of Acts, within the purview of this Act, fhall be, and are hereby repealed.

*Former Acts repealed.*

LXII. THIS Act fhall commence and be in force, from and after the paffing thereof.

*Commencement of this Act.*

## CHAP. LXV.

*An Act reducing into one, the feveral Acts and Parts of Acts concerning the General Court, and prefcribing the Manner of proceeding therein in certain cafes.*

[Paffed the 13th of December, 1792.]

1. BE it enacted by the General Affembly, That the General Court of this Commonwealth fhall confift of ten Judges, to be chofen and commiffioned in the manner directed by the Conftitution of the Commonwealth. Any three of the faid Judges fhall conftitute a Court, except in cafes of impeachment, on which occafion a majority of the whole number fhall be neceffary. The faid Court fhall be holden at the Capitol in the City of *Richmond,* or at fuch other place as fhall be appointed by the General Affembly, or in their recefs, by the Governor, with the advice of the Council of State, on any fuch emergency as will make the adjournment lawful. The faid Court fhall be holden twice in every year, namely, on the ninth day of *June* and the ninth day of *November,* or if either of thofe days fhall be *Sunday,* then on the fucceeding day, and fhall continue their Seffion for fixteen juridical days at each Term, unlefs the bufinefs before them be fooner difpatched. If a fufficient number of Judges fhould not attend on the firft day of any Term, or on any other day during the Term, any one of the faid Judges may adjourn the Court from day to day, for fix days fucceffively, and if a fufficient number fhould not be then able to attend, all fuits depending in fuch Court, fhall ftand continued over to the next fucceeding Term. Every perfon fo commiffioned before he enters upon the duties of his office, fhall take and fubfcribe the oath of fidelity to the Commonwealth, and take the following oath of office, to wit :

*General Court to confift of ten Judges : how chofen & commiffioned.*

*Where to be held.*

*Terms.*

*Regulations refpecting adjournment.*

*Oaths to be taken by the judges.*

*YOU fhall fwear that well and truly you will ferve this Commonwealth in the office of a Judge of the General Court, and that you will do equal right to all manner of people, great and fmall, high and low, rich and poor, according to Law, without refpect of perfons. You fhall not take by yourfelf, or by any other, privily or openly, any gift, fee, or reward of gold, filver, or any other thing, directly or indirectly, of any perfon or perfons, great or fmall, for any matter done or to be done, by virtue of your office, except fuch fees or falary, as fhall be by Law appointed. You fhall not maintain by yourfelf, or other, privily or openly, any plea or quarrel, depending in the Courts of this Commonwealth. You fhall not deny or delay any perfon of common right, for the letters or requeft of any perfon, nor for any other caufe ; and if any letter or requeft come to you contrary to Law, you fhall nothing do for fuch letter or requeft, but you fhall proceed to do the Law, any fuch letter or requeft notwithftanding ; and finally, in all things belonging to your faid office, during your continuance therein, you fhall faithfully, juftly, and truly, according to the beft of your fkill and judgment, do equal and impartial Juftice, without fraud, favor, affection or partiality. So help you GOD.*

Which oaths may be taken before the Executive, any Court of Record, or a Juftice of the Peace, and a certificate thereof being obtained, fhall enable fuch Judge to do all the duties of his office, and fuch certificate fhall be recorded in the General Court, or Diftrict Court where fuch Judge fhall firft fit. If any perfon fhall prefume to fit in Court or execute the faid office, without having

*By whom to be adminiftered.*

*Penalty for acting without taking the oath.*

taken the said oaths, he shall for such offence forfeit the sum of fifteen hundred dollars. *a*

**Officers to be appointed by the court. Sheriff of the county in which the court sits to attend.**

II. THE said Court shall appoint a Clerk, one or more assistant Clerks, if necessary, a Cryer and Tipstaff, the first removable for misbehaviour in the manner directed by the Constitution, the others at pleasure; who shall be entitled to such fees or salaries as shall be established by Law. And the Sheriff, or so many of the Under-Sheriffs as shall be thought necessary, of the County where such Court may be held, shall attend the said Court during their Sessions. *b*

**Jurisdiction of the court**

III. THE jurisdiction of the said Court shall be general over all causes, matters and things at common Law, as well criminal as civil, except in such cases, as by the Constitution of the United States of *America*, or of this Commonwealth, or any Statute made by the Congress of the said United States, or the General Assembly of this Commonwealth, are or shall be vested in any other tribunal; in any of which cases the jurisdiction of the General Court shall cease, unless concurrent jurisdiction be thereto expressly given by this Act, or some other Statute. The said Court shall have jurisdiction in all causes, matters and things therein depending at the commencement of this Act; and no discontinuance shall take place in any case whatsoever, by reason of the passing of this Act. The said Court shall continue to have jurisdiction, in all cases, suits and motions against public debtors and public defaulters of every denomination, for and in behalf of the Commonwealth. If the Judge of the High Court of Chancery shall be interested in any matter, which in the case of any other person would have been proper for the jurisdiction of such Court, it shall be lawful to institute such suit in the General Court, where proceedings shall be had conformably to the principles and usages of equity; and process shall be returnable as the General Court shall direct; and thereafter an appeal may be had to the Court of Appeals. Writs of *scire facias* may be issued from, and be tried in the General Court, upon all judgments which have been or shall be obtained therein; the said Court may fine Sheriffs, Deputy-Sheriffs, or Coroners, for not returning executions issued, or to be issued from the said Court, and enter up judgments against the said officers, for all money or tobacco, for which they have made or shall make themselves respectively liable by Law upon such executions; may award executions upon replevy bonds, or bonds to have goods forth-coming at the day of sale; may quash executions if illegally or improvidently issued or executed, and award new ones; and finally, may exercise full jurisdiction in every other legal mode necessary for carrying into complete execution, all judgments heretofore given, or hereafter to be given in the said Court; any Law to the contrary, or seeming to the contrary, notwithstanding. The said Court shall have power to hear and determine upon all errors and matters of fact, that shall or may have happened in the proceedings depending in the said Court. *c*

**May award writs of Mandamus to the district courts. Further description of jurisdiction.**

IV. THE said Court shall have power to issue writs of *mandamus* to the District Courts. *c*

V. THE said Court shall likewise have jurisdiction to hear and determine motions against the delinquent subscribers of the *Potowmac* and *James* River Companies, and for securities against their principals; and for Sheriffs against their deputies and securities, or either of them. *d*

**May for good cause direct any suit in a district court to be tried at their own bar or in another district.**

VI. FOR good cause shewn, the General Court may direct the trial of any cause depending before a District Court, to be had by a jury at their own bar, for which purpose the Sheriff, or any other officer attending them, shall summon a jury qualified as the Law now directs in cases of Juries in the General Court; or may cause a suit depending in one District to be tried in another. *e*

**Suits in which judges are parties, to be removed to the General Court.**

VII. UNLESS good cause be shewn to the contrary, the General Court shall direct a suit depending before a District Court, in which a Judge of the General Court is a party, to be removed to be tried at the bar of the General Court. *f*

**Jurisdiction relative to wills, administrations, &c.**

VIII. THE General Court shall have jurisdiction and authority to hear and determine all causes, matters, suits, and controversies testamentary, which shall be brought before the same, and to examine and take the proofs of wills, and to hear and determine the right of administration of the estates of persons

(*a*) Oct. 1777, *ch.* 2, 5. 1788, *ch.* 67, *sec.* 115, 116. *ibid. ch.* 72, *sec.* 3. (*b*) Oct. 1777, *ch.* 17, *sec.* 6. (*c*) *ibid. sec.* 2. 1788, *ch.* 67, *sec.* 117: *ibid. ch.* 69, *sec.* 7. (*d*) 1789, *ch.* 13, *sec.* 8. (*e*) 1788, *ch.* 67, *sec.* 119 *and* 120. (*f*) 1789, *ch.* 13, *sec.* 29.

dying-inteſtate, and to do all other things concerning wills and adminiſtrations, according to Law. *a*

IX.  THE ſaid Court ſhall have power and authority to receive *probat* of all deeds whatſoever, concerning lands in any part of this Commonwealth, to iſſue commiſſions for the privy examination of any *feme covert*, and to admit the ſame to Record, as alſo to receive proof of any other deed or inſtrument of writing whatſoever, and to admit the ſame to Record therein, if they ſhall be of opinion that the ſame is proper to be done.  A deed for lands now or at any time hereafter partly proved in the General Court, may either be fully proved there, or ſhall be delivered by the Clerk thereof to any perſon authoriſed to demand the ſame, with an endorſement of the proof made, and it may be fully proved and recorded in the Court of the Diſtrict or County in which the lands lie. *a* — *Deeds partly proved, may be either fully proved therein, or delivered to the parties to be fully proved in the diſtrict or county courts.*

X.  IF a queſtion of Law in any criminal caſe be adjourned to the General Court by any Diſtrict Court, the ſame may be therein argued and determined, although ſuch criminal be not preſent. *a* — *Rules reſpecting adjourned caſes.*

XI.  ON the adjournment of any queſtion of Law in any civil ſuit, the ſaid Court ſhall hear, determine, and certify ſuch their determination on the ſame, to the Court from whence the queſtion was adjourned; but no coſts ſhall be incurred on any adjourned queſtion. *b*

XII.  ALL original proceſs to bring any perſon or perſons to anſwer in any action or ſuit, information, bill or plaint, in the ſaid Court, and all ſubſequent proceſs thereon, all attachments or other writs of what nature ſoever awarded by the ſaid Court, ſhall be iſſued and ſigned by the Clerk of the ſaid Court in the name of the Commonwealth, ſhall bear teſte by the Clerk, and be returnable on the firſt day of the next ſucceeding Court, except *ſubpœnas* for witneſſes; and all ſuch proceſs may be executed at any time before the return day, except in ſuch caſes wherein it is otherwiſe directed by Law. *c* — *Rules reſpecting proceſs*

XIII.  THE appearance day to all writs and proceſs awarded by the ſaid Court, ſhall be according to the direction thereof. *d* — *The court to direct the appearance day.*

XIV.  THE Sheriff for the time being of the County in which the General Court ſhall be held, ſhall before every meeting of the General Court, ſummon twenty-four Freeholders of this Commonwealth, qualified as the Law directs for Grand Jurors, to appear at the ſucceeding General Court on the firſt day thereof, which the Sheriff is hereby empowered to do, as well without his County as within the ſame, and the ſaid twenty-four men, or any ſixteen of them ſhall be a Grand Jury, who ſhall be ſworn to enquire of and preſent all offences againſt the Commonwealth, which are cognizable in the ſaid Court, And if an indictment ſhall be found or preſentment made of any ſuch offence, the like proceedings ſhall be thereupon had to bring the party accuſed before the Court, as on indictments and preſentments in the Diſtrict Courts, having regard to the nature of the offence. — *Grand jury to be ſummoned. Proceedings on indictments, preſentments, &c.*

XV.  THE rules and proceedings in the General Court, in all caſes, not otherwiſe ſpecially directed, ſhall be the ſame as in the Diſtrict Courts in ſimilar caſes, and the ſaid Court ſhall have the ſame power of awarding and refuſing coſts, as the Diſtrict Courts have in like caſes.

XVI.  THE keeper of the public jail, ſhall conſtantly attend the General Court, and execute the commands of the Court. *e* — *Keeper of the public jail to attend the court.*

XVII.  THE Clerk of the General Court ſhall annually before the laſt day of *January*, tranſmit to the Sheriff of each County within this Commonwealth, a liſt of all fines impoſed by the ſaid Court in the year next preceding, to the uſe of the Commonwealth, on perſons reſiding in ſuch County, and the Sheriffs ſhall reſpectively proceed to collect, levy, account for, and pay the ſame in like manner, and ſubject to the ſame remedy and proceedings againſt them for default as is or ſhall be directed in caſe of public taxes, being allowed in their accounts for inſolvents, and five *per centum* commiſſions ; and the ſaid Clerk ſhall tranſmit copies of ſuch liſts to the Auditor, to enable him to call the Sheriffs to account. *f* — *The clerk to tranſmit liſts of fines impoſed by the court to the ſheriffs.*

XVIII.  ALL and every Act, clauſe and parts of Acts, within the purview of this Act, ſhall be, and are hereby repealed. — *Former acts repealed.*

XIX.  THIS Act ſhall commence in force, from and after the paſſing thereof. — *Commencement of this act.*

[*a*] 1789, ch. 13, ſec. 4 8 9 27.  [*b*] 1788, ch. 67, ſec. 17.  [*c*] Oct. 1777, ch. 17, ſec. 7.  1788, ch. 67, ſec. 23 118.  [*d*] 1789, ch. 13, ſec. 31.  [*e*] Oct. 1777, ch. 17, ſec. 72.  [*f*] Oct. 1777, ch. 17, ſec. 75.  1788, ch. 67, ſec. 132.

EXHIBIT 7

E. MERTON COULTER

A

# COMPILATION

OF THE

# LAWS

OF THE

# STATE OF GEORGIA,

*PASSED BY THE LEGISLATURE SINCE THE POLITICAL YEAR* 1800, *TO THE YEAR* 1810, *INCLUSIVE.*

······CONTAINING······

All the LAWS, whether in force or not, passed within those periods, arranged in a chronological order, with comprehensive references to those laws or parts of laws, that are amended, suspended or repealed.

······TOGETHER······

With an APPENDIX, comprising such concurred and approved RESOLUTIONS, as are of a general operative nature, and as relate to the duty of officers, the relief of individuals, and the settlement of boundary between counties, and this State with North Carolina.

*Concluding with a copious Index to the whole.*



BY AUGUSTIN SMITH CLAYTON, ESQ'R.

Augusta :

PRINTED BY ADAMS & DUYCKINCK.

·····1812·····

E. MERTON COULTER

6

**(No. 279.)**
Indictment to be prefered against fraudulent drawers and their punishment upon conviction.

Provise.

SEC. 3. *And be it further enacted*, That it shall be the duty of the attorney or solicitor-general, in all such cases to prefer indictments against such offenders in the county where such offence was committed, and on conviction thereof, the person so offending, shall be deemed and held incapable of holding any office of honor or profit in the State, for the term of ten years. And in cases where such offenders have made such fraudulent return on oath, they shall suffer all the pains, penalties and disabilities which are consequent upon the crime of perjury, *Provided always*, That in all trials under this act, the burthen of the proof shall rest upon the grantee, his, her or their heirs or assigns.*

BENJAMIN WHITAKER, *Speaker of the House of Representatives.*

DAVID BATES, *President of the Senate, pro. tem.*

Assented to, December 10, 1807.

JARED IRWIN, GOVERNOR.

**(No. 280.)**

## AN ACT

*To appropriate monies for the political year eighteen hundred and eight.*

15,000 dollars as a contingent fund

SEC. 1. **B**E it enacted by the Senate and House of Representatives of the State of Georgia, in General Assembly met, and by the authority of the same, it is hereby enacted, That the sum of fifteen thousand dollars be, and the same is hereby appropriated as a contingent fund, subject to the orders of the governor.

Compensation to the members of the Legislature, and their officers.

SEC. 2. *And be it further enacted,* That for the compensation of the members of the House of Representatives and Senate, the sum of three dollars per day, during their attendance ; and the sum of three dollars for every twenty miles in coming to, and returning from the seat of government ; and the sum of four dollars each per day, to the President of the Senate, and the Speaker of the House of Representatives, during their attendance ; and the sum of three dollars each for every twenty miles in coming to and returning from the seat of government ; to the clerk of the House of Representatives and secretary of the Senate, during the sitting of the legislature, four dollars each per day ; and also the sum of sixty dollars each, for contingent expenses ; to two engrossing clerks of the Senate, and two of the House of Representatives, four dollars each per day during their attendance ; to the messenger and door-keeper of the Senate, and messenger

* See act of 1808, No. 337, section 6th, repealing this act.

and door-keeper of the House of Representatives, three dollars each per day; to Edmund Booker Jenkins, clerk of the committee on finance, forty dollars; to Thomas H. Kenan, clerk of the committee on the state of the republic, forty dollars; to the clerk of the House of Representatives, secretary of the Senate, and the messenger and door-keeper of each house, three dollars each for every twenty miles in coming to and returning from the seat of government; to the adjutant-general, four dollars per day while in actual service; to the commissioners for selling the fractional parts of surveys of land, in the counties of Wilkinson and Baldwin, three dollars per day each, while in actual service; to Zachariah Reed, the sum of fifty dollars agreeable to a concurred resolution; to the commissioners of the late land lottery, three dollars per day each while engaged in the duties of their said appointment, exclusive of what they have already received, to Jemsey Righly and Nathaniel Clarke, boys who attended the wheels, two dollars per day each; to Peter Fair, door-keeper, three dollars per day; which said sums shall be in full for their several services; for defraying the expenses of the funerals of the honorable Ezra Jones and Walter Drane, the sum of one hundred and fifty dollars; to James Luke, tax collector of Columbia county, twenty-seven dollars eighty seven and an half cents; to James Foard, jailor of Wilkes county, seventy-eight dollars, sixty-two and a half cents; John Derrecot, forty-nine dollars ninety-seven cents; to James O. Cosby, thirty-four dollars; to Zebediah Payne, twelve dollars forty-eight and three quarter cents: to John Lamkin, eighteen dollars twelve and an half cents; to Dennis L. Ryan for printing, fifty-four dollars eighty-seven and a half cents; to Sarah Hillhouse, four dollars seventy-five cents; Ambrose Day, six dollars and fifty cents; Everitt and M'Lean, six dollars and fifty cents; Dennis Driscol, six dollars and fifty cents; Alexander M'Millan, four dollars ninety-three and three quarter cents; to Jacob Buckhalter, in behalf of himself and the heirs of Ann Wilson, for a negro girl named Jenny, five hundred dollars; to William Barnett, commissioner to ascertain the thirty fifth degree of north latitude between this State and North-Carolina, fifty nine dollars; to Thomas P. Carnes, commissioner as aforesaid, thirteen dollars, seventy-five cents; to John Herbert, commissioner of Milledgeville, three hundred and twenty-four dollars; to A. M. Devereaux, ditto, three hundred and nine dollars; to Howell Cobb, two hundred and fifty-two dollars; to Henry Carleton, thirty-six dollars; to Davis Gresham, fifty-one dollars; to Smart and Lane, fifty dollars; to Benjamin Easley, one hundred and fifty-three dollars; to Alexander M'Millan, for printing grants for fractional surveys, twenty dollars; to Jett Thomas, towards completing the State-House, to be expended under the direction of the commissioners, twenty-five thousand dollars; which said several sums are hereby appropriated out of any monies which now are, or may hereafter come into the treasury of this State; to Alexander M'Millan, for printing two hundred copies of the bank bill, fifteen dollars; to Benjamin Wall, Captain

(No. 280.)

Adjutant-general.

Fraction selling commissioners and to sundry other persons.

For the State-House, $ 25,000.

(No. 280.) of the Chatham Artillery company, two hundred dollars ; to provide a fund for the said company to repair their carriage, and furnish the said company with laboratory apparatus.

**BENJAMIN WHITAKER,** *Speaker of the House of Representatives.*

**JOHN FOSTER,** *President of the Senate, pro. tem.*

Assented to, December 10, 1807.

**JARED IRWIN,** GOVERNOR.

(No. 281.)                              AN ACT*

*To incorporate the Planter's Bank of the State of Georgia.*

A bank to be established in Savannah, the capital one million of dollars.

Subscriptions to be opened at Savannah and sundry other places.

SEC. 1. **B**E it enacted by the Senate and House of Representatives of the State of Georgia, in General Assembly met, and it is hereby enacted by the authority of the same, That a bank shall be established at Savannah, the capital stock whereof shall be one million of dollars, divided into ten thousand shares, of one hundred dollars each, but the directors or a majority of them, may at any time after the establishment of the said bank, increase the said stock to any amount, not exceeding three million of dollars : and that subscriptions towards constituting the said bank shall, on the first day of February next, be opened at the city of Savannah, under the superintendance of Charles Harris, William B. Bulloch and George Scott, commissioners, for two thousand four hundred shares ; at the city of Augusta, under the superintendence of Thomas Cumming, John Catlett and Freeman Walker, for eleven hundred shares ; at Columbia court-house, under the superintendance of Gary Davis, William Low and Thadeus Bell, for two hundred and fifty shares ; at the town of Washington, in Wilkes county, under the superintendence of Felix H. Gilbert, James Corbet and Doctor Gilbert Hay, for one thousand shares ; at Athens, under the superintendance of William Malone, Hope Hull and Stephen Thomas, for five hundred shares ; at Darien, under the superintendance of James Nephew, Norman M'Donald and William Dunham, commissioners, for eight hundred shares ; at Lexington, under the superintendance of Solomon A. Hopkins, Thomas W. Cobb and Robert Freeman, for four hundred shares ; at Petersburg, under the superintendance of Leroy Pope, Thomas Bibb and John Watkins, for six hundred shares ; at Greensborough, under the superintendance of George Clingham, Thomas W. Grimes and James Cun-

---

* This act repealed and another passed for the same purpose, in 1810, No. 560, which see.

# EXHIBIT 8

THE

# $\mathfrak{Statutes}$ $\mathfrak{at}$ $\mathfrak{Large}$

OF

# PENNSYLVANIA

FROM

# 1682 to 1801

COMPILED UNDER THE
AUTHORITY OF THE ACT OF MAY 19 1887 BY
JAMES T. MITCHELL AND HENRY FLANDERS
COMMISSIONERS

VOLUME X
1779 to 1781

WM. STANLEY RAY
STATE PRINTER OF PENNSYLVANIA
1904

persons between whom such party walls are to be made, and
the first builder shall be reimbursed one moiety of the charge
of such party wall, or for much thereof as the next builder
shall have occasion to make use of, before such next builder shall
use or break into said wall, the charge or value whereof to be
fixed by the said regulators, or by arbitrators mutually chosen.

[Section XIX.]  (Section XIX, P. L.)  And be it further
enacted by the authority aforesaid, That all appeals hereafter
made from the order, direction and award of the said regulators,
shall be taken and made, and shall lie to the next court of com-
mon pleas to be holden for the county of Philadelphia, within
one calendar month from the time of making the order, direc-
tion or award, appealed from, but not afterwards, nor otherwise;
whereupon the said court, upon security being entered by the
party appealing for the payment of all costs, in case he or she
should not prevail in his or her appeal, shall direct a venire to
the sheriff of the county, commanding him to summon a jury to
try the matter in dispute, and shall proceed therein according
to the course of common law.

[Section XX.]  (Section XX, P. L.)  And be it further en-
acted by the authority aforesaid, That if any person shall lay the
foundation, or begin to lay the foundation, of any party wall,
or any wall adjoining, or upon the line of any public street, lane
or alley, within the said district, before the line and boundaries
of the lot, or piece of land, whereon the said foundation shall be
so laid, or began to be laid, shall be adjusted and marked out by
the said regulators, or two of them, every such person, as well
employer as master builder, shall forfeit the sum of thirty
pounds, one half part thereof to the said commissioners, to be
laid out in making or amending the public streets in the said dis-
trict, and the other half to the use of the informer, together with
costs, provided the prosecution be commenced within twelve cal-
endar months from the time the offense shall be committed.

[Section XXI.]  (Section XXI, P. L.)  And be it further
enacted by the authority aforesaid, That the regulators, so to
be appointed, shall enter in a book all directions, orders and
awards, by them made in pursuance of this act, and every such
order and award, if made with reasonable notice to the parties

Digitized by Google

The other members of the house of assembly, for every day's attendance, each the sum of fifteen shillings.

The clerks of the house of assembly, for every day's attendance, the sum of one pound.

The sergeant-at-arms, for every day's attendance, the sum of ten shillings.

The door-keeper of the council and the door-keeper of the house of assembly, each the sum of ten shillings for every day's attendance.

[Section III.] (Section IV, P. L.) And be it further enacted by the authority aforesaid, That every delegate in Congress and member of council shall be further allowed, towards his traveling charges, after the rate of six pence per mile, once in every three months, in coming in and going from the places where the Congress and council shall respectively sit, provided he shall so often actually visit his family; and that every member of assembly shall be further allowed, towards his traveling charges, after the same rate, once in each sitting of the house; which said wages and traveling expenses shall be paid by the treasurer of this state to the delegates representing this state in Congress, and to the members of the council and their door-keeper, on the drafts of the president or vice-president in council; and to the speaker and other members of assembly, to the clerk of the assembly, sergeant-at-arms and door-keeper, on the drafts of the speaker of the house, signed in assembly.

[Section IV.] (Section V, P. L.) And be it further enacted by the authority aforesaid, That so much of any act of assembly heretofore made as declares what salaries shall be paid to the several officers of government and what wages shall be allowed to the speaker and other members of assembly, to the delegates representing this state in Congress, to the members of council and others herein specially mentioned shall be and is hereby repealed.

Passed December 27, 1781. Recorded L. B. No. 1, p. 264. See the Acts of Assembly passed February 25, 1783, Chapter 1005. The Act in the text was repealed by Acts of Assembly passed March 25, 1785, Chapter 1142; September 17, 1785, Chapter 1185.

# EXHIBIT 9



*Wm. W. Van Wagenen*

# L A W S

OF THE

## State of New-York.

PUBLISHED BY AUTHORITY.



LAW LIBRARY
UNIVERSITY

Banks
10/15/04

20048

IN TWO VOLUMES.

*VOL. I.*

ALBANY:
PRINTED BY CHARLES R. AND GEORGE WEBSTER,
1802.

Google

people of the state of New-York, and the bodies of the fame city and counties refpectively, and to do and receive all thofe things, which on the behalf of the people of the ftate of New-York fhall be then and there enjoined them ; and alfo all the prifoners then being in the gaols thereof, together with their attachments, indictments and all other minuments, any ways concerning thofe prifoners ; and **And petit** likewife fo many good and lawful men of the fame city **jurors.** and counties refpectively, duly qualified to ferve as jurors therein, as the faid courts of oyer and terminer and gaol delivery, or any juftice thereof, fhall from time to time direct, by whom the truth of the matter may be the better known, and enquired into, and who have no affinity to thofe prifoners. And the faid refpective fheriffs fhall **And to pro-** caufe to be publicly proclaimed throughout their refpec- **claim the** tive counties, that all thofe who will profecute againft **court, and** **notify profe-** thofe prifoners, be then and there to profecute againft **cutors, and** **officers to at-** them as fhall be juft ; and fhall alfo give notice to all juf- **tend.** tices of the peace, coroners, bailiffs, and conftables within their refpective counties, that they be then and there in their own perfons, with their rolls, records, indictments, and other remembrances, to do thofe things, which to their offices in that behalf fhall appertain to be done. And **Sheriffs and** the faid refpective fheriffs and their officers fhall then **their officers** and there attend in their own proper perfons, to do thofe **to attend.** things which to their offices fhall appertain. *And further,* **Diſtrict attor-** That the diftrict attornies fhall from time to time as foon **nies to ifſue** as conveniently may be, after every circuit court fhall be **precepts.** appointed to be held, in the cities and counties of this ftate, within their refpective diftricts, and at leaft fifteen days before the time of holding the fame, iffue precepts under the feal of the fupreme court, directed to the refpective fheriffs of the fame cities and counties, for the purpofes aforefaid, mentioning the day and place, when and where, the faid courts are to be held, and commanding the faid fheriffs refpectively, to do what is hereby required of them, and that the faid precepts fhall always be in the name of the people of the ftate of New-York, and be teft- **Teſte of ſuch** ed in the name of the chief juftice of the faid fupreme **precept.** court. *Provided,* That in cafe the office of chief juftice fhall be vacant, the precepts fhall be tefted in the name of the next fenior juftice of the faid fupreme court, and the faid precepts may be tefted on any day of the term preceding the vacation in which the court is to be held.

**Special com-** XII. *And be it further enacted,* That it fhall be lawful **miſſions of** for the perfon adminiftering the government of this ftate, **oyer and ter-** **miner and** by and with the advice and confent of the council of ap- **gaol delivery** pointment, to grant and iffue commiffions of oyer and **may be iſſued.** terminer and gaol delivery, or either of them, in the manner and form heretofore ufed, at any time hereafter, when and as often as occafions require: But the juftices

their being above the age of eighteen and under the age of forty-five years.

4   III. *And be it further enacted*, That within one year after the passing of this act, the militia of the respective states shall be arranged into divisions, brigades, regiments, battalions and companies as the legislature of each state shall direct; and each division, brigade and regiment shall be numbered at the formation thereof, and a record made of such numbers in the adjutant-generals office in the state; and when in the field or in service in the state, each division, brigade and regiment shall respectively take rank according to their numbers, reckoning the first or lowest number highest in rank; that if the same be convenient each brigade shall consist of four regiments, each regiment of two battalions, each battalion of five companies,
5  each company of sixty-four privates; that the said militia shall be officered by the respective states, as follows: To each division one major-general and two aids-de-camp, with the rank of a major; to each brigade one brigadier-general, with one brigade-inspector to serve also as a brigade-major, with the rank of major; to each regiment one lieutenant-colonel commandant, and to each battalion one major; to each company one captain, one lieutenant, one ensign, four sergeants, four corporals, one drummer and one fifer or bugler; that there shall be a regimental staff to consist of one adjutant and one quarter-master to rank as lieutenants, one pay-master, one surgeon and one surgeon's mate, one sergeant-major, one drum-major and one fife-major.

6   IV. *And be it further enacted*, That out of the militia enrolled as is herein directed, there shall be formed for each battalion at least
7  one company of grenadiers, light infantry or riflemen, and that to each division there shall be at least one company of artillery and one
8  troop of horse; there shall be to each company of artillery, one captain, two lieutenants, four sergeants, four corporals, six gunners, six bombardiers, one drummer and one fifer; the officers to be armed with a sword or hanger, a fusee, bayonet and belt, with a cartridge box to contain twelve cartridges, and each private or matross shall furnish himself with all the equipments of a private in the infantry, until proper ordnance and field artillery is provided; there shall be to each troop of horse, one captain, two lieutenants, one cornet, four sergeants, four corporals, one sadler, one farrier and one trumpeter; the commissioned officers to furnish themselves with good horses of at least fourteen hands and half high, and to be armed with a sword and pair of pistols, the holsters of which to be covered with bearskin caps; each dragoon to furnish himself with a serviceable horse, at least fourteen hands and an half high, a good saddle, bridle, mailpillion and valise, holsters, and a breast-plate and crooper, a pair of boots and spurs, a pair of pistols, a sabre, and a cartouch box to con-
9  tain twelve cartriadges for pistols; that each company of artillery and troop of horse shall be formed of volunteers from the brigade, at the discretion of the commander in chief of the state, not exceeding one company of each to a regiment, nor more in number than one ele-
10  venth part of the infantry, and shall be uniformly clothed in regimentals to be furnished at their own expense, the colour and fashion to be determined by the brigadier commanding the brigade to which they belong.

Digitized by Google — Original from NEW YORK PUBLIC LIBRARY

EXHIBIT 10

# A·B·R·I·D·G·M·E·N·T

OF THE

# PUBLIC PERMANENT LAWS

OF

# VIRGINIA.

THE REPEALING CLAUSES IN THE SEVERAL LAWS WHICH
HAVE THEM, ARE REDUCIBLE TO A FEW FORMS, AND
ARE ALIKE IN GENERAL. TO PREVENT THE SWEL-
LING OF THE BOOK UNNECESSARILY, AND YET
TO GIVE AT THE SAME TIME THE OPERA-
TIVE WORDS OF EVERY LAW, REFER-
ENCE IS MADE AT THE CLOSE OF EVE-
RY LAW TO THE FORM OF REPEAL
AS IT IS SET FORTH VERBATIM
IN THE APPENDIX.

EVERY ACT PASSED ON OR AFTER OCTOBER 19, 1792, IS TO BE
UNDERSTOOD TO CONTAIN THE FOLLOWING CLAUSE
OF COMMENCEMENT: " THIS ACT SHALL COMMENCE
" IN FORCE FROM AND AFTER THE PASSING
" THEREOF;" UNLESS ITS COMMENCEMENT
SHALL BE PARTICULARLY EXPRESSED TO
BE ON A DIFFERENT DAY, OR IN A DIF-
FERENT FORM. THOSE ACTS WHICH
PASSED BEFORE THE 19th OF OC-
TOBER, 1792, AND COMMENCE
THEIR OPERATION ON A
DIFFERENT DAY FROM
THE DAY OF THEIR
PASSING, WILL
BE SPECIFIED.

THE DATE PREFIXED TO EACH LAW IS THE DAY ON
WHICH IT PASSED.

RICHMOND:

PRINTED BY AUGUSTINE DAVIS,
M,DCC,XCVI.

X. The said court shall have power to appoint a clerk, who shall hold his office during good behaviour, and be entitled to such fees or salary as the legislature may appoint, as also a serjeant at arms: And in case of a vacancy, in the recess of the said court, the said judge may make the like appointments under his hand and seal, during a vacation; and such succeeding clerk or serjeant, having, in any court of record, taken the oaths required by law, shall exercise the same power, perform the same duties, and be entitled to the same fees and profits, as if he had been appointed in term time. *(a)*

XI. It shall be lawful for the high court of chancery to send any matter of law to the general court, for their opinion to be certified thereupon. *(b)*

XII. Although any of the defendants, whether debtors or others, in any suit instituted in the said court, shall be absent from the commonwealth, the court may nevertheless proceed to a hearing and decree therein, as in the case of absent debtors having effects within the commonwealth. *(c)*

XIII. The said court in its discretion, may direct an issue to be tried, whenever it shall be judged necessary, either in that court, or in any other court whatsoever, as justice or convenience to the parties may require, and in all other cases the mode of trial shall be the same as hath been heretofore used and practised in the courts of chancery in Virginia. *(d)*

XIV. If a majority of the judges of the general court be interested in any suit, which in the case of any other person would have been proper for the jurisdiction of such court, it may be lawful to institute such suit in the high court of chancery, where proceedings shall be had conformably to the rules of the general court, and process shall be returnable as the high court of chancery shall direct; and thereafter an appeal may be entered to the court of appeals. *(e)*

XV. It shall be lawful for the said court to arrange the business thereof, in the most convenient and equitable manner. *(f)*

XVI. Any party thinking himself aggrieved by a decree of the court of a county, city, or borough, in chancery, and not having entered an appeal from the decree at the time it was pronounced, may appeal from such decree at any time within one month after the decree pronounced, lodging for that purpose with the clerk of the high court of chancery, a copy of the proceedings in the suit, and a petition suggesting error in the decree, signed by some counsel attending the high court of chancery, and also lodging with the petition a bond executed by the appellant or his agent, and a surety or sureties with the like condition as is annexed to other appeal bonds, and affidavits, or solemn affirmations, verifying the sufficiency of the sureties; and the clerk shall thereupon issue a summons against the appellee, requiring him to appear and answer the said petition and appeal, and shall also issue a supersedeas, if necessary, to enjoin from proceeding in execution of the decree; and the court shall and may hear and determine the appeal in the same manner as if the appeal had been entered at the time the decree was pronounced. *(g)*

XVII. *Provided always,* That whenever an appeal is prayed for from any inferior court to the said high court of chancery, or bond is given for the removal of any suit in chancery, in any manner whatsoever, it shall be sufficient in either case, if the said bond or bonds shall be executed by good and sufficient securities, although the appellant or party shall not execute the said bond or bonds. *(h)*

XVIII. The said court, or the judge thereof in vacation, shall have power, for good cause shewn, to allow a petition of appeal, and if necessary, order a supersedeas to stop the execution of any decree pronounced by an inferior court, at any time within three years after pronouncing the same; the party praying such appeal and supersedeas, complying with the terms which the said court or judge shall annex to such order. *(h)*

XIX. All original process to bring any person to answer any bill, petition or information in the said court, and all subsequent process thereupon, shall be issued and signed by

*(a) Oct. 1777, c. 15. § 1. (b) 1788 c. 69. (c) 1787, c. 9. (d) Oct. 1773, c. 9. §4. (e) 1778 c. 67. § 121. (f) 1788, c. 69. (g) May 1780, c. 7. § 3. (h) 1787, c. 9.*

Google

ers, to examine and afcertain the moft eligible ground on the lands of the faid John Lynch, whereon to erect an additional warehoufe, and make report thereof to the county court of Amherft, who fhall thereupon order and direct the dimentions of the houfe to be built by the faid Lynch, at fuch place accordingly ; and moreover are hereby authorifed to take fuch meafures therein for the purpofe of effecting the faid building as are prefcribed by the fifth fection of the act, intituled, "An act for reducing into one the feveral acts of Affembly, for the infpection of tobacco :" So foon as the faid building fhall be completed and received by the court of the faid county, the fame fhall be held, deemed and taken, to all intents and purpofes whatfoever, as united with and under the fame infpection of Amherft warehoufe.

December the 4th 1795 –but commenced Jan. 1, 1796.

§ I. WHEREAS it hath been reprefented that the warehoufes for the reception and infpection of tobacco, in the town of Alexandria, are no longer neceffary, for that purpofe :

II. The infpection of tobacco at the faid place, fhall be, and the fame is hereby difcontinued, and the lot and houfes fhall be re-vefted in William Hepburn, and John Dundas, their heirs and affigns, in like manner as if the fame had not been appropriated to public ufe : *Provided neverthelefs,* That all the tobacco now remaining in the faid warehoufes, fhall be from thence difcharged according to law. Nothing in this act contained fhall be conftrued or taken to affect or impair the legal right or title of any perfon or perfons whatfoever to the faid lot of ground or warehoufes.

III. All and every act and acts, coming within the meaning of this act, is hereby repealed.

## TOWNS, CORPORATIONS, AND CITIES.

December the 11th, 1758.

§ I. UPON the death, removal out of the country, or other legal difability of any one or more of the truftees and directors of the feveral towns within this ftate not incorporated, fuch vacancy, fo often as the fame fhall happen, fhall hereafter be fupplied in manner following, that is to fay : The furviving truftees and directors, or one of them, fhall give immediate notice of fuch vacancy to the fheriff of the county wherein fuch town may be, who within twenty days thereafter fhall notify the fame to the freeholders of the faid town, in fuch manner as he may think beft, requiring them to appear at a certain place therein, and on a certain day, not lefs than ten days thence next following, then and there to elect a truftee in the room of the one fo dying, removing, or difabled. The fheriff fhall attend and take the poll at fuch election, entering the names of the perfons voted for in a diftinct column, and the name of every freeholder giving his vote under the name of the perfon he votes for ; and when no freeholders appear to vote, the fheriff fhall clofe the poll, and return the fame to the next court to be held for his county, upon oath, certifying the name of the perfon elected, to be by the clerk recorded.

II. Every perfon elected in manner directed by this act, fhall to all intents and purpofes, be a truftee of the town for which he was chofen.

III. So much of all acts of affembly as are contrary to the purview and meaning of this act, are hereby repealed.

December the 10th, 1793—but commenced Jan. 1, 1794.

§ I. WHEREAS great inconveniences have arifen in many, if not all the towns within this commonwealth, from the practice of hiring negroes and mulattoes, who pretend to freedom, but are in fact flaves : For remedy whereof,

Digitized by Google

# EXHIBIT 11

ASE79

# A C T S

### A N D

# L A W S

### O F T H E

## S T A T E

### O F

# CONNECTICUT,

### I N

# AMERICA



N E W - L O N D O N:

Printed by TIMOTHY GREEN,

Printer to the Governor and State of Connecticut.

M,DCC,LXXXIV.

## An Act for regulating Fees.

BE it enacted by the Governor, Council, and Representatives, in General Court assembled, and by the Authority of the same, That the Establishment of the Fees of the several Officers of this State, shall be as follows, to wit,

Fees of the several officers in this State.

| | £. | s. | d. | |
|---|---|---|---|---|
| **Assistants Fees.** | | | | |
| For attending the General Assembly, per Day, *Nine Shillings*, | o | 9 | o | |
| Travel per Mile out, *Six-pence*, | o | o | 6 | Assistants. |
| **Representatives Fees.** | | | | |
| For attending the General Assembly, per Day, *Six Shillings*, | o | 6 | o | |
| Travel per Mile out, *Six-pence*, | o | o | 6 | Representatives. |
| **Superior Court's Fees.** | | | | |
| Chief Judge, per Day, *Eighteen Shillings*, | o | 18 | o | |
| Assistant Judges, per Day, *Seventeen Shillings*, | o | 17 | o | Sup. court. |
| For trying each Action, *Twenty-four Shillings*, | 1 | 4 | o | |
| Each Default or Confession, *Twelve Shillings*, | o | 12 | o | |
| **Clerk of the Superior Court's Fees.** | | | | |
| For entering each Action and Judgment, *Three Shillings*, | o | 3 | o | Clerk of sup. court. |
| Filing each Deposition, *Three-pence*, | o | o | 3 | |
| Entering each Judgment acknowledged, *One Shilling*, | o | 1 | o | |
| Each Execution, *One Shilling* and *Six-pence*, | o | 1 | 6 | |
| For Copies, each Page of twenty-eight Lines, ten Words in a Line, *One Shilling* and *Six-pence*, | o | 1 | 6 | |
| **County Court's Fees.** | | | | |
| Chief Judge per Day, *Twelve Shillings*, | o | 12 | o | |
| Each Justice of the Quorum, per Day, *Nine Shillings*, | o | 9 | o | County court |
| Trying each Action, *Twelve Shillings*, | o | 12 | o | |
| Each Judgment, Default, or Confession, *Three Shillings* and *Six-pence*, | o | 3 | 6 | |
| Licence to each Tavern-keeper, *Six Shillings*, | o | 6 | o | |
| (Whereof to the Clerk, *One Shilling*.) | | | | |
| Licence to each Tanner, *Six Shillings*, | o | 6 | o | |
| **Jury's Fees at the Superior or County Court.** | | | | |
| For trying each Action, *Thirty-six Shillings*, | 1 | 16 | o | Jury. |
| Travel out per Mile, *Three-pence*, | o | o | 3 | |
| **Clerk of the County Court's Fees.** | | | | |
| For entering each Action, *Three-pence*, | o | o | 3 | |
| Entering each Judgment or Continuance, *One Shilling*, | o | 1 | o | Clerk county court. |
| For granting Writs, taking Bond, &c. the same as Justices Fees for like Services. | | | | |
| For Copies of every Kind, each Page of twenty-eight Lines, ten Words in a Line, *One Shilling* & *Six-pence*, | o | 1 | 6 | |
| **Court of Probate's Fees.** | | | | |
| Granting Administration, to the Judge, *One Shilling* and *Six-pence*, | o | 1 | 6 | |
| Receiving and Probate of every Will, and Inventory of *Fifty Pounds* or under, *Two Shillings*, | o | 2 | o | Court of probates. |
| (Whereof to the Clerk, *Nine-pence*.) | | | | |
| Receiving and Probate of every Will, and Inventory, of more than *Fifty Pounds*, *Three Shillings*, | o | 3 | o | |
| (Whereof to the Clerk, *One Shilling*.) | | | | |
| Each Quietus, *One Shilling*, | o | 1 | o | |
| (Whereof to the Clerk, *Six-pence*.) | | | | |
| Recording every Will, and each Inventory of *Fifty Pounds*, or under, *Two Shillings* and *Six-pence*, | o | 2 | 6 | |
| For recording every Will, and each Inventory of more than Fifty Pounds, and not exceeding One Hundred Pounds, *Three Shillings*, | o | 3 | o | |

And

And for every hundred Pound, after the first Hundred, *Three-pence,* | 0 | 0 | 1
And for a Copy, the same.

Each Bond for Administrator, and each Letter of Administration, *One Shilling,*    0 1

For making out and registering a Commission for receiving and examining the Claims of Creditors of an Insolvent Estate, *One Shilling,*    0 1

Registering the Report of Commissions, per Page of twenty-eight Lines, ten Words in a Line, *One Shilling and Six-pence,*    0 1 6

Making and entering an Order on the Administrator to pay out the Estate to the Creditors in due Proportion, *Four Shillings,*    0 4

Recording a Distribution, the same as for registering the Report of Commissioners.

Allowing Accounts for settling and dividing Intestate Estates, *One Shilling and Six-pence,*    0 1 6

Appointing Guardian and taking Bond, *Two Shillings,*    0 2

(Whereof to the Clerk, *One Shilling.*)

Order to sell Land, *Three Shillings,*    0 3

### Assistants and Justices Fees.

**Justices.**

Signing an Attachment or Summons for Action, *Six-Pence,*    0 0 6

Taking every Bond of Recognizance, *Six-pence,*    0 0 6

Summons for Witnesses, *Six-pence,*    0 0 6

Entering and Trial of an Action, *Three Shillings,*    0 3

Execution, *One Shilling,*    0 1

Judgment on Confession or Default, *One Shilling and Six-pence,*    0 1 6

Warrant in a Criminal Case, *One Shilling,*    0 1

Bond for Appeal, *Six-pence,*    0 0 6

Copies the same Fees as Clerks of Courts.

Affidavit taken out of Court, *Six-pence,*    0 0 6

Entering a Plea of Title, and taking Bond, *Three Shillings,*    0 3

Taking Acknowledgment of a Deed, &c. *Six-pence.*    0 0 6

### Secretary's Fees.

**Secretary.**

Recording Laws and Orders of the General Assembly, of public Concernment, each, *One Shilling,*    0 1

Affixing the State Seal, each Time, *One Shilling,*    0 1

Each Military Commission, *One Shilling,*    0 1

Each Commission for Justices in a County, *Five Shillings,*    0 5

Commission for Judges of the Superior Court, *Three Shillings,*    0 3

Each Commission for a Judge of the County Court, or Court of Probates, *One Shilling and Six-pence,*    0 1 6

Each Petition or Memorial to the General Assembly, *One Shilling and Six-pence,*    0 1 6

For the Use of the State, on each Petition, *Twenty Shillings,*    1 0

For Copy of each Order of the General Assembly, on a Petition or Memorial, not exceeding one Folio Page, *One Shilling and Six-pence,*    0 1 6

For Copies of greater Length, and all other Copies, the same as the Clerk of the Superior Court.

### Sheriffs and Constables Fees.

**Sheriffs and Constables.**

Serving every Summons, *Four-pence,*    0 0 4

If by Copy, *Six-pence,*    0 0 6

Serving every Attachment, *Six-pence,*    0 0 6

Bail Bond, *One Shilling,*    0 1

Levying every Execution not exceeding one Pound, *One Shilling* lawful Money, and *Three-pence* per Pound for every Pound above that Sum, in the same Currency of the Execution, or equivalent in lawful Money.

Attending

ACTS AND LAWS.

## Fees. 65

| | | | |
|---|---|---|---|
| ...tending a Justice's Court, on Trial of each Action when obliged to attend, *One Shilling* and *Six-pence*, | 0 | 1 | 6 | |
| ...ach Mile Travel out, *Three-pence*, | 0 | 0 | 3 | |
| ...heriff attending the General Court or Superior or County Court per Day, *Six Shillings*, | 0 | 6 | 0 | Constable. |
| ...onstable for like Service, *Four Shillings*, | 0 | 4 | 0 | Plaintiff and defendant |
| ...ees for Plaintiff or Defendant attending Court per Day, *One Shilling* and *Six-pence*, | 0 | 1 | 6 | |
| Witnesses attending any Court per Day, each *Two Shillings*, | 0 | 2 | 0 | Witness. |
| Travel for Witness per Mile, *Three-pence*, | 0 | 0 | 3 | Travel. |
| To the Party per Mile, *Two-pence*, | 0 | 0 | 2 | |
| Each Jury-man for viewing Highways per Day, *Four Shillings*, | 0 | 4 | 0 | Jurymen viewing highway. |
| Officers attending such Jury per Day, *Five Shillings*, | 0 | 5 | 0 | |

**Town Clerk's Fees.**

| | | | |
|---|---|---|---|
| For recording a Deed, *One Shilling*, | 0 | 1 | 0 | |
| For Copy of a Deed, *One Shilling*, | 0 | 1 | 0 | Town-clerk. |
| For other Copies, and recording survey Bill, the same Fees as the Clerk of the County Court for Copies. | | | | |
| For recording of Marriage, Birth or Death, *Three-pence*, | 0 | 0 | 3 | |

**Attorney's Fees to be taxed in Bills of Cost.**

| | | | |
|---|---|---|---|
| At the Superior Court, *Eight Shillings*, | 0 | 8 | 0 | Attorney. |
| At the County Court, *Four Shillings*, | 0 | 4 | 0 | |
| Each Grand Jury-man for attending the Superior or County Court, per Day, *Four Shillings*, | 0 | 4 | 0 | |
| Travel per Mile out, *Four-pence*, | 0 | 0 | 4 | |
| Each Witness in Criminal Cases, at the Suit of the State, for Attendance at the Superior or County Courts, and Expences, per Day, *Four Shillings*, | 0 | 4 | 0 | |
| If before an Assistant or Justice, per Day, *Two Shillings*, | 0 | 2 | 0 | |

**State Attornies Fees,**
Not exceeding the following Allowances.

| | | | |
|---|---|---|---|
| For conducting and pleading each Criminal Case, not Capital, before the Superior Court, on Bill found by the Grand-Jury, *Two Pounds Ten Shillings*, | 2 | 10 | 0 | |
| Drawing an Indictment or Information, *Six Shillings*, | 0 | 6 | 0 | State attorney. |
| For a Trial before the Superior Court, in a Criminal Case, on Information, or for conducting and pleading a Civil Cause, on Behalf of the State, *Two Pounds*, | 2 | 0 | 0 | |
| For prosecuting a Civil Cause, when Judgment is given on Confession or Default, in the Superior Court, *One Pound*, | 1 | 0 | 0 | |
| For a Capital Trial, *Four Pounds*, | 4 | 0 | 0 | |
| In a Criminal Case, on Confession, before the Superior Court, *One Pound Ten Shillings*, | 1 | 10 | 0 | |
| In Case of *nolle Prosequi* entered, or a return of a Grand-Jury, not a true Bill, *One Pound*, | 1 | 0 | 0 | |
| If an Assistant Attorney is allowed in any Trial, not Capital, before the Superior Court, in Behalf of the State, his Fee shall be *One Pound*, | 1 | 0 | 0 | Assisting-attorney. |
| Or if Capital, *Two Pounds*, | 2 | 0 | 0 | |
| In Prosecution on Behalf of the State, before the County Court, the Attorney shall be allowed, not exceeding two Thirds of the Fees allowed for the like Services in the Superior Court; or less, at the Discretion of the Court. | | | | |

**County Surveyor's Fees.**

| | | | |
|---|---|---|---|
| For himself and Horse, besides Expences, per Day, *Six Shillings* | 0 | 6 | 0 | County surveyor. |

I

Post

# EXHIBIT 12

 

DATE DOWNLOADED: Tue Jan  9 17:16:58 2024
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
1799 [xiv] .

ALWD 7th ed.
, , 1799 [xiv] .

Chicago 17th ed.
"," Maryland - General Assembly, November Session : [xiv]-[xv]


AGLC 4th ed.
'' Maryland - General Assembly, November Session [xiv]

OSCOLA 4th ed.
'' 1799 [xiv]            Please note: citations are provided as a general
guideline. Users should consult their preferred citation format's style manual for
proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
 Conditions of the license agreement available at
 *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

## C H A P. XXIII.

An ACT for the adjournment of Prince-George's county court.
Lib. JG. No. 3. fol. 266.

Paſſed 3d of
Jan. 1800.

WHEREAS Prince-George's September county court ſtands adjourned till the ſecond Monday in December,

Preamble.

II. BE IT ENACTED, *by the General Aſſembly of Maryland,* That all cauſes, pleas, proceſs and proceedings, now depending and returnable to the ſaid September court, ſhall be, and by virtue of this act are, adjourned and continued to the firſt Monday in April next, and that all the ſaid cauſes, pleas, proceſs and proceedings, in the ſaid court, now depending and returnable to the ſaid September court, ſhall be in the ſame ſtate and condition as they would be in on the ſaid ſecond Monday in December, any thing to the contrary notwithſtanding.

Cauſes, &c. adjourned, &c.

## C H A P. XXIV.

An ACT to empower the juſtices of the levy court of Anne-Arundel county to aſſeſs and levy a ſum of money for the purpoſe therein mentioned. Lib. JG. No. 3. fol. 266.

WHEREAS Elizabeth Purdy, of Anne-Arundel county, by her petition to this general aſſembly hath ſet forth, that ſhe, from age and indigence, is unable to ſupport herſelf and four ſmall children, (one of which, a girl, is entirely blind, and unable by any means to procure the neceſſaries of life,) and prays that a law may paſs for the ſupport of her ſaid daughter out of the poor-houſe; and the prayer of the petitioner appearing reaſonable,

Preamble.

II. BE IT ENACTED, *by the General Aſſembly of Maryland,* That the juſtices of Anne-Arundel county ſhall be and they are hereby directed and empowered, at their levy courts annually, ſo long as they may ſee cauſe, to aſſeſs and levy on ſaid county a ſum of money, not exceeding forty dollars, for the ſupport and maintenance of the ſaid Elizabeth Purdy's daughter, and that the ſame be collected and paid annually to the aforeſaid Elizabeth Purdy by the collector or collectors of Anne-Arundel county, agreeable to the order of the levy court aforeſaid.

Money to be
levied, &c.

## C H A P. XXV.

An ACT reſpecting the ſheriff of Talbot county. Lib. JG. No. 3. fol. 267.

WHEREAS it has been repreſented to the general aſſembly, that John Thomas, the ſheriff of Talbot county, did not, during the period between the eighth day of October, in the year ſeventeen hundred and ninety-eight, and the firſt day of January following, give bond with ſecurity for the faithful performance of his office for the year then next enſuing, as required by the conſtitution and the laws of this ſtate, whereby the validity of his proceedings, and his reſponſibility to thoſe who may have been affected by acts done by him under colour of his office, may be queſtioned; and the general aſſembly being ſatisfied that this omiſſion did not proceed from deſign, and that neither the ſaid John Thomas, nor any perſon affected by his acts, ought to ſuffer by reaſon thereof; therefore,

Preamble.

II. BE IT ENACTED, *by the General Aſſembly of Maryland,* That all lawful acts and proceedings done, performed or executed, and all powers, emoluments and rights, exerciſed or acquired, by the ſaid John Thomas, by virtue of his office of ſheriff of Talbot county during the year enſuing the period herein before mentioned, be and the ſame are hereby ratified, allowed and confirmed, to all intents and purpoſes, and in like manner and effect, as if the ſaid John Thomas had given bond with approved ſecurity during the ſaid period for the performance of his office, as required by the conſtitution and laws of this ſtate.

Acts ratified,
&c.

III. AND BE IT ENACTED, That the aſſociate juſtices of Talbot county court ſhall, on or before the firſt Tueſday of January next, meet at the court-houſe in the ſaid county, and require the ſaid John Thomas to attend them on the day which they ſhall appoint; and thereupon the ſaid John Thomas ſhall, in their preſence, enter into bond, with two ſufficient ſecurities, to be approved by the ſaid juſtices, to the ſtate of Maryland, in the penalty of five thouſand pounds current money, in the uſual form, with condition, " that if the ſaid John Thomas ſhall render to the ſeveral officers within this

Aſſociate juſtices to meet,
&c.

CHAP.
XXV.

this ſtate a juſt and true account of all fees placed in his hands for collection, and ſhall alſo well and truly pay all ſums of money received by him, and alſo pay and ſatisfy all public dues, fines and forfeitures, which are due or belonging to this ſtate, and ſhall alſo pay and deliver to the perſon or perſons entitled to receive the ſame, all ſum or ſums of money, tobacco, goods, chattels or property, by him levied, ſeized or taken, agreeably to the directions of the writ, proceſs or warrant, under which the ſame ſhall have been levied, ſeized or taken, and ſhall alſo pay and ſatisfy all judgments which may have been rendered againſt him as ſheriff of the ſaid county, and ſhall and will in all things ſatisfy, ſave harmleſs and indemnify, all and all manner of perſon or perſons who ſhall have been, or may be, aggrieved, affected or damnified, by any act, omiſſion, misfeaſance or neglect, done, ſuffered or committed, by him the ſaid John Thomas, in virtue or under colour of his ſaid office during the preceding year of his ſhrievalty, then the ſaid bond to be void and of no effect, otherwiſe to be and remain in full force and virtue;" and the ſaid juſtices ſhall atteſt and certify the execution of the ſaid bond, and depoſit the ſame in the office of the clerk of the ſaid county, to be affiled and recorded among the records thereof; and any perſon or perſons aggrieved by any act, omiſſion, misfeaſance or neglect, of the ſaid John Thomas, done, ſuffered or committed, by him, under colour of his ſaid office during the year enſuing the period herein before mentioned, ſhall have remedy by ſuit proſecuted on the ſaid bond, in like manner, and to the like effect, as ſuch perſon or perſons ſhould, could, or might have had, upon his ſhrievalty bond, if the ſame had been executed by the ſaid John Thomas, as required by the conſtitution and laws of this ſtate; and an official copy of the ſaid bond, under the hand of the clerk and the ſeal of his office, ſhall be received in evidence in any court of this ſtate, in like manner, and to the like effect, as if the original were produced and proved according to law.

To receive no benefit, &c.

IV. AND BE IT ENACTED, That the ſaid John Thomas ſhall receive no benefit or advantage of any part of this act, until he ſhall have entered into bond, with approved ſecurities, before the ſaid juſtices, as required by the proviſions thereof.

CHAP. XXVI.

Paſſed 3d of Jan. 1800.

An ACT for the relief of Triſtram Dalton, of the city of Waſhington. Lib. JG. No. 3. fol. 268.

Preamble.

WHEREAS it is repreſented to this general aſſembly, by the petition of Triſtram Dalton, of the city of Waſhington, that by a variety of loſſes and misfortunes in trade, as a co-partner of the firm of Lear and company, he is rendered unable wholly to ſatisfy the debts for which the ſaid co-partnerſhip are anſwerable, and that the moſt of their creditors live in Great-Britain, and that it will be impracticable for him to obtain the aſſent to his diſcharge of two thirds in amount of all the creditors of the ſaid Lear and company: And whereas the ſaid Triſtram Dalton has prayed a ſpecial act may paſs in his favour; therefore,

On application, notice to be given, &c.

II. BE IT ENACTED, by the General Aſſembly of Maryland, That upon the application of the ſaid Triſtram Dalton to the chancellor, by petition in writing, offering to deliver up all his eſtate in poſſeſſion, reverſion or remainder, for the benefit of his creditors, and the creditors of the ſaid Lear and company, and annexing to the ſaid petition a ſchedule of his property and debts, the ſaid ſchedule comprehending diſtinct and ſeparate liſts of the property and debts belonging to him in his own right, and alſo in right of his being a partner in the ſaid firm of Lear and company, and a liſt of his creditors, as well as the creditors of the ſaid Lear and company, ſo far as he can aſcertain the ſame, on oath, the chancellor ſhall direct notice of ſuch application to be given and publiſhed in ſuch manner as he ſhall think expedient, and appoint a certain day for the creditors of the ſaid Triſtram Dalton to appear in chancery, and to recommend a truſtee or truſtees on their behalf; and on the appearance of the ſaid creditors, or on their neglect to appear on notice as aforeſaid, the chancellor ſhall adminiſter to the ſaid Triſtram Dalton the following oath, to wit: "I, Triſtram Dalton, do "ſwear, that I will deliver up, convey and transfer, to my creditors, in ſuch manner as the chan-"cellor ſhall direct, all my property, that I have or claim any title to, or intereſt in, at this time, "and all debts, rights, claims and credits, which I have or am in any way entitled to, in poſſeſſion, "reverſion or remainder, as well ſeverally as jointly with any other perſon or perſons, and that I "have not, directly or indirectly, at any time, ſold, conveyed, leſſened or diſpoſed of, for the uſe "or benefit of any perſon or perſons, or intruſted, any part of my money or other property afore-"ſaid, debts, rights or claims, thereby to defraud my creditors, or any of them, or to ſecure the "ſame to receive or expect any profit, benefit or advantage thereby;" and in caſe of the neglect of the ſaid creditors to appear and recommend a truſtee or truſtees, the chancellor ſhall appoint ſuch perſon or perſons to be truſtee or truſtees as he ſhall think proper.

III. AND

EXHIBIT 13

# ACTS

AND

# LAWS

OF THE

# COMMONWEALTH

OF

# MASSACHUSETTS.

BOSTON:

Printed by Adams & Nourse,

Printers to the HONORABLE GENERAL COURT.

M,DCC,LXXXVI.

Reprinted by Wright & Potter Printing Company, State Printers.

1893.

# ACTS AND RESOLVES

OF

## MASSACHUSETTS.

### 1786-87.

[PUBLISHED BY THE SECRETARY OF THE COMMONWEALTH, UNDER
AUTHORITY OF CHAPTER 104, RESOLVES OF 1889.]

*shillings* and *six pence*. To the Officer attending the Jury for trial, *one shilling*, for every cause, to be paid with the Jury's fees.

For dispersing *Venires* for Jurymen, from the Clerk of the Supreme Judicial Court, Treasurer's Warrants, and Proclamations of all kinds, *three pence* each.

To each appraiser of real estates, for extending Executions, or assigning dower, *four shillings* a day, and so for a longer or shorter time.

Every Constable who shall attend the Supreme Judicial Court, or Court of General Sessions of the Peace, or Common Pleas, by their order, *three shillings* a day, to be paid out of the County Treasury ; and for encouragement unto the Sheriff to take and use all possible care and diligence, for the safe keeping of the Prisoners, that shall be committed to his custody, he shall have such salary allowed him for the same, as the Justices of the Court of General Sessions of the Peace, within the same County, shall think fit to order, not exceeding *ten pounds* a year for the County of *Suffolk;* and not exceeding *five pounds* each, for the other Counties within the Government, at the discretion of the Court of Sessions, to be paid out of the Treasury of such County.

*And be it enacted by the authority aforesaid*, that any Constable in any Town in this Commonwealth, be, and he is hereby fully authorized and empowered, to serve upon any person or persons in the Town to which he belongs, any original Writ, Summons or Writ of Execution, in any personal action, where the damage sued for or recovered, does not exceed *twenty pounds*, and return thereof to make to any Court proper to try the same.

### Criers Fees :

Calling a Jury, *four pence*, to be paid with the Jury fees. Criers fees.

A default or non suit, a judgment assigned or complaint, a verdict or demurrer, *eight pence* each.

Discharging a recognizance by Proclamation, *four pence*. Said fees to be paid to the Clerks of the respective Courts for the use of the Crier.

### Goalers Fees.

For turning the Key on each Prisoner committed, *two* Goalers fees. *shillings, viz. one shilling* in, and *one shilling* out.

EXHIBIT 14

1785 - 1196
[illegible handwritten marks]
177.
4719

# THE

# L A W S

OF THE

## STATE OF NEW-HAMPSHIRE,

THE

# CONSTITUTION

OF THE

### STATE OF NEW-HAMPSHIRE,

AND THE

## CONSTITUTION OF THE UNITED STATES,

WITH ITS PROPOSED AMENDMENTS.

STANFORD LIBRARY

PRINTED BY ORDER OF THE HONORABLE THE GENERAL-COURT.

———◦◦◦◦◦◦———

## STATE OF NEW-HAMPSHIRE:

PORTSMOUTH:—Printed by JOHN MELCHER,

PRINTER TO THE STATE.

1797.

Digitized by Google

Paſſed Feb.
9, 1791.

### An ACT regulating fees.

BE it enacted by the Senate and House of Repreſenta-
tives in General Court convened, That the fees
of the ſeveral officers and other perſons herein after
mentioned ſhall be as follows, viz.

*Fees of the juſtices of the peace in civil cauſes.*

For every writ of ſummons or writ of attachment
with ſummons, one ſhilling.

For every writ of ſubpœna, ſix pence.

For the entry of every action or complaint, inclu-
ding filing the papers, entering judgment, and appear-
ance and recording, three ſhillings and four pence.

For every execution, one ſhilling.

For granting an appeal, one ſhilling.

For entering ſatisfaction of a judgment on record,
ſix pence.

For taking affidavits out of court, two ſhillings for
ſwearing each witneſs and making the caption ; and
one ſhilling for writing each page of the depoſition ;
and for the juſtice's travel to ſwear witneſſes, at the
rate of two ſhillings for every ten miles, actual travel.
The juſtice's fees for travel and taking affidavits, and
the witneſſes travel and attendance ſhall be certified
by the juſtice in the affidavit, otherwiſe the juſtice
ſhall not be allowed any thing for his fees.

For taking affidavits in perpetuam, the ſame fees
to each juſtice as for the taking of other depoſitions.

For taking and certifying the acknowledgment of
any deed or other inſtrument, one ſhilling, but if
there be more than one perſon who ſhall acknowledge
the ſame inſtrument, and the acknowledgment be
made at different times, then one ſhilling for each
time of taking and certifying.

For granting warrant of appraiſement and ſwearing
the appraiſers, one ſhilling and ſix pence.

For every actual trial upon iſſue joined either upon
matter of law or of fact, two ſhillings.

For adminiſtering oaths in all other caſes and cer-
tifying the ſame (except the oaths of office adminiſ-
tered to town officers, and oaths adminiſtered to wit-
neſſes in the trial of cauſes before the juſtice) one
ſhilling.

*Fees*

*Fees of juftices of the peace in criminal cafes.*

For every warrant founded on a complaint for any offence, one fhilling.

For drawing a complaint, two fhillings.

For granting an appeal, one fhilling.

For every recognizance, one fhilling.

For taking bail of perfons committed in criminal caufes, two fhillings for each offender.

For every examination, two fhillings.

For every entry of a complaint and judgment thereon, two fhillings and nine pence.

For warrant of commitment and every other warrant, except thofe above mentioned, three fhillings, and for every adjournment, one fhilling.

*In cafes of forcible entry and detainer.*

The juftices for every day's attendance, fix fhillings each.

To the witneffes and parties the fame as in other cafes.

To the jurors, two fhillings per day for their attendance, and the fame travel as jurors at the fuperior court.

To the fheriff, fix fhillings per day.

*Juftices fees at the court of general feffions of the peace.*

To each juftice for each day's attendance, to be paid out of the county treafury, three fhillings and two pence per mile for travel, to and from court.

There fhall be paid to the clerk of the court of general feffions of the peace for the entry of every complaint, action or petition, nine fhillings, of which he fhall pay to the county treafurer feven fhillings and eight pence.

For every recognizance in criminal cafes, one fhilling, two thirds of which he fhall pay to the county treafurer.

For difcharging every recognizance fix pence.

For every warrant for criminals, one fhilling.

For examining the grand jurors accounts, yearly, and order thereon to the county treafurer, one fhilling and fix pence.

For entering fatisfaction of judgment on record, one fhilling.

For a writ of protection, one fhilling.

*Fees*

P

*Fees of the justices of the court of common pleas.*

For every action, petition or complaint, entered in the court of common pleas, the justices thereof shall be paid five shillings and four pence.

For every appeal, one shilling.

For receiving the proof of a deed in court, one shilling.

For granting a writ of protection, one shilling.

*Fees of the clerk of the court of common pleas.*

For every action, petition or complaint, entered in the court of common pleas the clerk thereof shall receive three shillings and eight pence, in full for entry, verdict, non-suit or default, judgment, recording and every other service relative to such action, petition or complaint, for which no fees are otherwise particularly prescribed by this act ; the said clerk paying thereout the crier's and sheriff's fees, for default or non-suit, said sum, together with five shillings and four pence for the justices, to be paid at the time of entry.

For a blank writ and summons, six pence.

For a writ of protection, nine pence.

For each execution, one shilling.

For entering satisfaction of a judgment, four pence.

For entering a continuance, eight pence.

For each venire, to be paid out of the county treasury, three pence.

For every writ of possession, one shilling and six pence.

For each writ of subpæna, six pence.

*Fees of the justices of the superior court.*

For the entry of every action, petition or complaint at the superior court, the justices thereof shall be paid twelve shillings.

For taking special bail, two shillings.

For a writ of habeas corpus, one shilling and four pence.

For allowing a bill of cost, eight pence.

For granting a writ of protection, one shilling.

For every deed proved in court, one shilling.

For allowing a writ of error, one shilling.

For every acknowledgment of satisfaction of a judgment on record, one shilling.

*Fees*

### Fees of the clerk of the superior court.

For the entry of every action or petition, four shillings.

For entry of a complaint for not prosecuting an appeal, two shillings.

For entering a judgment, and recording it at large, two shillings.

For a writ of review, three shillings.

For a writ of scire facias, three shillings.

For writ of execution, one shilling and six pence.

For a writ of possession, three shillings and six pence.

For a writ of habeas corpus, two shillings.

For entering an appearance at the request of any party, six pence.

For entering a satisfaction of a judgment on record, eight pence.

For entering a continuance, one shilling.

For filing papers, one penny half penny each.

For certifying the proof of a deed in court, one shilling.

For each venire, on certificate of the justices of the superior court, three pence, to be paid out of the county treasury.

For a subpæna, one shilling.

For every recognizance, one shilling,

For every writ of protection, one shilling.

For discharging a recognizance, one shilling.

### Sheriff's fees.

For the service of a writ of summons or scire facias, either by reading it to the defendant or leaving a copy, one shilling and four pence for each defendant.

For the service of a writ of attachment with or without a summons, one shilling and four pence, for each defendant.

For a bail bond, to be paid by the person bailed, one shilling.

For the service of a writ of possession, the same as for the service of the original writ on which it was obtained, with poundage for the costs as in personal actions.

For levying executions in personal actions and extents, six pence on the pound for the first twenty pounds; three pence on the pound for the second twenty pounds; two pence on the pound for all

sums

fums between forty and an hundred pounds, and one penny on the pound for all fums above one hundred pounds ; the poundage on extents to be taken in the fame paper bills, notes, orders or certificates, as the fame extent iffued for.

For travel for the fervice of each writ, execution or extent, two pence per mile ; the travel to be computed from the place of fervice to the office, place or court to which the writ is returnable, by the way moft commonly ufed : And where there are feveral perfons in the fame writ, execution or extent, upon whom it is ferved, the travel fhall be computed from the remoteft of them, and no more to be allowed for travel than if it was ferved only on the remoteft perfon as aforefaid ; provided that no more than fifty miles travel fhall be allowed the fheriff or other officer ferving any writ, execution or extent, in any cafe : The travelling fees, and fees of fervice to be endorfed on the writ in mefne procefs, and no more fhall be allowed in any cafe than is fo endorfed ; and alfo the fees for fervice, poundage and travel, on executions and extents, fhall be particularly fet down and expreffed thereon.

For fummoning witneffes, one fhilling each.

For ferving a writ of execution for partition of real eftate, on a judgment of court, five fhillings per day, and for travel and expenfes, three pence per mile.

For every trial, eight pence, to be paid with jurors fees.

For every default, four pence.

For attending the grand jury, two fhillings per day.

For attending the petit jury, nine pence each cafe, to be paid with the jury fees.

For difperfing venires, three pence each, to be paid out of the county treafury.

For difperfing proclamations, to be paid out of the county treafury, three pence each.

*Coroner's Fees.*

For ferving writs, the fame fee for travel and fervice as to the fheriff.

For every trial where the fheriff is concerned, eight pence to be paid with the jury's fees.

For taking an inquifition, nine fhillings.

To the foreman of the jury, three fhillings, and
other

# EXHIBIT 15

# A MANUAL

OF

# THE LAWS OF NORTH-CAROLINA,

## ARRANGED UNDER DISTINCT HEADS,

### IN ALPHABETICAL ORDER.

*WITH REFERENCES FROM ONE HEAD TO ANOTHER,*

WHEN A SUBJECT IS MENTIONED IN ANY OTHER PART OF THE BOOK
THAN UNDER THE DISTINCT HEAD TO WHICH IT BELONGS.

### BY JOHN HAYWOOD, ESQ.

LATE ONE OF THE JUDGES OF THE SUPREME COURTS OF LAW AND
EQUITY.

## THIRD EDITION, CORRECTED TO THE PRESENT TIME.

### RALEIGH:

PRINTED & SOLD BY J. GALES, AND MAY BE HAD OF THE PRINTERS
AND BOOKSELLERS IN ALL THE TOWNS IN THE STATE.

• • • • • • • •

1814.

Digitized by Google

## FEES.
### 1779. C. 4.

**Execution may issue for fees.** 1. §4. The clerks of the superior and county courts, on the fees not being paid by the party from whom they are due, may make out execution, directed to the sheriff of the county where the party resides, and the said sheriff shall levy the same by virtue of the said execution as in other cases; and to the said execution shall be annexed a copy of the bill of costs of the fees on which such execution shall issue, wrote **Bill of costs to be annexed.** in words at length without any abbreviation whatsoever, and all executions issuing without the copy of such bill of costs annexed, shall be deemed illegal, and no sheriff shall serve or execute the same.

**Courts to settle disputes about fees.** II. §7. If any clerk, during the sitting of the court whereof he is clerk, demand other or greater fees than by this act allowed, the court shall immediately, on complaint being made thereof, determine what fee or fees shall be paid to the said clerk by the party complaining.

### 1784. C. 7. Sess. 2.

IV. §1. The officers herein mentioned shall take and receive the following and no other or greater fees whatever.

**Copy of fees to be put up by clerk.** §2. The clerks of the several superior and county courts in this state, shall put up, in some public place in their office, an exact copy of the fees by this act allowed, and also in the court-house during the sitting of each court, and for every such failure or neglect they shall forfeit and pay the sum of five pounds, to be recovered by warrant, to the use of any person who will sue for the same.

**Execution for fees bill of costs annexed.** V. §8. The clerks of the superior and county courts where suits are determined, and the fees not paid by the party from whom they are due, may make out executions directed to the sheriff of any county of this state, and the said sheriff shall levy the same as in other cases; and to the said execution shall be annexed a copy of the bill of costs of the fees on which such execution shall issue, written in words at length without any abbreviation whatsoever, and all executions issuing without the copy of such bill of costs annexed, shall be deemed illegal, and no sheriff shall serve or execute the same.

**Penalty for not observing the act.** VI. §9. If the clerk of any court, sheriff, register or coroner of any county, shall hereafter be guilty of any breach of the duties enjoined him by this act, either by his own confession or verdict of a jury, it shall, on a second conviction, be adjudged and deemed a misbehavior in office, for which such clerk or other officer herein mentioned shall be removed from office: Provided nevertheless, that in cas

Digitized by Google

such clerk or other officer shall be disqualified with the determination of the county court, he may appeal to the superior court of the district in which he resides, in which case there shall be a trial by jury, where, if the suspension of the county court shall be confirmed, the said clerk or other officer as aforesaid, shall ever after be rendered incapable of acting in the said office in any county in this state.

### Sheriff's Fees.

1762. C. 5. § 10. For selling an orphan's estate, to be allowed by the county court, not exceeding 2 1-2 per cent.

For serving copy of a declaration, 1s.

For pilloring a person, 5s.

For an attachment, the same as for an arrest, and if further trouble by moving of goods, to be taxed by the court.

For executing a warrant of distress, or an execution against the body or goods, 2 1-2 per cent.

For summoning, impannelling and attending on every jury in every cause in court, 1s.

When a special venire shall issue by order of, court for summoning each juror, and attending the same, 2s.

For serving and attending on any person on a habeas corpus, per day, 15s.

1798. C. 18. § 1. For selling the estate of an intestate, to be allowed by the court, not exceeding 2 1-2 per cent.

1777. C. 7. § 1. For summoning every warden of the poor, to be paid by the county, 2s. 8d.---6d. 1-4 scaled.

1782. C. 11. § 5. For services of equity process and incidental thereto, the same fees as for the like services at law.

1797. C. 18. § 3 For apprehending any criminal, 10s.

For conveying any person in his custody for a criminal offence to the gaol where such person ought to be conveyed at the rate of 6d. per mile ; for each person composing the sheriff's guard 3d. per mile, and 4s. for each day such sheriff shall maintain said prisoner.

For carrying any sentence or order on the part of the state into execution, where the convict is to be corporally punished, except that of death, 10s.

For the execution and decent burial of any felon, 5l.

### 1802. C. 16. § 1.

The sheriffs of the different counties within this state, shall be entitled, for the following services, to the fees respectively annexed thereto : For every arrest, 7s. 6d. for every bail bond, 2s. 6d. For every subpœna he shall serve, 3s. and every attachment levied, 7s. 6d. for taking replevy bond upon such attachment, 2s. 6d. for putting in stocks, 6s For every commitment, 3s. For every release, 3s. For eve-

Digitized by Google

ry writ of possession, 10s. For calling every suit in court, 6d.

## Ranger's Fees.

VIII. 1777. C. 9. § 10. For every search, 1s. (Quære by reason of 1794, c. 7, § 1.)

1784, C. 7. § 6 For each and every horse, mare or gelda ing, including the certificate entered in his office, 5s.

For each head of neat cattle, 2s. 6d.

For each head of hogs and sheep, 1s.

1799. For every bond, 2s

## Secretary of State.

For copying and certifying a will, 4s.

For correcting an error in a patent by order of court, where an error was not committed by himself, 4s.

For copying and certifying the record of a grant or patent 4s. For every commission for a place of profit, 8s.

IX. 1799. C. 25. § 1. For receiving the surveyor's return, filing the plan, making out and recording the grant, with the endorsement thereof and the certificate thereon, to be paid by the grantee at or before the delivery of said grant, out of the office, shall be entitled to receive 5s. For docketing a caveat, filing order of suspension to the court, and entering and filing the judgment of the court thereon, 5s. For every search, 1s. For registering every deed for lands purchased for the use of the state, under an act of the General Assembly passed in the year 1798, entitled "An act to amend the revenue laws as repects the land tax." he shall receive the same fees that the Registers of the different counties would be entitled to receive for registering similar deeds; to be paid him by the Treasurer.

X. §2. The secretary shall keep a receipt book in which he shall take from each and every person to whom a grant shall be delivered, a receipt.

## Private Secretary.

XI. 1799. C. 25. § 3. For the certificate of suspension of a grant, shall be entitled to receive 2s. 6d. For sealing each grant for land, including wafers or wax, paper and tape used in making the same, to be paid by the grantee on or before the delivery of the grant out of secretary's office, 2s. 6d.

## 1806. C X. § 1.

From and after the passing of this act, the private secretary of the governor shall be allowed the sum of 150l. and the following fees, and no others whatever, viz. For a judge's commission, 40s. for an attorney-general's ditto, 20s. a solicitor's ditto 20s. senators to congress ditto 20s. representatives ditto 20s. notary-public's ditto 20s. for any commission

current, exhibited by any administrator, executor or guardian, or for search, copy and certificate of the same, if the estate be under one hundred pounds, 2s. if above, 4s. For every marriage licence and bond, 8s. For searching a record out of court, 1s. For proving or entering acknowledgment of a conveyance of lands, or other estate, and certifying the same, with order of registration and examination of a feme covert, without commission, 2s. For a commission to take the examination of a feme covert or witnesses in a case depending in court, entering the return thereon, and other necessary services, 2s. 4d. For guardian or other bond taken in court, including all services, 6s. For indentures for binding out apprentices, including all fees for every service necessary thereon, 6s. For a special verdict, or demurrer, or motion in arrest of judgment, 3s. For a writ of error or appeal, with a transcript of the record, and all services thereon, 8s. For making out certificates of witnesses' attendance, 8d. For recording a mark or brand, and granting a certificate thereof if required, 1s. And all other services done by the clerks of the county courts are hereby deemed ex efficio, amongst which all notices or writs of scire facias against jurymen shall be considered, and the respective courts may allow reasonable satisfaction for the same annually, out of the county tax, not exceeding 20l.

1787. C. 19. §. 4. For every security by him taken for the plaintiff's prosecuting his suit or to pay costs, 2s. For entering the same, with the names of the security, in a book to be by him kept for that purpose, 2s.

1790. C. 15. § 4. For each petition for correcting error in a grant or mesne conveyance, 5s.

1792. *Resolution.* For affixing the seal to every instrument of writing that may require the same, 2s. 6d.

1792. C. 9. § 8. For every processioner's certificate recorded, to be paid by the proprietor of the land, 2s.

1796. C. 7. § 13. For every search of the entry-taker's book in his possession, 1s. For the copy of every location, 1s.

1797. C. 16. § 4. For issuing warrant, granting a certificate, and affixing the seal of the county thereto, as directed by 1796, c. 7, § 4, *Entries* 40, the sum of 4s. and no more.

1798. C. 18. For tavern licence and bond, and furnishing a copy of the tavern rates, 8s.

## Register.

XV. 1784. C. 7. § 4. For every search, 8d. For registering every other instrument of writing than a deed or grant, 4s.

Digitized by Google

1797. C. 15. § 1. For registering each deed or grant, where the conveyance is only for one tract of land, including the certificate thereof, 4s. If the deed be for the conveyance of two or more tracts, the sum of 4s. for the first tract, and 1s. for every other tract mentioned and described in said instrument, and in like manner for all copies executed by him.

### Attorney General.

XVI. 1748. C. 2. § 1. For every indictment found or presentment made, 26 . 8d. If the bill be found ignoramus, then the prosecutor shall pay 13s. 4d.

### County Solicitor.

XVII. 1784. C. 31. § 2. For prosecuting for the state, in any of the county courts in any matter civil or criminal, the same fees which are by law allowed to the attorney-general for the like services.

### Solicitor-General.

XVIII. 1790. C. 3. § 7. The same allowances and fees as the Attorney-General.

### Constable.

XIX. 1784. C. 7. § 5. For attendance of a constable every court when summoned by the sheriff, 8s. per day. For whipping a negro by order of court or any justice, 2s. 8d.

1794. C. 13. § 22. For serving every warrant to the constable or or other officer, for each person named therein, 4s. For summoning every witness 2s. For every execution, 4s. For every attachment levied, 5s. For every bail bond, 1s. Constable for serving any person who fails to give in his list of taxables in due time, 2s.

### Coroner.

XX. 1784. C. 7. § 7. For attending on every inquest, 24s. and the same fees for discharging the duties of a sheriff as such sheriff would be entitled to by this act for performing the same service.

1803. C. 22. § 1. Whenever an inquest shall be held, that the treasurer of the county wherein the same may happen, shall pay off the cost and charges of the same out of the county monies.

### Commissioner of Affidavits.

XXI. 1784. C. 13. § 3. For every affidavit taken and certified, 4s.

### Attornies.

XXII. 1786. C. 14. § 4. For every suit in equity, 10l. For every suit in the superior courts, where the title of lands shall come in question, 5l. For all other suits originally

commenced in any of the said courts on the law side, 5l. In
all appeals from any other court to the said superior courts,
5l. In all suits in the county courts where the title of lands
come in question, 5l. In all other suits originally commen-
ced in the said county courts, 2l. In every appeal from the
judgment of a justice of the peace to the said county court,
20s.

## Inspectors and Turners up of Tobacco.

XXIV. 1803. C. 22. § 1. For inspecting, turning up,
coopering, finding nails, hoops, and issuing a note, for every
waggon hogshead, 7s. and for each and every rolling hogs-
head, 8s. and no more.

## Tobacco Pickers.

XXV. For every hundred weight picked and prized one
fifteenth part.

## Clerk and Master in Equity.

XXVI. 1787. C. 22. § 3. For a report on an answer, 3s.
on a plea and answer, 4s. on a demurrer and answer, 4s.
For an affidavit to an answer, 1s 6d ; For an affidavit to a
bill, 1s 6d : For a separate affidavit, 2s ; For a copy report
by the office copy sheet, *containing ninety words*, 2s ; For
copies of proceedings and exemplifications, copy sheet, 2s ;
For taking a bond, 1s 6d ; For every rule given for service
2s 6d ; For every rule not for service, 1s 3d ; For every
subpæna, writ or other process, 10s ; For every dedimus
or commission, 5s 4d ; For every injunction, 10s ; For
drawing decrees, 4s by the copy sheet ; For enrolling a bill
or answer, 2s by the copy sheet ; For entering a plea or de-
murrer, 2s ; For recording depositions to perpetuate testi-
mony by the copy sheet, 2s. For search, 1s. For every
dismission, 2s.

1793. C. 16. § 9. For a report stating an account as
much as the court may in discretion think adequate to the
actual labor and trouble bestowed, not exceeding 25l. and
the master shall in all cases give notice to the party liable to
pay costs of the time that he will move the court to tax such
costs as may arise on the reference of accounts.

## Inspectors of other articles than Tobacco.

XXVII. 1791. C. 14. § 3. For each barrel of flour, 6d.
1791. C. 14. § 7. For every barrel of pork or beef, 1s.
of rice or butter, 8d. of fish, 4d. of pitch or turpentine, 3d.
each hundred of staves or heading, 3d. every thousand shin-
gles, 3d. each thousand feet of boards, plank or scantling,
1s. each barrel of tar, 2d. And the fees of inspection shall
in all instances be paid by the purchaser or exporter of the

# EXHIBIT 16



A

# DIGEST

OF THE

# L A W S

OF THE

# State of Georgia.

FROM ITS FIRST ESTABLISHMENT AS A BRITISH PROVINCE DOWN
TO THE YEAR 1798, INCLUSIVE

AND THE

# PRINCIPAL ACTS OF 1799:

IN WHICH
Is comprehended the declaration of independence, the State Constitutions of 1777 and 1789, with the
alterations and amendments in 1794.

ALSO THE

### Constitution of 1798.

IT CONTAINS

As well all the Laws in force, as those which are deemed useful and necessary, or which are explanatory
of existing Laws, together with the

## TITLES OF ALL THE OBSOLETE AND OTHER ACTS.

AND CONCLUDES

With an Appendix containing the several Charters and other Documents, ascertaining and defining the
Limits and Boundary of the State; all the Treaties with the Southern Tribes of Indians; the articles of
Confederation and perpetual union; the Constitution of the United States, and a few Acts of Congress.

Together with a copious Index to the whole.

BY

## ROBERT & GEORGE WATKINS.

Philadelphia:
PRINTED BY R. AITKEN, No. 22, MARKET STREET.

1800.

III. *And be it further enacted,* That nothing herein contained shall affect the right or title of any person or persons claiming or holding a lot or lots within the said towns, as laid down in any former legal plan thereof.

IV. *And be it further enacted,* That all and every act or parts of acts which respects the surveying or laying out the town of Frederica, and also the act, entitled " An act to appoint commissioners for the town of Brunswick in the county of Glynn," passed at Augusta, the first day of February, one thousand seven hundred and eighty-eight, be and the same is hereby repealed.

WILLIAM GIBBONS, *Speaker of the House of Representatives.*
BENJAMIN TALIAFERRO, *President of the Senate.*
EDWARD TELFAIR, Governor.
December 17, 1792.

A. D. 1792.
No. 472.
The act passed to affect land claims under any former plan.

Certain acts respecting Frederica and Brunswick repealed.

*An Act for vesting certain powers in the commissioners of the court house and gaol in the county of Chatham, and for other purposes therein mentioned.*

No. 473.

I. BE it enacted by the senate and house of representatives, in general assembly met, That it shall and may be lawful to and for the commissioners of the court house and gaol of the said county, or a majority of them, together with the justices of the inferior court of the said county, or a majority of them, to issue bills of credit to be redeemed by fines and forfeitures of recognizances, ordered and taken to the superior and inferior courts of the said county, and the tax to be levied on the inhabitants and property in the county as aforesaid.

Commissioners of the court house and gaol of Chatham empowered to issue bills of credit.

How to be redeemed.

II. *And be it further enacted,* That the commissioners of the court house and gaol of the said county, or a majority of them, together with the justices of the inferior court of the said county, or a majority of them, shall be, and they are hereby authorized to levy a tax* on all persons and property within the said county liable to pay tax, not exceeding the one eighth part of their general tax for each year, while and until they shall be enabled fully to repair the said court house, build a new gaol, poor house and hospital as aforesaid.

Authorized to levy a county tax and to build a poor house.

WILLIAM GIBBONS, *Speaker of the House of Representatives.*
BENJAMIN TALIAFERRO, *President of the Senate.*
EDWARD TELFAIR, Governor.
December 18, 1792.

* So much as relates to county tax repealed by act of 1796, No. 555. *See p.*

*An Act to revise and amend an act for ascertaining the fees of public officers of this State.*

No. 474.

I. BE it enacted by the senate and house of representatives of the State of Georgia in general assembly met, and by the authority of the same, That the fees of the different

Fees of the public officers.

A. D. 1792. different public officers herein after mentioned, may be by them respectively received,
No. 474.  as follows :

## GOVERNOR's FEES.

Governor's fees. For signing a grant for five hundred acres or under, four shillings and eight pence.

For signing a grant above five hundred acres, and not exceeding a thousand acres, nine shillings and four pence.

On all grants above one thousand acres, at and after the rate of nine shillings and four pence for every thousand acres therein contained.

Ordering the great seal of the State to any paper of a private nature, four shillings and eight pence.

Which sums shall be paid into the treasury for public use, before any such grant or other paper is signed by the governor.

## SECRETARY OF STATE's FEES.

Secretary of State. For a grant of land and preparing and affixing the seal thereto, if five hundred acres or under, four shillings and eight pence; if above five hundred acres, nine shillings and four pence.

For registering a grant, two shillings and four pence.

For a bond, two shillings and four pence.

For a testimonial with the great seal, seven shillings.

For every search, seven pence.

For every militia commission, to be paid for by the public, two shillings and four pence.

Preparing and countersigning a *dedimus potestatem*, two shillings and four pence.

Entering satisfaction on every mortgage, one shilling and two pence.

Drawing and engrossing a proclamation, four shillings and eight pence.

Fixing the great seal of the State to any other paper, four shillings and eight pence.

For a certified copy of a grant or other paper, *per* copy sheet, three pence half-penny.

## SURVEYOR GENERAL's FEES.

Surveyor general. For examining a plat, two shillings and four pence.

For recording a plat, not exceeding five hundred acres, three shillings and six pence; if exceeding five hundred acres, seven shillings; if exceeding a thousand acres, fourteen shillings.

Recording a plan of a town, township or village, forty-six shillings and eight pence.

Transmitting a caveat to the governor, and attending thereon, four shillings and eight pence.

A certified copy of an original record, three shillings and six pence.

A certified copy of an original warrant, two shillings and four pence.

A search, seven pence.

Recording and issuing a certificate of a town lot, two shillings and four pence.

## COUNTY SURVEYOR's FEES.

County surveyor. Surveying a town lot and returning a certificate thereof to the surveyor general's office, four shillings and eight pence.

Surveying



Surveying a tract of land of or under one hundred acres, twelve shillings and six pence.

Each hundred acres after the first, two shillings and six pence.

Making a plat, recording, advertising and transmitting the same to the surveyor-general's office, four shillings and eight pence.

Entering a caveat, advertising and giving a certified copy thereof, seven shillings; attending trial of the same, three shillings and six pence; each postponement, two shillings and four pence, to be paid by the person postponing the same.

Recording judgment, and giving a certified copy thereof, two shillings and four pence.

Entering an appeal, and giving a certified copy thereof, four shillings and eight pence.

For a re-survey of land by order of court, of or under one hundred acres, twelve shillings and six pence, for the first one hundred acres; for every hundred acres after the first, two shillings and six pence.

For making and certifying a plat thereof, and transmitting the same, four shillings and eight pence.

And for any other re-survey, the same as aforesaid.

## SHERIFF's FEES, *in civil cases.*

For serving a copy of a process, and returning the original, seven shillings; if more than one defendant for each additional copy served, two shillings and four pence.

Levying execution on the body or property, seven shillings.

Summoning each witness, two shillings and four pence.

On all sums where the execution does not exceed fifteen pounds, five *per centum,* on the amount of property sold; on all sums above fifteen pounds, and where the execution does not exceed one hundred pounds, two and a half *per centum;* on all sums where the execution exceeds one hundred pounds, one *per centum;* and that no commission shall be demanded, where property is not actually sold.

Making out, and signing a bill of sale of other property, four shillings and eight pence: *Provided,* That fees shall be allowed only for one bill of sale, where the same will be sufficient to convey the property sold to one person or joint purchasers; unless the purchaser or purchasers, shall choose more than one.

Conducting a debtor under confinement before a judge or court, four shillings and eight pence.

Summoning a jury to try a caveat, and attendance, four shillings and eight pence.

Summoning a special jury, and all other services, attending trial of an appeal, four shillings and eight pence.

For a bail bond, four shillings and eight pence.

Making out, and executing titles to land, fourteen shillings, (if wrote by the purchaser, four shillings and eight pence.)

## SHERIFF's FEES, *in criminal cases.*

For re-committing of any person, when a *habeas corpus* is brought to his relief, four shillings and eight pence.

O o o            Summoning

*(margin:)* A. D. 1792. No. 614.

*(margin:)* Sheriff—in civil cases.

*(margin:)* Sheriff—in criminal cases.

A. D. 1792. Summoning a jury, four shillings and eight pence.

No. 474.     On every copy of a *mittimus*, one shilling and two pence.

For every mile a prisoner shall be removed on a *habeas corpus*, one shilling and two pence.

For removing a prisoner by *habeas corpus*, when no mileage is paid, per day, four shillings and eight pence.

Executing a criminal, thirty-seven shillings and four pence.

Attending a person, taken by a warrant, to the judges' chambers, three shillings and six pence.

Conducting a prisoner before a judge or court to and from gaol, four shillings and eight pence.

Executing a warrant of escape, three shillings and six pence.

Each mile to serve the same, two pence.

Executing and returning a bench warrant, four shillings and eight pence.

Each mile to serve the same, two pence.

Putting a person in the stocks, two shillings and four pence.

For whipping, cropping or branding a criminal, four shillings and eight pence.

Apprehending a person suspected, if committed or held to bail, four shillings and eight pence.

For each person, not exceeding two, who may be employed to guard a prisoner to gaol, per day, four shillings and eight pence.

## GAOLER's FEES.

Gaoler.     Receiving a prisoner or debtor, two shillings and four pence.

Turning the key or discharging a prisoner in virtue of a *habeas corpus*, or by order of the court, judge or justice, two shillings and four pence.

Dieting a prisoner per day, allowing two pounds of bread, one and a half pound of beef, or one pound of pork, with a sufficiency of water, all wholesome provisions, one shilling and nine pence.

Turning the key on commitment of any person, two shillings and four pence.

Dieting negroes, allowing one quart of rice or corn meal per day, seven pence.

## NOTARY PUBLIC's FEES.

Notary public.     For every protest and oath included, not exceeding sixteen copy sheets of ninety words, nine shillings and four pence.

Administering an oath in any other case, one shilling and two pence.

For each attendance on any person, to prove any matter or thing as notary public and certifying the same, two shillings and four pence.

Every other certificate, one shilling and two pence.

Noting a protest, four shillings and eight pence.

Registering a protest, per copy sheet, one sixteenth of a dollar.

Copy of a protest, per copy sheet, one sixteenth of a dollar.

## CORONER's FEES.

Coroner.     For summoning an inquest on a dead body, and returning the inquisition, forty-six shillings and eight pence.       For

A. D. 1792.  For subpœna tickets, commissions and letters of guardianship and enquiries respect-
No. 474.        ing property claimed, non-suits and any other service performed, the same
              fees as allowed to the clerk of the superior court.
            Each appeal prosecuted to judgment from a justices' court, four shillings and eight
              pence, if settled by the parties, two shillings and four pence, including every
              service to entering satisfaction.

### FEES to the CLERK of the HOUSE of REPRESENTATIVES, and SECRETARY of the SENATE.

Clerk of the      For every extract of a private nature, three pence half-penny *per copy* sheet.
house of repre-   For certifying an extract of a private nature, one shilling and two pence.
sentatives, and   For an act, passed for the benefit of an individual, or to incorporate a private society,
secretary of the    nine shillings and four pence.
senate.

### FEES of a CONSTABLE.

Constable.    Serving a warrant, summons or attachment in civil cases, one shilling and two pence.
            Returning the same, and attending the justices' court, one shilling and two pence.
            Summoning every witness, one shilling and two pence.
            Levying an execution and advertising the sale, one shilling and two pence.
            For selling, to satisfy an execution from a justice, five *per centum* on the amount of
              the debt.
            For attending grand jury, for each bill found, to be paid by the delinquent, one
              shilling and two pence.
            Serving a warrant in criminal cases, four shillings and eight pence.
            For carrying a prisoner to gaol, two pence per mile.
            For keeping and maintaining a prisoner, before examination, not exceeding twenty-
              four hours, one shilling and nine pence.

### FEES of the POWDER RECEIVER.

Powder receiv-   Every barrel of powder of one hundred pounds weight, lodged in the public maga-
er's fees.        zine, and delivered out, to be paid by the owner, one shilling and nine pence;
                and in proportion for any other quantity.

The public not      II. *And be it further enacted,* That none of the fees herein before set down or
accountable for   expressed, shall in any case (gaoler's fees for dieting prisoners, and coroner's fees for
fees in cases of  summoning an inquest, and returning an inquisition, and providing a coffin and burial
inability, except expences of a person found dead, and the sheriff's fees for executing a criminal,
in certain cases  excepted) be charged to the public, for or on account of any inability in the person
of gaolers, coro- who ought to have paid the same.
ners, & sheriffs.

Public officers     III. *And be it further enacted,* That every public officer and person herein men-
bound to give     tioned, or their deputy or agent, and every person acting as such, shall, if thereunto
statements of     required, be obliged to give a statement of the fees demanded, and a receipt for the
their fees.       same to any person paying any lawful or pretended fee or fees of office, claimed by
                and paid to any such public officer, or person herein before mentioned, his deputy
                or agent, or person acting as such, under pain that every public officer, or person
                                                                              herein

herein before mentioned, his deputy or agent, or person acting as such, shall for
every neglect or refusal, forfeit the sum of twenty-five shillings, with costs of suit,
to be sued for, recovered and applied in manner herein after directed. *Provided al-*
*ways nevertheless,* That all suits and actions which shall be brought or commenced by
virtue of this act, shall be instituted before the end of twelve months; and not
otherwise.

IV. *And be it further enacted,* That if at any time after the passing of this act,
any public officer or person herein mentioned, or his deputy or agent, or any person
acting as such, shall under pretence of any matter or thing done, transacted or per-
formed by any such public officer or person, or his deputy or agent, or any person
acting as such, demand any other or greater fee than is set down in the table hereunto
annexed, every such person so offending shall, for every such offence, forfeit and
pay four fold to the party aggrieved, for the sum so unjustly demanded or taken, to
be recovered with costs of suit, before any justice of the peace. *Provided,* the sum
does not exceed his jurisdiction, or in any court of record within this State.

V. *And be it further enacted,* That every public officer or person herein named,
and every deputy, agent or person acting as such, shall within ninety days after the
passing of this act, cause a true and exact copy of the table or docket of his fees, as
the same is established by this act, such table or docket to be in fair words and figures,
without any abbreviations, except sums, to be placed up, and to be constantly kept
in a conspicuous part of the room or place where he shall usually execute the business
of his office or employment, under pain of forfeiting two shillings and four pence
for each day's neglect of fixing up the same.

VI. *And be it further enacted,* That in case any public officer, or any person herein
before mentioned, shall be sued or prosecuted for, or by reason of any fee of office
whatever, and verdict shall be given for such public officer or other person, or if the
plaintiff or prosecutor shall discontinue such suit or prosecution, or shall be non-
suited, then such public officer or other person shall recover double costs.

VII. *And be it further enacted,* That all fines, penalties and forfeitures, incurred
under and by virtue of this act, shall be recovered, by action, in the superior or
inferior courts, without any delay; and shall be applied, one moiety to the use of
the State, and the other to the person or persons carrying on the prosecution to the
conviction of the offender; except such as come within the jurisdiction of a justice
of the peace, and except also those forfeitures, which are declared payable to the
party aggrieved.

VIII. *And be it further enacted,* That any public officer, who shall charge or take
fees not allowed by this act, shall on conviction thereof, be dismissed from office.

IX. *And be it further enacted,* That the State fees in the executive department
may be paid in the paper medium of this State.

X. *And be it further enacted,* That the clerks of the courts respectively shall
make a return on oath, of the fees collected on behalf the State, designating the
paper medium from the specie, received by them previous to the passing of this act,
and shall settle with the treasurer agreeably thereto.

XI.

Suits to be commenced within 12 months.

To forfeit four fold for illegal charges.

Tables of fees to be set up in public offices.

Penalty for neglect.

Officers sued may recover double costs.

Fines & forfeitures how to be recovered and applied.

Persons taking illegal fees to be dismissed from office.

State fees in the executive department to be paid in paper medium.

Clerks how to settle for State fees heretofore collected.

A. D. 1792.

No. 474.
Public officers
charging for services not done
to forfeit four
fold to illdiv.

No public officer
to tax costs of
witnesses at the
suits.

XI. *And be it further enacted,* That any public officer, who shall presume on any pretence whatever, to charge, demand or receive fees for services not done or performed, every such person so offending shall forfeit and pay to the party aggrieved four fold the sum so illegally charged, demanded or received, and shall be immediately dismissed from office.

XII. *And be it further enacted,* That no justice or justices of the peace shall tax any costs for the attendance of witnesses in any case tried before him or them.

WILLIAM GIBBONS, *Speaker of the House of Representatives.*
BENJAMIN TALIAFERRO, *President of the Senate.*

EDWARD TELFAIR, GOVERNOR.

*December* 18, 1792.

No. 475.

## An Act to revise, amend and consolidate the several judiciary acts of this State.*

Two judges of
the superior
court to be elected.

Their oath.

I. BE *it enacted by the senate and house of representatives of the State of Georgia in general assembly met, and by the authority of the same,* That from and immediately after the passing of this act, two fit and proper persons duly qualified shall be elected judges of the superior courts, which judges shall, before they enter on the duties of their respective offices, take the following oath or affirmation, to wit,

" I do solemnly swear or affirm, that I will administer justice without respect to
" persons, and do equal right to the poor and to the rich; and that I will faithfully
" and impartially discharge and perform all the duties incumbent on me as a judge
" of the superior courts of this State, according to the best of my abilities and under-
" standing, and agreeable to the laws and constitution of this State and the consti-
" tution of the United States. *So help me God.*"

To hold court
twice a year in
each county.
The times for
holding the
same in the respective counties.

In case of indisposition of either judges the
governor may
appoint a deputation to hold the
courts.

II. *And be it further enacted,* That the judges of the superior court, or one of them, shall hold the said courts in each county twice in every year, at the respective times and in the manner following, to wit, on the first Tuesday in January, in Camden; the Tuesday after in Glynn; the Tuesday after in Liberty; the Tuesday two weeks after in Chatham; the Tuesday two weeks after in Effingham; and the Tuesday after in Burk; the aforesaid counties shall be the Eastern district. And the said courts shall be held on the first Tuesday in January in Washington; the Tuesday after in Greene; the Tuesday two weeks after in Franklin; the Tuesday after in Elbert; the Tuesday after in Wilkes; the Tuesday two weeks after in Columbia; and the Tuesday after in Richmond; the aforesaid last counties shall be the western district. And when from indisposition of either of the judges of the superior courts the same cannot be held in manner as aforesaid, it shall and may be lawful for the governor for the time being, to issue a commission to some fit and proper person, being a barrister of the said court, authorizing and requiring such person to hold the same during the indisposition

* Revised and amended by act of 1793, No. 500; and both repealed by act of 1796, No. 574.

Thompſon and Thomas M'Call, the ſole and excluſive right of running a line of ſtage carriages between the city of Savannah and town of Auguſta, not being carried into effect on the part of the ſaid William Thompſon and Thomas M'Call, the ſame ſhall be and is hereby repealed.

> THOMAS STEVENS, *Speaker of the Houſe of Repreſentatives.*
> BENJAMIN TALIAFERRO, *Preſident of the Senate.*

Concurred, *February* 22, 1796.

> JARED IRWIN, GOVERNOR.

---

## *An Act for the better regulating and conducting elections in the ſeveral counties of this State.*

WHEREAS, the ſeveral acts heretofore paſſed for the ordering and conducting elections, have by experience been found defective and incomplete, and the good citizens of this State will probably ſuſtain injuries and impoſitions by a continuance of them; to prevent which as much as poſſible,

I. *Be it enacted by the ſenate and houſe of repreſentatives of the State of Georgia in general aſſembly met, and it is hereby enacted under and by virtue of the authority thereof,* That all elections for members to repreſent this State in the general aſſembly thereof, and for repreſentatives in congreſs, ſheriffs, clerks of the ſuperior and inferior courts, regiſters of probates, county ſurveyors and coroners, ſhall be held at the court houſe or place appointed for holding the ſuperior courts in the reſpective counties.

*Elections to be held at the court houſe.*

It ſhall be the duty of any three or more of the magiſtrates for each county, not being candidates, to preſide at and make returns of all elections for ſenators and repreſentatives in the general aſſembly, repreſentatives in congreſs, and county officers; and the ſheriff of each county or his deputy, is required to attend at ſuch elections, for the purpoſe of enforcing the orders of the preſiding magiſtrates in preſerving good order.

*Three or more magiſtrates to preſide—the ſheriff to preſerve order.*

That at the general election which ſhall be held on the firſt Monday in November, one thouſand ſeven hundred and ninety-ſeven, in the ſeveral counties of this State for members of the general aſſembly, the electors in each county ſhall elect a ſheriff, clerk of the ſuperior and inferior courts, regiſter of probates, county ſurveyor and coroner, who ſhall hold their offices for the term of two years if they ſhall ſo long well behave themſelves; and at the expiration of the ſaid term of two years, the ſaid electors ſhall again elect the county officers aforeſaid, and in like manner at every ſecond general election. *Provided,* That no perſon ſhall be twice elected ſheriff of any county in any term of four years; in which proviſion thoſe now in office are comprehended.

*County officers, when & in what manner to be elected—to hold their offices for two years.*

*Proviſo.*

That the general election ſhall be annually on the firſt Monday in November; and the time for taking in the votes ſhall be from nine o'clock in the morning till ſix o'clock in the afternoon.

*The general election to be annual. The time for taking votes.*

When.

# EXHIBIT 17

# The CONSTITUTION and FORM of GOVERNMENT agreed to by the Delegates of Maryland in free and full Convention affembled.

1. THAT the legiflature confift of two diftinct branches, a fenate, and a houfe of delegates, which fhall be ftiled the General Affembly of Maryland.

2. That the houfe of delegates fhall be chofen in the following manner: All freemen above twenty-one years of age, having a freehold of fifty acres of land in the county in which they offer to vote, and refiding therein, and all freemen having property in this ftate above the value of thirty pounds current money, and having refided in the county in which they offer to vote one whole year next preceding the election, fhall have a right of fuffrage in the election of delegates for fuch county; and all freemen fo qualified fhall, on the firft Monday of October feventeen hundred and feventy-feven, and on the fame day in every year thereafter, affemble in the counties in which they are refpectively qualified to vote, at the court-houfe in the faid counties, or at fuch other place as the legiflature fhall direct, and when affembled they fhall proceed to elect, *viva voce*, four delegates for their refpective counties, of the moft wife, fenfible, and difcreet of the people, refidents in the county where they are to be chofen one whole year next preceding the election, above twenty-one years of age, and having in the ftate real or perfonal property above the value of five hundred pounds current money, and upon the final cafting of the polls the four perfons who fhall appear to have the greateft number of legal votes, fhall be declared and returned duly elected for their refpective county.

3. That the fheriff of each county, or in cafe of ficknefs, his deputy, (fummoning two juftices of the county, who are required to attend for the prefervation of the peace) fhall be judge of the election, and may adjourn from day to day, if neceffary, till the fame be finifhed, fo that the whole election fhall be concluded in four days; and fhall make his return thereof, under his hand, to the chancellor of this ftate for the time being.

C

4 That

threats to, or abuse of their members, or by any obstruction to their proceedings; they may also punish, by imprisonment, any person who shall be guilty of a breach of privilege, by arresting on civil process, or by assaulting, any of their members, during their sitting, or on their way to or return from the house of delegates, or by any assault of, or obstruction to their officers, in the execution of any order or process, or by assaulting or obstructing any witness, or any other person, attending on, or on their way to or from, the house, or by rescuing any person committed by the house; and the senate may exercise the same power, in similar cases.

13. That the treasurers (one for the western and another for the eastern shore) and the commissioners of the loan office may be appointed by the house of delegates during their pleasure, and in case of refusal, death, resignations, disqualification, or removal out of the state of any of the said commissioners or treasurers, in the recess of the general assembly, the governor, with the advice of the council, may appoint and commission a fit and proper person to such vacant office, to hold the same until the meeting of the next general assembly.

14. That the senate be chosen in the following manner: All persons, qualified as aforesaid to vote for county delegates, shall on the first Monday of September 1781, and on the same day in every fifth year for ever thereafter, elect *viva voce*, by a majority of votes, two persons for their respective counties, qualified as aforesaid to be elected county delegates, to be electors of the senate; and the sheriff of each county, or in case of sickness his deputy (summoning two justices of the county who are required to attend for the preservation of the peace) shall hold and be judge of the said election, and make return thereof as aforesaid. And all persons qualified as aforesaid to vote for delegates for the city of Annapolis and Baltimore town, shall on the same first Monday of September 1781, and on the same day in every fifth year for ever thereafter, elect *viva voce*, by a majority of votes, one person for the said city and town respectively, qualified as aforesaid to be elected a delegate for the said city and town respectively; the said election to be held in the same manner as the election of delegates for the said city and town, the right to elect the said elector with respect to Baltimore town to continue as long as the right to elect delegates for the said town.

15. That the said electors of the senate meet at the city of Annapolis, or such other place as shall be appointed for
convening

# EXHIBIT 18

# LAWS

OF THE

## STATE OF NEW-JERSEY.—

COMPILED AND PUBLISHED,

UNDER THE AUTHORITY OF THE

## LEGISLATURE.

*BY JOSEPH BLOOMFIELD.*

TRENTON :
PRINTED BY JAMES J. WILSON.

1811.

*And provided alfo,* The legiſlature may give its conſent to the eſtabliſhment of one or
more governments weſtward thereof; but monopolies of land by individuals, being
contrary to the ſpirit of our free government, no ſale of territory of this State, or
any part thereof, ſhall take place to individuals or private companies, unleſs a coun-
ty or counties ſhall have been firſt laid off, including ſuch territory, and the Indian
rights ſhall have been extinguiſhed thereto.

Certain con-
templated pur-
chaſes ſtated to
have become
conſtitutionally
void by the fore-
going ſection.

The contract
having failed,
the legiſlature
to make provi-
ſion for return-
ing the conſi-
deration money

The money paid
for ſuch pur-
chaſes never to
be deemed a
part of the
funds of the
State.

Money is what
manner to be
drawn from the
treaſury.

Donations or
gratuities how
to be granted.
Sect. 24. The foregoing ſection of this article having declared the common rights
of the free citizens of this State, in and to all the territory without the preſent
temporary boundary line, and within the limits of this State, thereby defined, by
which the contemplated purchaſes of certain companies of a conſiderable portion
thereof, are become conſtitutionally void; and juſtice and good faith require, that
the State ſhould not detain a conſideration for a contract which has failed, the
legiſlature, at their next ſeſſion, ſhall make proviſion by law, for returning to any
perſon or perſons, who has or have *bona fide* depoſited monies for ſuch purchaſes in
the treaſury of this State: *Provided,* That the ſame ſhall not have been drawn
therefrom in terms of the act paſſed the thirteenth day of February, one thouſand
ſeven hundred and ninety-ſix, commonly called the reſcinding act, or the appro-
priation laws of the years one thouſand ſeven hundred and ninety-ſix and one thou-
ſand ſeven hundred and ninety-ſeven: Nor ſhall the monies, paid for ſuch purchaſes,
ever be deemed a part of the funds of this State, or be liable to appropriation as
ſuch; but until ſuch monies be drawn from the treaſury, they ſhall be conſidered
altogether at the riſque of the perſons who have depoſited the ſame. No money
ſhall be drawn out of the treaſury, or from the public funds of this State, except
by appropriation made by law; and a regular ſtatement and account of the receipts
and expenditures of all public monies, ſhall be publiſhed from time to time. No
vote, reſolution, law, or order, ſhall paſs the general aſſembly, granting a donation
or gratuity in favour of any perſon whatever, but by the concurrence of two-thirds
of the general aſſembly.

The cenſus in
what manner to
be taken.
Sect. 25. It ſhall be the duty of the juſtices of the inferior court, or any three of
them, in each county reſpectively, within ſixty days after the adjournment of this
convention, to appoint one one or more fit perſons in each county, not exceeding
one for each battalion diſtrict, whoſe duty it ſhall be to take a full and accurate
cenſus or enumeration of all free white perſons, and people of colour, reſiding
therein, diſtinguiſhing, in ſeparate columns, the free white perſons from perſons of
colour, and return the ſame to the clerks of the ſuperior courts of the ſeveral coun-
ties, certified under their hands, on or before the firſt day of December next; the
perſons ſo appointed, being firſt ſeverally ſworn before the ſaid juſtices, or either
of them, duly and faithfully to perform the truſt repoſed in them; and it ſhall be
the duty of the ſaid clerks, to tranſmit all ſuch returns, under ſeal, directed to the
ſpeaker of the houſe of repreſentatives, at the firſt ſeſſion of the legiſlature there-
after: And it ſhall be the duty of the general aſſembly, at their ſaid firſt ſeſſion, to
apportion the members of the houſe of repreſentatives among the ſeveral counties,
agreeably to the plan preſcribed by this conſtitution, and to provide an adequate
                                                              compenſation

ditaments shall be previously lodged with the said clerk, or recorded as aforesaid.

————

A supplement to the act entitled " An act respecting conveyances," passed June seventh, one thousand seven hundred and ninety-nine.

*Passed February* 8, 1811.

Sec. 1. BE IT ENACTED *by the council and general assembly of this state, and it is hereby enacted by the authority of the same,* That if the party who shall execute or may have executed, any deed or conveyance of lands, tenements or hereditaments, lying and being in this state, or the witnesses thereto, reside not in this state, but in one of the territories of the United States, or in one of the cities of Philadelphia or New-York, then the acknowledgment or proof which may have been, or shall be made before, and certified by one of the judges of the supreme court of such territory, or the mayor of such city, shall be as good and effectual as if the same had been made before, and certified by one of the judges of the supreme court of this state.

————

AN ACT constituting courts for the trial of small causes. [Rev.313]

*Passed March* 15, 1798.

Sec. 1. BE IT ENACTED *by the council and general assembly of this state, and it is hereby enacted by the authority of the same,* That every suit of a civil nature at law, where

G

Digitized by Google

<div style="margin-left: 2em;">

**What causes shall be cognizable before justices of the peace.**

**[Rev. 313]**

the debt, balance, or other matter in dispute, does not exceed, exclusive of costs, the sum or value of sixty* dollars, shall be, and hereby is made cognizable before any justice of the peace of any county in this state, who is hereby authorized to hold a court within such county to hear, try, and determine the same according to law, although the cause of action did not arise in the said county; and further, that the said court shall be a court of record, and vested, for the purposes aforesaid, with all such power as is usual in courts of record of this state. *Provided always*, That this act shall not extend to any action of replevin, slander, trespass for assault, battery, or imprisonment, or to any action, wherein the title of any lands, tenements, hereditaments, or other real estate, shall or may in any wise come in question.

**Territorial jurisdiction of justices to be coextensive with their counties.**

2. *And be it enacted*, That the territorial jurisdiction of every justice of the peace, under this act, shall be coextensive with the limits of the county, for which he is appointed and commissioned; that his writs, precepts and process shall run in and through such county, and that he may, in causes pending before him, award writs of subpœna ad testificandum into other counties of this state.

**Constables to be their ministerial officers.**

3. *And be it enacted*, That the constables of the several townships in such county shall be the ministerial officers of the said court, and that it shall be the duty of the said constables to execute and return all precepts, summons, warrants, writs and other process, issuing out of the said court, and to them or any of them

</div>

---

* *Extended to* 100 *dollars by act of* 29*th Nov.* 1801.

Digitized by Google

22. *And be it enacted*, That to the jurors, and each of them, who shall be returned to try any cause as aforesaid, the said justice shall administer the following oath or affirmation :

Juror's oath.

You do swear, in the presence of Almighty God, (or do affirm, as the case may require) that you will well and truly try the matter in difference between          plaintiff, and defendant, and a true verdict give according to evidence.

That to every witness produced at the said trial, the said justice shall administer the following oath or affirmation :

Oath of witness.

You do swear, in the presence of Almighty God, (or do affirm, as the case may require) that the evidence you shall give to the court and jury in this matter in difference between

plaintiff, and          defendant, shall be the truth, the whole truth, and nothing but the truth.

And that to the constable, who shall be appointed to attend the jury, the said justice shall administer the following oath or affirmation :

Constable's oath.

You do swear, in the presence of Almighty God, (or do affirm, as the case may require) that you will, to the utmost of your ability, keep every person sworn (or affirmed) on this jury together in some private and convenient place, without meat or drink, water excepted ; that you will not suffer any person to speak to them, nor speak to them yourself, except by order of the court, unless it be to ask them, whether they have agreed on their verdict, until they have agreed on their verdict.

23. *And be it enacted*, That every person summoned as a juror, or subpœnaed as a witness, who shall not appear, or appearing, shall

Digitized by Google

# EXHIBIT 19

# LAWS

OF THE

# STATE

OF

# DELAWARE,

FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN

HUNDRED, TO THE EIGHTEENTH DAY OF AUGUST, ONE

THOUSAND SEVEN HUNDRED AND NINETY-SEVEN,

## IN TWO VOLUMES.

### VOLUME II.

*Published by Authority.*

STANFORD LIBRARY

*N E W - C A S T L E:*

PRINTED BY SAMUEL AND JOHN ADAMS.

M,DCC,XCVII.

Digitized by Google

CHAP.
CCXIII.
1790.

them from and after the time for collection of the said tax, shall have expired.

*Passed October 26, 1790.*

---

## C H A P.   CCXIV. b.

1790.

*An* ACT *directing the election of a Representative for this state in the Congress of the United States. (a).*

Time and places of holding the election.

SECTION I. **B**E *it enacted by the General Assembly of Delaware,* That an election of a Representative for this state, to serve in the Congress of the United States, for two years from the fourth day of March next, shall be held by the citizens of this state, qualified to vote for Members of the House of Assembly, on the second Monday of November next, at the following places, *to wit*; For the county of New-Castle at the Court House in the town of New-Castle; For the county of Kent at the Court House in the town of Dover; For the county of Sussex at the Court House in the town of Lewes; *(b)* in like manner as by the election laws of this state is directed for the election of Members of the General

Public notice thereof to be given.

Assembly of this state; of which election due and public notice shall be given by the Sheriffs of the respective counties, agreeably to the said election laws: And the present Sheriffs, together with every other officer and person whose duty it was to attend, conduct, and regulate the General Election held on the first day of this present month of October, are hereby authorised and required to attend, conduct, and regulate the election herein directed to be held for the purpose aforesaid, in like manner as in and by the said

Powers of the officers for conducting the election.

election laws is directed; and the several powers and authorities to the several officers given by the laws of this state, relating to the election of Members of the

General

(a) See chap. 188. b. Ante.

(b) Place of election for Sussex county since established at George Town, see chap. 237. b.

of the act for raising county rates and levies, *(a)* as by this act is altered, is hereby repealed and made void.

*Passed June* 14, 1793.

---

## C H A P.  XIX. c.

*An* ACT *to regulate the courts in this state.*

SECTION I. BE it enacted by the Senate and House of Representatives of the state of Delaware in General Assembly met, That, from and after the first Tuesday of October next, the Court of Chancery, Supreme Court, Court of Common Pleas, and Court of General Quarter Sessions of the Peace and Gaol Delivery, shall be held in each county twice in every year; *(b)* and that the terms of the said several courts shall commence and be held as follows, *That is to say,* The Supreme Court in New-Castle county on the second Tuesday of April and October, in Kent county on the fourth Tuesday of April and October, and in Sussex county on the second Tuesday after the terms shall commence in Kent county; and the Court of Common Pleas shall commence and be held in Sussex county on the second Tuesday after the terms of the Supreme Court shall commence in Sussex county, in Kent county on the second Tuesday after the terms of the Court of Common Pleas shall commence in Sussex county, and in New-Castle county on the second Tuesday after the terms of that court shall commence in Kent county. *(c)*

SECT. 2. *And be it enacted,* That the Court of Chancery shall be commenced, and held in each county, on the first Tuesdays next immediately succeeding the

*Terms,*

*of the Supreme Court.*

*Of the Court of Common Pleas*

*Of the Court of Chancery.*

---

*(a)* Chap. 102. a. 16 Geo. II.

*(b)* See art. 6, of the constitution of this state adopted in 1792—and the schedule.

*(c)* Times of holding those two courts altered in chap. 61. c. after.

Digitized by Google

ments, as though no such writ or writs were sued forth or delivered to them or any of them.

SECT. 9. *And be it enacted,* That it shall and may be lawful for any party or parties, to any suit or suits depending in the Court of Common Pleas, which may have originated previous to the first Tuesday of October next, after that day to remove all and every such suit of suits, before issue joined, by *habeas corpus* or *certiorari,* at any time previous to the first Tuesday of October, One Thousand Seven Hundred and Ninety-four, in like manner as they now can be moved in such causes; *(g)* any law to the contrary notwithstanding.

*What suits may be removed, and when.*

SECT. 10. *And be it enacted,* That the High Court of Errors and Appeals *(b)* shall be held and kept, once in every year, at the town of Dover, in Kent county, on the first Tuesday in August, to receive, hear and judge of appeals in all matters of law and equity, that may come before the said court from the Court of Chancery, the Supreme Court, and the Court of Common Pleas, in every county in this state.

*High Court of Errors and Appeals when held.*

SECT. 11. *And be it enacted,* That the Sheriff of Kent county, for the time being, shall be attendant on the said High Court of Errors and Appeals during the sitting thereof, and be the officer for the purpose of executing the orders and process of the said court; and in case of neglect or refusal so to do, shall be liable to the like pain, penalty, or forfeiture, as he is in the Court of Chancery, Supreme Court, or Court of Common Pleas.

*Sheriff of Kent to be attendant thereon.*

*Penalty for neglect.*

SECT. 12. *And be it enacted,* That the act, intitled, *An act to establish a Court of Appeals in this state,* shall be, and is hereby repealed from and after the first Tuesday of October next.

*Chap. 169. b.*

*Former act repealed.*

*Passed June* 14, 1793.

VOL. II.            3 Q            CHAP.

*(g)* For which see chap. 227. b.

*(b)* For the establishment of this court, see art. 7, of the constitution of June 179

To be furnished
with tranſcripts
relative to the
finances.

SECT. 5. *And be it enacted*, That immediately after the paſſing of any act of the General Aſſembly having regard to, or concerning the Auditor's Office, or the finances of the ſtate, the Secretary of State ſhall furniſh the Auditor with an authenticated copy thereof; and the Clerks of the Senate and of the Houſe of Repreſentatives ſhall alſo furniſh the Auditor with authenticated copies of all reſolves, minutes, or orders, which may be entered into, made, or ordered by their reſpective Houſes, relating in any manner to the buſineſs of the Auditor, or the finances of the ſtate.

Salary.

SECT. 6. *And be it enacted*, That the Auditor of Accounts ſhall, for his ſervices, receive the annual ſum of Three Hundred Dollars, to be paid quarterly at the treaſury of the ſtate, out of any monies therein, not otherwiſe appropriated, and no more. *(c)*

Paſſed June 15, 1793.

---

# CHAP. XXVII. c.

## An ACT *for regulating and eſtabliſhing fees.*

Preamble.

FOR preventing extortion, undue exaction of fees by the ſeveral officers within this ſtate; and that all fees may be reduced to a certainty, and be eſtabliſhed;

SECTION 1. *BE it enacted by the Senate and Houſe of Repreſentatives of the ſtate of Delaware in General Aſſembly met,* That the fees to be paid within this ſtate ſhall be as herein after are aſcertained, limited, and appointed, *That is to ſay:*

To the uſe of the ſtate---

The Rate.

FOR a licence to keep a public houſe of entertainment, and to ſell all liquors, ſigned and ſealed, Twelve Dollars.

A licence for the ſame, and to ſell all liquors, except wine, Eight Dollars. *(d)*          A li-

*(c)* See after in chaps. 65. c.—81. c. increaſed to Five Hundred Dollars, to commence from the time of his appointment, and to continue till firſt of Jan. 1796.

*(d)* For the original act for regulating innholders, &c. ſee chap. 75. a. 13 Geo. II.—See alſo chap. a. b. Anno, 1777, ſects. 4, 5—chap. 5. c. ſect. 5—chap. 20. c

Sergeant at Arms.

Every day's attendance as Clerk, tranfcribing, &c. Two Dollars, *per* day, and no more.

SECT. 21. And the fees belonging to the Sergeant at Arms fhall be as follow, *viz.*

For ferving every order, One Dollar.

Taking any perfon into cuftody, Thirty-three Cents.

Travelling charges *per* mile, Two Cents going, and the fame returning.

Every day's attendance on any perfon, where committed, Twenty-fix Cents.

Door-keeper.

SECT. 22. Fees to the Door-keepers of the refpective Houfes—

For every day's attendance, One Dollar.

Bell-ringer.

SECT. 23. To the Bell-ringer of the General Affembly, each day, Thirty-three Cents.

Coroner.

SECT. 24. Fees to the Coroner of each county—

For viewing the body of any perfon flain or murdered, to be paid out of the goods and chattels, lands and tenements, of the murderer or flayer, if he hath any; but if he hath not, by the county, befides mileage, from the Court Houfe to where the body is found, One Dollar.

Summoning and qualifying the inqueft, drawing and returning the inquifition, including mileage, Two Dollars.

Summoning and qualifying each witnefs, and mileage from the place where the body is found, Thirty-three Cents.

Taking examinations, or depofitions of witneffes, in writing, for each, Twenty Cents.

Taking every recognizance, Ten Cents.

In fect. 9, Ante. Summoning or arrefting the Sheriff, or any other perfon where he is party, executing a writ of *fieri facias*, or other execution, the fame fees as are allowed the Sheriff in like cafes.

Travelling charges, Two Cents *per* mile.

The Cryer.

SECT. 25. To the Cryer—

For every action entered in the Supreme Court, and in the Court of Common Pleas, Thirteen Cents.

Every fuit in the Court of Appeals, Sixty-feven Cents.

Calling each witnefs on a trial, Two Cents.

Calling a jury fworn at the bar, Seven Cents.

Every indictment, Thirteen Cents.

Calling a non fuit, Seven Cents.                    Calling

# EXHIBIT 20

# The 150 Largest City Parks

These are the largest parks located within the limits of a U.S. city. Most are owned by the municipality, but some are owned by a state, a county, a regional agency or the federal government. If a park extends beyond the boundary of the city, only the acreage within the city is noted here.



Key:
| | |
|---|---|
| (M): Municipally Owned Park | (R): Regional Park |
| (S): State Park | (NP): National Park |
| (C): County Park | (NWR): National Wildlife Refuge |

| Rank | Park Name | Type | Acres | City |
|---|---|---|---|---|
| 1 | Chugach State Park | S | 490,125 | Anchorage, Alaska |
| 2 | Franklin Mountains State Park | S | 25,631 | El Paso, Tex. |
| 3 | Bayou Sauvage National Wildlife Refuge | NWR | 24,293 | New Orleans, La. |
| 4 | South Mountain Preserve | M | 16,094 | Phoenix, Ariz. |
| 5 | McDowell Sonoran Preserve | M | 16,000 | Scottsdale, Ariz. |
| 6 | Cullen Park | M | 9,270 | Houston, Tex. |
| 7 | Topanga State Park (part) | S | 8,960 | Los Angeles, Calif. |
| 8 | Timucuan Ecological and Historic Preserve | NP | 7,870 | Jacksonville, Fla. |
| 9 | George Bush Park | C | 7,800 | Houston, Tex. |
| 10 | North Mountain Preserve | M | 7,500 | Phoenix, Ariz. |
| 11 | Gateway National Recreation Area (part) | NP | 7,138 | New York, N.Y. |
| 12 | Don Edwards San Francisco Bay National Wildlife Refuge (part) | NWR | 6,800 | San Jose, Calif. |
| 13 | Jefferson Memorial Forest | M | 6,013 | Louisville, Ky. |
| 14 | Eufaula National Wildlife Refuge (part) | NWR | 6,000 | Eufaula, Ala. |
| 15 | Mission Trail | M | 5,840 | San Diego, Calif. |
| 16 | William B. Umstead State Park | S | 5,579 | Raleigh, N.C. |
| 17 | Cecil Field Greenway | M | 5,366 | Jacksonville, Fla. |
| 18 | Ahupua'a O Kahana State Park | S | 5,229 | Honolulu, Hawaii |
| 19 | Forest Park | M | 5,157 | Portland, Ore. |
| 20 | Eagle Creek Park and Golf Course | M | 4,766 | Indianapolis, Ind. |
| 21 | Far North Bicentennial Park | M | 4,500 | Anchorage, Alaska |
| 22 | Griffith Park | M | 4,217 | Los Angeles, Calif. |
| 23 | Fairmount Park - Wissahickon Valley | M | 4,167 | Philadelphia, Pa. |
| 24 | Pumpkin Hill Creek Preserve | S | 3,896 | Jacksonville, Fla. |
| 25 | Walter E. Long Park | M | 3,715 | Austin, Tex. |
| 26 | Bidwell Park | M | 3,670 | Chico, Calif. |
| 27 | Fort Worth Nature Center/Wildlife Refuge | M | 3,662 | Fort Worth, Tex. |
| 28 | Mountain Creek Lake Park | M | 3,643 | Dallas, Tex. |
| 29 | Bays Mountain Park | M | 3,585 | Kingsport, Tenn. |

| 30 | False Cape State Park and Natural Area Preserve | S | 3,572 | Virginia Beach, Va. |
|----|---|---|---|---|
| 31 | Bonita Lakes Park | M | 3,462 | Meridian, Miss. |
| 32 | North Landing River State Natural Area Preserve | S | 3,440 | Virginia Beach, Va. |
| 33 | First Landing State Park | S | 3,410 | Virginia Beach, Va. |
| 34 | Shelby Farms Park | C | 3,200 | Memphis, Tenn. |
| 35 | Trinity River Park | M | 3,173 | Dallas, Tex. |
| 36 | Mohawk Park and Golf Course | M | 3,100 | Tulsa, Okla. |
| 37 | Brecksville Reservation (part) | R | 3,026 | Brecksville, Ohio |
| 38 | Pelham Bay Park | M | 2,765 | New York, N.Y. |
| 39 | Newport News Park (part) | M | 2,688 | Newport News, Va. |
| 40 | Otter Creek Park | M | 2,600 | Louisville, Ky. |
| 41 | Los Penasquitos Canyon | M | 2,405 | San Diego, Calif. |
| 42 | Longview Lake Park (part) | C | 2,381 | Kansas City, Mo. |
| 43 | Blue River Parkway | C | 2,319 | Kansas City, Mo. |
| 44 | Mill Stream Run Reservation (part) | R | 2,238 | Strongsville, Ohio. |
| 45 | Fleming Park (part) | C | 2,229 | Lee's Summit, Mo. |
| 46 | Steele Creek Park | M | 2,224 | Bristol, Tenn. |
| 47 | Bear Creek Pioneers Park | C | 2,168 | Houston, Tex. |
| 48 | Tilden Park | M | 2,077 | Berkeley, Calif. |
| 49 | Percy Warner Park | M | 2,058 | Nashville, Tenn. |
| 50 | Cheyenne Mountain State Park | S | 2,040 | Colorado Springs, Colo. |
| 51 | Sepulveda Basin Recreation Area | M | 2,031 | Los Angeles, Calif. |
| 52 | Galveston Island State Park | S | 2,013 | Galveston, Tex. |
| 53 | Smith and Bybee Wetlands Natural Area | R | 1,973 | Portland, Ore. |
| 54 | White Rock Lake Park | M | 1,952 | Dallas, Tex. |
| 55 | Swope Park | M | 1,805 | Kansas City, Mo. |
| 56 | Torrey Pines State Reserve | S | 1,800 | San Diego, Calif. |
| 57 | Calero County Park | C | 1,782 | San Jose, Calif. |
| 58 | Greenbelt Park | M | 1,778 | New York, N.Y. |
| 59 | Barton Creek Greenway | M | 1,771 | Austin, Tex. |
| 60 | Little Talbot Island State Park | S | 1,768 | Jacksonville, Fla. |
| 61 | Mission Bay Park | M | 1,756 | San Diego, Calif. |
| 62 | Rock Creek Park (part) | NP | 1,754 | Washington, D.C. |
| 63 | Tijuana River Valley Regional Park | C | 1,720 | San Diego, Calif. |
| 64 | Big Talbot Island State Park | S | 1,708 | Jacksonville, Fla. |
| 65 | Adobe Dam Recreation Area | C | 1,642 | Phoenix, Ariz. |
| 66 | Fort Harrison State Park | S | 1,640 | Lawrence, Ind. |
| 67 | Lake Leatherwood Park | M | 1,620 | Eureka Springs, Ark. |
| 68 | Pennypack Park | M | 1,618 | Philadelphia, Pa. |
| 69 | Claremont Hills Wilderness Park | M | 1,589 | Claremont, Calif. |
| 70 | Burns Park | M | 1,575 | North Little Rock, Ark. |
| 71 | Hidden Valley Wildlife Area | R | 1,510 | Riverside, Calif. |
| 72 | Water Works Park | M | 1,500 | Des Moines, Iowa |
| 73 | Beaman Park | M | 1,493 | Nashville, Tenn. |

| 74 | The Presidio | NP | 1,491 | San Francisco, Calif. |
| 75 | Wilderness Park | M | 1,472 | Lincoln, Neb. |
| 76 | Mt. Airy Forest | M | 1,471 | Cincinnati, Ohio |
| 77 | Glenn Cunningham Lake | M | 1,439 | Omaha, Neb. |
| 78 | Hansen Dam Recreation Center | M | 1,437 | Los Angeles, Calif. |
| 79 | Stumpy Lake Park | M | 1,435 | Virginia Beach, Va. |
| 80 | Memorial Park | M | 1,431 | Houston, Tex. |
| 81 | Longview Lake Park (part) | C | 1,429 | Lee's Summit, Mo. |
| 82 | Sycamore Canyon Wilderness Park | M | 1,424 | Riverside, Calif. |
| 83 | Kincaid Park | M | 1,411 | Anchorage, Alaska |
| 84 | Rancho Diana | M | 1,392 | San Antonio, Tex. |
| 85 | Sacred Falls State Park | S | 1,374 | Honolulu, Hawaii |
| 86 | Garden of the Gods Park | M | 1,319 | Colorado Springs, Colo. |
| 87 | City Park | M | 1,300 | New Orleans, La. |
| 88 | Forest Park | M | 1,293 | St. Louis, Mo. |
| 89 | Black Mountain Park | M | 1,284 | San Diego, Calif. |
| 90 | Cherokee Park | M | 1,282 | Madison, Wis. |
| 91 | North Cheyenne Canyon Park | M | 1,260 | Colorado Springs, Colo. |
| 92 | Flushing Meadows/Corona Park | M | 1,255 | New York, N.Y. |
| 93 | Martin Luther King, Jr. Shoreline Park | R | 1,220 | Oakland, Calif. |
| 94 | Lincoln Park | M | 1,216 | Chicago, Ill. |
| 95 | Anacostia Park | NP | 1,215 | Washington, D.C. |
| 96 | Cave Buttes Recreation Area I & II | M | 1,200 | Phoenix, Ariz. |
| 96 | Gwynns Falls/Leakin Park | M | 1,200 | Baltimore, Md. |
| 98 | Liberty State Park | S | 1,188 | Jersey City, N.J. |
| 99 | Thunderbird Conservation Park | M | 1,185 | Glendale, Ariz. |
| 100 | McClay Gardens State Park | S | 1,179 | Tallahassee, Fla. |
| 101 | Three Creeks Parks | M | 1,156 | Columbus, Ohio. |
| 102 | Van Cortlandt Park | M | 1,146 | New York, N.Y. |
| 103 | Red Mountain Park | M | 1,144 | Mesa, Ariz. |
| 104 | Pioneers Park | M | 1,139 | Lincoln, Neb. |
| 105 | T.O. Fuller State Park | S | 1,138 | Memphis, Tenn. |
| 106 | Emma Long Park | M | 1,137 | Austin, Tex. |
| 107 | Rouge Park | M | 1,100 | Detroit, Mich. |
| 108 | Balboa Park | M | 1,091 | San Diego, Calif. |
| 109 | Bedford Reservation (part) | R | 1,033 | Bedford, Ohio |
| 110 | Rochester Park | M | 1,032 | Dallas, Tex. |
| 111 | River Legacy Park | M | 1,031 | Arlington, Tex. |
| 112 | Golden Gate Park | M | 1,027 | San Francisco, Calif. |
| 113 | Olmos Basin | M | 1,010 | San Antonio, Tex. |
| 114 | North Chagrin Reservation (part) | R | 1,004 | Willoughby Hills, Ohio |
| 115 | Stinchcomb Wildlife Refuge | M | 988 | Oklahoma City, Okla. |
| 116 | Richmond Parkway | M | 984 | New York, N.Y. |
| 117 | Belle Isle Park | M | 982 | Detroit, Mich. |

| 118 | Bryan Park | M | 980 | Greensboro, N.C. |
|---|---|---|---|---|
| 119 | Anderson Lake County Park | C | 975 | San Jose, Calif. |
| 120 | Riverfront Park | M | 955 | Kansas City, Mo. |
| 121 | Longview Lake Park (part) | C | 952 | Grandview, Mo. |
| 122 | Koko Head Regional Park | R | 951 | Honolulu, Hawaii |
| 123 | Eisenhower Park | C | 930 | East Meadow, N.Y. |
| 124 | Bedford Reservation (part) | R | 924 | Walton Hills, Ohio |
| 125 | Hubbard Park (part) | M | 902 | Meriden, Conn. |
| 126 | Hubbard Park (part) | M | 901 | Berlin, Conn. |
| 127 | San Diego National Wildlife Refuge Complex | NWR | 900 | San Diego, Calif. |
| 128 | Papago Park | M | 895 | Phoenix, Ariz. |
| 129 | Lake Wheeler Park | M | 866 | Raleigh, N.C. |
| 130 | McAllister Park | M | 856 | San Antonio, Tex. |
| 131 | Reedy Creek Park & Nature Preserve | C | 853 | Charlotte, N.C. |
| 132 | El Dorado Park | M | 850 | Long Beach, Calif. |
| 133 | Delaware Park | M | 846 | Buffalo, N.Y. |
| 134 | Central Park | M | 840 | New York, N.Y. |
| 135 | San Antonio Missions National Historical Park | NP | 835 | San Antonio, Tex. |
| 136 | Scripps Miramar Open Space | M | 822 | San Diego, Calif. |
| 137 | San Jacinto Battleground State Historic Park | S | 820 | La Porte, Tex. |
| 138 | Tierrasanta Open Space | M | 818 | San Diego, Calif. |
| 139 | William T. Davis Wildlife Refuge | M | 814 | New York, N.Y. |
| 140 | Shelby Bottoms | M | 810 | Nashville, Tenn. |
| 141 | Bell's Bend Park | M | 809 | Nashville, Tenn. |
| 142 | Mill Creek Park (part) | M | 802 | Youngstown, Ohio |
| 143 | Oak Point Park | M | 801 | Plano, Tex. |
| 143 | Robert H. Hodge Park | M | 801 | Kansas City, Mo. |
| 145 | Tres Rios | M | 800 | Phoenix, Ariz. |
| 146 | Gerritsen Beach (Marine Park) | M | 798 | New York, N.Y. |
| 147 | Hamilton Creek Park | M | 790 | Nashville, Tenn. |
| 148 | Cobb's Creek Park | M | 786 | Philadelphia, Pa. |
| 149 | Sabre Springs Open Space | M | 780 | San Diego, Calif. |
| 150 | Ka'ena Point State Park | S | 779 | Honolulu, Hawaii |

# The Oldest City Parks

These are the 84 oldest U.S. city parks ranked chronologically.  In the case of parks which were enlarged later, the date refers to the year of initial creation or acquisition.  In the case of parks whose names have changed, the modern name is given.  Of course, before the European invasion, there were hundreds of even older plazas, sports fields, ceremonial grounds and food preparation commons in such Native American communities as Cahokia, Cheektowaga, Tathlapotle and Taos Pueblo, but the pre-historical record does not yield dates of their establishment.



| Rank | Park Name | City | Year Established |
|------|-----------|------|-----------------|
| 1 | Plaza de la Constitución | St. Augustine, Fla. | 1573 |
| 2 | Boston Common | Boston, Mass. | 1634 |
| 3 | New Haven Green | New Haven, Conn. | 1641 |
| 4 | Washington/Marion Squares | Charleston, S.C. | 1680 |
| 5 | Rittenhouse/Washington/Logan/Franklin Squares | Philadelphia, Pa. | 1682 |
| 6 | Salem Common | Salem, Mass. | 1685 |
| 7 | Battery Park | New York, N.Y. | 1686 |
| 8 | Military/Washington Parks | Newark, N.J. | 1697 |
| 9 | Jackson Square | New Orleans, La. | 1718 |
| 10 | San Pedro Springs Park | San Antonio, Tex. | 1729 |
| 11 | Bowling Green | New York, N.Y. | 1733 |
| 11 | Johnson Square | Savannah, Ga. | 1733 |
| 13 | Old Town Plaza | Albuquerque, N.M. | 1760 |
| 14 | El Pueblo | Los Angeles, Calif. | 1781 |
| 15 | National Mall | Washington, D.C. | 1790 |
| 16 | Settlers Landing | Cleveland, Ohio | 1796 |
| 17 | Duane Street Park | New York, N.Y. | 1797 |
| 18 | Village Green Park | Worthington, Ohio | 1803 |
| 19 | Lafayette Square | Washington, D.C. | 1804 |
| 20 | River Common | Wilkes-Barre, Pa. | 1807 |
| 21 | Gravois/Laclede/Mt. Pleasant Parks | St. Louis, Mo. | 1812 |
| 22 | Jackson Place Park | St. Louis, Mo. | 1816 |
| 23 | Auction Park | Memphis, Tenn. | 1819 |
| 24 | Santa Fe Plaza | Santa Fe, N.M. | 1821 |
| 25 | Washington Square | New York, N.Y. | 1823 |
| 26 | Patterson Park | Baltimore, Md. | 1827 |
| 27 | Union Square | New York, N.Y. | 1832 |
| 28 | Tompkins Square Park | New York, N.Y. | 1833 |

| 29 | Cathedral Square Park | Milwaukee, Wis. | 1835 |
| 29 | Van Vorst Park | Jersey City, N.J. | 1835 |
| 31 | Port Richmond Park | Staten Island, N.Y. | 1836 |
| 32 | Grant Park | Chicago, Ill. | 1837 |
| 33 | Lafayette Park | St. Louis, Mo. | 1838 |
| 34 | Daniel Carter Beard Memorial Square | Queens, N.Y. | 1841 |
| 35 | Chapman Park | Portland, Ore. | 1843 |
| 36 | Wyanda Park | Queens, N.Y. | 1844 |
| 37 | Thomas Square | Honolulu, Hawaii | 1845 |
| 38 | Madison Square Park/Reservoir Square (Bryant Park) | New York, N.Y. | 1847 |
| 38 | Portsmouth Square | San Francisco, Calif. | 1847 |
| 38 | Washington Park (Fort Greene Park) | Brooklyn, N.Y. | 1847 |
| 41 | Rice Park | St. Paul, Minn. | 1849 |
| 41 | Sutter Land Grants Park | Sacramento, Calif. | 1849 |
| 43 | Grand Circus Park | Detroit, Mich. | 1850 |
| 43 | Oakland Cemetery | Atlanta, Ga. | 1850 |
| 43 | Orton Park | Madison, Wis. | 1850 |
| 43 | Pantoja Park | San Diego, Calif. | 1850 |
| 43 | Union/Washington Squares | San Francisco, Calif. | 1850 |
| 48 | Goodale Park | Columbus, Ohio | 1851 |
| 48 | Monroe Park | Richmond, Va. | 1851 |
| 50 | Union Park | Chicago, Ill. | 1853 |
| 51 | Artesian Park | Corpus Christi, Tex. | 1854 |
| 51 | Bushnell Park | Hartford, Conn. | 1854 |
| 51 | City Park | New Orleans, La. | 1854 |
| 51 | Elm Park | Worcester, Mass. | 1854 |
| 55 | East Fairmount Park | Philadelphia, Pa. | 1855 |
| 55 | Esther Short Park | Vancouver, Wash. | 1855 |
| 55 | Washington Park | Cincinnati, Ohio | 1855 |
| 58 | Hemming Plaza | Jacksonville, Fla. | 1857 |
| 58 | Murphy Square | Minneapolis, Minn. | 1857 |
| 60 | Central Park | New York, N.Y. | 1858 |
| 60 | San Jacinto Plaza | El Paso, Tex. | 1858 |
| 62 | Druid Hill Park | Baltimore, Md. | 1860 |
| 63 | Miller Park | Lynchburg, Va. | 1862 |
| 64 | Old Fort Park | Fort Wayne, Ind. | 1863 |
| 65 | Pershing Square | Los Angeles, Calif. | 1866 |
| 66 | Allegheny Commons | Pittsburgh, Pa. | 1867 |
| 66 | Buena Vista Park | San Francisco, Calif. | 1867 |
| 66 | Cooper Park | Lincoln, Neb. | 1867 |
| 66 | The Ellipse | Washington, D.C. | 1867 |
| 70 | Balboa Park | San Diego, Calif. | 1868 |
| 70 | DeFremery Park | Oakland, Calif. | 1868 |
| 70 | Farragut/Franklin Squares | Washington, D.C. | 1868 |

| 70 | Prospect Park | Brooklyn, N.Y. | 1868 |
| 74 | Golden Gate Park | San Francisco, Calif. | 1870 |
| 75 | Acadia Park | Colorado Springs, Colo. | 1871 |
| 75 | Lenk's Park | Toledo, Ohio | 1871 |
| 75 | Savage Park | Toledo, Ohio | 1871 |
| 78 | Alum Rock | San Jose, Calif. | 1872 |
| 78 | Belle Isle | Detroit, Mich. | 1872 |
| 78 | Emancipation Park | Houston, Tex. | 1872 |
| 78 | Hanscom Park | Omaha, Neb. | 1872 |
| 78 | Riverside Park | New York, N.Y. | 1872 |
| 83 | Garfield Park | Indianapolis, Ind. | 1873 |
| 83 | Hyde Park | Fort Worth, Tex. | 1873 |

# The Most Visited City Parks



| Rank | Park | City | Annual Visitorship |
|---|---|---|---|
| 1 | Central Park | New York, N.Y. | 25,000,000 |
| 2 | Lincoln Park | Chicago, Ill. | 20,000,000 |
| 3 | Mission Bay Park | San Diego, Calif. | 16,000,000 |
| 4 | Balboa Park | San Diego, Calif. | 14,000,000 |
| 5 | Golden Gate Park | San Francisco, Calif. | 13,000,000 |
| 6 | Forest Park | St. Louis, Mo. | 12,000,000 |
| 6 | Griffith Park | Los Angeles, Calif. | 12,000,000 |
| 8 | Coney Island Beach and Boardwalk | New York, N.Y. | 10,600,000 |
| 9 | Fairmount Park | Philadelphia, Pa. | 10,000,000 |
| 9 | The National Mall | Washington, D.C. | 10,000,000 |
| 11 | Cleveland Lakefront State Park | Cleveland, Ohio | 8,431,000 |
| 12 | Prospect Park | New York, N.Y. | 8,000,000 |
| 13 | Fair Park | Dallas, Tex. | 5,585,730 |
| 14 | Liberty State Park | Jersey City, N.J. | 5,326,978 |
| 15 | Hermann Park | Houston, Tex. | 5,200,000 |
| 16 | Chain of Lakes Regional Park | Minneapolis, Minn. | 5,115,200 |
| 17 | City Park | New Orleans, La. | 5,000,000 |
| 17 | Old Sacramento State Park | Sacramento, Calif. | 5,000,000 |
| 17 | The Presidio | San Francisco, Calif. | 5,000,000 |
| 20 | Independence National Historical Park | Philadelphia, Pa. | 3,998,309 |
| 21 | Bryant Park | New York, N.Y. | 3,800,000 |
| 22 | Green Lake Park | Seattle, Wash. | 3,650,000 |
| 23 | Piedmont Park | Atlanta, Ga. | 3,500,000 |
| 24 | White River State Park | Indianapolis, Ind. | 3,300,000 |
| 25 | Memorial Park | Houston, Tex. | 3,246,000 |
| 26 | Centennial Olympic Park | Atlanta, Ga. | 3,200,000 |
| 27 | Battery Park | New York, N.Y. | 3,000,000 |
| 27 | Belle Isle Park | Detroit, Mich. | 3,000,000 |
| 27 | Como Park | St. Paul, Minn. | 3,000,000 |
| 27 | White River Greenway | Indianapolis, Ind. | 3,000,000 |
| 31 | Riverside Park | New York, N.Y. | 2,800,000 |
| 32 | Drew Field | Jacksonville, Fla. | 2,500,000 |
| 32 | Millennium Park | Chicago, Ill. | 2,500,000 |
| 34 | Jefferson National Expansion Memorial | St. Louis, Mo. | 2,360,109 |
| 35 | Rockaway Beach and Boardwalk | New York, N.Y. | 2,300,000 |
| 36 | Lake Harriet Park/Lyndale Park | Minneapolis, Minn. | 2,250,000 |
| 37 | Boston National Historical Park | Boston, Mass. | 2,155,026 |
| 38 | Boston Common | Boston, Mass. | 2,000,000 |
| 38 | City Park | Denver, Colo. | 2,000,000 |
| 38 | Garden of the Gods Park | Colorado Springs, Colo. | 2,000,000 |
| 38 | Lyon Park | St. Louis, Mo. | 2,000,000 |
| 38 | Rock Creek Park | Washington, D.C. | 2,000,000 |
| 43 | Swope Park | Kansas City, Mo. | 1,850,000 |
| 44 | Delaware Park | Buffalo, N.Y. | 1,800,000 |

| 45 | San Antonio Missions National Historical Park | San Antonio, Tex. | 1,765,548 |
|----|-----|-----|-----|
| 46 | First Landing State Park | Virginia Beach, Va. | 1,762,464 |
| 47 | Schenley Park and Plaza | Pittsburgh, Pa. | 1,750,000 |
| 48 | Encanto Park | Phoenix, Ariz. | 1,500,000 |
| 48 | Louisville Waterfront Park | Louisville, Ky. | 1,500,000 |
| 48 | Park at Lady Bird Lake | Austin, Tex. | 1,500,000 |
| 48 | Point State Park | Pittsburgh, Pa. | 1,500,000 |
| 48 | Trinity Park | Fort Worth, Tex. | 1,500,000 |
| 53 | Country/Jaycee Park | Greensboro, N.C. | 1,444,286 |
| 54 | Timucuan Ecological & Historic Preserve | Jacksonville, Fla. | 1,318,872 |
| 55 | Balloon Fiesta Park | Albuquerque, N.M. | 1,300,000 |
| 56 | Chugach State Park | Anchorage, Alaska | 1,200,000 |
| 56 | Monon Greenway | Indianapolis, Ind. | 1,200,000 |
| 58 | The Esplanade | Boston, Mass. | 1,100,000 |
| 59 | Centennial Park | Santa Ana, Calif. | 1,040,000 |
| 60 | Burke-Gilman Trail | Seattle, Wash. | 1,000,000 |
| 60 | Bushnell Park | Hartford, Conn. | 1,000,000 |
| 60 | Centennial Park | Nashville, Tenn. | 1,000,000 |
| 60 | Longview Lake Park | Kansas City, Mo. | 1,000,000 |
| 60 | Myriad Gardens | Oklahoma City, Okla. | 1,000,000 |
| 60 | Overton Park | Memphis, Tenn. | 1,000,000 |
| 60 | San Antonio Riverwalk | San Antonio, Tex. | 1,000,000 |
| 60 | Tower Grove Park | St. Louis, Mo. | 1,000,000 |
| 68 | Nu'uanu Pali State Wayside | Honolulu, Hawaii | 905,300 |
| 69 | T.O. Fuller State Park | Memphis, Tenn. | 856,338 |
| 70 | McCormick-Stillman Park | Scottsdale, Ariz. | 850,000 |
| 71 | Cabrillo National Monument | San Diego, Calif. | 822,447 |
| 72 | Park Road Park | Charlotte, N.C. | 815,980 |
| 73 | Audubon Park | New Orleans, La. | 770,000 |
| 74 | Al Lopez (Horizon) Park | Tampa, Fla. | 750,000 |
| 74 | Franke Park | Fort Wayne, Ind. | 750,000 |
| 74 | Martin Luther King, Jr. National Historic Site | Atlanta, Ga. | 750,000 |
| 77 | Mount Trashmore Park | Virginia Beach, Va. | 715,005 |
| 78 | Land Park | Sacramento, Calif. | 709,597 |
| 79 | Randall's Island | New York, N.Y. | 700,000 |
| 80 | Fort McHenry National Monument | Baltimore, Md. | 660,589 |
| 81 | Eagle Creek Park | Indianapolis, Ind. | 635,206 |
| 82 | Diamond Head State Monument | Honolulu, Hawaii | 634,300 |
| 83 | El Dorado Park | Long Beach, Calif. | 625,000 |
| 84 | Ottawa Park | Toledo, Ohio | 600,000 |
| 84 | Woodward Park | Fresno, Calif. | 600,000 |
| 86 | William B. Umstead State Park | Raleigh, N.C. | 595,424 |
| 87 | Lewis and Clark Landing | Omaha, Neb. | 587,399 |
| 88 | Hermann Square | Houston, Tex. | 584,000 |
| 89 | William W. Powers State Recreation Area | Chicago, Ill. | 575,000 |
| 90 | Fairmount Park | Riverside, Calif. | 552,500 |
| 91 | Pioneers Park | Lincoln, Neb. | 550,000 |
| 92 | Pullen Park | Raleigh, N.C. | 540,000 |
| 93 | Tranquility Park | Houston, Tex. | 517,000 |
| 94 | Cherokee Park | Louisville, Ky. | 500,000 |

| 94  | Meridian Hill Park          | Washington, D.C.    | 500,000 |
| 94  | Mohawk Park                 | Tulsa, Okla.        | 500,000 |
| 94  | Riverside Park - Central    | Wichita, Kan.       | 500,000 |
| 94  | Seneca Park                 | Louisville, Ky.     | 500,000 |
| 94  | Shelby Farms Park           | Memphis, Tenn.      | 500,000 |
| 94  | Warner Park                 | Madison, Wis.       | 500,000 |
| 101 | Sawyer Point                | Cincinnati, Ohio    | 441,837 |
| 102 | Adobe Dam Recreation Area   | Phoenix, Ariz.      | 438,310 |
| 103 | Bayfront Park               | Miami, Fla.         | 433,362 |
| 104 | Town Square                 | Anchorage, Alaska   | 425,000 |

# EXHIBIT 21

# Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia

Anne Beamish

Downloaded from by Gessica Taddei on January 4, 2024. Copyright 2022

Landscape Journal  40:2  ISSN 0277-2426  e-ISSN 1553-2704
© 2021 by the Board of Regents of the University of Wisconsin System

**ABSTRACT** By the late nineteenth century, U.S. cities were busy building public parks for residents leisure and social activities. Before the development of parks, city dwellers had a variety of public spaces available to them, but these landscapes rarely receive the credit due to them. Using historical newspapers, journals, and city documents, this article argues that the very practical public landscapes of seventeenth- and eighteenth-century Boston, New York, and Philadelphia played an important, though frequently unrecognized, role in the development of the nineteenth-century American public park. The very modest utilitarian village green, common, square, and parade ground are the unsung ancestors of public parks. Although they usually did not begin as places for leisure, residents slowly began to layer on new uses and functions, gradually transforming them into park-like places and creating a shared familiarity with the types of activities that would become core to the public park.

**KEYWORDS** Public space, parks, streets, squares, leisure, open space, history

## INTRODUCTION

Each city illustrates the very different ways that North American cities used public open space in the 200 years before parks were created. Boston had one space, the Common, specifically established for grazing and military exercises. New York had several spaces—the Bowling Green in the middle of the town; the Battery, originally used for defense; and the Fields on the outskirts of town. Although Philadelphia had the most planned formal open spaces, the city used its squares for strictly utilitarian purposes and took advantage of private commercial pleasure gardens in and outside the city for leisure and socializing.

### Background

Public parks are such an integral part of urban public space—our cities would be unimaginable without them—that it is easy to forget they are a relatively recent innovation. Fortunately there are several important histories about public parks (Doell and Fitzgerald, 1954; Chadwick, 1966; Cranz, 1982; Schenker, 2009; Taylor, 2009) and the first great one in the United States, Central Park (Rogers, 1972, 2018; Kinkead, 1990; Miller, 2003). But as Rosenzweig and Blackmar (1992) note, the literature rarely refers to the urban conditions and landscapes that predate the public park. The purpose of this article is to highlight the existence and variety of the urban public spaces available to seventeenth- and eighteenth-century Americans in the three largest cities of Boston, New York, and Philadelphia before the introduction of public parks in the nineteenth century. It argues that that these prepark landscapes played an important, albeit often unrecognized, role in the development of the public park in the nineteenth century, for they were the stage on which

Downloaded from by Gessica Taddei on January 4, 2024. Copyright 2022

cities were not only on the forefront of urban innovation, they illustrate three very different approaches to public open space before the development of parks.

**Early Public Landscapes**

Before the nineteenth century, the demand for large open green space was low because most towns were relatively compact, density was low, homes had their own gardens and orchards, and residents had easy access to the countryside. Even in 1794, Thomas Pemberton described Boston as "capable of great increase, as many large spaces of land still remain vacant." He went on to say that most of the town's houses had wells and gardens "in which vegetables and flowers are raised, in some fruit trees are planted" (Pemberton, 1794, 249–50). Eighteenth-century maps all show that most residents could be outside of town and in nature within a 15-minute walk.

Most people worked long and hard, with little time for leisure and recreation, but like people everywhere, opportunities to socialize were valued (Cross, 1990). Typically, seventeenth- and eighteenth-century residents of Boston, New York, and Philadelphia found opportunities to gather in taverns, the common, markets, and streets.

The privately owned tavern or inn played a key role in the public life of the town and provided places where residents could drink, eat, and socialize. Some of these taverns and inns evolved into pleasure gardens in the eighteenth and early nineteenth centuries, which were privately owned businesses, enclosed by a fence or wall, open to the paying public as a resort or amusement area (Garrett, 1978). Pleasure gardens originated in London and were admired and emulated in other parts of the world, including North America. Baltimore, Boston, Charleston, New Orleans, Philadelphia, and many other cities created their own versions of Vauxhall, Ranelagh, and Cremorne Gardens (Douglas, 2011; Conlin, 2013). Paying to access these gardens was standard, which is why it isn't surprising that Downing initially proposed that a "small admission fee" be charged to enter the new public park he envisioned (Downing, 1921a, 376). Foreshadowing the future public park, one of the important characteristics of these pleasure gardens was the mixing of social classes.

The common was land owned by the king but intended for community use. There were several types of common in English law, including the right to graze livestock (common of pasture), cut wood for fuel or building for the cutter's own use (common of estovers), dig peat for fuel, and take away sand or stone for the digger's use. It was a familiar concept firmly embedded in the experience of the colonists and a successful model that New Englanders brought with them (Stilgoe, 1982; Rawson, 2010). The role of this land, held in common by the residents, was to ensure the survival of the town, which meant that it was utilitarian in nature. For example, Boston's common had many uses, such as grazing cattle, stockpiling gunpowder, temporarily storing merchandise for businesses that caught on fire, and even into the twentieth century, planting a victory garden during World War I.

A town's streets, docks, and markets were an important part of the community's economic life, but they also provided a place to meet friends and strangers (Figure 1). An active street life was highly valued, for a writer in the first half of the seventeenth century marveled at the transformation of Boston, which was no more than 20 years old at the time, from "hideous thickets" full of wolves and bears to a place where "the streets are full of Girles and Boys sporting up and down, with a continued concourse of people" (Johnson, 1654, 43).

Before spaces for leisure and socializing became formalized in the form of public parks in the late nineteenth century, cities provided designated public landscapes, but their approaches differed markedly. Boston had a single open space, the Common; New York converted utilitarian spaces; and even though Philadelphia had planned formal squares, none were used for that purpose. These were the public landscapes that created the conditions and foundation for the public park.

**BOSTON**

**The Common**

Located on the edge of the town, the treeless 45-acre Common was set aside as public open space in 1634, four years after the town's founding (Figure 2). Its use was unambiguous: "the Towne laid out a place for a trayning field; and which ever since and now is used for that purpose, and for the feeding of Cattell" (Newman, 1855, 10). Though intended as a place for grazing livestock and military use, Bostonians

Downloaded from by Gessica Taddei on January 4, 2024. Copyright 2022



**Figure 1**
The streets were some of the most common public spaces used by residents in eighteenth-century cities. *The Accident in Lombard Street, Philadelphia* by Charles Willson Peale, 1787. Image courtesy of the Library of Congress, Prints & Photographs Division [LC-USZ72-213].

regularly used it for their own practical purposes. For example, much to the chagrin of the selectmen, residents used the Common as a source of sod, sand, and stones and as a household trash dump. By 1666 the selectmen forbid the dumping of stones, entrails, garbage, dead dogs or rats, or any other stinking thing (City of Boston 1881, 31–32). A hundred years later in 1768, the selectmen were still exasperated to note that "the Carcases of several Horses which have died of a Contagious disorder now prevalent have been carried into the Common & other parts of the Town & left unburied," and they declared that the culprits who "leave the dead Bodys of Horses or any other Creatures so exposed above Ground, will be prosecuted" (City of Boston, 1889, 283). Bostonians ignored them. The Common was also a place to air the bedding and clothing of those who had died from smallpox during one of the town s many epidemics (City of Boston 1881, 119), and though the gallows were on the edge of town,

criminals were occasionally hung at the bottom of the Common (City of Boston, 1896, 38; "News from Europe," 1789).

The Common also served as a site for informal socializing and recreation. John Josselyn visited Boston in the 1660s and observed that:

> On the South there is a small, but pleasant Common where the Gallants a little before Sunset walk with their Marmalet-Madams, as we do in Morefields, &c. till the nine a clock Bell rings them home to their respective habitations, when presently the Constables walk their rounds to see good orders kept, and to take up loose people. (Josselyn, 1674, 162)[1]

The first row of elm trees was planted on the almost treeless Common by Jonathan Williams in 1725. A second row was added in 1734 (City of Boston, 1883, 192; 1885, 75, 78), and by 1740 the

Downloaded from by Gessica Taddei on January 4, 2024. Copyright 2022



**Figure 2**
Originally located on the outskirts of town, the Common was Boston s main open public space. *The town of Boston in New England by Capt. John Bonner, 1722.* Map reproduction courtesy of the Norman B. Leventhal Map & Education Center at the Boston Public Library.

modest allée was recognizable as a mall because it was described by a visitor:

> What they call the Mall is a walk on a fine green Common adjoining to the south-west side of the town. It is near half a mile over, with two rows of young trees planted opposite to each other, with a fine footway between, in imitation of St. James s Park. (Bennett, 1862, 125)

Strolling in the mall became a common activity for visitors and residents (Massachusetts Historical Society, 1873, 61–66), and although the Common was still regularly used for grazing and military exercises, as it was gradually fenced in and more trees were planted, it was increasingly used for pleasure and recreation (Figure 3). Horse- and carriage-riding

became common, and Bostonians played sports, including the popular but dangerous game called "throwing the long bullet" (Holliman, 1975, 83–85).[2] Though entertainment was frowned on by the local clergy, the Common was used for shows such as feats of horsemanship by visiting entertainers as well as exhibitions, including a camel (probably a moose). In 1796, permission was granted to William Blanton to exhibit a camera obscura in the Common, which caused great excitement ("There to be seen . . . ,", 1737; "The Camell is . . . ," 1748; City of Boston, 1886, 225; 1896, 288). The Common was the site for visiting preachers such as George Whitefield in the 1740s because there was no building large enough for the enormous crowds that came to listen ("Boston, September 22," 1740; "Boston. Last Thursday . . . ," 1740; "Boston,

Downloaded from by Gessica Taddei on January 4, 2024. Copyright 2022



**Figure 3**
The treeless Common eventually had two rows of trees planted in 1725 and 1734 that created a mall for promenading. John Hancock was given permission to plant a row of lime trees in front of his house on the far side of the Common in 1754. The center of the Common was kept open for military exercises and grazing. *A Prospective View of Part of the Common* (Christian Remick, 1768). 1902 engraving by Sidney L. Smith after Remick s 1768 watercolor. Image courtesy of the Miriam and Ira D. Wallach Division of Art, Prints and Photographs: Print Collection, The New York Public Library. Retrieved from http://digitalcollections.nypl.org/items/510d47d9 -7ad9-a3d9-e040-e00a18064a99.

September 29," 1740; "Last Week the Rev. Mr. Whitefield Preached . . .," 1740).

The Common was also the site for the town s raucous celebrations. For example, the celebration of military victories such as the fall of Louisburg in 1745 when the "the joy of the people knew no bounds," meant bonfires, food, and drink on the Common (De Wolfe Howe, 1910, 27–28). One of the largest celebrations was held in 1766 when the reviled Stamp Act was repealed, which led "to great rejoicing." It was an extraordinary event. Church bells rang, colors were displayed on ships, the town was illuminated, and the elms on the mall were decorated with lanterns (City of Boston, 1902, 10). There were fireworks, bonfires, and even a transparency obelisk designed by Paul Revere,[3] which unfortunately caught fire on the Common before it arrived at its final destination (Brigham, 1969, 26–31).

The transformation of the hardscrabble Common into "one of the most picturesque spots in the United States" did not occur until the nineteenth century, spurred by the 1795 construction of the new State House on its northeastern edge ("Miscellany," 1819). As a sign of the Common s new role, the almshouse and jail on its eastern edge moved to another part of the city, and the street was renamed Park Street in 1803 (City of Boston, 1910, 357). Even though the Common was slowly becoming

# EXHIBIT 22

Tribeca in Manhattan in New York County, New York — *The American Northeast (Mid-Atlantic)*

# Duane Park
## Origins

## Inscription. 🔊



Photographed By Larry Gertner, January 2009

**1. Duane Park Marker**

Duane Park
Origins

Duane Park was the first open space acquired by the City of New York specifically for use as a public park. It is located on Duane Street, which was named for James Duane, New York's first mayor (1784-89) after the American Revolution.

The park is the last remnant of Greensward of the Annetje Jans farm granted in 1636 by Governor Woulter van Twiller to Roeloff and Annetje Jans. After the death of Roeloff Jans, his widow married the Reverend Everardus Bogardus, second minister of the Dutch Church of New Amsterdam, and the farm became known as the Dominie's Bouwery, of the Minister's Farm.

It was sold in 1670 to the English governor, Sir Francis Lovelace, but was later confiscated by the Duke of York and deeded in 1795 to Trinity Church.

This triangle was purchased from Trinity Church by the City of New York in 1797 for the sum of five dollars, to be used as a park for the public

Gardens planted and maintained by Friends of Duane Park
To find out about us or to volunteer, visit www.duanepark.org

**Topics.** This historical marker is listed in these topic lists: Colonial Era • Parks & Recreational Areas. A significant historical year for this entry is 1636.



Click or scan to see
this page online

## Location.
40° 43.031′ N, 74° 0.563′ W. Marker is in Manhattan, New York, in New York County. It is in Tribeca. Marker is at the intersection of Duane Street and Duane Street when traveling north on Duane Street. The park is at a triangle bounded by Hudson, Duane and Staples Streets. Touch for map. Marker is in this post office area: New York NY 10013, United States of America. Touch for directions.

## Other nearby markers.
At least 8 other markers are within walking distance of this marker. A different marker also named Duane Park (here, next to this marker); James Bogardus Viewing Garden (about 400 feet away, measured in a direct line); Headquarters (about 400 feet away); James Bogardus Triangle (about 500 feet away); New York Mercantile Exchange (about 600 feet away); 31 Harrison Street (about 700 feet away); Icarus (about 700 feet away); Finn Square (approx. 0.2 miles away). Touch for a list and map of all markers in Manhattan.



Photographed By Larry Gertner, November 2009

**2. Duane Park from Staple Street**



Photographed By Larry Gertner, November 2009

**3. New Yorkp City Parks & Recreation Department marker**

Standard style marker at NYC parks.

## Credits.
This page was last revised on January 31, 2023. It was originally submitted on February 11, 2018, by Larry Gertner of New York, New York. This page has been viewed 187 times since then and 5 times this year. **Photos:** **1, 2, 3.** submitted on February 11, 2018, by Larry Gertner of New York, New York. • Bill Pfingsten was the editor who published this page.

m=113982

Copyright © 2006–2024, Some rights reserved.

# EXHIBIT 23

# GENERAL LAWS

### OF THE

## TWELFTH LEGISLATURE,

### OF THE

# STATE OF TEXAS.

## CALLED SESSION.

### BY AUTHORITY.



### AUSTIN:
PRINTED BY TRACY, SIEMERING & CO.
## 1870.

## CHAPTER XLVI.

### AN ACT REGULATING THE RIGHT TO KEEP AND BEAR ARMS.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.

SEC. 2. That this act take effect and be in force in sixty days from the passage thereof.

Approved August 12, 1870.

## CHAPTER XLVII.

### AN ACT AUTHORIZING THE GOVERNOR TO ORDER AN ELECTION TO BE HELD IN HILL COUNTY FOR THE PERMANENT LOCATION OF THEIR COUNTY SEAT.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That the Governor of the State of Texas be, and is hereby authorized to order an election to be held in the county of Hill, on the second Monday in September, A. D. 1870, (or as soon thereafter as possible), for the permanent location of the county seat of the

# EXHIBIT 24

# LAWS OF MISSOURI,

PASSED AT THE SESSION OF THE

# THIRTY-SECOND GENERAL ASSEMBLY,

BEGUN AND HELD AT THE CITY OF JEFFERSON,

# WEDNESDAY, JANUARY 3, 1883.

(REGULAR SESSION.)

## BY AUTHORITY.



JEFFERSON CITY:
STATE JOURNAL COMPANY, STATE PRINTERS.
1883.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1.   Any person or persons doing a commission business in this state who shall receive cattle, hogs, sheep, grain, cotton or other commodities consigned or shipped to him or them for sale on commission, and who shall wilfully make a false return to his or their consignor or shipper, in an account of sale or sales of any such cattle, hogs, sheep, grain, cotton or other commodities made and rendered by such person or persons for and to such consignor or shipper, either as to weights or prices, shall be guilty of a misdemeanor and shall, on conviction, be punished by imprisonment in the county jail not exceeding one year, or by a fine not exceeding five hundred dollars nor less than two hundred dollars, or by fine not less than one hundred dollars and imprisonment in the county jail not less than three months.

Approved April 2, 1883.

---

## CRIMES AND CRIMINAL PROCEDURE: CONCEALED WEAPONS.

AN ACT to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled "Of Crimes and Criminal Procedure."

SECTION 1.   Carrying concealed weapon. etc., penalty for increased.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1.   That section 1274 of the Revised Statutes of Missouri be and the same is hereby amended by inserting the word "twenty" before the word "five" in the sixteenth line of said section, and by striking out the word "one" in the same line and inserting in lieu thereof the word "two," and by striking out the word "three" in the seventeenth line of said section and inserting in lieu thereof the word "six," so that said section, as amended, shall read as follows: Section 1274. If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

Approved March 5, 1883.

# EXHIBIT 25

# GENERAL LAWS

OF THE

# STATE OF MINNESOTA

PASSED DURING THE

## THIRTY-FOURTH SESSION

OF THE

## STATE LEGISLATURE

COMMENCING JANUARY THIRD, ONE THOUSAND NINE
HUNDRED AND FIVE.

OFFICIAL PUBLICATION BY SECRETARY OF STATE.

MINNEAPOLIS:
HARRISON & SMITH CO.
1905.

in shipping fish, either within or without this state, shall be plainly marked with the name and address of the consignor and consignee, and with the contents of the package.

In counties of 150,000 and over.

SEC. 51. Sale of Fish Prohibited, When—No person shall sell, have in possession with intent to sell, or offer for sale any fish caught in any lake situated partly or wholly within a county in this state that has a population of one hundred and fifty thousand, or over.

## MISCELLANEOUS PROVISIONS.

SEC. 52. Game and Fish Taken in One Day.—No person shall wantonly waste or destroy any of the birds, animals or fish of the kinds mentioned in this chapter.

Fifteen birds in one day.

Twenty-five fish.

Exception.

The catching, taking or killing of more than fifteen birds by any one person in any one day, or the catching, taking or killing of more than twenty-five fish by any one person in any one day, except fish caught, taken or killed in the Mississippi river or international waters with nets or seines, as by this chapter permitted, shall be deemed a wanton waste, and destruction of all such birds or fish caught, taken or killed in excess of such number.

Hunting, etc., prohibited.

SEC. 53. State Parks.—No person shall pursue, hunt, take, catch, or kill any wild bird or animal of any kind within the limits of any territory set apart, designated, used or maintained as a state public park, or within one-half mile of the outer limits thereof or have any such bird or animal or any part thereof in his possession or under his control within said park or within one-half mile of said outer limits.

As to fire arms.

No person shall have in his possession within any such park or within one-half mile of the outer limits thereof, any gun, revolver, or other firearm unless the same is unloaded, and except after the same has been sealed by the park commissioner or a deputy appointed by him, and except also such gun or other firearm at all times during which it may be lawfully had in such park remains so sealed and unloaded. Upon application to the park commissioner or any deputy appointed by him, it is hereby made his duty to securely seal any gun or firearm in such a manner that it cannot be loaded or discharged without breaking such seal. The provisions of this section shall apply to all persons including Indians.

To residents.

SEC. 54. Sale of Game by Commission—The game and fish commission is hereby authorized to sell to resi-

# EXHIBIT 26

# WISCONSIN

# SESSION LAWS

## Acts
## Resolutions and Memorials

Passed at the Biennial Session of the
Legislature, 1917

———

The Acts are Numbered in Consecutive Chapters in the Order in
Which They are Received from the Governor

———

*Published by Authority*

———

MADISON, WIS.
DEMOCRAT PRINTING CO., STATE PRINTER
1917

of any person, grant a permit to such person to take and transport wild animals for propagation within the state, under the supervision of the commission or its deputies

29.56  FOREST COUNTY GAME REFUGE. Townships thirty-eight north, of range twelve and thirteen east, Forest county, shall be known as the Forest County Refuge. No person shall at any time or in any manner, hunt any game within said refuge.

29.57  WILD LIFE REFUGES. (1) Establishment. The owner or owners of any tract, or contiguous tracts, of land comprising in the aggregate not less than one hundred and sixty acres located outside the limits of any city or village, may apply to the state conservation commission for the establishment of said lands as a wild life refuge. The commission may thereupon employ such means as it may deem wise to inform itself regarding the premises; and if, upon inspection, investigation, hearing, or otherwise, it shall appear to the satisfaction of the commission that the establishment of said lands as a wild life refuge will promote the conservation of one or more useful species or varieties not native within this state, it may by order designate and establish the said lands as a wild life refuge.

(2) Enclosure. Within thirty days after the date of such order the owner or owners of the said lands shall enclose the same, wherever the same are not already enclosed by a fence, with a single substantial wire, and shall post and maintain along the said wire or fence, at each interval of twenty rods, signs or notices, furnished by the state conservation commission, proclaiming the establishment of said refuge.

(3) Publication. No such order shall be effective until at least thirty days after the date of its issue; nor unless the commission shall have caused notice thereof to be given by its publication, once in each week for three successive weeks next preceding the date of its effect, in at least one newspaper published in the county embracing the said lands. Thereupon the said lands shall be a wild life refuge, and shall so remain for a period of not less than five years, from and after the date of effect stated in said order.

(4) Absolute Protection. No owner of lands embraced within any such wild life refuge, and no other person whatever, shall hunt or trap within the boundaries of any wild life refuge, state park, or state fish hatchery lands; nor have in his possession or under his control therein any gun or rifle, unless the same is unloaded and knocked down or enclosed within its carry-

ing case; but nothing herein shall prohibit, prevent, or interfere with the state conservation commission, or its deputies, agents or employes, in the destruction of injurious animals.

(5) Animals procured by commission. The state conservation commission may place within any such wild life refuge, for the purpose of propagation, wild animals of any species or variety.

## DESTRUCTION OF INJURIOUS ANIMALS

29.58 MUSKRATS INJURING DAMS. The owner or lessee of any dam may in any manner capture or kill muskrats at any time when said muskrats are injuring or destroying such dams or the levees connected therewith; but shall not sell, barter, or give to any other person the skin of any muskrat captured or killed during the close season therefor.

29.59 BEAVER CAUSING DAMAGE. (1) Complaint. Upon complaint in writing, by the owner or lessee of any lands, to the state conservation commission, that beaver are causing damage thereto the commission shall employ such means as it may deem wise to inquire into the matter; and if, upon inspection, investigation, hearing, or otherwise, it shall appear to the satisfaction of the commission that the facts stated in such complaint are true, it may, by written permit, authorize the said owner or lessee to capture and remove such beaver, as hereinafter prescribed.

(2) Supervision. No beaver shall be captured or killed under such permit except only during such period of time, from and after the first day of January in each year, as may be limited by the commission, and then only under the direct supervision of a deputy conservation warden.

(3) Disposition of animals. The owner or lessee shall capture, alive and without avoidable injury, such number of beaver as may be designated by the commission, for delivery to zoological parks or collections or for transplantation to other localities within the state; all others shall be killed and skinned with care to conserve the value of the skins, which shall be shipped without delay to Madison, consigned to the state conservation commission.

(4) Sale and disposition of proceeds. All such skins shall be sold by the commission, in the manner of a sale of confiscated game, and the proceeds paid into the conservation fund.

(5) In Price, Rusk, and Sawyer counties. Licenses for the taking, catching or killing of beaver in Price, Rusk, and Sawyer

# EXHIBIT 27

STATE OF NORTH CAROLINA.

# PUBLIC LAWS AND RESOLUTIONS

ENACTED BY THE

## EXTRA SESSION

OF THE

## GENERAL ASSEMBLY

OF

## 1921

BEGUN AND HELD IN THE CITY OF RALEIGH
ON
TUESDAY, THE SIXTH DAY OF DECEMBER, A.D. 1921

PUBLISHED BY AUTHORITY

RALEIGH
MITCHELL PRINTING COMPANY
STATE PRINTERS
1922

*First.* To supplement the funds in those counties specified in section two of this act, in order to provide a six months school term in each of said counties; <span>Supplements to county funds.</span>

*Second.* After the provisions of section two have been complied, with, then the State Board of Education shall apportion the residue of the funds provided in this section in order to pay the salaries of the county superintendents and assistant superintendents for six months, and all city superintendents, all supervisors not otherwise provided for, all principals of elementary schools having ten or more teachers, and principals of standard high schools, for three months. <span>Apportionment of residue.</span> <span>County superintendents and assistants. City superintendents. Supervisors. Principals of elementary and high schools.</span>

SEC. 5. That section five thousand four hundred and eighty-eight of the Consolidated Statutes, as amended, be and the same is, hereby further amended by adding at the end thereof the following: *"Provided,* that no action in the nature of a writ of mandamus shall be brought against the board of county commissioners to compel said board to levy a rate of taxation greater than the rate authorized by the General Assembly." <span>Proviso: mandamus for increase of tax rate not to lie.</span>

SEC. 6. All laws and clauses of laws in conflict with the provisions of this act are hereby repealed. <span>Repealing clause.</span>

SEC. 7. This act shall be in full force and effect on and after the date of its ratification.

Ratified this the 20th day of December, A.D. 1921.

---

## CHAPTER 6

### AN ACT TO PROTECT ANIMALS AND GAME IN PARKS AND GAME RESERVATIONS IN EITHER PRIVATE OR PUBLIC PARKS OR PLACES.

*The General Assembly of North Carolina do enact:*

SECTION 1. That it shall be unlawful for any person or persons to hunt, trap, capture, willfully disturb, or kill any animal or bird of any kind whatever, or take the eggs of any bird within the limits of any park or reservation for the protection, breeding, or keeping of any animals, game, or other birds, including buffalo, elk, deer, and such other animals or birds as may be kept in the aforesaid park or reservation, by any person or persons either in connection with the Government of the United States, or any department thereof, or held or owned by any private person or corporation. <span>Protection of game in parks or reservations.</span>

SEC. 2. That any person or persons who shall hunt, trap, capture, willfully disturb, or kill any animal or bird, or take the eggs of any bird of any kind or description in any park or reservation <span>Misdemeanor.</span>

Punishment.      as described in section one of this act, at any time during the year, shall be guilty of a misdemeanor, and shall be fined or imprisoned in the discretion of the court for each and every offense.

Carrying weapons in parks or reservations.
Misdemeanor.
SEC. 3. That any person who shall carry a pistol, revolver, or gun in any park or reservation such as is described in section one of this act, without having first obtained the written permission of the owner or manager of said park or reservation, shall be

Punishment.      guilty of a misdemeanor, or shall be fined or imprisoned, in the discretion of the court, for each and every offense.

Application of act.    SEC. 4. That the provisions of this act shall apply only to that part of the State of North Carolina situated west of the main line of the Southern Railway running from Danville, Virginia, by Greensboro, Salisbury, Charlotte, and Atlanta, Georgia.

Repealing clause.    SEC. 5. All laws and clauses of laws in conflict with this act are hereby repealed.

SEC. 6. That this act shall be in force from and after its ratification.

Ratified this the 15th day of December, A.D. 1921.

## CHAPTER 7

AN ACT TO CHANGE THE MONTH DURING WHICH AC-
COUNTS OF STATE OFFICERS ARE EXAMINED BY COM-
MISSIONERS OF THE LEGISLATURE.

*The General Assembly of North Carolina do enact:*

Date changed.      SECTION 1. That section seven thousand six hundred and ninety-two of the Consolidated Statutes be and the same is hereby amended by striking out the word "December" in line six of said section and inserting in lieu thereof the word "July."

SEC. 2. That this act shall be in force from and after its ratification.

Ratified this the 10th day of December, A.D. 1921.

## CHAPTER 8

AN ACT TO AUTHORIZE THE TREASURER TO BORROW
NOT EXCEEDING $710,000 FOR THE STATE PUBLIC
SCHOOL FUND.

Preamble : tax at special session.
Purpose.
Whereas the special session of the General Assembly of one thousand nine hundred and twenty, chapter ninety-one, section one, Public Laws, provided a State tax of thirteen cents for the purpose of paying "one-half the annual salary of the county superintendents and three months salary of all teachers of all sorts

# EXHIBIT 28

# LAWS

#### OF THE

## GENERAL ASSEMBLY

#### OF THE

## STATE OF PENNSYLVANIA,

#### PASSED AT THE

## SESSION OF 1868,

### In the Ninety-second Year of Independence.

## WITH AN APPENDIX.

### BY AUTHORITY.

HARRISBURG:
SINGERLY & MYERS, STATE PRINTERS.
1868.

# LAWS

OF THE

# COMMONWEALTH OF PENNSYLVANIA.

------

## No. 1.

## An Act

To ascertain and appoint the fees to be received by the several officers
of this Commonwealth.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same;* That the fees of the several officers throughout this commonwealth shall be the same as are hereinafter ascertained and appointed.

### FEES TO BE RECEIVED BY THE SHERIFF.

SECTION 2. Serving *capias* with commitment or bail bond Sheriffs. and return, one dollar and twenty-five cents.

Each defendant besides the first, fifty cents.

Assigning bail bond, twenty-five cents.

Serving summons, or *certiorari,* summons in partition of landlord against tenant, *scire facias, replevin,* or foreign attachment, one dollar.

Each defendant beside the first, fifty cents.

Copy of summons, twenty-five cents.

Copy of *scire facias, replevin,* or foreign attachment, forty cents.

Taking and filing *replevin* or attachment bond, or other indemnification, to be furnished by the sheriff, fifty cents.

Traveling expenses on each writ, for each mile traveled, six cents.

Delivering lands to creditor, or his agent, or attorney, and no commission in such case to be taken, two dollars and forty cents.

Receiving and paying money to plaintiff, or his attorney, recovered upon any process, decree, or order of court, for every dollar not exceeding five hundred, in addition to fee for executing writ, two cents.

For every dollar above five hundred, one-half cent.

# EXHIBIT 29

# A DIGEST

### OF THE

# LAWS AND ORDINANCES

FOR THE GOVERNMENT OF THE MUNICIPAL CORPORATION OF THE

## CITY OF READING, PENNSYLVANIA,

### IN FORCE APRIL 1, 1897.



[PUBLISHED BY AUTHORITY OF THE CITY COUNCILS.]

COMPILED BY LOUIS RICHARDS.

READING, PA.:
EAGLE BOOK PRINT, 542 PENN STREET.
1897.


Digitized by Google

law authorizing cities of this commonwealth to acquire by purchase, or otherwise, private property for public park purposes.[1]

15. That the Mount Penn Gravity Railroad Company be and is hereby granted the right to occupy a portion of the northeast section of Penn's Common with their railroad and station appurtenances, and also the right to cross the Mineral Spring property of the city of Reading with their railroad track.

16. That the right to occupy Penn's Common is granted subject to the control and management of the common commissioners, and the right to cross the Mineral Spring property is granted subject to the control and management of the water commissioners.

17. That the rights herein are granted to the said railroad company for the purpose of constructing, maintaining and operating a gravity railroad, and shall continue during the corporate existence of the said company.

18. The employees of the water and park departments shall and are hereby directed to be paid semi-monthly, by pay roll, to be approved by the proper departments or committees ; said pay roll to contain name of person, kind and time of service, rate per day, amount due, and a receipt to be signed by the person receiving the amount set opposite his name, and shall be prepared and certified by the superintendent of each of said departments to the city clerk and city controller.

19. Upon presentation to the city clerk of pay rolls properly certified and approved as beforementioned, the city clerk shall and he is hereby directed to draw warrants as follows : * * * * * * For the park department, "to the order of the superintendent."

Said officials to dispose of the money in the manner indicated on the pay roll, and to be responsible for the proper disbursement of the same.[2]

### II. Park Rules and Regulations.

20. That the following rules and regulations be and are hereby established as the rules and regulations for the government and protection of Penn's Common, viz.:

(1) No person shall drive or ride in Penn's Common at a rate exceeding seven miles an hour.

(2) No one shall ride or drive therein, upon any part of the common, than upon the avenues and roads.

(3) No vehicle of burden or traffic shall pass through the common.

(4) No person shall enter or leave the common except by such gates or avenues as may be for such purposes arranged.

(5) No coach or vehicle used for hire shall stand upon any part of the common for the purposes of hire.

(6) No person shall indulge in any threatening, abusive, insulting or indecent language in the common.

*Margin notes:*
2 April 1896.

7 May 1889 § 1. J. 1889-90, App. 266.

Right of way granted to Mount Penn Gravity R. R. Company.

Id. § 2. Conditions.

Id. § 3. Purpose.

5 Feb. 1894 § 2. J. 1893-94, App. 632. Mode of payment of employees of park and water departments.

Pay rolls to be certified by superintendent.

Id. § 3. How warrants to be drawn and moneys disbursed.

30 Dec. 1887 § 1. J. 1887-88, App. 339.

Limit of speed.

Driving confined to roads.

Vehicles of burden.

Entrance and exit.

Coaches for hire.

Threatening language, etc.

---

[1] See the ordinance of October 1, 1889 (Jour. 1889-90, App. 294), forever exempting from being paved a triangular piece of ground at the intersection of Centre Avenue, Third and Windsor Streets, 108 feet on Third and 51 feet on Windsor Street, deeded by the owners to citizens of the vicinity for conversion into a park : "Provided, That it be sodded and laid out with walks of proper width, and that it be improved and beautified and kept as a park."

[2] By the resolution of May 14, 1889, the common commissioners were requested to see that all persons employed at the park are residents and taxpayers of the city, and to give such as are willing to earn off their taxes preference when they apply for work. Jour. 1889-90, App. 333.

30 Dec. 1887.

**Gaming and obscenity.** (7) No person shall engage in any gaming, nor commit any obscene or indecent act in the common.

**Firearms, etc.** (8) No person shall carry firearms, or shoot in the common, or within fifty yards thereof, or throw stones or other missiles therein.

**Disturbance of fish, birds or animals.** (9) No person shall disturb the fish or water fowl in the pool or pond, or birds in any part of the common, or annoy, strike, injure, maim or kill any animal kept by direction of the commis-
**Fireworks. Placards.** sioners, either running at large or confined in a close, nor discharge any fireworks, nor affix any bills or notices therein.

**Injury to trees, shrubbery, statuary, etc.** (10) No person shall cut, break, or in any wise injure or deface the trees, shrubs, plants, turf or any of the buildings, fences, bridges, structures or statuary, or foul any fountains or springs within the common.

**Dead animals, etc.** (11) No person shall throw any dead animal or offensive matter or substance of any kind within the boundaries of Penn's Common.

**Animals at large.** (12) No person shall turn cattle, goats, swine, horses, dogs or other animals loose into the common. Nor shall they be permitted in or around the common, unless accompanied by the owner; and whether accompanied by the owner or not, if any of said animals are found running at large in and about the said common, it shall be lawful for, and the park watchman or any of his assistants shall have full power and authority to impound them, or any of them, and if the said animals or any
**Impounding and disposition of estrays.** of them are not called for by their respective owners within forty-eight hours after the impounding of the same, it shall be lawful for the city authorities to sell and dispose of the said animals or kill the same.[1]

**Tearing down notices.** (13) No person shall injure, deface or destroy any notices, rules or regulations for the government of the common, posted or in any other manner permanently fixed by order or permission of the commissioners of Penn's Common, within the limits of the same.

**Leading of horses.** (14) No person shall be permitted to bring or lead horses within the limits of Penn's Common, or a horse that is not harnessed and attached to a vehicle, or mounted by an equestrian.

**Fakirs.** (15) No person shall expose any article for sale within the common, without the previous license of the commissioners.

**Musical entertainments, etc. Parades or funeral processions.** (16) No person shall have any musical, theatrical or other entertainment therein, nor shall any military or other parade or procession, or funeral, take place in or pass through the limits of the common, without the license of the common commissioners.

**Public meetings.** (17) No gathering or meeting of any kind, assembled through advertisement, shall be permitted in the common without the previous permission of the commissioners.

**Games of sport.** (18) No person shall engage in any play at base ball, cricket, shinney, foot ball, croquet, or at any other games with ball and bat, nor shall [any] foot race or horse race be permitted within the limits of the common, except on such grounds only as shall be specially designated for such purpose.

[1] This rule amended as above by ordinance of June 26, 1895, Jour. 1895-96, App. 549.

21. Any person who shall violate any of said rules and regu- 30 Dec. 1887 § 2.
lations shall be guilty of a misdemeanor, and for each and every **Penalty.**
such offence shall pay the sum of five dollars, to be recovered
before any alderman of the city of Reading, with costs, together
with judgment of imprisonment not exceeding thirty days, if
the amount of said judgment and costs shall not be paid, which
fines shall be paid into the city treasury for common purposes.[1]

[1] These rules are supplemented by a series of additional regulations adopted by the board of park commissioners, June 14, 1895, prescribing the duties of the superintendent, gardener and park police.

# Clerks of Councils.

1. Election of clerk of select council.
2. Term.
3. Duties.
4. Salary.
5. Repeal.
6. Duties of clerk of common council.

1. That the office of clerk of select council be and the same is 9 Mar. 1891 § 1.
hereby established. Said clerk of select council to be elected on J. 1890-91, App. 352.
the day fixed for the organization of council, or as soon there- **Election of**
after as practicable ; a majority of the votes cast shall be neces- **clerk of select council.**
sary for an election.

2. The term of office of the said clerk shall be one year, or Id. § 2.
until his successor shall have been duly elected and qualified. **Term.**

3. That it shall be the duty of the said clerk to keep a regu- Id. § 3.
lar and accurate journal of the acts and proceedings of the said **Duties.**
branch and prepare the same for printing, together with a cal-
endar of unfinished business at each stated meeting ; he shall
also act as clerk of councils in joint convention.

4. That the salary of the clerk of select council shall be three Id. § 4.
hundred dollars per annum, payable as the salaries of other city **Salary.**
officials are payable.[1]

5. That the ordinance, entitled "An ordinance defining the Id. § 5.
duties and fixing the bond and salary of the clerk of select **Repeal.**
council," approved by the mayor December 24th, 1875, and
any other ordinance or ordinances, or part of ordinance or ordi-
nances conflicting with the provisions of this ordinance, be and
the same are hereby repealed so far as the same affects this ordi-
nance.

6. It shall be the duty of the clerk of the common council to 31 Dec. 1875 § 1.
keep a regular and accurate journal of the proceedings of said J. 1875-76, App. 247.
branch and prepare the same for printing, together with a calen- **Duties of clerk**
dar of unfinished business at each stated meeting.[2] **of common council.**

[1] By Section 4 of the act of March 21, 1865, creating the Reading Water Board (*ante*, p. 186), the clerk of select council is *ex-officio* secretary of that body. His annual salary in that capacity is three hundred and sixty dollars.

[2] The annual salary of the clerk of common council remains at two hundred and fifty dollars, as fixed by the salary ordinance of February 17, 1877. (Jour. 1876-77, App. 183), those of all other officers therein named having been changed by subsequent legislation.

Digitized by Google

# EXHIBIT 30

# ACTS OF ASSEMBLY

AND

# ORDINANCES OF COUNCILS

RELATING TO

## FAIRMOUNT PARK

### HUNTING PARK

### BURHOLME PARK

#### COBB'S CREEK PARK

### MORRIS PARK

### PENNYPACK PARK

#### WISTER'S WOODS

AND

### FISHER PARK

UNDER THE CONTROL OF THE

## COMMISSIONERS OF FAIRMOUNT PARK

PHILADELPHIA
PRINTED FOR THE COMMISSIONERS
1912

**Rules and regulations.**

Sect. 21. The said Park shall be under the following rules and regulations, and such others as the Park Commissioners may from time to time ordain:

**Cattle, goats, swine, horses, etc.**

I. No persons shall turn cattle, goats, swine, horses or other animals loose into the Park.

**Fire-arms, throwing stones, etc.**

II. No persons shall carry fire-arms, or shoot birds in the Park, or within fifty yards thereof, or throw stones or other missiles therein.

**Defacing trees, buildings, etc., and fouling springs, etc.**

III. No one shall cut, break, or in anywise injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, structures or statuary, or foul any fountains or springs within the Park.

**Rate of speed.**

IV. No person shall drive or ride therein at a rate exceeding seven miles an hour.

**Driving off roads.**

V. No one shall ride or drive therein, upon any other than upon the avenues and roads.

**Vehicles used for hire.**

VI. No coach or vehicle used for hire, shall stand upon any part of the Park for the purpose of hire, nor except in waiting for persons taken by it into the Park, unless in either case at points designated by the Commission.

**Vehicles of burden.**

VII. No wagon or vehicle of burden or traffic shall pass through the Park, except upon such road or avenue as shall be designated by the Park Commissioners for burden transportation.

**Street railroad cars.**

VIII. No street railroad car[25] shall come within the lines of the Park without the license of the Park Commission.

**Articles exposed for sale.**

IX. No person shall expose any article for sale within the Park without the previous license of the Park Commission.

[25]See Act of March 16, 1870, post, page 30.

X. No person shall take ice from the Schuylkill within Ice. the Park without the license of the said Commission first had, upon such terms as they may think proper.

XI. No threatening, abusive, insulting, or indecent language shall be allowed in the Park. Indecent language, etc.

XII. No gaming shall be allowed therein, nor any obscene or indecent act therein. Gaming, obscenity, etc.

[XIII. No person shall go in to bathe within the Park.]²⁶ Bathing.

XIV. No person shall fish or disturb the water-fowl in the pool, or any pond, or birds in any part of the Park, nor discharge any fire-works therein, nor affix any bills or notices therein. Fish, water-fowl, birds, fire-works and notices.

XV. No person shall have any musical, theatrical, or other entertainment therein, without the license of the Park Commissioners. Entertainments.

XVI. No person shall enter or leave the Park except by such gates or avenues as may be for such purpose arranged. Entrance and exit.

XVII. No gathering or meeting of any kind, assembled through advertisement, shall be permitted in the Park without the previous permission of the Commission; nor shall any gathering or meeting for political purposes in the Park be permitted under any circumstances. Political and other meetings.

XVIII. That no intoxicating liquors shall be allowed to be sold within said Park. Intoxicating liquors.

SECT. 22. Any person who shall violate any of said rules and regulations, and any others which shall be ordained by the said Park Commissioners, for the government of said Park, not inconsistent with this act, or the laws and constitutions of this State and United States— the power to ordain which rules and regulations is hereby expressly given to said Commissioners—shall be guilty of Commissioners shall have power to ordain other rules.

²⁶Repealed by Act of June 3, 1911, post, page 56.

# EXHIBIT 31

# SECOND ANNUAL REPORT

OF THE

# BOARD

OF

# PARK COMMISSIONERS

OF THE

## CITY OF SAINT PAUL.

### 1888-9.

(MARCH 1 TO FEBRUARY 28.)

GLOBE JOB OFFICE,
D. RAMALEY & SON, PRINTERS.
1889.

RULES AND REGULATIONS OF THE PUBLIC PARKS AND GROUNDS
OF THE CITY OF SAINT PAUL.

1. No person shall drive or ride in any Park in the City of Saint Paul at a rate exceeding seven (7) miles per hour.

2. No person shall ride or drive upon any other part of any Park than the avenues and roads.

3. No coach or vehicle used for hire shall stand upon any part of any Park for the purpose of hire, unless licensed by the Board of Park Commissioners.

4. No person shall indulge in any threatening or abusive, insulting or indecent language in any Park.

5. No person shall engage in any gaming nor commit any obscene or indecent act in any Park.

6. No person shall carry firearms or shoot birds in any Park or within fifty yards thereof, or throw stones or other missiles therein.

7. No person shall disturb the fish or water fowl in any pool or pond or birds in any part of any Park, or annoy, strike, injure, maim or kill any animal kept by direction of the Board of Park Commissioners, either running at large or confined in a close; nor discharge any fireworks, nor affix any bills or notices therein.

8. No person shall cut, break or in anywise injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, structures or statuary, or foul any fountain, well or spring within any Park.

9. No person shall throw any dead animal or offensive matter, or substance of any kind into any lake, stream or pool, within the limits of any Park.

10. No person shall go in to bathe within the limits of any Park.

11. No person shall turn cattle, goats, swine, horses, dogs or other animals loose in any Park, nor shall any animals be permitted to run at large therein.

12. No person shall injure, deface or destroy any notices, rules or regulations for the government of any Park, posted or in any other way fixed by order or permission of the Board of Park Commissioners within the limits of any Park.

13. Complaints against any employe of any Park may be made at the office of the Superintendent of Parks.

14 No person shall use any Park drive for business purposes, or for the transportation of farm products, dirt or any like material, or for the passage of teams employed for such purposes.

Any person who shall violate any of the foregoing rules and regulations shall be guilty of a misdemeanor, and for each and every offense shall be fined not less than the sum of Five Dollars ($5), nor more than Fifty Dollars ($50), which sum shall be paid into the city treasury for park purposes.

JOHN D. ESTABROOK,
Superintendent.



EXHIBIT 32

# MINUTES OF PROCEEDINGS

OF THE

# BOARD OF COMMISSIONERS

OF THE

# CENTRAL PARK,

FOR THE

## YEAR ENDING APRIL 30, 1858.

————<+●+>————

NEW YORK:

WM. C. BRYANT & CO., PRINTERS, 41 NASSAU ST., COR. LIBERTY.

————

1858.

Digitized by Google

# TUESDAY, MARCH 16, 1858.

PRESENT:

| Commissioner Gray, | Commissioner Fields, |
| --- | --- |
| "  Dillon, | "  Green, |
| "  Russell, | "  Strong, |
| "  Butterworth, | "  Hogg. |
| "  Hutchins, | |

On motion, the reading of the minutes of the previous meeting was dispensed with.

On motion of Mr. BUTTERWORTH, it was

*Resolved*, That the Annual Report of this Board to the Common Council, dated January 30, 1858, be printed as one of the documents of this Board.

As follows:

*Ayes*—Messrs Dillon, Butterworth, Gray, Fields, Green, Strong, Hogg—7.

On motion of Mr. DILLON, the ordinances recommended by the Superintendent were adopted, as follows:

"Be it ordained by the Commissioners of the Central Park:

All persons are forbidden

To enter or leave the Park except by the gateways.

To climb or walk upon the wall.

To turn cattle, horses, goats or swine into the Park.

To carry fire-arms or to throw stones or other missiles within it.

To cut, break, or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, or other constructions upon the Park;

Or to converse with, or in any way hinder those engaged in its construction.

All persons offending against these ordinances shall be deemed guilty of misdemeanor, and be punished, on conviction before the Mayor, Recorder, or any magistrate of the city of New York. by a fine not exceeding fifty dollars; and, in default of payment, by imprisonment not exceeding thirty days."

Visitors may obtain all necessary information and directions from the police.

The business offices and the police station of the Park are on Fifth avenue at Seventy-ninth street."

Mr. DILLON also moved the adoption of the following:

*Ordered*, That the Superintendent cause these ordinances to be posted on the Park, in such number and manner as he may deem advisable.

*Ordered*, That it be published for ten days in the Daily Times, Tribune, Sun, and Staats Zeitung.

Which was carried, as follows:

*Ayes*—Messrs. Dillon, B tterworth, Gray, Fields, Green, Strong, Hogg—7.

A communication from the Chief Engineer, submitting a report on " A Comprehensive Plan of Drainage " of the Park, accompanied by a map of the same, was received.

Mr. DILLON moved that the report be printed and referred to the Committee on Draining and Sewerage.

Which was carried, as follows:

*Ayes*—Messrs. Dillon, Butterworth, Gray, Fields, Green, Strong, Hogg—7.

A report from the Chief Engineer, announcing the completion of the sectional and drainage maps of the Park, and the discharge of all persons directly employed by him, was referred to the Executive Committee.

A communication from the same, as to a plan for receiving within the limits of the Park the waste water from the present and new reservoirs, was also referred to the Executive Committee.

A communication from Thomas F. Webb, as to furnishing blasting powder for the Park, was also referred to the same committee.

The following communication was received from A. W. Craven, Esq., of the Croton Aqueduct Board, and on motion of Mr. Dillon ordered to be engrossed in the minutes of the Board:

CROTON AQUEDUCT DEPARTMENT,
Engineer's Office, March 2d, 1858.

Gentlemen,—I beg leave to acknowledge the receipt of a note from your Board, through Mr. Hart, dated February 16th, and to apologise for not replying to it more promptly.

The questions asked, and the answers thereto, are as follows:

"1st. What is the height of the Reservoir on the line of Fifth avenue at 41st street, excluding the railing?"

The top of the wall, exclusive of the railing, and also exclusive of the projections at the corners and over the gateway, is 119 feet above mean tide and 39 feet above the curb of Forty-first street. The height of water when the Reservoir is full is four feet below this level, or 115 feet above mean tide.

"2d. Will the top of the wall of the new Reservoir be on a level with the top of that now built in Seventy-n'nth street?"

These heights are intended to be precisely the same.

"3d. Could not the height of the wall be reduced in the Reservoir now built and in the new one, and if so, how much, and yet answer all the purposes of the Reservoir?"

The height of water in these Reservoirs could not be reduced without greatly impairing the efficiency of our water distribution throughout the city, and the height of the wall could not be reduced with safety without a corresponding reduction in the high-water level.

I have the honor to be, very respectfully,
Your obedient servant,
A. W. CRAVEN,
Chief Engineer.

To the Commissioners of the Central Park, New York.

The monthly report of the Superintendent was read and ordered on file.

A petition of Norman Ewen, late Surveyor and Engineer of the third division Central Park Survey, to be allowed his pay,

at the rate of $150 per annum, from May 1st to November 13th, 1857, was read and referred to the Auditing Committee.

Mr. FIELDS moved to take up the special order, being the election to fill the vacancy caused by the resignation of Mr. Cooley, in pursuance of the notice given by Mr. Strong, at the meeting of February 16, 1858.

The ayes and nays being called for upon the motion, it was carried, as follows:

*Ayes*—Messrs. Dillon, Russell, Gray, Hutchins, Fields, Green, Strong, Hogg—8.

*Nay*—Mr. Butterworth—1.

Mr. RUSSELL offered the following:

*Resolved*, That it is inexpedient at the present meeting to go into an election, to fill the vacancy in the Board occasioned by the resignation of Mr. Cooley.

Lost.

Mr. FIELDS moved that the Board now go into ballot.

Carried, as follows:

*Ayes*—Messrs. Dillon, Gray, Hutchins, Fields, Green, Strong, Hogg—7.

*Nays*—Messrs. Russell, Butterworth—2.

The Chair appointed as tellers Messrs. Green and Butterworth.

The Board then proceeded to ballot, with the following result:

> For August Belmont.................... 7
> "    George Bancroft..... ............. 1
>      Blank ............................ 1

On motion of Mr. RUSSELL, the election of Mr. Belmont was declared unanimous.

On motion of Mr. HUTCHINS, the Vice-President was requested to communicate to Mr. Belmont his election to the Board.

Mr. STRONG moved that when the Board adjourn it be to Tuesday next at 1 o'clock.—Carried.

On motion of Mr. RUSSELL, the Clerk was directed to prepare a calendar of unfinished business for the use of the Board, at each stated meeting.

The Board then adjourned.

Digitized by Google

# EXHIBIT 33

# EIGHTH ANNUAL REPORT

OF THE

## BOARD OF COMMISSIONERS

OF

# PROSPECT PARK,

BROOKLYN.

JANUARY, 1868.

BROOKLYN:
J. VAN ANDEN'S PRINT, EAGLE BUILDINGS, 30 & 32 FULTON STREET.

1868.

# RULES AND REGULATIONS

The Commissioners of Prospect Park, in the City of Brooklyn, do make and publish the following Rules and Regulations to be observed by all persons who visit the Public Parks in said city:

1. The Parks will be open to the public daily, except when special occasion may require either of them to be closed, and will continue open from sunrise to 10 o'clock in the evening during the months of June, July, August, and September, and from sunrise to 9 o'clock in the evening during the other months of the year. The City Hall Park will remain open at all times.

2. No person, unless he is employed by the Board of Commissioners, will be permitted to enter or remain in or upon any of the Parks except when they are open, as above provided. Nor shall any person enter or leave any of said Parks except by the usual gateways, nor climb upon, or in any manner cut, injure, or deface any tree, shrub, plant, grass, or turf, or any fence or other erection thereon.

3. No person shall make use of any loud, threatning, abusive, or indecent language; nor throw stones or other missiles; nor play upon any musical instrument; nor post any bill, notice, or other device upon any tree or structure; nor do any obscene or indecent act whatever upon or within any of said Parks.

4. No cattle, horses, goats, swine, or poultry of any description will be allowed within said Parks; nor any dog, unless led by a suitable chain or cord not exceeding six feet in length; nor shall any person expose any thing for sale thereon, unless by special permission from the Commissioners.

5. No person shall fire or discharge any gun, pistol, squib, torpedo rocket, or other fireworks whatever in or upon any of said Parks; nor shall any military or target company or any civic or other procession march or parade thereon, unless by special permission from said Commissioners.

6. The above Rules and Regulations apply to all Parks under the control of the Commissioners, and extend to the sidewalks adjacent to said Parks.

7. The drives of Prospect Park will be open to the use of the public, solely for pleasure riding or driving. Animals to be used upon them, must be well broken, and constantly held in such control, that they may be easily and quickly turned or stopped. They will not be allowed to move at a rate of speed, which shall cause danger or reasonable anxiety to others; nor

under any circumstances at more than eight miles an hour. The park keepers will be held responsible, for such regulation of the speed of animals passing under their observation, as the general safety and convenience of those using the drives may require. And when in the judgment of a keeper, any animal is moving too rapidly, and the keeper shall intimate this by a gesture, it shall be the duty of the rider or driver of such animal, immediately to moderate its speed. And no animal or vehicle, will at any time be allowed to stand upon the rides or drives, to the inconvenience of travel thereon.

8. No horse or vehicle of any description, will be allowed upon any part of said Park, except upon the rides, drives, concourses, or other places appropriated for horses and carriages ; nor will any vehicle, drawn by any animal, be allowed upon any foot-walk or ride in said Park.

9. No hackney coach, carriage, or other vehicle for hire, shall stand anywhere within said Park, for the purpose of taking up passengers other than those which shall have been carried by it to said Park; nor shall any person upon said Park solicit or invite passengers.

10. No omnibus or express-wagon, either with or without passengers, nor any cart, dray, wagon, or other vehicle carrying goods, merchandise, manure or other articles, or which shall be ordinarily used for such purposes, shall be allowed upon any part of said Park, except upon such roads as may be specially provided for the purpose.

11. No person shall bathe, or take fish, or send or throw any animal or thing, in or upon any of the waters of said Park, or in any manner disturb or annoy any water-fowl, singing or other bird, deer, or other animal appertaining to said Park : nor shall any boat or vessel be placed upon said waters, except by special permission from the said Commissioners. And no skating or sledding will be allowed thereon, unless the officer in charge shall consider the ice to be in a suitable condition for that purpose.

12. For any violation of these rules and regulations, the offender will be liable to be summarily ejected from the premises, and to such punishment as the law directs.

# EXHIBIT 34

# 22-2908(L)

**22-2972 (Con)**

## 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔖𝔢𝔠𝔬𝔫𝔡 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

IVAN ANTONYUK,

*Plaintiffs-Appellees*,

v.

STEVEN A. NIGRELLI, in his Official Capacity as Acting Superintendent of the New York State Police,

*Defendants-Appellants.*

(*Caption continues inside front cover.*)

On Appeal from a Judgement of the United States District Court
for the Northern District New York

**BRIEF FOR THE CENTER FOR HUMAN LIBERTY
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND
AFFIRMANCE**

_____

BENBROOK LAW GROUP, PC
Bradley A. Benbrook
Stephen M. Duvernay
701 University Avenue, Suite 106
Sacramento, CA  95825
(916) 447-4900

February 8, 2023

(*Caption continues from front cover.*)

COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN, LESLIE LEMAN, LAWRENCE SLOANE,

*Plaintiffs-Appellees*,

v.

MATTHEW J. DORAN, in his Official Capacity as the Licensing Official of Onondaga County, JOSEPH CECILE, in his Official Capacity as the Chief of Police of Syracuse,

*Defendants-Appellants*,

KATHLEEN HOCHUL, in her Official Capacity as the Governor of the State of New York, WILLIAM FITZPATRICK, in his Official Capacity as the Onondaga County District Attorney, EUGENE CONWAY, in his Official Capacity as the Sheriff of Onondaga County, P. DAVID SOARES, in his Official Capacity as the District Attorney of Albany County, GREGORY OAKES, in his Official Capacity as the District Attorney of Oswego County, DON HILTON, in his Official Capacity as the Sheriff of Oswego County, JOSEPH STANZIONE, in his Official Capacity as the District Attorney of Greene County,

*Defendants*.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(c)(1) of the Federal Rules of Appellate Procedure, counsel for *amicus curiae* hereby state that the Center for Human Liberty has no parent corporation and has issued no stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES................................................................. iii

INTEREST OF AMICUS CURIAE..........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.......................................1

ARGUMENT ...............................................................................3

I.    This Court Should Focus Its Historical Analysis On The Founding Era ........3

II.   New York's Expansive List Of New "Sensitive Places" Is Inconsistent With
      The Nation's Historical Tradition Of Firearm Regulation..............................8

      A.   The Core "Sensitive Places" Identified In *Heller* And *Bruen* Were All
           Secured By Guards, Thus Reducing The Imperative Of Carrying For
           Self Defense ................................................................9

           1.   Legislatures................................................................10

           2.   Courthouses ..............................................................12

           3.   Polling Places ...........................................................15

      B.   The Supposed Sensitive Places At Issue Here Cannot Be Analogized
           To The Founding-Era Sensitive Places Identified In *Heller* And *Bruen*
           ................................................................................17

      C.   The Historical Record Supports Restrictions On Students' Firearm
           Rights, But Not A Complete Ban On Firearms At Schools, Colleges,
           And Universities ..........................................................20

      D.   Founding-Era Historical Regulations *Required* The Carry Of Firearms
           At Public Assemblies And Church Services......................................22

      E.   Historical Restrictions On Hunting And The Discharge Of Firearms
           Confirm That There Is No Basis To Ban Carrying Firearms On
           Private Property Altogether ...............................................25

CONCLUSION ..............................................................................29

CERTIFICATE OF COMPLIANCE ........................................................30

# TABLE OF AUTHORITIES

## Cases

*Antonyuk v. Hochul*,
2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) ........................................... passim

*Castle Rock v. Gonzales*,
545 U.S. 748 (2005) ................................................................................18

*Crawford v. Washington*,
541 U.S. 36 (2004) ................................................................................4, 5

*DeShaney v. Winnebago Cnty. Dep't of Social Servs.*,
489 U.S. 189 (1989) ................................................................................18

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ............................................................................ passim

*Espinoza v. Montana Dep't of Revenue*,
140 S.Ct. 2246 (2020) ................................................................................6

*Gamble v. United States*,
139 S.Ct. 1960 (2019) ................................................................................5

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ................................................................5

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ................................................................................6

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ................................................................................4

*Nevada Comm'n on Ethics v. Carrigan*,
564 U.S. 117 (2011) ................................................................................4

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S.Ct. 2111 (2022) ....................................................................... passim

*Ramos v. Louisiana*,
140 S.Ct. 1390 (2020) ................................................................................6

*Timbs v. Indiana*,
139 S.Ct. 682 (2019) ................................................................................7

*Virginia v. Moore*,
553 U.S. 164 (2008) ................................................................................4

**Historical Regulations**

1 Laws of the State of New York (1807) ................................................13

1 Records Of The Colony Of Rhode Island And Providence Plantations, In New England (Bartlett 1856)......................................................................24

1 The Statutes At Large: Being A Collection Of All The Laws Of Virginia, From The First Session Of The Legislature (Hening 1808)...........................24

5 Laws Of The Colony Of New York (1894).........................................26

1746 Mass. Acts 208, An Act to Prevent the Firing of Guns Charged with Shot or Ball in the Town of Boston, chap. 11, §§ 1 to 3 ...................................26

1812 Del. Laws 329..............................................................................26

1818 Vermont Acts & Resolves 64, § 42 ...............................................27

1823 N.H. Laws 73-74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4 ...................................26

A Journal of the Proceedings of the Honorable Senate of the State of New-Hampshire (1808) ............................................................................12

A Collection Of All Such Acts Of the General Assembly Of Virginia (1803).......13

A Compilation of the Laws of the State of Georgia, Passed by the Legislature Since the Political Year 1800, to the Year 1810, Inclusive (1812).....................11

A Digest of the Laws of the State of Georgia (1800).........................14, 16

A Manual of The Laws of North-Carolina(3d ed. 1814)..........................15

Abridgement Of The Public Permanent Laws Of Virginia (1796) .........................16

Acts and Laws of the State of Connecticut, In America (1784)..............................14

Acts and Resolves of Massachusetts, 1786–87 (1893). ..........................................14

An Act for the Support of Government, in 1 Laws of the State of New York (2nd ed. 1807). ...........................................11

Digest Of The Laws Of Georgia (1800)...............................................28

Hammond Trumbull, The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony (Brown & Parsons 1850)...........................23

Laws of the State of Delaware, From the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-seven, vol. 2 (1797)......................10, 13, 16

Laws of the State of New Jersey (Bloomfield, ed. 1811)...........................16

iv

Maryland, 3 Archives of Maryland (Browne 1885)...............................................24

Massachusetts Bay Colony, 1 Nathaniel B. Shurtleff, Records of the Governor and Company of the Massachusetts Bay in New England (White 1853)..................23

Md. Const. art 1, § I (1776) ....................................................................................19

Md. Const. art. 1, §§ 3 & 14 (1776) .......................................................................16

New Jersey, Laws of the State of New Jersey, Compiled and Published, Under the Authority of the Legislature (Joseph Bloomfield, 1811). ....................................13

North Carolina, A Manual Of The Laws Of North Carolina (1814).......................27

Provincial Congress, Journal of the Votes and Proceedings of the Provincial Congress of New-Jersey: Held at Trenton in the Month of October (1835)........11

The Laws of Maryland to which are prefixed The Original Charter, with an English translation, v. 1, ch. XXV (1799)............................................................................14

The Laws of the State of New-Hampshire (1797)...................................................15

The Laws of the State of Vermont, vol. II (1808). .................................................15

The Public Laws of the State of Rhode-Island (1798) .....................................10, 15

The Public Laws Of The State Of Rhode-Island And Providence Plantations (1798). ........................................................................................25

The Public Laws of the State of South-Carolina (1790) ............................11, 12, 17

The Statutes at Large of Pennsylvania From 1682 to 1801, vol. X (1779–1781). ...............................................................11, 14

Vermont, The Laws of the State of Vermont, vol. II (1808)..................................12

Virginia, Abridgment of the Permanent Laws of Virginia, (1796) ........................28

Virginia, Journal of the House of Delegates of the Commonwealth of Virginia (Printed by Thomas W. White, 1828). ...................................................................12

Votes and Proceedings of the House of Delegates of the State of Maryland, October Session (1781)..........................................................................................12

Votes and Proceedings of the Senate of the State of Maryland, November Session (1792)......................................................................................12

## Other Authorities

Amar, The Bill of Rights: Creation and Reconstruction xiv, 223 (1998) ................3

Boyd, Take Your Guns to Church: The Second Amendment and Church
Autonomy, 8 Liberty Univ. L. Rev. 653 (2014) ...................................23

Cramer, Guns On Campus: A History,
27 Acad. Questions 411 (Dec. 2014) ................................................20

Kopel & Greenlee, *The "Sensitive Places" Doctrine*,
13 Charleston L. Rev. 203 (2018).............................................9, 20

Lash, Re-Speaking the Bill of Rights: A New Doctrine of Incorporation
(manuscript Jan. 15, 2021)...................................................3

Laws of the Columbian College in the District of Columbia (1824). .....................22

Laws of the University of North-Carolina; Established by the Board of Trustees, at
Their Session in December 1799 (Gales 1800). ...................................21

Mark Smith, *"Not all History is Created Equal": In the Post-Bruen World, the
Critical Period for Historical Analogues is when the Second Amendment was
Ratified in 1791, and not 1868*, (manuscript posted Nov. 4, 2022)..............4, 5, 7

The Lawes Of The Colledge
Published Publiquely Before The Students Of Harvard Colledge (1655). ..........21

The Laws of Rhode-Island College,
Enacted by the Fellows and Trustees (Carter 1803). ...........................21

The Laws of Yale College, in New-Haven, In Connecticut,
Enacted by the President and Fellows, The Sixth Day of October, A.D. 1795
(Thomas Green and Son 1800). ...............................................21

Univ. of Georgia,
The Minutes of the Senatus Academicus, 1799-1842 (Univ. Ga. Lib. 1976)......22

Walker & Katz, The Police in America  (2013) .....................................18

## INTEREST OF AMICUS CURIAE

The Center for Human Liberty is a nonprofit organization dedicated to defending and advancing individual liberty and freedom, including the rights and liberties protected by the Constitution. Consistent with this purpose, The Center for Human Liberty engages in legal efforts, including the submission of amicus briefs, to promote the protection of liberty. Amicus is interested in this case to ensure that New York's regulation of firearms is consistent with the original meaning of the Second Amendment as the Framers understood it.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Amicus offers this brief to assist the Court's consideration of the historical evidence of "sensitive place" restrictions on the right to carry firearms. *Bruen*, like *Heller* before it, stressed that the scope of the Second Amendment's protection must be determined by historical analysis: "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court

---

[1] No party's counsel authored this brief in whole or part and, apart from the Constitutional Defense Fund, Inc., no person (including any party or party's counsel) contributed money to fund its preparation or submission. All parties on appeal have consented to the filing of this brief.

1

conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2126 (2022) (citation omitted).

We begin by emphasizing that the founding-era understanding of the "sensitive location" doctrine controls. The "scholarly debate" referenced in *Bruen*—when conducting the historical analysis, should a court look to the understanding of the Second Amendment's scope in 1791 or 1868?—provides no basis for straying from the Court's consistent practice. The "scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S.Ct. at 2137-38.

The many locations New York now hopes to treat as "sensitive" cannot possibly be analogized to the core founding-era sensitive locations recognized in *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The historical record shows that, at the founding, carry restrictions were strictly limited to locations where the government exercised a heightened level of control to secure the proper operation of government, which stands in stark contrast to New York's sweeping restrictions.

Indeed, early Americans were *required* by law to carry firearms in many of the locations—such as places of worship and at public assemblies—where the State now seeks to disarm citizens altogether. New York's current impulse to protect

2

potential victims by disarming everyone at public gatherings thus runs directly contrary to the Founders' solution: Where contained spaces could not be comprehensively secured by government-provided protection, the people were instructed to be ready to defend themselves in the event of violence.

New York's bans fail *Bruen*'s test. The injunction should not be disturbed.

## ARGUMENT

### I.    This Court Should Focus Its Historical Analysis On The Founding Era.

*Bruen* cautioned lower courts to remember that, when they analyze history to evaluate whether the government has met its burden, "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Id*. at 2136 (quoting *Heller*, 554 U.S. at 634-35) (emphasis in *Bruen*). While the Court "acknowledge[d] that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)," 142 S.Ct. at 2138,[2] multiple signs show that this "debate" must be settled in favor of 1791.

---

[2] Citing Amar, The Bill of Rights: Creation and Reconstruction xiv, 223, 243 (1998), and Lash, Re-Speaking the Bill of Rights: A New Doctrine of Incorporation (Jan. 15, 2021) (manuscript at 2), https://papers.ssrn.com/sol3/papers.cfm? abstract_id=3766917).

The notion that, "[w]hen the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings," Lash, *supra* at 2,[3] makes little sense. *See* Mark Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868*, (manuscript posted Nov. 4, 2022, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248297). *Bruen* stressed that "we have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment *have the same scope* as against the Federal Government." 142 S.Ct. at 2137 (emphasis added and citations omitted). And it cautioned that the Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." 142 S.Ct. at 2137-38.[4] In other words, the Fourteenth Amendment's passage did not change the scope of incorporated rights.

---

[3] *See also* ECF No. 193, Am. Br. of Everytown for Gun Safety at 7-16.

[4] *Bruen* cited *Crawford v. Washington*, 541 U.S. 36, 42-50 (2004) (scope of Sixth Amendment right to confrontation governed by "founding generation's" understanding); *Virginia v. Moore*, 553 U.S. 164, 168-69, 172 (2008) (scope of Fourth Amendment determined in "founding era") (citation omitted); and *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122-23 (2011) (founding-era treatment "dispositive" on scope of First Amendment). *See also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 359 (1995) (Thomas, J. concurring) (First

*Bruen* further affirmed that post-founding-era regulations are relevant only to the extent they *confirm* traditions from the founding, so courts must "guard against giving postenactment history more weight than it can rightly bear." 142 S.Ct. at 2136. Thus, while it is *permissible* for courts to consider post-founding-era historical regulations, that review is limited to determining whether such regulations *confirm* a founding-era tradition. *Bruen*, 142 S.Ct. at 2136.[5] Nineteenth-century laws that regulated firearms in a manner that broke with founding-era traditions do not establish a "tradition" that could narrow the scope of the Second Amendment's protection. *Bruen*, 142 S.Ct. at 2137 ("'post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text'") (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)); *id.* at 2154 n.28 ("late-19th-century [and] 20th-century evidence . . . *does not provide*

---

Amendment must be interpreted based on its "original meaning" by "seek[ing] the original understanding" of Framers).

[5] *See also Gamble v. United States*, 139 S.Ct. 1960, 1975-76 (2019) (observing that, in *Heller*, "19th-century treatises were treated as mere *confirmation* of what the Court thought had already been established") (emphasis added); *see also* Smith, *supra*, manuscript at 4-5 ("No Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities, generally very shortly after the founding, remained consistent with the public understanding in 1791."); *Crawford*, 541 U.S. at 47, 50 (citing 19th-century treatises that "confirm[ed]" founding-era rule).

*insight* into the meaning of the Second Amendment when it contradicts earlier evidence") (emphasis added).[6]

These principles doom the eccentric theory that the Second Amendment's original meaning could be "transformed" by Civil War era regulations that were inconsistent with founding-era practices. "Incorporation" simply asks whether a particular limitation on the *federal* government in the Bill of Rights should also apply to state and local governments because it is a "fundamental" right. *McDonald v. City of Chicago*, 561 U.S. 742, 764 (2010). And because incorporation assumes and accepts that the right has restricted the federal government *since the founding*, "incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government." *Ramos v. Louisiana*, 140 S.Ct. 1390, 1397 (2020). Their meanings did not *change* in the 19th century with the adoption of the Fourteenth Amendment. *McDonald*, 561 U.S. at 788 ("relationship between the Bill of Rights' guarantees and the States must be governed by a single, neutral principle"); *Timbs v. Indiana*, 139 S.Ct. 682, 687

---

[6] *Bruen* also cited *Espinoza v. Montana Dep't of Revenue*, 140 S.Ct. 2246, 2258-59 (2020) (rejecting argument that 30 states' late-19th-century adoption of "no aid" laws inconsistent with founding-era understanding of Free Exercise Clause could overcome original understanding). Justice Barrett cited this analysis from *Espinoza* in stressing that *Bruen* "should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights. On the contrary, the Court is careful to caution 'against giving postenactment history more weight than it can rightly bear.'" 142 S.Ct. 2163 (Barrett, J., concurring).

6

(2019) ("if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires"); Smith, *supra* at 4-5.

\* \* \*

Limiting the use of 19th-century evidence to only confirm the founding-era understanding plays a dispositive role here. New York relied on late 19th-century laws for the vast majority of its historical evidence in the district court.[7] The State sought to justify a ban on carrying firearms in "any place of worship or religious observation" by pointing to six state and territorial regulations enacted between 1870 and 1890.[8] It cited a series of state, territorial, and municipal regulations passed between 1870 and 1897 to support its ban on carrying in "public playgrounds, public parks, and zoos."[9] It then relied on four state and territorial laws from 1869 to 1890 when defending its prohibition on carrying firearms in "aviation transportation," "airports," and "buses";[10] identified a series of regulations primarily from the 1880s

---

[7] By contrast, New York identified *only one* founding-era law—a lone 1786 Virginia law that prohibited carrying arms "in terror of the Country" that the Supreme Court did not find persuasive in *Bruen*—to support any of its sensitive place restrictions. New York offered this law to justify the ban on carrying on planes, in airports, and on buses, as well as the carry prohibition in theaters, conferences centers, and banquet halls. *Antonyuk v. Hochul*, 2022 WL 16744700 at *69, *73 (N.D.N.Y. Nov. 7, 2022).

[8] *Id.* at *61.

[9] *Id.* at *64.

[10] *Id.* at *69.

to support its prohibition on carrying firearms in bars;[11] referenced four post-Civil War regulations in defense of its firearms ban in "theaters," "conference centers," and "banquet halls";[12] and found six state and territorial laws passed between 1869 and 1890 to support its ban on carrying firearms at gatherings to "express . . . constitutional rights to protest or assemble."[13]

As shown below, however, these 19th-century laws were not consistent with the tradition of sensitive-place regulation in the founding era.[14]

## II. New York's Expansive List Of New "Sensitive Places" Is Inconsistent With The Nation's Historical Tradition Of Firearm Regulation.

Founding-era history confirms not only that government authority to ban firearms was sharply limited (primarily to contained places under the government's control with government-provided security), it demonstrates that citizens were generally allowed to carry firearms (schools) or even required to do so (places of worship) in several of the very same locations where New York seeks to ban firearms altogether. New York's law cannot survive *Bruen*'s test.

---

[11] *Id.* at *71.

[12] *Id.* at *73.

[13] *Id.* at *75.

[14] Although the district court ultimately reached the correct conclusion when enjoining each of the sensitive-place restrictions that are at issue in this appeal, the court could have reached that conclusion more swiftly by dismissing the mid- and late-19th century regulations that were inconsistent with regulations (or lack of regulations) at the founding.

8

A.    The Core "Sensitive Places" Identified In *Heller* And *Bruen* Were All Secured By Guards, Thus Reducing The Imperative Of Carrying For Self Defense.

In *Bruen*, the Court identified three types of "sensitives places" where historical regulations traditionally prohibited the possession of weapons: "legislative assemblies, polling places, and courthouses." 142 S.Ct. at 2133 (citing Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 203, 229–236, 244–247 (2018), and Br. of Independent Institute as Amicus Curiae in Supp. of Pet'rs at 11–17). Review of these regulations illuminates the limits of the so-called sensitive places doctrine and provides the historical context for the analogical inquiry *Bruen* prescribes for analyzing New York's restrictions in this case.

Two defining characteristics run through each of the sensitive places acknowledged by *Bruen*. First, each location involved deliberative processes central to the republican democracy that should be free from potential armed intimidation. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 205 ("Protecting government deliberation from violent interference is the core of the sensitive places tradition."). Second, and correspondingly, history demonstrates substantial evidence that each of these places was, in contrast to virtually all other locations, well secured by the presence of armed guards, so the *need* for armed self-defense by the public was significantly reduced. This latter characteristic will, as shown below, prevent New York from analogizing its widespread bans to the founding era tradition.

9

1.    **Legislatures.** The historical record reflects a uniform tradition of providing publicly-funded or publicly-administered physical security in legislative assemblies throughout the nation. Legislative records from throughout the United States in the founding era reflect the presence of sergeants-at-arms and door-keepers at legislative proceedings, which is evidenced through public funding and legislative journals detailing the appointment of these officers:

- In Rhode Island, sheriffs, town sergeants, and constables were paid for attending the General Assembly. The Public Laws of the State of Rhode-Island, pp. 220, 222 (1798) ("The Sheriffs," "Town Sergeants, and Constables" "shall be allowed" fees "[f]or attending the General Assembly").

- Delaware provided for public payment of fees to the legislature's sergeant-at-arms and door-keepers. Laws of the State of Delaware, From the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-seven, vol. 2, pp. 1100, 1118 (1797) ("the fees belonging to the Sergeant at Arms shall be as follow . . . Taking any person into custody, Thirty-31 three Cents," "Fees to the Door-keepers of the respective Houses—For every day's attendance, One Dollar").

- Pennsylvania appropriated funds for the assembly's sergeant-at-arms and door-keepers in 1781: "The sergeant-at-arms, for every day's attendance, the sum of ten shillings. The door-keeper of the council and the door-keeper of the house

10

of assembly, each the sum of ten shillings for every day's attendance." The Statutes at Large of Pennsylvania From 1682 to 1801, vol. X, pp. 376, 378 (1779–1781).

- South Carolina provided for the payment of door-keepers in 1787. The Public Laws of the State of South-Carolina, pp. 426, 427 (1790) ("Two Door-keepers £50 each per annum").

- New York legislated that "there shall also be allowed and paid to the serjeant at arms and the door keepers of the senate and assembly, each the sum of two dollars for every day they shall attend the legislature" An Act for the Support of Government, in 1 Laws of the State of New York, p. 532 (2nd ed. 1807).

- Georgia appropriated funds for the legislature's door-keepers in 1808: "to the messenger and door-keeper of the Senate, and messenger and door-keeper of the House of Representatives, three dollars each per day." A Compilation of the Laws of the State of Georgia, Passed by the Legislature Since the Political Year 1800, to the Year 1810, Inclusive, pp. 372–73 (1812).

- New Jersey provided for payment "[t]o the door keeper, the sum of five shillings per diem, for each day that he hath or shall attend this Congress." Provincial Congress, Journal of the Votes and Proceedings of the Provincial Congress of New-Jersey: Held at Trenton in the Month of October 1775, pp. 239, 240 (1835).

- Virginia provided for "allowances" for the sergeant-at-arms and door-keepers' "services" to the General Assembly in 1783. Virginia, Journal of the House

11

of Delegates of the Commonwealth of Virginia, p.77 (Printed by Thomas W. White, 1828).

- Vermont compensated sheriffs and constables "[f]or attendance on the general assembly" in 1798. Vermont, The Laws of the State of Vermont, vol. II, pp. 382, 387 (1808).[15]

    2. **Courthouses.** The historical record likewise confirms that states provided for the securing of courthouses at the founding by requiring law enforcement officials (sheriffs or constables) to attend court.

- South Carolina directed that "sheriffs shall by themselves, or their lawful deputies respectively, attend all the courts hereby appointed, or directed to be held, within their respective districts." The Public Laws of the State of South-Carolina, pp. 268, 271 (1790).

- Virginia enacted a 1792 law providing that "[t]he keeper of the public jail, shall constantly attend the General Court, and execute the commands of the

---

[15] *See also* Votes and Proceedings of the House of Delegates of the State of Maryland, October Session, 1780, p. 2 (1781) ("The house appointed . . . Mr. Robert Reynolds sergeant at arms, and Mr. Cornelius Mills door-keeper."); Votes and Proceedings of the Senate of the State of Maryland, November Session, 1791, p. 1 (1792) ("Edward Roberts [was appointed] door-keeper"); A Journal of the Proceedings of the Honorable Senate of the State of New-Hampshire, p. 6. (1808) ("Voted that Mr. James Buswell be door-keeper for the Senate the present Session."); A Journal of the Proceedings of the Honorable Senate of the State of New-Hampshire, p. 6. (1808) ("Voted that Mr. James Buswell be door-keeper for the Senate the present Session.").

Court," and further providing that "the Sheriff, or so many of the Under-Sheriffs as shall be thought necessary, of the County where such Court may be held, shall attend the said Court during their Sessions." A Collection Of All Such Acts Of the General Assembly Of Virginia, pp. 69–71 (1803).

- Delaware, in a 1793 law, directed that "the Sheriff of Kent county . . . shall be attendant on the said High Court of Errors and Appeals during the sitting thereof, and be the officer for the purpose of executing the orders and process of the said court." Laws of the State of Delaware, From The Fourteenth Day Of October, One Thousand Seven Hundred, To The Eighteenth Day Of August, One Thousand Seven Hundred And Ninety-Seven, vol. 2, pp. 1088, 1091 (1797).

- New Jersey, in 1798, mandated that "the constables of the several townships in such county shall be the ministerial officers of the said court" and provided that the constable "shall be appointed to attend the jury." New Jersey, Laws of the State of New Jersey, Compiled and Published, Under the Authority of the Legislature, pp. 49, 50, 58 (Joseph Bloomfield, 1811).

- New York, in 1801, required "sheriffs and their officers" to attend court proceedings "to do those things which to their officers shall appertain." 1 Laws of the State of New York, p. 172 (1807).

- Pennsylvania, in 1780, provided courts with "the power to . . . compel the attendance of sheriffs, coroners, constables, and other ministerial officers require

13

sheriffs, constables, and other officers." The Statutes at Large of Pennsylvania From 1682 to 1801, vol. X, p. 57 (Wm. Stanley Ray 1904).

Beyond these requirements, the legislative record in other early American jurisdictions shows that law enforcement officials were compensated for attending judicial proceedings, which provides further evidence that courthouses were secured by the government:

- Connecticut's legislative record includes a fee schedule for sheriffs and constables attending court proceedings. Acts and Laws of the State of Connecticut, In America, pp. 63–65 (1784).

- Georgia provided in a 1792 law for fees to sheriffs and constables for court proceedings. A Digest of the Laws of the State of Georgia, pp. 471, 473, 474, 478 (1800).

- Maryland law provided for compensation "to the Sheriff," including for "Empanelling" and "Swearing" juries and for "Attendances, per day." The Laws of Maryland to which are prefixed The Original Charter, with an English translation, v. 1, ch. XXV (1799) (1779 law).

- Massachusetts provided for payment to "[e]very Constable who shall attend the Supreme Judicial Court, or Court of General Sessions of the Peace, or Common Pleas." Acts and Resolves of Massachusetts, 1786–87, p. 235 (1893) (1786 law).

14

- New Hampshire law provided for "Sheriff's fees" "[f]or every trial," "[f]or attending the grand jury," and "[f]or attending the petit jury." The Laws of the State of New-Hampshire, pp. 112–16 (1797).

- North Carolina allocated payment to sheriffs "[f]or summoning, impannelling and attending on every jury in every cause in court" and "[f]or attendance of a constable every court when summoned by the sheriff." A Manual of The Laws of North-Carolina, pp. 190, 191, 196 (3d ed. 1814).

- Rhode Island directed that "[t]he Sheriffs," "Town Sergeants, and Constables" "shall be allowed" fees "[f]or attending the General Assembly, the Supreme Judicial Court, and the Courts of Common Pleas, by the day." The Public Laws of the State of Rhode-Island, pp. 220, 222 (1798).

- Vermont provided for payment of fees to sheriffs and constables "[f]or attending before a justice's court, when required," "[f]or attending freeholders' courts," and "[f]or attendance on the general assembly, or supreme or county court." The Laws of the State of Vermont, vol. II, pp. 382, 387 (1808) (1798 law).

3. **Polling Places.** The founding-era record reveals a similarly robust tradition of stationing government-funded officers at polling places to oversee elections, maintain order, and provide security:

15

- Georgia law required sheriffs to attend elections "for the purpose of enforcing the orders of the presiding magistrates in preserving good order." A Digest of the Laws of the State of Georgia, p. 611 (1800).

- Virginia provided in 1778 that "[t]he sheriff shall attend and take the poll at such election, entering the names of the persons voted for." Abridgement Of The Public Permanent Laws Of Virginia, p. 325 (1796).

- An 1807 New Jersey statute provided constables and other elections officers with authority to detain "riotous" or "disorderly" people for up to 24 hours to preserve "good order" and "for the security of the election officers from insult and personal abuse." Laws of the State of New Jersey, p. 36 (Bloomfield, ed. 1811).

- Maryland's constitution mandated that "the Sheriff of each county, or . . . his Deputy . . . shall be the judges of the election" for the house of delegates, and "the Sheriff of each county, or . . . his Deputy . . . shall hold and be judge of the said election" for senate." Md. Const. art. 1, §§ 3 & 14 (1776).

- Delaware law authorized "the Sheriffs" and other officials "to attend, conduct, and regulate the election." Laws of the State of Delaware, From The Fourteenth Day Of October, One Thousand Seven Hundred, To The Eighteenth Day Of August, One Thousand Seven Hundred And Ninety-Seven, vol. 2, p. 984 (1797).

- South Carolina's laws contain a "Table of Fees" that includes payment to the sheriff for "publishing writs for electing members of the General Assembly,

16

taking the ballots and returning the writ." The Public Laws of the State of South-Carolina, pp. 386–88 (1790).

### B. The Supposed Sensitive Places At Issue Here Cannot Be Analogized To The Founding-Era Sensitive Places Identified In *Heller* And *Bruen*.

For a historic law to serve as a "proper analogue" to a modern firearm regulation under *Bruen*, the two laws must be "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S.Ct. at 2132-33. On that score, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* at 2133 (citations omitted).

The context of the founding era's narrow categories of "sensitive places" was highly unique. The government exercised a heightened level of control to secure the proper operation of government (*i.e.*, safeguarding the legislature's business, promoting free election, or securing legal proceedings). Each of the areas was self-contained such that government officers actually could provide for the safety of the individuals in the area. With that guarantee of personal protection, the burden on a citizens' right to armed self-defense was significantly reduced: If violence broke out, government security was present and ready to quell it, so there was a vastly reduced *need* to carry arms for self-defense.

17

This stands in stark contrast to the supposed "sensitive" locations where New York has sought to disarm citizens. They encompass a broad swath of locations that ordinary citizens visit on a routine basis that have no connection to core government functions and, most important, lack ubiquitous state-provided security in any way comparable to armed security in contained locations like courthouses or legislative assemblies. Modern policing does not remotely compare to the level of security provided at founding-era sensitive places. *Cf. Bruen*, 142 S.Ct. at 2133-34 ("there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department").[16] As such, all of the locations enjoined below flunk *both* the "how" and "why" tests.

New York points to no founding-era historical precedent that supports general authority to ban firearms in "crowded locations," which underlies its attempt to prohibit firearms in places like public parks, zoos, conference centers, theaters,

---

[16] Since the founding, Americans have been their own first responders outside of the few sensitive locations described above. Advancements in professional policing have not remotely changed this condition: Citizens remain primarily responsible for their own defense. *See* Walker & Katz, The Police in America 4 (2013) (noting the an "enduring myth[] that police are primarily crime fighters," even though "[o]nly about one-third of a patrol officer's activities are devoted to criminal law enforcement"). This reality surely underlies the Supreme Court's consistent refusal to recognize a right to protection from law enforcement. *See, e.g.*, *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189 (1989); *Castle Rock v. Gonzales*, 545 U.S. 748 (2005).

18

public assemblies, public transportation, and the like. *See* ECF No. 95, Nigrelli Opening Br. at 62–63. It claims that these modern restrictions are analogous to founding-era prohibitions on "bearing arms in . . . 'fairs or markets,'" *id.* at 55, but the only precedent cited for this assertion is a 1786 Virginia law that prohibited carrying arms "in terror of the Country." *See Antonyuk*, 2022 WL 16744700 at *73-74. *Bruen* already established that this very law—and others like it that "prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people"—provides no historical foundation for a "broad prohibition[]" against carrying arms generally. 142 S.Ct. at 2144-45. Even setting that aside, a single regulation from one state is insufficient to establish an adequate historical tradition to withstand constitutional scrutiny. *Heller*, 554 U.S. at 632; *Bruen*, 142 S.Ct. at 2153.

Beyond that, New York relies on a handful of mid- to late-19th century laws prohibiting firearms in public gatherings and assemblies. ECF No. 95, Nigrelli Opening Br. at 55–58; *see also supra*, § I, pp. 7-8 (reviewing historical precedent New York submitted to the district court). Because this 19th-century evidence does not confirm a similar practice at the founding, it is entitled to no weight. *Bruen*, 142 S.Ct. at 2136-37. In short, New York's historical material cannot demonstrate the "well-established and representative" tradition of analogous regulation that *Bruen* requires. 142 S.Ct. at 2133.

**C.** **The Historical Record Supports Restrictions On Students'
Firearm Rights, But Not A Complete Ban On Firearms At
Schools, Colleges, And Universities.**

New York's attempt to prohibit firearms at all schools, colleges, and
universities is inconsistent with the historical tradition of firearms regulation at the
founding. There is no evidence that guns were generally banned from schools in
Colonial America before 1791, and the post-ratification evidence shows an
acceptance for restricting *students'* possession and use of firearms. *See*, *e.g.*, Clayton
Cramer, Guns On Campus: A History, 27 Acad. Questions 411 (Dec. 2014),
available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2998355,
manuscript at 12–13 (noting that in many instances, students needed to be armed for
militia duty and observing that while "[c]olleges in the Colonial period often
prohibited students from hunting, . . . this does not appear to have been a prohibition
on firearms possession"). Such restrictions on students were prominent at colleges
and universities at the time of the founding, and the record demonstrates that those
restrictions did not apply to faculty, staff, or visitors:

- Kopel and Greenlee describe the University of Virginia's prominent
1825 ban on student possession in response to the students' "spoiled and violent
behavior;" they had previously "fired guns in the air, and shot at each other." 13
Charleston L. Rev. at 247–48.

20

- Harvard's rules stated that "[n]o Student nor students shall be suffered to have a Gunn in his or their Chambers, or Studyes, or keeping for their use any elsewhere in the Towne." The Lawes Of The Colledge Published Publiquely Before The Students Of Harvard Colledge (1655).

- Yale similarly provided that "[n]o Scholar is allowed to keep any kind of fire-arms, or gun-powder, upon penalty of seventeen cents; and if any Scholar shall fire any gun-powder in or near the College-yard, he shall be fined fifty cents: and if it be done near the dwelling-house or the person of the President, a Professor or a Tutor, he shall also be punished as for contempt." The Laws of Yale College, in New-Haven, In Connecticut, Enacted by the President and Fellows, The Sixth Day of October, A.D. 1795, p. 26 (Thomas Green and Son 1800).

- The University of North Carolina followed suit: "No student shall keep a dog or fire-arms; nor shall he use fire-arms without permission from some one of the Faculty." Laws of the University of North-Carolina; Established by the Board of Trustees, at Their Session in December 1799, p. 12 (Gales 1800).

- Rhode Island College (now Brown University) provided that "No student shall keep any kind of fire-arms or gunpowder in his room, nor fire gunpowder in or near the College, in any manner whatever." The Laws of Rhode-Island College, Enacted by the Fellows and Trustees, p. 12 (Carter 1803).

21

- At the University of Georgia, an 1810 restriction providing that "no student shall be allowed to keep any gun, pistol, Dagger, Dirk sword cane or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever." The Minutes of the Senatus Academicus, 1799-1842, p. 86 (Univ. Ga. Lib. 1976).

- Columbian College (now George Washington University) provided that "No student shall keep a servant, nor shall he keep fire arms, or any deadly weapon whatever. He shall bring no gunpowder upon the College premises . . . ." Laws of the Columbian College in the District of Columbia, p. 10 (1824).

In short, the historical evidence demonstrates that restrictions on firearms at schools were limited to minors or students, therefore these cannot serve as analogues for broad-based gun restrictions on law-abiding adults.

### D. Founding-Era Historical Regulations *Required* The Carry Of Firearms At Public Assemblies And Church Services.

New York has included in its "sensitive place" restrictions places of worship and religious congregations, as well as public assemblies, which it justifies by pointing to late-19th century regulations. *Antonyuk*, 2022 WL 16744700, at *61–62 & *75. In a remarkable contrast to current bans, evidence from the founding shows that, instead of general bans on firearms in these locations, there was a tradition of ensuring that citizens were in fact armed when they came to church or assembled

22

together. Indeed, *Heller* cited to a 1770 Georgia law that required men to carry firearms "to places of public worship." 554 U.S. at 601.

Georgia was not alone: There is a robust tradition in Colonial and early-America requiring the carrying of arms not only to religious services, but to public assemblies more broadly. *See* Boyd, Take Your Guns to Church: The Second Amendment and Church Autonomy, 8 Liberty Univ. L. Rev. 653, 697–99 (2014) (reviewing Colonial and founding-era historical precedent for requiring firearms at church services). Laws dating back across the colonial period required the carry of firearms in assemblies or at church services precisely because of the risk of violence in those locations.

• Connecticut ordered "that one person in every severall howse wherein is any souldear or souldears, shall bring a musket, pystoll or some peece, w[i]th powder and shott to e[a]ch meeting." Connecticut, Hammond Trumbull, The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony, p. 95 (Brown & Parsons 1850) (1643 order).

• Colonial Massachusetts ordered that "all such persons . . . shall come to the publike assymblyes with their muskets, or other peeces fit for service, furnished w[i]th match, powder & bullets . . . ." Massachusetts Bay Colony, 1 Nathaniel B. Shurtleff, Records of the Governor and Company of the Massachusetts Bay in New England, p. 190 (White 1853) (1639 order).

- Colonial Maryland ordered that every man "able to bear arms" must carry a firearm when at church. Maryland, 3 Archives of Maryland, p. 103 (Browne 1885) (1642 order).

- Rhode Island prescribed in 1639 that "noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon." 1 Records Of The Colony Of Rhode Island And Providence Plantations, In New England, p. 94 (Bartlett 1856).

- Virginia enacted multiple similar requirements. 1 The Statutes At Large: Being A Collection Of All The Laws Of Virginia, From The First Session Of The Legislature, p. 174 (Hening 1808) (1631 law requiring "[a]ll men that are fittinge to beare armes, shall bringe their pieces to the church"); *id.* at 263 (1642 act requiring that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"); *id.*, vol. VI, p. 534 (1755 law "providing that "it shall and may be lawful, for the chief officer of the militia, in every county, to order all persons listed therein, to go armed to their respective parish churches").

This widespread precedent confirms that New York's effort to ban firearms at places of worship and public assembly runs directly *counter* to the Nation's history and tradition. New York's solution to the risk of violence breaking out is that *no one* may lawfully carry arms in these locations. The founders took precisely the

24

opposite approach: Where public spaces could not be comprehensively secured by government-provided protection, the people were instructed to carry arms so they could defend themselves in the event of violence. The founding era's solution must control under *Bruen*.

### E.     Historical Restrictions On Hunting And The Discharge Of Firearms Confirm That There Is No Basis To Ban Carrying Firearms On Private Property Altogether.

Beyond the so-called "sensitive places" discussed above, New York has also attempted to ban firearms in what it terms "restricted locations," which effectively cover all privately-owned property. *See Antonyuk*, 2022 WL 16744700 at *78. Two facets of historical regulation show how this broad effort to disarm New Yorkers is unconstitutional.

First, founding-era regulations consistently focused on restricting *discharge* (not possession of arms) if indiscriminate firing posed a problem at a particular location. Such restrictions were often imposed in city limits or particular public spaces, but they did not prohibit carry more broadly. Several states restricted discharge in this manner:

* Rhode Island prohibited the discharge of a firearm "in or across any road, street, square or lane," punishable by fine. The Public Laws Of The State Of Rhode-Island And Providence Plantations, p. 568 (1798).

- Delaware prohibited the "fir[ing] or discharg[ing]" of a firearm "within or on any of the greens, streets, alleys or lanes of any of the towns and villages within this State." 1812 Del. Laws 329.

- New Hampshire generally restricted firearm discharge within a "quarter mile from the nearest building of any such city, town, village or station." 1823 N.H. Laws 73-74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.

- Colonial New York enacted a similar restriction. 5 Laws Of The Colony Of New York, p. 12 (1894) (1769 law).

- New York City in 1763 prohibited the "Fire and discharge of any gun" by "any Children, Youth, apprentices, Servants, or other persons . . . at any mark, or at random against any fence, pales or other place in any street, lane or alley, or within any orchard, garden or other inclosure, or in any place where persons frequent to walk." *See* Supp. App'x of New York City, *NYSRPA v. New York*, No. 18-280 at SA6 (U.S. 2019) (reprinting Ordinances of the City of New York, § 6 (1763)).

- Massachusetts enacted similar restrictions. 1746 Mass. Acts 208, An Act to Prevent the Firing of Guns Charged with Shot or Ball in the Town of Boston, chap. 11, §§ 1 to 3 ("no person or persons, from and after the publication of this act, shall presume to discharge or fire off any cannon laden with shot, from any wharf or

26

vessel," and "no person shall . . . discharge any gun or pistol, charged with shot or ball, in the town of Boston, or in any part of the Harbor . . . .").

•    Vermont law provided that "[n]o non-commissioned officer, private or citizen shall unnecessarily fire a gun, single musket or pistol in any public road or near any house, or place of parade . . . ." 1818 Vermont Acts & Resolves 64, § 42.

These discharge restrictions are not a proper analogue to modern regulations banning firearms in a particular location. After all, a restriction on discharging firearms presupposes individuals possess firearms. And in a related context, *Heller* recognized that it would be "implausible" for such discharge restrictions to "have been enforced against a citizen acting in self-defense." 554 U.S. at 633.

Second, founding-era regulations restricted hunting and poaching on private land, rather than prohibiting carry altogether. In addition to the laws identified by New York in the district court, laws from other states confirm that firearm restrictions on private land generally prohibited trespassing, *i.e.*, hunting on someone else's land without permission. A 1784 North Carolina law, for example, prohibited "hunt[ing] with a gun or dogs on the lands of any other person, without leave obtained from the owner of the said land," so long as "the owner of the land shall, by advertisement posted up in two or more public places, have forbid the persons so hunting by name, or all persons generally to hunt on his land, previous to the offence." North Carolina, A Manual Of The Laws Of North Carolina, p. 236 (1814).

27

And Virginia similarly established a fine "[i]f any person or persons, shall at any time shoot, hunt, or range upon the lands or tenements . . . included within the bounds of any other person or persons, without license first obtained of the owner of such lands." Virginia, Abridgment of the Permanent Laws of Virginia, pp. 157–58 (1796); *accord* Georgia, Digest Of The Laws Of Georgia, p. 428 (1800) (1790 law making it punishable by fine to "hunt with a gun by fire light or kill any deer so hunting by fire light in the night time without his or their own enclosures").

For its part, New York relied on several anti-poaching regulations to justify its "restricted locations" law—and the district court rightly rejected this gambit. *Antonyuk*, 2022 WL 16744700 at *79–81. These regulations show that when the founding generation considered banning firearms in particular types of property, they only did so in a very narrow circumstance (hunting), and they did not ban carry in these locations for self-defense. These restrictions provide no support for New York's private-property restriction. As the district court observed, "the need to restrict fowling-piece-wielding poachers on fenced-in farms in 18th and 19th century America appears of little comparable analogousness to the need to restrict law-abiding responsible license holders in establishments that are open for business to the public today." 2022 WL 16744700 at *80.

In short, founding-era historical precedent regulating hunting and firearm discharge provides no support for New York's broad carry bans on private property.

28

## CONCLUSION

This Court should affirm the district court's order granting a preliminary injunction.


Dated:  February 8, 2023         Respectfully submitted,

                                        Benbrook Law Group, PC
                                        Bradley A. Benbrook

                                        s/ Bradley A. Benbrook
                                        Attorneys for *Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this amicus brief complies with the type-volume limitation in Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) and Local Rules 29.1(c) and 32.1(a)(4)(A) because it contains 6,762 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Fed. R. of App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated:  February 8, 2023

Respectfully submitted,

Benbrook Law Group, PC
Bradley A. Benbrook

s/ Bradley A. Benberook
Attorneys for *Amicus Curiae*

30

# EXHIBIT 35

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

Nos. 23-1900, 23-2043

RONALD KOONS, ET AL.,
*Plaintiffs-Appellees*,
v.
MATTHEW J. PLATKIN, ET AL.,
*Defendants-Appellants*
and
NICHOLAS P. SCUTARI, ET AL.,
*Intervenors-Defendants-Appellants*.

AARON SIEGEL, ET AL.,
*Plaintiffs-Appellees / Cross-Appellants*,
v.
MATTHEW J. PLATKIN, ET AL.,
*Defendants-Appellants / Cross-Appellees*
and
NICHOLAS P. SCUTARI, ET AL.,
*Intervenors-Defendants-Appellants*.

On Appeal from a Judgement of the United States District Court
for the District of New Jersey

## BRIEF FOR CITIZENS COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS AND FPC ACTION FOUNDATION AS *AMICI CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE

BENBROOK LAW GROUP, PC
Bradley A. Benbrook
Stephen M. Duvernay
701 University Avenue, Suite 106
Sacramento, CA  95825
(916) 447-4900                                    August 16, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(c)(1) of the Federal Rules of Appellate Procedure, counsel for *amici curiae* hereby state that the Citizens Committee for the Right to Keep and Bear Arms and FPC Action Foundation have no parent corporations and have issued no stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................... i

TABLE OF AUTHORITIES .................................................................. iii

INTEREST OF *AMICI CURIAE* .......................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 2

ARGUMENT ....................................................................................... 3

I.     This Court Should Focus Its Historical Analysis On The Founding Era ....... 3

II.    New Jersey's Expansive List Of New "Sensitive Places" Is Inconsistent
       With The Nation's Historical Tradition Of Firearm Regulation ................... 8

       A.     The Core "Sensitive Places" Identified In *Heller* And *Bruen* Were
              All Secured By Guards, Thus Reducing The Imperative Of
              Carrying For Self Defense ................................................ 8

              1.     Legislatures ................................................................. 9

              2.     Courthouses ............................................................... 12

              3.     Polling Places ............................................................ 15

       B.     The Supposed Sensitive Places At Issue Here Cannot Be
              Analogized To The Founding-Era Sensitive Places Identified In
              *Heller* And *Bruen* ......................................................... 17

       C.     Historical Restrictions On Hunting And The Discharge Of Firearms
              Confirm There Is No Basis To Ban Carrying Firearms On Private
              Property Altogether ......................................................... 22

CONCLUSION ................................................................................. 27

CERTIFICATE OF COMPLIANCE ....................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Crawford v. Washington*,
   541 U.S. 36 (2004) ............................................................5, 6

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) .............................................3, 4, 20, 24

*Espinoza v. Montana Dep't of Revenue*,
   140 S.Ct. 2246 (2020) .............................................................6

*Gamble v. United States*,
   139 S.Ct. 1960 (2019) .............................................................5

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) ...............................................6

*Koons v. Platkin*,
   2023 WL 3478604 (D. N.J. May 16, 2023) ................... passim

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ............................................................6, 7

*McIntyre v. Ohio Elections Comm'n*,
   514 U.S. 334 (1995) .................................................................5

*Nevada Comm'n on Ethics v. Carrigan*,
   564 U.S. 117 (2011) .................................................................5

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S.Ct. 2111 (2022) .............................................. passim

*Ramos v. Louisiana*,
   140 S.Ct. 1390 (2020) .............................................................7

*Timbs v. Indiana*,
   139 S.Ct. 682 (2019) ................................................................7

*Virginia v. Moore*,
   553 U.S. 164 (2008) .................................................................5

**Historical Regulations**

1 Laws of the State of New York (1807) ...................................13

1 Records Of The Colony Of Rhode Island And Providence Plantations, In New
   England (Bartlett 1856) .........................................................21

1 The Statutes At Large: Being A Collection Of All The Laws Of Virginia, From The First Session Of The Legislature (Hening 1808).............................................21

10 The Statutes at Large of Pennsylvania From 1682 TO 1801 (1779–1781) .........10

1746 Mass. Acts 208, An Act to Prevent the Firing of Guns Charged with Shot or Ball in the Town of Boston, chap. 11, §§ 1 to 3 ...................................................24

1812 Del. Laws 329....................................................................................................23

1818 Vermont Acts & Resolves 64, § 42 ..................................................................24

1823 N.H. Laws 73–74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4 ..................................................23

2 Laws of the State of Delaware, From the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven (1797)..............................................................10

2 Laws of the State of Delaware, From The Fourteenth Day Of October, One Thousand Seven Hundred, To The Eighteenth Day Of August, One Thousand Seven Hundred And Ninety-Seven (1797) .....................................................13, 16

5 Laws Of The Colony Of New York (1894)............................................................23

A Collection Of All Such Acts Of the General Assembly Of Virginia (1803).......13

A Compilation of the Laws of the State of Georgia, Passed by the Legislature Since the Political Year 1800, to the Year 1810, Inclusive (1812).....................11

A Digest of the Laws of the State of Georgia (1800).........................................14, 16

A Journal of the Proceedings of the Honorable Senate of the State of New-Hampshire (1808) .................................................................................................12

A Manual Of The Laws Of North Carolina (1814)...........................................15, 25

Abridgement of The Public Permanent Laws Of Virginia (1796) ....................16, 25

Acts and Laws of the State of Connecticut, In America (1784)...............................14

Acts and Resolves of Massachusetts, 1786–87 (1893) ............................................14

An Act for the Support of Government, in 1 Laws of the State of New York (2nd ed. 1807) .......................................................................................................11

Connecticut, Hammond Trumbull, The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony (Brown & Parsons 1850) ...................................................................................21

Digest Of The Laws Of Georgia (1800)...................................................................25

Laws of the State of New Jersey (Bloomfield, ed. 1811)........................................16

Maryland, 3 Archives of Maryland (Browne 1885)................................................21

Massachusetts Bay Colony, 1 Nathaniel B. Shurtleff, Records of the Governor and
    Company of the Massachusetts Bay in New England (White 1853)...................21

Md. Const. art. 1, §§ 3 & 14 (1776) ....................................................................16

New Jersey, Laws of the State of New Jersey, Compiled and Published, Under the
    Authority of the Legislature (Joseph Bloomfield, 1811) ....................................13

Ordinances of the City of New York, § 6 (1763) .....................................................24

Provincial Congress, Journal of the Votes and Proceedings of the
    Provincial Congress of New-Jersey: Held at Trenton in the Month of
    October 1775 (1835) ..........................................................................................11

The Laws of Maryland to which are prefixed The Original Charter,
    with an English translation, v. 1, ch. XXV (1799) (1779 law) ...........................14

The Laws of the State of New-Hampshire (1797)....................................................15

The Laws of the State of Vermont, vol. II (1808)...............................................12, 15

The Public Laws Of The State Of Rhode-Island (1798) ...................................10, 15

The Public Laws Of The State Of Rhode-Island And
    Providence Plantations (1798) ...........................................................................23

The Public Laws of the State of South-Carolina (1790) ...........................11, 12, 17

The Statutes at Large of Pennsylvania From 1682 to 1801,
    vol. X (Wm. Stanley Ray 1904)...........................................................................13

Virginia, Journal of the House of Delegates of the Commonwealth of Virginia
    (Printed by Thomas W. White, 1828)..................................................................11

Votes and Proceedings of the House of Delegates of the State of Maryland,
    October Session, 1780 (1781) .............................................................................12

## Other Authorities

AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION (1998) ...................4

Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*,
    8 LIBERTY UNIV. L. REV. 653 (2014)..................................................................20

Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 203
    (2018).....................................................................................................................8

Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917) ...............4

Schlesinger, *Political Mobs and the American Revolution, 1765-1776*, 99 PROCEEDINGS OF THE AM. PHILOSOPHICAL SOC'Y 244 (1955)..............................9

Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (manuscript posted Nov. 4, 2022, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248297) .........................5

WALKER & KATZ, THE POLICE IN AMERICA (2013).................................................19

## INTEREST OF *AMICI CURIAE*

The Citizens Committee for the Right to Keep and Bear Arms, a non-profit organization, seeks to preserve Second Amendment rights through education and advocacy. It strives to ensure that the Second Amendment is not misinterpreted in derogation of the people's right to keep and bear arms for self-defense and other constitutional purposes. CCRKBA's programs are designed to help all Americans understand the importance of the Second Amendment and its role in keeping Americans free.

FPC Action Foundation (FPCAF) is a nonprofit organization dedicated to restoring human liberty and protecting the rights enshrined in the Constitution. FPCAF conducts charitable research, education, public policy, and legal programs. The scholarship and amicus briefs of the Foundation's Director of Constitutional Studies, Joseph Greenlee, have been cited by the Supreme Court on multiple occasions.

*Amici* are interested in this case to ensure that New Jersey's regulation of firearms is consistent with the original meaning of the Second Amendment as the Framers understood it.[1]

---

[1] No party's counsel authored this brief in whole or part and, apart from the Constitutional Defense Fund, Inc., no person (including any party or party's counsel) contributed money to fund its preparation or submission. All parties on appeal have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici* offer this brief to assist the Court's consideration of the historical evidence of "sensitive place" restrictions on the right to carry firearms. *Bruen*, like *Heller* before it, stressed that the scope of the Second Amendment's protection must be determined by historical analysis: "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2126 (2022) (citation omitted).

We begin by emphasizing that the Founding-era understanding of the "sensitive location" doctrine controls. The "scholarly debate" referenced in *Bruen*— whether a court should look to the understanding of the Second Amendment's scope in 1791 or 1868—provides no basis for straying from the Court's consistent practice. The "scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S.Ct. at 2137–38.

The many locations New Jersey now hopes to treat as "sensitive" cannot possibly be analogized to the core founding-era sensitive locations recognized in *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The historical record shows that, at the founding, carry restrictions were strictly limited to locations where the government exercised a heightened level of control to secure the proper operation of government, which stands in stark contrast to New Jersey's sweeping restrictions.

Indeed, early Americans were *required* by law to carry firearms in many of the locations—such as places of worship and at public assemblies—where the State now seeks to disarm citizens altogether. New Jersey's current impulse to protect potential victims by disarming everyone at public gatherings thus runs directly contrary to the Founders' solution: Where contained spaces could not be comprehensively secured by government-provided protection, the people were instructed to be ready to defend themselves in the event of violence.

New Jersey's bans fail *Bruen*'s test. The injunction should not be disturbed.

## ARGUMENT

### I.    This Court Should Focus Its Historical Analysis On The Founding Era.

*Bruen* cautioned lower courts to remember that, when they analyze history to evaluate whether the government has met its burden, "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have

*when the people adopted them.*'" *Id.* at 2136 (quoting *Heller*, 554 U.S. at 634–35) (emphasis in *Bruen*). While the Court "acknowledge[d] that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)," 142 S.Ct. at 2138,[2] multiple signs show that this "debate" must be settled in favor of 1791.

New Jersey's effort to focus the Court's attention on Reconstruction-era laws cannot be squared with the Supreme Court's approach. Appellants' Opening Br. at 33–34.[3] *Bruen* stressed that "we have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment *have the same scope* as against the Federal Government." 142 S.Ct. at 2137 (emphasis added and citations omitted). And it cautioned that the Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the

---

[2] Citing AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION xiv, 223, 243 (1998), and Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript at 2), https://papers.ssrn.com/sol3/papers.cfm? abstract_id=3766917).

[3] *See also* ECF No. 36, Am. Br. of Everytown for Gun Safety at 3–15.

Bill of Rights was adopted in 1791." 142 S.Ct. at 2137–38.[4] In other words, the

Fourteenth Amendment's passage did not change the scope of incorporated rights.

*See* Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical*

*Period for Historical Analogues is when the Second Amendment was Ratified in*

*1791, and not 1868* (manuscript posted Nov. 4, 2022,

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248297).

    *Bruen* further affirmed that post-founding-era regulations are relevant only to

the extent they *confirm* traditions from the founding, so courts must "guard against

giving postenactment history more weight than it can rightly bear." 142 S.Ct. at

2136. Thus, while it is *permissible* for courts to consider post-founding-era historical

regulations, that review is limited to determining whether such regulations *confirm*

a founding-era tradition. *Bruen*, 142 S.Ct. at 2136.[5] Nineteenth-century laws that

---

[4] *Bruen* cited *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (scope of Sixth Amendment right to confrontation governed by "founding generation's" understanding); *Virginia v. Moore*, 553 U.S. 164, 168–69, 172 (2008) (scope of Fourth Amendment determined in "founding era") (citation omitted); and *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–23 (2011) (founding-era treatment "dispositive" on scope of First Amendment). *See also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 359 (1995) (Thomas, J. concurring) (First Amendment must be interpreted based on its "original meaning" by "seek[ing] the original understanding" of Framers).

[5] *See also Gamble v. United States*, 139 S.Ct. 1960, 1975–76 (2019) (observing that, in *Heller*, "19th-century treatises were treated as mere *confirmation* of what the Court thought had already been established") (emphasis added); *see also* Smith, *supra*, manuscript at 4–5 ("No Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent

regulated firearms in a manner that broke with founding-era traditions do not establish a "tradition" that could narrow the scope of the Second Amendment's protection. *Bruen*, 142 S.Ct. at 2137 ("'post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text'") (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).[6]

These principles doom the eccentric theory that the Second Amendment's original meaning could be "transformed" by Civil War era regulations that were inconsistent with founding-era practices. "Incorporation" simply asks whether a particular limitation on the *federal* government in the Bill of Rights should also apply to state and local governments because it is a "fundamental" right. *McDonald v. City of Chicago*, 561 U.S. 742, 764 (2010). And because incorporation assumes and accepts that the right has restricted the federal government *since the founding*,

---

authorities, generally very shortly after the founding, remained consistent with the public understanding in 1791."); *Crawford*, 541 U.S. at 47, 50 (citing 19th-century treatises that "confirm[ed]" founding-era rule).

[6] *Bruen* also cited *Espinoza v. Montana Dep't of Revenue*, 140 S.Ct. 2246, 2258–59 (2020) (rejecting argument that 30 states' late-19th-century adoption of "no aid" laws that are inconsistent with founding-era understanding of Free Exercise Clause could overcome original understanding). Justice Barrett cited this analysis from *Espinoza* in stressing that *Bruen* "should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights. On the contrary, the Court is careful to caution 'against giving postenactment history more weight than it can rightly bear.'" 142 S.Ct. 2163 (Barrett, J., concurring).

"incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government." *Ramos v. Louisiana*, 140 S.Ct. 1390, 1397 (2020). Their meanings did not *change* in the 19th century with the adoption of the Fourteenth Amendment. *McDonald*, 561 U.S. at 788 ("relationship between the Bill of Rights' guarantees and the States must be governed by a single, neutral principle"); *Timbs v. Indiana*, 139 S.Ct. 682, 687 (2019) ("if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires"); Smith, *supra* at 4–5.

\*    \*    \*

Limiting the use of 19th-century evidence to only confirm the founding-era understanding plays a critical role here, as New Jersey invites this Court to rely heavily on Reconstruction-era and late 19th-century laws to defend the constitutionality of its sweeping restrictions. Appellees' Opening Br. at 14–21, 24–25, 29–30, 41, 44, 46–47, 50–51. As shown below, however, these 19th-century laws were not consistent with the tradition of sensitive-place regulation in the founding era.[7]

---

[7] Although the district court ultimately reached the correct conclusion when enjoining each of the restrictions that are at issue in this appeal, the court could have reached that conclusion more swiftly—and consistently with *Bruen*—by dismissing the mid- and late-19th century regulations that were inconsistent with regulations (or lack of regulations) at the founding.

**II.    New Jersey's Expansive List Of New "Sensitive Places" Is Inconsistent With The Nation's Historical Tradition Of Firearm Regulation.**

Founding-era history demonstrates that New Jersey cannot justify its modern list of locations banning the carriage of firearms.

**A.    The Core "Sensitive Places" Identified In *Heller* And *Bruen* Were All Secured By Guards, Thus Reducing The Imperative Of Carrying For Self Defense.**

In *Bruen*, the Court identified three types of "sensitives places" where historical regulations traditionally prohibited the possession of weapons: "legislative assemblies, polling places, and courthouses." 142 S.Ct. at 2133 (citing Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 203, 229–236, 244–247 (2018) and Br. for Independent Institute as *Amicus Curiae* in Supp. of Petitioners at 11–17). Review of these regulations illuminates the limits of the so-called sensitive places doctrine and provides the historical context for the analogical inquiry *Bruen* prescribes for analyzing New Jersey's restrictions in this case.

Two defining characteristics run through each of the sensitive places acknowledged by *Bruen*. *First*, each location involved deliberative processes central to the republican democracy that should be free from potential armed intimidation. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 205 ("Protecting government deliberation from violent interference is the core of the sensitive places tradition."); *Koons v. Platkin*, 2023 WL 3478604, *78 (D. N.J. May 16, 2023) ("History reveals that those places were considered sensitive places because either government

8

officials met at those locations to perform core government administration (courthouses and legislative assemblies), or the location involved a citizen's fundamental right to participate in the political process (polling places)."). Concern over potential intimidation was justified: The founding generation was acutely aware of mob violence routinely breaking out over political matters. *See*, *e.g*., Schlesinger, *Political Mobs and the American Revolution, 1765-1776*, 99 PROCEEDINGS OF THE AM. PHILOSOPHICAL SOC'Y 244, 244–50 (1955).

*Second*, and correspondingly, substantial historical evidence demonstrates that each of these places was, in contrast to virtually all other locations, well secured by the presence of armed guards, which significantly impacts a prohibition's burden on Second Amendment rights. As the district court put it, "[t]he common thread that runs through all these 'sensitive' locations [recognized in *Bruen*] is that historically the government provided security at them, and so the need for armed self-defense was reduced." *Koons*, 2023 WL 3478604 at *78. As shown below, this characteristic prevents New Jersey from analogizing its widespread bans to the founding era tradition.

      **1.**     **Legislatures.** The historical record reflects a uniform tradition of providing publicly funded or publicly administered physical security in legislative assemblies throughout the nation. Legislative records from throughout the United States in the founding era reflect the presence of sergeants-at-arms and door-keepers

at legislative proceedings, which is evidenced through public funding and legislative journals detailing the appointment of these officers:

- In Rhode Island, sheriffs, town sergeants, and constables were paid for attending the General Assembly. The Public Laws Of The State Of Rhode-Island 220, 222 (1798) ("The Sheriffs," "Town Sergeants, and Constables" "shall be allowed" fees "[f]or attending the General Assembly").

- Delaware provided for public payment of fees to the legislature's sergeant-at-arms and door-keepers. 2 Laws of the State of Delaware, From the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven, pp. 1100, 1118 (1797) ("the fees belonging to the Sergeant at Arms shall be as follow . . . Taking any person into custody, Thirty-31 three Cents," "Fees to the Door-keepers of the respective Houses—For every day's attendance, One Dollar").

- Pennsylvania appropriated funds for the assembly's sergeant-at-arms and door-keepers in 1781: "The sergeant-at-arms, for every day's attendance, the sum of ten shillings. The door-keeper of the council and the door-keeper of the house of assembly, each the sum of ten shillings for every day's attendance." 10 The Statutes at Large of Pennsylvania From 1682 TO 1801, pp. 376, 378 (1779–1781).

- South Carolina provided for the payment of door-keepers in 1787. The Public Laws of the State of South-Carolina, pp. 426, 427 (1790) ("Two Door-keepers £50 each per annum").

- New York legislated that "there shall also be allowed and paid to the serjeant at arms and the door keepers of the senate and assembly, each the sum of two dollars for every day they shall attend the legislature" An Act for the Support of Government, in 1 Laws of the State of New York, p. 532 (2nd ed. 1807).

- Georgia appropriated funds for the legislature's door-keepers in 1808: "to the messenger and door-keeper of the Senate, and messenger and door-keeper of the House of Representatives, three dollars each per day." A Compilation of the Laws of the State of Georgia, Passed by the Legislature Since the Political Year 1800, to the Year 1810, Inclusive, pp. 372–73 (1812).

- New Jersey provided for payment "[t]o the door keeper, the sum of five shillings per diem, for each day that he hath or shall attend this Congress." Provincial Congress, Journal of the Votes and Proceedings of the Provincial Congress of New-Jersey: Held at Trenton in the Month of October 1775, pp. 239, 240 (1835).

- Virginia provided for "allowances" for the sergeant-at-arms and door-keepers' "services" to the General Assembly in 1783. Virginia, Journal of the House of Delegates of the Commonwealth of Virginia, p.77 (Printed by Thomas W. White, 1828).

11

- Vermont compensated sheriffs and constables "[f]or attendance on the general assembly" in 1798. The Laws of the State of Vermont, vol. II, pp. 382, 387 (1808).[8]

    **2.    Courthouses.** The historical record likewise confirms that states provided for the securing of courthouses at the founding by requiring law enforcement officials (sheriffs or constables) to attend court.

- South Carolina directed that "sheriffs shall by themselves, or their lawful deputies respectively, attend all the courts hereby appointed, or directed to be held, within their respective districts." The Public Laws of the State of South-Carolina, pp. 268, 271 (1790).

- Virginia enacted a 1792 law providing that "[t]he keeper of the public jail, shall constantly attend the General Court, and execute the commands of the Court," and further providing that "the Sheriff, or so many of the Under-Sheriffs as shall be thought necessary, of the County where such Court may be held, shall attend

---

[8] *See also* Votes and Proceedings of the House of Delegates of the State of Maryland, October Session, 1780, p. 2 (1781) ("The house appointed . . . Mr. Robert Reynolds sergeant at arms, and Mr. Cornelius Mills door-keeper."); Votes and Proceedings of the Senate of the State of Maryland, November Session, 1791, p. 1 (1792) ("Edward Roberts [was appointed] door-keeper"); A Journal of the Proceedings of the Honorable Senate of the State of New-Hampshire, p. 6. (1808) ("Voted that Mr. James Buswell be door-keeper for the Senate the present Session.").

the said Court during their Sessions." A Collection Of All Such Acts Of the General Assembly Of Virginia, pp. 69–71 (1803).

• Delaware, in a 1793 law, directed that "the Sheriff of Kent county . . . shall be attendant on the said High Court of Errors and Appeals during the sitting thereof, and be the officer for the purpose of executing the orders and process of the said court." 2 Laws of the State of Delaware, From The Fourteenth Day Of October, One Thousand Seven Hundred, To The Eighteenth Day Of August, One Thousand Seven Hundred And Ninety-Seven, pp. 1088, 1091 (1797).

• New Jersey, in 1798, mandated that "the constables of the several townships in such county shall be the ministerial officers of the said court" and provided that the constable "shall be appointed to attend the jury." New Jersey, Laws of the State of New Jersey, Compiled and Published, Under the Authority of the Legislature, pp. 49, 50, 58 (Joseph Bloomfield, 1811).

• New York, in 1801, required "sheriffs and their officers" to attend court proceedings "to do those things which to their officers shall appertain." 1 Laws of the State of New York, p. 172 (1807).

• Pennsylvania, in 1780, provided courts with "the power to . . . compel the attendance of sheriffs, coroners, constables, and other ministerial officers require sheriffs, constables, and other officers." The Statutes at Large of Pennsylvania From 1682 to 1801, vol. X, p. 57 (Wm. Stanley Ray 1904).

13

Beyond these requirements, the legislative record in other early American jurisdictions shows that law enforcement officials were compensated for attending judicial proceedings, which provides further evidence that courthouses were secured by the government:

- Connecticut's legislative record includes a fee schedule for sheriffs and constables attending court proceedings. Acts and Laws of the State of Connecticut, In America, pp. 63–65 (1784).

- Georgia provided in a 1792 law for fees to sheriffs and constables for court proceedings. A Digest of the Laws of the State of Georgia, pp. 471, 473, 474, 478 (1800).

- Maryland law provided for compensation "to the Sheriff," including for "Empanelling" and "Swearing" juries and for "Attendances, per day." The Laws of Maryland to which are prefixed The Original Charter, with an English translation, v. 1, ch. XXV (1799) (1779 law).

- Massachusetts provided for payment to "[e]very Constable who shall attend the Supreme Judicial Court, or Court of General Sessions of the Peace, or Common Pleas." Acts and Resolves of Massachusetts, 1786–87, p. 235 (1893) (1786 law).

14

- New Hampshire law provided for "Sheriff's fees" "[f]or every trial," "[f]or attending the grand jury," and "[f]or attending the petit jury." The Laws of the State of New-Hampshire, pp. 112–16 (1797).

- North Carolina allocated payment to sheriffs "[f]or summoning, impannelling and attending on every jury in every cause in court" and "[f]or attendance of a constable every court when summoned by the sheriff." A Manual of The Laws of North-Carolina, pp. 190, 191, 196 (3d ed. 1814).

- Rhode Island directed that "[t]he Sheriffs," "Town Sergeants, and Constables" "shall be allowed" fees "[f]or attending the General Assembly, the Supreme Judicial Court, and the Courts of Common Pleas, by the day." The Public Laws of the State of Rhode-Island, pp. 220, 222 (1798).

- Vermont provided for payment of fees to sheriffs and constables "[f]or attending before a justice's court, when required," "[f]or attending freeholders' courts," and "[f]or attendance on the general assembly, or supreme or county court." The Laws of the State of Vermont, vol. II, pp. 382, 387 (1808) (1798 law).

   **3.    Polling Places.** The founding-era record reveals a similarly robust tradition of stationing government-funded officers at polling places to oversee elections, maintain order, and provide security:

- Georgia law required sheriffs to attend elections "for the purpose of enforcing the orders of the presiding magistrates in preserving good order." A Digest of the Laws of the State of Georgia, p. 611 (1800).

- Virginia provided in 1778 that "[t]he sheriff shall attend and take the poll at such election, entering the names of the persons voted for." Abridgement Of The Public Permanent Laws Of Virginia, p. 325 (1796).

- An 1807 New Jersey statute provided constables and other elections officers with authority to detain "riotous" or "disorderly" people for up to 24 hours to preserve "good order" and "for the security of the election officers from insult and personal abuse." Laws of the State of New Jersey, p. 36 (Bloomfield, ed. 1811).

- Maryland's constitution mandated that "the Sheriff of each county, or . . . his Deputy . . . shall be the judges of the election" for the house of delegates, and "the Sheriff of each county, or . . . his Deputy . . . shall hold and be judge of the said election" for senate." Md. Const. art. 1, §§ 3 & 14 (1776).

- Delaware law authorized "the Sheriffs" and other officials "to attend, conduct, and regulate the election." 2 Laws of the State of Delaware, From The Fourteenth Day Of October, One Thousand Seven Hundred, To The Eighteenth Day Of August, One Thousand Seven Hundred And Ninety-Seven, p. 984 (1797).

- South Carolina's laws contain a "Table of Fees" that includes payment to the sheriff for "publishing writs for electing members of the General Assembly,

16

taking the ballots and returning the writ." The Public Laws of the State of South-Carolina, pp. 386–88 (1790).

In short, the government's provision of armed security is an essential component of the narrowly defined categories of "sensitive" places.

### B. The Supposed Sensitive Places At Issue Here Cannot Be Analogized To The Founding-Era Sensitive Places Identified In *Heller* And *Bruen*.

For a historic law to serve as a "proper analogue" to a modern firearm regulation under *Bruen*, the two laws must be "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S.Ct. at 2132–33. On that score, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* at 2133 (citations omitted). New Jersey cannot carry its burden of analogizing the narrow categories of sensitive places to the expansive locations where New Jersey has sought to disarm citizens, including public assemblies, entertainment venues, bars and restaurants, parks, beaches, zoos, museums, and health care facilities, and more.

1.    The context of the founding era's narrow categories of "sensitive places" was highly unique. The government exercised a heightened level of control to secure the proper operation of government (*i.e.*, safeguarding the legislature's

business, promoting free election, or securing legal proceedings). Each of the areas was self-contained such that government officers actually could provide for the safety of the individuals in the area. With that guarantee of personal protection, the burden on a citizens' right to armed self-defense was significantly reduced: If violence broke out, government security was present and ready to quell it, so there was a vastly reduced *need* to carry arms for self-defense.

This stands in stark contrast to the regulations here. "Without considering the government-provided security feature of the recognized sensitive places, the State would stretch the sensitive places doctrine to cover all places of public congregation—this is a bridge too far." *Koons*, 2023 WL 3478604 at *80 (quoting *Bruen*, 142 S.Ct. at 2134, for proposition that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly").

The district court correctly found that New Jersey's prohibitions are far more burdensome: New Jersey's bans encompass a broad swath of locations that ordinary citizens visit on a routine basis. Most important, these locations lack ubiquitous state-provided security in any way comparable to armed security in contained locations like courthouses or legislative assemblies. Modern policing does not remotely compare to the level of security provided at founding-era sensitive places. *Cf. Bruen*, 142 S.Ct. at 2133–34 ("there is no historical basis for New York to

18

effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department").[9] As such, all of the locations enjoined by the district court plainly flunk the "how" test.

    **2.**    New Jersey's effort to include public assemblies in its "sensitive place" restrictions fails *Bruen*'s history test for a separate important reason. *Koons*, 2023 WL 3478604 at *72, *74. "[T]he State provided no historical firearm laws from the colonial generation that banned firearms at public assemblies." *Id.*; *see id.* at *72–75 (reviewing Founding-era historical record establishing a tradition of requiring carry in public places).[10] New Jersey's failure here has a simple explanation: "The colonial generation *required* the settlers to carry weapons during public assemblies to defend against hostilities from Native Americans, protect themselves from

---

[9] Since the founding, Americans have been their own first responders outside of the few sensitive locations described above. Advancements in professional policing have not remotely changed this condition. Citizens remain primarily responsible for their own defense. *See, e.g.,* WALKER & KATZ, THE POLICE IN AMERICA 4 (2013) (noting the "enduring myth[] that police are primarily crime fighters," even though "[o]nly about one-third of a patrol officer's activities are devoted to criminal law enforcement").

[10] The State's core historical evidence to support the public assembly restriction is a handful of late-19th century regulations prohibiting the carry of firearms at certain public gatherings. Appellees' Opening Br. at 14–15. As discussed above, the Founding is the critical period for determining the Second Amendment's scope, since it codified a pre-existing right to keep and bear arms. *Bruen*, 142 S.Ct. at 2130, 2136, 2137–38. Moreover, the district court correctly held that these laws "[were] not 'well-established' and 'representative' historical firearm regulations" under *Bruen*'s test. *Koons*, 2023 WL 3478604 at *75; *see id.* at *75–78.

criminals and pirate raids, to curb slave rebellions, and to be ready for a potential foreign invasion." *Id.* at \*72 (emphasis added).

The district court's analysis in this regard was spot on. In direct contrast to current bans, evidence from the founding shows that, instead of general bans on firearms at assemblies, there was a tradition of *requiring* citizens to be armed when they came to church, where they most consistently "assembled" together. Indeed, *Heller* cited a 1770 Georgia law that required men to carry firearms "to places of public worship." 554 U.S. at 601; *see also* Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 697–99 (2014) (reviewing Colonial and founding-era historical precedent for requiring firearms at church services). And colonists were not required to arm themselves only at church: There is a robust tradition in Colonial and early-America requiring the carrying of arms not only to religious services, but to public assemblies more broadly. Laws dating back across the colonial period required the carry of firearms in assemblies or at church services precisely because of the risk of violence in those locations.

- Connecticut ordered "that one person in every severall howse wherein is any souldear or souldears, shall bring a musket, pystoll or some peece, w[i]th powder and shott to e[a]ch meeting." Connecticut, Hammond Trumbull, The Public

Records of the Colony of Connecticut, Prior to the Union with New Haven Colony, p. 95 (Brown & Parsons 1850) (1643 order).

- Colonial Massachusetts ordered that "all such persons . . . shall come to the publike assymblyes with their muskets, or other peeces fit for service, furnished w[i]th match, powder & bullets . . . ." Massachusetts Bay Colony, 1 Nathaniel B. Shurtleff, Records of the Governor and Company of the Massachusetts Bay in New England, p. 190 (White 1853) (1639 order).

- Colonial Maryland ordered that every man "able to bear arms" must carry a firearm when at church. Maryland, 3 Archives of Maryland, p. 103 (Browne 1885) (1642 order).

- Rhode Island prescribed in 1639 that "noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon." 1 Records Of The Colony Of Rhode Island And Providence Plantations, In New England, p. 94 (Bartlett 1856).

- Virginia enacted multiple similar requirements. 1 The Statutes At Large: Being A Collection Of All The Laws Of Virginia, From The First Session Of The Legislature, p. 174 (Hening 1808) (1631 law requiring "[a]ll men that are fittinge to beare armes, shall bringe their pieces to the church"); *id.* at 263 (1642 act requiring that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"); *id.*, vol. VI, p. 534

(1755 law "providing that "it shall and may be lawful, for the chief officer of the militia, in every county, to order all persons listed therein, to go armed to their respective parish churches"").

This widespread precedent confirms that New Jersey's effort to ban firearms at public assemblies runs directly *counter* to the Nation's history and tradition. Where New Jersey's solution to the risk of violence at public assemblies is that *no one* may lawfully carry, the founders took precisely the opposite approach: Where public spaces could not be comprehensively secured by government-provided protection, the people were instructed to carry arms so they could defend themselves in the event of violence. The founding era's solution must control under *Bruen*.

C.    **Historical Restrictions On Hunting And The Discharge Of Firearms Confirm There Is No Basis To Ban Carrying Firearms On Private Property Altogether.**

Beyond the so-called "sensitive places" discussed above, New Jersey has attempted to effectively ban firearms on all privately-owned property unless the property owner explicitly provides consent or posts a sign authorizing carry. *See Koons*, 2023 WL 3478604 at *56 (describing the "Default Rule" prohibiting carry of a concealed handgun on private property); Appellees' Opening Br. at 37–48 (defending the "Default Rule"). Two facets of historical regulation show how this broad effort to disarm New Jerseyans is unconstitutional.

First, founding-era regulations consistently focused on restricting *discharge* (not possession of arms) if indiscriminate firing posed a problem at a particular location. Such restrictions were often imposed in city limits or particular public spaces, but they did not prohibit carry more broadly. Several states restricted discharge in this manner:

- Rhode Island prohibited the discharge of a firearm "in or across any road, street, square or lane," punishable by fine. The Public Laws Of The State Of Rhode-Island And Providence Plantations, p. 568 (1798).

- Delaware prohibited the "fir[ing] or discharg[ing]" of a firearm "within or on any of the greens, streets, alleys or lanes of any of the towns and villages within this State." 1812 Del. Laws 329.

- New Hampshire generally restricted firearm discharge within a "quarter mile from the nearest building of any such city, town, village or station." 1823 N.H. Laws 73–74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.

- Colonial New York enacted a similar restriction. 5 Laws Of The Colony Of New York, p. 12 (1894) (1769 law).

- New York City in 1763 prohibited the "Fire and discharge of any gun" by "any Children, Youth, apprentices, Servants, or other persons . . . at any mark, or at random against any fence, pales or other place in any street, lane or alley, or within

23

any orchard, garden or other inclosure, or in any place where persons frequent to walk." *See* Supp. App'x of New York City, *NYSRPA v. New York*, No. 18-280 at SA6 (U.S. 2019) (reprinting Ordinances of the City of New York, § 6 (1763)).

- Massachusetts enacted similar restrictions. 1746 Mass. Acts 208, An Act to Prevent the Firing of Guns Charged with Shot or Ball in the Town of Boston, chap. 11, §§ 1 to 3 ("no person or persons, from and after the publication of this act, shall presume to discharge or fire off any cannon laden with shot, from any wharf or vessel," and "no person shall . . . discharge any gun or pistol, charged with shot or ball, in the town of Boston, or in any part of the Harbor . . . .").

- Vermont law provided that "[n]o non-commissioned officer, private or citizen shall unnecessarily fire a gun, single musket or pistol in any public road or near any house, or place of parade . . . ." 1818 Vermont Acts & Resolves 64, § 42.

These discharge restrictions are not a proper analogue to modern regulations banning firearms in a particular location. After all, a restriction on discharging firearms presupposes individuals possess firearms. And in a related context, *Heller* recognized that it would be "implausible" for such discharge restrictions to "have been enforced against a citizen acting in self-defense." 554 U.S. at 633.

Second, founding-era regulations restricted hunting and poaching on private land, rather than prohibiting carry altogether. In addition to the laws identified by

New Jersey in the district court,[11] laws from other states confirm that firearm restrictions on private land generally prohibited trespassing, *i.e.*, hunting on someone else's land without permission. A 1784 North Carolina law, for example, prohibited "hunt[ing] with a gun or dogs on the lands of any other person, without leave obtained from the owner of the said land," so long as "the owner of the land shall, by advertisement posted up in two or more public places, have forbid the persons so hunting by name, or all persons generally to hunt on his land, previous to the offence." North Carolina, A Manual Of The Laws Of North Carolina, p. 236 (1814). And Virginia similarly established a fine "[i]f any person or persons, shall at any time shoot, hunt, or range upon the lands or tenements . . . included within the bounds of any other person or persons, without license first obtained of the owner of such lands." Virginia, Abridgment of the Permanent Laws of Virginia, pp. 157–58 (1796); *accord* Georgia, Digest Of The Laws Of Georgia, p. 428 (1800) (1790 law making it punishable by fine to "hunt with a gun by fire light or kill any deer so hunting by fire light in the night time without his or their own enclosures").

For its part, New Jersey relied on several anti-poaching regulations to justify its "restricted locations" law—and the district court rightly rejected this gambit.

---

[11] *Koons*, 2023 WL 3478604 at *62–68 (reviewing New Jersey's historical evidence to support the "Default Rule").

*Koons*, 2023 WL 3478604 at \*62–68.[12] These regulations show that when the founding generation considered banning firearms in particular types of property, they only did so in a very narrow circumstance (hunting), and they did not ban carry in these locations for self-defense. These restrictions provide no support for New Jersey's private-property restriction. As the district court observed, the "fish-and-game laws [New Jersey] cites are not analogous to the Default Rule," since they "are clearly hunting regulations designed to discourage poaching." *Koons*, 2023 WL 3478604 at \*64; *see also id.* at \*66 (rejecting New Jersey's attempt to identify several additional laws because they were designed to prevent poaching). New Jersey's law, by contrast, "is designed to exclude firearms from all private property in New Jersey, for whatever reason and regardless of the nature of the land at issue." *Id.* at \*67. Put simply, these "colonial hunting laws" are not appropriate analogues under *Bruen* because they "are differently situated" and "do not impose a comparable burden on licensed firearm carriers." *Id.*

In short, founding-era historical precedent regulating hunting and firearm discharge provides no support for New Jersey's broad carry bans on private property.

---

[12] New Jersey also relied on three Reconstruction-era laws restricting the carry of firearms on certain private property. *Koons*, 2023 WL 3478604 at \*68. The district court appropriately concluded these laws "could be construed as outliers" and therefore were insufficient "to establish a *representative* historical tradition to justify the Default Rule." *Id.*

## CONCLUSION

This Court should affirm.

Dated:  August 16, 2023

Respectfully submitted,

Benbrook Law Group, PC
Bradley A. Benbrook

s/ Bradley A. Benbrook
Attorneys for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this amicus brief complies with the type-volume limitation in Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because it contains 6,172 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Fed. R. of App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated:  August 16, 2023                    Respectfully submitted,

                                           Benbrook Law Group, PC
                                           Bradley A. Benbrook


                                           s/ Bradley A. Benberook
                                           Attorneys for *Amici Curiae*

# EXHIBIT 36

# Colonial Firearm Regulation

## Clayton E. Cramer

*Recently published scholarship concerning the regulation of firearms in Colonial America claims that because Colonial governments distrusted the free population with guns, the laws required guns to be stored centrally, and were not generally allowed in private hands. According to this view, even those guns allowed in private hands were always considered the property of the government. This Article examines the laws of the American colonies and demonstrates that at least for the free population, gun control laws were neither laissez-faire nor restrictive. If Colonial governments evinced any distrust of the free population concerning guns, it was a fear that not enough freemen would own and carry guns. Thus, the governments imposed mandatory gun ownership and carriage laws.*

*Clayton E. Cramer is an independent scholar who took the leading role in exposing the Michael Bellesiles hoax. His website is: www.claytoncramer.com.*

## I. THE LEGAL SIGNIFICANCE OF COLONIAL FIREARM REGULATION TODAY

In much the same way that an understanding of the limits of free speech in Colonial America may provide insights into the intent of Congress and the states when they adopted the First Amendment, so an understanding of colonial firearms regulation has the potential to illuminate our understanding of the limits of the right protected by the Second Amendment. What types of firearms laws were common, and might therefore have been considered within the legitimate scope of governmental regulation?

In the last several years, widely publicized scholarship by Michael Bellesiles has asserted that the English colonies strictly regulated the individual possession and use of firearms. While acknowledging that the English government ordered the colonists to own firearms for the public defense as a cost-cutting measure, he asserts:

> At the same time, legislators feared that gun-toting freemen might, under special circumstances, pose a threat to the very polity that they were supposed to defend. Colonial legislatures therefore strictly regulated the storage of firearms, with weapons kept in some central place, to be produced only in emergencies or on muster day, or loaned to individuals living in outlying areas. They were to remain the property of the government. The Duke of York's first laws for New York required that each town have a storehouse for arms and ammunition. Such legislation was on the books of colonies from New Hampshire to South Carolina.[i]

This assertion—that the Colonial governments distrusted their free people with firearms, and closely controlled their possession in governmental hands—has began to appear in court decisions concerning the meaning of the right to keep and bear arms provisions contained in the U.S. Constitution and 46 of the state constitutions.[ii]

Then as now, laws were not always obeyed, and were sometimes indifferently or unequally enforced. The evidence from contemporary accounts, from probate records, or even from archaeological digs (which could suggest something about gun ownership levels by recovered artifacts), might provide us with evidence for evaluating how often those laws were followed. Under the best of conditions, however, analysis of this type is complex, and differing interpretative models may come to differing conclusions as to whether those laws were generally obeyed, generally ignored, or perhaps somewhere in between. By comparison, evaluating the claim that Colonial governments passed laws that restricted firearms ownership and use (regardless of how they were actually enforced) is fairly easy.

An examination of the Colonial statutes reveals that, contrary to Bellesiles's claim of distrusted and disarmed freemen, almost all colonies *required* white adult men to possess firearms and ammunition. Some of these statutes were explicit that militiamen were to keep their guns at home; others imply the requirement, by specifying fines for failing to bring guns to musters or church. Colonies that did not explicitly require firearms

Electronic copy available at: https://ssrn.com/abstract=2759961

ownership passed laws requiring the carrying of guns under circumstances that implied nearly universal ownership.

None of the Colonial militia statutes even *suggest* a requirement for central storage of all guns. None of the Colonial laws in any way limited the possession of firearms by the white non-Catholic population; quite the opposite. Most colonies did, however, pass laws restricting possession of firearms by blacks and Indians. In a few cases, in a few colonies, whites suspected of disloyalty (including Catholics) were also disarmed.

As the statutes demonstrate, colonial governments did not hold that firearms in private hands, "were to remain the property of the government."[iii] Indeed, the evidence is largely in the other direction—that colonial governments were often reluctant to seize weapons for public use. When driven by necessity to do so, they compensated owners of those guns.

Colonial regulations that limited the use of firearms were usually for reasons of public safety. These regulations were similar in nature, though generally less restrictive in details, than similar laws today.

II. FIREARMS AND CIVIC DUTY

The laws regulating firearms ownership adopted by the American colonies bear a strong resemblance to each other. This is not surprising, since by 1740, every colony bore allegiance to the English crown, and the laws reflected the shared heritage. The similarity in laws is especially noticeable with respect to the English duty of nearly all adult men to serve in the militia, and to bear arms in defense of the realm.

A. Connecticut

Among the Colonial militia statutes, Connecticut's 1650 code contains one of the clearest expressions of the duty to own a gun: "That all persons that are above the age of sixteene yeares, except magistrates and church officers, shall beare arms...; and every male person with this jurisdiction, above the said age, shall have in continuall readines, a good muskitt or other gunn, fitt for service, and allowed by the clark of the band...."[iv] A less elaborate form of the law appeared in 1636, with reiterations in 1637, 1665, 1673, 1696, and 1741.[v] Fines varied between two and ten shillings for lacking firearms or for failure to appear with firearms "compleat and well fixt upon the days of training...."[vi]

B. Virginia

Virginia provides another example of a militia statute obligating all free men to own a gun. A 1684 statute required free Virginians to "provide and furnish themselves with a sword, musquet and other furniture fitt for a soldier... two pounds of powder, and eight pounds of shott...."[vii] A similar 1705 statute required every foot soldier to arm himself "with a firelock, muskett, or fusee well fixed" and gave him eighteen months to comply with the law before he would subject to fine.[viii] There are minor modifications to the statute in 1738 that still required all members of the militia to appear at musters with the same list of gun choices, but reduced the ammunition requirement to one pound of powder and four pounds of lead balls.[ix] A 1748 revision is also clear that militiamen were obligated to provide themselves with "arms and ammunition."[x] The 1748 statute, however, did acknowledge that all freemen might not be wealthy enough to arm themselves, and provided for issuance of arms "out of his majesty's magazine."[xi] By 1755, all cavalry officers were obligated to provide themselves with "holsters and pistols well fixed...."[xii]

C. New York

Another typical colonial militia statute is the Duke of York's law for New York (adopted shortly after the colony's transfer from the Dutch), that provided, "Besides the Generall stock of each Town[,] Every Male within this government from Sixteen to Sixty years of age, or not freed by public Allowance, shall[,] if freeholders[,] at their own, if sons or Servants[,] at their Parents and Masters Charge and Cost, be furnished from time to time and so Continue well furnished with Arms and other Suitable Provition hereafter mentioned: under the penalty of five Shillings for the least default therein[:] Namely a good Serviceable Gun, allowed Sufficient by his Military Officer to be kept in Constant fitness for present Service" along with all the other equipment required in the field.[xiii]

Electronic copy available at: https://ssrn.com/abstract=2759961

D. Maryland

Similar to statutes appearing in other colonies, Maryland's "An Act for Military Discipline" enacted in February or March of 1638/9 (O.S.) required "that every house keeper or housekeepers within this Province shall have ready continually upon all occasions within his her or their house for him or themselves and for every person within his her or their house able to bear armes[,] one Serviceable fixed gunne of bastard muskett boare…" along with a pound of gunpowder, four pounds of pistol or musket shot, "match for matchlocks and of flints for firelocks…."[xiv] A different form of this law, ordering every member of the militia to "appear and bring with him one good serviceable Gun, fixed, with Six Charges of Powder," appears in a 1715 Maryland statute book as well.[xv] Cavalrymen were obligated to "find themselves with Swords, Carbines, Pistols, Holsters and Ammunition" with a fine for failure to appear armed at militia muster.[xvi]

Of course, laws were sometimes passed but not enforced in colonial times, just as happens now. But the provisions for enforcement in Maryland would seem likely to encourage enforcement for purely selfish reasons. The officers of the militia were required to verify compliance with the law by "a Sight or view of the said armes and ammunition" every month. People who failed to possess arms and ammunition were to be fined thirty pounds of tobacco, payable to the militia officer responsible for the inspection. Anyone who lacked arms and ammunition was to be armed by their militia commander, who could force payment at "any price… not extending to above double the value of the said armes and ammunition according to the rate then usual in the Country."[xvii]

To make sure that householders moving to the new land were adequately armed, it appears that one of the conditions of receiving title to land in Maryland beginning in 1641 was bringing "Armes and Ammunition as are intended & required by the Conditions abovesaid to be provided & carried into the said Province of Maryland for every man betweene the ages of sixteene & fifty years w[hi]ch shalbe transported thether." The arms required included "one musket or bastard musket with a snaphance lock," ten pounds of gunpowder, forty pounds of bullets, pistol, and goose shot.[xviii]

The Maryland militia law of 1638/9 was revised in 1642 requiring, "That all housekeepers provide fixed gunn and Sufficient powder and Shott for each person able to bear arms."[xix] A 1658 revision of the law required "every householder provide himselfe speedily with Armes & Ammunition according to a former Act of Assembly viz 2 [pounds] of powder and 5 [pounds] of shott & one good Gun well fixed for every man able to bear Armes in his house." A householder was subject to fines of 100, 200, or 300 pounds of tobacco, for the first, second, and third failures to keep every man in the house armed.[xx]

In 1756, Maryland again made it explicit that " all and every Person and Persons of the Militia of this Province are as aforesaid, not only liable to the Duties and Services required by this Act, but also if able to find, at their own proper Cost and Charge, Suitable Arms…." At the same time, concerned that those exempted from militia duty who were wealthy were getting an unfair advantage, it ordered that exempts were obligated to "each of them find one good and Sufficient Firelock, with a Bayonet, and deliver the Same to the Colonel or Commanding Officer of the County wherein he shall reside, or pay to the Said Colonel or Commanding Officer the Sum of Three Pounds Current Money in lieu thereof…."[xxi]

At the start of the Revolution, Maryland still assumed that the freemen of the colony were armed as required by law. The Maryland Convention in 1775 threatened that: "if any Minute or Militia-man shall not appear at the time and place of Muster with his Firelock and other accoutrements in good order, … he shall forfeit and pay a sum not exceeding five shillings Common money…."[xxii]

E. Massachusetts

Massachusetts adopted a measure March 22, 1630/1 that required all adult men to be armed.[xxiii] Although this measure is not explicit that the arms were *firearms*, it is apparent that guns were not in short supply in Massachusetts, because within 15 years, the Colonial government had made the requirement for guns explicit, and had even become quite demanding as to what type of guns were acceptable for militia duty. An order of October 1, 1645 directed that in the future, the only arms that would be allowed "serviceable, in our trained bands… are ether full musket boare, or basterd musket at the least, & that none should be under three foote 9 inches…."[xxiv] Even those exempt from militia duty were not exempt from the requirement to have a gun in their home. A June 18, 1645 order required "all inhabitants" including those exempt from militia duty, "to have armes in their howses fitt for service, with pouder, bullets, match, as other souldiers…."[xxv]

Electronic copy available at: https://ssrn.com/abstract=2759961

Massachusetts Bay Colony, like many modern governments, expressed its concern about the nexus of guns and children. A May 14, 1645 order directed that "all youth within this jurisdiction, from ten yeares ould to the age of sixteen yeares, shalbe instructed, by some one of the officers of the band, or some other experienced souldier… upon the usuall training dayes, in the exercise of armes, as small guns, halfe pikes, bowes & arrows….."[xxvi] The duty to be armed meant that even children were required to learn to use a gun.

F. New Haven and Plymouth

Other colonies also required their free adult males to own guns. New Haven Colony passed such laws in 1639, 1643, 1644, and 1646.[xxvii] Plymouth Colony did the same in 1632, 1636, and 1671 (although the last statute is less clear than the earlier two as to requiring private ownership).[xxviii]

G. New Hampshire

A statute in New Hampshire's 1716 compilation ordered "That all Male Persons from Sixteen Years of Age to Sixty, (other than such as are herein after excepted) shall bear Arms … allowing Three Months time to every Son after his coming to Sixteen Years of Age, and every Servant so long, after his time is out, to provide themselves with Arms and Ammunition…. That every Listed Souldier and Housholder, (except Troopers) shall be always provided with a well fix'd, Firelock Musket, of Musket or Bastard-Musket bore,… or other good Fire-Arms, to the satisfaction of the Commission Officers of the Company… on penalty of *Six Shillings* for want of Such Arms, as is hereby required…." [emphasis in original] Similar requirements were imposed on cavalrymen.[xxix]

H. New Jersey

New Jersey's 1703 militia statute was similar, requiring all men "between the Age of Sixteen and Fifty years" with the exception of ministers, physicians, school masters, "Civil Officers of the Government," members of the legislature, and slaves, to be members of the militia. "Every one of which is listed shall be sufficiently armed with one good sufficient Musket or Fusee well fixed, a Sword or [Bayonet], a Cartouch box or Powder-horn, a pound of Powder, and twelve sizeable Bullets, who shall appear in the Field, so armed, twice every year…."[xxx]

I. Delaware

In 1742, Delaware required, "That every Freeholder and taxable Person residing in this Government (except such as are hereafter excepted) shall, on or before the First Day of March next, provide himself with the following Arms and Ammunition, viz. One well fixed Musket or Firelock, one Cartouch-Box, with Twelve Charges of Gun-Powder and Ball therein, and Three good Flints, to be approved of by the Commanding Officer of the respective Company to which he belongs, and shall be obliged to keep such Arms and Ammunition by him, during the Continuance of this Act…." There was a fine of forty shillings for those who failed to do so.

While "every Freeholder and taxable Person" in Delaware was obligated to provide himself with a gun, not all were required to enlist in the militia, only "all Male Persons, above Seventeen and under Fifty Years of Age" with a few exceptions.

The exemptions from militia duty are quite interesting. Quakers were exempted from the requirement to provide themselves with guns, from militia duty, and from nightly watch duty, in exchange for paying two shillings six pence for every day that "others are obliged to attend the said Muster, Exercise, or Watch…."

Others were exempted from militia musters, but not from the requirement to fight, or the requirement to own a gun. "[A]ll Justices of the Peace, Physicians, Lawyers, and Millers, and Persons incapable through Infirmities of Sickness or Lameness, shall be exempted and excused from appearing to muster, except in Case of an Alarm: They being nevertheless obliged, by this Act, to provide and keep by them Arms and Ammunition as aforesaid, as well as others. And if an Alarm happen, then all those, who by this Act are obliged to keep Arms as aforesaid… shall join the General Militia…." Ministers appear to have been exempted from all of these requirements.[xxxi]

J. Rhode Island

Electronic copy available at: https://ssrn.com/abstract=2759961

There seems to be no explicit Rhode Island law that required every man to own a gun. There is, however, a 1639 statute that ordered "noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon."[xxxii] While not an explicit order that every man was required to own a gun, widespread gun ownership was clearly assumed. The Rhode Island city of Portsmouth did impose a requirement to own a gun in 1643, and directed militia officers to personally inspect every inhabitant of the town to verify that they had both bullets and powder.[xxxiii]

### K. South Carolina

Much like Rhode Island, South Carolina's obligation to own a gun is not explicit, but did require "all, and every person and persons now in this Colony" to "appear in armes ready fitted in their severall Companies…."[xxxiv] "Armes," of course, might include a sword or other non-firearm weapon, but South Carolina's 1743 requirement to bring guns to church (to be discussed later), suggests that "armes" meant guns.

### L. North Carolina

North Carolina passed militia laws in or before 1715 and in 1746 that were similar in form. The earlier statute required every member of the militia (every freeman between 16 and 60) to show up for muster "with a good Gun well-fixed Sword & at least Six Charges of Powder & Ball" or pay a fine.[xxxv] The 1746 statute obligated "all the Freemen and Servants... between the Age of Sixteen Years, and Sixty" to enlist in the militia, and further, required all such persons "be well provided with a Gun, fit for Service,… and at least Twelve Charges of Powder and Ball, or Swan Shot, and Six spare Flints….." Failure to have those when called to militia muster would subject one to a fine of two shillings, eight pence, "for Want of any of the Arms, Accoutrements, or Ammunition…." Interestingly enough, unlike other colonies, the definition of militia member under both statutes did not exclude free blacks.[xxxvi] According to John Hope Franklin, "free Negroes served in the militia of North Carolina with no apparent discrimination against them."[xxxvii]

### M. Georgia

Georgia's long and poorly written militia law of 1773 at first appears to provide for the government to arm the militia, since it declares that the governor or military commander may "assemble and call together all male Persons in this Province from the Age of Sixteen Years to Sixty Years… at such times, and arm and array them in such manner as is hereafter expressed…."[xxxviii] But later the statute directs that, "every Person liable to appear and bear arms at any Exercise Muster or Training… Shall constantly keep and bring with them… one Gun or Musket fit for Service[,] one Catridge [*sic*] Box with at least Nine Catridges filled with Good Gun Powder and Ball that shall fit his Piece[,] a horn or Flask containing at least a Quarter of a Pound of Gun Powder[,] a shot Pouch with half a pound of Bulletts…." This is followed by a *very* complete list of tools required to use a gun in the field.[xxxix]

A member of the militia who was an indentured servant, or otherwise subject to "Government or Command" of another, was not obligated to arm himself, but like New York and other colonies, his master was. He "Shall constantly keep such arms amunition [*sic*] and Furniture for every such Indented Servant…."[xl] The militia statute also provided for enlisting male slaves from 16 to 60 "as [their masters] can Recommend as Capable and faithful Slaves." Masters were also supposed to arm such slaves when in actual militia service "with one Sufficient Gun… powder Horn and shot pouch…."[xli]

Failure to appear "completely armed and furnished as aforesaid at any General Muster" could result in a fine of twenty shillings. Militia officers were allowed to appear at the residence of any person obligated to militia duty up to six times a year, "and to Demand a Sight of their arms amunition [*sic*] and accoutrements aforesaid…." Failure to possess the arms and ammunition could result in a five shilling fine.[xlii] Similar provisions applied to those who were cavalry militiamen.[xliii]

### N. Pennsylvania

Pennsylvania is the only colony that does not appear to have imposed an obligation to own guns on its citizens.[xliv] It appears that Pennsylvania's exception was because of its Quaker origins and Quaker pacifism.

Electronic copy available at: https://ssrn.com/abstract=2759961

O. Indentured Servants

As part of requiring the arming of all freemen, several colonies imposed requirements that masters give guns to indentured servants who had completed their term of service. A 1699 Maryland statute (reiterated in 1715) directed what goods the master was to provide a servant completing his term. Along with clothes and a variety of tools, the master was also directed to give a newly freed male servant, "One Gun of Twenty Shillings Price, not above Four Foot by the barrel, nor less than Three and a Half; which said Gun shall, by the Master or Mistress, in the Presence of the next Justice of the Peace, be delivered to such Free-man, under the Penalty of Five Hundred Pounds of Tobacco on such Master or Mistress omitting so to do…." To encourage the newly freed servant to keep his gun, "And the like Penalty on the said Free-man selling or disposing thereof within the Space of Twelve Months…." Starting in 1705, Virginia imposed a similar requirement that freedom dues include a musket worth at least twenty shillings.[xlv] A 1715 North Carolina statute gave masters the choice of fulfilling freedom dues with either a suit or "a good well-fixed Gun…."[xlvi]

P. Gunpowder

Gunpowder import records also provide some clues about firearms ownership and use. The British Board of Trade recorded quantities of gunpowder imported through American ports for a brief period just before the Revolution. We have surviving records for the years 1769, 1770, and 1771 that show the American colonies imported a total of 1,030,694 pounds.[xlvii] Of course, this shows only gunpowder imported with knowledge of the Crown; Americans smuggled goods quite regularly during those years, and there was some domestic production of gunpowder as well.[xlviii]

Gunpowder was used not only for civilian small arms, but also for cannon, blasting, and (in extremely small quantities), for tattooing. It seems likely that at least some of this million pounds of gunpowder was sold to the British military, colonial governments, or the Indians. Nonetheless, the quantity is enormous. Even if only one-quarter of the million pounds of gunpowder was used in civilian small arms, that is enough for eleven to seventeen million shots over those three years—in a nation where, according to some, few Americans owned guns, most guns were stored in central storehouses because of mistrust of the population, and few Americans hunted with guns.[xlix]

Q. Summary

Common to nearly every colony was the requirement that members of the militia (nearly all free white men) possess muskets and ammunition; the rest, such as Rhode Island and South Carolina, clearly assume it. Some of these statutes are explicit that militiamen are to keep their guns at home; others imply it, by specifying fines for failure to appear with guns at church or militia musters. If the militiaman's gun was stored in an armory, and was issued "only in emergencies or on muster day," it is strange that the governments fined militiaman for failing to appear with gun and ammunition. None of the Colonial militia statutes even *suggest* a requirement for central storage of all guns. None of these laws in any way regulated the possession of firearms by the white population, except for requiring nearly all white men to own guns.

III. THE OBLIGATION TO CARRY FIREARMS

Another part of the civic duty to be armed included the duty to bring guns to church and other public meetings, or while traveling.

A. Guns in Church

The statute that most clearly states the intent of "bring your guns to church" laws is a 1643 Connecticut order, "To prevent or withstand such sudden assaults as may be made by Indeans upon the Sabboth or lecture dayes, It is Ordered, that one person in every several howse wherein is any souldear or souldears, shall bring a musket, pystoll or some peece, with powder and shott to e[a]ch meeting…." Connecticut found within a month that, "Whereas it is obsearved that the late Order for on[e] in a Family to bring his Arms to the meeting house every Sabboth and lecture day, hath not bine attended by divers persons" there was now a fine for failing to do so.[l]

Massachusetts Bay Colony also imposed a requirement to come to church armed, though it was repealed

Electronic copy available at: https://ssrn.com/abstract=2759961

and reinstated several times as fear of Indian attack rose and fell. A March 9, 1636/7 ordinance required individuals to be armed. (Britain and its colonies changed from Julian to Gregorian calendar in 1752; as part of that change, the beginning of the new year changed from March 25 to January 1. What had been January 3, 1751 on the Julian calendar would be January 3, 1752 on the Gregorian calendar. Dates from before March 25, 1752 are typically recorded in a form that shows what year appears in the records—but also what year our calendar would consider that date to have been.)

Because of the danger of Indian attack, and because much of the population neglected to carry their guns, every person above eighteen years of age (except magistrates and elders of the churches) was ordered to "come to the publike assemblies with their muskets, or other peeces fit for servise, furnished with match, powder, & bullets, upon paine of 12*d.* for every default…."[li]

The requirement to bring guns to church was repealed November 20, 1637[lii] (perhaps because of the Antinomian crisis to be discussed below). A May 10, 1643 order that directed the military officer in each town to "appoint what armes to bee brought to the meeting houses on the Lords dayes, & other times of meeting" suggests that this requirement was again back in force. The motivation for the 1643 law appears to have been preventing theft of arms while the inhabitants were attending church.[liii]

Rhode Island's 1639 law ordered that, "none shall come to any public Meeting without his weapon." There was a fine of three shillings for failing to be armed at public meetings.[liv] Maryland did likewise in 1642: "Noe man able to bear arms to goe to church or Chappell… without fixed gunn and 1 Charge at least of powder and Shott."[lv] The Rhode Island town of Portsmouth passed a similar requirement in 1643,[lvi] as did New Haven Colony in 1644.[lvii]

Plymouth's 1641 law is oddly worded, and might at first be read as referring to a communal obligation of the township: "It is enacted That every Towneship within this Government do carry a competent number of pieeces fixd and complete with powder shott and swords every Lord's day to the meetings…." The rest of the sentence clarifies that at least one member of each household was obligated to bring weapons to church during that part of the year when Indian attack was most feared: "one of a house from the first of September to the middle of November, except their be some just & lawfull impedyment."[lviii] By 1658, Plymouth had reduced the requirement so that only one fourth of the militia was obligated to come to church armed on any particular Sunday.[lix] In 1675, apparently in response to a current military crisis, all were again required to come to church armed "with att least six charges of powder and shott" during "the time of publicke danger…."[lx]

The earliest mandatory gun carrying law is a 1619 Virginia statute that required everyone to attend church on the Sabbath, "and all suche as beare armes shall bring their pieces, swords, pouder and shotte." Those failing to bring their guns were subject to a three shilling fine.[lxi] This law was restated in 1632 as: "All men that are fittinge to beare arms, shall bring their pieces to the church…."[lxii]

While the original motivation in colonies both North and South for bringing guns to church was fear of Indian attack, by the eighteenth century, the Southern colonies' concerns appear to have shifted to fear of slave rebellion. Virginia's 1619 and 1632 statutes were somewhat vague as to whether all white men were required to come armed to church or not, because of the qualification "fittinge to beare arms." The requirement was more clearly restated in a November 1738 statute that required all militiamen to come to church armed, if requested by the county's militia commander. Other language in the statute suggests that protection of the white inhabitants from possible slave uprising was now the principal concern.[lxiii]

South Carolina's 1743 confusingly worded statute required "every white male inhabitant of this Province, (except travelers and such persons as shall be above sixty years of age,) who [are] liable to bear arms in the militia of this Province… shall, on any Sunday or Christmas day in the year, go and resort to any church or any other public place of divine worship within this Province, and shall not carry with him a gun or a pair of horse-pistols… with at least six charges of gun-powder and ball, and shall not carry the same into the church or other place of divine worship as aforesaid" would be fined twenty shillings. Other provisions required church-wardens, deacons, or elders to check each man coming in, to make sure that he was armed. The purpose was "for the better security of this Province against the insurrections and other wicked attempts of Negroes and other Slaves…."[lxiv] A very similar statute appears in Georgia in 1770.[lxv]

## B. Guns for Travelers

Along with the duty to be armed at church, several colonies required travelers to be armed. A 1623

Electronic copy available at: https://ssrn.com/abstract=2759961

Virginia law (reissued in similar form in 1632) required, "That no man go or send abroad without a sufficient parte will armed…. That go not to worke in the ground without their arms (and a centinell upon them.)… That the commander of every plantation take care that there be sufficient of powder and am[m]unition within the plantation under his command and that their pieces fixt and their arms compleate…."[lxvi]

Massachusetts imposed a similar requirement in 1631, ordering that no person was to travel singly between Massachusetts Bay and Plymouth, "nor without some armes, though 2 or 3 togeathr." While the law does not specify that "armes" meant firearms, it would seem likely, considering Massachusetts's other laws requiring all militiamen to own a gun.[lxvii] The measure was strengthened in 1636: "And no person shall travel above one mile from his dwelling house, except in places wheare other houses are neare together, without some armes, upon paine of 12d. for every default…."[lxviii]

Rhode Island imposed a similar requirement in 1639: "It is ordered, that noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword…." There was a fine of five shillings for failing to be armed.[lxix] Maryland's 1642 law requiring everyone to come to church armed also dictated, "Noe man able to bear arms to goe… any considerable distance from home without fixed gunn and 1 Charge at least of powder and Shott."[lxx]

While the requirements varied from colony to colony, and the motivations changed in the South from fear of Indians to fear of slaves, common to many of the colonies was the duty to come to church armed. Somewhat less commonly there was an obligation to be armed (sometimes explicitly with a gun) while traveling away from settled areas.

IV. RACE, SLAVERY, & REGULATION

Colonial governments imposed a duty to own guns, but otherwise seem to have imposed few restrictions on gun possession—for whites. For Indians and blacks (either free or slave), colonial laws were much more restrictive.

A. Indians

Colonial concern about Indians acquiring guns is not surprising. Firearms provided a significant advantage to whites because of their novelty, because gunfire created fear and confusion, and because a gun could do damage where an arrow could not.

William Bradford's account of the Pilgrims' first battle with Indians shows the advantage that guns provided the Europeans. A band of Pilgrims who were exploring the new land in December of 1620 found themselves under attack by Indians armed with bow and arrow. When the Pilgrims began firing muskets, most of the attacking Indians retreated. One brave member of the band, perhaps their leader, stood behind a tree, "within half a musket shot of us," and fired arrows repeatedly at the Pilgrims. He was far enough way, and making sufficiently good use of cover, that Myles Standish, the only professional soldier among the Pilgrim settlers, had little opportunity of hitting him. Finally, Standish, after taking "full aim at him… made the bark or splinters of the tree fly about his ears, after which he gave an extraordinary shriek, and away they went, all of them."[lxxi]

When the Pilgrims arrived in 1620, the Indians of Massachusetts had no guns. Only three years later, John Pory's account reported that those Indians unfriendly to the Pilgrims had been "furnished (in exchange of skins) by some unworthy people of our nation with bow and arrow, shot, [and] powder…."[lxxii] By 1627, the Indians of Massachusetts Bay were believed to have at least sixty guns, largely supplied by Thomas Morton, an Englishman whose trading post, Merrymount, was filled with the sort of hedonists whom the Pilgrims had hoped to leave behind in England. Morton bartered guns for furs with the Indians, violating a royal proclamation against supplying firearms, powder, or shot to the Indians.[lxxiii]

Even after Morton's banishment to England, there were problems with other Europeans selling guns to the Indians. Governor Bradford's history of Plymouth details the arrest of an Englishman named Ashley for illegal sales in 1631, and complaines about French traders selling guns and ammunition to the Indians.[lxxiv]

Attempts to regulate gun sales to the Indians appear in many colonies, and the severity of the punishments suggests that not all colonists shared their government's concerns. Much like the modern effort

Electronic copy available at: https://ssrn.com/abstract=2759961

to disarm people who are not trusted, the colonial gun control efforts were a series of very strict bans that could not be enforced, and were sometimes replaced with more realistic laws that sought to control rather than prohibit sales.

The prohibitions vary in the severity of punishments and vigorous of enforcement. In 1640, Springfield, Massachusetts tried a woman accused of selling her late husband's gun to an Indian. Her defense was that she did not sell it, but lent it to the Indian, "for it lay [spoiling] in her [cellar]," and she expected to reclaim it shortly. The judge warned her that she should get it home again speedily, "for no commonwealth would allow of such a misdemeanor."lxxv At the other extreme, a 1642 Maryland law prohibited providing gunpowder or shot to the Indians, and made execution one of the possible punishments.lxxvi

Massachusetts Bay Colony, to supplement the royal proclamation against providing guns or ammunition to the Indians, passed its own ordinance on May 17, 1637 prohibiting sale of guns, gunpowder, shot, lead, or shot molds to the Indians, or repair of their guns.lxxvii In 1642, Massachusetts Bay complained that "some of the English in the eastern parts" who were under no government at all, were supplying gunpowder and ammunition to the Indians. Unsurprisingly, Massachusetts Bay passed laws punishing those sales.lxxviii

Other evidence of a mistrust based on race can be seen in a pair of orders concerning militia duty. The first, on May 27, 1652, required all "Scotsmen, Negers, & Indians inhabiting with or servants to the English" between 16 and 60 to train with the militia.lxxix In May, 1656, perhaps after the military crisis of the moment had passed, "no Negroes or Indians… shalbe armed or permitted to trayne…."lxxx

Connecticut struggled with unlawful sales of guns to Indians. The very first entry in *Public Records of the Colony of Connecticut* concerns a 1636 complaint that "Henry Stiles or some of the ser[vants] had traded a piece with the Indians for corn."lxxxi In 1640, Connecticut ordered George Abbott to pay a £5 fine for "selling a pistol & powder to the Indians…."lxxxii A few years later, Robert Slye, George Hubberd, John West, and Peter Blatchford were each fined £10 for "exchanging a gun with an Indian…."lxxxiii

Connecticut found enforcement of its gun control law prohibiting sales to the Indianslxxxiv frustrated by other colonies. Because merchants in the Dutch and French colonies were selling guns to the Indians, Connecticut next prohibited sale of guns outside the colony. Finally, Connecticut prohibited foreigners from doing business with Indians in Connecticut; the ban was retaliation for continued sales of guns to the Indians by Dutch and French traders elsewhere.lxxxv Connecticut also repeatedly fined colonists for selling ammunition to the Indians.lxxxvi

By the middle of the seventeenth century, either the original fear of the Indians having guns was receding throughout the New England colonies, or the futility of trying to keep them disarmed was becoming apparent. The laws appear to have changed by the 1660s to less restrictive forms. In 1662, a Springfield, Massachusetts court fined two Indians for drunkenness. Not having the money for the fine, one of them, "Left a gun with the County Treasurer till they make payment."lxxxvii On April 29, 1668, the Massachusetts General Court decided to license the sale of "powder, shot, lead, guns, i.e., hand guns [small arms]" to Indians "not in hostility with us or any of the English in New England…."lxxxviii In 1668-69, an Indian sued Francis West in Plymouth for the theft of a hog and a gun. The court ordered West to pay for the stolen hog and return the gun to the Indian.lxxxix

A similar progression is visible in Connecticut in this same period. In 1660, Connecticut ordered that "if any Indians shall bring in guns into any of the towns" that the colonists were to seize them. The Indians could redeem their seized guns for 10*s.* each, with half paid to the Treasury, and the other half paid to the Englishman who seized the gun. Because the Indians could redeem their guns, it seems that the objection was not to the Indians having guns, but bringing them to town.

By the following year, this ban on Indians bringing guns to town was repealed for the Tunxis Indians that lived nearby, who "have free liberty to carry their guns, through the English towns, provided they are not above 10 men in company."xc The Tunxis Indians were apparently trusted enough to come to town (in small numbers) armed.

Virginia provides perhaps the best example of the shifting views of the colonists about the effectiveness of such laws. A March 1658 Virginia statute provided that "what person or persons so ever shall barter or sell with any Indian or Indians for piece, powder or shot, and being lawfully convicted, shall forfeit his whole estate…." Any Virginian who found an Indian with gun, powder, or shot, was legally entitled to confiscate it.xci

Electronic copy available at: https://ssrn.com/abstract=2759961

By the following year, "it is manifest that the neighboring plantations both of English and [foreigners] do plentifully furnish the Indians with guns, powder & shot, and do thereby draw from us the trade of beaver to our great loss and their profit, and besides the Indians being furnished with as much of both guns and ammunition as they are able to purchase, *It is enacted*, That every man may freely trade for guns, powder and shot: It derogating nothing from our safety and adding much to our advantage…."[xcii] [emphasis in original]

In October 1665, Virginia again prohibited the sale of guns and ammunition to the Indians. The statute admitted that New Amsterdam's sales of guns to the Indians had made the March 1658 law unenforceable. The seizure of New Amsterdam by the Duke of York in 1664 had changed the situation. "[T]hose envious neighbors are now by his majesty's justice and providence removed from us," thus the ban was again in force.[xciii]

The ban on gun sales was not obeyed, however. In March 1676, as tensions between whites and Indians escalated into Bacon's Rebellion, Virginia enacted a new statute, complaining "the traders with Indians by their [avarice] have so armed the Indians with powder, shot and guns, that they have been thereby emboldened…." The new statute made it a capital offense to sell guns or ammunition to the Indians, and also declared that any colonist found "within any Indian town or three miles without the English plantations" with more than one gun and "ten charges of powder and shot for his necessary use" would be considered guilty of selling to the Indians, and punished accordingly.[xciv]

In times of tension, of course, colonies might again pass restrictions on sale of guns or ammunition to Indians, but Maryland seems to have followed the model of Virginia—severe restrictions followed by more realistic regulations. A 1638/9 Maryland law made it a felony "to sell give or deliver to any Indian or to any other declared or professed enemie of the Province any gunne pistol powder or shott without the knowledge or lycence of the Leiutenant Generall…."[xcv] A 1649 statute provided that "noe Inhabitant of this Province shall deliver any Gunne or Gunnes or Ammunicon or other kind of martiall Armes, to any Indian borne of Indian Parentage…."[xcvi] A 1763 Maryland law prohibited "any Person or Persons within this Province to Sell or give to any Indian Woman or Child any Gun Powder Shot or lead Whatsoever[,] nor to any Indian Man within this Province more than the Quantitys of one Pound of Gun Powder and six Pounds of Shot or lead at any one Time[,] and not those or lesser Quantitys of Powder or Lead oftener than once in Six Months…."[xcvii]

### B. Blacks

Laws disarming blacks were more common in the southern colonies. A 1680 Virginia statute prohibited "any negroe or other slave to carry or arme himselfe with any club, staffe, gunn, sword or any other weapon of defence or offence…"[xcviii]

By May, 1723, however, there seem to have been enough free blacks and Indians in the militia that the law was changed: "That every free negro, mulatto, or indian, being a house-keeper, or listed in the militia, may be permitted to keep one gun, powder, and shot…." Those blacks and Indians who were "not house-keepers, nor listed in the militia" were required to dispose of their weapons by the end of October, 1723. Blacks and Indians living on frontier plantations were required to obtain a license "to keep and use guns, powder, and shot…."[xcix] Even the small number of blacks and Indians who were members of the militia were apparently no longer trusted with guns in public by 1738. They were still required to muster, but "shall appear without arms…."[c]

Other southern colonies showed similar mistrust of blacks with guns. A Maryland statute passed in or before 1715 directed, "That no Negro or other slave, within this Province, shall be permitted to carry any Gun or any other offensive Weapon, from off their Master's Land, without Licence from their said Master…."[ci] While less clear, Delaware's 1742 militia statute prohibited all indentured servants and slaves from bearing arms, or mustering in any company of the militia. It is unclear from the statute if this ban applied to free blacks as well.[cii]

A Georgia statute of 1768 "for the Establishing and Regulating Patrols" prohibited slaves possessing or carrying "Fire Arms or any Offensive Weapon whatsoever, unless such Slave shall have a Ticket or License in Writing from his Master Mistress or Overseer to Hunt and Kill Game Cattle or Mischievous Birds or Birds of Prey…." Other provisions allowed a slave to possess a gun while in the company of a white person 16 years or older, or while actually protecting crops from birds. Under no conditions was a slave allowed to carry "any

Electronic copy available at: https://ssrn.com/abstract=2759961

Gun Cutlass Pistol or other Offensive Weapon" from Saturday sunset until sunrise Monday morning. The "Patrols" alluded to in the law's title were for the purpose of "Searching and examining any Negroe house for Offensive Weapons Fire Arms and Ammunition."[ciii]

Unlike the white population, blacks and Indians were not generally trusted with guns, and the laws reflected this. While individual whites might be disarmed as punishment for a crime or suspected disloyalty (as will be discussed next), gun ownership was generally unrestricted, except for blacks or Indians.

V. DISARMING THE DISLOYAL

Individual whites were sometimes disarmed if they were perceived as disloyal to the polity.

A. Antinomians

In 1637 Massachusetts, Anne Hutchinson's Antinomian heresy threatened the social order. Hutchinson's beliefs had spread rapidly through Puritan society, and "some persons being so hot headed for maintaining of these sinfull opinions, that they feared breach of peace, even among the Members of the superiour Court… those in place of government caused certain persons to be disarmed in the severall Townes, as in the Towne of Boston, to the number of 58, in the Towne of Salem 6, in the Towne of Newbery 3, in the Towne of Roxbury 5, in the Towne of Ipswitch 2, and Charles Towne 2."[civ]

Today we can look with disfavor on this disarming order for a variety of violations of the Constitution: as a bill of attainder; as a deprivation of due process; for granting favor to one religious point of view. These concerns, of course, are ahistorical. What the disarming order tells us about Colonial Massachusetts strongly indicates that gun regulation was generally *not* restrictive.

While consistent with the claim that Colonial governments disarmed persons who were not trusted, that there was a need to cause "certain persons to be disarmed" suggests that firearms were *not* stored in central storehouses and were not usually under governmental control. Most freemen were armed, as the laws of all the colonies except Pennsylvania required. Only as punishment for a specific crime—heresy—did Massachusetts disarm Hutchinson's partisans. The number disarmed—77 out of a population then in the thousands—is far less than the percentage legally disarmed in America today.

Virginia's statutes provide a positive variant of this notion. A 1676/7 statute directed: "It is ordered that all persons have hereby liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony…."[cv] Any loyal subject of the crown was permitted to purchase and own guns.

B. Catholics

Maryland provides a somewhat different example. Catholics were exempted from militia duty because, like Hutchinson's Antinomians, and blacks almost everywhere in the colonies, they were not completely trusted. In light of the role that Catholics played in the recurring attempts to restore the Stuarts to the throne of England, the distrust is unsurprising.

In exchange for exemption from militia duty, Catholics were doubly taxed on their lands.[cvi] As part of the same statute, members of the militia were required to swear an oath of allegiance to King George II. Catholics who refused the oath—thus refusing their legal obligation as British subjects to defend the realm— were not allowed to possess arms or ammunition.[cvii]

The law of Britain concerning Catholics and arms after the accession of William I to the throne is at first glance quite confusing. A 1689 law prohibited Catholics from possessing "any arms, Weapons, Gunpowder, or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace, at their general Quarter sessions, for the Defence of his House or Person)."[cviii] The law both prohibited Catholics from possessing arms, and yet allowed them, under some restrictions, to have at least defensive arms. Joyce Malcolm argues that, "This exception is especially significant, as it demonstrates that even when there were fears of religious war, Catholic Englishmen were permitted the means to defend themselves and their households; they were merely forbidden to stockpile arms."[cix]

At least in times of crisis, the English law would appear to have been the justification for disarming Catholics both in Britain and America. In Britain, for example, the death of the queen in 1714 caused orders that, "The Lords Leiutents of the severall Countrys were directed to draw out the Militia to take from Papists

Electronic copy available at: https://ssrn.com/abstract=2759961

& other suspected Persons their Arms & Horses & to be watchfull of the Publick Tranquillity."[cx]

Yet there seem to be relatively few incidents that appear in the *Archives of Maryland* that actually involve taking away arms from Catholics, and even these bear careful scrutiny. In 1744, "No Roman Catholick be for the future enrolled or mustered among the Militia of the said County and that if any of the *Publick Arms* be in the Possession of any Roman Catholick, the Colonel of the said County is hereby desired to oblige the Person in whose Custody such Arms are, to deliver the same to him." [emphasis added][cxi] The law apparently did not order confiscation of privately owned arms owned by Catholics.

By contrast, in 1756, "all Arms Gunpowder and Ammunition of what kind soever any Papist or reputed Papist within this Province hath or shall have in his House or Houses" were ordered seized.[cxii] That the order was adopted when it was, however, suggests that while the 1689 law *allowed* complete prohibition of Catholic gun ownership at the discretion of the government, in Maryland they were not *usually* prohibited from possession.

Catholics settled mainly in Maryland. In other colonies, there is no evidence that Catholics in general were disarmed.

Georgia provides an example of selective Catholic disarmament. At the start of the French & Indian War, British forces demanded that the French population of Nova Scotia swear an oath of allegiance to the crown. Persons who refused were forcibly removed to other British colonies. Some of these Acadians (the ancestors of the Cajuns) were bound as indentured servants in Georgia. A 1756 law prohibited indentured Acadians "to have or use any fire Arms or other Offensive Weapons otherwise than in his Masters Plantation or immediately under his Inspection…."[cxiii] There seems to be no general prohibition on Catholic ownership of firearms in Georgia; the Acadians were disarmed because they had refused to be loyal subjects of the British government, and the suspicion of disloyalty followed them to Georgia.

## VI. PRIVATE VS. GOVERNMENT OWNERSHIP

Regarding Bellesiles's claim that guns "were to remain the property of the government,"[cxiv] the evidence suggests quite the opposite.

### A. Guns for the Poor

On any number of occasions, the Colonial governments supplied guns to subjects too poor to purchase them. The laws usually specified that the recipient was to pay for the gun.

For example, a March 22, 1630/1 Massachusetts statute required the entire adult male population to be armed. Every person, including servants, was to own "good & sufficient armes" of a type "allowable by the captain or other officers, those that want & are of abilitie to buy them themselves, others that are unable to have them provided by the town…." Those who were armed by the town under the March 22 statute were to reimburse the town "when they shalbe able."[cxv] On March 6, 1632/3, the law was amended to require that any single person who had not provided himself with acceptable arms would be compelled to work for a master. The work earned him the cost of the arms provided to him by the government.[cxvi]

Connecticut's Code of 1650 provided that a person who was required to arm themselves, or arm a dependent, but "cannot purchase them by such means as he hath, hee shall bring to the clark so much corne or other merchantable goods" as was necessary to pay for them. The value of the arms was to be appraised by the clerk "and two others of the company, (whereof one to bee chosen by the party, and the other by the clarke,) as shall be judged of a greater value by a fifth parte, then such armes or ammunition is of…."

Thus, the man who would not purchase a gun and ammunition would have one provided by the government, but at a price as much as twenty percent above the market price. The high price created an incentive to purchase a gun privately.

Another part of the law provided for hiring out any unarmed single men to earn the price of a gun and ammunition.[cxvii] Very similar laws appeared in New York[cxviii] and New Hampshire.[cxix]

A 1673 Virginia law, while less explicit about the process for determining the value of the arms, directed militia officers to purchase guns on the public account for distribution to those who could not afford them, "for them to dispose of the same as there shalbe occasion; and that those to whome distribution shalbe made doe pay for the same at a reasonable rate…."[cxx] The law does not directly disprove that guns were "to remain

Electronic copy available at: https://ssrn.com/abstract=2759961

the property of the government." It does, however, seem a bit strange for the government to provide guns to individual militiamen, and then require them to pay for those guns, if the guns were to remain governmental property.

## B. Public Arms

Not every Virginia militiaman apparently succeeded in arming himself; a 1748 statute provided "it may be necessary in time of danger, to arm part of the militia, not otherwise sufficiently provided, out of his majesty's magazine and other stores within this colony…." Contrary to the claim that all guns were considered the property of the government, the same statute criminalized embezzlement of "arms or ammunition" that were issued to those who were too poor to arm themselves, and thus drew a distinction between public arms issued from "his majesty's magazine" and other, presumably privately owned firearms.[cxxi]

Similarly, a Maryland statute of 1733 passed "to prevent the Embezzlement of the Public Arms" directed "That all the Public Arms shall be Marked with such Marks… to denote such Arms to belong to the Public; after which Marks so made, no Person or Persons whatsoever, shall presume to Sell or Purchase such Arms so Marked…."[cxxii] If all guns automatically belonged to the government, it seems a bit odd that there was a need to mark them as "Public Arms."

In 1756, Maryland's militia officers were ordered to make a diligent search for arms and ammunition, demanding that everyone show what guns they had. The reason would appear to be, "Whereas on many Occasions Arms Ammunition and military Accoutrements of different Kinds have been delivered out of the public Magazines of this Province and are now dispersed among the Inhabitants and have been Sold or Sent from one to another and it is represented that the Locks have been taken of from many of the Said Arms and put to private Use…."[cxxiii] If all guns were "automatically government property," the careful search for publicly owned arms, distinguishing them from private property, would make no sense.

Massachusetts at one point directed that, "The surveyar genrall of the armes of the country shall have power to sell any of the country armes for an equall price, either in corne or other country pay, & to p[ro]vide armes againe therew[i]th so soone as may bee, so hee sell them not out of this jurisdiction."[cxxiv] Publicly owned arms were to be sold (not issued or loaned), as long as they were sold in Massachusetts.

A 1765 Virginia statute is also strong evidence that guns were not regarded as automatically government property. It provided for militia commanders in "each of the counties from which the militia has been sent into service in the pay of this colony shall, within the space of three months after the passing this act, sell, for the best price that be had for the same, all arms, ammunition, provisions, and necessaries purchased at the publick expense in the said counties…."[cxxv] Surplus government guns were clearly sold, not loaned out to militiamen.

## C. Private Arms

Other evidence establishes that Colonial governments at least sometimes recognized that guns could be private property, and were *not* regarded as automatically the property of the government. Connecticut's records provide such evidence. In 1639, after the Pequot War, "a musket with 2 letters I W" was found, "conceaved to be Jno. Woods who was killed att the Rivers mouth. It was ordered for the present [that] the musket should be delivered to Jno. Woods friends until other appeare."[cxxvi] If the Connecticut government regarded a dead man's musket as "government property," it is odd that they delivered it to his friends.

We also have examples of colonists fined for selling guns to the Indians—and with no suggestion that these were publicly owned arms. A 1636 complaint in the Connecticut records shows that "Henry Stiles or some of the ser[vants] had traded a peece with the Indians for Corne."[cxxvii] In 1640, George Abbott is ordered to pay a £5 fine for "selling a pystoll & powder to the Indeans…."[cxxviii] Fines are also repeatedly assessed for selling guns to the Indians, with no hint or suggestion that these were government property.[cxxix]

Were guns privately owned or government property? We have evidence such as a Connecticut lawsuit in 1639 by a "Jno. Moody contra Blachford, for a fowling peece he bought and should have payd for it 40s."[cxxx] In 1640, also in Connecticut, a William Hill was fined £4 "for buying a stolen peece of Mr. Plums man."[cxxxi] There is nothing in the reports of these cases that suggests that these guns were considered government property.

Similarly, in New Haven Colony, a civil suit of 1645 concerns a gun purchased by Stephen Medcalfe from

Electronic copy available at: https://ssrn.com/abstract=2759961

a Francis Linley. The gun was defective, and when it exploded, Medcalfe lost an eye. There is nothing in the description of the suit that suggests that the gun was "property of the government" and it was no surprise that one person sold a gun to another.[cxxxii]

Bellesiles claims that "the government reserved to itself the right to impress arms on any occasion, either as a defensive measure against possible insurrection or for use by the state. No gun ever belonged unqualifiedly to an individual."[cxxxiii]

Yet there are a number of examples that directly contradict this claim. An October 13, 1675 statute of Massachusetts Bay provided for assessments on persons exempt from militia training of "so many fire armes, muskets, or carbines, with a proportionable stocke of [powder] & am[m]union, as the said committees respectively shall appoint…." It appears that this was an assessment in kind, not of money. Another part of the statute specified "all such persons as shall be assessed, and shall accordingly provide three fire armes, shall be freed from being sent abroad to the warrs, except in extreame & utmost necessity."[cxxxiv]

Thus, the government believed that there were enough people who owned at least three guns that the government was prepared to exempt them from the onerous duty to fight overseas if they offered those guns to the government. As much as the government needed the guns, it did not believe that it had the authority to confiscate them. Instead, it needed to make a deal with the owners. Apparently the government did not believe that all guns were its property.

More evidence that militiamen possessed their *own* arms, and that the arms were not always issued from government magazines for militia service, is Massachusetts Governor William Shirley's 1755 order to the militia to appear for service. "To such of them as shall be provided with sufficient Arms at their first Muster, they shall be allowed a *Dollar* over and above their Wages, and full Recompence for such of their Arms as shall be inevitably lost or spoiled."[cxxxv]

Clearly, Governor Shirley believed that there were some members of the militia who, contrary to law, did not have firearms appropriate to military service. Just as clearly, Governor Shirley believed that some members would show up appropriately armed, and he was prepared to pay them extra to do so. Most importantly from the standpoint of private vs. public ownership, "full Recompence" shows that militiamen would be compensated for the loss of their privately owned guns; the guns were not "property of the government."

Maryland's Governor Sharpe similarly directed calling up of the militia, offering to provide government arms in 1759, but also "That for Every One of such Arms as any of Your men shall bring with them, and that may be Spoiled or Lost in actual Service, I will pay at the rate of Twenty five Shillings a Firelock."[cxxxvi]

At the start of the Revolution, a number of colonies made arrangements for additional pay for those soldiers who showed up with their own guns. Connecticut, for example, provided "that each inlisted inhabitant that shall provide arms for himself, well fixed with a good bayonet and cartouch box, shall be paid a premium of ten shillings…."[cxxxvii] Later measures also suggest that militia men showing up with their own guns, and being paid extra, were the rule, not the exception.[cxxxviii] Like Governor Shirley's "full Recompense," the Connecticut laws provided for compensation for those whose guns were lost in the war. While Connecticut impressed guns from the population for militiamen who did not have their own, the owners were to be paid four shillings for the use of impressed guns, and "the just value of the such gun" if lost.[cxxxix]

At the start of the Revolution, the Provincial Congress of Massachusetts purchased firearms from private parties,[cxl] and requested private citizens to sell their guns to the government: "[I]t is strongly recommended to such inhabitants…, that they supply the colony with same."[cxli] A request of June 15, 1775 for individuals to sell their arms is also phrased in terms that seem quite voluntary. "*Resolved*, that any person or persons, who may have such to sell, shall receive so much for them, as the selectmen of the town or district in which or they may dwell, shall appraise such arms at…."[cxlii]

Other colonies also purchased guns from private parties—a strange behavior if guns remained "the property of the government." [cxliii] Similarly, in November of 1775, with the war well under way, the Pennsylvania government issued a very odd statement, if guns were automatically "property of the government":

> The Committee of Safety are of opinion, that it is not improper for Mr. James Innes to purchase any second hand Arms which he may find in the hands of Individuals of this Province,

Electronic copy available at: https://ssrn.com/abstract=2759961

and therefore have no objection to his buying them; But as they have employed, and are endeavouring to employ, all the Artificers that can be procured in making new arms for the public, they apprehend any application by Mr. Innes to such Artificers, will be attended with bad consequences to the general Cause by enhancing the Price of arms….[cxliv]

At the start of the Revolution, the Maryland government confiscated guns from Tories and others suspected of disloyalty to the Patriot cause. Yet even then, the owners received compensation for the value of their guns.[cxlv] Even disloyalty was not just cause for confiscation without compensation.

Another piece of evidence that guns were not "property of the government" is a 1776 order of the Continental Congress:

> Whereas in the execution of the resolve of Congress of the 14th of March, respecting the disarming disaffected persons, many fire arms may be taken, which may not be fit for use to arm any of the troops mentioned therein: Therefore, Resolved, That all the fire arms so taken, being appraised according to said resolve, none of them shall be paid for, but those that are fit for the use of such troops, or that may conveniently be so made, and *the remainder shall be safely kept by the said assemblies, conventions, councils or committees of safety, for the owners, to be delivered to them when the Congress shall direct.*[cxlvi] [emphasis added]

The owners were to be paid for guns taken for military use. Government ownership of guns was not assumed. Quite the opposite, private ownership was assumed and respected, even for Tories.

In the days after Lexington and Concord, General Gage was understandably nervous about being attacked from the rear by armed rebels. General Gage consequently ordered the people of Boston to turn in their arms. Many Bostonians were also deeply interested in leaving town, both because of the increasing poverty caused by the Boston Port Act of 1774, and the likelihood that the revolutionary army would attack Boston.

As an incentive, General Gage offered passes to leave Boston to all who turned in their weapons. No weapons or ammunition were allowed to leave Boston. The arms were to be "marked with the names of the respective owners…that the arms aforesaid, at a suitable time, would be returned to the owners." The marking of the arms demonstrates that at least some of these were personally owned, not public arms. On April 27th, "the people delivered to the selectman 1778 fire-arms, 634 pistols, 973 bayonets, and 38 blunderbusses…."[cxlvii]

## VII. RESTRICTIONS ON PRIVATE USE

There are restrictions on the use of firearms in the Colonial law, and most of these are unsurprising. They are safety and hunting regulations of the same general form, though less restrictive, than current laws.

### A. Restrictions on Discharge

The need for such laws strongly suggests that the claim that guns were kept centrally stored is incorrect. A March 1655/6 Virginia statute, for example, prohibited shooting "any guns at drinkeing (marriages and funerals onely excepted)" because gunshots were the common alarm of Indian attack, "of which no certainty can be had in respect of the frequent shooting of gunns in drinking…."[cxlviii] Similarly, a 1642 Maryland statute also ordered that, "No man to discharge 3 guns within the space of ¼ hour… except to give or answer alarm."[cxlix]

There are some regulations that appear to have been temporary measures designed to deal with a particular crisis, and we may only speculate as to the motivations. An example is a 1675 Plymouth statute that prohibited shooting except at an Indian or a wolf. Since this measure immediately followed one requiring everyone to come to church armed "during the time of publicke danger,"[cl] it seems likely that the law was an attempt to prevent unnecessary alarm, for the same reasons as the Virginia and Maryland laws.

Shooting was apparently a common enough pastime in 1638 Massachusetts that when an Emanuell Downing had "brought over, at his great charges, all things fitting for takeing wild foule by way of [decoy],"

Electronic copy available at: https://ssrn.com/abstract=2759961

the General Court felt it necessary to order "that it shall not bee lawfull for any person to shoote in any gun within halfe a mile of the pond where such [decoy] shalbee placed…."[cli] The need for such a law suggests that guns were not kept locked in a central storehouse.

The laws were passed not only for the economic benefit of the community as a whole, but also because negligent misuse of firearms was not unknown. An incident from a history of Plymouth Colony described how:

> On 1 July 1684 Robert Trayes of Scituate, described as a 'negro,' was indicted for firing a gun at the door of Richard Standlake, thereby wounding and shattering the leg of Daniel Standlake, which occasioned his death. The jury found the death of Daniel Standlake by 'misadventure,' and the defendant, now called 'negro, John Trayes,' was cleared with admonition and fine of £5.[clii]

A statute adopted at the Massachusetts 1713-14 legislative session complained, "Whereas by the indiscreet firing of guns laden with shot and ball within the town and harbour of Boston, the lives and limbs of many persons have been lost, and others have been in great danger, as well as other damage has been sustained…" the legislature prohibited firing of any "gun or pistol" in Boston ("the islands thereto belonging excepted").[cliii]

Perhaps for a similar reason—or just to allow the inhabitants to get some sleep—in 1759, Georgia made it unlawful to fire "any great gun or [small] arm in the town or harbour of Savannah after Sun Set without leave or permission from the Governor…."[cliv]

B. Restrictions on Hunting

Hunting with firearms was also sufficiently common for Colonial governments to adopt restrictions. A 1632 Virginia statute licensed hunting wild pigs, but "any man be permitted to kill deare or other wild beasts or fowle in the common woods, forests, or rivers…. That thereby the inhabitants may be trained in the use of theire armes, the Indians kept from our plantations, and the wolves and other vermine destroyed."[clv] A March 1661/2 statute prohibited "hunting and shooting of diverse men" on land without the owner's permission "whereby many injuryes doe dayly happen to the owners of the said land…." The statute also provided that it was lawful to pursue game shot elsewhere onto private land without permission.[clvi] A 1699 statute, "prohibiting the unseasonable killing of Deer," complained about how the deer population "is very much destroyed and diminished" by killing "Does bigg with young…."[clvii]

Laws regulating hunting appear in at least two colonies by mid-eighteenth century, and the language in both statutes suggests that hunting was common. A 1722 New Jersey "Act to prevent the Killing of Deer out of Season" prohibited deer hunting from January through June. That same law included a provision prohibiting "Persons carrying of Guns, and presuming to Hunt on other Peoples Land" explaining that it was required because "divers Abuses have been committed, and great Damages and Inconveniencies arisen…." The same act prohibited a slave from hunting or carrying a gun without permission of his master.[clviii]

A 1738 North Carolina "Act, to Prevent killing Deer, at Unseasonable Times" made it unlawful "to kill or destroy any Deer… by Gun, or other Ways and Means whatsoever" from February 15 to July 15."[clix]

Virginia temporarily banned deer hunting in 1772, complaining that "many idle people making a practice, in severe frozen weather, and deep snows, to destroy deer, in great numbers, with dogs, so that the whole breed is likely to be destroyed, in the inhabited parts of the colony…." The government's concern was that, "numbers of disorderly persons… almost destroyed the breed, by which the inhabitants will… be deprived of that wholesome and agreeable food…." Therefore, deer hunting was completely prohibited until August 1, 1776.[clx] It is not made explicit that the hunting was with guns, however.

Maryland had a few hunting restrictions as well. A 1648 law complained that because licenses previously issued for "killing of Wild Hoggs [e]mploying Indians to kill deere with Gunnes" both to residents and non-residents of Maryland "hath occasioned some inconvenience & hath given great offence to divers of the Inhabitants of this Province," all existing licenses were repealed. Unfortunately, the statute failed to explain in what manner this hunting had inconvenienced or offended the "Inhabitants."[clxi]

Two years later, another law prohibited foreigners "either English or Indian" from hunting "in any part of this Province or kill any Venison or other Game" without a license from the governor,[clxii] again with no

Electronic copy available at: https://ssrn.com/abstract=2759961

explanation of the problem this law was intended to solve.

A 1654 Maryland law sought to prohibit shooting on Sundays: "Noe work shall be done on the Sabboth day but that which is of Necessity and Charity to be done no Inordinate Recreations as fowling, fishing, hunting or other, no shooting of Gunns be used on that day Except in Case of Necessity[.]" Following immediately upon prohibitions on drunkenness, swearing and gossiping, the statute seems intended to improve morals of the population, and was not specifically directed at guns.[clxiii] In 1678, the law was expanded to prohibit a larger list of amusements, and still prohibited fishing and hunting.[clxiv]

C. Restrictions on Fire-hunting

One particularly destructive practice of Colonial America was "fire-hunting," well described by a 1760 account explaining why white pines in New York, New England, and New Jersey were protected for the use of the Royal Navy:

> This restriction is absolutely necessary, whether considered as securing a provision for the navy, or as a check upon that very destructive practice, taken from the Indians, of fire-hunting. It used to be the custom for large companies to go into the woods in the winter, and to set fire to the brush and underwood in a circle of several miles. This circle gradually contracting itself, the deer, and other wild animals inclosed, naturally retired from the flames, till at length they got herded together in a very small compass.
>
> Then, blinded and suffocated by the smoke, and scorched by the fire, which every moment came nearer to them, they forced their way, under the greatest trepidation and dismay, through the flames. As soon as they got into the open daylight again, they were shot by the hunters, who stood without and were in readiness to fire upon them.[clxv]

Fire-hunting was not confined to the Northeast colonies; there are a number of statutes of Colonial Virginia and Maryland that either directly prohibit fire-hunting with reference to guns,[clxvi] or that license hunting on the frontier in an attempt to control fire-hunting.[clxvii] Doubtless other restrictions on firearms use existed—but if so, those who argue that Colonial governments severely restricted firearms use have yet to produce them.

CONCLUSION: COLONIAL FIREARMS REGULATIONS WERE NEITHER *LAISSEZ-FAIRE* NOR RESTRICTIVE

As should be clear from the preceding walk through these laws, the Colonial statutes were not *laissez-faire*; there were many obligations concerning the ownership and carrying of guns adopted for the public good. Neither were they restrictive, at least for whites (with the exception of Catholics in Maryland). There were, it is true, some severe restrictions on firearms ownership in Colonial America, but they applied only to people who were not trusted to be loyal members of the community, particularly Indians and blacks. For the vast majority of people, who were considered loyal members of the community, gun ownership was not only allowed, it was an obligation.

ENDNOTES

---

[i]. Michael A. Bellesiles, *Arming America: The Origins of a National Gun Culture* (New York: Alfred A. Knopf, 2000), 73. Similar text, with a subset of the same footnotes, appears at Michael Bellesiles, "Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794," *Law & History Review.* 16:575 (1998).

Bellesiles also asserts government ownership of all guns at *Arming America*, pp. 79-80. Because individuals failed to take adequate care of guns in private hands, "The eventual solution to the lack of care devoted to firearms was to make all guns into the property of the state, subject to storage in central storehouses where they could be cleaned and repaired

Electronic copy available at: https://ssrn.com/abstract=2759961

by paid government gunsmiths." Similarly, Belleisles asserts that while "the colonies supported and subsidized the private ownership of firearms, the government reserved to itself the right to impress arms on any occasion, either as a defensive measure against possible insurrection or for use by the state. No gun ever belonged unqualifiedly to an individual."

ii. *State v. Hirsch*, 177 Or. App. 441, 34 P.3d 1209 (Or. App. 2001).

iii. Belleisles, *Arming America,* 73.

iv. *Code of 1650, Being a Compilation of the Earliest Laws and Orders of the General Court of Connecticut* (Hartford, Conn.: Silas Andrus, 1822), 72-73; J. Hammond Trumbull (vol. 1-3), Charles J. Hoadly (vol. 4-15), *The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony* (Hartford, Conn.: Brown & Parsons, 1850) (hereinafter *Public Records of Connecticut*), 1:542-543.

v. *Public Records of Connecticut*, 1:3-4, 15-16, 2:19-20, 217-18, 4:177, 8:379-80.

vi. *Id.*, 2:217-18, 4:177, 8:379-80.

vii. William Waller Hening, *The Statutes at Large; Being a Collection of all the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* (New York: R. & W. & G. Bartow, 1823), 3:13.

viii. *Id.*, 3:338.

ix. *Id.*, 5:17, 21.

x. *Id.*, 6:116.

xi. *Id.*, 6:118.

xii. *Id.*, 6:537.

xiii. *The Colonial Laws of New York from the Year 1664 to the Revolution…* (Albany, New York: James B. Lyon, 1894), 1:49-50.

xiv. William Hand Browne, ed., *Archives of Maryland* (Baltimore: Maryland Historical Society, 1885) (hereinafter *Archives of Maryland*), 1:77.

xv. *Id.*, 75:258.

xvi. *Id.*, 75:259.

xvii. *Id.*, 1:77.

xviii. *Id.*, 3:100-1.

xix. *Id.*, 3:103.

xx. *Id.*, 3:345.

xxi. *Id.*, 52:469.

xxii. *Id.*, 11:21. But see *id.*, 11:90 for a complaint that many had failed to conform to the law, though the complaint alleges that that the problem was "would not," not "could not."

xxiii. Nathaniel B. Shurtleff, *Records of the Governor and Company of the Massachusetts Bay in New England* (Boston: William White, 1853), 1:84.

xxiv. *Id.*, 2:134. This requirement is reiterated on November 11, 1647. *Id.*,2:222.

xxv. *Id.*, 3:84.

xxvi. *Id.*, 2:99.

xxvii. Charles J. Hoadly, ed., *Records Of The Colony And Plantation Of New Haven, From 1638 To 1649* (Hartford, Conn.: Case, Tiffany, 1857), 25-26, 96-97, 131, 202. Hoadly, 122-3, lists a number of men fined for failure to obey.

xxviii. William Brigham, ed., *The Compact with the Charter and Laws of the Colony of New Plymouth…* (Boston: Dutton and Wentworth, 1836), 31, 44-45, 285-6.

xxix. *Acts and Laws, Passed by the General Court or Assembly of the Province of New-Hampshire in New-England…* (1716), 91-92, in Clifford K. Shipton, ed., *Early American Imprints, 1639-1800* (Worcester, Mass.: American Antiquarian Society, 1967), imprint 1985.

Electronic copy available at: https://ssrn.com/abstract=2759961

xxx. *The Laws and Acts of the General Assembly of Her Majesties Province of Nova Caesarea or New-Jersey* (W. Bradford, 1709), 12-13, in Clifford K. Shipton, ed., *Early American Imprints, 1639-1800* (Worcester, Mass.: American Antiquarian Society, 1967), imprint 1412.

xxxi. *Laws of the Government of New-Castle, Kent and Sussex Upon Delaware* (Philadelphia: B. Franklin, 1741), 171-7. While the title page is clearly 1741, this must have been only for the first of annual series, since the law was passed in 1742. See also a 1740 statute, *Id.*, 151, imposing similar requirements on the town of Lewes, which was apparently considered especially exposed to naval attack.

xxxii. John Russell Bartlett, ed., *Records of the Colony of Rhode Island and Providence Plantations, in New England* (Providence, R.I.: A. Crawford Greene and Brother, 1856), 1:94.

xxxiii. *Id.*, 1:79-80.

xxxiv. Alexander S. Salley, *Journal of the Grand Council of South Carolina* (Columbia, S.C.: Historical Commission of South Carolina, 1907), 1:10-11.

xxxv. *Laws of North Carolina–1715*, ch. 25, in John D. Cushing, ed., *The Earliest Printed Laws of North Carolina, 1669-1751* (Wilmington, Del.: Michael Glazier, Inc., 1977), 2:29-31.

xxxvi. *A Collection of all the Public Acts of Assembly, of the Province of North-Carolina: Now in Force and Use...* (Newbern, N.C.: James Davis, 1751), 215-16.

xxxvii. John Hope Franklin, *The Free Negro in North Carolina, 1790-1860* (Chapel Hill, N.C.: University of North Carolina Press, 1995), 101-102.

xxxviii. Allen D. Candler, comp., *The Colonial Records of the State of Georgia* (Atlanta, Ga.: Chas. P. Byrd, 1911), 19(part 1):291. Nearly identical language appears in the 1755 militia statute. *Id.*, 18:7, 11-12.

xxxix. *Id.*, 19(part 1):296.

xl. *Id.*, 19(part 1):303. There are many pages of highly detailed fines and provisions to handle any imaginable contingency in this statute.

xli. *Id.*, 19(part 1):324-25.

xlii. *Id.*, 19(part 1):297-8.

xliii. *Id.*, 19(part 1):299. See the similar obligation imposed in 1757 on members of the militia to keep and carry "one good Gun or Pistol in Order… and a Cartridge Box with at least Six Cartridges" when on patrol duty. *Id.*, 18:231.

xliv. A few scattered scraps that give some idea of the conflict between governor and legislature on passage of a mandatory militia law can be found at *Pennsylvania Archives*, 4th series, 1:706-8, 2:441, 548, 555.

xlv. *Archives of Maryland*, 75:264; Abbot Emerson Smith, *Colonists in Bondage: White Servitude and Convict Labor in America, 1607-1776* (Gloucester, Mass.: Peter Smith, 1965), 239.

xlvi. *Laws of North Carolina—1715*, ch. 46, in John D. Cushing, ed., *The Earliest Printed Laws of North Carolina, 1669-1751* (Wilmington, Del.: Michael Glazier, Inc., 1977), 63; Farley Grubb, "The Statutory Regulation of Colonial Servitude: An Incomplete-Contract Approach," *Explorations in Economic History* 37 (January, 2000):69.

xlvii. Public Records Office, Customs 16:85, 109, 171. In 1769: 229,545 pounds; 1770: 410,591; 1771: 390,558 pounds.

xlviii. William J. Novak, "*Salus Populi*: The Roots of Regulation in America, 1787-1873" (Ph.D. diss., Brandeis University, 1992), 188.

xlix. This calculation is necessarily imprecise, but is based on statutes of the time that assumed four pounds of lead for every pound of gunpowder, and a 0.75 caliber Brown Bess: *Archives of Maryland*, 1:77; Matthew Page Andrews, *Tercentenary History of Maryland* (Chicago and Baltimore: S.J. Clarke Publishing Co., 1925), 1:150; Hening, 5:17, 21. Many firearms in Colonial America were smaller caliber, and consequently used less powder, increasing the number of shots that could have been fired. Concerning the claim of gun ownership, storage requirements, and hunting, see generally Bellesiles, *Arming America*.

l. *Public Records of Connecticut*, 1:95, 96.

li. Shurtleff, 1:190.

lii. *Id.*, 1:210.

Electronic copy available at: https://ssrn.com/abstract=2759961

liii. *Id.*, 2:38.

liv. Bartlett, 1:94.

lv. *Archives of Maryland*, 3:103.

lvi. Bartlett, 1:79.

lvii. Hoadly, 131-32. See *id.*, 122-23, for men fined for failure to bring their guns to church, and Hoadly, 500, for William Paine's request that he be exempted from this requirement, "he lives [far off] and hath three small children, and his wife is lame and cannot help to bring the children."

lviii. Brigham, 70.

lix. *Id.*, 115.

lx. *Id.*, 176.

lxi. August 2, 1619, "Proceedings of the Virginia Assembly, 1619," in Lyon Gardiner Tyler, *Narratives of Early Virginia, 1606-1625* (New York: Charles Scribner's Sons, 1907; reprinted New York: Barnes & Noble, 1959), 273.

lxii. Hening, 1:198.

lxiii. *Id.*, 5:19.

lxiv. David J. McCord, *Statutes at Large of South Carolina* (Columbia, S.C.: A. S. Johnson, 1840), 7:417-19.

lxv. Candler, *The Colonial Records of the State of Georgia*, 19(part 1):137-40.

lxvi. Hening, 1:127, 198.

lxvii. Shurtleff, 1:85.

lxviii. *Id.*, 1:190.

lxix. Bartlett, 1:94.

lxx. *Archives of Maryland*, 3:103.

lxxi. William Bradford, Samuel Eliot Morison, ed., *Of Plymouth Plantation, 1620-1647* (New York: Alfred A. Knopf, 2001), 70.

lxxii. Sydney V. James, Jr., *Three Visitors to Early Plymouth* (Bedford, Mass.: Applewood Books, 1997), 16.

lxxiii. Francis Adams, Jr., ed., *New English Canaan of Thomas Morton* (Boston: The Prince Society, 1883; reprinted New York: Burt Franklin, 1967), 21-28.

lxxiv. Bradford, 204, 206-8, 232-3.

lxxv. Joseph H. Smith, ed., *Colonial Justice in Western Massachusetts (1639-1702): The Pynchon Court Record, An Original Judges' Diary of the Administration of Justice in the Springfield Courts in the Massachusetts Bay Colony* (Cambridge: Harvard University Press, 1961), 208.

lxxvi. *Archives of Maryland*, 3:103.

lxxvii. Shurtleff, 1:196.

lxxviii. *Id.*, 2:24.

lxxix. *Id.*, 3:268.

lxxx. *Id.*, 3:397.

lxxxi. *Public Records of Connecticut*, 1:1, 2.

lxxxii. *Id.*, 1:49.

lxxxiii. *Id.*, 1:182.

lxxxiv. *Id.*, 1:79-80.

lxxxv. *Id.*, 1:113-14, 138, 145-6, 197-8.

lxxxvi. *Id.*, 1:146-7, Richard Lord fined £7 and Thomas Stanton, £5. *Id.*, 1:167, Thomas Lord ordered to appear. *Id.*, 1:242, Captain Sebadoe fined £10.

Electronic copy available at: https://ssrn.com/abstract=2759961

[lxxxvii]. Smith, 263.

[lxxxviii]. Shurtleff, 4 (part 2):365.

[lxxxix]. John E. Soule, Milton E. Terry, and Robert S. Wakefield, comp., *George Soule of the Mayflower and His Descendants for Four Generations*, 3rd ed. (Plymouth, Mass.: General Society of Mayflower Descendants, 1999), 6.

[xc]. *Public Records of Connecticut*, 1:351, 375.

[xci]. Hening, 1:441.

[xcii]. *Id.*, 1:525.

[xciii]. *Id.*, 2:215.

[xciv]. *Id.*, 2:336-7.

[xcv]. *Archives of Maryland*, 1:71.

[xcvi]. *Id.*, 1:250.

[xcvii]. *Id.*, 58:420.

[xcviii]. Hening, 2:481.

[xcix]. *Id.*, 4:131.

[c]. *Id.*, 5:17. Indians and blacks to appear unarmed for muster reiterated in 1757. *Id.*, 7:95.

[ci]. *Archives of Maryland*, 75:268.

[cii]. *Laws of the Government of New-Castle, Kent and Sussex Upon Delaware* (Philadelphia: B. Frankllin, 1741), 178.

[ciii]. Candler, *The Colonial Records of the State of Georgia*, 19(part 1):76-78. Essentially identical language appears in the 1755 slave law, *Ibid.*, 18-117-18.

[civ]. J. Franklin Jameson, ed., *Johnson's Wonder-Working Providence: 1628-1651* (New York: Barnes & Noble, Inc., 1959), 175. Shurtleff, 1:211-12, gives the disarming orders.

[cv]. Hening, 2:403.

[cvi]. *Archives of Maryland*, 52:450-1 contains a 1756 militia law that exempts "Papists, the Persons commonly called Neutralls, Servants, and Slaves." See instructions at 52:598 ordering that no soldier be enlisted "Roman Catholic or Deserter, knowing them to be such…." Also discussed at 6:419-20, 9:315-6; 28:315

[cvii]. *Id.*, 52:451-2.

[cviii]. Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (Cambridge, Mass.: Harvard University Press, 1994), 123. Britain and Ireland had different laws concerning the disarming of Catholics, with the Irish law somewhat more restrictive on the possession of arms for self-defense. Compare 1 W. & M., ch. 15 (1689) with the Irish law 7 Will, III ch.5 (1695).

[cix]. Joyce Lee Malcolm, "The Right of the People to Keep and Bear Arms: The Common Law Tradition," *Hastings Constitutional. Law Quarterly* 10:310 (1983).

[cx]. *Archives of Maryland*, 25:288-9.

[cxi]. *Id.*, 28:315.

[cxii]. *Id.*, 52:454.

[cxiii]. Candler, *The Colonial Records of the State of Georgia*, 18:190-1.

[cxiv]. Bellesiles, *Arming America,* 73.

[cxv]. Shurtleff, 1:84.

[cxvi]. *Id.*, 1:93.

[cxvii]. *Code of 1650, Being a Compilation of the Earliest Laws and Orders of the General Court of Connecticut* (Hartford, Conn.: Silas Andrus, 1822), 72-73.

[cxviii]. *Colonial Laws of New York*, 1:52.

Electronic copy available at: https://ssrn.com/abstract=2759961

[cxix]. *Acts and Laws, Passed by the General Court or Assembly of the Province of New-Hampshire in New-England…* (1716), 91-92, in Clifford K. Shipton, ed., *Early American Imprints, 1639-1800* (Worcester, Mass.: American Antiquarian Society, 1967), imprint 1985, 94.

[cxx]. Hening, 2:304.

[cxxi]. *Id.*, 6:118.

[cxxii]. *Archives of Maryland*, 75:425.

[cxxiii]. *Id.*, 52:452.

[cxxiv]. Shurtleff, 2:31. Shurtleff, 3:187, includes a May 23, 1650 order that the public arms to be sold not include cannon. An October 14, 1651 order at Shurtleff, 3:248, provides for the gift of five publicly owned muskets to inhabitants of Salem and "our present honored Governor."

[cxxv]. Hening, 8:125-6.

[cxxvi]. *Public Records of Connecticut,* 1:29.

[cxxvii]. *Id.*, 1:1, 2.

[cxxviii]. *Id.*, 1:49.

[cxxix]. *Id.*, 1:182, Robert Slye fined £10 for "exchanging a gunn with an Indian," George Hubberd, John West, and Peter Blatchford "for the same" all fined the same amount.

[cxxx]. *Id.*, 1:33.

[cxxxi]. *Id.*, 1:50.

[cxxxii]. Hoadly, *Records Of The Colony And Plantation Of New Haven,* 176-77.

[cxxxiii]. Bellesiles, *Arming America*, 79.

[cxxxiv]. Shurtleff, 5:48-49.

[cxxxv]. Library of Congress, Printed Ephemera Collection; Portfolio 35, Folder 15b.

[cxxxvi]. *Archives of Maryland*, 9:565. Similar offers appear at 31:404, in 1760, and at 56:404 in 1761.

[cxxxvii]. *Public Records of Connecticut,* 14:417-18. See *id.*, 15:188, for a similar measure in December 1775.

[cxxxviii]. *Id.*, 15:97.

[cxxxix]. *Id.*, 14:418-19.

[cxl]. Massachusetts Provincial Congress, *The Journals of Each Provincial Congress of Massachusetts in 1774 and 1775* (Boston: Dutton and Wentworth, 1838), 536-37, 584-93. *Id.*, 584 (107 "small arms"); 585 (13 "guns"); 591 (28 "guns, for the use of the colony, collected by order of Congress").

[cxli]. *Id.*, 210.

[cxlii]. *Id.*, 336-37.

[cxliii]. February 7, 1776, *Colonial Records of Pennsylvania* (Chicago: Library Resources, 1970), 10:478;    February 9, 1776, 10:481; April 9, 1776. 10:537; April 10, 1776, 10:537; July 30, 1776, 10:471; July 24, 1776, 10:653; August 23, 1776, 10:698; November 29, 1775, *Minutes of the Supreme Executive Council of Pennsylvania* (Harrisburg, Penn.: Theo. Fenn & Co., 1852), 10:416-67, 10:550-51, 686-67, 700.

[cxliv]. November 30, 1775, *Min.Sup.Penn.*, 418.

[cxlv]. See March 8, 1776, *American Archives* 4th series, 5:1509 for Baltimore, Maryland's confiscation and compensation of guns.

[cxlvi]. Worthington C. Ford, *et al,.* ed., *Journals of the Continental Congress, 1774-1789* (Washington, D.C., 1904-37), 4:220-21.

[cxlvii]. Richard Frothingham, *History of the Siege of Boston, and of the Battles of Lexington, Concord, and Bunker Hill,* 6th ed. (Boston: 1903), 94-95.

[cxlviii]. Hening, 1:401-2.

[cxlix]. *Archives of Maryland,* 3:103.

Electronic copy available at: https://ssrn.com/abstract=2759961

[cl]. Brigham, 176.

[cli]. September 6, 1638, Shurtleff, 1:236.

[clii]. Eugene Aubrey Stratton, *Plymouth Colony: Its History & People, 1620-1691* (Salt Lake City: Ancestry Publishing, 1986), 188.

[cliii]. *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay…* (Boston: Albert J. Wright, 1878), 3:305-6.

[cliv]. Candler, *The State Records of the Colony of Georgia,* 18:294-5.

[clv]. Hening, 1:199.

[clvi]. *Id.,* 2:96-97. *Id.,* 3:328, contains a minor revision of this law in 1705.

[clvii]. *Id.,* 3:180.

[clviii]. *Laws and Acts of the General Assembly Of His Majesties Province of Nova Caesarea or New-Jersey…* (William Bradford, 1722), 143-45.

[clix]. *Laws of North Carolina—1738,* ch. 10, in John D. Cushing, ed., *The Earliest Printed Laws of North Carolina, 1669-1751* (Wilmington, Del.: Michael Glazier, Inc., 1977), 2:128.

[clx]. Hening, 8:592-3.

[clxi]. *Archives of Maryland,* 3:255.

[clxii]. *Id.,* 1:295-96. Also reiterated in 1654 at 1:351.

[clxiii]. *Id.,* 1:343-44.

[clxiv]. *Id.,* 7:51-52.

[clxv]. Andrew Burnaby, "In the Woods" in Albert Bushnell Hart and Mabel Hill, *Camps and Firesides of the Revolution* (New York: Macmillan Co., 1937), 51. See also J. Franklin Jameson, ed., *Johnson's Wonder-Working Providence: 1628-1651* (New York: Barnes & Noble, Inc., 1959), 85, for what *may* be a description of Indian fire-hunting of deer in seventeenth century New England.

[clxvi]. Hening, 5:62 is a 1738 statute prohibiting fire-hunting by both colonists and Indians. "And if any Indian be found fire-hunting… it shall and may be lawful, for the owner of such land… to take away the gun of such Indian, and the same to keep to his own use." *Id.,* 5:431 again punishes fire-hunting.

*Archives of Maryland,* 28:348-9 is a 1745 statute that prohibits fire-hunting, although it is not explicit that the "hunters" were using guns. *Id.,* 44:21, 36, 39, 173, 180-1, trace the legislative history from the request earlier that year from the backwoods farmers to prohibit fire-hunting and hunting by non-residents to final passage. For reasons not explained, a similar law is debated in 1753 at 50:211 and 251, where it was "referred to the Consideration of next Assembly."

Connecticut's 1733 statute regulating "Firing the Woods" at *Public Records of Connecticut,* 7:456-7, is not explicitly about hunting, nor does it ever mention firearms, but may have been motivated by the same concerns.

[clxvii]. Hening, 3:69.

Electronic copy available at: https://ssrn.com/abstract=2759961

EXHIBIT 37

# ARCHIVES OF MARYLAND

## PROCEEDINGS

OF THE

## COUNCIL OF MARYLAND

1636–1667

PUBLISHED BY AUTHORITY OF THE STATE, UNDER THE DIRECTION
OF THE MARYLAND HISTORICAL SOCIETY

WILLIAM HAND BROWNE
*Editor*



BALTIMORE
MARYLAND HISTORICAL SOCIETY
1885

in executing the charge and Command aforesaid upon pain of Liber F.
Contempt as may be Justly Inflicted by the Law Martiall, Given
under our Great Seal at S^t Maries this 23^th June 1642

This our Comission to endure untill further Order to the
Contrary. Given 23 June 1642.

Cecilius &c To our Trusty Councellor William Blount Esq p. 154
Greeting Whereas the Military band of our County of S^t Maries
is at this time destitute of a Captain to take care & Charge of
the Safety and defence thereof Especially in this present danger
and fear of the Incursions of Some Indians our enemies, We
relyeing much upon the Skill and Courage Doe hereby Con-
stitute and authorise you to be the Captain of the Souldiery
our Said County of S^t Maries to leavie Muster and train all or
any English able to bear arms within O^r S^d County according
to your disretion and to punish all Contemners and other
offenders against the Law of discipline of war, according to the
Said Law and discipline as near as you may, and to use all
force and means you may for the resistance of the Enemy and
Safety and defence of the Colony, and to doe all and every
other thing which unto the Charge and Office of a Captain of
an Army belongeth or have accustomed to belong, And We
doe hereby require all the Inhabitants of the Said County and
all other persons within the Same for the time being to be
obedient unto you in all things that Shall concern the Execution
of the power & Command hereby Comitted unto you upon
Such pain of Contempt as may be Justly Inflicted by the Law
Martiall, This our Comission to endure untill the return of our
Dear brother Leonard Calvert into this Province, or untill
furth^r Order to the Contrary Given 23 June 1642.

Orders proclaimed 23 June 1642 upon pain of death or other
penalties, as by Severity of Martiall Law may be inflicted:

That noe Inhabitant or housekeeper entertain any Indian
upon any colour of Licence, nor doe permitt to any Indian any
Gunn powder and Shott.

That all housekeepers provide fixed gunn and Sufficient
powder and Shott for each person able to bear arms.

Noe man to discharge 3 Gunns within the Space of ¼ hour p. 155
nor concurr to the dischargeing Soe many, except to give or
Answer alarm.

Upon the hearing of an Alarum every housekeeper to answer
and continue it Soe far as he may.

Noe man able to bear arms to goe to church or Chappell or
any considerable distance from home without fixed gunn and
1 Charge at least of powder and Shott.

# EXHIBIT 38

·G·M·S·

THE

# Statutes at Large;

BEING

# A COLLECTION

OF ALL THE

# LAWS OF VIRGINIA,

FROM THE

## FIRST SESSION of the LEGISLATURE,

IN THE YEAR 1619.

PUBLISHED PURSUANT TO AN ACT OF THE GENERAL ASSEMBLY OF
VIRGINIA, PASSED ON THE FIFTH DAY OF FEBRUARY,
ONE THOUSAND EIGHT HUNDRED AND EIGHT.

## VOLUME I.

### By WILLIAM WALLER HENING.

"The *Laws* of a country are necessarily connected with every thing be-
longing to the people of it : so that a thorough knowledge of *them*, and
of their progress would inform us of every thing that was most use-
ful to be known about them ; and one of the greatest imperfections
of historians in general, is owing to their ignorance of law."
PRIESTLEY'S LECT. ON HIST. pa. 149.

## RICHMOND :

PRINTED BY AND FOR SAMUEL PLEASANTS, JUNIOR, PRIN'
TO THE COMMONWEALTH.
1809.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

## ACT LI.

To go armed to church.

ALL men that are fittinge to beare armes, shall bringe their peices to the church uppon payne of every effence, yf the mayster allow not thereof to pay 2 lb. of tobacco, to be disposed by the church-wardens, who shall levy it by distresse, and the servants to be punished.

## ACT LII.

Obedience to superiors.

NOE person within this colony uppon rumour of supposed change and alteration shall presume to be disobedient to the present government, nor servants to their private officers, maysters and overseers, at their uttermost perills.

## ACT LIII.*

Adjoining plantations to assist, uppon alarms.

THE ioyninge plantations, to assisst the fronteires or their neighbours, uppon alarmns, the default to be severelie censured, and false alarmns punished.

## ACT LIV.

No hides to be exported.

IT is ordered, That no cowe hides, oxe hides, bull hides, goate skynes, deer skynes, or other hides, or skynes whatsoever, be sent or carryed out of this colony uppon forfeiture of thrice the value, whereof the one halfe to the informer, and the other halfe to publique uses.

## ACT LV.

Terms of the quarterly courts at James City.

IT is established and appoynted, That the fowre quarter corts shall be held at James-Citty yearlie, as followeth, vizt. uppon the first day of September, the first day of December, the first of March, and the first day of June.

## ACT LVI.

Commanders to exercise their men at stated

IT is ordered and appoynted, That the comanders of all the severall plantations, doe upon holy days exercise the men under his comand, and that the coman-

* There is no act numbered LIII in the manuscript.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated on 2023-11-15 18:06 GMT / https://hdl.handle.net/2027/mdp.35112104867868
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

ed as authentick, And that no person or persons what-
soever who hath layd out or surveyed his or their land
or lands shall be hereafter compelled to resurvey his
or their land or lands by any surveyor or surveyors
whatsoever.

## ACT XXXIX.

FOR the dispatch and reputation of publique buis-
nesses, Be it enacted and confirmed that none of
the Burgesses of this nor any following Assembly shall
be arrested from the time of his election vntil ten days
after disolution of the Assembly wherein he serves as
a Burgesse.

*Burgesses privileged from arrests.*

## ACT XL.

BE it enacted and confirmed by the authoritie of
this Grand Assembly that the 22d day of March
be yearly kept holy in commemoration of our deliver-
ance from the Indians at the bloody massacre the 22d
March 1621, And that the ministers of every parish
give notice thereof to his parishoners the Sabbath day
next before.

*The 22d of Marc' to be kept as a ho-ly day.*

## ACT XLI.

IT is enacted and confirmed that masters of every fa-
mily shall bring with them to church on Sondays
one fixed and serviceable gun with sufficient powder
and shott vpon penalty of ten pound of tobacco for eve-
ry master of a family so offending to be disposed of by
the churchwardens who shall leavy it by distresse, and
servants being commanded and yet omitting shall re-
ceive twenty lashes on his or their bare shoulders, by
order from the county courts where he or they shall
live.

*Guns to be carried to church.*

*Penalty.*

## ACT XLII.

IT is enacted and confirmed by the authoritie afore-
said that all such persons as were here or came in
att the last comeing of Sr. Tho. Gates should be ex-
empted from their personall service to the wars and all

*Old settlers exempted from public charges.*

the same, and for whatsoever he the sa'd sherriff shall
soe receive to become responsible to the next Abs; m-
Penalty for bly, And if any such master shall refuse vpum dt-mand
refusing pay- of the sherriffe to make payment thereof accordmglv,
ment. Then the said sherriffe to make his c mplaint to the
next comissioner of the quorum in that coul ty, Avho
by vertue of this act is, without futtht-r processt- mi-
powered to graunt execution against the person oi is-
t a t e tate of the said master refusing to pay his dutits an a-
Orthe sheriff foresaid, And if anie sherriffe shall neglect ihr ptrform-
for neglect p negteof, hince of his duty in demanding and recovering th
port-charges and castle-duties. Then the estate of the
sherriffe to be liable to make satisfaction for his neg-
lect to the next Assembly.

## ACT VIII.

### An Act where the Port-Charges and Castle-Duties are to be paid.

Preamble

WHEREAS the charge in hyreing boates and hands
to collect the port charges and castle-duties, and
the vnconsiderablenesse of the value of the comodities
they are paid in, being commonly the refuse of their
whole cargo, hath added little to the supply of the Go-
vernour to which by severall Assemblies they have
Collectors of been appropriated, Bee it therefore enacted andconfirm-
port charges ed, That there be in every river certaine places and per-
and castle sons appoipnted and authorized by the Governmour to re-
duties to be
appointed by ceive the same, within whose respective limmitts and
the gov'r. precincts what master or commander of shipp or vessel
soever shall intend to lade, he the said master or com-
mander shall before he beginns repaire to the said place
and person so appointed and authorized, And there
shall enter his shipp, And either in kind or in other
good valuable commodities att the rate he sells shall
make just payment of the said port-charges and castle-
duties, And vpon payment thereof shall take from the
Penalty on said officer a discharge and license to load, And if the
master of said master shall fraudulently conceale the burthen of
vessel for the shipp, And thereby defraud the Governmour of his
concealing
the burthen due, Them to forfeit his recognizance.
of his ship.

EXHIBIT 39

Connecticut.

F
97
.C7
v. 1
1636/1665

THE

# PUBLIC RECORDS

OF THE

# COLONY OF CONNECTICUT,

PRIOR TO THE UNION WITH NEW HAVEN COLONY,

MAY, 1665;

TRANSCRIBED AND PUBLISHED, (IN ACCORDANCE WITH A RESOLUTION
OF THE GENERAL ASSEMBLY,) UNDER THE SUPERVISION
OF THE SECRETARY OF STATE,

WITH OCCASIONAL NOTES, AND AN APPENDIX;



By J. HAMMOND TRUMBULL,

COR. SEC. CONN. HIST. SOCIETY; COR. MEMB. N. YORK HIST. SOCIETY, ETC.

HARTFORD:
BROWN & PARSONS.
1850.

DOES NOT CIRCULATE

OF CONNECTICUT.

It is Ordered that there shall be a rate of forty pownd leuied, to be paid to Mr. Fenwicke, to be laid out for the repaireing the Fort.

For the avoyding of many differences and quarrells that may arise by takeing vppe debts of Indeans, It is Ordered, that whosoeuer, after the publisheing this Order, shall sell for day, or trust any Indean or Indeans w<sup>th</sup> goods or comodityes, shall forfeit to the Country the double some or value of what they do betrust them w<sup>th</sup>all; and that no man shall trade w<sup>th</sup> them at or about their wygwams, but in their vessells or Pynnaces or att their owne howses, vnder the penalty of 20s. ech tyme.

To p<sup>r</sup>uent or w<sup>th</sup>stand such sudden assaults as may be made by Indeans vppon the Sabboth or lecture dayes, It is Ordered, that one p<sup>r</sup>son in euery seuerall howse wherein is any souldear or souldears, shall bring a muskett, pystoll or some peece, w<sup>th</sup> powder and shott to ech meeting, excepte some on Magistrate dispense w<sup>th</sup> any on, and appoynt some other to supply his roome.

Jacob Waterhowse doth acknowledge himselfe bownd in a recognizance of Fifty pownd, to attend the next Court to answer for his mysdemeanor towards the Indeans.

The Court is adioyrned vntill Thursday next.

---

[113]    A P<sup>r</sup>ticuler Court, held the ix<sup>th</sup> of No: 1643.

John Heynes Esq<sup>r</sup>, Gou<sup>r</sup>.

Ed: Hopkins Esq<sup>r</sup>, Dep.

Roger Ludlowe Esq<sup>r</sup>, George Willis, Mr. Webster, Mr. Welles, Mr. Whiteing, Capten Mason, Mr. Woolcott, Mr. Swayne.

*The Jury.* Mr. Tailcott, Tho: Osmore, Ed: Stebbing, John Barnard, Arther Williams, Mathewe Sension, Tho: Dewey, Tho: Orton, Tho: Vffoote, Samuel Hales, Richard Parke, John Demon.

In the action of Nathaniell Dickinson pl<sup>t</sup>, ag<sup>t</sup> John Robins defen<sup>t</sup>, the Jury find for the def<sup>t</sup>. Costs of Court vij*s*,

In the ac. of Nathaniell Eldredge pl<sup>t</sup>, ag<sup>t</sup> Tho: Marshfield, the Jury find for the pl<sup>t</sup>, the debt and costs of Court, x*l*.


EXHIBIT 40

Rhode Island (Colony)

# RECORDS

OF THE

# COLONY OF RHODE ISLAND

AND

## PROVIDENCE PLANTATIONS,

IN

## NEW ENGLAND.



PRINTED BY ORDER OF THE LEGISLATURE.

TRANSCRIBED AND EDITED BY

JOHN RUSSELL BARTLETT,

SECRETARY OF STATE.

VOL. I.

## 1636 TO 1663.

--------------

PROVIDENCE, R. I.

A. CRAWFORD GREENE AND BROTHER, STATE PRINTERS.

1856.

1639.      It is ordered, that Mr. Robert Jefferies shall traine the
Band for the present.

It is ordered, that noe man shall go two miles from the
Towne unarmed, eyther with Gunn or Sword ; and that
none shall come to any public Meeting without his weap-
on. Upon the default of eyther he shall forfeitt five
shillings.

It is further ordered, that those Commissioners for-
merly appointed to negotiate the Business with our
Brethren of Pocassett, shall give them our propositions
under their hands, and shall require their propositions
under their hands, with their answers, and shall give reply
unto it ; and so shall returne to the Body a Brieve of
what they therein have done.

By order, Mr. Easson and Mr. John Clarke are desired
to informe Mr. Vane by writing, of the state of things
here, and desire him to treate about the obtaining a Pat-
tent of the Island from his Majestie ; and likewise to
write to Mr. Thomas Burrwood, Brother to Mr. Easson,
concerning the same thing.

The Court is adjourned to this day three weeks.

———

At the particular Courte holden the 3d of y$^e$ 10th,
1639.

John Bartlett and John Hadson, being convicted and as
well by witnesses as their own confession, found guiltie of
the Breach of the Peace, by their excess in drinking, are
adjudged to pay five shillings a piece unto the hands of
the Constable according to the Law in that case pro-
vided.

EXHIBIT 41

Princeton University Press

Chapter Title: [Entries 800–899]

Book Title: Jefferson's Legal Commonplace Book
Book Author(s): Thomas Jefferson
Book Editor(s): DAVID THOMAS KONIG, MICHAEL P. ZUCKERT, LES HARRIS, W. BLAND
WHITLEY
Published by: Princeton University Press. (2019)
Stable URL: https://www.jstor.org/stable/j.ctvc77mr8.18

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide
range of content in a trusted digital archive. We use information technology and tools to increase productivity and
facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at
https://about.jstor.org/terms



Princeton University Press is collaborating with JSTOR to digitize, preserve and extend
access to Jefferson's Legal Commonplace Book

This content downloaded from 198.91.37.2 on Thu, 18 Jan 2024 22:24:41 +00:00
All use subject to https://about.jstor.org/terms

come rispetteranno le minori, e la puramente arbitrarie?[1] queste peggiorano la condizione degli assaliti, migliorando quella degli assalitori, non iscemano gli omicidi, ma gli accrescano, perchè è maggiore la confidenza nell'assalire i disarmati, che gli armati. queste si chiaman leggi, non prevenitrici, ma paurose dei delitti, che nascono dalla tumultuosa impressione di alcuni fatti particolari, non dalla ragionata meditazione degl'inconvenienti, ed avantaggi di un decreto universale.[2] ib. §.40.

<div align="center">EDITORS' TRANSLATION</div>

It is a false notion of expedience that causes one to renounce a thousand real advantages in view of an inconvenience that is either imaginary or of small consequence. It is the kind that would take fire away from men because it is used for arsons, and water because we drown in it. It does not amend evils but by way of destruction. The laws that forbid carrying arms are laws of this kind. They disarm only those who are not inclined or determined to commit a crime. On the contrary, those who have the courage of breaking the most sacred laws of humanity and the most important ones in the Code, how would they respect the lesser and purely arbitrary ones? These laws worsen the condition of the assailed, bettering that of the assailants. They do not diminish the number of homicides, but they increase it, because greater is the confidence in assailing unarmed people than those who bear arms. These laws are not preventative, but fearful of the crimes. They are born from the turbulent impression of some particular fact, not from the reasoned reflection on the disadvantages and advantages of a universal decree. ib. §.40

829. e meglio prevenire i delitti, che punirli. questo è il fine principale d'ogni buona legislazione, che è l'arte di condurre gli uomini al massimo di felicità, o al minimo d'infelicita possibile.[3] il proibire una moltitudine di azioni indifferenti non è prevenire i delitti, che non possono nascere, ma egli è un crearne dei nuovi, *Prevenire i delitti.*

---

[1] A brief paean to personal freedom ("so dear to mankind and to the wise legislator") omitted here.

[2] From Beccaria, chap. 40, "False Ideas of Utility." The remaining few sentences, which discuss the state of nature and the futility of the use of fear as a political instrument, omitted.

[3] A passage here omitted, on the limits of the law in eradicating social disorder.

<div align="center">[ 521 ]</div>

This content downloaded from 198.91.37.2 on Thu, 18 Jan 2024 22:24:41 +00:00
All use subject to https://about.jstor.org/terms