**Nos. 23-2166, 23-2167, 23-2185**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

WE THE PATRIOTS USA, INC., ZACHARY FORT, RANDY DONK, et al.,

Plaintiffs-Appellants,

v.

MICHELLE LUJAN GRISHAM, in her official capacity, et al.,

Defendants-Appellees.

On Appeal from the United States District Court, District of New Mexico
The Honorable David Herrera Urias, District Judge
District Court Case Nos. 1:23-cv-773, 1:23-cv-778, 1:23-cv-772

## PLAINTIFFS-APPELLANTS' CORRECTED
## CONSOLIDATED APPENDIX

## VOLUME 1 of 3

Cameron Lee Atkinson
ATKINSON LAW, LLC
122 Litchfield Road
P.O. Box 340 St. 2
Harwinton, CT 06791
203-677-0782
catkinson@atkinsonlawfirm.com

*Attorney for Plaintiffs We the Patriots USA, Inc. et al.*

Jordon P. George
ARAGON MOSS GEORGE JENKINS, LLP
2201 Menaul Blvd NE
Albuquerque, NM 87107
505-872-3022
jordon@amglaw.com

David H. Thompson
Peter A. Patterson
Kate Hardiman
COOPER & KIRK, PLLC
1523 New Hampshire Ave NW
Washington, D.C. 20036
202-220-9600
dthompson@cooperkirk.com

*Attorneys for Plaintiffs Fort et al.*

Robert J. Olson
WILLIAM J. OLSON, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
(703) 356-5070
wjo@mindspring.com

Stephen Stamboulieh
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

*Attorneys for Plaintiffs Donk et al.*

# TABLE OF CONTENTS[1]

## Volume 1 of 3

District Court Docket Sheet, Case No. 1:23-cv-773-DHU,
*We the Patriots USA, Inc. v. Grisham* (D.N.M.).....................................App. 1

Document 1, Complaint (Sept. 9, 2023) ........................................................App. 16

Document 1, Ex. A, Executive Order 2023-130 (Sept. 9, 2023)....................App. 29

Document 1, Ex B, Public Health Order (Sept. 9, 2023)...............................App. 33

Document 3-1, Memorandum of Law in Support of Plaintiffs' Emergency
Motion for a TRO and Preliminary Injunction (Sept. 9, 2023)............App. 37

Document 3-1 Ex. A, Declaration of Dennis Smith (Sept. 9, 2023) .............App. 61

Document 11, Temporary Restraining Order (Sept. 13, 2023)......................App. 64

Document 13-1, Memorandum of Law in Support of Plaintiffs' Second
Emergency Motion for a TRO and Preliminary Injunction
(Sept. 21, 2023) ...................................................................................App. 76

Document 13-2, Amended Public Health Order (Sept. 21, 2023)................App. 100

Document 13-3, Declaration of Dennis Smith (Sept. 21, 2023)...................App. 105

Document 15, Order Denying Second Emergency Motion for a Temporary
Restraining Order or a Preliminary Injunction (Sept. 29, 2023)........App. 108

Document 16, Defendants' Combined Response in Opposition to Plaintiffs'
Motion for a TRO and Preliminary Injunction (Oct. 2, 2023) ...........App. 115

Document 24, Supplemental Declaration of Dennis Smith re Second
Motion for a Preliminary Injunction (Oct. 6, 2023) ..........................App. 135

Document 25-1, Supplemental Memorandum of Law in Support of
Preliminary Injunction (Oct. 9, 2023) ...............................................App. 138

Document 25-4, Amended Public Health Order (Oct. 9, 2023) ..................App. 162

Document 25-5, Executive Order 2023-135 (Oct. 9, 2023) .........................App. 167

Document 26, Order Consolidating Cases (Oct. 10, 2023) ..........................App. 171

---

[1] To mitigate confusion given the three separate district court dockets, and at the request of the clerk's office, Plaintiffs hereby submit an appendix in three volumes, each of which corresponds to one of the individual lower court cases. To the extent there are repeat documents on each of the three dockets, only one copy from the lead case, *We the Patriots USA, Inc. v. Grisham*, is included in Volume 1.

Document 27, Order on Plaintiffs' Motions for Preliminary Injunction
(Oct. 11, 2023) ........................................................................App. 177

Document 31, *We the Patriots* Notice of Appeal (Oct. 19, 2023) ...............App. 200

Document 33, *Fort* Notice of Appeal (Oct. 20, 2023)..................................App. 202

Document 49, *Donk* Notice of Appeal (Nov. 11, 2023)................................App. 204

APPEAL,LEADCS,STAYED

# U.S. District Court
# United States District Court - District of New Mexico (Albuquerque)
# CIVIL DOCKET FOR CASE #: 1:23-cv-00773-DHU-LF

| | |
|---|---|
| We The Patriots USA, INC. et al v. Grisham et al | Date Filed: 09/09/2023 |
| Assigned to: District Judge David H. Urias | Jury Demand: None |
| Referred to: Magistrate Judge Laura Fashing | Nature of Suit: 440 Civil Rights: Other |
| Case in other court: USCA for the Tenth Circuit, 23-02166 | Jurisdiction: Federal Question |
| USCA for the 10th Circuit, 23-02167 | |
| Tenth Circuit, 23-02185 | |
| Cause: 28:1343 Violation of Civil Rights | |

**Plaintiff**

**We The Patriots USA, INC.**                        represented by    **Cameron Lee Atkinson**
Atkinson Law, LLC
122 Litchfield Road
P.O. Box 340
Ste. 2
Harwinton, CT 06791
203-677-0782
Email: catkinson@atkinsonlawfirm.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeremy M. Gay**
Advocate Law Center, P.A.
New Mexico
821 S. Ford Drive
Gallup, NM 87301
505-722-2055
Fax: 505-722-0531
Email: jeremy@alcpafirm.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dennis Smith**                        represented by    **Cameron Lee Atkinson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeremy M. Gay**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**National Association for Gun Rights**                        represented by    **Barry K Arrington**
Arrington Law Firm

App. 1

4195 Wadsworth Blvd
Wheat Ridge, CO 80033
303-205-7870
Email: barry@arringtonpc.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jason Bowles**
Bowles Law Firm
4811 Hardware Drive, N.E.
Bldg D, Suite 5
Albuquerque, NM 87109
505-217-2680
Fax: 505-217-2681
Email: jason@Bowles-Lawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Foster Allen Haines**                     represented by  **Barry K Arrington**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jason Bowles**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Randy Donk**                     represented by  **Anthony Roman Napolitano**
Bergin, Frakes, Smalley & Oberholtzer
PLLC
4343 East Camelback Road
Ste 210
Phoenix, AZ 85018
602-848-5449
Email: anapolitano@bfsolaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark J Caruso**
Caruso Law Offices, PC
4302 Carlisle Blvd, NE
Albuquerque, NM 87107
(505) 883-5000
Fax: 505-883-5012
Email: mark@carusolaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Stamboulieh**

**App. 2**

Stambouliéh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
601-852-3440
Email: stephen@sdslaw.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gun Owners of America, Inc.**                represented by   **Anthony Roman Napolitano**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Mark J Caruso**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Stephen Stambouliéh**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gun Owners Foundation**                      represented by   **Anthony Roman Napolitano**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Mark J Caruso**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Stephen Stambouliéh**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shawn Blas**                                 represented by   **Marc M Lowry**
                                                                Rothstein Donatelli LLP
                                                                500 4th Street N.W. Suite 400
                                                                Albuquerque, NM 87102
                                                                (505) 243-1443
                                                                Fax: (505) 242-7845
                                                                Email: mlowry@rothsteinlaw.com
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Zachary Fort**                                    represented by **Jordon George**
                                                                   Aragon Moss George Jenkins, LLP
                                                                   New Mexico
                                                                   2201 Menaul Blvd NE
                                                                   87107
                                                                   Albuquerque, NM 87199
                                                                   505-503-7782
                                                                   Fax: 505-214-5317
                                                                   Email: jordon@amgjlaw.com
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Robert Julian Aragon**
                                                                   Aragon Law Firm PC
                                                                   2201 Menaul Blvd, NE
                                                                   Albuquerque, NM 87107
                                                                   505-872-3022
                                                                   Fax: 505-888-6040
                                                                   Email:
                                                                   Robertaragon@aragonlawfirmpc.com
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Robert Henry Moss**
                                                                   Aragon Moss George Jenkins, LLP
                                                                   2201 Menaul Blvd NE
                                                                   Albuqerque, NM 87107
                                                                   505-872-3022
                                                                   Email: moss@amgjlaw.com
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**New Mexico Shooting Sports Association**          represented by **Jordon George**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Robert Julian Aragon**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Robert Henry Moss**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Firearms Policy Coalition, Inc**                 represented by **Jordon George**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

**Robert Julian Aragon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Henry Moss**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Second Amendment Foundation**          represented by   **Jordon George**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Julian Aragon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Henry Moss**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Richard M Anderson**          represented by   **Joseph Lee Woods**
Law Office of Joseph L. Woods LLC
500 Marquette Ave NW
Suite 1200
Albuquerque, NM 87102
505-305-4529
Fax: 505-305-4529
Email: joseph@woodsinjurylaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**Michelle Lujan Grisham**          represented by   **Cody R. Rogers**
*in her official capacity only*
Serpe Andrews, PLLC
2540 El Paseo Rd, Suite D
Las Cruces, NM 88001
575-288-1453
Email: crogers@serpeandrews.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Holly Agajanian**
Office of the Governor
490 Old Santa Fe Trail

App. 5

Ste. 400
Santa Fe, NM 87501
505-476-2210
Email: holly.agajanian@exec.nm.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle P Duffy**
Office of the Governor
490 Old Santa Fe
Ste. 400
Santa Fe, NM 87501
505-476-2210
Email: kyle.duffy@state.nm.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Patrick M. Allen**
*in his official capacity only*

represented by **Cody R. Rogers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Holly Agajanian**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle P Duffy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Jason R. Bowie**
*in his official capacity only*

represented by **Cody R. Rogers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Holly Agajanian**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle P Duffy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Troy W. Weisler**
*in his official capacity only*

represented by **Cody R. Rogers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**App. 6**

**Holly Agajanian**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle P Duffy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Harold Medina**
*in his official capacity only*

**Defendant**

**Office of the Governor of New Mexico**

**Defendant**

**New Mexico Department of Health**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/09/2023 | 1 | COMPLAINT against All Defendants ( Filing Fee - Online Payment), filed by We The Patriots USA, INC.. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet)(Gay, Jeremy) (Entered: 09/09/2023) |
| 09/09/2023 | 2 | NOTICE of Appearance by Jeremy M. Gay on behalf of We The Patriots USA, INC. (Gay, Jeremy) (Entered: 09/09/2023) |
| 09/09/2023 | 3 | Emergency MOTION for a Temporary Restraining Order and Preliminary Injunction (Ex Parte Relief Requested) by Dennis Smith, We The Patriots USA, INC. (Attachments: # 1 Supplement Memorandum of Law in Support of Motion For Temporary Injunction, # 2 Supplement FRCP 65 Certification) (Gay, Jeremy) Modified docket text on 9/11/2023 (ng). (Entered: 09/09/2023) |
| 09/09/2023 | | Filing and Administrative Fees Received: $ 402 receipt number ANMDC-8997796 re 1 Complaint filed by We The Patriots USA, INC. (Payment made via Pay.gov)(Gay, Jeremy) (Entered: 09/09/2023) |
| 09/11/2023 | 4 | ASSOCIATION of Attorney Licensed Outside the District for Plaintiffs Dennis Smith, We The Patriots USA, INC. by Jeremy M. Gay on behalf of:<br>Cameron L. Atkinson<br>ATKINSON LAW, LLC<br>122 Litchfield Rd., Ste. 2 P.O. Box 340<br>Harwinton, CT 06791<br>203.677.0782<br>catkinson@atkinsonlawfirm.com<br><br>(Association Dues - Online Payment)<br>(Gay, Jeremy)<br>[THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (Entered: 09/11/2023) |
| 09/11/2023 | | Association Dues Received: $ 100 receipt number BNMDC-8999186 re: # 4 Association of Attorney Licensed Outside the District, filed by We The Patriots USA, INC., Dennis |

| | | |
|---|---|---|
| | | Smith (Payment made via Pay.gov)(Gay, Jeremy) (Entered: 09/11/2023) |
| 09/11/2023 | 5 | INFORMATION SHEET for T.R.O *re 3 Emergency MOTION for a Temporary Restraining Order and Preliminary Injunction (Ex Parte Relief Requested)* by Dennis Smith, We The Patriots USA, INC. (Gay, Jeremy) Modified docket text on 9/11/2023 (ng). (Entered: 09/11/2023) |
| 09/11/2023 | | United States District Judge David H. Urias and United States Magistrate Judge Laura Fashing assigned. (dr) (Entered: 09/11/2023) |
| 09/12/2023 | 6 | NOTICE of Appearance by Cameron Lee Atkinson on behalf of Dennis Smith, We The Patriots USA, INC. (Atkinson, Cameron) (Entered: 09/12/2023) |
| 09/12/2023 | 7 | Corporate Disclosure Statement by We The Patriots USA, INC. (Atkinson, Cameron) (Entered: 09/12/2023) |
| 09/12/2023 | 8 | NOTICE by Dennis Smith, We The Patriots USA, INC. re 3 First MOTION for Preliminary Injunction , 5 Appendix/Supplement *Confirming That All Defendants Have Received Actual Notice Of The Request For Emergency Relief* (Atkinson, Cameron) (Entered: 09/12/2023) |
| 09/12/2023 | 9 | NOTICE of Hearing on Motion 3 Temporary Restraining Order : <br><br> Motion Hearing set for 9/13/2023 at 01:00 PM in Albuquerque - 420 Mimbres Courtroom before District Judge David H. Urias. <br> (jmg) <br> [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (Entered: 09/12/2023) |
| 09/13/2023 | 10 | NOTICE OF PUBLIC ACCESS TO HEARING scheduled for 9/13/2023 at 1:00 PM: <br><br> AUDIO connection to this hearing can be accessed by following the link below and using the login information provided: <br><br> Click here to access public hearing. <br><br> USERNAME: audio <br><br> PASSWORD: 7AE9EC <br> (jmg) <br> [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (Entered: 09/13/2023) |
| 09/13/2023 | 11 | TEMPORARY RESTRAINING ORDER by District Judge David H. Urias GRANTING 3 Motion for Temporary Restraining Order (jdf). Modified on 9/14/2023 (bc). (Entered: 09/13/2023) |
| 09/13/2023 | | Set Hearings: Motion Hearing set for 10/3/2023 at 10:00 AM in Albuquerque - 420 Mimbres Courtroom before District Judge David H. Urias. (fs) (Entered: 09/14/2023) |
| 09/13/2023 | 12 | Clerk's Minutes for proceedings held before District Judge David H. Urias: Motion Hearing held on 9/13/2023 re 3 First MOTION for Temporary Restraining Orders and Preliminary Injunction filed by We The Patriots USA, INC., Dennis Smith. (Court Reporter C. McAlister) (bap) (Entered: 09/14/2023) |
| 09/21/2023 | 13 | Second MOTION for Temporary Restraining Order , Second MOTION for Preliminary Injunction by Dennis Smith, We The Patriots USA, INC.. (Attachments: # 1 Supplement Memorandum of Law In Support, # 2 Exhibit A - Amended Public Health Order Issued 9-15-2023, # 3 Exhibit B - Declaration of Dennis Smith, # 4 Supplement FRCP 65 |

| | | |
|---|---|---|
| | | Certification of Counsel, # 2 Supplement TRO Info Sheet) (Atkinson, Cameron) (Entered: 09/21/2023) |
| 09/22/2023 | 14 | TRANSCRIPT of Proceedings held on September 13, 2023, before District Judge David H. Urias. Court Reporter/Transcriber Carmela McAlister, Telephone number 505-348-2094. Transcript may be viewed at the Clerk's Office public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.<br><br>**PLEASE TAKE NOTICE that each party now has seven (7) calendar days to file a Notice of Intent to Request Redaction of any personal identifiers from this transcript. If no notice is filed during this seven-day period, the court will assume that redaction of personal data is not necessary and will make the transcript electronically available, as is, to the public after 90 days. For additional guidance, PLEASE REVIEW the complete policy, located in the CM/ECF Administrative Procedures Manual at https://www.nmd.uscourts.gov.**<br><br>Notice of Intent to Request Redaction set for 9/29/2023. Redaction Request due 10/13/2023. Redacted Transcript Deadline set for 10/23/2023. Release of Transcript Restriction set for 12/21/2023.(cm) (Entered: 09/22/2023) |
| 09/29/2023 | 15 | ORDER by District Judge David H. Urias denying 13 Motion for TRO; denying 13 Motion for Preliminary Injunction (jmg) (Entered: 09/29/2023) |
| 10/02/2023 | 16 | RESPONSE in Opposition re 13 Second MOTION for Temporary Restraining Order Second MOTION for Preliminary Injunction filed by Patrick M. Allen, Jason R. Bowie, Michelle Lujan Grisham, Troy W. Weisler. (Attachments: # 1 Exhibit A) (Agajanian, Holly) (Entered: 10/02/2023) |
| 10/03/2023 | 17 | NOTICE OF PUBLIC ACCESS TO HEARING scheduled for 10/3/2023 at 10:00 AM:<br><br>AUDIO connection to this hearing can be accessed by following the link below and using the login information provided:<br><br>Click here to access public hearing.<br><br>USERNAME: audio<br><br>PASSWORD: 07FE9C<br>(jmg)<br>[THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (Entered: 10/03/2023) |
| 10/03/2023 | 18 | **FILED IN ERROR** NOTICE of Appearance by Holly Agajanian on behalf of Patrick M. Allen, Jason R. Bowie, Michelle Lujan Grisham, Troy W. Weisler (Agajanian, Holly) Modified on 10/3/2023 - attorney refiled with correct attachment (bp). (Entered: 10/03/2023) |
| 10/03/2023 | 19 | NOTICE of Appearance by Holly Agajanian on behalf of Patrick M. Allen, Jason R. Bowie, Michelle Lujan Grisham, Troy W. Weisler (Agajanian, Holly) (Entered: 10/03/2023) |
| 10/03/2023 | 20 | Clerk's Minutes for proceedings held before District Judge David H. Urias: Preliminary Injunction Hearing held on 10/3/2023. (Court Reporter C. McAlister) (fs) (Entered: 10/03/2023) |

| 10/04/2023 | 21 | ORDER by District Judge David H. Urias:<br><br>DENYING Plaintiffs Motion for Preliminary Injunction as to Defendants Public Health Order dated September 8, 2023 (Original PHO) on mootness grounds;<br><br>Extending Temporary Restraining Order as to firearms restrictions in public parks until October 11, 2023;<br><br>The Court takes Plaintiffs request for a preliminary injunction [Doc. 13] as to the Amended Public Health Order issued September 15, 2023, under advisement. (crg)<br><br>THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED. (Entered: 10/04/2023) |
|---|---|---|
| 10/05/2023 | 22 | NOTICE OF HEARING WITH VIDEO STREAMING: Status Conference set for 10/18/2023 at 11:00 AM in Remote via Zoom before Magistrate Judge Laura Fashing. (cda)<br><br>NOTE:<br><br>1. This proceeding will be held via Zoom Video/Web Conferencing with all participants appearing remotely; The Zoom ID and Passcode will be docketed separately and available to the parties but not the public.<br><br>2. Participants should connect to the proceeding 15 minutes prior its scheduled start time to allow time for trouble-shooting of any connectivity issues.<br><br>3. To ensure the record is of the best quality participants are encouraged to utilize a headset to reduce static and background noise; if not using a headset participants must ensure the audio feed at their location is muted when not speaking.<br><br>*** REMINDER: Recording or broadcasting of this hearing is prohibited. ***<br><br>This hearing will be available for remote viewing by video stream.<br>Please visit the Court's website at www.nmd.uscourts.gov for information and instructions to connect.<br>(Entered: 10/05/2023) |
| 10/06/2023 | 24 | APPENDIX/SUPPLEMENT re 13 Second MOTION for Temporary Restraining Order Second MOTION for Preliminary Injunction *Supplemental Declaration of Dennis Smith* by Dennis Smith, We The Patriots USA, INC. (Atkinson, Cameron) (Entered: 10/06/2023) |
| 10/09/2023 | 25 | Third MOTION for Preliminary Injunction by Dennis Smith, We The Patriots USA, INC.. (Attachments: # 1 Supplement Plaintiffs' Memorandum of Law In Support, # 2 Exhibit A - Declaration of Dennis Smith, # 3 Exhibit B - 9/15/2023 Public Health Order, # 4 Exhibit C - 10/6/2023 Public Health Order, # 5 Exhibit D - Executive Order 2023-135) (Atkinson, Cameron) (Entered: 10/09/2023) |
| 10/10/2023 | 26 | ORDER CONSOLIDATING CASES by District Judge David H. Urias. Cases: 23-CV-771, 23-CV-772, 23-CV-773, 23-CV-774, 23-CV-778, and 23-CV-839. All pleadings shall be filed under the lead case number 23-CV-773. (fs) (Entered: 10/10/2023) |
| 10/11/2023 | 27 | ORDER by District Judge David H. Urias denying 25 Motion for Preliminary Injunction |

| | | |
|---|---|---|
| | | (crg) (Entered: 10/11/2023) |
| 10/12/2023 | 28 | ASSOCIATION of Attorney Licensed Outside the District for Plaintiff Richard M Anderson by Joseph Lee Woods on behalf of:<br>CJ Grisham<br>Law Offices of CJ Grisham<br>3809 S. General Bruce Dr #103-101<br>Temple, TX 76502<br>2543831726<br>cj@cjgrisham.com<br><br>(Association Dues - Online Payment)<br>(Woods, Joseph)<br>[THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (Entered: 10/12/2023) |
| 10/12/2023 | | Association Dues Received: $ 100 receipt number ANMDC-9044900 re: # 28 Association of Attorney Licensed Outside the District, filed by Richard M Anderson (Payment made via Pay.gov)(Woods, Joseph) (Entered: 10/12/2023) |
| 10/17/2023 | 29 | NOTICE of Appearance by Cody R. Rogers on behalf of Patrick M. Allen, Jason R. Bowie, Michelle Lujan Grisham, New Mexico Department of Health, Troy W. Weisler (Rogers, Cody) (Entered: 10/17/2023) |
| 10/18/2023 | 30 | Clerk's Minutes for proceedings held before Magistrate Judge Laura Fashing: Status Conference held on 10/18/2023. (Recording Info: Liberty/MARS) (cda) (Entered: 10/18/2023) |
| 10/19/2023 | 31 | NOTICE OF APPEAL as to 27 Order on Motion for Preliminary Injunction by Dennis Smith, We The Patriots USA, INC.. (Filing Fee - Online Payment) (Atkinson, Cameron) (Entered: 10/19/2023) |
| 10/19/2023 | | Filing Fee Received: $ 505 receipt number ANMDC-9056394 re 31 Notice of Appeal filed by We The Patriots USA, INC., Dennis Smith (Payment made via Pay.gov)(Atkinson, Cameron) (Entered: 10/19/2023) |
| 10/20/2023 | 32 | Transmission of Preliminary Record to US Court of Appeals re 31 Notice of Appeal (Attachments: # 1 Preliminary Record) (bap) (Entered: 10/20/2023) |
| 10/20/2023 | 33 | NOTICE OF APPEAL as to 27 Order on Motion for Preliminary Injunction by Firearms Policy Coalition, Inc, Zachary Fort, New Mexico Shooting Sports Association, Second Amendment Foundation. (Filing Fee - Online Payment) (George, Jordon) (Entered: 10/20/2023) |
| 10/20/2023 | 34 | USCA Information Letter with Case Number 23-2166 for 31 Notice of Appeal filed by We The Patriots USA, INC., Dennis Smith. (fs) (Entered: 10/20/2023) |
| 10/20/2023 | 35 | NOTICE OF HEARING WITH VIDEO STREAMING: Rule 16 Initial Scheduling Conference set for 11/27/2023 at 10:00 AM Remote via Zoom before Magistrate Judge Laura Fashing. Joint Status Report and Provisional Discovery Plan due 11/17/2023. (cda)<br><br>NOTE:<br><br>1. This proceeding will be held via Zoom Video/Web Conferencing with all participants appearing remotely; The Zoom ID and Passcode will be docketed separately and available to the parties but not the public.<br><br>2. Participants should connect to the proceeding 15 minutes prior its scheduled start time to allow time for trouble-shooting of any connectivity issues. |

3. To ensure the record is of the best quality participants are encouraged to utilize a headset to reduce static and background noise; if not using a headset participants must ensure the audio feed at their location is muted when not speaking.

*** REMINDER: Recording or broadcasting of this hearing is prohibited. ***

This hearing will be available for remote viewing by video stream.
Please visit the Court's website at www.nmd.uscourts.gov for information and instructions to connect.
Modified on 10/23/2023 (jg). (Entered: 10/20/2023)

| | | |
|---|---|---|
| 10/20/2023 | 37 | Emergency MOTION for Injunction Pending Appeal re 27 Order on Motion for Preliminary Injunction *Pending Appeal (Relief Requested by 5 PM, October 23, 2023)* by Dennis Smith, We The Patriots USA, INC.. (Attachments: # 1 Supplement Memorandum of Law In Support) (Atkinson, Cameron) Modified title of document on 10/23/2023 (bap). (Entered: 10/20/2023) |
| 10/20/2023 | 38 | USCA Appeal Fees received $ 505 receipt number ANMDC-9057975 re 33 Notice of Appeal filed by New Mexico Shooting Sports Association, Zachary Fort, Second Amendment Foundation, Firearms Policy Coalition, Inc (bap) [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (Entered: 10/23/2023) |
| 10/23/2023 | 39 | Transmission of Preliminary Record to US Court of Appeals re 33 Notice of Appeal (Attachments: # 1 Preliminary Record) (bap) (Entered: 10/23/2023) |
| 10/23/2023 | 40 | USCA Information Letter with Case Number 23-2167 for 33 Notice of Appeal filed by New Mexico Shooting Sports Association, Zachary Fort, Second Amendment Foundation, Firearms Policy Coalition, Inc. (fs) (Entered: 10/23/2023) |
| 10/27/2023 | 41 | Emergency MOTION for Preliminary Injunction *Pending Appeal* by Firearms Policy Coalition, Inc, Zachary Fort, New Mexico Shooting Sports Association, Second Amendment Foundation. (George, Jordon) (Entered: 10/27/2023) |
| 11/01/2023 | 42 | SUMMONS Returned Executed by Randy Donk. Randy Donk served on 10/18/2023, answer due 11/8/2023. (Caruso, Mark) (Entered: 11/01/2023) |
| 11/01/2023 | 43 | SUMMONS Returned Executed by Randy Donk. (Caruso, Mark) (Entered: 11/01/2023) |
| 11/01/2023 | 44 | SUMMONS Returned Executed by Randy Donk. (Caruso, Mark) (Entered: 11/01/2023) |
| 11/01/2023 | 45 | SUMMONS Returned Executed by Randy Donk. (Caruso, Mark) (Entered: 11/01/2023) |
| 11/01/2023 | 46 | SUMMONS Returned Executed by Randy Donk., SUMMONS Returned Executed by Randy Donk. (Caruso, Mark) (Entered: 11/01/2023) |
| 11/03/2023 | 47 | Court Reporter's Transcript Order Form filed on 11/3/2023 re 33 Notice of Appeal Estimated Completion Date: 12/3/2023.(cm) (Entered: 11/03/2023) |
| 11/03/2023 | 48 | TRANSCRIPT ORDER FORM by Firearms Policy Coalition, Inc, Zachary Fort, New Mexico Shooting Sports Association, Second Amendment Foundation requesting the proceedings held on 10/03/23 be transcribed for the 33 Notice of Appeal (George, Jordon) (Entered: 11/03/2023) |
| 11/06/2023 | 49 | NOTICE OF APPEAL as to 27 Order on Motion for Preliminary Injunction by Randy Donk, Gun Owners Foundation, Gun Owners of America, Inc.. (Filing Fee - Online Payment) (Stamboulieh, Stephen) (Entered: 11/06/2023) |

| 11/06/2023 | | Filing Fee Received: $ 505 receipt number ANMDC-9079106 re 49 Notice of Appeal filed by Gun Owners Foundation, Gun Owners of America, Inc., Randy Donk (Payment made via Pay.gov)(Stamboulieh, Stephen) (Entered: 11/06/2023) |
|---|---|---|
| 11/06/2023 | 50 | MOTION for Extension of Time to File Response/Reply as to 37 Emergency MOTION to Stay re 27 Order on Motion for Preliminary Injunction *Pending Appeal (Relief Requested by 5 PM, October 23, 2023)* by Patrick M. Allen, Jason R. Bowie, Michelle Lujan Grisham, Troy W. Weisler. (Rogers, Cody) (Entered: 11/06/2023) |
| 11/06/2023 | 51 | Transmission of Preliminary Record to US Court of Appeals re 49 Notice of Appeal (Attachments: # 1 Preliminary Record) (bap) (Entered: 11/06/2023) |
| 11/06/2023 | 52 | NOTICE by Richard M Anderson *Affidavit of Good Standing Pro-Hac* (Woods, Joseph) (Entered: 11/06/2023) |
| 11/06/2023 | 55 | USCA Information Letter with Case Number 23-2185 for 49 Notice of Appeal filed by Gun Owners Foundation, Gun Owners of America, Inc., and Randy Donk. (fs) (Entered: 11/09/2023) |
| 11/07/2023 | 53 | TRANSCRIPT ORDER FORM by Randy Donk, Gun Owners Foundation, Gun Owners of America, Inc. requesting the proceedings held on 10/3/2023 be transcribed for the 49 Notice of Appeal (Stamboulieh, Stephen) (Entered: 11/07/2023) |
| 11/07/2023 | 54 | ORDER by District Judge David H. Urias GRANTING 50 Motion for Extension of Time to File Response/Reply re 50 MOTION for Extension of Time to File Response/Reply as to 37 Emergency MOTION to Stay re 27 Order on Motion for Preliminary Injunction *Pending Appeal (Relief Requested by 5 PM, October 23, 2023)* Responses due by 11/10/2023 (fs) (Entered: 11/07/2023) |
| 11/07/2023 | | ORDER OF USCA - Minute order filed - Transcript order form due 11/21/2023 for Carmela McAlister (Preliminary injunction hearing from 10/03/2023). (Text Only - No Attachment) (fs) (Entered: 11/09/2023) |
| 11/10/2023 | 56 | NOTICE of Appearance by Kyle P Duffy on behalf of Patrick M. Allen, Jason R. Bowie, Michelle Lujan Grisham, Troy W. Weisler (Duffy, Kyle) (Entered: 11/10/2023) |
| 11/10/2023 | 57 | RESPONSE in Opposition re 37 Emergency MOTION to Stay re 27 Order on Motion for Preliminary Injunction *Pending Appeal (Relief Requested by 5 PM, October 23, 2023)*, 41 Emergency MOTION for Preliminary Injunction *Pending Appeal* filed by Patrick M. Allen, Jason R. Bowie, Michelle Lujan Grisham, Troy W. Weisler. (Duffy, Kyle) (Entered: 11/10/2023) |
| 11/13/2023 | 61 | TRANSCRIPT ORDER FORM by Dennis Smith, We The Patriots USA, INC. requesting the proceedings held on 10/3/2023 be transcribed for the 31 Notice of Appeal (fs) (Entered: 11/15/2023) |
| 11/14/2023 | 58 | Court Reporter's Transcript Order Form filed on 11/14/2023 re 49 Notice of Appeal Estimated Completion Date: 12/3/2023.(cm) (Entered: 11/14/2023) |
| 11/14/2023 | 59 | Court Reporter's Transcript Order Form filed on 11/14/2023 re 31 Notice of Appeal Estimated Completion Date: 12/14/2023.(cm) (Entered: 11/14/2023) |
| 11/14/2023 | 60 | Joint MOTION to Stay *pending appeal* by Randy Donk, Gun Owners Foundation, Gun Owners of America, Inc.. (Stamboulieh, Stephen) (Entered: 11/14/2023) |
| 11/14/2023 | | ORDER OF USCA - Minute order filed - Transcript order form due 11/28/2023 for Carmela McAlister. (Text Only - No Attachment) [23-2166] (Preliminary Injunction hearing of 10/3/23) (fs) (Entered: 11/15/2023) |

| | | |
|---|---|---|
| 11/16/2023 | 62 | TRANSCRIPT of Proceedings held on October 3, 2023, before District Judge David H. Urias. Court Reporter/Transcriber Carmela McAlister, Telephone number 505-348-2094. Transcript may be viewed at the Clerk's Office public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.<br><br>**PLEASE TAKE NOTICE that each party now has seven (7) calendar days to file a Notice of Intent to Request Redaction of any personal identifiers from this transcript. If no notice is filed during this seven-day period, the court will assume that redaction of personal data is not necessary and will make the transcript electronically available, as is, to the public after 90 days. For additional guidance, PLEASE REVIEW the complete policy, located in the CM/ECF Administrative Procedures Manual at https://www.nmd.uscourts.gov.**<br><br>Notice of Intent to Request Redaction set for 11/24/2023. Redaction Request due 12/7/2023. Redacted Transcript Deadline set for 12/18/2023. Release of Transcript Restriction set for 2/14/2024.(cm) (Entered: 11/16/2023) |
| 11/16/2023 | 63 | Joint MOTION to Stay *with other Plaintiffs' positions* by Randy Donk, Gun Owners Foundation, Gun Owners of America, Inc.. (Stamboulieh, Stephen) (Entered: 11/16/2023) |
| 11/17/2023 | 64 | ORDER by District Judge David H. Urias DENYING 37 Motion to Stay; DENYING 41 Motion for Preliminary Injunction (fs) (Entered: 11/17/2023) |
| 11/17/2023 | 65 | ORDER by District Judge David H. Urias GRANTING 63 Motion to Stay (fs) (Entered: 11/17/2023) |
| 11/17/2023 | 66 | ORDER VACATING Initial Scheduling Conference by Magistrate Judge Laura Fashing. Judge Urias granted the parties' Motion to Stay. Doc. 65 . IT IS THEREFORE ORDERD that the Rule 16 Initial Scheduling Conference set for 11/27/2023 at 10:00 AM Remote via Zoom before Magistrate Judge Laura Fashing is VACATED along with all associated deadlines. [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (cda) (Entered: 11/17/2023) |
| 11/27/2023 | 67 | ORDER by District Judge David H. Urias denying 60 Motion to Stay as moot per Doc. 65. [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ARE ATTACHED.] (crg) (Entered: 11/27/2023) |
| 11/27/2023 | 68 | AMENDED ORDER by District Judge David H. Urias DENYING 37 Motion to Stay; DENYING 41 Motion for Preliminary Injunction. Amended to fix document number. (fs) (Entered: 11/27/2023) (fs) (Entered: 11/27/2023) |
| 12/05/2023 | 69 | NOTICE TO USCA that Record is Complete re 33 Notice of Appeal. (arp) (Entered: 12/05/2023) |
| 12/19/2023 | 70 | NOTICE TO USCA that Record is Complete re 31 Notice of Appeal, 49 Notice of Appeal. (fs) (Entered: 12/19/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/30/2024 07:08:37 | | | |
| **PACER Login:** | reception | **Client Code:** | |

| Description: | Docket Report | Search Criteria: | 1:23-cv-00773-DHU-LF |
|---|---|---|---|
| Billable Pages: | 12 | Cost: | 1.20 |

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

WE THE PATRIOTS USA, INC,       :
DENNIS SMITH,                :         Civil Action No. 1:23-cv-00773
                              :
     Plaintiffs,             :
                              :
v.                             :
                              :
MICHELLE LUJAN GRISHAM,  :
in her official capacity only, PATRICK  :
M. ALLEN, in his official capacity only,  :
JASON R. BOWIE, in his official     :
capacity only, TROY WEISLER, in his  :
official capacity only, HAROLD      :
MEDINA, in his official capacity only,  :
                              :
     Defendants.           :         SEPTEMBER 9, 2023

## <u>COMPLAINT</u>

1.     The past three years have effectuated tremendous changes in the American way of life due to the health dangers posed by the COVID-19 pandemic. Courts repeatedly approved state infringements on civil liberties to protect public health. The Supreme Court, however, reminded states that, even during public health crises, "the Constitution cannot be put away and forgotten." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 68 (2020).

2.     The expansion of state police power for public health protection remains a dangerous slippery slope where constitutional rights yield to expansive claims that regulation is necessary to protect the public health. Once a state starts descending the slippery slope of a public health state, the "compelling" exceptions to constitutional rights

– if there are truly any – begin to swallow the guarantees of rights themselves. This action presents a case in point.

3.      Late on the afternoon of Friday, September 8, 2023, New Mexico Governor Michelle Lujan Grisham issued Executive Order 2023-130 and declared gun violence "a statewide public health emergency of unknown duration." **Exhibit A, p. 2.** New Mexico Public Health Secretary Patrick M. Allen then wasted no time issuing a public health order dated September 8, 2023 banning the carrying of firearms in cities or counties that meet certain crime statistics. **Exhibit B, p. 2.**

4.      The practical effect of this order is to ban the public carrying of handguns and other firearms for the lawful purpose of self-defense in New Mexico's largest city – Albuquerque.

5.      The United States Supreme Court reshaped its Second Amendment jurisprudence in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022). It held that the Second Amendment protects a right to carry firearms in public, and it reached two conclusions regarding lawful restrictions on that right:

   a. First, "[s]tates could lawfully eliminate one kind of public carry – concealed carry – so long as they left open the option to carry openly." *Id.* at 2150.

   b. Second, governments may not classify entire cities as "sensitive places" in order to ban any carrying of firearms in public. *Id.* at 2133.

6.      New Mexico's new draconian gun laws completely deprive law-abiding citizens of Albuquerque and other large cities in New Mexico of their Second Amendment right to carry firearms for self-defense.

7.      Thus, the Plaintiffs seek emergency and permanent injunctive relief from the Court enjoining the Defendants from enforcing Allen's September 8, 2023 public health order, a declaratory judgment that it violates the Second Amendment, attorneys' fees, and costs.

**PARTIES**

8.      Plaintiff We The Patriots USA, Inc. is a nonprofit public charity organized and operated exclusively for tax-exempt purposes in accordance with Section 501(c)(3) of the Internal Revenue Code. More specifically, it is dedicated to promoting constitutional rights, public safety, and other freedoms through education, outreach, and public interest litigation, thereby advancing religious freedom, medical freedom, parental rights, educational freedom, and public safety for all. As a Section 501(c)(3) public charity, it has members who participate in its tax-exempt activities as volunteers and committed community stakeholders bringing and supporting litigation in federal and state courts on a variety of constitutional and other freedom-related matters directly affecting their rights and interests. Some of its members are New Mexico residents affected by the matters complained of herein and share common claims to that brought by We The Patriots USA, Inc., in its representative capacity.

9.      Plaintiff Dennis Smith is an Albuquerque, New Mexico resident and a member and support of We The Patriots USA, Inc.

3

**App. 18**

10.     Defendant Michelle Lujan Grisham is the governor of New Mexico. She is sued in her official capacity only.

11.     Defendant Patrick M. Allen is the New Mexico Department of Health's Secretary. He is sued in his official capacity only.

12.     Defendant Jason R. Bowie is the Secretary of the New Mexico Department of Public Safety. He is sued in his official capacity only.

13.     Defendant Troy Weisler is the chief of New Mexico's State Police. He is sued in his official capacity only. As chief of New Mexico's State Police, Weisler is responsible for enforcing the orders issued by Defendants Grisham and Allen, which are complained of herein.

14.     Defendant Harold Medina is the chief of the Albuquerque Police Department. He is sued in his official capacity only. Under state law, Medina must enforce the orders issued by Defendants Grisham and Allen, which are complained of herein.

## JURISDICTION

15.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, 2201, and § 1651 as well as 42 U.S.C. § 1983. Venue is appropriate under 28 U.S.C. § 1391 because all of the parties are domiciled in New Mexico and all of the factual events giving rise to the cause of action occurred in New Mexico.

## FACTUAL ALLEGATIONS

### *The Alleged Impetus For New Mexico's Violation Of The Second Amendment.*

16.     On July 28, 2023, a 14-year-old boy produced a pistol and shot a 13-year-old girl in Questa, New Mexico while they were both hanging out with friends. **Exhibit C**. He allegedly obtained the pistol because the homeowner failed to properly secure it. *Id.*

17.     On August 14, 2023, a criminal attempting a drive-by shooting of another individual shot and killed a 5-year-old girl at a trailer park in Albuquerque. **Exhibit D**.

18.     On September 6, 2023, a criminal murdered an eleven-year-old boy in connection with what appears to be a road rage incident. **Exhibit E.**

19.     Additionally, on May 15, 2023, a mentally disturbed teenager – Beau Wilson – killed three people in Farmington, New Mexico when he randomly walked through a neighborhood shooting at homes and drivers after he allegedly struggled to cope with his parents' divorce and being removed from his school's varsity wresting team. **Exhibit F.**

20.     Governor Grisham's office cited these incidents as her basis for declaring "gun violence" a public health emergency and banning the carrying of firearms in certain localities.[1]

### *Grisham And Allen Ban The Carrying Of Firearms In Certain New Mexico Localities For 30 Days.*

21.     In response to these incidents, Defendant Grisham issued, on September 8, 2023, Executive Order 2023-130, which declared "gun violence" a public health

---

[1] https://www.governor.state.nm.us/2023/09/08/governor-announces-statewide-enforcement-plan-for-gun-violence-fentanyl-reduction-plan-includes-30-day-suspension-of-concealed-open-carry-in-albuquerque-and-bernalillo-county/

**App. 20**

emergency of unknown duration under New Mexico law. **Exhibit A, pp. 2**. She ordered Defendant Allen and other New Mexico state agencies to prepare an effective and coordinated response to the so-called emergency and ordered all local governments to enforce any directives issued under the executive order. *Id.* at p. 3.

22.     Defendant Allen then issued a public health emergency order banning the public carry of firearms in public parks across New Mexico and in cities and counties that average 1,000 or more violent crimes per 100,000 residents per year since 2021 according to the FBI's Uniform Crime Reporting Program and more than 90 firearm-related emergency department visits per 100,000 residents from July 2022 to June 2023 according to the New Mexico Department of Public Health. **Exhibit B, p. 1.**

23.     If a person willfully violates Allen's order, Allen and Defendant Bowie have the authority under New Mexico Stat. § 12-10A-19 to impose civil penalties of up to $5,000 per violation.

24.     Albuquerque, New Mexico meets the data thresholds established by Allen's order.

### *Plaintiff Dennis Smith.*

25.     Dennis Smith is a law-abiding retiree who has lived in Albuquerque for approximately 40 years.

26.     Smith has held a concealed carry license for approximately 6 years, and he meets all of the federal and state requirements to lawfully obtain, possess, and carry firearms.

27.     Smith's age makes it impossible for him to rely on speed of foot to elude an attacker or strength of body to overpower one. Thus, Smith regularly carries a handgun loaded and holstered on his body for the purpose of self-defense whenever he leaves his home.

28.     Smith also engages in recreation on a weekly basis at New Mexico public parks – primarily Los Poblanos Open Space in Albuquerque, New Mexico.

29.     He regularly carries his handgun when he uses Los Poblanos Open Spaces to protect himself from wild coyotes, stray dogs, and potential human attackers.

30.     Smith will continue to carry his handgun in public within the City of Albuquerque as well as Los Poblanos Open Spaces despite the Defendants' orders and actions.

31.     When Smith carries his handgun in violation of the Defendants' orders, he will violate the directives issued by the Defendants, and he will face a $5,000 fine for each time that he violates the directives.

## COUNT ONE – 42 U.S.C. § 1983 CLAIM FOR VIOLATION OF THE SECOND AND FOURTEENTH AMENDMENTS

32.     Paragraphs 1 through 31 are incorporated herein.

33.     The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (Jun. 23, 2022) has completely reshaped Second Amendment analysis in the United States.

34.     Prior to *Bruen*, courts employed a combination of a malleable public-policy interest-balancing test and means-end scrutiny (e.g., strict scrutiny) to analyze Second

**App. 22**

Amendment claims. *See, e.g.*, *New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015).

35.     *Bruen* abolishes the quasi-public policy and scrutiny analyses completely. Its reshaping of the analysis starts and ends with two basic principles:

      a. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2126.

      b. "[T]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

36.     The Second Amendment's plain text indisputably covers the conduct that Smith and similarly situated members of We The Patriots USA, Inc. seek to engage in: the carrying of a pistol or revolver for the purpose of self-defense in case of confrontation.

37.     The United States Supreme Court confirmed this interpretation in *Bruen*: "We too agree, and now hold, consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 141 S.Ct. at 2122, 2134.

38.     Under *Bruen*, the burden of proof now falls on the Defendants to show historical analogues to New Mexico's prohibition on the public carrying of handguns in the City of Albuquerque and in New Mexico public parks and forests that are both "well-established and representative." *Id.* at 2133. There are no such historical analogues that can save their orders.

39.     With respect to the Defendants' ban on carrying firearms in Albuquerque, *Bruen* conducted a thorough survey of the relevant historical analogues. Those analogues simply established that individuals cannot bear arms in a way that "spreads fear or terror among the people." *Id.* at 2144-46 (internal quotation marks omitted).

40.     The only other analogue that the Supreme Court could locate were statutory prohibitions on the *concealed carry* of pistols and other small weapons. *Id.* at 2146-2147. These analogues though only permitted states to ban *concealed carry* if they did not ban *open carry. Id.* at 2146-47.

41.     New Mexico's prohibition on the carrying of any firearms in any manner within the City of Albuquerque and public parks is not remotely similar to these analogues because it completely prohibits public carry rather than one of the two options: open carry or concealed carry. Thus, it violates Smith's Second and Fourteenth Amendment rights, the Second and Fourteenth Amendment rights of We The Patriots USA, Inc.'s members, and all other similarly situated New Mexico citizens.

42.     With respect to New Mexico's prohibition on carrying firearms in public parks, history does not support the argument that public parks are "sensitive places."

43.     *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008) only cited two historical examples of "sensitive places:" "schools and government buildings." 554 U.S. at 626.

44.     *Bruen* built on the specificity of *Heller*'s examples, adding "legislative assemblies, polling places, and courthouses." 142 S.Ct. at 2133.

9

**App. 24**

45.     Neither these specific examples nor *Heller*'s and *Bruen*'s broader categories are remotely analogous to the Defendants' ban on carrying firearms in public parks. Our nation's history is also completely devoid of any suitable analogue to that prohibition.

46.     In fact, our nation's history shows that, both before and after the adoption of the Second Amendment, public parks and their forerunners existed in America and no prohibitions on carrying firearms within them existed in any well-established form until well after the ratification of the Fourteenth Amendment.

47.     In colonial times, village greens, commons, gardens, and squares constituted colonial forerunners to modern public parks. *See* Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 14 (2021) ("Today's American public park is deeply rooted in the seventeenth- and eighteenth-century utilitarian village green, common, square, and parade ground"). Almost none of them contained laws that prohibited the carrying of firearms in parks.

   a. For instance, America's oldest park – the Boston Common – did not have any rules or laws prohibiting the carrying of firearms within its confines.

   b. The parks developed at the order of New York Governor Thomas Dongan in 1686 did not have rules or laws prohibiting individuals from carrying firearms.

**App. 25**

c.  The parks developed in Philadelphia in the early 1700s also did not have rules or laws prohibiting individuals from carrying firearms.

48.     Thus, to the extent that the Defendants' order prohibits the carrying of firearms in New Mexico public parks, it violates Smith's Second and Fourteenth Amendment rights, the Second and Fourteenth Amendment rights of We The Patriots USA, Inc.'s members, and all other similarly situated New Mexico citizens

### PRAYER FOR RELIEF

Wherefore, the Plaintiffs seeks the following relief:

A.     A declaratory judgment that the September 8, 2023 public health emergency order prohibiting the public carry of firearms in New Mexico for 30 days and Executive Order 2023-130's enforcement provision of the same violates the Second and Fourteenth Amendments to the United States Constitution;

B.     A declaratory judgment that the September 8, 2023 public health emergency order prohibiting the public carry of firearms in New Mexico public parks for 30 days and Executive Order 2023-130's enforcement provision of the same violates the Second and Fourteenth Amendments to the United States Constitution;

C.     A preliminary injunction barring the Defendants from enforcing the September 8, 2023 public health emergency order's prohibition on the public carrying of firearms in New Mexico for 30 days, its prohibition on the public carrying of firearms in New Mexico public parks for 30 days, and Executive Order 2023-130's enforcement provision of the same;

D.     A permanent injunction barring the Defendants from e enforcing the

September 8, 2023 public health emergency order's prohibition on the public carrying of

firearms in New Mexico for 30 days, its prohibition on the public carrying of firearms in

New Mexico public parks for 30 days, and Executive Order 2023-130's enforcement

provision of the same;

E.     Costs and attorneys' fees;

F.     Any such other and further relief that the Court deems just and reasonable.


                              The Plaintiffs,

                              By: /s/ Cameron L. Atkinson /s/
                              Cameron L. Atkinson, Esq.
                              *pro hac vice application pending*
                              ATKINSON LAW, LLC
                              122 Litchfield Rd., Ste. 2
                              P.O. Box 340
                              Harwinton, CT 06791
                              Telephone: 203.677.0782
                              Email: catkinson@atkinsonlawfirm.com

                              */s/ Jeremy M. Gay*
                              Jeremy M. Gay, Esq.
                              Advocate Law Center, P.A.
                              821 S. Ford Dr.
                              Gallup, New Mexico 87301
                              (505) 722-2055
                              Jeremy@alcpafirm.com

**App. 27**

### _PRO HAC VICE_ CERTIFICATION OF JEREMY M. GAY, ESQ. FOR CAMERON L. ATKINSON, ESQ.

The undersigned hereby certifies, pursuant to Local Civil Rule 83.3, that he has reviewed the attached declaration of Cameron L. Atkinson, Esq. (**Exhibit G**) and all relevant information pertaining to it. He certifies that Atkinson is a member in good standing of the Connecticut bar, and he agrees to associate with Atkinson for purposes of this action and accept service on his behalf.

_/s/ Jeremy M. Gay_
Jeremy M. Gay
Advocate Law Center, P.A.
821 S. Ford Dr.
Gallup, New Mexico 87301
(505) 722-2055
Jeremy@alcpafirm.com

13

# Exhibit A



# State of New Mexico

Michelle Lujan Grisham
*Governor*

**EXECUTIVE ORDER 2023-130**

**DECLARING STATE OF PUBLIC HEALTH EMERGENCY DUE TO GUN VIOLENCE**

**WHEREAS,** New Mexico consistently has some of the highest rates of gun violence in the nation;

**WHEREAS,** the rate of gun deaths in New Mexico increased 43% from 2009 to 2018, compared to an 18% increase over this same time period nationwide;

**WHEREAS,** guns are the leading cause of death among children and teens in New Mexico, and have led to the deaths of a thirteen-year-old girl on July 28, a five-year-old girl on August 14, and an eleven-year-old boy on September 6;

**WHEREAS,** New Mexico has recently experienced an increasing amount of mass shootings, including mass shootings in Farmington and Red River this year;

**WHEREAS,** these gun-related deaths and injuries have resulted in devastating physical and emotional consequences for individuals, families, and communities throughout the State;

**WHEREAS,** the impact of gun violence extends beyond physical injuries and fatalities—causing emotional trauma, economic burdens, and long-lasting consequences for those affected individuals and their families;

**WHEREAS,** the increasing number of gunshot victims strains our already over-burdened healthcare system and places undue pressure on medical professionals and resources;

State Capitol   •   Room 400 •   Santa Fe, New Mexico 87501   •   505-476-2200

**WHEREAS,** after consulting with the Secretary of the Department of Health, I have determined that the foregoing situation constitutes a statewide public health emergency of unknown duration, as defined by the Public Health Emergency Response Act; and

**WHEREAS,** the foregoing situation also constitutes a man-made disaster causing or threatening widespread physical or economic harm that is beyond local control and requiring the resources of the State pursuant to the All Hazard Emergency Management Act.

**NOW, THEREFORE, I,** Michelle Lujan Grisham, Governor of the State of New Mexico, by the authority vested in me by the Constitution and laws of the State of New Mexico, do hereby **DECLARE** that a state of public emergency exists throughout the State due to gun violence and **ORDER** and **DIRECT** as follows:

1.     The Department of Public Health, Department of Homeland Security and Emergency Management, and Department of Public Safety shall immediately begin collaborating with my Office to provide an effective and coordinated response to this public health emergency.

2.     The Department of Finance and Administration shall make available emergency financial resources in an amount not to exceed seven hundred fifty thousand dollars ($750,000.00) to the to the Department of Health, Department of Homeland Security and Emergency Management, and/or Department of Public Safety, in accordance with NMSA 1978, Sections 12-11-23 to -25. Funds shall be expended for the purpose of complying with this Order and shall be expended specifically to avoid and minimize economic or physical harm and to protect the public health, safety, and welfare. Funds shall be paid out upon warrants drawn by the Secretary of Finance and Administration upon vouchers approved by the Governor or an agent or agency designated by her for that purpose.

3.      All mayors, sheriffs, and members of governing bodies of municipalities or counties are encouraged to request, if necessary, an emergency proclamation and implementation of temporary additional restrictions to address this public health emergency pursuant to the Riot Control Act.

4.      All political subdivisions of the State shall comply with and enforce all directives issued pursuant to this Order.

**I FURTHER ORDER** and **DIRECT** as follows:

1.      This Order supersedes any previous orders, proclamations, or directives to the extent they are in conflict.

2.      This Order shall take effect immediately and shall remain in effect until October 6, 2023.

ATTEST:

MAGGIE TOULOUSE OLIVER
SECRETARY OF STATE

DONE AT THE EXECUTIVE OFFICE
THIS 7TH DAY OF SEPTEMBER 2023

WITNESS MY HAND AND THE GREAT
SEAL OF THE STATE OF NEW MEXICO

MICHELLE LUJAN GRISHAM
GOVERNOR



*Executive Order 2023-130*                                    *Page 3*

State Capitol   •   Room 400   •   Santa Fe, New Mexico 87501   •   505-476-2200

**App. 32**

# Exhibit B



NEW MEXICO
**Department of Health**
Office of the Secretary

MICHELLE LUJAN GRISHAM
**Governor**

PATRICK M. ALLEN
**Cabinet Secretary**

**PUBLIC HEALTH ORDER
NEW MEXICO DEPARTMENT OF HEALTH
SECRETARY PATRICK M. ALLEN**

**September 8, 2023**

**Public Health Emergency Order Imposing Temporary Firearm
Restrictions, Drug Monitoring and Other Public Safety Measures**

**WHEREAS,** for the reasons stated in Governor Michelle Lujan Grisham's Executive Orders 2023-130 and 2023-132, gun violence and drug abuse currently constitute statewide public health emergencies, as defined in the Public Health Emergency Response Act;

**WHEREAS,** pursuant to those Executive Orders, I have begun collaborating with the New Mexico Department of Homeland Security and Emergency Management, the New Mexico Department of Public Safety, and the Governor's Office to provide an effective and coordinated response to these public health emergencies;

**WHEREAS,** the New Mexico Department of Health possesses legal authority pursuant to the Public Health Act, NMSA 1978, Sections 24-1-1 to -40, the Public Health Emergency Response Act, NMSA 1978, Sections 12-10A-1 to -19, the Department of Health Act, NMSA 1978, Sections 9-7-1 to -18, and inherent constitutional police powers of the New Mexico state government to preserve and promote public health and safety, to maintain and enforce rules for the control of a condition of public health importance; and

**WHEREAS,** temporary firearm restrictions, drug monitoring, and other public safety measures are necessary to address the current public health emergencies.

**NOW, THEREFORE, I,** Patrick M. Allen, Secretary of the New Mexico Department of Health, in accordance with authority vested in me by the Constitution and the Laws of the State of New Mexico, and as directed by the Governor pursuant to the full scope of emergency powers under the All Hazard Emergency Management Act, do hereby **DECLARE** that gun violence and drug use constitute conditions of public health importance, as defined in NMSA 1978, Section 24-1-2(A), and hereby **ORDER** and **DIRECT** as follows:

(1)     No person, other than a law enforcement officer or licensed security officer, shall possess a firearm, as defined in NMSA 1978, Section 30-7-4.1, either openly or concealed, within cities or counties averaging 1,000 or more violent crimes per 100,000 residents per year since 2021 according to Federal Bureau of Investigation's Uniform Crime Reporting Program AND more than 90 firearm-related emergency department visits per 100,000 residents from July 2022 to June 2023 according to the New Mexico Department of Public Health, except:

A.     On private property owned or immediately controlled by the person;

**OFFICE OF THE SECRETARY**
1190 St. Francis Dr., Suite N4100 • P.O. Box 26110 • Santa Fe, New Mexico • 87502
(505) 827-2613 • FAX: (505) 827-2530 • www.nmhealth.org



B.      On private property that is not open to the public with the express permission of the person who owns or immediately controls such property;

C.      While on the premises of a licensed firearms dealer or gunsmith for the purpose of lawful transfer or repair of a firearm;

D.      While engaged in the legal use of a firearm at a properly licensed firing range or sport shooting competition venue; or

E.      While traveling to or from a location listed in Paragraphs (1) through (4) of this section; provided that the firearm is in a locked container or locked with a firearm safety device that renders the firearm inoperable, such as a trigger lock.

(2)      The New Mexico Regulation and Licensing Department shall conduct monthly inspections of licensed firearms dealers in the State to ensure compliance with all sales and storage laws.

(3)      The Department of Health shall, within 20 days, compile and issue a comprehensive report on gunshot victims presenting at hospitals in New Mexico, which shall include (if available): demographic data of gunshot victims, including age, gender, race, and ethnicity; data on gunshot victim's healthcare outcomes; the brand and caliber of the firearm used; the general circumstances leading to the injury; the impact of gunshot victims on New Mexico's healthcare system; and any other pertinent information.

(4)      No person, other than a law enforcement officer or licensed security officer, shall possess a firearm on state property, public schools, and public parks.

(5)      The New Mexico Department of Health and the New Mexico Environmental Department shall develop a program to conduct wastewater testing for illicit substances, such as fentanyl, at all public schools.

(6)      The Children, Youth and Families Department shall immediately suspend the Juvenile Detention Alternative Initiative and evaluate juvenile probation protocols.

(7)      The Department of Public Safety shall dispatch additional officers and resources to Bernalillo County and work with the Albuquerque Police Department and Bernalillo County Sheriff to determine the best use of those resources.

(8)      The Department of Public Safety shall coordinate with local law enforcement agencies and the district attorneys' offices and assist in apprehension of individuals with outstanding arrest warrants.

**I FURTHER DIRECT** as follows:

(1)      This Order shall be broadly disseminated in English, Spanish, and other appropriate languages to the citizens of the State of New Mexico.

(2)     Trigger locks shall be made available free of charge to all firearm owners; provided that each firearm owner shall only be entitled to one free trigger lock. Firearm owners wishing to obtain a free trigger lock should call 505-984-3085 or email info@newmexicanstopreventgunviolence.org.

(3)     The New Mexico Department of Health, the New Mexico Department of Public Safety, the New Mexico Department of Homeland Security and Emergency Management, and all other State departments and agencies are authorized to take all appropriate steps to ensure compliance with this Order.

(4)     Any person or entity who willfully violates this Order may be subject to civil administrative penalties available at law.

(5)     This Order shall take effect on September 8, 2023, and remain in effect for the duration of the public health emergencies declared in Executive Orders 2023-130 and 2023-132 and any subsequent renewals of those public health emergency declarations, unless otherwise rescinded.

(6)     Should any provision of this Order or its application to any person or circumstances be held invalid by a court of law, the remainder of this Order or the application of its provisions to other persons or circumstances shall remain in full force and effect.

ATTEST:                                          DONE AT THE EXECUTIVE OFFICE
                                                 THIS 8TH DAY OF SEPTEMBER 2023

_____
MAGGIE TOULOUSE OLIVER                           WITNESS MY HAND AND THE GREAT
SECRETARY OF STATE                               SEAL OF THE STATE OF NEW MEXICO


                                                 _____
                                                 PATRICK M. ALLEN
                                                 SECRETARY OF THE
                                                 NEW MEXICO DEPARTMENT OF HEALTH

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| WE THE PATRIOTS USA, INC, | : | |
| DENNIS SMITH, | : | Civil Action No. 1:23-cv-00773 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MICHELLE LUJAN GRISHAM, | : | |
| in her official capacity only, PATRICK | : | |
| M. ALLEN, in his official capacity only, | : | |
| JASON R. BOWIE, in his official | : | |
| capacity only, TROY WEISLER, in his | : | |
| official capacity only, HAROLD | : | |
| MEDINA, in his official capacity only, | : | |
| | : | |
| Defendants. | : | SEPTEMBER 9, 2023 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (EX PARTE RELIEF REQUESTED)

In the early evening hours of September 8, 2023, New Mexico Governor Michelle Grisham and Secretary Patrick Allen of the New Mexico Department of Public Health issued a combination of executive and administrative orders that not even King George III dared to issue against the Thirteen Colonies. Collectively, the orders – effective immediately – prohibit law-abiding New Mexico citizens from publicly carrying firearms for self-defense in New Mexico's largest city, Albuquerque, during a time where state officials have determined it to be extremely unsafe for law-abiding people. The orders also prohibit the carrying of firearms in public parks. While the orders purport to be of limited duration (30 days), Defendant Grisham declared "gun violence" a public health emergency of unknown duration, and, if the last three years have shown us anything, public health

emergencies continue for years with no end in sight. Predicting the end of these latest public health measures is no more accurate than palm-reading.

The Constitution does not permit Grisham's orders to continue. In *New York State Rifle and Pistol Association v. Bruen*, the United States Supreme Court expressly recognized that the Second and Fourteenth Amendments protect a right to publicly carry firearms for lawful purposes, including self-defense. 142 S.Ct. 2111, 2134 (2022). It further reached two legal conclusions grounded in its historical analysis: (1) states may not eliminate all forms of public carry and (2) governments may not classify entire cities as "sensitive places" to justify any carrying of firearms in public." *Id.* at 2133, 2150. The Defendants' orders and actions violate both holdings, and the Second and Fourteenth Amendments require the immediate enjoinder of their actions.

The Defendants also banned the carrying of firearms in public parks statewide for 30 days. The Second and Fourteenth Amendments do not permit this restriction either. Nothing in the historical record demonstrates the well-established and representative analogue *Bruen* requires to justify banning the carry of firearms in public parks. In fact, the historical record shows that public parks predated the Second Amendment, and it yields a dearth of any regulations banning the carrying of firearms within their confines.

Finally, regardless of how dire the Defendants perceive the public health emergency, the Supreme Court has already warned that "the Constitution cannot be put away and forgotten." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 68 (2020). The Defendants, however, have ignored this warning entirely, and their actions – if left unchecked – will set a dangerous nationwide precedent for an unparalleled

expansion of the state police power to the derogation of every citizen's constitutional rights and the creation of a public health state. The Court should not endorse that course, and it should put an immediate stop to the Defendants' unconstitutional actions.

## **FACTUAL BACKGROUND**

New Mexico has seen several isolated incidents of shootings over the last six weeks. On July 28, 2023, a 14-year-old boy obtained a pistol due a homeowner's alleged negligence in storing it and shot a 13-year-old girl in Questa, New Mexico while they both were hanging out with friends. Dkt. 1, ¶ 16. On August 14, 2023, a criminal attempting a drive-by shooting of another individual shot and killed a 5-year-old girl at a trailer park in Albuquerque. *Id.* at ¶ 17. On September 6, 2023, a criminal shot and murdered an eleven-year-old boy in what appears to be a road rage incident. *Id.* at ¶ 18. Additionally, a mentally disturbed teenager – Beau Wilson – killed three people in Farmington, New Mexico on May 15, 2023 when he randomly walked through a neighborhood shooting at homes and drivers after he allegedly struggled to cope with his parents' divorce and being removed from his school's varsity wrestling team. *Id.* at ¶ 19.

Citing these incidents to declare "gun violence" a public health emergency, Defendants Grisham and Allen collectively issued executive and administrative orders banning the public carry of firearms in public parks across New Mexico and in cities and counties that meet certain statistics – effective immediately. *Id.* at ¶¶ 20-22. Albuquerque, New Mexico meets the statistical markers established by these orders. *Id.* at ¶ 24.

Plaintiff Dennis Smith is a law-abiding citizen who has lived in Albuquerque for approximately 40 years. **Exhibit A, ¶ 3**. His age renders it impossible for him to outrun or

3

**App. 39**

overpower a criminal who attacks him or his loved ones. *Id.* at ¶ 5. Thus, he has held a New Mexico concealed carry permit for approximately 6 years, and he meets all of the federal and state requirements to lawfully obtain, possess, and carry firearms. *Id.* at ¶ 4.

Smith regularly carries a loaded handgun in a holster on his body for the purpose of self-defense whenever he leaves his home and when he is out in public in Albuquerque. *Id.* at ¶ 6. Additionally, Smith carries his handgun when he engages in recreation weekly at New Mexico Public Parks – primarily Los Poblanos Open Space – to protect himself from wild coyotes, stray dogs, and potential human attackers. *Id.* at ¶ 8.

Despite the Defendants' orders and conduct, Smith still intends to carry his handgun in public within the City of Albuquerque as well as Los Poblanos Open Spaces. *Id.* at ¶ 10. If he does, New Mexico law exposes him to civil penalties up to $5,000 per violation of the Defendants' orders. New Mexico Stat. § 12-10A-19. Penalties in that amount would exceed Smith's financial means. **Exhibit A, ¶ 11**.

Plaintiff We The Patriots USA, Inc. – of whom Smith is a member and supporter – joins Smith's claims and motion for a temporary restraining order and a preliminary injunction on behalf of its similarly situated New Mexico members. Dkt. 1, ¶¶ 8-9.

## LEGAL STANDARD

The Court may grant a temporary restraining order or a preliminary injunction or a preliminary injunction if the moving party shows "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm in the absence of the injunction; (3) proof that the threatened harm outweighs any damage the injunction may cause to the party opposing it; and (4) that the injunction, if issued, will not be adverse to the public interest." *Kansas*

*Health Care Ass'n, Inc. v. Kansas Dep't of Social & Rehabilitation Servs.*, 31 F.3d 1536, 1542-42 (10th Cir. 1994) (internal citations omitted.

The Court may grant a temporary restraining order without notice to the adverse party only if (1) "specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition;" and (2) "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b).

## ARGUMENT

**I.     The Plaintiffs Demonstrate A Substantial Likelihood Of Prevailing On The Merits.**

### A.  The Supreme Court has already established that the Second and Fourteenth Amendments protect the right to publicly carry firearms.

The Defendants' orders completely deprive the law-abiding citizens of Albuquerque and the Plaintiffs of their Second and Fourth Amendment right to carry firearms for the purpose of self-defense. The Defendants' orders defy the plain text of the Second Amendment and the Supreme Court's express holding in *Bruen*. For those reasons, the Plaintiffs demonstrate a substantial likelihood of success on the merits of their challenge to the public carry provision of the Defendants orders.

*Bruen* establishes a two-part test for analyzing Second Amendment claims. The Plaintiffs must first demonstrate that "the Second Amendment's plain text covers [their] conduct." *Bruen*, 142 S.Ct. at 2129-30. If they carry that burden, "the Constitution presumptively protects that conduct." *Id.* "The government must then justify its regulation

by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* at 2130 (internal quotation marks and citations omitted).

The Plaintiffs carry their textual burden. As in *Bruen*, there is no meaningful dispute that Smith and We The Patriots USA's members – "ordinary, law-abiding citizens" – are part of the people whom the Second Amendment protects. *Id.* at 2134. Nor is there any dispute that "handguns are weapons 'in common use' today for self-defense." *Id.* The definition of "bear" in the Second Amendment "naturally encompasses public carry." *Id.* at 2134-35. Thus, as the Supreme Court concluded in *Bruen*, the Second Amendment's plain text presumptively guarantees the Plaintiffs a right to "bear" arms in public for self-defense just as they have done peacefully and lawfully for many years. *Id.* at 2135.

The burden now shifts to the Defendants to demonstrate that their orders and conduct are consistent with the historical tradition of firearm regulation. The Defendants cannot prevail in that inquiry both as to cities and public parks (addressed below).

*Bruen* is instructive. First, it completely forecloses any argument that cities are "sensitive places" simply because many people congregate there and law enforcement is presumptively available.[1] *Id.* at 2134-35 ("Put simply, there is no historical basis for New

---

[1] Even if it was, the right to self-defense takes on additional importance in light of *Deshaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189 (1989) and *Town of Castle Rock, Colo. V. Gonzales*, 545 U.S. 748 (2005). *Deshaney* and *Castle Rock* unequivocally establish that law enforcement and government officials have no obligation "to protect the life, liberty, and property of [their citizens] against invasion by private actors." *Deshaney*, 489 U.S. at 195; *Castle Rock*, 545 U.S. 748 (holding that the Fourteenth Amendment does not require police officers to enforce the law or arrest

York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department").

Second, *Bruen* categorized the main historical analogues of firearms regulation into three categories: common law offenses, statutory prohibitions, and surety statutes. *Id.* at 2145. None of these analogues supports a per se ban on public carry.

Common law offenses derived from the Statute of Northampton and its progeny. They typically prohibited individuals from arming themselves with dangerous and unusual weapons and going about to terrorize their fellow citizens. *Id.* at 2145-46 (summarizing various examples). In short, these offenses did not prohibit individuals from "carry[ing] firearms publicly and peaceably." *Id.* at 2146.

The Supreme Court held that historical statutory prohibitions did not ban public carry altogether. *Id.* at 2146-47. Instead, it found that they typically banned concealed carry and could so lawfully so long as they did not ban open carry. *Id.* at 2146-47 (summarizing cases). Thus, the Supreme Court found "that it was considered beyond the pale in antebellum America to altogether prohibit public carry."[2] *Id.* at 2147.

Finally, surety statutes imposed no restrictions on the right to carry, except to require sureties or bonds to ensure a person did not breach the peace. *Id.* at 2148

---

someone who violates the law). In other words, even the presence of law enforcement officers does not guarantee their safety or that law enforcement officers will act to protect them when they are the potential victims of a violent crime.

[2] Nor can the Defendants rely on New Mexico's territorial statute that banned both concealed and open carry of pistols. 1860 Terr. of N. M. Laws §§ 1–2, p. 94. *Bruen* expressly explained that this law stood as an extreme outlier and was never tested in court. *Bruen*, 142 S.Ct. at 2147 n.22. It ultimately ceased to govern New Mexico after New Mexico became a state in 1911. *Id.*

7

**App. 43**

(summarizing statutes). If a person was accused of intending to injure someone or breach the peace, the laws required that person to post a bond. *Id.* at 2148-49. Thus, the Supreme Court found it "unlikely these surety statutes constituted a "severe" restraint on public carry, let alone a restriction tantamount to a ban, when they were supplemented by direct criminal prohibitions on specific weapons and methods of carry." *Id.* at 2150.

In sum, the Second Amendment's plain text protects the Plaintiffs' conduct and there are no historical analogues to support the Defendants' orders or enforcement of them. If their orders pertained to issues of speech or other constitutional rights, there would be little dispute that the First Amendment would require the Court to enjoin them immediately. "The constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 2156 (internal quotations marks and citations omitted). Thus, the Court should not tarry in enjoining the Defendants' orders.

### B. No well-established and representative historical analogues justify public parks being treated as "sensitive places."

The Defendants' orders also ban the carrying of firearms in public parks across New Mexico. As discussed above, the Plaintiffs demonstrate that carrying firearms in these public places is protected by the Second Amendment's text. Thus, the proper inquiry is whether there are any appropriate historical analogues justifying the prohibition of carrying firearms in these places.

The Plaintiffs do not dispute that there is a well-established and representative historical analogue that permits states to prohibit the possession and carrying of firearms

in "sensitive places." *See Bruen*, 142 S.Ct. at 2133. They dispute whether public parks fall within the definition of "sensitive places" in view of the historical record.

Although the Supreme Court declined to "comprehensively define 'sensitive places'" in *Bruen*, it did not leave courts without any guidance. In *Bruen*, New York proposed a definition of "sensitive places" as "all places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id.* at 2133 (quoting New York's brief) (internal quotation marks and citations omitted). *Bruen* rejected this definition as being far too broad and being without a historical basis. *Id.* at 2134. It also found that such a definition "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense…."*Id.* at 2134.

Instead, the Supreme Court recognized that the 18th and 19th-century historical record yielded few places where governments banned the possession of weapons. *Bruen*, 142 S.Ct. at 2133 (listing "legislative assemblies, polling places, and courthouses" as "sensitive places"). Thus, *Bruen* instructed courts to use "analogies" to these "historical regulations of 'sensitive places' to determine [whether] modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* at 2133 (emphasis in original).

Public parks do not even remotely resemble the well-established historical "sensitive places" analogues *Bruen* cites. Those analogues shared a common feature. They only covered places where the core functions of government or self-government took place. Core government functions do not take place in public parks. Virtually every

**App. 45**

government in the United States has established a central building or location in which to conduct its core functions. That includes the federal capitol, the state capitals, federal and state legislative buildings, municipal city and town halls, and courthouses. Conversely, public parks – open to the public for recreation – are the furthest thing imaginable from a place where core government functions take place.

> **1. The American historical tradition of "sensitive places" were rare and typically covered places where the core functions of government took place.**

The "sensitive places" doctrine lacks a clear historical starting point. The Supreme Court has rightfully cautioned that medieval history is ill-suited for interpreting the Second Amendment. *See Bruen*, 142 S.Ct. at 2139. The Plaintiffs concede nothing though by acknowledging that ancient history informs the historical tradition of "sensitive places." The Founding Fathers rejected ancient history and even colonial history as being too weak in formulating the Second Amendment. Thus, the United States' "sensitive places" doctrine is informed, but not controlled, by pre-Founding Era history.

Marcus Tullus Cicero provided a timeless example of the need for a "sensitive places" doctrine. Titus Annius Milo selected Cicero – one of Rome's greatest orators – to deliver his closing argument to a jury stacked by his political opponents when he faced trial for murdering a political rival, Publius Clodius Pulcher. While Cicero's Milo Oration stands as one of the greatest defenses of the principle of self-defense in human history, Cicero himself never gave the oration at Milo's trial due to armed intimidation from Clodius' friends. Marcus Tullius Cicero, Speech in Defence of Titus Annius Milo (52 B.C.), in 3 ORATIONS OF MARCUS TULLIUS CICERO 204-05 (Charles Duke Yonge trans.,

**App. 46**

rev. ed. 1899). The stacked jury convicted Milo, and the tribunal exiled him. Cicero's prominence as a Roman legal thinker endured though, and his work influenced much of western legal thought. Thus, it is no stretch to say that the context of the Milo oration influenced western thought pertaining to the "sensitive places" doctrine.[3]

Medieval English regulations addressed the same problem that Cicero encountered in the Milo trial. In 1313, the English Parliament took steps to protect legislative assemblies, enacting a statute that provided "in all parliaments, treaties, and other assemblies which should be made in the realm of England for ever, every man shall come without all force and armour, well and peaceably." 7 Edw. 2, 170 (1313). Later, the 1328 Statute of Northampton ("the Statute") provided protections to the King's ministers and officers, including the English Courts. The Statute came into being during a time of turmoil. *Bruen*, 142 S.Ct. at 2139. After Edward II was deposed by force and Edward III took the throne, England descended into a state of anarchy and rebellion, and knights and commoners alike ravaged the land in a general "spirit of insubordination." *Id.* The Statute sought to restore order and respect for royal authority by prohibiting Englishmen from coming

> before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring[ing] no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to

---

[3] The Supreme Court has held that chaos that falls far short of the armed intimidation present in the Milo trial violates a criminal defendant's due process right to a fair trial. *Sheppard v. Maxwell*, 384 U.S. 333, 336 (1966). *Sheppard* plainly establishes that the need to protect core government functions by treating the places in which critical government business is conducted as "sensitive" is not simply limited to weapons and armed intimidation of participants. Instead, the free and just operation of core government functions depends on an orderly environment and the preclusion of chaos.

11

**App. 47**

forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure.

*Id.* at 2139 (quoting 2 Edw. 3 c. 3 (1328).

While *Bruen* held that the Statute has little bearing on the modern interpretation of the Second Amendment, *id.* at 2139-2142, the Statute still builds upon the Milo trial example as one of the earliest examples of a "sensitive places" regulation and its policy goal to ensure the unfettered operation of core government functions.

*Bruen*'s caution as to the Statute is well-placed. From the earliest days of English colonies in America, the American colonial tradition of the right to bear arms broke radically from their English counterparts. It began when King James I issued the English-speaking-world's first written guarantee of a right to obtain, keep, and bear arms in the 1606 Virginia Charter. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 229 (2018). The 1620 New England Charter carried an identical guarantee. *Id.* at 229-30. Since the geographical scope of these charters covered the entire area of the original thirteen American States, the early colonists enjoyed a greater right to bear arms than their English counterparts did. *Id.* at 230.

The American tradition not only contained a right to obtain, keep, and bear arms, but the colonial record is replete with compulsory possession laws mandating that men bring their arms to churches and public meetings.[4]

---

[4] *See, e.g.,* 1 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 173 (1808) (1632 Virginia statute providing that "ALL men that are fittinge to beare armes, shall bringe their pieces to the church"); *id.* at 263 (1632 Virginia statute

Restrictions on the places where firearms could be carried in the colonial and Founding Eras were few and far between. For instance, not even the classification of legislatures as "sensitive places" appears to have a firm foundation in colonial and Founding Era regulations. Maryland and Delaware were the only two colonies and states that prohibited the carrying of arms into legislative assemblies. *See* 1647 Md. Laws 216 ("[N]oe one shall come into the howse of Assembly (whilst the howse is sett) with any weapon upon perill of such fine or censure as the howse shall thinke fit"); 1650 Md. Laws 273 ("That none shall come into eyther of the houses whilst they are sett, with any gun or weapon upon perill of such fine or censure as the howses shall thinke fit." "Orders made & agreed vppon by the Assembly for the better ordering of Both Howses"); DEL. CONST, art. 28 (1776). The United States Congress did not prohibit the carrying of arms in both houses, and Representative Preston Brook's historical beating of anti-slavery Senator Charles Sumner did not culminate in just the near-death of Senator Sumner. Brooks then threatened Representative Calvin Chaffee who responded by buying a revolver and openly displaying it on his desk in the House to the approbation of his colleagues. David

---

providing that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"); *id.* (1643 Virginia statute requiring that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"); 2 *id.* at 126 (similar 1676 Virginia law); 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 94 (John Russell Bartlett ed., 1856) ("noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon."); 19 (part 1) THE COLONIAL RECORDS OF THE STATE OF GEORGIA 137-40 (Allen D. Candler ed., 1904) (1770 Georgia statute imposing fines on militiamen who went to church unarmed). See *also* JOHNSON ET AL., *supra* note 1, at 183-85 (Connecticut, Massachusetts Bay, Maryland, South Carolina).

B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 235 n.112 (2018).

While the Plaintiffs do not challenge prohibitions on the carrying of arms in legislative buildings and no decision issued by this Court or any other court on the merits of his case will cast doubt on the legislative prohibitions common today, they submit this example to show just how different the American tradition of what were considered "sensitive places" was from its English antecedent. The laws and regulations that they discuss above were the only "sensitive places" regulations in the colonial and Founding Eras. Thus, assuming *arguendo* Maryland's and Delaware's regulations could supply a well-established and representative historical analogue for any sort of regulation,[5] they would only supply that analogue for buildings where core government functions took place – legislative assemblies, courts, executive buildings, and polling places. They do not supply a well-established and representative historical analogue for other places.

Reconstruction Era history also does not supply a well-established and representative historical analogue for a broader definition. The former Confederate states entered a state of chaos similar to that addressed by the Statute of Northampton. *Bruen*, 142 S.Ct. at 2152-53; *see also McDonald v. City of Chicago, Ill.* 561 U.S. 742, 772 (2010). Both *Bruen* and *McDonald* emphasized evidence submitted in the Congressional record that showed armed bands of former Confederate soldiers perpetrating all sorts of violent outrages on the newly free blacks and Southern states' efforts to disarm blacks to leave

---

[5] *Bruen* requires more than isolated examples. *See Bruen*, 142 S.Ct. at 2153 (requiring more than a single statute and a pair of state-court decisions to justify New York's regulation).

14

**App. 50**

them at the mercy of these bands. *Bruen*, 142 S.Ct. at 2152-53; *McDonald*, 561 U.S. at 772. Congress's regulatory response was to take emphatic steps to protect blacks' right to bear arms through the Freedmen's Bureau and the Fourteenth Amendment. *Bruen*, 142 S.Ct. at 2151.

The former Confederate states who chose to regulate these ravages functionally enacted "sensitive place" laws although they usually took the form of "time" restrictions rather than "sensitive places" regulations. In 1870, Louisiana prohibited people from carrying arms in public at all on election day and within half a mile of a voter registration place. 1870 La. Acts 159-60.

Maryland focused on regulating two problematic counties. In 1874, it banned the carrying of weapons on election day in Kent County. 2 PUBLIC LOCAL LAWS OF MARYLAND, ARTICLES 11-24, at 1457 (King Bros, ed. 1888). In 1886, it banned the carrying of arms within 300 yards of polling places on election day in Calvert County. 1886 Md. Laws 315. In 1873, Texas prohibited the carrying of weapons within half a mile of a polling place during election hours. 2 A DIGEST OF THE LAWS OF TEXAS, CONTAINING THE LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST, FROM 1754 TO 1874, CAREFULLY ANNOTATED 1317-18 (4th ed. 1874).

These regulations, sounding in the "sensitive places" doctrine, received their first judicial endorsement in 1874 when the Georgia Supreme Court upheld a statute prohibiting the carrying of weapons into a court. *State v. Hill*, 53 Ga. 472 (1874). Without

citing Cicero's Milo example or the Statute of Northampton, the Georgia Supreme Court

ensured that a similar situation would not happen in its courts in no uncertain terms:

> [T]he right to go into a court-house and peacefully and safely seek its
> privileges, is just as sacred as the right to carry arms, and if the temple of
> justice is turned into a barracks, and a visitor to it is compelled to mingle in
> a crowd of men loaded down with pistols and Bowie-knives, or bristling with
> guns and bayonets, his right of free access to the courts is just as much
> restricted as is the right to bear arms infringed by prohibiting the practice
> before courts of justice.

*Id.* at 477-78.

While it is true that other states in the Reconstruction Era attempted broad

classifications of "sensitive places," those classifications escaped Second Amendment

review by virtue of the Supreme Court's decision in *United States v. Cruikshank*, 92 U.S.

542 (1875), which declined to incorporate the Bill of Rights against the states. For

instance, in 1869, Tennessee prohibited the carrying of pistols and various other

dangerous or deadly weapons to polling places and "any fair, race course, or other public

assembly of the people." PUBLIC STATUTES OF THE STATE OF TENNESSEE, SINCE

THE YEAR 1858: BEING IN THE NATURE OF A SUPPLEMENT TO THE CODE 108 (2d

ed. Supp. 1872). It never received judicial review.

Texas enacted several laws that at least partially attempted "sensitive places"

regulation. In 1870, it banned the carrying of firearms at election places, "any other place

where people may be assembled to muster or to perform any other public duty, or any

other public assembly," churches, schools, and private social events. 1870 Tex. Laws 63.

Broad laws of both the Tennessee and Texas vintage, however, carry both First

and Second Amendment implications due to their broad coverage of private gatherings.

Since these sorts of laws did not become subject to Second Amendment scrutiny until 2010 by way of *McDonald v. City of Chicago, Ill.* 561 U.S. 742 (2010), they provide little support for a broad "sensitive places" exception to the Second Amendment.

At best, the historical record supports a conclusion that places where the core functions of government and self-government took place were "sensitive" because the survival of the United States as a constitutional republic depended on free expression and unfettered access to justice. Thus, historical laws properly protected voting, legislative debate, and courts of law in a manner consistent with the Second Amendment. They, however, did not grant states broad authority to declare virtually any area a sensitive place. *Bruen*, 142 S.Ct. at 2133. Thus, this limited "sensitive places" tradition favors the Plaintiffs' argument that public parks cannot be declared "sensitive places."

### 2. The modern addition of schools as a "sensitive places" exception is a narrow one that comports with the "core government functions" definition and does not justify a broader definition.

Like the "sensitive place" restrictions discussed above, colonial and Founding Era history and tradition does not supply many examples of blanket prohibitions on carrying firearms in schools. It, however, does supply ample evidence that schools were places where a core government function occurred, supporting the Plaintiffs' contention that their modern addition to the "sensitive places" doctrine does not expand the definition of "sensitive places" but confirms the "core government function" standard.

The historical record of arms prohibitions at American schools begins in 1824 at the University of Virginia. Founded by Thomas Jefferson and others, the student body soon gave Jefferson and his fellow members of the Board of Visitors, including James

Madison, much grief by rioting, carousing, firing guns in the air, and shooting at each other. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 249-50 (2018). The Board responded by banning students, but not faculty or other employees, from keeping or carrying weapons on campus. *Id.*

In 1878, Missouri prohibited students from carrying concealed weapons at any university, college, or school. *See* 1878 Miss. Laws 176. Its prohibition, however, did not prohibit students from openly carrying weapons, and it did not prohibit faculty members or staff employees from carrying concealed weapons. *Id.* As discussed previously, Texas banned the carrying of arms to schools in 1870, similar to modern school regulations. 1870 Tex. Laws 63. The historical record, however, is bare of widespread examples of prohibiting firearm possession in schools.

The lack of specific historical examples does not doom the classification of schools as "sensitive places" though if they can properly be said to be carrying out a core government function. The historical record provides ample historical support for the principle that schools carry out core government functions. *See, e.g.*, *Horton v. Meskill*, 172 Conn. 615, 647 (1977) (discussing Connecticut's 1650 laws requiring every township to hire a schoolmaster). Because education became a state duty, schoolhouses became places where core government functions are carried out – either by state or municipal governments. Thus, their classification as "sensitive places" comfortably meets the definition of "sensitive places" as places where core government functions occur, and

their addition to the modern doctrine of "sensitive places" does not support a definition for "sensitive places" broader than the "core government function" definition.

### 3. Prohibitions on carrying firearms in public parks did not surface until well after the adoption of the Second Amendment and did not become commonplace until well after the Civil War.

Public parks and their forerunners have existed well before modern public parks. In colonial times, village greens, commons, gardens, and squares constituted colonial forerunners to modern public parks. *See* Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 14 (2021) ("Today's American public park is deeply rooted in the seventeenth- and eighteenth-century utilitarian village green, common, square, and parade ground"). Those colonial forerunners claim parks that still exist today such as the Boston Common, Bowling Green Park, and Battery Park. *Koons v. Platkin*, 2023 WL 3478604, at *83 (D. NJ 2023) (listing examples). None of these early forerunners of modern public parks imposed a prohibition on the carrying of firearms within their confines. *Id.* (granting a preliminary injunction as to a carry ban at public parks).

Instead, the earliest bans on carrying firearms in public parks came between 1858 and 1872 in large municipalities. *See e.g.*, *Minutes of Proceedings of the Board of Commissioners of the Central Park*, at 166 (1858); *First Annual Report of the Commissioners of Fairmont Park*, § 21 (1870). These bans came well after the adoption of the Second Amendment, and the Supreme Court's failure to incorporate the Second Amendment against state and local governments until 2010 meant that they went unchallenged. Additionally, two other district courts have found that the local park

19

**App. 55**

ordinances up until 1890 governed less than 10% of the nation's entire population and were unrepresentative within the meaning of *Bruen*. *Koons*, 2023 WL 3478604, at * 85; *Antonyuk v. Hochul*, 2022 WL 16744700, at *67 (N.D.N.Y. 2022).

The lack of widespread historical evidence – especially before and immediately after the Founding Era – is fatal to any attempt to justify bans on carrying in public parks under the "sensitive places" doctrine. The Court should join the *Koons* and *Antonyuk* courts in rejecting such arguments, and it should enjoin the Defendants' ban on carrying in New Mexico's public parks.

## II.   The Plaintiffs Demonstrate Irreparable Harm In The Absence Of A Temporary Restraining Order And A Preliminary Injunction.

Plaintiffs demonstrate irreparable harm "when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001). The Plaintiffs carry their burden on this prong.

As discussed above, the Second and Fourteenth Amendments guarantee a right to publicly carry firearms for lawful purposes. The Defendants have issued orders that completely bar the Plaintiffs from exercising those rights in the City of Albuquerque and New Mexico public parks in violation of the Second and Fourteenth Amendments for the next 30 days. Their injury is thus immediate and ongoing.

Plaintiff Smith, however, still intends to exercise his rights despite the Defendants' orders. If he does, he and other similarly situated members of We The Patriots USA, Inc. will face crippling financial sanctions, arrest, and criminal prosecution. **Exhibit A**, **¶ 11**. In

**App. 56**

other words, the collective burden of the Defendants' enforcement of their unconstitutional orders will speedily end Smith's determination to exercise his Second Amendment rights.

Monetary damages would constitute an inadequate remedy and would be extremely difficult to ascertain. The very essence and value of a constitutional right is the ability to exercise it uninhibited within the constitutionally permissible bounds established by law, not executive fiat. Thus, a day where the Plaintiffs cannot exercise their constitutional rights without violating the law or exposing themselves to crippling financial sanctions is a day lost to them forever. No amount of money cannot adequately compensate them for days where they could not exercise their constitutional rights. More importantly, monetary damages would be completely unavailable as to the Defendants if the Plaintiffs suffered death or serious injury at the hands of a gun-wielding criminal while the Defendants barred them from lawfully carrying firearms.

Additionally, there is no way to reliably determine what monetary damages to award the Plaintiffs for the loss of their constitutional rights. A jury would simply have to pull a number out of their hats, and that number could be astronomically high or nominal depending on their sympathies. Thus, the Court should conclude that the Plaintiffs have demonstrated irreparable harm.

### III.   The Plaintiffs Demonstrate That The Threatened Harm Outweighs Any Damage That The Injunction May Cause To The Party Opposing It.

The Defendants will suffer no damage by the granting of a temporary restraining order or a preliminary injunction. Prior to the Defendants' issuance of their orders, Smith and other similarly situated, law-abiding New Mexico citizens carried their firearms

regularly in public. They represented no threat to public safety or the public health then, and nothing about their conduct has changed to render them a threat to public safety now.

Additionally, nothing about their behavior will change in the next 30 days to render them more responsible to carry firearms in public. No important public health goals will be served by prohibiting law-abiding citizens from exercising their Second Amendment rights in a law-abiding manner.

The Defendants have grounded their rationale for issuing their orders in nothing extraordinary. Crime happens. While the loss of any life is tragic, the Defendants' reliance on three isolated shootings – the result of criminal conduct – does not establish a broader societal problem that imperils New Mexico citizens as a community. Every city and state in the United States experience shootings and murders, but they still permit their law-abiding citizens to bear arms just as New Mexico did until the Defendants reacted emotionally and unilaterally.

The problems that the Defendants seek to address will not disappear as long as human beings coexist in communities. As discussed at length above, the Supreme Court has already recognized these problems, but it has affirmed the superseding importance of the right to publicly carry firearms. Thus, the Court's issuance of emergency injunctive relief will not cause any harm to the Defendants who will simply be returned to the same circumstances that every state and city in the United States exists in.

## IV.    The Plaintiffs Demonstrate That The Injunction Will Not Be Adverse To The Public Interest.

*Bruen*'s plain language controls the final factor in the temporary restraining order/preliminary injunction analysis: "The Second Amendment is the very *product* of an

interest balancing by the people, and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Bruen*, 142 S.Ct. at 2131 (internal quotation marks and citations omitted, emphasis in original). Thus, "[i]t is this balance – struck by the traditions of the American people – that demands our unqualified deference." *Id*. This language alone is dispositive of this factor. Thus, the Second Amendment's protection of a right to public carry supersedes the interests that the Defendants have relied on in banning it.

There is more to the analysis though. The Defendants do not act under the color of a duly enacted state law or legislative action. They imposed a public carry ban late at night when the courts closed their doors for business, and they thought no one would pay heed to their actions. They solicited no public comment, and they completely disregarded any constitutional limitations on their conduct. In other words, the Defendants' conduct does not carry the weight of a carefully calculated legislative judgment, but rather the emptiness of a panicked late-night decision to impose an absolute deprivation of a constitutional right on countless law-abiding New Mexico citizens.

Thus, the absence of any carefully articulated public interest and the strength of the Second Amendment's interest balancing leads to one conclusion: The public interest favors the issuance of immediate, ex-parte injunctive relief.

## **CONCLUSION**

For the foregoing reasons, the Plaintiffs respectfully request that the Court issue an emergency ex-parte temporary restraining order barring the enforcement of the public carry bans and speedily schedule this matter for a preliminary injunction hearing.

**App. 59**

The Plaintiffs,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq.
*pro hac vice admission pending*
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

/s/ Jeremy M. Gay
Jeremy M. Gay, Esq.
Advocate Law Center, P.A.
821 S. Ford Dr.
Gallup, New Mexico 87301
Telephone :(505) 722-2055
Email: Jeremy@alcpafirm.com

## CERTIFICATION OF SERVICE

The Defendants have not appeared in this matter yet. The undersigned has

identified their appropriate legal representatives though and will provide them with copies

of it immediately after he has verified that it has been electronically filed on the foregoing

date. He will provide notice to the Court as soon as he has confirmed their receipt of the

foregoing.

/s/ Cameron L. Atkinson /s/

24

# Exhibit A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

| | |
|---|---|
| WE THE PATRIOTS USA, INC, | : |
| DENNIS SMITH, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| MICHELLE LUJAN GRISHAM, | : |
| in her official capacity only, PATRICK | : |
| M. ALLEN, in his official capacity only, | : |
| JASON R. BOWIE, in his official | : |
| capacity only, TROY WEISLER, in his | : |
| official capacity only, HAROLD | : |
| MEDINA, in his official capacity only, | : |
| | : |
| Defendants. | : |

## <u>DECLARATION OF DENNIS SMITH</u>

Pursuant to 28 U.S.C. § 1746, Dennis Smith, having been duly sworn, does hereby depose and state as follows:

1.    I am over 18 years of age and understand and believe in the obligations of an oath.

2.    I make this declaration pursuant to 28 U.S.C. § 1746 and understand that the same obligations applicable to an affidavit apply to the statements made within.

3.    I am a law-abiding citizen who has lived in Albuquerque, New Mexico for approximately 45 years.

4.    I have held a New Mexico concealed carry permit for approximately 6 years, and I meet all of the federal and state requirements to lawfully obtain, possess, and carry firearms.

5.    Since I am older, I do not believe that I can outrun or overpower a criminal who attacks me or my loved ones.

6.    I regularly carry a loaded handgun in a holster on my body for the purpose of self-defense whenever I leave my home and I am out and about in Albuquerque.

7.    I also engage in recreation on a weekly basis at New Mexico public parks – primarily Los Poblanos Open Space in Albuquerque, New Mexico.

8.    I regularly carry my handgun when I use Los Poblanos Open Spaces in order to protect myself from wild coyotes, stray dogs, and potential human attackers.

9.    I am aware of Executive Order 2023-130 and Defendant Allen's September 8, 2023 public health emergency order prohibiting the carrying of handguns within the City of Albuquerque as well as Los Poblanos Open Spaces for the next 30 days.

10.    Despite those orders, I will continue to carry my handgun in public within the City of Albuquerque as well as Los Poblanos Open Spaces.

11.    I fear that I will be arrested and/or fined beyond my financial means to pay if I exercise my Second Amendment right to carry my handgun despite the directives.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed: September 9, 2023

Dennis Smith

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

NATIONAL ASSOCIATION FOR GUN RIGHTS
and FOSTER ALLEN HAINES,

      Plaintiffs,

vs.                                                                          No. 1:23-cv-00771-DHU-LF

MICHELLE LUJAN GRISHAM ,
*In her official capacity as the*
*Governor of the State of New Mexico,*
and PATRICK M. ALLEN, *in his*
*official capacity as the Secretary of the*
*New Mexico Department of Health*,

      Defendants.


and


RANDY DONK,
GUN OWNERS OF AMERICA, INC.
GUN OWNERS FOUNDATION,

      Plaintiffs,

vs.                                                                          No. 1:23-cv-00772-DHU-LF


MICHELLE LUJAN GRISHAM, *in her*
*official capacity as the Governor of New Mexico*,
PATRICK M. ALLEN, *in his official capacity as the*
*Cabinet Secretary of the New Mexico Department of Health*,
JASON R. BOWIE, *in his official capacity as the Cabinet*
*Secretary of the New Mexico Department of Public Safety*
and TROY W. WEISLER, *in his individual capacity as the*
*Chief of the New Mexico State Police*,

      Defendants.

and

WE THE PATRIOTS USA, INC., and
DENNIS SMITH,

      Plaintiffs,

vs.                                    No. 1:23-cv-00773-DHU-LF

MICHELLE LUJAN GRISHAM, *in her*
*official capacity only*,
PATRICK M. ALLEN, *in his official capacity only*,
JASON R. BOWIE, *in his official capacity only*,
TROY W. WEISLER, *in his individual capacity only*,
and HAROLD MEDINA, *in his official capacity only*,

      Defendants.

and

SHAWN BLAS,

      Plaintiff,

vs.                                    No. 1:23-cv-00774-DHU-LF

MICHELLE LUJAN GRISHAM, *in her*
*capacity as the Governor of New Mexico as well as*
*in her individual capacity,* PATRICK M. ALLEN, *in his capacity as the*
*Secretary of the New Mexico Department of Health as well as in his*
*individual capacity,* OFFICE OF THE GOVERNOR
OF NEW MEXICO and NEW MEXICO DEPARTMENT OF
HEALTH,

      Defendants.

and

ZACHARY FORT,
NEW MEXICO SHOOTING
SPORTS ASSOCIATION,

2

**App. 65**

FIREARMS POLICY COALITION, INC.,
and SECOND AMENDMENT FOUNDATION,

      Plaintiffs,

vs.                                  No. 1:23-cv-00778-DHU-LF

MICHELLE LUJAN GRISHAM, *individually and
in her official capacity as the Governor of New Mexico*,
PATRICK M. ALLEN, *individually and in his official capacity as the
Cabinet Secretary for the New Mexico Department of Health*,
JASON R. BOWIE, *individually and in his official capacity as
the Cabinet Secretary of the New Mexico Department of Public Safety*
and TROY W. WEISLER, *individually and in his official capacity as the
Chief of the New Mexico State Police*,

      Defendants.

### TEMPORARY RESTRAINING ORDER

Plaintiffs, individual firearm owners or Second Amendment advocacy organizations (collectively "Plaintiffs"), have moved for a temporary restraining order ("TRO") pursuant to Rule 65(b)(1) of the Federal Rules of Civil Procedure. They seek to enjoin enforcement of the New Mexico Department of Health's "Public Health Emergency Order Imposing Temporary Firearm Restrictions, Drug Monitoring and Other Public Safety Measures," issued on September 8, 2023 and/or certain portions of Executive Order 2023-130, published on September 7, 2023. The Court held a hearing on the requests for a TRO on September 13, 2023, and heard oral argument from the parties. For the reasons stated below, the Court will grant the Plaintiffs' motions and will issue an Order temporarily enjoining the enforcement of certain provisions of the Public Health Order.

## BACKGROUND

On September 7, 2023, responding to a rise in mass shootings and gun-related deaths, New Mexico Governor Michelle Lujan Grisham ("the Governor") issued Executive Order 2023-130 ("EO") declaring a state of public health emergency "of unknown duration" due to gun violence. Exec. Order No. 2023-130, (Sept. 07, 2023). The Governor's EO directed the New Mexico State Departments of Public Health, Homeland Security and Emergency Management, and Public Safety to collaborate with the Governor's officer to provide a coordinated response to implement the EO. The following day, on September 8, 2023, New Mexico Department of Health Secretary Patrick M. Allen ("Secretary Allen") issued a "Public Health Emergency Order Imposing Temporary Firearm Restrictions, Drug Monitoring and Other Public Safety Measures" ("PHO") pursuant to his authority to preserve and promote public health and safety. PHO (N.M. Dep't of Health Sept. 8, 2023).

Among other prohibitions in the PHO, Section (1) restricts open or concealed possession of a firearm by any person, other than by a law enforcement officer or licensed security officer, "within cities or counties averaging 1,000 or more violent crimes per 100,000 residents per year since 2021 according to [the] Federal Bureau of Investigation's Uniform Crime Reporting Program AND more than 90 firearm-related emergency department visits per 100,000 residents from June 2022 to June 2023 according to" the Public Health Department. *Id*. at § 1(A). Section (4) of the PHO further prohibits the possession of a firearm on "state property, public schools, and public parks" unless the person carrying the firearm is a law enforcement officer or licensed security officer. *Id*. at § 4.

**App. 67**

The PHO contains certain exceptions on the blanket prohibition of possessing firearms depending on who the person is and where the firearm is possessed.  As noted, Section (1) of the PHO does not apply to "a law enforcement officer or licensed security officer." *Id.* at § 1.  The PHO also exempts possessing a firearm while on private property and firearm possession while at a licensed firearm dealer or gunsmith, possession for use at a licensed firing range or sport shooting competition, or possession of a firearm while traveling to designated locations, provided that the firearm is appropriately locked and secured rendering it inoperable. *See id*. § 1(A)-(E). Willful noncompliance with the PHO subjects "[a]ny person or entity" to "civil administrative penalties available at law." *Id.* at § 4.

Plaintiffs assert that the firearm restrictions in the PHO and Executive Order are clearly unconstitutional in that any such restrictions on their ability to possess firearms, either openly or concealed, violates the Second Amendment to the United States Constitution.  As such, Plaintiffs state that despite the PHO, they intend to continue to carry a firearm, and that doing so would expose them to civil or potential criminal liability. These cases are also brought by several organizational Plaintiffs dedicated to Second Amendment advocacy. Some of these organizational Plaintiffs bring suit on behalf of their members and supporters, alleging that their affected members and supporters each would have standing to sue individually to challenge Defendants' orders; that the interests of the organizational Plaintiffs are germane to their organizational purpose; and that the claims asserted do not require the participation of individual members and supporters in this lawsuit.

Within days of the issuance of the PHO, Plaintiffs moved for a temporary restraining order, seeking to enjoin enforcement of certain provision of the PHO which restricted the possession of firearms.

**App. 68**

**DISCUSSION**

To obtain a temporary restraining order, Plaintiffs must show: "(1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits." *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992). "The likelihood-of-success and irreparable-harm factors are 'the most critical' in the analysis." *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd*., 350 F. Supp. 3d 1129, 1139 (D.N.M. 2018) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

**1.      Plaintiffs Have Established a Likelihood of Success on the Merits**

Plaintiffs have shown a likelihood of success on the merits that their Second and Fourteenth Amendment rights to publicly carry a firearm for self-defense will be violated if the PHO remains in effect. Under the Second Amendment, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND II. The Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742, 130 S.Ct. 3020 (2010) established that the Second Amendment "protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald*, 561 U.S. at 780, 130 S.Ct. 3020 (plurality). Additionally, in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, ⸺ U.S. ⸺ –, 142 S. Ct. 2111, 2125, 213 L. Ed. 2d 387 (2022), the Supreme Court explained that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id*. 142 S. Ct. at 2122.

6

**App. 69**

*Bruen* is particularly instructive here as it was a public carry case that involved a challenge to New York State's public-carry licensing regime requiring that an applicant demonstrate "proper cause" for a license to carry a firearm outside his home or place of business for self-defense. *Id.* at 2122. In *Bruen*, the Supreme Court explained that the initial question was "whether the plain text of the Second Amendment protects [the plaintiffs'] proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 2134. The Supreme Court had "little difficulty" concluding that the plaintiffs' desire to "carry[ ] handguns publicly for self-defense" was covered by the Second Amendment and that the Amendment "presumptively guarantee[d]" the plaintiffs the right to public carry for self-defense. *Id.* at 2134, 2135. Given that presumption, the Supreme Court explained that, in order to justify a restriction on the right to openly carry firearms for self-defense,

> the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nations' historical tradition of firearm regulation. Only if a firearm regulation is consistent with the Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id.* at 2126 (internal quotation marks and citation omitted). The Supreme Court then examined whether the Nation's historical tradition of firearm regulation would justify a restriction on the public carrying of firearms for self-defense and concluded that it would not. As noted by the Court, "[a]part from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense." *Id.* at 2156.

The Court finds that the analysis in *Bruen* will likely control in the instant case, given that here the Plaintiffs challenge a restriction on the right to carry firearms in public for self-defense. Of course, the Court is cognizant of the fact that the instant case may present issues not explicitly raised in *Bruen*, *McDonald* or *Heller*, but given the directives and holdings of this Supreme Court

precedent, the Court concludes that Plaintiffs have shown a substantial likelihood of success on the merits of their Second Amendment claim.

## 2. Plaintiffs Will Suffer Irreparable Harm Absent an Injunction

The Court also finds that Plaintiffs have shown they will suffer irreparable harm if a temporary injunction is not issued. "A plaintiff suffers irreparable injury when [a] court [is] unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1263 (10th Cir. 2016) (citation and internal quotation marks omitted). "When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Id.* (citation omitted). The Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citation omitted). Although "the Supreme Court … ha[s] [not] addressed whether a violation of the Second Amendment 'unquestionably constitutes irreparable injury,'" courts have reasoned that Second Amendment infringements constitute a *per se* injury because "[t]he constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Wolford v. Lopez*, No. CV 23-00265 LEK-WRP, 2023 WL 5043805, at *30, 31 (D. Haw. Aug. 8, 2023) (quoting *Bruen*, 142 S. Ct. at 2156) (other citation omitted). Like the gun owners in *Wolford*, "Plaintiffs have sufficiently established that the irreparable harm is immediate because they intend to continue to carry their firearms in accordance with their permits in places where carrying firearms are now prohibited." *Id.* at *31. The Court therefore concludes that that Plaintiffs are likely to face irreparable harm of their Second Amendment rights to publicly carry a firearm for self-defense absent an injunction.

**App. 71**

### 3.      The Temporary Restraining Order Will Not Be Adverse to the Public Interest

Plaintiffs have shown that the Temporary Restraining Order will not be adverse to the public interest. As the Tenth Circuit has stated, "it is always in the public interest to prevent the violation of a party's constitutional rights[.]" *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (citation omitted). Moreover, a state "does not have an interest in enforcing a law that is likely constitutionally infirm." *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010). Although the State of New Mexico raises important safety concerns, at this stage it fails to demonstrate that the public safety concerns overcome the public's interest in preventing constitutional violations. At a fuller hearing on Plaintiffs' request for a preliminary injunction, the State of New Mexico may present more detailed information about how public safety strongly weighs against issuing a preliminary injunction because of the dangers and safety concerns associated with firearms. However, given *Bruen*'s clarity that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home," *Bruen*, 142 S. Ct. at 2122, the Court concludes that issuing a TRO to prevent the violation of a constitutional right would be in the public interest.

### 4.      The Balance of Equities Favor Plaintiffs

The balance of equities weigh in favor of issuing a TRO. As noted "it is always in the public interest to prevent the violation of a party's constitutional rights[.]" *Hobby Lobby*, 723 F.3d at 1145; *see id*. at 1147 (finding that the balance of equities favored First Amendment plaintiffs where they faced "the Hobson's choice between catastrophic fines or violating [their] religious beliefs.") Because the PHO likewise subjects "[a]ny person or entity" to "civil administrative penalties available at law," the Plaintiffs face the choice of either facing fines or violating their

9

**App. 72**

Second Amendment right to carry a firearm in public for self-defense. *Id*. Accordingly, the Plaintiffs have shown that the balance of equities weigh in their favor.

## CONCLUSION

For the reasons explained herein, Plaintiffs' Motions for a Temporary Restraining Order pursuant to Rule 65(b)(1) of the Federal Rules of Civil Procedure is **GRANTED**.

**IT IS THEREFORE ORDERED BY THE COURT** that the Defendants New Mexico Governor Michelle Lujan Grisham, New Mexico Department Secretary Patrick M. Allen, New Mexico Department of Public Safety Jason R. Bowie, Chief of the New Mexico State Police and any other New Mexico officials ("Defendants") are **ENJOINED** from applying, enforcing, or attempting to enforce, either criminally or civilly, Section (1) of the New Mexico Department of Health's "Public Health Emergency Order Imposing Temporary Firearm Restrictions, Drug Monitoring and Other Public Safety Measures" ("PHO") published on September 8, 2023, which reads:

> (1) No person, other than a law enforcement officer or licensed security officer, shall possess a firearm, as defined in NMSA 1978, Section 30-7-4.1, either openly or concealed, within cities or counties averaging 1,000 or more violent crimes per 100,000 residents per year since 2021 according to Federal Bureau of Investigation's Uniform Crime Reporting Program AND more than 90 firearm-related emergency department visits per 100,000 residents from July 2022 to June 2023 according to the New Mexico Department of Public Health, except:
>
> A.  On private property owned or immediately controlled by the person;
>
> B.  On private property that is not open to the public with the express permission of the person who owns or immediately controls such property;
>
> C.  While on the premises of a licensed firearms dealer or gunsmith for the purpose of lawful transfer or repair of a firearm;
>
> D.  While engaged in the legal use of a firearm at a properly licensed firing range or sport shooting competition venue; or

E.  While traveling to or from a location listed in Paragraphs (1) through (4) of this section; provided that the firearm is in a locked container or locked with a firearm safety device that renders the firearm inoperable, such as a trigger lock.

\*\*\*

In addition, Defendants are **ENJOINED** from applying, enforcing, or attempting to enforce, either criminally or civilly, Section (4) of the New Mexico Department of Health's "Public Health Emergency Order Imposing Temporary Firearm Restrictions, Drug Monitoring and Other Public Safety Measures" to the extent it imposes additional restrictions on the carrying or possession of firearms that were not already in place prior to its issuance.

**IT IS FURTHER ORDERED** that this Temporary Restraining Order shall be effective as of 2:55 P.M. on September 13, 2023 and until such time as the Court has ruled on the Plaintiffs' motions for preliminary injunction, following a hearing at which all parties shall have the opportunity to present further argument to this Court.

**IT IS FURTHER ORDERED** that in the exercise of its discretion, the Court has considered the issue and determined that a bond, pursuant to Fed. R. Civ. P. 65(c), is unnecessary because "there is an absence of proof showing a likelihood of harm." *Coquina Oil Corp. v. Transwestern Pipeline Co.,* 825 F. 2d 1461 (10th Cir. 1987).

**IT IS FURTHER ORDERED** that this matter shall be set for hearing on the Plaintiffs' motion for preliminary injunction on **October 3, 2023** at **10:00 A.M.** in the Mimbres Courtroom, United States District Court for the District of New Mexico, Albuquerque, New Mexico.

**IT IS SO ORDERED**.

_____

HON. DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE

**App. 75**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| WE THE PATRIOTS USA, INC, | : | |
| DENNIS SMITH, | : | DKT No.: 1:23-cv-00773-DHU-LF |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MICHELLE LUJAN GRISHAM, | : | |
| in her official capacity only, PATRICK | : | |
| M. ALLEN, in his official capacity only, | : | |
| JASON R. BOWIE, in his official | : | |
| capacity only, TROY WEISLER, in his | : | |
| official capacity only, HAROLD | : | |
| MEDINA, in his official capacity only, | : | |
| | : | |
| Defendants. | : | SEPTEMBER 21, 2023 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' SECOND EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (EX PARTE RELIEF REQUESTED)**

After the Court issued a temporary restraining order on September 13, 2023 enjoining the Defendants from enforcing provisions of Executive Order 2023-130 and Defendants' Grisham and Allen's September 8, 2023 public health order, Defendants Grisham and Allen doubled down in the waning hours of a Friday afternoon when they knew that the courts would be inaccessible to the Plaintiffs. They issued an amended public health order dated September 15, 2023 that eliminates the broad restriction on public carrying in Albuquerque, but modifies their ban on carrying on state property to one that restricts the public carrying of firearms in public parks (except for state parks) and public playgrounds or any other area provided for children to play. **Exhibit A, § 1.** This language expands the scope of the original order to public playgrounds and any other

areas where children play despite the amended order's disclaimer that it is not to be enforced to the extent that it violates the temporary restraining order that the Court issued.

The amended public health order suffers from the same defect as the original public health order: the Defendants have made absolutely no effort to justify it under any of the exceptions to the Second Amendment's guarantee of a right to public carry that the United States Supreme Court recognized in *New York State Rifle and Pistol Association v. Bruen*, 142 S.Ct. 2111, 2134 (2022). Instead, the Defendants continue to restrict the Plaintiffs' Second Amendment rights to carry firearms in the places where the Plaintiffs need firearms the most to protect themselves and their families based on an emotional reaction to three tragic homicides in New Mexico.

The Defendants' failure to offer any rationale as to how their order is constitutional in view of *Bruen* requires the Court to speedily restrain it. Additionally, the Defendants' reissuance of an amended order requires the Court's intervention a second time to avoid confusion and protect the Plaintiffs' Second Amendment rights.

## FACTUAL BACKGROUND

New Mexico has seen several isolated incidents of shootings over the last six weeks. On July 28, 2023, a 14-year-old boy obtained a pistol due a homeowner's alleged negligence in storing it and shot a 13-year-old girl in Questa, New Mexico while they both were hanging out with friends. Dkt. 1, ¶ 16. On August 14, 2023, a criminal attempting a drive-by shooting of another individual shot and killed a 5-year-old girl at a trailer park in Albuquerque. *Id*. at ¶ 17. On September 6, 2023, a criminal shot and murdered an eleven-year-old boy in what appears to be a road rage incident. *Id*. at ¶ 18. Additionally, a

mentally disturbed teenager – Beau Wilson – killed three people in Farmington, New Mexico on May 15, 2023 when he randomly walked through a neighborhood shooting at homes and drivers after he allegedly struggled to cope with his parents' divorce and being removed from his school's varsity wrestling team. *Id*. at ¶ 19.

Citing these incidents to declare "gun violence" a public health emergency, Defendants Grisham and Allen collectively issued executive and administrative orders banning the public carry of firearms in public parks across New Mexico and in cities and counties that meet certain statistics – effective immediately. *Id*. at ¶¶ 20-22. Albuquerque, New Mexico meets the statistical markers established by these orders. *Id*. at ¶ 24.

Plaintiff Dennis Smith is a law-abiding citizen who has lived in Albuquerque for approximately 40 years. **Exhibit B, ¶ 3**. His age renders it impossible for him to outrun or overpower a criminal who attacks him or his loved ones. *Id*. at ¶ 5. Thus, he has held a New Mexico concealed carry permit for approximately 6 years, and he meets all of the federal and state requirements to lawfully obtain, possess, and carry firearms. *Id*. at ¶ 4.

Smith regularly carries a loaded handgun in a holster on his body for the purpose of self-defense whenever he leaves his home and when he is out in public in Albuquerque. *Id*. at ¶ 6. Additionally, Smith carries his handgun when he engages in recreation weekly at New Mexico public parks – primarily Los Poblanos Open Space – to protect himself from wild coyotes, stray dogs, and potential human attackers. *Id*. at ¶ 8.

Despite the Defendants' orders and conduct, Smith still intends to carry his handgun in public within the City of Albuquerque as well as Los Poblanos Open Spaces. *Id*. at ¶ 10. If he does, New Mexico law exposes him to civil penalties up to $5,000 per

violation of the Defendants' orders. New Mexico Stat. § 12-10A-19. Penalties in that amount would exceed Smith's financial means. **Exhibit B, ¶ 11**.

Plaintiff We The Patriots USA, Inc. – of whom Smith is a member and supporter – joins Smith's claims on behalf of its similarly situated New Mexico members. Dkt. 1, ¶¶ 8-9.

The Plaintiffs moved for emergency injunctive relief on September 9, 2023. Dkt. 3. After a hearing on September 13, 2023, the Court granted a temporary restraining order enjoining the Defendants from enforcing certain provisions of their September 8, 2023 public health order. Dkt. 11.

On September 15, 2023, Defendants Grisham and Allen amended the public health order in response to the Court's order. **Exhibit A**. The amended public health order prohibits the carrying of firearms – openly or concealed – "in public parks or playgrounds, or other public area[s] provided for children to play in…" in Albuquerque, New Mexico. *Id*. at p. 2, § 1. This definition, however, exempts areas designated as state parks. *Id*. at p. 2, § 1.

## <u>LEGAL STANDARD</u>

The Court may grant a temporary restraining order or a preliminary injunction or a preliminary injunction if the moving party shows "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm in the absence of the injunction; (3) proof that the threatened harm outweighs any damage the injunction may cause to the party opposing it; and (4) that the injunction, if issued, will not be adverse to the public interest." *Kansas*

*Health Care Ass'n, Inc. v. Kansas Dep't of Social & Rehabilitation Servs.*, 31 F.3d 1536, 1542-42 (10th Cir. 1994) (internal citations omitted.

The Court may grant a temporary restraining order without notice to the adverse party only if (1) "specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition;" and (2) "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b).

## **ARGUMENT**

**I.     The Plaintiffs Demonstrate A Substantial Likelihood Of Prevailing On The Merits.**

   **A. The Defendants' Amended Orders Do Not Regulate "Sensitive Places" And Violate The Second And Fourteenth Amendments.**

The Defendants' initial orders completely deprived the law-abiding citizens of Albuquerque and the Plaintiffs of their Second and Fourth Amendment right to carry firearms for the purpose of self-defense throughout the entire city, and the Defendants' amended orders do little to narrow that definition. The Defendants' amended orders still defy the plain text of the Second Amendment and *Bruen*. For those reasons, the Plaintiffs demonstrate a substantial likelihood of success on the merits of their challenge to the public carry provision of the Defendants orders.

 *Bruen* establishes a two-part test for analyzing Second Amendment claims. The Plaintiffs must first demonstrate that "the Second Amendment's plain text covers [their] conduct." *Bruen*, 142 S.Ct. at 2129-30. If they carry that burden, "the Constitution

presumptively protects that conduct." *Id*. "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id*. at 2130 (internal quotation marks and citations omitted).

The Plaintiffs carry their textual burden. As in *Bruen*, there is no meaningful dispute that Smith and We The Patriots USA's members – "ordinary, law-abiding citizens" – are part of the people whom the Second Amendment protects. *Id*. at 2134. Nor is there any dispute that "handguns are weapons 'in common use' today for self-defense." *Id*. The definition of "bear" in the Second Amendment "naturally encompasses public carry." *Id*. at 2134-35. Thus, as the Supreme Court concluded in *Bruen*, the Second Amendment's plain text presumptively guarantees the Plaintiffs a right to "bear" arms in public for self-defense just as they have done peacefully and lawfully for many years. *Id*. at 2135.

The burden now shifts to the Defendants to demonstrate that their orders and conduct are consistent with the historical tradition of firearm regulation. The Plaintiffs do not dispute that there is a well-established and representative historical analogue that permits states to prohibit the possession and carrying of firearms in "sensitive places." *See Bruen*, 142 S.Ct. at 2133. The Defendants cannot prevail in that inquiry though as to public parks, playgrounds, and other public areas provided for children to play in.

A key principle from *Bruen* governs at the outset. *Bruen* completely forecloses any argument that any place can be a "sensitive place" simply because many people

congregate there and law enforcement is presumptively available. [1] *Id*. at 2134-35 ("Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department").

Although the Supreme Court declined to "comprehensively define 'sensitive places'" in *Bruen*, it did not leave courts without any guidance. In *Bruen*, New York proposed a definition of "sensitive places" as "all places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id*. at 2133 (quoting New York's brief) (internal quotation marks and citations omitted). *Bruen* rejected this definition as being far too broad and being without a historical basis. *Id*. at 2134. It also found that such a definition "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense…."*Id*. at 2134.

Instead, the Supreme Court recognized that the 18th and 19th-century historical record yielded few places where governments banned the possession of weapons. *Bruen*, 142 S.Ct. at 2133 (listing "legislative assemblies, polling places, and courthouses"

---

[1] Even if it was, the right to self-defense takes on additional importance in light of *Deshaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189 (1989) and *Town of Castle Rock, Colo. V. Gonzales*, 545 U.S. 748 (2005). *Deshaney* and *Castle Rock* unequivocally establish that law enforcement and government officials have no obligation "to protect the life, liberty, and property of [their citizens] against invasion by private actors." *Deshaney*, 489 U.S. at 195; *Castle Rock*, 545 U.S. 748 (holding that the Fourteenth Amendment does not require police officers to enforce the law or arrest someone who violates the law). In other words, even the presence of law enforcement officers does not guarantee their safety or that law enforcement officers will act to protect them when they are the potential victims of a violent crime.

as "sensitive places"). Thus, *Bruen* instructed courts to use "analogies" to these "historical regulations of 'sensitive places' to determine [whether] modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id*. at 2133 (emphasis in original).

Public parks, playgrounds, and play areas for children do not even remotely resemble the well-established historical "sensitive places" analogues *Bruen* cites. Those analogues shared a common feature. They only covered places where the core functions of government or self-government took place. Core government functions do not take place in public parks, playgrounds, and play areas for children. Virtually every government in the United States has established a central building or location in which to conduct its core functions. That includes the federal capitol, the state capitals, federal and state legislative buildings, municipal city and town halls, and courthouses. Conversely, public parks, playgrounds, and play areas – open to the public for recreation – are the furthest thing imaginable from a place where core government functions take place.

**1. The American historical tradition of "sensitive places" were rare and typically covered places where the core functions of government took place.**

The "sensitive places" doctrine lacks a clear historical starting point. The Supreme Court has rightfully cautioned that medieval history is ill-suited for interpreting the Second Amendment. *See Bruen*, 142 S.Ct. at 2139. The Plaintiffs concede nothing though by acknowledging that ancient history informs the historical tradition of "sensitive places." The Founding Fathers rejected ancient history and even colonial history as being too

weak in formulating the Second Amendment. Thus, the United States' "sensitive places" doctrine is informed, but not controlled, by pre-Founding Era history.

Marcus Tullus Cicero provided a timeless example of the need for a "sensitive places" doctrine. Titus Annius Milo selected Cicero – one of Rome's greatest orators – to deliver his closing argument to a jury stacked by his political opponents when he faced trial for murdering a political rival, Publius Clodius Pulcher. While Cicero's Milo Oration stands as one of the greatest defenses of the principle of self-defense in human history, Cicero himself never gave the oration at Milo's trial due to armed intimidation from Clodius' friends. Marcus Tullius Cicero, Speech in Defence of Titus Annius Milo (52 B.C.), in 3 ORATIONS OF MARCUS TULLIUS CICERO 204-05 (Charles Duke Yonge trans., rev. ed. 1899). The stacked jury convicted Milo, and the tribunal exiled him. Cicero's prominence as a Roman legal thinker endured though, and his work influenced much of western legal thought. Thus, it is no stretch to say that the context of the Milo oration influenced western thought pertaining to the "sensitive places" doctrine.[2]

Medieval English regulations addressed the same problem that Cicero encountered in the Milo trial. In 1313, the English Parliament took steps to protect legislative assemblies, enacting a statute that provided "in all parliaments, treaties, and other assemblies which should be made in the realm of England for ever, every man shall

---

[2] The Supreme Court has held that chaos that falls far short of the armed intimidation present in the Milo trial violates a criminal defendant's due process right to a fair trial. *Sheppard v. Maxwell*, 384 U.S. 333, 336 (1966). *Sheppard* plainly establishes that the need to protect core government functions by treating the places in which critical government business is conducted as "sensitive" is not simply limited to weapons and armed intimidation of participants. Instead, the free and just operation of core government functions depends on an orderly environment and the preclusion of chaos.

come without all force and armour, well and peaceably." 7 Edw. 2, 170 (1313). Later, the

1328 Statute of Northampton ("the Statute") provided protections to the King's ministers

and officers, including the English Courts. The Statute came into being during a time of

turmoil. *Bruen*, 142 S.Ct. at 2139. After Edward II was deposed by force and Edward III

took the throne, England descended into a state of anarchy and rebellion, and knights

and commoners alike ravaged the land in a general "spirit of insubordination." *Id*. The

Statute sought to restore order and respect for royal authority by prohibiting Englishmen

from coming

> before the King's Justices, or other of the King's Ministers doing their office,
> with force and arms, nor bring[ing] no force in affray of the peace, nor to go
> nor ride armed by night nor by day, in Fairs, markets, nor in the presence
> of the Justices or other Ministers, nor in no part elsewhere, upon pain to
> forfeit their Armour to the King, and their Bodies to Prison at the King's
> pleasure.

*Id*. at 2139 (quoting 2 Edw. 3 c. 3 (1328).

While *Bruen* held that the Statute has little bearing on the modern interpretation of

the Second Amendment, *id*. at 2139-2142, the Statute still builds upon the Milo trial

example as one of the earliest examples of a "sensitive places" regulation and its policy

goal to ensure the unfettered operation of core government functions.

*Bruen*'s caution as to the Statute is well-placed. From the earliest days of English

colonies in America, the American colonial tradition of the right to bear arms broke

radically from their English counterparts. It began when King James I issued the English-

speaking-world's first written guarantee of a right to obtain, keep, and bear arms in the

1606 Virginia Charter. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places"*

*Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 229

(2018). The 1620 New England Charter carried an identical guarantee. *Id*. at 229-30. Since the geographical scope of these charters covered the entire area of the original thirteen American States, the early colonists enjoyed a greater right to bear arms than their English counterparts did. *Id*. at 230.

The American tradition not only contained a right to obtain, keep, and bear arms, but the colonial record is replete with compulsory possession laws mandating that men bring their arms to churches and public meetings.[3]

Restrictions on the places where firearms could be carried in the colonial and Founding Eras were few and far between. For instance, not even the classification of legislatures as "sensitive places" appears to have a firm foundation in colonial and Founding Era regulations. Maryland and Delaware were the only two colonies and states that prohibited the carrying of arms into legislative assemblies. *See* 1647 Md. Laws 216 ("[N]oe one shall come into the howse of Assembly (whilst the howse is sett) with any

---

[3] *See, e.g.,* 1 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 173 (1808) (1632 Virginia statute providing that "ALL men that are fittinge to beare armes, shall bringe their pieces to the church"); *id.* at 263 (1632 Virginia statute providing that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"); *id.* (1643 Virginia statute requiring that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"); 2 *id.* at 126 (similar 1676 Virginia law); 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 94 (John Russell Bartlett ed., 1856) ("noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon."); 19 (part 1) THE COLONIAL RECORDS OF THE STATE OF GEORGIA 137-40 (Allen D. Candler ed., 1904) (1770 Georgia statute imposing fines on militiamen who went to church unarmed). See *also* JOHNSON ET AL., *supra* note 1, at 183-85 (Connecticut, Massachusetts Bay, Maryland, South Carolina).

weapon upon perill of such fine or censure as the howse shall thinke fit"); 1650 Md. Laws 273 ("That none shall come into eyther of the houses whilst they are sett, with any gun or weapon upon perill of such fine or censure as the howses shall thinke fit." "Orders made & agreed vppon by the Assembly for the better ordering of Both Howses"); DEL. CONST, art. 28 (1776). The United States Congress did not prohibit the carrying of arms in both houses, and Representative Preston Brook's historical beating of anti-slavery Senator Charles Sumner did not culminate in just the near-death of Senator Sumner. Brooks then threatened Representative Calvin Chaffee who responded by buying a revolver and openly displaying it on his desk in the House to the approbation of his colleagues. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 235 n.112 (2018).

While the Plaintiffs do not challenge prohibitions on the carrying of arms in legislative buildings and no decision issued by this Court or any other court on the merits of his case will cast doubt on the legislative prohibitions common today, they submit this example to show just how different the American tradition of what were considered "sensitive places" was from its English antecedent. The laws and regulations that they discuss above were the only "sensitive places" regulations in the colonial and Founding Eras. Thus, assuming *arguendo* Maryland's and Delaware's regulations could supply a well-established and representative historical analogue for any sort of regulation,[4] they would only supply that analogue for buildings where core government functions took place

---

[4] *Bruen* requires more than isolated examples. *See Bruen*, 142 S.Ct. at 2153 (requiring more than a single statute and a pair of state-court decisions to justify New York's regulation).

– legislative assemblies, courts, executive buildings, and polling places. They do not supply a well-established and representative historical analogue for other places.

Reconstruction Era history also does not supply a well-established and representative historical analogue for a broader definition. The former Confederate states entered a state of chaos similar to that addressed by the Statute of Northampton. *Bruen*, 142 S.Ct. at 2152-53; *see also McDonald v. City of Chicago, Ill*. 561 U.S. 742, 772 (2010). Both *Bruen* and *McDonald* emphasized evidence submitted in the Congressional record that showed armed bands of former Confederate soldiers perpetrating all sorts of violent outrages on the newly free blacks and Southern states' efforts to disarm blacks to leave them at the mercy of these bands. *Bruen*, 142 S.Ct. at 2152-53; *McDonald*, 561 U.S. at 772. Congress's regulatory response was to take emphatic steps to protect blacks' right to bear arms through the Freedmen's Bureau and the Fourteenth Amendment. *Bruen*, 142 S.Ct. at 2151.

The former Confederate states who chose to regulate these ravages functionally enacted "sensitive place" laws although they usually took the form of "time" restrictions rather than "sensitive places" regulations. In 1870, Louisiana prohibited people from carrying arms in public at all on election day and within half a mile of a voter registration place. 1870 La. Acts 159-60.

Maryland focused on regulating two problematic counties. In 1874, it banned the carrying of weapons on election day in Kent County. 2 PUBLIC LOCAL LAWS OF MARYLAND, ARTICLES 11-24, at 1457 (King Bros, ed. 1888). In 1886, it banned the carrying of arms within 300 yards of polling places on election day in Calvert County. 1886

Md. Laws 315. In 1873, Texas prohibited the carrying of weapons within half a mile of a polling place during election hours. 2 A DIGEST OF THE LAWS OF TEXAS, CONTAINING THE LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST, FROM 1754 TO 1874, CAREFULLY ANNOTATED 1317-18 (4th ed. 1874).

These regulations, sounding in the "sensitive places" doctrine, received their first judicial endorsement in 1874 when the Georgia Supreme Court upheld a statute prohibiting the carrying of weapons into a court. *State v. Hill*, 53 Ga. 472 (1874). Without citing Cicero's Milo example or the Statute of Northampton, the Georgia Supreme Court ensured that a similar situation would not happen in its courts in no uncertain terms:

> [T]he right to go into a court-house and peacefully and safely seek its privileges, is just as sacred as the right to carry arms, and if the temple of justice is turned into a barracks, and a visitor to it is compelled to mingle in a crowd of men loaded down with pistols and Bowie-knives, or bristling with guns and bayonets, his right of free access to the courts is just as much restricted as is the right to bear arms infringed by prohibiting the practice before courts of justice.

*Id*. at 477-78.

While it is true that other states in the Reconstruction Era attempted broad classifications of "sensitive places," those classifications escaped Second Amendment review by virtue of the Supreme Court's decision in *United States v. Cruikshank*, 92 U.S. 542 (1875), which declined to incorporate the Bill of Rights against the states. For instance, in 1869, Tennessee prohibited the carrying of pistols and various other dangerous or deadly weapons to polling places and "any fair, race course, or other public assembly of the people." PUBLIC STATUTES OF THE STATE OF TENNESSEE, SINCE

THE YEAR 1858: BEING IN THE NATURE OF A SUPPLEMENT TO THE CODE 108 (2d ed. Supp. 1872). It never received judicial review.

Texas enacted several laws that at least partially attempted "sensitive places" regulation. In 1870, it banned the carrying of firearms at election places, "any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly," churches, schools, and private social events. 1870 Tex. Laws 63.

Broad laws of both the Tennessee and Texas vintage, however, carry both First and Second Amendment implications due to their broad coverage of private gatherings. Since these sorts of laws did not become subject to Second Amendment scrutiny until 2010 by way of *McDonald v. City of Chicago, Ill*. 561 U.S. 742 (2010), they provide little support for a broad "sensitive places" exception to the Second Amendment.

The laws of two states also falls far short of the well-established and representative historical analogue *Bruen* requires. *See Bruen*, 142 S.Ct. at 2155-56 & n. 31 (rejecting New York argument that Kansas and Arkansas's laws banning public carry in certain instances supplied the necessary historical analogue because two states' laws did not "demonstrate a broad tradition of States doing so).

Thus, at best, the historical record supports a conclusion that places where the core functions of government and self-government took place were "sensitive" because the survival of the United States as a constitutional republic depended on free expression and unfettered access to justice. Thus, historical laws properly protected voting, legislative debate, and courts of law in a manner consistent with the Second Amendment. They, however, did not grant states broad authority to declare virtually any area a

sensitive place. *Bruen*, 142 S.Ct. at 2133. Thus, this limited "sensitive places" tradition favors the Plaintiffs' argument that public parks cannot be declared "sensitive places."

> **2. The modern addition of schools as a "sensitive places" exception is a narrow one that comports with the "core government functions" definition and does not justify a broader definition.**

Like the "sensitive place" restrictions discussed above, colonial and Founding Era history and tradition does not supply many examples of blanket prohibitions on carrying firearms in schools. It, however, does supply ample evidence that schools were places where a core government function occurred, supporting the Plaintiffs' contention that their modern addition to the "sensitive places" doctrine does not expand the definition of "sensitive places" but confirms the "core government function" standard.

The historical record of arms prohibitions at American schools begins in 1824 at the University of Virginia. Founded by Thomas Jefferson and others, the student body soon gave Jefferson and his fellow members of the Board of Visitors, including James Madison, much grief by rioting, carousing, firing guns in the air, and shooting at each other. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 249-50 (2018). The Board responded by banning students, but not faculty or other employees, from keeping or carrying weapons on campus. *Id*.

In 1878, Missouri prohibited students from carrying concealed weapons at any university, college, or school. *See* 1878 Miss. Laws 176. Its prohibition, however, did not prohibit students from openly carrying weapons, and it did not prohibit faculty members or staff employees from carrying concealed weapons. *Id*. As discussed previously, Texas

banned the carrying of arms to schools in 1870, similar to modern school regulations. 1870 Tex. Laws 63. The historical record, however, is bare of widespread examples of prohibiting firearm possession in schools.

The lack of specific historical examples does not doom the classification of schools as "sensitive places" though if they can properly be said to be carrying out a core government function. The historical record provides ample historical support for the principle that schools carry out core government functions. *See, e.g.*, *Horton v. Meskill*, 172 Conn. 615, 647 (1977) (discussing Connecticut's 1650 laws requiring every township to hire a schoolmaster). Because education became a state duty, schoolhouses became places where core government functions are carried out – either by state or municipal governments. Thus, their classification as "sensitive places" comfortably meets the definition of "sensitive places" as places where core government functions occur, and their addition to the modern doctrine of "sensitive places" does not support a definition for "sensitive places" broader than the "core government function" definition.

### 3. Prohibitions on carrying firearms in public parks did not surface until well after the adoption of the Second Amendment and did not become commonplace until well after the Civil War.

Public parks, public places of recreation, and their forerunners have existed well before modern public parks. In colonial times, village greens, commons, gardens, and squares constituted colonial forerunners to modern public parks. *See* Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 14 (2021) ("Today's American public park is deeply rooted in the seventeenth- and eighteenth-century utilitarian village green,

common, square, and parade ground"). Those colonial forerunners claim parks that still exist today such as the Boston Common, Bowling Green Park, and Battery Park. *Koons v. Platkin*, 2023 WL 3478604, at *83 (D. NJ 2023) (listing examples). None of these early forerunners of modern public parks and places of recreation imposed a prohibition on the carrying of firearms within their confines. *Id*. (granting a preliminary injunction as to a carry ban at public parks).

Instead, the earliest bans on carrying firearms in public parks came between 1858 and 1872 in large municipalities. *See e.g.*, *Minutes of Proceedings of the Board of Commissioners of the Central Park*, at 166 (1858); *First Annual Report of the Commissioners of Fairmont Park*, § 21 (1870). These bans came well after the adoption of the Second Amendment, and the Supreme Court's failure to incorporate the Second Amendment against state and local governments until 2010 meant that they went unchallenged. Additionally, two other district courts have found that the local park ordinances up until 1890 governed less than 10% of the nation's entire population and were unrepresentative within the meaning of *Bruen*. *Koons*, 2023 WL 3478604, at * 85; *Antonyuk v. Hochul*, 2022 WL 16744700, at *67 (N.D.N.Y. 2022).

The lack of widespread historical evidence – especially before and immediately after the Founding Era – is fatal to any attempt to justify bans on carrying in public parks under the "sensitive places" doctrine. The Court should join the *Koons* and *Antonyuk* courts in rejecting such arguments, and it should enjoin the Defendants' ban on carrying in New Mexico's public parks, playgrounds, and other areas provided for children to play in.

**II.     The Plaintiffs Demonstrate Irreparable Harm In The Absence Of A Temporary Restraining Order And A Preliminary Injunction.**

Plaintiffs demonstrate irreparable harm "when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001). The Plaintiffs carry their burden on this prong.

As discussed above, the Second and Fourteenth Amendments guarantee a right to publicly carry firearms for lawful purposes. The Defendants have issued orders that completely bar the Plaintiffs from exercising those rights in New Mexico public parks, playgrounds, and other areas where children play in violation of the Second and Fourteenth Amendments for the next 30 days. Their injury is thus immediate and ongoing. *See Elrod v. Burns* 427 U.S. 347, 373 (1976) (establishing a presumption of harm for the loss of constitutional freedoms).

Plaintiff Smith, however, still intends to exercise his rights despite the Defendants' orders. If he does, he and other similarly situated members of We The Patriots USA, Inc. will face crippling financial sanctions, arrest, and criminal prosecution. **Exhibit A, ¶ 11**. In other words, the collective burden of the Defendants' enforcement of their unconstitutional orders will speedily end Smith's determination to exercise his Second Amendment rights.

Monetary damages would constitute an inadequate remedy and would be extremely difficult to ascertain. The very essence and value of a constitutional right is the ability to exercise it uninhibited within the constitutionally permissible bounds established by law, not executive fiat. Thus, a day where the Plaintiffs cannot exercise their

constitutional rights without violating the law or exposing themselves to crippling financial sanctions is a day lost to them forever. No amount of money cannot adequately compensate them for days where they could not exercise their constitutional rights. More importantly, monetary damages would be completely unavailable as to the Defendants if the Plaintiffs suffered death or serious injury at the hands of a gun-wielding criminal while the Defendants barred them from lawfully carrying firearms.

Additionally, there is no way to reliably determine what monetary damages to award the Plaintiffs for the loss of their constitutional rights. A jury would simply have to pull a number out of their hats, and that number could be astronomically high or nominal depending on their sympathies. Thus, the Court should conclude that the Plaintiffs have demonstrated irreparable harm.

## III. The Plaintiffs Demonstrate That The Threatened Harm Outweighs Any Damage That The Injunction May Cause To The Party Opposing It.

The Defendants will suffer no damage by the granting of a temporary restraining order or a preliminary injunction. Prior to the Defendants' issuance of their orders, Smith and other similarly situated, law-abiding New Mexico citizens carried their firearms regularly in public parks, playgrounds, and other areas that children played. They represented no threat to public safety or the public health then, and nothing about their conduct has changed to render them a threat to public safety now.

Additionally, nothing about their behavior will change in the next 30 days to render them more responsible to carry firearms in public. No important public health goals will be served by prohibiting law-abiding citizens from exercising their Second Amendment rights in a law-abiding manner.

The Defendants' amended order also opens fire on its own logic. It still permits the Plaintiffs to carry their firearms in state parks, playgrounds, and other areas where children play outside the City of Albuquerque. If these locations truly were "sensitive places," the Defendants' failure to extent their order to those locations outside the City of Albuquerque is baffling.

The Defendants have grounded their rationale for issuing their orders in nothing extraordinary. Crime happens. While the loss of any life is tragic, the Defendants' reliance on three isolated shootings – the result of criminal conduct – does not establish a broader societal problem that imperils New Mexico citizens as a community. Every city and state in the United States experience shootings and murders, but they still permit their law-abiding citizens to bear arms just as New Mexico did until the Defendants reacted emotionally and unilaterally.

The problems that the Defendants seek to address will not disappear as long as human beings coexist in communities. As discussed at length above, the Supreme Court has already recognized these problems, but it has affirmed the superseding importance of the right to publicly carry firearms. Thus, the Court's issuance of emergency injunctive relief will not cause any harm to the Defendants who will simply be returned to the same circumstances that every state and city in the United States exists in.

## IV. The Plaintiffs Demonstrate That The Injunction Will Not Be Adverse To The Public Interest.

*Bruen*'s plain language controls the final factor in the temporary restraining order/preliminary injunction analysis: "The Second Amendment is the very *product* of an interest balancing by the people, and it surely elevates above all other interests the right

of law-abiding, responsible citizens to use arms for self-defense." *Bruen*, 142 S.Ct. at 2131 (internal quotation marks and citations omitted, emphasis in original). Thus, "[i]t is this balance – struck by the traditions of the American people – that demands our unqualified deference." *Id*. This language alone is dispositive of this factor. Thus, the Second Amendment's protection of a right to public carry supersedes the interests that the Defendants have relied on in banning it.

There is more to the analysis though. The Defendants do not act under the color of a duly enacted state law or legislative action. They amended their ban late at night when the courts closed their doors for business, and they thought no one would pay heed to their actions. They solicited no public comment, and they completely disregarded any constitutional limitations on their conduct. In other words, the Defendants' conduct does not carry the weight of a carefully calculated legislative judgment, but rather the emptiness of a panicked late-night decision to impose an absolute deprivation of a constitutional right on countless law-abiding New Mexico citizens.

Thus, the absence of any carefully articulated public interest and the strength of the Second Amendment's interest balancing leads to one conclusion: The public interest favors the issuance of immediate, ex-parte injunctive relief.

## CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request that the Court issue an emergency ex-parte temporary restraining order barring the enforcement of the public carry bans in public parks, playgrounds, and other areas provided for children to play in and speedily schedule this matter for a preliminary injunction hearing.

The Plaintiffs,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq.
    *pro hac vice application pending*
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

*/s/ Jeremy M. Gay*
Jeremy M. Gay
Advocate Law Center, P.A.
821 S. Ford Dr.
Gallup, New Mexico 87301
(505) 722-2055
Jeremy@alcpafirm.com

## **CERTIFICATION OF SERVICE**

The Defendants have not appeared in this matter. The undersigned has identified their appropriate legal representatives though and certifies that he has served copies of the foregoing on the following counsel by electronic mail:

Holly Agajanian, Esq.
Chief General Counsel – Office of Governor Michelle Grisham
    *For Defendants Grisham, Allen, Bowie, and Weisler*
State Capitol Building, Ste. 400
Santa Fe, NM 87501
Holly.agajanian@exec.nm.gov

Lauren Keefe, Esq.
City Attorney – City of Albuquerque
    *For Defendant Medina*
One Civic Plaza NW
4th Floor, Room 4072
Albuquerque, NM 87102
lkeefe@cabq.gov

        /s/ Cameron L. Atkinson /s/

# Exhibit A



NEW MEXICO
**Department of Health**
Office of the Secretary

MICHELLE LUJAN GRISHAM
**Governor**

PATRICK M. ALLEN
**Cabinet Secretary**

# PUBLIC HEALTH ORDER
## NEW MEXICO DEPARTMENT OF HEALTH
## SECRETARY PATRICK M. ALLEN

### September 15, 2023

### Amended Public Health Emergency Order Imposing Temporary Firearm
### Restrictions, Drug Monitoring and Other Public Safety Measures

**WHEREAS,** for the reasons stated in Governor Michelle Lujan Grisham's Executive Orders 2023-130 and 2023-132, gun violence and drug abuse currently constitute statewide public health emergencies, as defined in the Public Health Emergency Response Act;

**WHEREAS,** pursuant to those Executive Orders, I have begun collaborating with the New Mexico Department of Homeland Security and Emergency Management, the New Mexico Department of Public Safety, and the Governor's Office to provide an effective and coordinated response to these public health emergencies;

**WHEREAS,** both the Bernalillo County Sheriff and Chief of the Albuquerque Police Department have identified the Bernalillo County Metropolitan Detention's lack of staffing, space, and prompt screening of arrested individuals as a significant contributor to these public health emergencies by keeping police officers off the streets while they wait for arrestees to be processed;

**WHEREAS**, according to the New Mexico Department of Health, child firearm emergency department visits in New Mexico increased by 100% for youth ages 0-13 between 2018 and 2022.

**WHEREAS,** the New Mexico Department of Health possesses legal authority pursuant to the Public Health Act, NMSA 1978, Sections 24-1-1 to -40, the Public Health Emergency Response Act, NMSA 1978, Sections 12-10A-1 to -19, the Department of Health Act, NMSA 1978, Sections 9-7-1 to -18, and inherent constitutional police powers of the New Mexico state government to preserve and promote public health and safety, to maintain and enforce rules for the control of a condition of public health importance; and

**WHEREAS,** temporary firearm restrictions, drug monitoring, and other public safety measures are necessary to address the current public health emergencies.

**NOW, THEREFORE, I,** Patrick M. Allen, Secretary of the New Mexico Department of Health, in accordance with authority vested in me by the Constitution and the Laws of the State of New Mexico, and as directed by the Governor pursuant to the full scope of emergency powers under the All Hazard Emergency Management Act, do hereby **DECLARE** that gun violence and drug use constitute conditions of public health importance, as defined in NMSA 1978, Section 24-1-2(A), and hereby **ORDER** and **DIRECT** as follows:

**OFFICE OF THE SECRETARY**
1190 St. Francis Dr., Suite N4100 • P.O. Box 26110 • Santa Fe, New Mexico • 87502
(505) 827-2613 • FAX: (505) 827-2530 • www.nmhealth.org

App. 101



(1)     No person, other than a law enforcement officer or licensed security officer, or active duty military personnel shall possess a firearm, as defined in NMSA 1978, Section 30-7-4.1, either openly or concealed in public parks or playgrounds, or other public area provided for children to play in, within cities or counties averaging 1,000 or more violent crimes per 100,000 residents per year since 2021 according to Federal Bureau of Investigation's Uniform Crime Reporting Program AND more than 90 firearm-related emergency department visits per 100,000 residents from July 2022 to June 2023 according to the New Mexico Department of Public Health, except:

    A.     While traveling to or from a location listed in Paragraph (B) of this section; provided that the firearm is in a locked container or locked with a firearm safety device that renders the firearm inoperable, such as a trigger lock.

    B.     In areas designated as a state park within the state parks system and owned or managed by the New Mexico Energy, Minerals and Natural Resources Department State Parks Division, or the State Land Office.

(2)     The New Mexico Regulation and Licensing Department shall conduct monthly inspections of licensed firearms dealers in the State to ensure compliance with all sales and storage laws.

(3)     The Department of Health shall, no later than September 28, compile and issue a comprehensive report on gunshot victims presenting at hospitals in New Mexico, which shall include (if available): demographic data of gunshot victims, including age, gender, race, and ethnicity; data on gunshot victim's healthcare outcomes; the brand and caliber of the firearm used; the general circumstances leading to the injury; the impact of gunshot victims on New Mexico's healthcare system; and any other pertinent information.

(4)     The New Mexico Department of Health and the New Mexico Environmental Department shall develop a program to conduct wastewater testing for illicit substances, such as fentanyl, at all public schools.  NMED has the authority to independently test the wastewaters of the state, and perform any other acts authorized by the Public Health Act (Section 24-1-3) necessary to address the public health emergency as outlined herein and within the Executive Order 2023-132, and also to receive funds directly from DFA pursuant to Sections 12-11-23 through 12-11-25, to promptly address the public health emergency.

(5)     The New Mexico Children, Youth and Families Department shall immediately suspend the Juvenile Detention Alternative Initiative and evaluate juvenile probation protocols.

(6)     The New Mexico Department of Public Safety shall dispatch additional officers and resources to Bernalillo County and work with the Albuquerque Police Department and Bernalillo County Sheriff to determine the best use of those resources.

(7)     The Department of Public Safety shall coordinate with local law enforcement agencies and the district attorneys' offices and assist in apprehension of individuals with outstanding arrest warrants.

(8)     All participating New Mexico Managed Care Organizations shall immediately ensure that individuals who need drug or alcohol treatment have received a permanent, adequate treatment placement within 24 hours of the request.

(9)     The New Mexico Human Services Department shall send relevant Managed Care Organizations letters of direction requiring them to provide their plans to achieve continual behavioral health network adequacy.

(10) The New Mexico Department of Corrections and the Department of Homeland Security shall provide assistance to the Bernalillo County Metropolitan Detention Center and its contractors to ensure adequate staffing, space, and screening for arrested and incarcerated individuals; provided that nothing in this provision shall be construed to limit the authority and responsibility of Bernalillo County Metropolitan Detention Center in managing its operations.

**I FURTHER DIRECT** as follows:

(1)     This Order shall be broadly disseminated in English, Spanish, and other appropriate languages to the citizens of the State of New Mexico.

(2)     Trigger locks shall be made available free of charge to all firearm owners; provided that each firearm owner shall only be entitled to one free trigger lock. Firearm owners wishing to obtain    a    free    trigger    lock    should    call    505-984-3085    or    email info@newmexicanstopreventgunviolence.org.

(3)     The New Mexico Department of Health, the New Mexico Department of Public Safety, the New Mexico Department of Homeland Security and Emergency Management, and all other State departments and agencies are authorized to take all appropriate steps to ensure compliance with this Order.

(4)     Any person or entity who willfully violates this Order may be subject to civil administrative penalties available at law.

(5)     This Order supersedes any previous Order to the extent it is in conflict and shall take effect on September 15, 2023, and remain in effect for the duration of the public health emergencies declared in Executive Orders 2023-130 and 2023-132 and any subsequent renewals of those public health emergency declarations, unless otherwise rescinded.

(6)     Should any provision of this Order or its application to any person or circumstances be held invalid by a court of law, the remainder of this Order or the application of its provisions to other persons or circumstances shall remain in full force and effect.

(7)     Nothing in this Order shall be construed to contradict or evade any court orders temporarily enjoining provisions in previous public health emergency orders that remain in this Order. Any court order regarding such provisions shall apply to the same provisions found herein.


ATTEST:

MAGGIE TOULOUSE OLIVER
SECRETARY OF STATE

DONE AT THE EXECUTIVE OFFICE
THIS 15TH DAY OF SEPTEMBER 2023

WITNESS MY HAND AND THE GREAT
SEAL OF THE STATE OF NEW MEXICO


PATRICK M. ALLEN
SECRETARY OF THE
NEW MEXICO DEPARTMENT OF HEALTH

# Exhibit B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

WE THE PATRIOTS USA, INC,            :
DENNIS SMITH,                        :
                                     :
          Plaintiffs,                :
                                     :
v.                                   :
                                     :
MICHELLE LUJAN GRISHAM,              :
in her official capacity only, PATRICK  :
M. ALLEN, in his official capacity only,  :
JASON R. BOWIE, in his official      :
capacity only, TROY WEISLER, in his  :
official capacity only, HAROLD       :
MEDINA, in his official capacity only,  :
                                     :
          Defendants.                :

<u>**DECLARATION OF DENNIS SMITH**</u>

Pursuant to 28 U.S.C. § 1746, Dennis Smith, having been duly sworn, does hereby depose and state as follows:

1.      I am over 18 years of age and understand and believe in the obligations of an oath.

2.      I make this declaration pursuant to 28 U.S.C. § 1746 and understand that the same obligations applicable to an affidavit apply to the statements made within.

3.      I am a law-abiding citizen who has lived in Albuquerque, New Mexico for approximately 45 years.

4.      I have held a New Mexico concealed carry permit for approximately 6 years, and I meet all of the federal and state requirements to lawfully obtain, possess, and carry firearms.

5.      Since I am older, I do not believe that I can outrun or overpower a criminal who attacks me or my loved ones.

6.      I regularly carry a loaded handgun in a holster on my body for the purpose of self-defense whenever I leave my home and I am out and about in Albuquerque.

7.      I also engage in recreation on a weekly basis at New Mexico public parks – primarily Los Poblanos Open Space in Albuquerque, New Mexico.

8.      I regularly carry my handgun when I use Los Poblanos Open Spaces in order to protect myself from wild coyotes, stray dogs, and potential human attackers.

9.      I am aware of Executive Order 2023-130 and Defendant Allen's September 8, 2023 public health emergency order prohibiting the carrying of handguns within the City of Albuquerque as well as Los Poblanos Open Spaces for the next 30 days.

10.     Despite those orders, I will continue to carry my handgun in public within the City of Albuquerque as well as Los Poblanos Open Spaces.

11.     I fear that I will be arrested and/or fined beyond my financial means to pay if I exercise my Second Amendment right to carry my handgun despite the directives.


I declare under the penalty of perjury that the foregoing is true and correct.

Executed: September 9, 2023

*Dennis Smith*

Dennis Smith

**App. 107**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

WE THE PATRIOTS USA, INC., and
DENNIS SMITH,
Plaintiffs,


vs.                                                        No. 1:23-cv-00773-DHU-LF


MICHELLE LUJAN GRISHAM, *in her*
*official capacity only,*
PATRICK M. ALLEN, *in his official capacity only,*
JASON R. BOWIE, *in his official capacity only,*
TROY W. WEISLER, *in his individual capacity only,*
and HAROLD MEDINA, *in his official capacity only,*
Defendants.


## ORDER DENYING TEMPORARY RESTRAINING ORDER AND REQUEST FOR HEARING

Plaintiffs, We the Patriots, a Second Amendment advocacy organization, and Dennis Smith, an individual gun owner (collectively "Plaintiffs"), have moved a second time for a temporary restraining order ("TRO") pursuant to Rule 65(b)(1) of the Federal Rules of Civil Procedure. They now seek to enjoin enforcement of the New Mexico Department of Health's "Amended Public Health Emergency Order Imposing Temporary Firearm Restrictions, Drug Monitoring and Other Public Safety Measures," ("Amended Order") issued on September 15, 2023.  For the reasons stated below, the Court will deny the Plaintiffs' motion and their request for a hearing.

**BACKGROUND**

On September 7, 2023, responding to a rise in mass shootings and gun-related deaths, and in particular the deaths of three children, New Mexico Governor Michelle Lujan Grisham ("the Governor") issued Executive Order 2023-130 ("EO") declaring a state of public health emergency "of unknown duration" due to gun violence. Exec. Order No. 2023-130, (Sept. 07, 2023). The Governor's EO directed the New Mexico State Departments of Public Health, Homeland Security and Emergency Management, and Public Safety to collaborate with the Governor's officer to provide a coordinated response to implement the EO.

The following day, on September 8, 2023, New Mexico Department of Health Secretary Patrick M. Allen ("Secretary Allen") issued a "Public Health Emergency Order Imposing Temporary Firearm Restrictions, Drug Monitoring and Other Public Safety Measures" ("PHO") pursuant to his authority to preserve and promote public health and safety. PHO (N.M. Dep't of Health Sept. 8, 2023).

Among other prohibitions in the PHO, Section (1) restricted open or concealed possession of a firearm by any person, other than by a law enforcement officer or licensed security officer, "within cities or counties averaging 1,000 or more violent crimes per 100,000 residents per year since 2021 according to [the] Federal Bureau of Investigation's Uniform Crime Reporting Program AND more than 90 firearm-related emergency department visits per 100,000 residents from June 2022 to June 2023 according to" the Public Health Department. *Id*. at § 1(A). Section (4) of the PHO further prohibited the possession of a firearm on "state property, public schools, and public parks" unless the person carrying the firearm is a law enforcement officer or licensed security officer. *Id*. at § 4.

The PHO contained certain exceptions on the blanket prohibition of possessing firearms depending on who the person is and where the firearm is possessed. As noted, Section (1) of the PHO did not apply to "a law enforcement officer or licensed security officer." *Id.* at § 1. The PHO also exempted possessing a firearm while on private property and firearm possession while at a licensed firearm dealer or gunsmith, possession for use at a licensed firing range or sport shooting competition, or possession of a firearm while traveling to designated locations, provided that the firearm is appropriately locked and secured rendering it inoperable. *See id*. § 1(A)-(E). Willful noncompliance with the PHO subjects "[a]ny person or entity" to "civil administrative penalties available at law." *Id.* at § 4.

On September 9, 2023, Plaintiffs[1] moved for a temporary restraining order, and sought to enjoin enforcement of certain provisions of the PHO which restricted the possession of firearms. The Plaintiffs asserted that the firearm restrictions were unconstitutional in that any such restrictions on their ability to possess firearms in public, either openly or concealed, violated the Second Amendment to the United States Constitution. The Plaintiffs alleged they each had standing to bring their lawsuit.

On September 13, 2023, the Court heard oral argument from the various Plaintiffs and the Defendants. Following that hearing, the Court found that Plaintiffs had met their burden in proving the necessity of a TRO and the Court issued an Order temporarily enjoining the enforcement of Sections 1 and Section 4 of the Public Health Order.

---

[1] Four other sets of plaintiffs moved for a TRO against the original Public Health Order. Those plaintiffs have not moved for a second TRO with regard to the Amended Public Health Order, and therefore the term "Plaintiffs" throughout the rest of this opinion refers only to Plaintiffs in the instant case, Dennis Smith and We the Patriots.

On September 15, 2023, the Defendants issued an Amended Order which eliminates the broad restriction on public carrying of firearms in Albuquerque but maintains the restriction on the public carrying of firearms in public parks (except for state parks) and in "public playgrounds or other area provided for children to play in."  Amended Order, Section (1).

On September 21, 2023, Plaintiffs filed the instant motion for a Temporary Restraining Order and Preliminary Injunction.

## DISCUSSION

1. **The Request for a Temporary Restraining Order as It Pertains to the Public Parks Provision of the Amended Order Is Denied Because It Would Be Superfluous.**

The Court has already enjoined enforcement of the PHO as it pertains to public parks. In its hearing on September 13, 2023, the Court enjoined "Section (1) of the New Mexico Department of Health's 'Public Health Emergency Order Imposing Temporary Firearm Restrictions, Drug Monitoring and Other Public Safety Measures' ("PHO") published on September 8, 2023…[and] Section (4) of the New Mexico Department of Health's 'Public Health Emergency Order Imposing Temporary Firearm Restrictions, Drug Monitoring and Other Public Safety Measures' to the extent it imposes additional restrictions on the carrying or possession of firearms that were not already in place prior to its issuance." *See Temporary Restraining Order;* Doc. 11. The exact language of Section (4) was as follows: "no person other than a law enforcement officer or a licensed security officer, shall possess a firearm on state property, public schools, or public parks." PHO (N.M. Dep't of Health Sept. 8, 2023) at 2. The prohibition of guns in public parks was not in place prior to the issuance of the original PHO which means that this Court enjoined enforcement of the order as it applied to public parks on September 13, 2023.  To issue another TRO restraining the enforcement of the Amended Order as it pertains to public parks would be superfluous and unnecessary.

**2. The Request to Enjoin the Amended PHO as It Pertains to Playgrounds and "Other Areas for Children to Play In" Is Denied Because Plaintiff's Have Failed to Demonstrate That There Is a Substantial Likelihood That They Will Succeed on the Merits of Their Claim at This Stage in the Litigation.**

For Plaintiff's to succeed in their petition for a temporary restraining order, they must show that (1) they will suffer irreparable injury unless the injunction issues; (2) the threatened injury to them outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that they will eventually prevail on the merits. *See Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992). "The likelihood-of-success and irreparable-harm factors are 'the most critical' in the analysis." *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1139 (D.N.M. 2018) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

The Court focuses on the fourth factor because it is where Plaintiffs struggle to meet their burden.  Notably, Plaintiffs do not provide any support for their contention that *New York State Rifle and Pistol Association v. Bruen*, 142 S.Ct. 2111, 2134 (2022) or other Second Amendment jurisprudence would bar laws which restrict the carrying of guns in playgrounds or other areas where children play.  In fact, in one of the post-*Bruen* cases that Plaintiffs rely on, *Koons v. Platkin*, the district court held that, "For playgrounds, the parties have not persuaded this Court to change its earlier ruling allowing the State to ban firearms at playgrounds during this litigation." 2023 WL 3478604, at *83 (D. N.J. 2023).  In its earlier ruling, the *Koons* court found that in both *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783 (2008), the Supreme Court had identified legitimate restrictions in "sensitive places" like schools, and identified historical traditions of law from the eighteenth and nineteenth centuries which restricted the usage of guns in schools. *Siegel v. Platkin*, No. CV 22-7464 (RMB/AMD), 2023 WL 1103676, at *10 (D.N.J.

Jan. 30, 2023). "The inference, the [Supreme] Court suggested, is that some gun-free zones are simply obvious, undisputed, and uncontroversial. These are: (a) certain government buildings … (b) polling places, and (c) schools. *Id.*  *Bruen* further instructs courts to consider analogies to such sensitive places when considering whether the Government can meet its burden of showing that a given regulation is constitutionally permissible." *Id*. [2] Given this invitation from the Supreme Court to consider this analogy when evaluating other sensitive places, the *Koons/Seigel* court decided that "schools and playgrounds intersect, that is, playgrounds fall within the sphere of schools.   Therefore, under *Bruen*, the Court "can assume it settled" that playgrounds are a "sensitive place." *Id.* (citing *Bruen*, 142 S.Ct. at 2133); *see also Antonyuk v. Hochul*, 639 F.Supp.3d 232, 324 (N.D.N.Y. 2022), reconsideration denied sub nom, *Antonyuk v. Negrelli*, No. 122CV0986GTSCFH, 2022 WL 19001454 (N.D.N.Y. Dec. 13, 2022) (declining to preliminarily enjoin New York's gun law ban on carrying firearms at public playgrounds).

The analysis by the *Koons/Seigel* court that led to its determination that schools and playgrounds intersect is logically applicable to the restriction of firearms in "other areas for children to play," therefore the regulation of gun activity in such areas may very well be constitutional under *Bruen* and *Heller.* Given the post-*Bruen* decisions analyzing the restriction of firearms in playgrounds, Plaintiffs are unable to show a substantial likelihood of success on the merits in their constitutional challenge of the Governor's Amended Order as it relates to playgrounds and other areas where children play. Because Plaintiffs have not shown a substantial

---

[2] *Seigel* and *Koons* represent two different plaintiffs who challenged the same New Jersey law and received the same TRO and Preliminary injunction. Therefore, the Plaintiffs' references to *Koons* are references to *Seigel* as well.

likelihood of success on the merits of their challenge to the restriction in these areas, their request

for a Temporary Restraining Order will be denied.

### CONCLUSION

For the reasons explained herein, Plaintiffs' Motions for a Temporary Restraining Order

pursuant to Rule 65(b)(1) of the Federal Rules of Civil Procedure [Doc. No. 13] is **DENIED** and

their request for a hearing on this issue is **DENIED.**

_____

UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**NATIONAL ASSOCIATION FOR GUN RIGHTS**
**and FOSTER ALLEN HAINES,**

       **Plaintiffs,**

**vs.**                                                                   **No. 1:23-cv-00771-DHU-LF**

**MICHELLE LUJA GRISHAM, in her official**
**capacity as the Governor of the State of**
**New Mexico and PATRICK M. ALLEN, in**
**his official capacity as the Secretary of the**
**New Mexico Department of Health,**

       **Defendants.**

**and**

**RANDY DONK,**
**GUN OWNERS OF AMERICA, INC.**
**GUN OWNERS FOUNDATION,**

       **Plaintiffs,**

**vs.**                                                                   **No. 1:23-cv-00772-DHU-LF**

**MICHELLE LUJAN GRISHAM, in her official**
**capacity as the Governor of New Mexico,**
**PATRICK M. ALLEN, in his official capacity**
**as the Cabinet Secretary of the New Mexico**
**Department of Public Safter and TROY W.**
**WEISLER, in his individual capacity as the**
**Chief of the New Mexico State Police,**

       **Defendants.**

**and**

**WE THE PATRIOTS USA, INC., and**
**DENNIS SMITH,**

       **Plaintiffs,**

vs.                                                    No. 1:23-cv-00773-DHU-LF

**MICHELLE LUJAN GRISHAM, in her**
**official capacity only,**
**PATRICK M. ALLEN, in his official capacity only,**
**JASON R. BOWIE, in his official capacity only,**
**TROY W. WEISLER, in his individual capacity only,**
**and HAROLD MEDINA, in his official capacity only,**

      **Defendants.**

**and**

**SHAWN BLAS,**

      **Plaintiff,**

vs.                                                    No. 1:23-cv-00774-DHU-LF

**MICHELLE LUJAN GRISHAM, in her**
**capacity as the Governor of New Mexico as well as**
**in her individual capacity, PATRICK M. ALLEN,**
**in his capacity as the Secretary of the New Mexico**
**Department of Health as well as in his individual**
**capacity, OFFICE OF THE GOVERNOR OF**
**NEW MEXICO and NEW MEXICO DEPARTMENT**
**OF HEALTH,**

      **Defendants.**

**and**

**ZACHARY FORT,**
**NEW MEXICO SHOOTING**
**SPORTS ASSOCIATION,**
**FIREARMS POLICY COALITION, INC.,**
**and SECOND AMENDMENT FOUNDATION,**

      **Plaintiffs,**

vs.                                                    No. 1:23-cv-00778-DHU-LF

**MICHELLE LUJAN GRISHAM, individually**
**and in her official capacity as the Governor of**
**New Mexico, PATRICK M. ALLEN, individually**
**and in his official capacity as the Cabinet Secretary**

**App. 116**

**for the New Mexico Department of Health,
JASON R. BOWIE, individually and in his
Official capacity as the Cabinet Secretary of
The New Mexico Department of Public Safety
and TROY W. WEISLER, individually and in
his official capacity as the Chief of the New
Mexico State Police,**

        **Defendants.**

## DEFENDANTS' COMBINED RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendants Governor Michelle Lujan Grisham, Secretary Patrick M. Allen, Secretary Jase R. Bowie, and Chief Troy W. Weisler (collectively, Defendants), by and through their counsel of record, hereby submit their Combined Response in Opposition to plaintiffs' motions for temporary restraining orders and preliminary injunctions in cases 23cv0771-DHU-LF, 23cv00772-DHU-LF, 23cv00773-DHU-LF, 23cv00774-DHU-LF, and 23cv00778-DHU-LF, including plaintiffs' Second Emergency Motion for a Temporary Restraining Order and Preliminary Injunction filed in 23cv00773-DHU-LF.   Defendants request the Court deny the motions for the reasons set forth herein.

### Introduction and Background

Having only recently emerged from a global pandemic, New Mexico finds itself in the midst of another public health crisis.   In 2021, the last year for which complete data is available, New Mexico's gun death rate was the third highest in the nation. *Comprehensive Report on Gunshot Victims Presenting at Hospitals in New Mexico*, at 5, N.M. Dep't of Health (Sept. 28, 2023), https://www.nmhealth.org/publication/view/report/8462/ (hereinafter DOH Report).   In a single year (July 2022-June 2023) firearm related Emergency Room visits increased 77% for males aged 0-13; 115% for females aged 14-17, and 32% for males aged 14-17. *See* DOH Report.  Since

2017, firearm death rates have increased by 91% for American Indian/Alaska Native residents; 78% for Hispanic residents, and 47% overall. *Id.* Staggeringly, New Mexico's firearm injury death rate is 90% higher than the national average. *Id*.

One need look no further than local news coverage to witness the tragic effects of this crisis. On September 6, 11-year-old Froylan Villegas, along with his mother, baby brother, and cousin were returning home from an evening at the Isotopes game when seventeen bullets tore through their car.[1] At least one of those bullets struck Froylan, killing him; another seriously injured his cousin. Unfortunately, this is only one example of how gun violence is acting to destroy the lives of New Mexicans, including children.

In response to this crisis, Governor Michelle Lujan Grisham has made numerous efforts to champion public safety efforts, including increased funding for public safety and law enforcement purposes, and supporting legislation designed to increase public safety.[2] The terrible events described above deprived the Governor of luxury of time to wait and see these efforts yield results. Accordingly, the Governor took more immediate action and issued Executive Orders 2023-130 and 2023-132 invoking her powers under the All Hazard Emergency Management Act (AHEMA), NMSA 1978, §§ 12-10-1 to -10 (2007), and declaring a state of public health emergency due to

---

[1] Alexa Skonieski, *Family, friends grieve 11-year-old shot, killed while leaving Isotopes Park*, KRQE News (Sept. 12, 2023), https://www.krqe.com/news/albuquerque-metro/family-friends-remember-11-year-old-shot-killed-while-leaving-isotopes-park/.

[2] *See, e.g.*, Press Release, *Governor delivers over $40 million for new police officers across New Mexico*, Office of Governor Michelle Lujan Grisham (Sept. 9, 2022), https://www.governor.state.nm.us/2022/09/09/governor-delivers-over-40-million-for-new-police-officers-across-new-mexico/; Press Release, *Gov. Lujan Grisham priority legislation effective today*, Office of Governor Michelle Lujan Grisham (June 16, 2023), https://www.governor.state.nm.us/2023/06/16/gov-lujan-grisham-priority-legislation-effective-today/.

gun violence and drug abuse pursuant to the Public Health Emergency Response Act (PHERA), NMSA 1978, §§ 12-10A-1 to -19 (2003, as amended through 2015).

Shortly thereafter, Department of Health Secretary Patrick Allen issued a public health emergency order imposing certain restrictions on the possession of firearms in cities and counties with high levels of gun violence and implementing various other measures meant to reduce gun violence and drug abuse (hereinafter "PHO"). Plaintiffs sought preliminary injunctive relief to bar enforcement of the PHO, primarily arguing it infringed upon their Second Amendment rights. On September 13, 2023, this Court entered a Temporary Restraining Order ("TRO"), finding that plaintiffs were likely to succeed in arguing that the gun-related restrictions in the PHO violated their Second Amendment rights in light of *New York State Rifle & Pistol Ass'n., Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *See Nat'l Ass'n for Gun Rights v. Lujan Grisham*, 2023 WL 5951940 (D.N.M. Sept. 13, 2023).

On September 15, 2023, Secretary Allen amended the PHO. *See* Amended Public Health Order Imposing Temporary Firearm Restrictions, Drug Monitoring and Other Public Safety Measures ("Amended PHO"), attached hereto as **Exhibit A**. The Amended PHO states, in relevant part, that

> **No person**, other than a law enforcement officer or licensed security officer, or active duty military personnel shall possess a firearm, as defined in NMSA 1978, Section 30-7- 4.1, **either openly or concealed in public parks or playgrounds, or other public areas provided for children to play in**, within cities or counties averaging 1,000 or more violent crimes per 100,000 residents per year since 2021 according to Federal Bureau of Investigation's Uniform Crime Reporting Program AND more than 90 firearm-related emergency department visits per 100,000 residents from July 2022 to June 2023.

As discussed at length below, the Amended PHO is consistent with *Bruen*.

On September 21, 2023, the plaintiffs in 23cv00773-DHU-LF, We the Patriots USA, Inc. and Dennis Smith, filed an updated motion seeking preliminary injunctive relief against the

Amended PHO ("Second Motion").  *See* Doc. 13-1 (23cv00773-DHU-LF).  The Second Motion sought an *ex parte* temporary restraining order and preliminary injunction to bar enforcement of the Amended PHO, claiming that its limited restrictions are still unconstitutional.  *Id.* at 2. On September 29, 2023, the Court entered an Order Denying Temporary Restraining Order and Request for Hearing ("Order"), finding that plaintiffs were unlikely to succeed in demonstrating that the provisions of the Amended PHO pertaining to playgrounds and other public areas provided for children to play in were unconstitutional.  *See* Doc. 15 at 5-6 (23cv00773-DHU-LF).  However, the Court did not reach the issue of the constitutionality of the Amended PHO's firearm restrictions for public parks because that provision had already been enjoined by the Court's September 13 temporary restraining order. *See id.* at 4. Defendants file this response to address the merits of We the Patriots USA, Inc. and Dennis Smith's request for a temporary restraining order regarding the provisions of the Amended PHO applicable to public parks, as well as all plaintiffs' requests for a preliminary injunction related to the original and Amended PHO as a whole.

At the outset, each of plaintiffs' requests for preliminary injunctive relief against the PHO's now-rescinded provisions is moot and not subject to an exception to mootness. Plaintiffs also lack standing to challenge the Amended PHO because most do not specifically allege or assert that they intend to carry firearms in public parks or playgrounds, or other public areas provided for children to play in, and the only plaintiff who attempts to do so only alleges he carries a firearm in Albuquerque's Open Space, which is already proscribed by existing municipal ordinances. For the same reason, plaintiffs cannot demonstrate an irreparable injury. As for the merits of any challenge to the Amended PHO, this Court has already indicated that plaintiffs are simply incorrect regarding the constitutionality of the Amended PHO's provisions relating to playgrounds and other places designated for children to play in and thus cannot demonstrate a likelihood of success on the merits

vis-à-vis those provisions. The same goes for the temporary restriction on firearms in public parks. The regulations on firearms set forth in the Amended PHO are constitutional because they apply to historically "sensitive spaces" and because they are sufficiently analogous to historical regulations as to be consistent with this country's "historical regulation" of firearms.   Accordingly, plaintiffs' motions must be denied.

<u>**Argument & Authorities**</u>

### I.   Plaintiffs' challenges to the original PHO's now-rescinded provisions are moot

The Court lacks subject matter jurisdiction over a moot case.  *Unified Sch. Dist. No. 259 v. Disability Rights Ctr. Of Kan.*, 491 F.3d 1143, 1146-47 (10th Cir. 2007).  "Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction." *Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 996 (10th Cir. 2005) (internal quotation marks and citation omitted).   This is true of actions for declaratory and injunctive relief.  *Unified Sch. Dist. No. 259*, 491 F.3d at 1147.  "The crucial question is whether granting a *present* determination of the issues offered will have some effect in the real world." *Wyoming v. U.S. Dep't. of Agric.*, 414 F.3d 1174, 1182 (10th Cir. 2000).

It is obvious that the Amended PHO moots plaintiffs' challenges to the PHO.  The Amended PHO superseded the PHO and removed the vast majority of the restrictions plaintiffs sought to enjoin.  "[A]llegations of legal wrongdoing must be grounded in a concrete and particularized factual context; they are not subject to review as free-floating, ethereal grievances." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1111 (10th Cir. 2010).   Given the intervening issuance of the Amended PHO, plaintiffs can no longer point to "some concrete and ongoing injury." *Id*. at 1112.  Any concerns plaintiffs purport to express about whether additional or different restrictions may be re-implemented at some point in the future are wholly speculative

and would require this Court to render an advisory opinion. *See id*. at 1112-1113 (reiterating the impropriety of advisory opinions directed at policy concerns once "ultimate objective" of litigation has been achieved and collecting cases holding the same).   The Amended PHO places the parties in the same situation addressed by the Tenth Circuit in *Rio Grande Silvery Minnow*: "[W]e are not situated to issue a *present* determination with real-world effect because those regulations no longer are operational-for all material purposes, they no longer exist." *Id*.  at 1113 (emphasis in original).

True, there are exceptions to the mootness doctrine, but none of those exceptions are implicated in this case. The first recognized exception to mootness is for disputes capable of repetition yet evading review, which occur when "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Brown v. Buhman*, 822 F.3d 1151, 1166 (10th Cir. 2016) (internal quotation marks and citation omitted). The second recognized exception is for cases in which the defendant voluntarily ceases the challenged conduct. *See N.M. Health Connections*, 946 F.3d at 1159. The purpose behind this exception is to counteract gamesmanship aimed at mooting a case before resuming the illegal conduct. *Id.* Thus, the exception does not apply if it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (internal quotation marks and citation omitted). In this vein, "although governmental defendants might take action as a direct response to litigation, . . . self-correction again provides a secure foundation for mootness so long as it seems genuine." *Rio Grande Silvery Minnow*, 601 F.3d at 1118 (quoting 13C Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Fed. Prac. & Proc. Juris. § 3533.7 (3rd ed. 2008)).

Neither exception applies to this case, as there is no *reasonable* expectation that plaintiffs will be subject to the same challenged action again. The Governor and Secretary Allen have no

intent on reimposing the broad restrictions that this Court found likely unconstitutional and that have since been removed from the PHO. *See Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1116 n.15 (10th Cir. 2010) ("[I]n a mootness analysis courts must undertake to make predictions, including as to the probability of recurrence, and that the process of prediction also is shaped by the character of the defendant—claims of discontinuance by public officials are more apt to be trusted than like claims by private defendants[.]" (internal quotation marks and citation omitted)).[3]

Other than rank speculation, which is insufficient to enliven a moot controversy, there is no indication that Defendants plan to revert to the PHO. Accordingly, the Court should deny plaintiffs' requests for preliminary injunctive relief against the now-rescinded measures in the Original PHO as moot. *See Pleasant View Baptist Church v. Beshear*, 838 Fed. Appx. 936, 938-39 (6th Cir. 2020) (finding challenge to a COVID-19 public health order moot because the order expired and the governor stated he would not issue a similar order in the future); *Maryville Baptist Church, Inc. v. Beshear*, 977 F.3d 561, 566 (6th Cir. 2020) (per curiam) (refusing to apply the voluntary cessation or capable of repetition yet evading review exceptions to mootness to a challenge to an enjoined COVID-19 public health order and observing that "discretion is the better part of judgment when it comes to a potentially premature (and unnecessary) ruling about a moving target"); *Spell v. Edwards*, 962 F.3d 175, 179-80 (5th Cir. 2020) (holding that the "voluntary cessation" and "capable of repetition, yet evading review" exceptions to mootness did not apply to an expired COVID-19 restriction where it is only speculative that the Governor would reimpose

---

[3] Nor is the Court "here presented with a mere informal promise or assurance on the part of the [governmental] defendants that the challenged practice will cease." *Rio Grande Silvery Minnow*, 601 F.3d at 1118 (internal quotation marks and citations omitted). Defendants have taken the concrete step of issuing an Amended PHO that supersedes the PHO and renders it obsolete.

the expired order); *S. Wind Women's Ctr. LLC v. Stitt*, 823 Fed. Appx. 677, 680 (10th Cir. 2020) (concluding that an appeal from a preliminary injunction enjoining Oklahoma from enforcing parts of an executive order as it related to abortions was moot because the order's abortion restrictions expired shortly after the district court granted the preliminary injunction and "Oklahoma no longer seeks to do what the injunction prohibits").

## II.    Most plaintiffs lack standing to challenge the Amended PHO

Plaintiffs in federal civil actions must demonstrate standing to assert their claims. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560.  The "irreducible constitutional minimum" requirements of standing consist of three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) the injury must be fairly traceable to the actions of the defendant; and (3) it must be "likely" that the injury will be "redressed by a favorable decision." *Id.* at 560-61, 112 S.Ct. 2130 (citations omitted).  To demonstrate injury-in-fact in the context of a future or prospective prosecution, a plaintiff must establish "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).  Given the unique requirements imposed by *Bruen* that the Court analyze Second Amendment restrictions as to certain and specific places, plaintiffs must establish standing as to each such "place" where regulations apply.  *Maryland Shall Issue, Inc. v. Montgomery Cnty., Maryland*, 2023 WL 4373260, *5 (D. Md. July 6, 2023); *Antonyuk v. Hochul*, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022); *Koons v. Platkin*, 2023 WL 3478604 (D.N.J. May 16, 2023).

The only plaintiff who has attempted to demonstrate standing to challenge the Amended PHO's provisions is Dennis Smith. In his challenge to the Amended PHO, Smith alleges that he "engage[s] in recreation on a weekly basis at New Mexico public parks- primarily Los Poblanos

Open Space in Albuquerque, New Mexico."   Doc. 13-1 (23cv00773-DHU-LF).   Smith's

Declaration is silent as to any activity, now or in the future, that would involve carrying a firearm

to a playground or "other public areas provided for children to play in."   No other facts are set

forth in the Second Motion, the complaints, or any other motion to establish standing on behalf of

the other plaintiffs as to any of the places set forth in the Amended PHO.   Accordingly, only Smith

has standing to challenge the Amended PHO, and even then, only to challenge its application to

public parks.   *See, e.g., Maryland Shall Issue*, 2023 WL 4373260, at **5-6.

### III.   Plaintiffs cannot establish that they are entitled to preliminary injunctive relief against the Amended PHO

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule."

*Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (internal quotation

marks and citation omitted).[4] To obtain preliminary injunctive relief, plaintiffs must show that "(1)

the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury

to the moving party outweighs whatever damage the proposed injunction may cause the opposing

party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a

substantial likelihood that the moving party will eventually prevail on the merits." *Resolution Trust*

*Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992).   "The third and fourth factors 'merge' when,

like here, the government is the opposing party." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir.

2020). Because preliminary injunctive relief is an "extraordinary remedy, . . . the right to relief

must be clear and unequivocal." *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 (10th Cir.

---

[4] "The requirements for a TRO issuance are essentially the same as those for a preliminary injunction order." *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018).

2006). The movant *must* satisfy his or her burden for *each* one of these prerequisites. *See Diné Citizens Against Ruining Our Env't*, 839 F.3d 1276, 1281-82 (10th Cir. 2016).

### A.     Plaintiffs seek a disfavored preliminary injunction

"Because the limited purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," the Tenth Circuit specifically disfavors "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Schrier v. Univ. of Colorado et.al.*, 427 F.3d 1252, 1258-59, (10th Cir. 2005) (internal quotation marks and citation omitted). Therefore, "any preliminary injunction fitting within one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course[,]" and "a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms[.]" *O Centro Espirita Beneficente Uniao do Vegetal ("O Centro") v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004).

Plaintiffs' requested injunctive relief falls into the category of disfavored injunctions. Plaintiffs are requesting the same injunctive relief sought in their Complaint. *See* Doc. 1, pp. 11. Plaintiffs seek virtually all the relief they could be awarded at the end of trial on the merits.[5] *See Peterson v. Kunkel*, 492 F. Supp. 3d 1183, 1193 (D.N.M. 2020) (holding that the plaintiffs'

---

[5] That Plaintiffs also seek nominal monetary damages does not compel a different result. *Cf. Strickland v. Madden Sales & Serv.*, No. 19-918 MV/JFR, 2020 U.S. Dist. LEXIS 95430, at *8 (D.N.M. May 8, 2020) (holding that the defendant's motion for a preliminary injunction seeking enforcement of a non-compete agreement was disfavored because it sought all the relief that it could recover at the conclusion of a full trial on the merits and even though it sought monetary damages, the "primary objective" of its counterclaims was to enforce the non-compete agreement).

requested preliminary injunction was disfavored because it was an exact overlay of the relief
sought in their complaint). The requested preliminary injunctive relief is also disfavored because
it would require the Court to force Defendants to affirmatively alter the Amended PHO and the
State's enforcement of it. *Cf. ETP Rio Rancho Park, LLC v. Grisham*, 522 F. Supp. 3d 966, 1003,
1028 (D.N.M. 2021) (noting that the plaintiffs' request "to prohibit Defendants from enforcing all
PHOs" required affirmative action and was therefore disfavored). Thus, this Court should closely
scrutinize Plaintiffs' request for preliminary injunctive relief and require Plaintiffs to "make a
strong showing both with regard to the likelihood of success on the merits and with regard to the
balance of harms[.]" *O Centro*, 389 F.3d at 975.

### B.    Plaintiffs cannot demonstrate irreparable harm

As described in his Declaration, Smith's alleged conduct in carrying a firearm in Los
Poblanos Open Space is already prohibited by the City of Albuquerque in both its municipal
ordinances and administrative rules. [6]  The Albuquerque Code of Ordinances, Chapter 5, Article 8,
Section 6 states:

> The following activities are prohibited in any Open Space Lands or Regional
> Preserves:
>
> . . . .
>
> (G) *Weapons and Firearms.*   No person shall carry, possess, or discharge any
> firearm … on Open Space Lands or Regional Preserves.

*Id*. Section 5-8-99 makes violations of this article a misdemeanor, and states that, upon conviction
of a violation of Section 5-8-6(G), "the weapon or firearm shall be forfeited to the city by order of
the Court."

---

[6]    *See    Firearms    &    Hunting*,    City    of    Albuquerque,
https://www.cabq.gov/parksandrecreation/resources-rules/open-space-rules-etiquette/firearms-
hunting (last visited Sept. 30, 2023).

In 2019 and 2020, the City of Albuquerque issued administrative instructions confirming that New Mexico statutes prohibiting the carrying of deadly weapons (including firearms) on school premises[7] apply to City neighborhood parks, City sports fields, City pools and their parking lots, Balloon Fiesta Park, and Civic Plaza, which are used for school playing areas and other school-related activities, along with other enumerated City properties such as community centers, health and social service centers, and senior centers.[8]   The Amended PHO's firearms restrictions regarding parks does not change these facts and does not make anything illegal that was previously permitted.   As discussed above, plaintiffs utterly failed to identify any public park that the Amended PHO would prohibit them from lawfully entering while carrying a firearm, particularly where the only "park" identified by plaintiffs already prohibits possessing or carrying firearms and has for decades.   *See Valdez v. Lujan Grisham*, 2022 WL 2129071 (10th Cir. 2022) (unpublished) (noting that even if injunction were granted to prohibit enforcement of state vaccine mandate for hospital workers, the plaintiff was still required to be vaccinated under federal law, and thus her "injury . . . is not redressable by enjoining the PHO").   Because Plaintiffs cannot demonstrate that they will be injured at all by enforcement of the Amended PHO, much less irreparably, their Second Motion should be denied.

    **B.**  **Plaintiffs cannot demonstrate a likelihood of success on the merits**

      1.   The Amended PHO is constitutional under *Bruen*

         a.  <u>Playgrounds and "other public areas provided for children to play in" are "traditionally sensitive places" where firearms can be restricted</u>

---

[7] *See* NMSA 1978 § 30-7-2.1(a); § 2.1(b)(2); § 12.

[8] *See* AI Nos. 5-19, 5-20, https://codelibrary.amlegal.com/codes/albuquerque/latest/albuquerque_nm_admin/0-0-0-33083.

Even if plaintiffs could establish standing to challenge the Amended PHO or demonstrate irreparable injury, the PHO passes constitutional muster under *Bruen*, and plaintiffs cannot demonstrate they are likely to succeed in establishing otherwise.  The exclusion of firearms in "traditionally sensitive places" was recognized and reiterated by the Supreme Court in *Bruen*.  *See* 142 S. Ct. 2111, 2133 (recognizing "longstanding" laws forbidding carrying of firearms "in sensitive places such as schools" and assuming "it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment").  In the context of "sensitive places," the Court is not required to engage in historical analysis pertaining to regulations on firearms. This is because "some gun-free zones are simply obvious, undisputed, and uncontroversial." Order at 5-6 (quoting *Siegel v. Platkin*, No. CV 22-7464 (RMB/AMD), 2023 WL 1103676, at \*10 (D.N.J. Jan. 30, 2023)).

As this Court detailed in its Order, the Supreme Court specifically deemed "schools" to be "sensitive places" where carrying firearms could be regulated consistent with the Second Amendment.  *Id*.; *see Bruen*, 142 S.Ct. at 2133.  Courts examining the contours of this statement have held that "schools" encompasses both elementary and public schools, as well as private schools and institutions of higher education, in part because *Bruen* drew no distinction between public or private schools and did not reference any limitations based on the age of the students attending a school.  *See, e.g.*, *Maryland Shall Issue*, 2023 WL 4373260, at \*9.  The same is true of other areas where children are frequently present in large numbers, including playgrounds, areas where youth sporting events are held, and similar spaces.  There are clear analogues between schools and public playgrounds and "other public places provided for children to play in."  *See* Order at 6; *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 324 (N.D.N.Y. 2022), *reconsideration denied sub nom. Antonyuk v. Nigrelli*, 2022 WL 19001454 (N.D.N.Y. Dec. 13, 2022) (finding that ban on

firearms in public playgrounds "finds support in those historical analogues prohibiting firearms in schools given that, by their very nature, both places often contain children"); *Koons v. Platkin*, 2023 WL 3478604, at \*85 (D.N.J. May 16, 2023) (finding that youth sport events fall within the sphere of schools, where firearm bans are presumptively lawful).[9]  As the Court noted in its Order, the Court can "assume it settled" that playgrounds are "sensitive places" under *Bruen*'s analysis, and it is not a significant leap to include "other public places provided for children to play in." Order at 6.   Accordingly, the Amended PHO's provisions banning firearms possession in playgrounds and other public places provided for children to play in is constitutional.

2.   <u>The Amended PHO's restriction on firearm possession in public parks is consistent with historical restrictions on firearm possession in public parks and their historical analogues</u>

For areas that are not "traditionally sensitive places," *Bruen* calls for a different analysis, which requires the government to proffer evidence that a regulation is consistent with "this Nation's historical tradition of firearm regulation" so that the Court can determine how "the Second Amendment's historically fixed meaning applies to new circumstances[.]" *Bruen*, 142 S. Ct. at 2132; see Order at 6.   Given the application of historical principals to modern situations, this analysis "will often involve reasoning by analogy" and "[l]ike all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are **relevantly similar**." *Bruen*, 142 S. Ct. at 2132 (emphasis added) (internal quotation marks and citation omitted).   To determine

---

[9] Plaintiffs erroneously lump analysis of all the "places" set forth in the Amended PHO together and cite *Koons and Atonyuk* as though they made the same error and thus support plaintiffs' contention.  *See* Doc. 13-1 at 18.   However, both the *Koons* and *Antonyuk* courts analyzed playgrounds *separately* from public parks, and concluded that playgrounds (and in *Koons*, youth sports events) were either sensitive places where firearm bans were presumptively lawful, *see Koons*, 2023 WL 3478604, at \*82, or that such bans were constitutional under *Bruen*. *See Antonyuk*, 639 F.Supp.3d at 324.

whether regulations are "relevantly similar under the Second Amendment," the Court must look "toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33.  "[A]nalogical reasoning requires only that the government identify a well-established and representative **analogue**, not a historical **twin**. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* (emphases in original).

In *Mayland Shall Issue*, the court found that that the historical record demonstrated "a history of restricting firearm possession and carrying in public parks and at locations where large numbers of people engaged in recreation."  2023 WL 4373260, at *10-12.  The court specifically identified dozens of state and local regulations restricting the possession or carry of firearms in public parks or their historical analogues, including firearm bans in parks in the five largest cities in the United States.  *Id.* at *11.[10] The court explained: "As to public parks, numerous historical statutes and ordinances from the time period before and following the ratification of the *Fourteenth Amendment* imposed such restrictions in relation to parks." *Id.* The court identified examples of prohibiting gun carrying in parks in Central Park in New York City, Fairmount Park in Philadelphia, Pennsylvania, parks in Detroit, Michigan, Chicago, Illinois, Saint Paul, Minnesota, Williamsport, Pennsylvania, Reading, Pennsylvania, Boulder, Colorado, Phoenixville, Pennsylvania, Oakland, California, Staunton, Virginia, Birmingham, Alabama, as well as state

---

[10] The district court in *Wolford v. Lopez*, 2023 WL 5043805 (D. Haw. August 8, 2023), found that firearms restrictions in public parks and beaches were not part of a "historical tradition" of regulation.  The *Wolford* court based its conclusion on the fact that the State failed to produce any evidence regarding whether "parks" as we know them today existed at the time the Fourteenth Amendment was ratified and failed to introduce sufficient evidence of any historical regulation of firearms in such settings.  *Id.* at *21-22.  The *Wolford* court also rejected evidence of firearms regulations in parks passed *after* the ratification of the Fourteenth Amendment, despite the *Bruen* court leaving the issue open.  *Id.* at *22.  The *Wolford* court disagreed with the analysis in *Maryland Shall Issue* on similar grounds.  As discussed herein, this analysis is incorrect.

laws in Minnesota, Wisconsin, and North Carolina. *Id.* at *11. Territorial New Mexico had its own law making it "unlawful for any person to carry deadly weapons, either concealed or otherwise, on or about their persons within any settlements of this Territory" unless they were threatened with imminent danger of an attack on themselves, family or property. 1869 Terr. of N.M. Laws ch. 32, § 1.[11] Texas similarly prohibited firearms in numerous public venues and social gatherings. 1871 Texas Gen. Laws ch. 34, § 1. The Supreme Court of Texas upheld the law, finding arguments to the contrary "little short of ridiculous." *English v. State*, 35 Tex. 473, 476 (1871). The opinion was cited approvingly by Justice Scalia's majority opinion in *District of Columbia v. Heller*, 128 S. Ct. 2783, 2817 (2008).

The regulations regarding public parks in the Amended PHO are historically analogous to prior regulations prohibiting guns in public parks both before and after the ratification of the Fourteenth Amendment. Plaintiffs attempt to limit their focus to regulations that existed solely in the eras "especially before and immediately after the Founding Era," but this narrow interpretation flies in the face of *Bruen*.[12] As the *Bruen* court noted, present-day firearm regulations that were

---

[11] Although *Bruen* discounted the impact of territorial restrictions on firearms, subsequent research and legal analysis has suggested that because territories were subjected to the Second Amendment well before the Fourteenth Amendment made it applicable to the states, this approach may have been short-sighted. *See Atkinson v. Garland*, 70 F.4th 1018, 1036 (7th Cir. 2023); Andrew Willinger, *The Territories Under Text, History and Tradition*, 101 Wash. U. L. Rev. 1, at 13-21.

[12] It is also historically incorrect, which is important in the context of *Bruen*. There were no modern-style parks at the time of the Founding Era. "Parks" such as Boston Common, were used primarily as a pasture, a place for public executions, and a site for the militia to muster and drill. Steven R. Pendery, *Probing the Boston Common* 43 ARCHAEOLOGY 42-47 (1990); Suzanne Scheld et. al, RETHINKING URBAN PARKS: PUBLIC SPACE AND CULTURAL DIVERSITY, 19-20 (2009); Michael Rawson, EDEN ON THE CHARLES: THE MAKING OF BOSTON, 73 (2014). Notably, in Colonial Massachusetts, militia members were prohibited from coming to muster with a loaded firearm. *See* RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND, 98 (1853) and 1866 Mass. Acts 197, An Act Concerning the Militia, § 120.

"unimaginable at the founding" may still be upheld if they are consistent with the "historical tradition of firearm regulation." 142 S. Ct. at 2132. In addition, while the Supreme Court left open the question of whether historical regulations from the time the Second Amendment was ratified in 1791, or the ratification of the Fourteenth Amendment in 1868 were entitled to greater consideration, the Court pointedly noted that "[s]trictly speaking, states are bound to respect the right to keep and bear arms **because of the Fourteenth Amendment, not the Second**." *Id.* at 2137 (internal quotation marks omitted) (emphasis supplied). Accordingly, courts conducting historical analysis in the wake of *Bruen* have determined that historical sources from the time of the ratification of the Fourteenth Amendment in 1868 are "equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment." *Maryland Shall Issue*, 2023 WL 4373260, at *8. As the right to carry a firearm in a public park has historically been regulated during all relevant time periods, the Amended PHO's public park restrictions are constitutional under *Bruen*. Accordingly, because Plaintiffs cannot establish that they are likely to succeed in challenging any of the Amended PHO's provisions, their Second Motion should be denied.

## <u>Conclusion</u>

For the foregoing reasons, the Court should deny plaintiffs' requests for preliminary injunctive relief.

Respectfully submitted,

*/s/ Holly Agajanian*
**HOLLY AGAJANIAN**
*Chief General Counsel to Governor Michelle Lujan Grisham*

490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2200
holly.agajanian@exec.nm.gov

*Counsel for Governor Michelle Lujan Grisham,
Secretary Patrick M. Allen, Secretary Jason R.
Bowie* and *Chief W. Troy Weisler*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 2, 2023, I filed the foregoing via the CM/ECF filing system,

which caused all counsel of record to be served by electronic means.

Respectfully submitted,

*/s/ Holly Agajanian*
Holly Agajanian

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | |
|---|---|
| WE THE PATRIOTS USA, INC,<br>DENNIS SMITH, | : |
| | : |
| | : |
|      Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| MICHELLE LUJAN GRISHAM,<br>in her official capacity only, PATRICK<br>M. ALLEN, in his official capacity only,<br>JASON R. BOWIE, in his official<br>capacity only, TROY WEISLER, in his<br>official capacity only, HAROLD<br>MEDINA, in his official capacity only, | :<br>:<br>:<br>:<br>:<br>:<br>: |
| | : |
|      Defendants. | : |

## <u>SUPPLEMENTAL DECLARATION OF DENNIS SMITH</u>

Pursuant to 28 U.S.C. § 1746, Dennis Smith, having been duly sworn, does hereby depose and state as follows:

1.     I am over 18 years of age and understand and believe in the obligations of an oath.

2.     I make this supplemental declaration pursuant to 28 U.S.C. § 1746 and understand that the same obligations applicable to an affidavit apply to the statements made within.

3.     I am a law-abiding citizen who has lived in Albuquerque, New Mexico for approximately 45 years.

**App. 135**

4.      I have held a New Mexico concealed carry permit for approximately 6 years, and I meet all of the federal and state requirements to lawfully obtain, possess, and carry firearms.

5.      Since I am older, I do not believe that I can outrun or overpower a criminal who attacks me or my loved ones.

6.      I regularly carry a loaded handgun in a holster on my body for the purpose of self-defense whenever I leave my home and I am out and about in Albuquerque.

7.      I also engage in recreation on a weekly basis at New Mexico public parks – primarily Los Poblanos Open Space in Albuquerque, New Mexico.

8.      I regularly carry my handgun when I use Los Poblanos Open Spaces in order to protect myself from wild coyotes, stray dogs, and potential human attackers.

9.      I am a grandfather, and I occasionally visit playgrounds with my grandchildren and attend various recreational events that they are involved in at various places where children play in the City of Albuquerque.

10.     I am aware of Executive Order 2023-130 and Defendant Allen's September 15, 2023 amended public health emergency order prohibiting the carrying of handguns within Los Poblanos Open Spaces, playgrounds, and other public areas provided for children to play in for the next 30 days.

11.     Despite those orders, I will continue to carry my handgun in public within Los Poblanos Open Spaces, playgrounds, and other public areas provided for children to play in.

12.     I fear that I will be arrested and/or fined beyond my financial means to pay if I exercise my Second Amendment right to carry my handgun despite the directives.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed: October 6, 2023

Dennis Smith

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| WE THE PATRIOTS USA, INC, | : | |
| DENNIS SMITH, | : | DKT No.: 1:23-cv-00773-DHU-LF |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MICHELLE LUJAN GRISHAM, | : | |
| in her official capacity only, PATRICK | : | |
| M. ALLEN, in his official capacity only, | : | |
| JASON R. BOWIE, in his official | : | |
| capacity only, TROY WEISLER, in his | : | |
| official capacity only, HAROLD | : | |
| MEDINA, in his official capacity only, | : | |
| | : | |
| Defendants. | : | October 9, 2023 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' THIRD EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION

As Court and counsel noted at the preliminary injunction hearing on October 3, 2023, the Defendants needed to extend the orders that this action challenges before their expiration. Governor Grisham and Defendant Allen acted as the Court and counsel indicated. Late on Friday, October 6, 2023, Governor Grisham issued Executive Order 2023-135 declaring gun violence to be an emergency in the state of New Mexico. **Exhibit D.** Defendant Allen and Governor Grisham then issued an amended public health order that same day that superseded the prior ones that were the subject of the Plaintiffs' first and second motions for preliminary injunctions. **Exhibit C.**

Much has changed in the Defendants' new orders. They still ban the public carrying of firearms (open or concealed) at public parks and playgrounds in the City of Albuquerque and Bernalillo County. *Id.* at § 1. The order, however, does attempt to

address the concerns that the Court noted with respect to how vague the terms of the second batch of orders were. It eliminates the second order's inclusion of public places where children might play. *Id*. at § 1. The order permits the carrying of firearms in "the City of Albuquerque's Shooting Range park and areas designated as a state park within the state parks system and owned or managed by the New Mexico Energy, Minerals and Natural Resources Department State parks Division, or the State Land Office." *Id*. at § 1.

The amended public health order necessitates this new filing – particularly since the Defendants chose to issue the orders late on October 6, 2023, which was the deadline that the Court gave the Plaintiffs to file any supplemental documents.

The amended public health order suffers from the same defects as the first two did.  the Defendants have made absolutely no effort to justify it under any of the exceptions to the Second Amendment's guarantee of a right to public carry that the United States Supreme Court recognized in *New York State Rifle and Pistol Association v. Bruen*, 142 S.Ct. 2111, 2134 (2022). Instead, the Defendants continue to restrict the Plaintiffs' Second Amendment rights to carry firearms in the places where the Plaintiffs need firearms the most to protect themselves and their families based on an emotional reaction to three tragic homicides in New Mexico. The Defendants' failure to offer any rationale as to how their order is constitutional in view of *Bruen* requires the Court to speedily restrain it.

## **FACTUAL BACKGROUND**

New Mexico has seen several isolated incidents of shootings over the last six weeks. On July 28, 2023, a 14-year-old boy obtained a pistol due a homeowner's alleged

negligence in storing it and shot a 13-year-old girl in Questa, New Mexico while they both were hanging out with friends. Dkt. 1, ¶ 16. On August 14, 2023, a criminal attempting a drive-by shooting of another individual shot and killed a 5-year-old girl at a trailer park in Albuquerque. *Id*. at ¶ 17. On September 6, 2023, a criminal shot and murdered an eleven-year-old boy in what appears to be a road rage incident. *Id*. at ¶ 18. Additionally, a mentally disturbed teenager – Beau Wilson – killed three people in Farmington, New Mexico on May 15, 2023 when he randomly walked through a neighborhood shooting at homes and drivers after he allegedly struggled to cope with his parents' divorce and being removed from his school's varsity wrestling team. *Id*. at ¶ 19.

Citing these incidents to declare "gun violence" a public health emergency, Defendants Grisham and Allen collectively issued executive and administrative orders banning the public carry of firearms in public parks across New Mexico and in cities and counties that meet certain statistics – effective immediately. *Id*. at ¶¶ 20-22. Albuquerque, New Mexico met the statistical markers established by these orders. *Id*. at ¶ 24.

Plaintiff Dennis Smith is a law-abiding citizen who has lived in Albuquerque for approximately 40 years. **Exhibit A, ¶ 3**. His age renders it impossible for him to outrun or overpower a criminal who attacks him or his loved ones. *Id*. at ¶ 5. Thus, he has held a New Mexico concealed carry permit for approximately 6 years, and he meets all of the federal and state requirements to lawfully obtain, possess, and carry firearms. *Id*. at ¶ 4.

Smith regularly carries a loaded handgun in a holster on his body for the purpose of self-defense whenever he leaves his home and when he is out in public in Albuquerque. *Id*. at ¶ 6. Additionally, Smith carries his handgun when he engages in recreation weekly

at New Mexico public parks – primarily Los Poblanos Open Space – to protect himself from wild coyotes, stray dogs, and potential human attackers. *Id*. at ¶ 8. Finally, when Smith takes his grandchildren to public playgrounds in the City of Albuquerque, he carries his handgun to those places to protect himself and his children. *Id*. at ¶¶ 9-11.

Despite the Defendants' orders and conduct, Smith still intends to carry his handgun in public within the City of Albuquerque as well as Los Poblanos Open Spaces. *Id*. at ¶ 11. If he does, New Mexico law exposes him to civil penalties up to $5,000 per violation of the Defendants' orders. New Mexico Stat. § 12-10A-19. Penalties in that amount would exceed Smith's financial means. **Exhibit A, ¶ 11**.

Plaintiff We The Patriots USA, Inc. – of whom Smith is a member and supporter – joins Smith's claims on behalf of its similarly situated New Mexico members. Dkt. 1, ¶¶ 8-9.

The Plaintiffs moved for emergency injunctive relief on September 9, 2023. Dkt. 3. After a hearing on September 13, 2023, the Court granted a temporary restraining order enjoining the Defendants from enforcing certain provisions of their September 8, 2023 public health order. Dkt. 11.

On September 15, 2023, Defendants Grisham and Allen amended the public health order in response to the Court's order. **Exhibit B**. The amended public health order prohibits the carrying of firearms – openly or concealed – "in public parks or playgrounds, or other public area[s] provided for children to play in…" in Albuquerque, New Mexico. *Id*. at p. 2, § 1. This definition, however, exempted areas designated as state parks. *Id*. at p. 2, § 1.

On October 6, 2023, Defendants Grisham and Allen amended the public health order in response to questions posed by the Court at the October 3, 2023 preliminary injunction hearing. **Exhibit C**. The amended public health order bans the public carrying of firearms (open or concealed) at public parks and playgrounds in the City of Albuquerque and Bernalillo County. *Id*. at § 1.

## LEGAL STANDARD

The Court may grant a temporary restraining order or a preliminary injunction or a preliminary injunction if the moving party shows "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm in the absence of the injunction; (3) proof that the threatened harm outweighs any damage the injunction may cause to the party opposing it; and (4) that the injunction, if issued, will not be adverse to the public interest." *Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Social & Rehabilitation Servs.*, 31 F.3d 1536, 1542-42 (10th Cir. 1994) (internal citations omitted.

## ARGUMENT

I.    **The Plaintiffs Demonstrate A Substantial Likelihood Of Prevailing On The Merits.**

      A. **The Defendants' Amended Orders Do Not Regulate "Sensitive Places" And Violate The Second And Fourteenth Amendments.**

The Defendants' initial orders completely deprived the law-abiding citizens of Albuquerque and the Plaintiffs of their Second and Fourth Amendment right to carry firearms for the purpose of self-defense throughout the entire city, and the Defendants' amended orders do little to narrow that definition. The Defendants' amended orders still defy the plain text of the Second Amendment and *Bruen*. For those reasons, the Plaintiffs

demonstrate a substantial likelihood of success on the merits of their challenge to the public carry provision of the Defendants orders.

*Bruen* establishes a two-part test for analyzing Second Amendment claims. The Plaintiffs must first demonstrate that "the Second Amendment's plain text covers [their] conduct." *Bruen*, 142 S.Ct. at 2129-30. If they carry that burden, "the Constitution presumptively protects that conduct." *Id*. "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id*. at 2130 (internal quotation marks and citations omitted).

The Plaintiffs carry their textual burden. As in *Bruen*, there is no meaningful dispute that Smith and We The Patriots USA's members – "ordinary, law-abiding citizens" – are part of the people whom the Second Amendment protects. *Id*. at 2134. Nor is there any dispute that "handguns are weapons 'in common use' today for self-defense." *Id*. The definition of "bear" in the Second Amendment "naturally encompasses public carry." *Id*. at 2134-35. Thus, as the Supreme Court concluded in *Bruen*, the Second Amendment's plain text presumptively guarantees the Plaintiffs a right to "bear" arms in public for self-defense just as they have done peacefully and lawfully for many years. *Id*. at 2135.

The burden now shifts to the Defendants to demonstrate that their orders and conduct are consistent with the historical tradition of firearm regulation. The Plaintiffs do not dispute that there is a well-established and representative historical analogue that permits states to prohibit the possession and carrying of firearms in "sensitive places."

*See Bruen*, 142 S.Ct. at 2133. The Defendants cannot prevail in that inquiry though as to public parks, playgrounds, and other public areas provided for children to play in.

A key principle from *Bruen* governs at the outset. *Bruen* completely forecloses any argument that any place can be a "sensitive place" simply because many people congregate there and law enforcement is presumptively available. [1] *Id*. at 2134-35 ("Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department").

Although the Supreme Court declined to "comprehensively define 'sensitive places'" in *Bruen*, it did not leave courts without any guidance. In *Bruen*, New York proposed a definition of "sensitive places" as "all places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id*. at 2133 (quoting New York's brief) (internal quotation marks and citations omitted). *Bruen* rejected this definition as being far too broad and being without a historical basis. *Id*. at 2134. It also found that such a definition "would in effect

---

[1] Even if it was, the right to self-defense takes on additional importance in light of *Deshaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189 (1989) and *Town of Castle Rock, Colo. V. Gonzales*, 545 U.S. 748 (2005). *Deshaney* and *Castle Rock* unequivocally establish that law enforcement and government officials have no obligation "to protect the life, liberty, and property of [their citizens] against invasion by private actors." *Deshaney*, 489 U.S. at 195; *Castle Rock*, 545 U.S. 748 (holding that the Fourteenth Amendment does not require police officers to enforce the law or arrest someone who violates the law). In other words, even the presence of law enforcement officers does not guarantee their safety or that law enforcement officers will act to protect them when they are the potential victims of a violent crime.

exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense…."*Id.* at 2134.

Instead, the Supreme Court recognized that the 18th and 19th-century historical record yielded few places where governments banned the possession of weapons. *Bruen*, 142 S.Ct. at 2133 (listing "legislative assemblies, polling places, and courthouses" as "sensitive places"). Thus, *Bruen* instructed courts to use "analogies" to these "historical regulations of 'sensitive places' to determine [whether] modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id*. at 2133 (emphasis in original).

Public parks and playgrounds for children do not even remotely resemble the well-established historical "sensitive places" analogues *Bruen* cites. Those analogues shared a common feature. They only covered places where the core functions of government or self-government took place. Core government functions do not take place in public parks, playgrounds, and play areas for children. Virtually every government in the United States has established a central building or location in which to conduct its core functions. That includes the federal capitol, the state capitals, federal and state legislative buildings, municipal city and town halls, and courthouses. Conversely, public parks and playgrounds – open to the public for recreation – are the furthest thing imaginable from a place where core government functions take place.

1.   **The American historical tradition of "sensitive places" were rare and typically covered places where the core functions of government took place.**

The "sensitive places" doctrine lacks a clear historical starting point. The Supreme Court has rightfully cautioned that medieval history is ill-suited for interpreting the Second Amendment. *See Bruen*, 142 S.Ct. at 2139. The Plaintiffs concede nothing though by acknowledging that ancient history informs the historical tradition of "sensitive places." The Founding Fathers rejected ancient history and even colonial history as being too weak in formulating the Second Amendment though. Thus, the United States' "sensitive places" doctrine is informed, but not controlled, by pre-Founding Era history.

Marcus Tullus Cicero provided a timeless example of the need for a "sensitive places" doctrine. Titus Annius Milo selected Cicero – one of Rome's greatest orators – to deliver his closing argument to a jury stacked by his political opponents when he faced trial for murdering a political rival, Publius Clodius Pulcher. While Cicero's Milo Oration stands as one of the greatest defenses of the principle of self-defense in human history, Cicero himself never gave the oration at Milo's trial due to armed intimidation from Clodius' friends. Marcus Tullius Cicero, Speech in Defence of Titus Annius Milo (52 B.C.), in 3 ORATIONS OF MARCUS TULLIUS CICERO 204-05 (Charles Duke Yonge trans., rev. ed. 1899). The stacked jury convicted Milo, and the tribunal exiled him. Cicero's prominence as a Roman legal thinker endured though, and his work influenced much of

western legal thought. Thus, it is no stretch to say that the context of the Milo oration influenced western thought pertaining to the "sensitive places" doctrine.[2]

Medieval English regulations addressed the same problem that Cicero encountered in the Milo trial. In 1313, the English Parliament took steps to protect legislative assemblies, enacting a statute that provided "in all parliaments, treaties, and other assemblies which should be made in the realm of England for ever, every man shall come without all force and armour, well and peaceably." 7 Edw. 2, 170 (1313). Later, the 1328 Statute of Northampton ("the Statute") provided protections to the King's ministers and officers, including the English Courts. The Statute came into being during a time of turmoil. *Bruen*, 142 S.Ct. at 2139. After Edward II was deposed by force and Edward III took the throne, England descended into a state of anarchy and rebellion, and knights and commoners alike ravaged the land in a general "spirit of insubordination." *Id*. The Statute sought to restore order and respect for royal authority by prohibiting Englishmen from coming

> before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring[ing] no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure.

---

[2] The Supreme Court has held that chaos that falls far short of the armed intimidation present in the Milo trial violates a criminal defendant's due process right to a fair trial. *Sheppard v. Maxwell*, 384 U.S. 333, 336 (1966). *Sheppard* plainly establishes that the need to protect core government functions by treating the places in which critical government business is conducted as "sensitive" is not simply limited to weapons and armed intimidation of participants. Instead, the free and just operation of core government functions depends on an orderly environment and the preclusion of chaos.

*Id*. at 2139 (quoting 2 Edw. 3 c. 3 (1328)).

While *Bruen* held that the Statute has little bearing on the modern interpretation of the Second Amendment, *id*. at 2139-2142, the Statute still builds upon the Milo trial example as one of the earliest examples of a "sensitive places" regulation and its policy goal to ensure the unfettered operation of core government functions.

*Bruen*'s caution as to the Statute is well-placed. From the earliest days of English colonies in America, the American colonial tradition of the right to bear arms broke radically from their English counterparts. It began when King James I issued the English-speaking-world's first written guarantee of a right to obtain, keep, and bear arms in the 1606 Virginia Charter. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 229 (2018). The 1620 New England Charter carried an identical guarantee. *Id*. at 229-30. Since the geographical scope of these charters covered the entire area of the original thirteen American States, the early colonists enjoyed a greater right to bear arms than their English counterparts did. *Id*. at 230.

The American tradition not only contained a right to obtain, keep, and bear arms, but the colonial record is replete with compulsory possession laws mandating that men bring their arms to churches and public meetings.[3]

---

[3] *See, e.g.,* 1 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 173 (1808) (1632 Virginia statute providing that "ALL men that are fittinge to beare armes, shall bringe their pieces to the church"); *id.* at 263 (1632 Virginia statute providing that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"); *id.* (1643 Virginia statute requiring that "masters of every family shall bring with them to church on Sundays one

Restrictions on the places where firearms could be carried in the colonial and Founding Eras were few and far between. For instance, not even the classification of legislatures as "sensitive places" appears to have a firm foundation in colonial and Founding Era regulations. Maryland and Delaware were the only two colonies and states that prohibited the carrying of arms into legislative assemblies. *See* 1647 Md. Laws 216 ("[N]oe one shall come into the howse of Assembly (whilst the howse is sett) with any weapon upon perill of such fine or censure as the howse shall thinke fit"); 1650 Md. Laws 273 ("That none shall come into eyther of the houses whilst they are sett, with any gun or weapon upon perill of such fine or censure as the howses shall thinke fit." "Orders made & agreed vppon by the Assembly for the better ordering of Both Howses"); DEL. CONST, art. 28 (1776). The United States Congress did not prohibit the carrying of arms in both houses, and Representative Preston Brook's historical beating of anti-slavery Senator Charles Sumner did not culminate in just the near-death of Senator Sumner. Brooks then threatened Representative Calvin Chaffee who responded by buying a revolver and openly displaying it on his desk in the House to the approbation of his colleagues. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 235 n.112 (2018).

---

fixed and serviceable gun with sufficient powder and shott"); 2 *id.* at 126 (similar 1676 Virginia law); 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 94 (John Russell Bartlett ed., 1856) ("noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon."); 19 (part 1) THE COLONIAL RECORDS OF THE STATE OF GEORGIA 137-40 (Allen D. Candler ed., 1904) (1770 Georgia statute imposing fines on militiamen who went to church unarmed). See *also* JOHNSON ET AL., *supra* note 1, at 183-85 (Connecticut, Massachusetts Bay, Maryland, South Carolina).

While the Plaintiffs do not challenge prohibitions on the carrying of arms in legislative buildings and no decision issued by this Court or any other court on the merits of his case will cast doubt on the legislative prohibitions common today, they submit this example to show just how different the American tradition of what were considered "sensitive places" was from its English antecedent. The laws and regulations that they discuss above were the only "sensitive places" regulations in the colonial and Founding Eras. Thus, assuming *arguendo* Maryland's and Delaware's regulations could supply a well-established and representative historical analogue for any sort of regulation,[4] they would only supply that analogue for buildings where core government functions took place – legislative assemblies, courts, executive buildings, and polling places. They do not supply a well-established and representative historical analogue for other places.

Reconstruction Era history also does not supply a well-established and representative historical analogue for a broader definition. The former Confederate states entered a state of chaos similar to that addressed by the Statute of Northampton. *Bruen*, 142 S.Ct. at 2152-53; *see also McDonald v. City of Chicago, Ill.* 561 U.S. 742, 772 (2010). Both *Bruen* and *McDonald* emphasized evidence submitted in the Congressional record that showed armed bands of former Confederate soldiers perpetrating all sorts of violent outrages on the newly free blacks and Southern states' efforts to disarm blacks to leave them at the mercy of these bands. *Bruen*, 142 S.Ct. at 2152-53; *McDonald*, 561 U.S. at 772. Congress's regulatory response was to take emphatic steps to protect blacks' right

---

[4] *Bruen* requires more than isolated examples. *See Bruen*, 142 S.Ct. at 2153 (requiring more than a single statute and a pair of state-court decisions to justify New York's regulation).

to bear arms through the Freedmen's Bureau and the Fourteenth Amendment. *Bruen*, 142 S.Ct. at 2151.

The former Confederate states who chose to regulate these ravages functionally enacted "sensitive place" laws although they usually took the form of "time" restrictions rather than "sensitive places" regulations. In 1870, Louisiana prohibited people from carrying arms in public at all on election day and within half a mile of a voter registration place. 1870 La. Acts 159-60.

Maryland focused on regulating two problematic counties. In 1874, it banned the carrying of weapons on election day in Kent County. 2 PUBLIC LOCAL LAWS OF MARYLAND, ARTICLES 11-24, at 1457 (King Bros, ed. 1888). In 1886, it banned the carrying of arms within 300 yards of polling places on election day in Calvert County. 1886 Md. Laws 315. In 1873, Texas prohibited the carrying of weapons within half a mile of a polling place during election hours. 2 A DIGEST OF THE LAWS OF TEXAS, CONTAINING THE LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST, FROM 1754 TO 1874, CAREFULLY ANNOTATED 1317-18 (4th ed. 1874).

These regulations, sounding in the "sensitive places" doctrine, received their first judicial endorsement in 1874 when the Georgia Supreme Court upheld a statute prohibiting the carrying of weapons into a court. *State v. Hill*, 53 Ga. 472 (1874). Without citing Cicero's Milo example or the Statute of Northampton, the Georgia Supreme Court ensured that a similar situation would not happen in its courts in no uncertain terms:

> [T]he right to go into a court-house and peacefully and safely seek its privileges, is just as sacred as the right to carry arms, and if the temple of

justice is turned into a barracks, and a visitor to it is compelled to mingle in a crowd of men loaded down with pistols and Bowie-knives, or bristling with guns and bayonets, his right of free access to the courts is just as much restricted as is the right to bear arms infringed by prohibiting the practice before courts of justice.

*Id*. at 477-78.

While it is true that other states in the Reconstruction Era attempted broad classifications of "sensitive places," those classifications escaped Second Amendment review by virtue of the Supreme Court's decision in *United States v. Cruikshank*, 92 U.S. 542 (1875), which declined to incorporate the Bill of Rights against the states. For instance, in 1869, Tennessee prohibited the carrying of pistols and various other dangerous or deadly weapons to polling places and "any fair, race course, or other public assembly of the people." PUBLIC STATUTES OF THE STATE OF TENNESSEE, SINCE THE YEAR 1858: BEING IN THE NATURE OF A SUPPLEMENT TO THE CODE 108 (2d ed. Supp. 1872). It never received judicial review.

Texas enacted several laws that at least partially attempted "sensitive places" regulation. In 1870, it banned the carrying of firearms at election places, "any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly," churches, schools, and private social events. 1870 Tex. Laws 63.

Broad laws of both the Tennessee and Texas vintage, however, carry both First and Second Amendment implications due to their broad coverage of private gatherings. Since these sorts of laws did not become subject to Second Amendment scrutiny until 2010 by way of *McDonald v. City of Chicago, Ill*. 561 U.S. 742 (2010), they provide little support for a broad "sensitive places" exception to the Second Amendment.

The laws of two states also falls far short of the well-established and representative historical analogue *Bruen* requires. *See Bruen*, 142 S.Ct. at 2155-56 & n. 31 (rejecting New York argument that Kansas and Arkansas's laws banning public carry in certain instances supplied the necessary historical analogue because two states' laws did not "demonstrate a broad tradition of States doing so).

Thus, at best, the historical record supports a conclusion that places where the core functions of government and self-government took place were "sensitive" because the survival of the United States as a constitutional republic depended on free expression and unfettered access to justice. Thus, historical laws properly protected voting, legislative debate, and courts of law in a manner consistent with the Second Amendment. They, however, did not grant states broad authority to declare virtually any area a sensitive place. *Bruen*, 142 S.Ct. at 2133. Thus, this limited "sensitive places" tradition favors the Plaintiffs' argument that public parks and playgrounds cannot be declared "sensitive places."

**2. The modern addition of schools as a "sensitive places" exception is a narrow one that comports with the "core government functions" definition and does not justify a broader definition.**

Like the "sensitive place" restrictions discussed above, colonial and Founding Era history and tradition does not supply many examples of blanket prohibitions on carrying firearms in schools. It, however, does supply ample evidence that public schools were places where a core government function occurred, supporting the Plaintiffs' contention that their modern addition to the "sensitive places" doctrine does not expand the definition of "sensitive places" but confirms the "core government function" standard.

The historical record of arms prohibitions at American schools begins in 1824 at the University of Virginia. Founded by Thomas Jefferson and others, the student body soon gave Jefferson and his fellow members of the Board of Visitors, including James Madison, much grief by rioting, carousing, firing guns in the air, and shooting at each other. David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 249-50 (2018). The Board responded by banning students, but not faculty or other employees, from keeping or carrying weapons on campus. *Id*.

In 1878, Missouri prohibited students from carrying concealed weapons at any university, college, or school. *See* 1878 Miss. Laws 176. Its prohibition, however, did not prohibit students from openly carrying weapons, and it did not prohibit faculty members or staff employees from carrying concealed weapons. *Id*. As discussed previously, Texas banned the carrying of arms to schools in 1870, similar to modern school regulations. 1870 Tex. Laws 63. The historical record, however, is bare of widespread examples of prohibiting firearm possession in schools.

The lack of specific historical examples does not doom the classification of schools as "sensitive places" though if they can properly be said to be carrying out a core government function. The historical record provides ample historical support for the principle that schools carry out core government functions. *See, e.g.*, *Horton v. Meskill*, 172 Conn. 615, 647 (1977) (discussing Connecticut's 1650 laws requiring every township to hire a schoolmaster). Because education became a state duty, public schoolhouses became places where core government functions are carried out – either by state or

municipal governments. Thus, their classification as "sensitive places" comfortably meets the definition of "sensitive places" as places where core government functions occur, and their addition to the modern doctrine of "sensitive places" does not support a definition for "sensitive places" broader than the "core government function" definition.

### 3. Prohibitions on carrying firearms in public parks did not surface until well after the adoption of the Second Amendment and did not become commonplace until well after the Civil War.

Public parks, public places of recreation, and their forerunners have existed well before modern public parks. In colonial times, village greens, commons, gardens, and squares constituted colonial forerunners to modern public parks. *See* Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 14 (2021) ("Today's American public park is deeply rooted in the seventeenth- and eighteenth-century utilitarian village green, common, square, and parade ground"). Those colonial forerunners claim parks that still exist today such as the Boston Common, Bowling Green Park, and Battery Park. *Koons v. Platkin*, 2023 WL 3478604, at *83 (D. NJ 2023) (listing examples). None of these early forerunners of modern public parks and places of recreation imposed a prohibition on the carrying of firearms within their confines. *Id.* (granting a preliminary injunction as to a carry ban at public parks).

Instead, the earliest bans on carrying firearms in public parks came between 1858 and 1872 in large municipalities. *See e.g.*, *Minutes of Proceedings of the Board of Commissioners of the Central Park*, at 166 (1858); *First Annual Report of the Commissioners of Fairmont Park*, § 21 (1870). These bans came well after the adoption

**App. 155**

of the Second Amendment, and the Supreme Court's failure to incorporate the Second Amendment against state and local governments until 2010 meant that they went unchallenged. Additionally, two other district courts have found that the local park ordinances up until 1890 governed less than 10% of the nation's entire population and were unrepresentative within the meaning of *Bruen*. *Koons*, 2023 WL 3478604, at * 85; *Antonyuk v. Hochul*, 2022 WL 16744700, at *67 (N.D.N.Y. 2022).

The lack of widespread historical evidence – especially before and immediately after the Founding Era – is fatal to any attempt to justify bans on carrying in public parks under the "sensitive places" doctrine. The Court should join the *Koons* and *Antonyuk* courts in rejecting such arguments, and it should enjoin the Defendants' ban on carrying in New Mexico's public parks and playgrounds.

## II.     The Plaintiffs Demonstrate Irreparable Harm In The Absence Of A Temporary Restraining Order And A Preliminary Injunction.

Plaintiffs demonstrate irreparable harm "when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001). The Plaintiffs carry their burden on this prong.

As discussed above, the Second and Fourteenth Amendments guarantee a right to publicly carry firearms for lawful purposes. The Defendants have issued orders that completely bar the Plaintiffs from exercising those rights in New Mexico public parks and playgrounds in violation of the Second and Fourteenth Amendments for the next 30 days. Their injury is thus immediate and ongoing. *See Elrod v. Burns* 427 U.S. 347, 373 (1976) (establishing a presumption of harm for the loss of constitutional freedoms).

Plaintiff Smith, however, still intends to exercise his rights despite the Defendants' orders. If he does, he and other similarly situated members of We The Patriots USA, Inc. will face crippling financial sanctions, arrest, and criminal prosecution. **Exhibit A, ¶ 12**. In other words, the collective burden of the Defendants' enforcement of their unconstitutional orders will speedily end Smith's determination to exercise his Second Amendment rights.

Monetary damages would constitute an inadequate remedy and would be extremely difficult to ascertain. The very essence and value of a constitutional right is the ability to exercise it uninhibited within the constitutionally permissible bounds established by law, not executive fiat. Thus, a day where the Plaintiffs cannot exercise their constitutional rights without violating the law or exposing themselves to crippling financial sanctions is a day lost to them forever. No amount of money cannot adequately compensate them for days where they could not exercise their constitutional rights. More importantly, monetary damages would be completely unavailable as to the Defendants if the Plaintiffs suffered death or serious injury at the hands of a gun-wielding criminal while the Defendants barred them from lawfully carrying firearms.

Additionally, there is no way to reliably determine what monetary damages to award the Plaintiffs for the loss of their constitutional rights. A jury would simply have to pull a number out of their hats, and that number could be astronomically high or nominal depending on their sympathies. Thus, the Court should conclude that the Plaintiffs have demonstrated irreparable harm.

**III.    The Plaintiffs Demonstrate That The Threatened Harm Outweighs Any Damage That The Injunction May Cause To The Party Opposing It.**

The Defendants will suffer no damage by the granting of a temporary restraining order or a preliminary injunction. Prior to the Defendants' issuance of their orders, Smith and other similarly situated, law-abiding New Mexico citizens carried their firearms regularly in public parks and playgrounds. They represented no threat to public safety or the public health then, and nothing about their conduct has changed to render them a threat to public safety now.

Additionally, nothing about their behavior will change in the next 30 days to render them more responsible to carry firearms in public. No important public health goals will be served by prohibiting law-abiding citizens from exercising their Second Amendment rights in a law-abiding manner.

The Defendants' amended order also opens fire on its own logic. It still permits the Plaintiffs to carry their firearms in state parks, playgrounds, and other areas where children play outside the City of Albuquerque and Bernalillo County. If these locations truly were "sensitive places," the Defendants' failure to extent their order to those locations outside the City of Albuquerque and Bernalillo County is baffling.

The Defendants have grounded their rationale for issuing their orders in nothing extraordinary. Crime happens. While the loss of any life is tragic, the Defendants' reliance on three isolated shootings – the result of criminal conduct – does not establish a broader societal problem that imperils New Mexico citizens as a community. Every city and state in the United States experience shootings and murders, but they still permit their law-

**App. 158**

abiding citizens to bear arms just as New Mexico did until the Defendants reacted emotionally and unilaterally.

The problems that the Defendants seek to address will not disappear as long as human beings coexist in communities. As discussed at length above, the Supreme Court has already recognized these problems, but it has affirmed the superseding importance of the right to publicly carry firearms. Thus, the Court's issuance of emergency injunctive relief will not cause any harm to the Defendants who will simply be returned to the same circumstances that every state and city in the United States exists in.

## IV.   The Plaintiffs Demonstrate That The Injunction Will Not Be Adverse To The Public Interest.

*Bruen*'s plain language controls the final factor in the temporary restraining order/preliminary injunction analysis: "The Second Amendment is the very *product* of an interest balancing by the people, and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Bruen*, 142 S.Ct. at 2131 (internal quotation marks and citations omitted, emphasis in original). Thus, "[i]t is this balance – struck by the traditions of the American people – that demands our unqualified deference." *Id*. This language alone is dispositive of this factor. Thus, the Second Amendment's protection of a right to public carry supersedes the interests that the Defendants have relied on in banning it.

There is more to the analysis though. The Defendants do not act under the color of a duly enacted state law or legislative action. They amended their ban late at night when the courts closed their doors for business, and they thought no one would pay heed to their actions. They solicited no public comment, and they completely disregarded any

constitutional limitations on their conduct. In other words, the Defendants' conduct does not carry the weight of a carefully calculated legislative judgment, but rather the emptiness of a panicked late-night decision to impose an absolute deprivation of a constitutional right on countless law-abiding New Mexico citizens.

Thus, the absence of any carefully articulated public interest and the strength of the Second Amendment's interest balancing leads to one conclusion: The public interest favors the issuance of immediate, ex-parte injunctive relief.

## **CONCLUSION**

For the foregoing reasons, the Plaintiffs respectfully request that the Court issue an emergency ex-parte temporary restraining order barring the enforcement of the public carry bans in public parks, playgrounds, and other areas provided for children to play in and speedily schedule this matter for a preliminary injunction hearing.

The Plaintiffs,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq.
          *pro hac vice application pending*
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

 /s/ Jeremy M. Gay
Jeremy M. Gay
Advocate Law Center, P.A.
821 S. Ford Dr.
Gallup, New Mexico 87301
(505) 722-2055
Jeremy@alcpafirm.com

**<u>CERTIFICATION OF SERVICE</u>**

Counsel for Defendants Grisham, Allen, Bowie, and Weisler have appeared in this matter. They have been served copies of this filing by the Court's CM/ECF filing system at the time of filing. Defendant Medina has not appeared and the undersigned will serve this filing by electronic mail:

Holly Agajanian, Esq.
Chief General Counsel – Office of Governor Michelle Grisham
     *For Defendants Grisham, Allen, Bowie, and Weisler*
State Capitol Building, Ste. 400
Santa Fe, NM 87501
Holly.agajanian@exec.nm.gov

Lauren Keefe, Esq.
City Attorney – City of Albuquerque
     *For Defendant Medina*
One Civic Plaza NW
4th Floor, Room 4072
Albuquerque, NM 87102
lkeefe@cabq.gov

<u>/s/ Cameron L. Atkinson /s/</u>

**App. 161**

# Exhibit C

NEW MEXICO
**Department of Health**
Office of the Secretary

MICHELLE LUJAN GRISHAM
**Governor**

PATRICK M. ALLEN
**Cabinet Secretary**

## PUBLIC HEALTH ORDER
## NEW MEXICO DEPARTMENT OF HEALTH
## SECRETARY PATRICK M. ALLEN

### October 6, 2023

### Amended Public Health Emergency Order Imposing Temporary Firearm Restrictions, Drug Monitoring and Other Public Safety Measures

**WHEREAS,** for the reasons stated in Governor Michelle Lujan Grisham's Executive Orders 2023-130 and 2023-132, and subsequent renewals of those orders, gun violence and substance misuse currently constitute statewide public health emergencies, as defined in the Public Health Emergency Response Act;

**WHEREAS,** pursuant to those Executive Orders, I have begun collaborating with the New Mexico Department of Homeland Security and Emergency Management, the New Mexico Department of Public Safety, and the Governor's Office to provide an effective and coordinated response to these public health emergencies;

**WHEREAS,** both the Bernalillo County Sheriff and Chief of the Albuquerque Police Department have identified the Bernalillo County Metropolitan Detention's lack of staffing, space, and prompt screening of arrested individuals as a significant contributor to these public health emergencies by keeping police officers off the streets while they wait for arrestees to be processed;

**WHEREAS**, according to the New Mexico Department of Health, child firearm emergency department visits in New Mexico increased by 100% for youth ages 0-13 between 2018 and 2022;

**WHEREAS,** the New Mexico Department of Health possesses legal authority pursuant to the Public Health Act, NMSA 1978, Sections 24-1-1 to -40, the Public Health Emergency Response Act, NMSA 1978, Sections 12-10A-1 to -19, the Department of Health Act, NMSA 1978, Sections 9-7-1 to -18, and inherent constitutional police powers of the New Mexico state government to preserve and promote public health and safety, to maintain and enforce rules for the control of a condition of public health importance; and

**WHEREAS,** temporary firearm restrictions, illicit substance monitoring, and other public safety measures are necessary to address the current public health emergencies.

**NOW, THEREFORE, I,** Patrick M. Allen, Secretary of the New Mexico Department of Health, in accordance with authority vested in me by the Constitution and the Laws of the State of New Mexico, and as directed by the Governor pursuant to the full scope of emergency powers

**OFFICE OF THE SECRETARY**
1190 St. Francis Dr., Suite N4100 • P.O. Box 26110 • Santa Fe, New Mexico • 87502
(505) 827-2613 • FAX: (505) 827-2530 • www.nmhealth.org



under the All Hazard Emergency Management Act, do hereby **DECLARE** that gun violence and substance misuse constitute conditions of public health importance, as defined in NMSA 1978, Section 24-1-2(A), and hereby **ORDER** and **DIRECT** as follows:

(1)     No person, other than a law enforcement officer or licensed security officer, or active duty military personnel shall possess a firearm, as defined in NMSA 1978, Section 30-7-4.1, either openly or concealed, in public parks or playgrounds within the City of Albuquerque or Bernalillo County, except in the City of Albuquerque's Shooting Range Park and areas designated as a state park within the state parks system and owned or managed by the New Mexico Energy, Minerals and Natural Resources Department State Parks Division, or the State Land Office.

(2)     The New Mexico Regulation and Licensing Department shall conduct monthly inspections of licensed firearms dealers in the State to ensure compliance with all sales and storage laws.

(3)     The New Mexico Department of Health and the New Mexico Environment Department shall develop a program to conduct wastewater testing for illicit substances, such as fentanyl, at all public schools.  The New Mexico Environment Department shall have the authority to independently test the wastewaters of the state and perform any other acts authorized by the NMSA 1978, Section 24-1-3 of the Public Health Act necessary to address the public health emergency as outlined herein and within the Executive Order 2023-132. The New Mexico Environment Department shall be eligible to receive funds directly from the New Mexico Department of Finance and Administration pursuant to NMSA 1978, Sections 12-11-23 to -25, necessary to promptly address the public health emergency.

(4)     The New Mexico Children, Youth and Families Department shall immediately suspend the Juvenile Detention Alternatives Initiative and evaluate juvenile probation protocols.

(5)     The New Mexico Department of Public Safety shall dispatch additional officers and resources to Bernalillo County and work with the Albuquerque Police Department and Bernalillo County Sheriff to determine the best use of those resources.

(6)     The New Mexico Department of Public Safety shall coordinate with local law enforcement agencies and the district attorneys' offices and assist in apprehension of individuals with outstanding arrest warrants.

(7)     All participating New Mexico Managed Care Organizations shall immediately ensure that individuals who need drug or alcohol treatment have received a permanent, adequate treatment placement within 24 hours of the request.

(8)     The New Mexico Human Services Department shall send relevant Managed Care Organizations letters of direction requiring them to provide their plans to achieve continual behavioral health network adequacy.

(9)     The New Mexico Department of Corrections and the New Mexico Department of Homeland Security shall provide assistance to the Bernalillo County Metropolitan Detention Center and its contractors to ensure adequate staffing, space, and screening for arrested and

incarcerated individuals; provided that nothing in this provision shall be construed to limit the authority and responsibility of Bernalillo County Metropolitan Detention Center in managing its operations.

(10)     The New Mexico Department of Public Safety shall organize safe surrender events in the cities of Albuquerque, Espanola, and Las Cruces within thirty days.

**I FURTHER DIRECT** as follows:

(1)     This Order shall be broadly disseminated in English, Spanish, and other appropriate languages to the citizens of the State of New Mexico.

(2)     Trigger locks shall be made available free of charge to all firearm owners; provided that each firearm owner shall only be entitled to one free trigger lock. Firearm owners wishing to obtain a free trigger lock should visit www.safestoragenm.org.

(3)     The New Mexico Department of Health, the New Mexico Department of Public Safety, the New Mexico Department of Homeland Security and Emergency Management, and all other State departments and agencies are authorized to take all appropriate steps to ensure compliance with this Order.

(4)     Any person or entity who willfully violates this Order may be subject to civil administrative penalties available at law.

(5)     This Order supersedes any previous Order to the extent it is in conflict and shall take effect on October 6, 2023, and remain in effect for the duration of the public health emergencies declared in Executive Orders 2023-130 and 2023-132 and any subsequent renewals of those public health emergency declarations, unless otherwise rescinded.

(6)     Should any provision of this Order or its application to any person or circumstances be held invalid by a court of law, the remainder of this Order or the application of its provisions to other persons or circumstances shall remain in full force and effect.

(7)     Nothing in this Order shall be construed to contradict or evade any court orders temporarily enjoining provisions in previous public health emergency orders that remain in this Order. Any court order regarding such provisions shall apply to the same provisions found herein.

ATTEST:

MAGGIE TOULOUSE OLIVER
SECRETARY OF STATE

DONE AT THE EXECUTIVE OFFICE
THIS 6TH DAY OF OCTOBER 2023

WITNESS MY HAND AND THE GREAT
SEAL OF THE STATE OF NEW MEXICO

PATRICK M. ALLEN
SECRETARY OF THE
NEW MEXICO DEPARTMENT OF HEALTH

# Exhibit D



# State of New Mexico

Michelle Lujan Grisham
*Governor*

### EXECUTIVE ORDER 2023-135

### RENEWING STATE OF PUBLIC HEALTH EMERGENCY DUE TO GUN VIOLENCE

**WHEREAS,** New Mexico consistently has some of the highest rates of gun violence in the nation;

**WHEREAS,** the rate of gun deaths in New Mexico increased 43% from 2009 to 2018, compared to an 18% increase over this same time period nationwide;

**WHEREAS,** guns are the leading cause of death among children and teens in New Mexico, and have led to the deaths of a thirteen-year-old girl on July 28, a five-year-old girl on August 14, and an eleven-year-old boy on September 6;

**WHEREAS,** New Mexico has recently experienced an increasing amount of mass shootings, including mass shootings in Farmington and Red River this year;

**WHEREAS,** these gun-related deaths and injuries have resulted in devastating physical and emotional consequences for individuals, families, and communities throughout the State;

**WHEREAS,** the impact of gun violence extends beyond physical injuries and fatalities—causing emotional trauma, economic burdens, and long-lasting consequences for those affected individuals and their families;

**WHEREAS,** the increasing number of gunshot victims strains our already over-burdened healthcare system and places undue pressure on medical professionals and resources;

**WHEREAS,** after consulting with the Secretary of the Department of Health, I have determined that the foregoing situation constitutes a statewide public health emergency of unknown duration, as defined by the Public Health Emergency Response Act; and

**WHEREAS,** the foregoing situation also constitutes a man-made disaster causing or threatening widespread physical or economic harm that is beyond local control and requiring the resources of the State pursuant to the All Hazard Emergency Management Act;

**WHEREAS,** I declared a state of public emergency for this situation on September 7, 2023; and

**WHEREAS,** although my Administration has taken swift action to address this public health emergency, the Secretary of the Department of Health and I have determined it is necessary to renew my declaration of public health emergency to protect the public health, safety, and welfare.

**NOW, THEREFORE, I**, Michelle Lujan Grisham, Governor of the State of New Mexico, by the authority vested in me by the Constitution and laws of the State of New Mexico, do hereby **DECLARE** that a state of public emergency exists throughout the State due to gun violence and **ORDER** and **DIRECT** as follows:

1.　　The Department of Public Health, Department of Homeland Security and Emergency Management, and Department of Public Safety shall immediately begin collaborating with my Office to provide an effective and coordinated response to this public health emergency.

2.　　The Department of Finance and Administration shall make available additional emergency financial resources in an amount not to exceed seven hundred fifty thousand dollars ($750,000.00) to the Department of Health, Department of Homeland Security and Emergency Management, Environment Department, Corrections Department, and/or Department of Public

*Executive Order 2023-135*　　　　　　　　　　　　　　　　　　　　　　　　　*Page 2*

Safety, in accordance with NMSA 1978, Sections 12-11-23 to -25. Funds shall be expended for the purpose of complying with this Order and shall be expended specifically to avoid and minimize economic or physical harm and to protect the public health, safety, and welfare. Funds shall be paid out upon warrants drawn by the Secretary of Finance and Administration upon vouchers approved by the Governor or an agent or agency designated by her for that purpose.

3.    All mayors, sheriffs, and members of governing bodies of municipalities or counties are encouraged to request, if necessary, an emergency proclamation and implementation of temporary additional restrictions to address this public health emergency pursuant to the Riot Control Act.

4.    All political subdivisions of the State shall comply with and enforce all directives issued pursuant to this Order.

**I FURTHER ORDER** and **DIRECT** as follows:

1.    This Order supersedes any previous orders, proclamations, or directives to the extent they are in conflict.

2.    This Order shall take effect immediately and shall remain in effect until November 3, 2023.

ATTEST:

MAGGIE TOULOUSE OLIVER
SECRETARY OF STATE

DONE AT THE EXECUTIVE OFFICE
THIS 5TH DAY OF OCTOBER 2023

WITNESS MY HAND AND THE GREAT
SEAL OF THE STATE OF NEW MEXICO

MICHELLE LUJAN GRISHAM
GOVERNOR

*Executive Order 2023-135*

*Page 3*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

 NATIONAL ASSOCIATION FOR GUN RIGHTS
and FOSTER ALLEN HAINES,

        Plaintiffs,

vs.                                                                                   No. 1:23-cv-00771-DHU-LF

MICHELLE LUJAN GRISHAM ,
*In her official capacity as the*
*Governor of the State of New Mexico,*
and PATRICK M. ALLEN, *in his*
*official capacity as the Secretary of the*
*New Mexico Department of Health,*

        Defendants.

and

RANDY DONK,
GUN OWNERS OF AMERICA, INC.
GUN OWNERS FOUNDATION,

        Plaintiffs,

vs.                                                                                   No. 1:23-cv-00772-DHU-LF

MICHELLE LUJAN GRISHAM, *in her*
*official capacity as the Governor of New Mexico,*
PATRICK M. ALLEN, *in his official capacity as the*
*Cabinet Secretary of the New Mexico Department of Health*,
JASON R. BOWIE, *in his official capacity as the Cabinet*
*Secretary of the New Mexico Department of Public Safety*
and TROY W. WEISLER, *in his individual capacity as the*
*Chief of the New Mexico State Police,*

        Defendants.

and

WE THE PATRIOTS USA, INC., and
DENNIS SMITH,

       Plaintiffs,

vs.                                              No. 1:23-cv-00773-DHU-LF

MICHELLE LUJAN GRISHAM, *in her
official capacity only,*
PATRICK M. ALLEN, *in his official capacity only,*
JASON R. BOWIE, *in his official capacity only,*
TROY W. WEISLER, *in his individual capacity only,*
and HAROLD MEDINA, *in his official capacity only,*

       Defendants.

and

SHAWN BLAS,

       Plaintiff,

vs.                                              No. 1:23-cv-00774-DHU-LF

MICHELLE LUJAN GRISHAM, *in her
capacity as the Governor of New Mexico as well as
in her individual capacity,* PATRICK M. ALLEN, *in his capacity as the
Secretary of the New Mexico Department of Health as well as in his
individual capacity,* OFFICE OF THE GOVERNOR
OF NEW MEXICO and NEW MEXICO DEPARTMENT OF
HEALTH,

       Defendants.

and

ZACHARY FORT,
NEW MEXICO SHOOTING
SPORTS ASSOCIATION,
FIREARMS POLICY COALITION, INC.,
and SECOND AMENDMENT FOUNDATION,

       Plaintiffs,

vs.                                                    No. 1:23-cv-00778-DHU-LF

MICHELLE LUJAN GRISHAM, *individually and*
*in her official capacity as the Governor of New Mexico*,
PATRICK M. ALLEN, *individually and in his official capacity as*
*the Cabinet Secretary for the New Mexico Department of Health,*
JASON R. BOWIE, *individually and in his official capacity as*
*the Cabinet Secretary of the New Mexico Department of Public Safety*
and TROY W. WEISLER, *individually and in his official capacity as the*
*Chief of the New Mexico State Police,*

     Defendants.

and

RICHARD M. ANDERSON,

     Plaintiff,

vs.                                                    No. 1:23-CV-00839-DHU-LF

MICHELLE LUJAN GRISHAM, *in her*
*official capacity only,*
PATRICK M. ALLEN, *in his official capacity only,*

     Defendants.

## ORDER CONSOLIDATING CASES

This matter comes before the Court *sua sponte*. Plaintiffs initiated cases in this Court with complaints that contain identical factual allegations and substantially similar constitutional law claims. The Court has concluded that these cases should be joined for the purposes of their litigation going forward.

**I.**
**BACKGROUND**

The Plaintiffs in *National Association For Gun Rights et al v. Grisham et al*, No. 1:23-cv-00771; *Donk et al v. Grisham*, No. 1:23-cv-00772; *We the Patriots USA Inc. et al v. Grisham et al*, No. 1:23-cv-00773; *Blas v. Grisham et al*, No. 1:23-cv-00774; *Fort et al v. Grisham et al*, No. 1:23-cv-00778; and *Anderson v. Grisham et al*, No. 1:23-cv-00839   (Plaintiffs"), have each brought actions in the United States District Court for the District of New Mexico against certain government defendants, including Governor Michelle Lujan Grisham, Secretary of the New Mexico Department of Health Patrick M. Allen, and various other individuals and law enforcement officials (collectively, "Defendants").   These actions were filed in response to New Mexico Governor Michelle Lujan Grisham's Executive Order 2023-130 , first issued on September 7, 2023, and Secretary Patrick M. Allen's Public Health Emergency Order Imposing Temporary Firearms Restrictions, Drug Monitoring and Other Public Safety Measures ("PHO"), first issued on September 8, 2022.  The PHO contained broad restrictions on the public possession of firearms in certain areas in New Mexico.

## II.
## STANDARD

"If actions before the court involve a common question of law or fact, the court may (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed. R. Civ. P. 42(a). The decision to consolidate actions involving common questions of law or fact is at the sound discretion of the district court. *Shump v. Balka,* 574 F.2d 1341, 1344 (10th Cir.1978). A district court can consolidate cases under these standards *sua sponte. Devlin v. Transportation Commc'ns Int'l Union*, 175 F.3d 121 (2d Cir. 1999); *Maiteki v. Marten Transportation Ltd.*, No. 12-CV-2021-WJM-CBS, 2014 WL 4331664 (D. Colo. Sept. 2, 2014); *See Cook v. Baca*, 625 F. App'x 348 (10th

Cir. 2015) (rejecting an appeal that the district court abused its discretion by consolidating cases *sua sponte.*)

If the district court determines that there is a common question of law or fact, then it must weigh the interests of judicial convivence of consolidating with the delay, confusion, and prejudice that consolidation could cause. *Devlin,* 175 F.3d at 130 (("In assessing whether consolidation is appropriate in given circumstances, a district court should consider both equity and judicial economy."); *Cook*, 625 F.App'x at 355 ("Fed.R.Civ.P. 42 … permit[s]] the district court to consolidate 'actions before the court' that 'involve a common question of law or fact.'); *Servants of the Paraclete, Inc. v. Great American Ins. Co*., 866 F. Supp.1560, 1572 (D.N.M. 1994) ("If the cases involve a common question of law or fact, the Court should then weigh the interests of judicial convenience in consolidating the cases against the delay, confusion, and prejudice consolidation might cause."); *See also Shump v. Balka*, 574 F.2d at 1344.

### III.
### ANALYSIS

Consolidation of these complaints is appropriate because all the cases involve common questions of law and identical facts. In particular, each of these cases requires the Court to answer the question of whether the Second Amendment to the United States Constitution permits Defendants to temporarily ban firearms in the areas now stated in the most recent Amended Public Health Order, specifically public parks and playgrounds.

For the most part,[1] Plaintiffs have been attending the same hearings and have even joined orally joined motions at these hearings. Due to this fact, consolidation is unlikely to cause delay

---

[1] Due to Plaintiff Anderson's date of filing, he did not attend the two hearings the Court has had on this matter.

among the parties. Consolidation is also necessary to avoid judicial inefficiency: allowing each case to proceed individually would require the Court to rule in six separate cases on the same issues and determine nearly identical requests for relief. The Court has also determined that none of the Plaintiffs will be prejudiced by having their claims determined in the same action, because the same judge is already adjudicating each Plaintiff's claims. Thus, the interests of judicial economy in consolidating the ruling on the motions to remand greatly outweigh any delay, confusion or prejudice that might occur.

**IT IS THEREFORE ORDERED** that the complaints in the following cases are hereby consolidated: *National Association For Gun Rights et al v. Grisham et al*, No. 1:23-cv-00771; *Donk et al v. Grisham*, No. 1:23-cv-00772; *We the Patriots USA Inc. et al v. Grisham et al*, No. 1:23-cv-00773; *Blas v. Grisham et al*, No. 1:23-cv-00774; *Fort et al v. Grisham et al*, No. 1:23-cv-00778; and *Anderson v. Grisham et al*, No. 1:23-cv-00839.

**IT IS ALSO ORDERED** that all documents filed in the future for any of the listed cases shall be filed in the case that currently contains a motion for preliminary injunction as to the most recent Amended Public Health Order, *We the Patriots USA Inc.*, No. 1:23-cv-00773.

_____
DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE

App. 176

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

WE THE PATRIOTS, INC,
DENNIS SMITH,                                          No. 1:23-cv-00773-DHU-LF


             Plaintiffs,                               Consolidated with:

                                                       No. 1:23-cv-00771-DHU-LF
                                                       No. 1:23-cv-00772-DHU-LF
                                                       No. 1:23-cv-00774-DHU-LF
vs.                                                    No. 1:23-cv-00778-DHU-LF
                                                       No. 1:23-cv-00839-DHU-LF
MICHELLE LUJAN GRISHAM,
in her official capacity only, PATRICK
M. ALLEN, in his official capacity only,
JASON R. BOWIE, in his official
capacity only, TROY WEISLER, in his
official capacity only, HAROLD
MEDINA, in his official capacity only,


             Defendants.


**ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

     In this consolidated action, Plaintiffs, individual firearm owners and Second Amendment

advocacy organizations (collectively "Plaintiffs"),[1] have moved for a preliminary injunction

---

[1] The following cases were filed with complaints, motions for temporary restraining orders (TRO), and preliminary injunctions on September 9, 2023: *National Association for Gun Rights et al. v. Michelle Lujan Grisham et al.* (1:23-cv-00771-DHU-LF), *Randy Donk et al. v. Michelle Lujan Grisham et al.* (1:23-cv-00772-DHU-LF), and *We the Patriots et al. v. Michelle Lujan Grisham et al.* (1:23-cv-00773-DHU-LF). *Shawn Blas v. Grisham et al.* (1:23-cv-00774-DHU-LF) was filed with a complaint, motion for a TRO, and preliminary injunction on September 10, 2023. *Zachary Fort et al. v. Michelle Lujan Grisham et al.* (1:23-cv-00778-DHU-LF) was filed with a complaint, motion for a TRO, and a preliminary injunction on September 11, 2023. *Richard M. Anderson v. Michelle Lujan Grisham et al.* (1:23-cv-00839-DHU-LF) was filed with a complaint and a request for a TRO and a preliminary injunction on September 26, 2023.

1

**App. 177**

pursuant to Rule 65(a) of the Federal Rules of Civil Procedure.  They seek to enjoin enforcement

of the New Mexico Department of Health's "Amended Public Health Emergency Order Imposing

Temporary Firearm Restrictions, Drug Monitoring and Other Public Safety Measures" issued on

October 6, 2023.[2] The Court held a hearing on October 3, 2023, addressing a previous order that

raised the same legal issues and heard oral argument on the motions.  For the reasons stated below,

the Court will **DENY** Plaintiffs' motion.

# I.
# BACKGROUND

## A.  The Second Amendment

In 1791, Congress ratified the Second Amendment to the Constitution of the United States,

along with nine other amendments that form the Bill of Rights.  The text of the Second Amendment

reads in full:

> A well-regulated Militia, being necessary to the security of a free
> State, the right of the people to keep and bear Arms, shall not be
> infringed.

U.S. CONST. amend. II.  At the time of its ratification, "the Second Amendment [ ] applied only to

the Federal Government." *McDonald v. City of Chicago*, 561 U.S. 742, 754, 130 S.Ct. 3020, 177

L.Ed.2d 894 (2010).  However, in 1868, Congress ratified the Fourteenth Amendment and,

thereafter, the Supreme Court of the United States "eventually incorporated almost all of the

provisions of the Bill of Rights," to the States, including the Second Amendment right to keep and

---

[2] Plaintiffs filed motions or supplemental briefs directed at two previous Public Health Orders (one issued on September 8, 2023 and another issued on September 15, 2023). However, only one Plaintiff – We the Patriots Inc – filed a motion in response to the most recent Amended Public Health Order (issued on October 6, 2023). In any event, the arguments from the first two sets of briefing remain applicable as to the current restrictions found in the Amended Order and thus the Court will consider those arguments here.

bear arms.  *Id*. at 750, 764, 130 S.Ct. 3020.   It was not until 2008, however, that the Supreme

Court provided substantive interpretation of the meaning and scope of the Second Amendment.  In

*District of Columbia v. Heller*, 554 U.S. 570, 581-592, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008),

the Supreme Court thoroughly analyzed the textual language of the amendment and determined

that it protects an individual right to possess a firearm unconnected to service in a militia, and to

use that arm for traditionally lawful purposes, such as self-defense within the home. Two years

later, in *McDonald*, 561 U.S. at 767-80, the Court confirmed that the Fourteenth Amendment made

the Second Amendment right to keep and bear arms fully applicable to the States.  And, most

recently, in *New York State Rifle & Pistol Association, Inc. v. Bruen*, __U.S. __, 142 S.Ct. 2111,

2122-23, 213 L.Ed.2d 387 (2022), the Supreme Court struck down a New York law that

conditioned the issuance of a license to publicly carry a handgun on the existence of "proper

cause," explaining that the Second Amendment protects "an individual's right to carry a handgun

for self-defense outside the home."  *Id*. at 2122.

**B.  The New Mexico Department of Health's Public Health Orders**

**1.  <u>The Executive Order and the Original Public Health Order</u>**

On September 7, 2023, New Mexico Governor Michelle Lujan Grisham ("the Governor")

issued Executive Order 2023-130, declaring a state of public health emergency due to gun

violence.  Exec. Order No. 2023-130, (Sept. 07, 2023) ("EO" or "Executive Order"), Doc. 1,

Exhibit A.[3]   The Executive Order cited, as the basis for the declaration, that New Mexico

consistently had some of the highest rates of gun violence in the nation; the rate of gun deaths in

New Mexico increased 43% from 2009 to 2018, compared to an 18% increase over this same time

---

[3] All references to docket numbers refer to the docket of the lead case, 1:23-cv-00773-DHU-LF,
unless otherwise noted.

**App. 179**

period nationwide; guns were the leading cause of death among children and teens in New Mexico, and had led to the recent deaths of a thirteen-year-old girl, a five-year-old girl, and an eleven-year-old boy; New Mexico had experienced an increasing amount of mass shootings; gun-related deaths and injuries had resulted in devastating physical and emotional consequences for individuals, families and communities throughout the State; the impact of gun violence extended beyond physical injuries and fatalities, causing emotional trauma, economic burdens, and long-lasting consequences for those affected individuals and their families; and that the increasing number of gunshot victims strained New Mexico's over-burdened healthcare system and placed undue pressure on medical professionals and resources. *Id.* at 1-2. The Executive Order, among other things, directed the New Mexico State Departments of Public Health, Homeland Security and Emergency Management, and Public Safety to collaborate with the Governor's office to provide a coordinated response to implement the Executive Order. *See id*. at 2.  The Executive Order was to "take effect immediately and [ ] remain in effect until October 6, 2023." *Id*. at 3.

The following day, on September 8, 2023, the Secretary of the New Mexico Department of Health, Patrick M. Allen ("Secretary Allen") issued a "Public Health Emergency Order Imposing Temporary Firearm Restrictions, Drug Monitoring and Other Public Safety Measures" ("PHO" or "Public Health Order") pursuant to his authority to preserve and promote public health and safety.  Public Health Order (N.M. Dep't of Health Sept. 8, 2023), Doc. 1 at Exhibit B. Among other prohibitions, Section (1) of the PHO temporarily restricted open or concealed possession of a firearm by any person, other than by a law enforcement officer or licensed security officer, "within cities or counties averaging 1,000 or more violent crimes per 100,000 residents per year since 2021 according to [the] Federal Bureau of Investigation's Uniform Crime Reporting Program AND more than 90 firearm-related emergency department visits per 100,000 residents from June

4

**App. 180**

2022 to June 2023 according to" the Public Health Department. *Id*. at § (1)A. Section (4) of the PHO further prohibited the possession of a firearm on "state property, public schools, and public parks" unless the person carrying the firearm is a law enforcement officer or licensed security officer. *Id*. at § (4).

The PHO provided certain exceptions to the prohibition of possessing firearms depending on who the person was and where the firearm was possessed. As noted, Section (1) of the PHO did not apply to "a law enforcement officer or licensed security officer." *Id.* at § (1). The PHO also exempted possessing a firearm while on private property and firearm possession while at a licensed firearm dealer or gunsmith, possession for use at a licensed firing range or sport shooting competition, or possession of a firearm while traveling to designated locations, provided that the firearm was appropriately locked and secured rendering it inoperable. *See id*. § (1)A-E. Willful noncompliance with the PHO subjected "[a]ny person or entity" to "civil administrative penalties available at law." *Id.* at § (4).   The firearm restrictions in the PHO were temporary and were to remain in effect for the duration of the public health emergencies declared in the Governor's Executive Order, which was October 6, 2023, unless the public health emergencies were extended. *See id*. at 3, ¶ 6.

### 2.   <u>The Temporary Restraining Order Prohibiting Enforcement of the PHO</u>

On September 9, 2023, five sets of the Plaintiffs in this consolidated action ("First Set of Plaintiffs") filed suit against the Governor, Secretary Allen, the New Mexico Department of Health, and various other state and local officials and moved for a temporary restraining order and preliminary injunction seeking to enjoin enforcement of certain provisions of the PHO which restricted the possession of firearms. The First Set of Plaintiffs asserted first that the broad firearm restrictions were unconstitutional and that any such restrictions on their ability to possess firearms

**App. 181**

in public, either openly or concealed, violated the Second Amendment of the United States Constitution.   Some of the Plaintiffs also challenged the vagueness of the PHO and argued that the PHO violated the Constitution of the State of New Mexico as well as the Federal Constitution.[4]

On September 13, 2023, this Court held a hearing on the request for a TRO and heard arguments from the First Set of Plaintiffs and Defendants. Following that hearing, the Court found the First Set of Plaintiffs had met their burden in proving the necessity of immediate injunctive relief and the Court issued an Order temporarily enjoining Defendants from enforcing Section (1) and part of Section (4) of the Public Health Order.  *See* Temporary Restraining Order, September 13, 2023, Doc. 11.  The Court's decision to temporarily restrain the enforcement of the PHO was driven by its finding that Plaintiffs had met all the factors necessary to obtain temporary injunctive relief; more specifically that, pursuant to the Supreme Court's decision in *Bruen*, Plaintiffs had shown a substantial likelihood of success on the merits as to their Second Amendment challenge to the broad prohibition of possession of a firearm in public.  *See id*. at 6-8.  The Temporary Restraining Order not only enjoined Section (1)'s broad prohibition as to the possession of firearms in the areas designated by the PHO, but also to Section (4) of the PHO to the extent that section imposed additional restrictions on the carrying or possession of firearms that were not already in place prior to the issuance of the PHO, which included public parks.  *See id.* at 11.

**3.  <u>The Amended Public Health Order</u>**

Two days after the Court's issuance of the Temporary Restraining Order, the New Mexico Department of Health issued an Amended Public Health Order which eliminated the broad restriction of carrying firearms in public but prohibited the carrying of any firearm "in public parks and playgrounds, or other public areas provided for children to play in."  Amended Public Health

---

[4] *See Blas v. Grisham*, et al, 1:23-cv-00774 DHU-LF.

**App. 182**

Order (N.M. Dep't of Health Sept. 15, 2023) ("Amended PHO") at Section (1), Doc. 13-2. Following the issuance of the Amended PHO, some of the consolidated Plaintiffs filed requests for ex parte TRO's and preliminary injunctions directed at the Amended PHO. *See* Doc. 13; *Anderson v. Grisham et al.*, 1:23-cv-00839-DHU-LF, Doc. 1. The Court denied both requests for ex parte temporary restraining orders without a hearing, finding that the requests to enjoin the firearm restriction at public parks was superfluous and unnecessary because the Court had already temporarily enjoined that restriction and finding that, given the lack of legal support in the ex parte motions, Plaintiffs did not show a substantial likelihood of success on the merits of their challenge to the restriction on playgrounds and other public areas provided for children to play in. *See* Order Denying Temporary Restraining Order and Request for Hearing, Doc. 15 and Order Denying Temporary Restraining Order, 1:23-cv-00839-DHU-LF, Doc. 2.

On October 3, 2023, the Court held a hearing on the motions for preliminary injunction directed at the Amended PHO.[5] Clerk's Minutes, Doc. 20.  At the hearing, the Court denied the First Set of Plaintiffs' motions for preliminary injunction regarding the original PHO on the grounds of mootness, given that the broad prohibition of the possession of firearms was eliminated by operation of the amendment to the PHO. *See id.*   The Court did not rule on the motions for a

---

[5] Those Plaintiffs who did not file new motions for injunctive relief directed at the Amended PHO joined in the arguments made by others at the hearing on the motions for preliminary injunction or later filed supplemental briefs directed at the Amended PHO. *See* Supplemental Brief In Support of Preliminary Injunction as to the Amended Public Health Order Issued September 15, 2023, 1:23-cv-00772-DHU-LF, Doc. 26; Supplemental Motion for Preliminary Injunction, 1:23-cv-00774-DHU-LF, Doc. 19; Supplemental Motion for Temporary Restraining Order [and] Supplemental Motion for Preliminary Injunction, 1:23-cv-00778-DHU-LF, Doc. 24. Plaintiff National Association for Gun Rights filed Supplemental Motion for Preliminary Injunction, 1:23-cv-00771-DHU-LF, Doc. 18, as an "Appendix/Supplement" on September 21, 2023.

**App. 183**

preliminary injunction as to the Amended PHO but took the issue under advisement.  The Court

then extended the Temporary Restraining Order until October 11, 2023.  *See id.*

### 4.  **The Second Amended Public Health Order and Revised Executive Order**

On October 6, 2023, before the Court could rule on the motions for preliminary injunction

directed at the Amended PHO, Defendant New Mexico Department of Health issued another

amended Public Health Order.  *See* Amended Public Health Order (N.M. Dep't of Health October

6, 2023) ("Second Amended PHO"), Doc. 25-4.  The Governor also issued a renewed Executive

Order extending the public health emergency due to gun violence until November 3, 2023.  Exec.

Order No. 2023-135, (October 6, 2023) ("Revised EO"), Doc. 25-5.  The Second Amended PHO

maintains the temporary firearm restrictions as to public parks and playgrounds, but no longer

prohibits the possession of firearms in other "public areas provided for children to play in."  *See*

Second Amended PHO, Section (1).  The restrictions do not apply to law enforcement officers,

licensed security officers, active-duty military personnel, to the City of Albuquerque's Shooting

Range Park, and areas designated as a state park within the state parks system and owned or

managed by the New Mexico Energy, Minerals and Natural Resources Department State Parks

Division, or the State Land Office. *See id.*, § (1).  The Second Amended PHO also eliminated the

language that had been previously challenged as being overly vague and explicitly made the

temporary firearm restrictions applicable only to the City of Albuquerque and Bernalillo County.

*See id.*

On the same day the Second Amended Order was issued, one of the consolidated Plaintiffs

filed its Third Emergency Motion for a Preliminary Injunction, now taking aim at the Second

Amended PHO.  *See* Doc. 25.

**App. 184**

What remains to be determined at this stage of the litigation is whether the consolidated Plaintiffs have met their burden to show that they are entitled to a preliminary injunction as to the temporary firearm restrictions remaining in the Second Amended PHO – namely, the restrictions on public parks and playgrounds. Those restrictions are set to expire on November 3, 2023. *See* Second Amended PHO at 3; Revised EO at 3.

## II.
## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019) (citing *U.S. ex rel. Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989)). "Because a preliminary injunction is an extraordinary remedy, the movant's right to relief *must be clear and unequivocal*." *Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (emphasis added) (citing *Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1224 (10th Cir. 2008)).

To obtain a preliminary injunction, the moving party must establish that (1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits. *See Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198–99 (10th Cir. 1992).

The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis. *Nken v. Holder*, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). "Tenth Circuit decisions have linked the 'irreparable injury' inquiry to the 'likelihood of success' inquiry,

9

**App. 185**

holding that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled

to a presumption of irreparable harm." *Logan v. Pub. Emps. Ret. Ass'n*, 163 F.Supp.3d 1007, 1030

(D.N.M. 2016) (Browning, J.) (citing *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1266 (10th Cir.

2005)).

## III.
## DISCUSSION

Plaintiffs now seek a preliminary injunction as to the enforcement of Defendants'

temporary firearm restrictions on the possession of firearms "either openly or concealed in public

parks or playgrounds within the City of Albuquerque and Bernalillo County."[6]  Second Amended

PHO, Section (1).   Plaintiffs make the same constitutional arguments that were directed at the

original PHO, primarily challenging, on Second Amendment grounds, the Second Amended

PHO's temporary firearm restrictions in the areas stated above.[7]

Defendants respond to the request for preliminary injunctive relief first by asserting that

Plaintiffs lack standing to challenge the Amended PHO (now the Second Amended PHO) because

most do not specifically allege or assert that they intend to carry firearms in public parks or

---

[6] As stated above, at the time of this Court's consideration of whether the Seconded Amended PHO should be preliminarily enjoined, only one Plaintiff had filed a Third Motion for Preliminary Injunction specifically targeting the Second Amended PHO.  *See* Doc. 25.  The Court thereafter consolidated this litigation and will not require any of the other Plaintiffs to file motions directed at the Second Amended PHO or the Defendants to file a response to additional motions directed at the current order before the Court decides whether it should be preliminarily enjoined.  With regard to the restrictions on public parks and playgrounds, the Court has received and reviewed substantial briefing on the issue and has had heard oral argument sufficient to make a decision on the current request for preliminary injunctive relief.

[7] Certain Plaintiffs had challenged the original PHO and the Amended PHO as being void for vagueness, arguing that they failed to provide adequate warning to individuals of ordinary intelligence as to where the possession of firearms was prohibited, both in the language concerning the geographical areas subject to the Amended PHO's restrictions and as to the prior restriction on "public areas provided for children to play in."  *See* Doc. 13-2. Those arguments, however, are now moot given the narrowing of the temporary firearm restrictions in the Second Amended PHO.

**App. 186**

playgrounds.  Defendants then contend that, regarding the specific areas where the temporary firearm restrictions are to be enforced, Supreme Court precedent does not invalidate such restrictions.

### A. Plaintiffs' Standing to Challenge the Temporary Firearm Restrictions at Public Parks and Playgrounds.

Defendants contend Plaintiffs do not have standing to challenge the temporary firearm restrictions at issue in this request for injunctive relief.  For a plaintiff to demonstrate standing, they must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016), as revised (May 24, 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-1, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)). In the case at bar, this means that Plaintiffs must demonstrate standing to challenge the distinct restrictions of the Second Amended Order, both public parks and playgrounds, and with regards to the relief requested.  *See Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought"); *see also Los Angeles v. Lyons*, 461 U.S. 95, 109, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983) (determining that, notwithstanding the fact that plaintiff had standing to pursue damages, he lacked standing to pursue injunctive relief). "[S]tanding is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358, n. 6, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996), and each plaintiff must demonstrate standing for each claim he seeks to bring and for each form of relief requested in his complaint.  *See Davis v. Federal Election Comm'n*, 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008).

Regarding the first requirement of the standing test laid out in *Spokeo*, when a plaintiff is challenging a law which has not yet been applied to them, as is the case for Plaintiffs here, "they

**App. 187**

need not show that they have been subject to an actual arrest, prosecution, or other enforcement action as a prerequisite to challenging the law." *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014); *Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).  Instead, federal courts have permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent. As the Supreme Court has explained, "[A] plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List*, 573 U.S. at 158-159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)).  Thus, Plaintiffs must only demonstrate that there is a real threat of enforcement and subsequent injury if they were to engage in their constitutionally protected activity.

Considering the above law regarding standing, two of the Plaintiffs in this consolidated action have satisfied the standing requirement for preliminary injunctive relief as to restrictions on public parks and playgrounds.  In his sworn affidavit submitted to the Court, Plaintiff Donk testified,

> I carry my handgun with me every day, everywhere it is lawful to do so… I regularly walk my dog into and through public parks. In one of these locations, access along the paved path to the dog area requires traveling through a playground. There is no other reasonable way for me to access this area of the park that is set aside for dogs (not children) to play…I frequently visit public parks, playgrounds, and public areas provided for children to play in with my grandchildren.

Pl.'s Suppl. Br., 1:23-cv-00772, Doc. 26-1, at 2. This testimony is sufficient to allege an injury in fact given that the order could be enforced against him for carrying a firearm in these locations,

that injury would be traceable to the Second Amended Order, and could be resolved by a favorable order from this Court.

In addition, Plaintiff Smith submitted an affidavit in which he testified that:

> I regularly carry a loaded handgun in a holster on my body for the purpose of self-defense whenever I leave my home and I am out and about in Albuquerque … I also engage in recreation on a weekly basis at New Mexico public parks – primarily Los Poblanos Open Space in Albuquerque, New Mexico… I regularly carry my handgun when I use Los Poblanos Open Spaces in order to protect myself from wild coyotes, stray dogs, and potential human attackers… I am a grandfather, and I occasionally visit playgrounds with my grandchildren and attend various recreational events that they are involved in at various places where children play in the City of Albuquerque.

Suppl. Decl. of Dennis Smith, 1:23-cv-00773, Doc. 24 at 2. Again, this testimony satisfies the three requirements necessary to establish standing as Plaintiff Smith has shown facts sufficient to demonstrate that he intends to engage in a course of action where there exists a credible threat of prosecution.

The remaining Plaintiffs have not provided sufficient information to establish standing to challenge the Second Amended Order in its entirety. Plaintiff Haines and Fort only testify to regularly carrying firearms in parks, and Plaintiffs Blas and Anderson do not mention carrying guns in either public parks or playgrounds.  Plaintiff Haines and Fort thus have standing to challenge the Second Amended Order as it applies to public parks but lack standing to request preliminary injunctive relief for playgrounds, and Plaintiffs Blas and Anderson lack standing to request preliminary injunctive relief for both parks and playgrounds.  Nevertheless, the Court will determine whether preliminary injunctive relief is appropriate in this consolidated action because two Plaintiffs have demonstrated that they have standing to challenge both restrictions at issue.

**B.  Preliminary Injunction Factors and the Firearm Restrictions.**

**App. 189**

Whether Plaintiffs are entitled to the extraordinary remedy of a preliminary injunction depends on whether they can meet the factors outlined in *Resolution Trust Corp.*, 972 F.2d at 1198–99, including, most importantly, showing that they have a substantial likelihood of success on the merits of their claims and, in the absence of injunctive relief, they will suffer irreparable injury.  If Plaintiffs can show that there is a substantial likelihood they will succeed on their constitutional challenge to the firearm restrictions at issue here, then the other factors necessary to obtain a preliminary injunction will necessarily favor Plaintiffs.  *See Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1263 (10th Cir. 2016) ("When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.") (citation and internal quotation marks omitted). The Court will thus focus first on whether Plaintiffs have shown, clearly and unequivocally, that they have shown a substantial likelihood of success on the merits of their constitutional claims.

### 1.   <u>The Temporary Firearm Restrictions at Public Parks</u>

Relying heavily on the Supreme Court's decision in *Bruen* and the post-*Bruen* district court decisions in *Koons v. Platkin*, 2023 WL 3478604 (D.N.J. 2023) and *Antonyuk v. Hochul*, 639 F.Supp.3d 232, 324 (N.D.N.Y. 2022), *reconsideration denied sub nom*, *Antonyuk v. Negrelli*, No. 122CV0986GTSCFH, 2022 WL 19001454 (N.D.N.Y. Dec. 13, 2022), Plaintiffs argue that the temporary firearm restrictions at public parks clearly violate the Second Amendment.

In *Bruen*, the Supreme Court held that a New York statute which conditioned the issuance of an unrestricted license to publicly carry a handgun on the existence of "proper cause," violated the Second and Fourteenth Amendments.   142 S.Ct. at 2122-23.  The Supreme Court explained that the Second Amendment protects "an individual's right to carry a handgun for self-defense outside the home." *Id.* at 2122.  In coming to that conclusion, the *Bruen* Court rejected the means-

14

**App. 190**

end inquiry that had previously been used by the Courts of Appeals in evaluating the constitutionality of gun restrictions, *see id*. at 2126-27, and instead adopted a new two-part test to determine whether a restriction passed constitutional scrutiny under the Second Amendment. *Id*. at 2129-30. In the first step, a court reviewing a restriction must determine "whether the Second Amendment's plain text covers an individuals' conduct" – if it does, "the Constitution presumptively protects that conduct." *Id*. at 2130. In the second step, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. Only if the government makes such a showing "may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id*. (citation and internal quotations omitted).

In this case, there seems to be no dispute that the first step outlined in *Bruen* has been met because the Second Amendment's text covers the individual Plaintiffs' conduct in this case. As the *Bruen* Court explained, "[t]he Second Amendment's plain text [ ] presumptively guarantees [law abiding citizens] a right to bear arms in public for self-defense." *Id.* at 2135. Here, the Second Amended PHO purports to restrict such persons from bearing arms in public parks and playgrounds, implicating the guarantees of the Constitution and the command of the Second Amendment. Where the parties do diverge, however, is whether under *Bruen's* second step of the analysis, Defendants can justify their temporary firearm restrictions by demonstrating that they are consistent with the Nation's historical tradition of firearm regulation. Plaintiffs urge this Court to join the district courts in *Antonyuk* and *Koons* and reject any argument that the restriction of firearms in public parks is consistent with this history. Defendants, on the other hand, argue that the correct analysis can be found in another post-*Bruen* case, *Maryland Shall Issue v. Montgomery Co.*, 2023 WL 4373260 (D. Md. 2023). In that case, the district court upheld Montgomery

County's similar restrictions based on the historical evidence of gun restrictions on public parks during and after the Reconstruction Era.  *See id*. at *11.

To begin with, it is important to determine the types of historical sources to be considered when analyzing the historical evidence of state law firearm restrictions on public parks.  In *Bruen*, the Supreme Court explicitly acknowledged that "there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope."  142 S. Ct. at 2138.  The *Bruen* Court, however, declined to resolve that debate because the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry. *See id*.

For the purposes of this Court's analysis, the Court agrees with the Eleventh Circuit Court of Appeals and the district court in *Maryland Shall Issue* that historical sources from the period of the ratification of the Fourteenth Amendment in 1868 are more probative of the scope of the Second Amendment's right to bear arms than those from the Founding Era.  *See National Rifle Association v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023); *Maryland Shall Issue*, 2023 WL 4373260 at *8.  As the Eleventh Circuit explained, this is so "because the Fourteenth Amendment is what *caused* the Second Amendment to apply to the States, [thus] the Reconstruction Era understanding of the right to bear arms—that is, the understanding that prevailed when the States adopted the Fourteenth Amendment—is what matters."  *Id*.

In *Antonyuk*, *Koons*, and *Maryland Shall Issue*, each of these district courts discussed, to varying extents, the historical evidence of gun restrictions at public parks during the time of the ratification of the Fourteenth Amendment.  In *Antonyuk*, the court observed two state laws, one from Texas in 1870 and one from Missouri in 1883, and city laws and regulations from New York City, N.Y., Philadelphia, Pa., Chicago, Ill., St. Louis, Mo. and St. Paul, Minn., which restricted the

16

**App. 192**

carrying of firearms in public parks during and after the ratification of the Fourteenth Amendment. *See Antonyuk*, 639 F.Supp.3d at 324.  The district court there determined that two state laws could not represent a national tradition that was established and representative of the Nation.  *See id*.  As to the city laws restricting firearms, the *Antonyuk* court noted that they arguably supported a historical tradition of banning firearms in public parks in cities but could not establish a historical tradition of such bans in public parks outside of a city.  *See id*. at 325.

In *Koons*, the district court acknowledged that the state (New Jersey) had presented "many laws - mostly local ordinances – from the 19th and 20th century restricting firearms at parks." *Koons*, 2023 WL 3478604 at *82.  The court, however, determined it would only consider those laws that were closer in time to the ratification of the Fourteenth Amendment.  *See id*. at *84. Once that limitation was considered, the court recognized only one state law and about 25 local ordinances from this time frame, which the court found to be insufficient to establish a historical tradition of banning firearms at parks, rendering the New Jersey gun restrictions on public parks unconstitutional.

However, in *Maryland Shall Issue*, the district court reached a different conclusion.  In its analysis, the court determined there existed "numerous historical statutes and ordinances from the time period before and following the ratification of the Fourteenth Amendment [that] imposed [firearm] restrictions in relation to parks." 2023 WL 4373260 at *11.  The Maryland court observed that, during that time period, cities including New York, N.Y., Philadelphia, Pa., Detroit, Mich., Chicago, Ill., Saint Paul, Minn., Williamsport, Pa., Wilmington, Del., Reading, Pa., Boulder Colo., Trenton, N.J., Phoenixville, Pa., Oakland, Cal., Staunton, Va., and Birmingham, Ala., all maintained regulations that prohibited firearms within public parks.  *See id*.  At the state level, the court found that at least three states – Minnesota, Wisconsin, and North Carolina had prohibited

**App. 193**

the carrying of firearms at public parks not long after the ratification of the Fourteenth Amendment. *See id*. According to the Maryland court, "These laws which [ ] categorically bar the carrying of firearms in parks, demonstrate that there is 'historical precedent' from before, during and after the ratification of the Fourteenth Amendment that 'evinces a comparable tradition of regulation' of firearms in parks." *Id.* (citing *Bruen*, 142 S. Ct. at 2131-32). The firearm restriction as to public parks was therefore not at odds with the Second or Fourteenth Amendment. *See id*.

In this case, Defendants cite to all the historical evidence presented by the court in *Maryland Shall Issue* to justify the temporary firearm restrictions in their Second Amended Public Health Order. Defendants assert that, as the right to carry a firearm in a public park has historically been regulated during the relevant time period, the public park restrictions are constitutional under *Bruen*. Doc. 21 at 19.

Whether or not this Court will ultimately agree that Defendants can justify their temporary firearm restrictions under the second step of the *Bruen* analysis remains to be seen. When all of the laws and ordinances cited by *Antonyuk*, *Koons*, and *Maryland Shall Issue* are combined and tallied, it appears plausible, although not certain, that Defendants may be able to demonstrate a national historical tradition of firearm restrictions at public parks within cities, as observed to arguably be the case by the court in *Antonyuk* as well as the court in *Maryland Shall Issue*. *See Antonyuk*, 639 F.Supp.3d at 325. Plaintiffs, for the most part, say very little about the firearm restrictions at public parks in and around the time of the ratification of the Fourteenth Amendment or thereafter, except to disagree that this is the correct time frame under which to perform the *Bruen* historical traditions analysis and to point out that "two other district courts have found that the local park ordinances up until 1890 governed less than 10% of the nation's entire population and were unrepresentative with the meaning of *Bruen*." *See* Doc. 25-1 at 18. It is hard to tell, at

**App. 194**

this stage of this litigation, and in a case involving temporary firearm restrictions in public parks in one city in New Mexico, whether Plaintiffs will ultimately succeed on the merits of their Second Amendment claim.  They may very well do so.  But the Court finds that, given the different analysis of the historical evidence by three district courts which have considered the issue post-*Bruen*, it cannot be said that Plaintiffs' right to relief is "clear and unequivocal." *Dine Citizens*, 839 F.3d at 1281.  Plaintiffs have thus not shown a substantial likelihood of success on the merits of their Second Amendment challenge to Defendants' temporary firearm restrictions at public parks sufficient to obtain the extraordinary relief of a preliminary injunction.

### 2. <u>The Temporary Firearm Restrictions on Playgrounds</u>

Defendants also request that the Court preliminarily enjoin the Defendants from enforcing the Second Amended Public Health Order's temporary firearm restrictions on playgrounds, but say very little about why they have a substantial likelihood of success in their constitutional challenge to such restrictions other than to proclaim playgrounds do not resemble the historical "sensitive places" analogues referenced by the Supreme Court.  The Court disagrees.

There is no question that the Second Amendment protects the possession and carrying of firearms for self-defense in the home and in public, but, as the Supreme Court has explained, it is not absolute:

> Like most rights, the right secured by the Second Amendment is not *unlimited*. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.

*Heller*, 554 U.S. at 626.  The *Bruen* Court cited this passage of *Heller,* agreeing that although "the Second Amendment protect[s] an individual right to armed self-defense, we [have] also relied on the historical understanding of the Amendment to demark the *limits* on the exercise of that right."

19

**App. 195**

*Bruen,* 142 S. Ct. at 2128 (emphasis added). "To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 2111. Given the Supreme Court's admonitions, it is clear that the Second Amendment does not constitute a general pass for any individual to use and carry firearms in anyway or anyplace that individual sees fit.

In holding that the Second Amendment conferred an individual right to keep and bear arms in the home, the Supreme Court in *Heller* was careful to explain that it's holding was not meant to overrule long standing exceptions to the Second Amendment:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms **in sensitive places** *such as* **schools and government buildings**, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626–27 (emphasis added). Thus, the *Heller* Court recognized that exceptions to the protections of the Second Amendment included the longstanding prohibition of firearms in "sensitive" places *such as* schools or government buildings.[8]

This position was reaffirmed in *Bruen*, in which the Supreme Court clarified that their decision did nothing to overrule *Heller's* recognition of the sensitive places doctrine:

> Consider, for example, *Heller*'s discussion of longstanding laws forbidding the carrying of firearms in sensitive places such as

---

[8] The Supreme Court's use of "such as" is illuminating: the term is illustrative and non-exhaustive, meant to give some examples of sensitive places that lawmakers and lower-court judges could use as a guidepost for determining whether certain firearm regulations violated the Second Amendment. *See United States v. Morrow*, 79 F.4th 1169, 1174 (10th Cir. 2023) (holding that the term "such as" in Fed. R. Evid. 404(b)(2) was used to illustrate permissible uses of other-act evidence, but was not exhaustive); *see also United States v. Armijo*, 38 F.4th 80 (10th Cir. 2022).

> schools and government buildings… Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g.,* legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. … We therefore can assume it *settled* that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

*Bruen*, 142 S. Ct. at 2133 (internal citations omitted) (emphasis added). The Supreme Court again confirmed it is settled law that the sensitive places doctrine is consistent with the Second Amendment, and nothing in its holdings in *Heller* or *Bruen* were meant to disturb judicial recognition of that exception to the Second Amendment's protections. The *Bruen* Court not only added additional examples to the non-exhaustive list of potentially sensitive places, it encouraged the lower courts to use historical analogies to the enumerated "sensitive" places in order to determine if new regulations are constitutionally permissible. *See id*.

Given the Supreme Court's clear invitation for lower courts to conduct their own analogues analysis under the sensitive places doctrine, this Court finds that playgrounds are "sensitive places" and are excepted from the Second Amendment's commands. As other courts have noted, playgrounds are often associated with schools and therefore the inference that they are sensitive places under *Bruen* is appropriate. *See, e.g. Siegel v. Platkin*, 2023 WL 1103676, at *10 (D.N.J. Jan. 30, 2023) ("schools and playgrounds intersect, that is, playgrounds fall within the sphere of schools. Therefore, under *Bruen*, the Court 'can assume it settled' that playgrounds are a 'sensitive place.'") (quoting *Bruen*, 142 S.Ct. at 2133).

Like with public parks, the holdings of *Bruen* and *Heller* did not directly deal with the issue of firearms in playgrounds. Plaintiffs rely primarily on various district court opinions to assert

**App. 197**

their argument that playgrounds are not sensitive places, including *Antonyuk*, *Koons*, *Siegel*, *Wolford v. Lopez*, No. CV 23-00265 LEK-WRP, 2023 WL 5043805 (D. Haw. Aug. 8, 2023). However, while each of these district courts enjoined similar laws to the Second Amended PHO as they pertained to public parks, they were largely silent on the issue of playgrounds and if the courts did comment on playgrounds it was to assert that they *were* sensitive places. *See Antonyuk, 639 F.Supp.3d at 324*; *Koons*, 2023 WL 3478604 at *82 ("For playgrounds, the parties have not persuaded this Court to change its earlier ruling allowing the State to ban firearms at playgrounds during this litigation").[9]

This Court also rejects the argument that schools are only recognized as sensitive places because a "core government" function occurs within them (i.e., the education of children) and playgrounds (and parks) do not fit within that exception because no government functions occur in such places. Doc. 25, at 8. While Plaintiffs' commentary on Cicero's defense of Milo is interesting, as is their analysis of Medieval history, it ultimately has no bearing on a modern legal analysis of sensitive places doctrine and Plaintiff cites no case law which supports their "core government function" theory as to sensitive places. In *Antonyuk*, one of the district decisions relied upon by Plaintiffs for their arguments regarding restrictions at public parks, the court concluded that public schools (and, by analogy, playgrounds) were not sensitive places because they involved a government function, but rather because they both contained a vulnerable population – children. *See Antonyuk,* 639 F.Supp.3d at 324 (holding that public parks were analogous to schools given that both places often contain children and therefore constituted protected sensitive places).

---

[9] The *Wolford* cases cited by the Plaintiffs was completely silent on the issue of playgrounds, and they refused to enjoin the Hawaii law as it applied to playgrounds.

Given the Supreme Court's recognition of schools as sensitive places and the sound analogy between schools and playgrounds stated in *Antonyuk*, the Court finds that the recognition of what constitutes a sensitive place could very well be determined by the type of function occurring at those locations as well as whether a vulnerable population – such as children – utilize such locations.  Plaintiffs have provided no legal support for their contention that sensitive places can only be tied to places where core government functions are conducted.

For these reasons, the Court finds that Plaintiffs have not proved a substantial likelihood of success on the merits regarding their challenge to the temporary restriction of firearms on playgrounds.

## IV.
## CONCLUSION

Because the Court has found that Plaintiffs have not shown a substantial likelihood of success on the merits of their challenge to the Second Amended PHO's temporary firearms restrictions, it need not evaluate the remaining factors necessary to obtain a preliminary injunction. *See Denver Homeless Out Loud v. Denver, Colorado,* 32 F.4th 1259, 1278 (10th Cir. 2022) ("an injunction can issue only if each factor is established.") (citing *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

Therefore, for the reasons stated herein, Plaintiffs' Motion for a Preliminary Injunction [Doc. 25] is **DENIED.**

_____
HON. DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE

23

**App. 199**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| WE THE PATRIOTS USA, INC, | : | |
| DENNIS SMITH, | : | DKT No.: 1:23-cv-00773-DHU-LF |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MICHELLE LUJAN GRISHAM, | : | |
| in her official capacity only, PATRICK | : | |
| M. ALLEN, in his official capacity only, | : | |
| JASON R. BOWIE, in his official | : | |
| capacity only, TROY WEISLER, in his | : | |
| official capacity only, HAROLD | : | |
| MEDINA, in his official capacity only, | : | |
| | : | |
| Defendants. | : | OCTOBER 19, 2023 |

## PLAINTIFFS' NOTICE OF APPEAL

The Plaintiffs – We The Patriots USA, Inc. and Dennis Smith – hereby give notice

of their appeal of the Court's October 11, 2023 order denying their motion for a preliminary

injunction (Dkt. 27).

The Plaintiffs,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq.
    *pro hac vice admitted*
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

*/s/ Jeremy M. Gay*

Jeremy M. Gay
Advocate Law Center, P.A.
821 S. Ford Dr.
Gallup, New Mexico 87301
(505) 722-2055
Jeremy@alcpafirm.com

**<u>CERTIFICATION OF SERVICE</u>**

Counsel for Defendants Grisham, Allen, Bowie, and Weisler have appeared in this matter. They have been served copies of this filing by the Court's CM/ECF filing system at the time of filing. Defendant Medina has not appeared and the undersigned will serve this filing by electronic mail:

Holly Agajanian, Esq.
Chief General Counsel – Office of Governor Michelle Grisham
    *For Defendants Grisham, Allen, Bowie, and Weisler*
State Capitol Building, Ste. 400
Santa Fe, NM 87501
Holly.agajanian@exec.nm.gov

Lauren Keefe, Esq.
City Attorney – City of Albuquerque
    *For Defendant Medina*
One Civic Plaza NW
4th Floor, Room 4072
Albuquerque, NM 87102
lkeefe@cabq.gov

/s/ Cameron L. Atkinson /s/

**App. 201**

**IN UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| WE THE PATRIOTS USA, INC., *et al.* | : |
|     *Plaintiffs*, | :   No. 1:23-cv-00773-DHU-LF |
| | : |
| v. | : |
| | :   Consolidated with: |
| MICHELLE LUJAN GRISHAM, individually and | : |
| in her official capacity as the Governor of New | :   No. 1:23-cv-00771-DHU-LF |
| Mexico, *et al.*, | :   No. 1:23-cv-00772-DHU-LF |
|     *Defendants*. | :   No. 1:23-cv-00774-DHU-LF |
| | :   No. 1:23-cv-00778-DHU-LF |
| | :   No. 1:23-cv-00839-DHU-LF |
| | : |
| | : |

**NOTICE OF APPEAL**

Plaintiffs, Zachary Fort, Firearms Policy Coalition, Inc., Second Amendment Foundation, and New Mexico Shooting Sports Association, Inc., hereby give notice of their appeal to the United States Court of Appeals for the Tenth Circuit from the Order on Plaintiffs' Motion for Preliminary Injunction, entered October 11, 2023 (Doc. No. 27).

Respectfully Submitted,

**ARAGON MOSS**
**GEORGE JENKINS, LLP**

By:    /s/ Jordon P. George
        Jordon P. George
        2201 Menaul Blvd NE
        Albuquerque, NM 87107
        (505) 872-3022
        (505) 214-5317 (facsimile)
        jordon@amgjlaw.com

        *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on <u>October 20, 2023</u>, a copy of the foregoing was served by electronic

filing with the Clerk of the Court via CM/ECF to all counsel of record.

*/s/ Jordon P. George*
Jordon P. George

2

**App. 203**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| WE THE PATRIOTS USA, INC., et al. | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-00773-DHU-LF |
| | ) | |
| MICHELLE LUJAN GRISHAM, in her | ) | Consolidated with: |
| official capacity as the Governor of | ) | |
| New Mexico, | ) | No. 1:23-cv-00771-DHU-LF |
|     Defendants. | ) | No. 1:23-cv-00772-DHU-LF |
| | ) | No. 1:23-cv-00774-DHU-LF |
| | ) | No. 1:23-cv-00778-DHU-LF |
| | ) | No. 1:23-cv-00839-DHU-LF |
| | ) | |
| _____ | ) | |

## NOTICE OF APPEAL

Now come Randy Donk, Gun Owners of America, Inc., and Gun Owners Foundation

("Plaintiffs"), by and through counsel, and hereby give notice of their appeal to the United States

Court of Appeals for the Tenth Circuit from the Order on Plaintiffs' Motion for Preliminary

Injunction, entered on October 11, 2023 (Document No. 27).

Respectfully submitted,

Dated:  November 6, 2023

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
MS Bar No. 102784
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
stephen@sdslaw.us

1

**App. 204**

Anthony R. Napolitano
Bergin, Frakes, Smalley & Oberholtzer, PLLC
4343 E Camelback Rd, Ste. 210
Phoenix, AZ 85018
(602) 848-5449
anapolitano@bfsolaw.com

Mark J. Caruso
4302 Carlisle Blvd., NE
Albuquerque, NM 87107
(505) 883-5000
mark@carusolaw.com
Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I Stephen D. Stamboulieh, hereby certify that I have on this day, caused the foregoing document or pleading to be file with this Court's CM/ECF system which generated a notice and delivered a true and correct copy to all counsel of record.

_/s/ Stephen D. Stamboulieh_
Stephen D. Stamboulieh

2

**App. 205**