Nos. 23-2166, 23-2167, 23-2185

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
_____

WE THE PATRIOTS, INC., et al.,

*Plaintiffs-Appellants,*

v.

MICHELLE LUJAN GRISHAM, in her official capacity only, et al.,

*Defendants-Appellees.*

*(Caption continues inside front cover.)*
_____

On Appeal from the United States District Court for the District of New Mexico
(Nos. 1:23-cv-00772-DHU-LF, 1:23-cv-00773-DHU-LF, 1:23-cv-00778-DHU-LF)
(Hon. David H. Urias)
_____

**BRIEF OF DEFENDANTS-APPELLEES**
_____

ORAL ARGUMENT REQUESTED
_____

Holly Agajanian
*Chief General Counsel to Gov. Lujan Grisham*
Kyle P. Duffy
*Deputy General Counsel to Gov. Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, NM 87501

Cody Rogers
Serpe Andrews
2540 El Paseo Road, Suite D
Las Cruces, NM 88001

Janet Carter
William J. Taylor, Jr.
Carina Bentata Gryting
Everytown Law
450 Lexington Ave, P.O. Box 4184
New York, NY 10163
(646) 324-8174
jcarter@everytown.org

Freya Jamison
Everytown Law
P.O. Box 14780
Washington, DC 20044

ZACHARY FORT, et al.,

*Plaintiffs-Appellants,*

v.

MICHELLE LUJAN GRISHAM, in her official capacity only, et al.,

*Defendants-Appellees.*

——————————————————

RANDY DONK, et al.,

*Plaintiffs-Appellants,*

v.

MICHELLE LUJAN GRISHAM, in her official capacity only, et al.,

*Defendants-Appellees.*

# CORPORATE DISCLOSURE STATEMENT

Because Defendants-Appellants are all state officers and agencies, no corporate disclosure statement is required under Federal Rule of Appellate Procedure 26.1.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................... 1

STATEMENT OF THE ISSUES ........................................................... 1

STATEMENT OF THE CASE .............................................................. 2

   I. Factual Background ...................................................................... 2

   II. Procedural History ...................................................................... 5

SUMMARY OF ARGUMENT ............................................................ 7

ARGUMENT ....................................................................................... 8

   I. Standard of Review ...................................................................... 8

   II. Plaintiffs Are Unlikely to Succeed on the Merits of their Second Amendment Claims ................................................................. 9

      A. The *Bruen* Framework ........................................................... 9

      B. Methodological Considerations in *Bruen*'s Historical Analysis ................ 11

         i. Analogical reasoning under *Bruen* ...................................... 11

         ii. The Reconstruction era is the proper focus of historical analysis ....... 12

         iii. Understanding the historical record .................................... 21

      C. Plaintiffs Have Not Established that They Are Likely to Succeed in Showing that the Parks Restriction Is Unconstitutional .......................... 23

         i. There is a robust historical tradition of prohibiting firearms in parks ...... 25

         ii. Prohibitions on firearms in parks are analogous to historical prohibitions on firearms in public forums and gatherings and in schools ...................... 32

            1. Public forums and gatherings ...................................... 32

            2. Schools ................................................................... 35

         iii. Plaintiffs' efforts to deny that the Parks Restriction is consistent with historical tradition are without merit .......................... 36

            1. Sensitive places are not limited to those with comprehensive, government-provided security ...................... 36

            2. Plaintiffs cannot dismiss over a hundred historical laws as "outliers" .......................................................... 40

    3.   Plaintiffs' other arguments are meritless .........................................41

D. Plaintiffs Have Not Established that They Are Likely to Succeed in Showing that the Playgrounds Restriction Is Unconstitutional ...............44

    i.   Playgrounds are sensitive places where the government may prohibit firearms because of their close relationship to schools.........................44

    ii.  Prohibitions on firearms in playgrounds are analogous to historical prohibitions on firearms in parks and public gatherings ....................48

III.    Plaintiffs Did Not Carry their Burden on the Non-Merits Factors..........50

CONCLUSION......................................................................................................52

ATTACHMENT A (separate volumes)

    Part A-1

    Part A-2

    Part A-3

ATTACHMENT B (separate volume)

# TABLE OF AUTHORITIES

## Cases

*Amdor v. Lujan Grisham*,
  No. S-1-SC-40105 (N.M. Sup. Ct.) ..................................................5

*Andrews v. State*,
  50 Tenn. 165 (1871) ........................................................................34

*Antonyuk v. Chiumento*,
  89 F.4th 271 (2d Cir. 2023), *petition for cert. filed*, No. 23-910 (U.S. Feb. 20, 2024)
  ...............................12, 13, 18, 20, 21, 22, 27, 29, 30, 32, 33, 34, 35, 36, 40, 41, 44

*Antonyuk v. Hochul*,
  639 F. Supp. 3d 232 (N.D.N.Y. 2022), *aff'd in part and vacated in part on other grounds*,
  89 F.4th 271 ..................................................................................46

*Baca v. Dep't of Army*,
  983 F.3d 1131 (10th Cir. 2020) ......................................................26

*Bevis v. City of Naperville*,
  85 F.4th 1175 (7th Cir. 2023), *petitions for cert. filed*, Nos. 23-877, 23-878, 23-879,
  23-880 (U.S. Feb. 12, 2024) ...........................................................10

*Bonidy v. U.S. Postal Service*,
  790 F.3d 1121 (10th Cir. 2015) ........................................36, 37, 44, 47

*Bridgeville Rifle & Pistol Club v. Small*,
  176 A.3d 632 (Del. 2017) ................................................................43

*Burson v. Freeman*,
  504 U.S. 191 (1992) ........................................................................38

*Colorado v. EPA*,
  989 F.3d 874 (10th Cir. 2021) ...........................................................9

*Diné Citizens Against Ruining Our Env't v. Jewell*,
  839 F.3d 1276 (10th Cir. 2016) ..........................................................9

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .......................................9, 10, 14, 18, 35, 40, 44

*Dobbs v. Jackson Women's Health Organization*,
  597 U.S. 215 (2022) ...................................................................20, 31

*Dred Scott v. Sandford*,
  19 How. 393 (1857) ........................................................................23

*English v. State,*
  35 Tex. 473 (1871) ............................................................34

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) ..........................................16

*Friedman v. City of Highland Park,*
  784 F.3d 406 (7th Cir. 2015) ..........................................22

*GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs,*
  788 F.3d 1318 (11th Cir. 2015) ......................................43

*Goldstein v. Hochul,*
  No. 1:22-cv-08300, 2023 WL 4236164 (S.D.N.Y. June 28, 2023), *appeal docketed,*
  No. 23-995 (2d Cir. July 6, 2023) ....................................48

*Gonyo v. D.S.,*
  No. 2023-796, 2024 WL 296876 (N.Y. Sup. Ct. Jan. 19, 2024) ........................42

*Gould v. Morgan,*
  907 F.3d 659 (1st Cir. 2018) ..........................................16

*Kennedy v. Bremerton Sch. Dist.,*
  597 U.S. 507 (2022) ......................................................11

*Kipke v. Moore,*
  Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503 (D. Md. Sept.
  29, 2023) ..............................................14, 26, 28, 31, 38, 46

*Koons v. Platkin,*
  2023 WL 3478604 (D.N.J. May 16, 2023), *appeal docketed,* No. 23-1900 (3d Cir.
  May 17, 2023) ............................................................46

*LaFave v. Cnty. of Fairfax,*
  No. 1:23-cv-01605 (E.D. Va. Jan. 24, 2024), Doc. 33 ........................28

*LaFave v. Cnty. of Fairfax,*
  No. CL2021-01569, 2023 Va. Cir. LEXIS 203 (Fairfax Cnty. Cir. Ct. June 23,
  2023) ....................................................................31

*Lara v. Commissioner Pennsylvania State Police,*
  91 F.4th 122 (3d Cir. 2024), *petition for reh'g en banc filed,* No. 21-1832, Dkt. 81 (3d
  Cir. Feb. 15, 2024) ......................................................14

*Maryland v. King,*
  567 U.S. 1301 (2012) ....................................................50

*May v. Bonta,*
  No. 8:23-cv-01696, 2023 WL 8946212 (C.D. Cal. Dec. 20, 2023) ....................46

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ...................................................................12, 23

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ...................................................................22, 35

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995) .........................................................................18

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
  No. 8:21-cv-01736, 2023 WL 4373260 (D. Md. July 6, 2023), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023)............................................14, 27, 42

*Moore v. Madigan*,
  702 F.3d 933 (7th Cir. 2012) ...........................................................24

*Nat'l Rifle Ass'n v. Bondi*,
  61 F.4th 1317 (11th Cir.), *vacated on grant of reh'g en banc*, 72 F. 4th 1346 (11th Cir. 2023)..........................................................................13, 15

*New York State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022)................1, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 21, 24, 25, 27, 32, 33, 34, 35, 40, 43, 50

*Nordyke v. King*,
  563 F.3d 439 (9th Cir. 2009), *vacated*, 611 F.3d 1015 (9th Cir. 2010) .................45

*People v. Bell*,
  107 N.E.3d 1047 (Ill. App. Ct. 2018) ................................................43

*Siegel v. Platkin*,
  653 F. Supp. 3d 136 (D.N.J. 2023)....................................................46

*Springer v. Lujan Grisham*,
  No. 1:23-cv-00781, 2023 WL 8436312 (D.N.M. Dec. 5, 2023) .................6, 7, 46

*State v. Huntly*,
  25 N.C. 418 (1843) ..........................................................................33

*State v. Shelby*,
  2 S.W. 468 (Mo. 1886) .....................................................................34

*Uniformed Fire Officers Ass'n v. De Blasio*,
  973 F.3d 41 (2d Cir. 2020) ...............................................................51

*United States v. Alaniz*,
  69 F.4th 1124 (9th Cir. 2023)........................................................10, 26

*United States v. Class*,
930 F.3d 460 (D.C. Cir. 2019) ..........................................................24, 37, 38, 45

*United States v. Greeno*,
679 F.3d 510 (6th Cir. 2012) ............................................................................16

*United States v. Masciandaro*,
648 F. Supp. 2d 779 (E.D. Va. 2009), *aff'd*, 638 F.3d 458 (4th Cir. 2011).....43, 45

*United States v. Reyna*,
No. 3:21-cr-00041, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022), *appeal docketed*,
No. 23-1231 (7th Cir. Feb. 7, 2023) ...................................................................24

*Vincent v. Garland*,
80 F.4th 1197 (10th Cir. 2023), *petition for cert. filed*, No. 23-683 (U.S. Dec. 21,
2023) ......................................................................................................10, 14, 37

*Warden v. Nickels*,
697 F. Supp. 2d 1221 (W.D. Wash. 2010) ..........................................................43

## Statutes and Rules

1786 Va. Acts 35, ch. 49 ......................................................................................32

1869-70 Tenn. Pub. Acts 23-24 ....................................................................33, 34

1871 Tex. Gen. Laws ch. 34 § 3.....................................................................33, 34

1883 Mo. Sess. Laws 76 .................................................................................33, 34

1889 Ariz. Sess. Laws 17 ...............................................................................33, 34

1890 Okla Terr. Stats., art. 47 ......................................................................33, 34

2 Edw. 3, 258, ch. 3 (1328)..................................................................................32

Collection of Statutes of the Parliament of England in Force in the State of North
Carolina 60-61, ch. 3 (F. Martin Ed. 1792)........................................................33

Edwin L. Jewell, *The Laws and Ordinances of the City of New Orleans* 1 (1882)..............34

N.M. Stat. Ann. §§ 12-10A-1 to -19 ...................................................................50

R.H. Clark, *The Code of the State of Georgia* 818 (1873)........................................33, 34

## Other Authorities

*'Rampage' in Farmington: Police say gunman fired at random, killing 3 and shooting 6 others*,
Albuquerque J. (May 15, 2023),
https://www.abqjournal.com/news/local/rampage-in-farmington-police-say-

gunman-fired-at-random-killing-3-and-shooting-6-others/article_0543162c-c828-5429-8695-f0243f244154.html ................................................................. 2

Allan Greer, *Commons and Enclosure in the Colonization of North America*, 2 Am. Hist. Rev. 365 (2012) ................................................................. 29

Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1 (2021) ................................... 30

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.) ................................................................. 21

*Bulletin of the Park and Outdoor Art Association* (1901), bit.ly/3NPLSae ........................ 29

Clarence Elmer Rainwater, *The Play Movement in the United States: A Study of Community Recreation* (1921) ................................................................. 49

Darrell A.H. Miller et al., *Technology, Tradition, and "The Terror of the People,"* Notre Dame L. Rev. (forthcoming), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4521030 ....................... 51

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) ................................................................. 21

David Hemenway & Sara J. Solnick, *The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007-2011*, 79 Preventive Med. 22 (2015) ................................................................. 52

David Schuyler, *Summary of Parks in Urban America*, Oxford Rsch. Encyc. of Am. Hist. (Nov. 3, 2015) ................................................................. 30

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022)....15

*Executive Order 2024-004*, Gov. Michelle Lujan Grisham (Feb. 23, 2024), https://www.governor.state.nm.us/wp-content/uploads/2024/02/Executive-Order-2024-004.pdf ................................................................. 2, 3, 45, 51

Frederick Law Olmstead, *A Consideration of the Justifying Value of a Public Park* (1881) ................................................................. 30

Henry S. Curtis, *The Play Movement and its Significance* (1917).................................... 49

J. William Harris, *Portrait of a Small Slaveholder: The Journal of Benton Miller*, 74 Georgia Historical Quarterly 1 (1990) ................................................................. 39

John J. Donohue et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. Empirical Legal Stud. 198 (2019), https://law.stanford.edu/wp-content/uploads/2017/06/Donohue_et_al-2019-JELS-RTC-Law-and-Viol-Crime.pdf ...............................................................51

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) ..........................................15

Liz Enochs et al., *3 people killed and 5 wounded in shooting at motorcycle rally in Red River, New Mexico*, CNN (May 29, 2023), https://www.cnn.com/2023/05/28/us/red-river-new-mexico-shooting.html .....................................2

Luke Barr, *Trump Says He Wants Police at Polling Sites. Experts Say that's Unlawful*, ABC News (Aug. 21, 2020), tinyurl.com/fcv5x9xe.........................................38

Margaret Walls, *Parks and Recreation in the U.S.: Local Park Systems*, Resources for the Future (June 2009).............................................................30

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) ...........................................15

N.M. Dep't of Health, *Comprehensive Report on Gunshot Victims Presenting at Hospitals in New Mexico* (2023), www.nmhealth.org/publication/view/report/8463/ .............3

Nadav Shoked, *Property Law's Search for a Public*, 97 Wash. U. L. Rev. 1517 (2020).29

NYC Parks, *History of Playgrounds in Parks*, https://www.nycgovparks.org/about/history/playgrounds ...............................50

Paul M. Reeping et al., *The Effect of Gun-Free School Zones on Crimes Committed with a Firearm in Saint Louis, Missouri*, 100 J. Urb. Health 1118 (2023), https://bit.ly/3Rwvwqd ........................................................51

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) .....................................................16

Steven E. Barkan & Michael Rocque, *Crime Prevention: Programs, Policies, and Practices* (2021)...............................................................................52

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008).......................15

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021).............................................................16

## STATEMENT OF RELATED CASES

Defendants-Appellants respectfully submit that *Springer v. Lujan Grisham* (Nos. 23-2192 & 23-2194) is related to these consolidated appeals. *Springer* presents a Second Amendment challenge to the same restriction on carrying firearms in public parks and playgrounds in Albuquerque and Bernalillo County at issue in these cases.

## INTRODUCTION

New Mexico is suffering from an epidemic of gun violence. In the face of this public health crisis, Plaintiffs ask this Court to rule that enacting even narrow, common-sense restrictions—prohibitions on guns in parks and playgrounds in Albuquerque and Bernalillo County—is constitutionally forbidden. They are wrong. The Supreme Court made clear in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 30 (2022), that the Second Amendment is not a "regulatory straightjacket." Because New Mexico's restrictions are "consistent with this Nation's historical tradition of firearm regulation," *id.* at 34, including well over a hundred historical prohibitions on carrying firearms in parks, they should not be enjoined.

## STATEMENT OF THE ISSUES

1. Whether the district court abused its discretion in determining that parks are "sensitive places" where the government may prohibit guns in light of the robust historical tradition of regulating firearms in parks, other public-gathering places, and schools; and

2. Whether the district court abused its discretion in determining that playgrounds are "sensitive places" where the government may prohibit guns, given the close analogy between playgrounds and schools.

**STATEMENT OF THE CASE**

## I.　　Factual Background

In 2022, 550 New Mexicans died by gun violence, a deadly trend that continued into 2023. *Executive Order 2024-004*, Gov. Michelle Lujan Grisham (Feb. 23, 2024), https://www.governor.state.nm.us/wp-content/uploads/2024/02/Executive-Order-2024-004.pdf ("February Executive Order"). Gun violence can be deadly for all New Mexicans—including citizens peacefully driving along a residential street[1] or enjoying a motorcycle rally[2]—but poses a particularly potent threat to the state's youth; guns are the leading cause of death among New Mexico's children and teens. *Id.* at 1. In just a six-week period in the summer of 2023, guns took the lives of a five-year-old girl, an eleven-year-old boy, and a thirteen-year-old girl. *Id.* at 1-2. This crisis disproportionately impacts Albuquerque and Bernalillo County, the state's most populous areas. *Id.* at 3. Heightened gun violence has devasting and lasting consequences. In addition to fatalities and physical injuries, it causes emotional trauma, economic harm, and

---

[1] *'Rampage' in Farmington: Police say gunman fired at random, killing 3 and shooting 6 others*, Albuquerque J. (May 15, 2023), https://www.abqjournal.com/news/local/rampage-in-farmington-police-say-gunman-fired-at-random-killing-3-and-shooting-6-others/article_0543162c-c828-5429-8695-f0243f244154.html.

[2] Liz Enochs et al., *3 people killed and 5 wounded in shooting at motorcycle rally in Red River, New Mexico*, CNN (May 29, 2023), https://www.cnn.com/2023/05/28/us/red-river-new-mexico-shooting.html.

other lasting consequences for affected individuals, families, and communities. *Id.* at 2.

Recognizing the epidemic proportions of New Mexico's gun violence crisis, Governor Michelle Lujan Grisham declared gun violence a statewide public-health emergency on September 7, 2023. App. Vol. 1 at 29-32. The Governor's emergency order directed state agencies to collaborate on an effective and coordinated response to the emergency and allocated funds for that effort. *Id.* at 31.

The agencies quickly got to work implementing the Governor's order. On September 29, 2023, the New Mexico Department of Health published a comprehensive study on firearm-related injuries and deaths in the state between 1999 and 2023.[3] The report confirmed the alarming trends identified in the Governor's order: New Mexico's firearm-induced casualty rates are among the highest in the nation and are increasing at a significantly higher rate than the country as a whole. Gunshot Victims Report at 5. Not only have shootings become more frequent, they have also become more deadly: between 2019 and 2022, New Mexico's trauma centers saw a 39% increase in patients requiring treatment for firearm injuries and a 61% increase in gunshots injuries requiring surgical intervention. *Id.* at 4.

---

[3] N.M. Dep't of Health, *Comprehensive Report on Gunshot Victims Presenting at Hospitals in New Mexico* (2023), www.nmhealth.org/publication/view/report/8463/ ("Gunshot Victims Report").

In accordance with the Governor's order and informed by this sobering data, Defendant Patrick Allen, Secretary of the New Mexico Department of Health, issued a series of public health orders aimed at reducing gun violence in the state's most vulnerable areas. The operative public health order (the "Order"), issued on October 6, 2023, prohibits most individuals from "possess[ing] a firearm, … either openly or concealed, in public parks or playgrounds within the City of Albuquerque or Bernalillo County" for the duration of the emergency.[4] App. Vol. 1 at 164. The Order does not apply to Albuquerque's Shooting Range Park or to state parks owned or managed by the New Mexico State Parks Division or the State Land Office. *Id.*

Governor Lujan Grisham's original emergency order expired on October 6, 2023. *Id.* at 32. The Governor renewed the state of emergency in month-long increments thereafter, finding renewal necessary to protect the public health, safety, and welfare amid the ongoing crisis.[5] *See, e.g.*, App. Vol. 1 at 168-70. Absent further

---

[4] Plaintiffs challenged prior iterations of the Order earlier in this suit. *See* App. Vol. 1 at 66-75 (granting temporary restraining order against Sept. 8, 2023, public health order); *id.* at 108-14 (denying temporary restraining order against Sept. 15, 2023, public health order); *see also infra* p. 5 (describing those challenges). Secretary Allen's issuance of the operative Order mooted Plaintiffs' requests for relief against those earlier orders.

[5] Each executive order renewing the state of emergency is available at https://www.governor.state.nm.us/about-the-governor/executive-orders/.

renewal, the state of emergency (and its implementing orders) will expire on March 22, 2024.

## II. Procedural History

Several cases challenging Governor Lujan Grisham's emergency orders and the Department of Health's implementing public health orders were consolidated before Judge Urias.[6] App. Vol. 1 at 173-76 (consolidation order); *see also id.* at 16-28 (*We the Patriots* complaint); App. Vol. 2 at 8-23 (*Donk* complaint); App. Vol. 3 at 7-16 (*Fort* complaint).[7]

Litigation over the earlier public health orders proceeded quickly. Judge Urias issued a temporary restraining order barring enforcement of the original order, which prohibited carrying firearms in densely populated cities and counties with specified rates of gun violence. App. Vol. 1 at 66-75. Secretary Allen issued a revised order, *id.* at 100-04, which Plaintiffs again challenged, *id.* at 76-98, but that challenge was mooted by Secretary Allen's issuance of the operative Order, *see id.* at 163-66. Plaintiffs subsequently sought a preliminary injunction against the Order.

---

[6] A separate suit challenging Governor Lujan Grisham's authority to declare the state of emergency was argued before the New Mexico Supreme Court on January 8, 2024. *See Amdor v. Lujan Grisham*, No. S-1-SC-40105 (N.M. Sup. Ct.). No decision has issued to date.

[7] One of those cases, *Springer v. Lujan Grisham*, was subsequently reassigned to Judge Riggs due to a potential conflict of interest, No. 1:23-cv-00781 (D.N.M. Oct. 2, 2023), Doc. 8, and the cases proceeded in parallel.

On October 11, 2023, Judge Urias declined to enjoin the Order, ruling that the challengers in the consolidated cases failed to establish likely success in their Second Amendment challenge to the Order's prohibition on guns either in parks or in playgrounds (hereafter, respectively, the "Parks Restriction" and the "Playgrounds Restriction"). *Id.* at 177-99. Judge Urias reasoned that, because Plaintiffs challenged state restrictions, the most relevant period for the historical analysis is the mid-to-late 19th century, when the ratification of the Fourteenth Amendment made the Second Amendment applicable to the states, *id.* at 192, and concluded that Defendants could plausibly establish a national historical tradition of firearm restrictions in city parks sufficient to satisfy the standard established in *Bruen. Id.* at 192-95. He then explained that it is "settled law" that governments may regulate firearms in "sensitive places" including schools and upheld the Playgrounds Restriction because of the "sound analogy between schools and playgrounds." *Id.* at 197-99.

Judge Riggs reached a mixed result on an identical preliminary injunction motion in the standalone suit several weeks later. *Springer v. Lujan Grisham*, No. 1:23-cv-00781, 2023 WL 8436312 (D.N.M. Dec. 5, 2023). Judge Riggs agreed with Judge Urias and "the majority of district courts to consider th[e] issue" that the Playgrounds Restriction was likely constitutional given the analogy between playgrounds and schools. *Id*. at *8. But she enjoined the Parks Restriction, believing

that the numerous mid-to-late 19th- and early 20th-century laws prohibiting firearms in parks and public-gathering places were too recent to establish a historical tradition, and faulting Defendants for not providing the Court with copies of those laws. *Id.* at *5-8. Cross-appeals of Judge Riggs's decision are pending.[8]

Plaintiffs in three of the consolidated cases appealed the denial of their preliminary injunction motion. App. Vol. 1 at 200 (*We the Patriots*), 202 (*Fort*), 204 (*Donk*). They then filed two emergency motions for a preliminary injunction pending appeal in the district court, which Judge Urias construed as motions for reconsideration and denied because Plaintiffs again failed to establish a likelihood of success on the merits. Am. Order, *We the Patriots*, No. 1:23-cv-00773, slip op. at 3-4 (D.N.M. Nov. 27, 2023), Doc. 68.

## SUMMARY OF ARGUMENT

Plaintiffs have not established that they are likely to succeed on the merits of their Second Amendment claims. Both the Parks Restriction and the Playgrounds Restriction sit firmly within this nation's historical tradition of firearm regulation.

---

[8] *See* Nos. 23-2192, 23-2194. Defendants requested a stay of the injunction pending appeal. *See* No. 1:23-cv-00781 (D.N.M. Dec. 8, 2023), Doc. 21. Judge Riggs initially entered a temporary stay pending briefing on the motion, *see* Doc. 22 (Dec. 11, 2023), but ultimately denied the request, *see* Doc. 37 (Jan. 22, 2024), and Defendants then sought a stay from this Court, *see* No. 23-2192, Doc. 10010994431 (Feb. 2, 2024). That motion is fully briefed.

The Parks Restriction is part of a tradition that includes well over a hundred historical laws specifically and unambiguously prohibiting the carrying of firearms in parks, which emerged contemporaneously with the creation of modern-style parks in the late 19th century. Together, those prohibitions are also part of a tradition, stretching back to the founding and beyond, of prohibiting guns in crowded public forums and gathering places and in schools. Plaintiffs' efforts to deflect this robust collection of laws as too late, too few, or too local are not consistent with *Bruen*'s reasoning, which is why multiple federal courts have rejected similar post-*Bruen* challenges to prohibitions on guns in parks—including the only appellate court so far to consider such a challenge. The Playgrounds Restriction is equally well supported by historical tradition—not only by analogy to the same tradition of parks and gathering-place prohibitions, but also by analogy to the firmly established principle that schools are sensitive places where guns may be prohibited. Plaintiffs have also failed to establish the remaining requirements for a preliminary injunction. This Court should affirm.

## ARGUMENT

### I.      Standard of Review

To obtain a preliminary injunction, the movant must prove: "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the

preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest." *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (citation omitted). Because a preliminary injunction is an "extraordinary remedy," the movant's right to relief on all four factors must be "clear and unequivocal." *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021) (citations omitted). This Court reviews the grant of a preliminary injunction for abuse of discretion. *Id.*

## II. Plaintiffs Are Unlikely to Succeed on the Merits of their Second Amendment Claims

The following sections first set out the methodological principles *Bruen* established (Parts II.A-B), then show that, under those principles, Plaintiffs are not likely to succeed on the merits of their challenge either to the Parks Restriction (Part II.C) or the Playgrounds Restriction (Part II.D).

### A. The *Bruen* Framework

The Second Amendment protects an individual right to keep and bear arms cabined by historical limitations on the scope of that right. *See Bruen*, 597 U.S. at 21 ("[T]he historical understanding of the [Second] Amendment … demark[s] the limits on the exercise of that right."). As such, the Second Amendment right is "not unlimited," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), but rather is subject to a range of textually- and historically-grounded constraints, *see, e.g.*, *id.* at

626-27, 627 n.26 (providing a non-exhaustive list of "presumptively lawful" firearm regulations).

*Bruen* instructs courts to assess whether a regulation impermissibly infringes the right to bear arms in two steps: one focused on constitutional text and the other focused on history. 597 U.S. at 24. The first step asks whether the Second Amendment's plain text covers the challenger's proposed conduct. *Id.*; *see Vincent v. Garland*, 80 F.4th 1197, 1200 (10th Cir. 2023), *petition for cert. filed*, No. 23-683 (U.S. Dec. 21, 2023). In other words, the court must first ask "whether the challenger is 'part of "the people" whom the Second Amendment protects,'" whether the item at issue is a "weapon" that is "'in common use' today for self-defense," and "whether the 'proposed course of conduct' falls within the Second Amendment." *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (quoting *Bruen*, 597 U.S. at 31-32). If not, the inquiry ends: self-evidently, if people, items, or conduct are outside the Second Amendment's protection, then the government may regulate them without infringing the Second Amendment. *See Bevis v. City of Naperville*, 85 F.4th 1175, 1192 (7th Cir. 2023), *petitions for cert. filed*, Nos. 23-877, 23-878, 23-879, 23-880 (U.S. Feb. 12, 2024). The burden to satisfy this initial, textual inquiry is on the party challenging a law.[9] If they succeed, the burden shifts to the government to

_____

[9] *Bruen* makes this clear by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 597 U.S. at 24, 44 n.11; *cf. Kennedy v. Bremerton Sch.*

"justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Part II.B details methodological considerations governing that historical analysis.

## B.    Methodological Considerations in *Bruen*'s Historical Analysis

### i.  Analogical reasoning under *Bruen*

To guide courts in the historical analysis, *Bruen* stressed that a modern firearms regulation need not be a "dead ringer for historical precursors" and will pass constitutional muster so long as it is "analogous enough" to historical restrictions. 597 U.S. at 30 ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*."). Courts should uphold a modern law if, in comparison to historical regulations, the law imposes a "comparable burden on the right of armed self-defense" and the burden is "comparably justified." *Id*. at 29. In other words, courts should consider "how and why" a regulation burdens the right to self-defense. *Id.* And *Bruen* instructs courts to "use analogies to … historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* at 30.

---

*Dist.*, 597 U.S. 507, 524 (2022) ("[A] plaintiff bears certain burdens to demonstrate an infringement of [their] rights under the [First Amendment]. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]").

*Bruen* also recognized that "cases implicating unprecedented societal concerns … may require a more nuanced approach" to the historical inquiry. *Id.* at 27. If a societal condition did not exist in the time period a court is examining, then self-evidently there will be no historical firearms laws addressing that condition in that period—making the consideration of later history particularly crucial. *See McCullen v. Coakley*, 573 U.S. 464, 481 (2014) ("States adopt laws to address problems that confront them." (citation omitted)). Thus, firearms prohibitions concerning societal conditions that did not exist at the founding—like public parks and playgrounds, *see infra* pp. 29-31, 48-49—demand a more expansive approach to historical analogy. *See Antonyuk v. Chiumento*, 89 F.4th 271, 359 n.78 (2d Cir. 2023) ("Though the historical analogues here are relatively simple to draw, the relative novelty of public parks as institutions also justifies a flexible approach under *Bruen*." (cleaned up)), *petition for cert. filed*, No. 23-910 (U.S. Feb. 20, 2024).

### ii. The Reconstruction era is the proper focus of historical analysis

Plaintiffs read *Bruen* as mandating that the founding era is the only material time period for analyzing the historical traditions that inform the scope of the right to keep and bear arms. *See* Appellants' Br. 14 (claiming that "the public understanding of the right" in 1791 "controls"). According to Plaintiffs, later history "serves a merely confirmatory role for traditions already established at the

Founding," *id.* (cleaned up)—apparently maintaining that later history has no real role at all, since confirming something already established is unnecessary.

Plaintiffs are mistaken. *Bruen* expressly left open the question whether the most important time period for the historical analysis focuses on 1791 (when the Second Amendment was first adopted as a constraint on the federal government) or 1868 (when the Fourteenth Amendment made it applicable to state and local governments). *See* 597 U.S. at 37-38. Even in leaving the issue unresolved, however, *Bruen* gave strong indications that the Reconstruction era should be the key focus, as this section will explain. These indications have led to a host of persuasive opinions—including in the district court below—concluding that 1868 is at least as important as, if not more important than, 1791. *See Antonyuk*, 89 F.4th at 304 ("Because the [challenged law] is a state law, the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis."); *id.* at 318 n.27 ("[E]vidence from Reconstruction regarding the scope of the right to bear arms incorporated by the Fourteenth Amendment is at least as relevant as evidence from the Founding Era regarding the Second Amendment itself."); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023) ("[T]he [Second Amendment] right's contours turn on the understanding that prevailed at the time … when the Fourteenth Amendment was ratified."), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023); *Md. Shall Issue, Inc. v. Montgomery Cnty.*, No. 8:21-cv-

01736, 2023 WL 4373260, at *8 (D. Md. July 6, 2023) ("[H]istorical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states[.]"), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023); *Kipke v. Moore*, Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503, at *6 (D. Md. Sept. 29, 2023) (agreeing with *Maryland Shall Issue*); App. Vol. 1 at 192 (agreeing with *Bondi* and *Maryland Shall Issue* that Reconstruction-era sources "are more probative" than founding-era sources); *see also Vincent*, 80 F.4th at 1203 (Bacharach, J., concurring) (noting that, in conducting the *Bruen* analysis, a court should consider history "through the end of the nineteenth century").[10]

The foundation for these decisions is *Bruen*'s originalist principle that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 597 U.S. 34 (quoting *Heller*, 554 U.S. at 634-35 (emphasis added in *Bruen*)). Because the people did not adopt the Second

---

[10] The Third Circuit recently took a different approach in *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024), *petition for reh'g en banc filed*, No. 21-1832, Dkt. 81 (3d Cir. Feb. 15, 2024). This Court should not follow *Lara*. Instead of engaging with originalist principles, the Third Circuit based its conclusion on the "general assumption" in several Supreme Court cases cited by *Bruen*, *see* 597 U.S. at 37. *See Lara*, 91 F.4th at 133-34. But those cases did not address the significance of the Fourteenth Amendment's ratification for the question of which time period is most relevant to the historical inquiry and cannot have resolved the question that *Bruen* expressly left open. *See Bruen*, 597 U.S. at 37-38; *infra* p. 17 & n.14. Because it failed to recognize that issue and cannot be squared with originalist principles, *Lara* is not persuasive.

14

Amendment as a constraint on the states until they ratified the Fourteenth Amendment in 1868, the public understanding from that time should define the scope of the right, at least as against the states. After all, "[i]t makes no sense to suggest that the States would have bound themselves to an understanding of the [Second Amendment] that they did not share when they ratified the Fourteenth Amendment." *Bondi*, 61 F.4th at 1324.[11]

Accordingly, focusing on 1868 in a case against a state is the view more consistent with originalist theory. Leading originalist scholars routinely take this position.[12] So did federal circuits when considering the first, historical step of the

---

[11] Although *Bondi* has been vacated for rehearing en banc, it remains persuasive because its reasoning and authorities are robust.

[12] *See, e.g.*, Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52 (2010) ("1868 is … the proper temporal location for applying a whole host of rights to the states, including the right that had earlier been codified as the Second Amendment …. Interpreting the right to keep and bear arms as instantiated by the Fourteenth Amendment—based on the original public meaning in 1791—thus yields an inaccurate analysis." (footnote omitted)); Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling view that 1868 understanding applies against states "ascendant among originalists"); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485 (2008) (asserting that "[Akhil] Amar is exactly right" that 1868 meaning controls as against states); Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008); Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008) ("I am unable to conceive of a persuasive originalist argument asserting the view that, with regard to the states, the meaning of the Bill in 1789 is to be

Second Amendment analysis they applied prior to *Bruen*.[13] Indeed, when Justice Thomas asked counsel for New York's NRA affiliate, former Solicitor General Paul Clement, about the correct time period during oral argument in *Bruen*, he responded that if "the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding." Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

To be sure, the originalist answer to the correct time period in cases against the federal government is more complex, because *Bruen* stated that individual rights applicable against the states "have the same scope as against the Federal Government," 597 U.S. at 37, and the Second Amendment has bound the federal government since 1791. But *Bruen* itself charted the path through this complexity: it observed that "that there is an ongoing scholarly debate on whether courts should

---

preferred to its meaning in 1868.").

[13] *See Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) (Sykes, J.) ("[W]hen state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."). Because *Bruen* explained that "[s]tep one" of the pre-*Bruen* framework these courts applied "is broadly consistent with *Heller*," 597 U.S. at 19, these step-one analyses remain, as a general matter, good law.

primarily rely on the prevailing understanding of an individual right when the

Fourteenth Amendment was ratified in 1868 when defining its scope (*as well as the*

*scope of the right against the Federal Government*), *id.* (emphasis added)—and then cited

two scholars who support the position that the 1868 understanding applies with

respect to both state and federal governments, and none who opposes it. *See id.* at

37-38 (citing scholarship by Akhil Amar and Kurt Lash). Thus, the 1868

understanding is the correct touchstone in cases involving both state and federal

restrictions.

Plaintiffs claim that applying the 1868 understanding rather than the 1791

understanding is "contrary to established precedent" in decisions preceding *Bruen*.

Appellants' Br. 15-17. That cannot be correct: If prior Supreme Court cases had

resolved the issue, *Bruen* would not have—expressly—left the time-period question

open.[14]

Plaintiffs' assertion that *Bruen*'s "reasoning" also supports their position, *see*

Appellants' Br. 17-18, is likewise mistaken. They state that *Bruen* examined post-

1868 sources "[o]nly after canvassing" earlier evidence, *see id.* at 18, but the fact

that *Bruen* arranged its discussion chronologically is hardly remarkable. Moreover,

---

[14] Indeed, *Bruen* noted that prior decisions had "assumed"—not *decided*—that
the scope for both state and federal governments "is pegged to the public
understanding … in 1791." 597 U.S. at 37. If the majority believed those decisions
controlled the issue, it would have said so.

*Bruen* indicated that restrictions on guns in legislative assemblies, polling places, and courthouses found in "18th- *and 19th-century*" laws are adequate to satisfy its historical analysis, 597 U.S. at 30 (emphasis added)—an incomprehensible statement if it believed that the 18th century was the only relevant period.

Plaintiffs' backup argument—that even if 1868 is the correct focus, that year should be treated as a cutoff, *see* Appellants' Br. 20—is also mistaken. Evidence of the public understanding of the right in the period after 1868 is just as probative of the 1868 understanding as evidence from the period before. *See, e.g.*, *Antonyuk*, 89 F.4th at 304 (finding it "implausible" that "public understanding would promptly dissipate whenever [one] era gave way to another"); *id.* at 354-55, 354 n.69 (giving significant weight to parks ordinances from 1880s and 1890s); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) ("Principles of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness.").

In any event, even if 1791 were the most relevant focus, "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 605 (second emphasis added)). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the

constitutional text at the relevant point in time would not change that meaning. *See* 597 U.S. at 36, 66 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 35-36 (cleaned up) (quoting decision quoting James Madison). Thus, even if this Court were to focus on the founding era and find the evidence from that period indeterminate, it should recognize that later evidence of regulatory authority settles the meaning of the Second Amendment right and demonstrates that the Order is constitutional.[15]

Here, the copious 19th- and early-20th-century laws Defendants present, *see infra* Part II.C.i, do not contradict any earlier evidence. To the contrary, those laws reflect and confirm limitations on the right to keep and bear arms that existed in the founding and earlier periods. *See id.* Plaintiffs present no treatises, caselaw, or other evidence to establish that, in any era, the public understanding of the right

---

[15] Looking to 19th-century and later evidence can also help contextualize earlier legislative inaction, even if this Court were to focus on the founding era. For instance, if a regulation passed in the decades around Reconstruction—*within the lifetimes* of some who were alive at the founding—did not raise a constitutional challenge at the time, and there is no separate evidence showing that the regulation would have raised constitutional concern in the decades prior, then it can be inferred that the regulation comports with the founding-era understanding of the right. Thus, absent affirmative evidence to the contrary, a court should presume that a Reconstruction-era or later public understanding of the right also reflects the founding-era understanding. Such a presumption reflects and reinforces the Supreme Court's position that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S. at 37.

forbade the government to prohibit guns in parks or playgrounds. Instead, they suggest that the Second Amendment must have been understood as establishing a constitutional right to carry guns in open spaces and public gatherings at the founding, because in that era (a) some people carried guns in some open spaces and no laws identified to date prohibited them from doing so, and (b) some states permitted (and sometimes required) some people to carry guns to some public gatherings. *See* Appellants' Br. 44; *see also id.* at 2, 10, 29-31, 40-41. But Plaintiffs' inference is not warranted, because "[l]egislatures past and present have not generally legislated to their constitutional limits." *Antonyuk*, 89 F.4th at 301. Thus, in *Dobbs v. Jackson Women's Health Organization*, the Supreme Court rejected the argument that the absence of laws criminalizing pre-quickening abortion "at the Founding and for decades thereafter" supported a right to an abortion, explaining "the fact that many States in the late 18th and early 19th century did not criminalize pre-quickening abortions does not mean that anyone thought the States lacked the authority to do so." 597 U.S. 215, 252-53 (2022); *see also Antonyuk*, 89 F.4th at 301 ("[I]t is not necessarily the case that, if no positive legislation from a particular place is in the record, it must be because the legislators there deemed such a regulation inconsistent with the right to bear arms."). Plaintiffs' claim that they have presented evidence "contradict[ing]" the copious later parks and

gathering-places restrictions, *see* Appellants' Br. 44, rests on exactly the inference from legislative silence that *Dobbs* (and *Antonyuk*) rejected.[16]

### iii. Understanding the historical record

Two further principles should guide this Court's historical analysis. *First*, even a small number of historical laws can be sufficient to carry a government's burden to show consistency with historical tradition, so long as there is not "countervailing historical evidence." *Antonyuk*, 89 F.4th at 303. As the Second Circuit explained, *Bruen*'s conclusion that history supported prohibiting guns in legislative assemblies, courthouses, and polling places relied on sources that identified only one or two founding-era laws. *See id.* at 303-04. Notably, the two sources *Bruen* cited for the historical record justifying prohibitions on legislative assemblies referenced only two laws from a single colony, Maryland, which were enacted three years apart, in 1647 and 1650. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 235 (2018); Br. for Indep. Inst. as Amicus Curiae 11-12, *Bruen* (No. 20-843); *Bruen*, 597 U.S. at 30. "Thus, depending on the historical context, comparable historical laws need not proliferate to justify a modern prohibition," *Antonyuk*, 89 F.4th at 304, and Plaintiffs' suggestion that historical analogues must be "present in many states and

---

[16] Plaintiff's theory also disregards that this case involves changed societal conditions, specifically the advent of public parks and playgrounds in the mid- to late-nineteenth century.

therefore affect large swaths of the population," Appellants' Br. at 21, is not grounded in doctrine.[17]

*Second*, concluding that a small number of state and local laws can demonstrate a public understanding of a limitation on the Second Amendment right is consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. States historically may have chosen not to regulate particular conduct not because the public understood the right to keep and bear arms to forbid regulation, but because of policy choices and local conditions. *See Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015) (Easterbrook, J.) ("[T]he Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity."); *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality opinion) (noting that states and localities may "experiment[] with reasonable firearms regulations" (cleaned up)). For example, "lawmakers are not moved to forbid behavior that is governed by custom, universal practice, or private warning." *Antonyuk*, 89 F.4th at 301-02. Nor would a state be expected to "regulate

---

[17] Plaintiffs' suggestion that a certain number of states or percentage of the population must be subject to a regulation for analogous modern regulations to survive constitutional scrutiny suffers from another fatal flaw: it does not account for our Nation's varied landscape and characteristics. For instance, if a court were assessing states' regulatory approach to activity on underground public transit systems, it would not make sense to assign significance to the absence of regulations in Wyoming or Hawaiʻi. *See Antonyuk*, 89 F.4th at 339.

for problems that do not exist" in their jurisdiction. *McCullen*, 573 U.S. at 481 (citation omitted).

Accordingly, while laws restricting firearms demonstrate that the people of those jurisdictions understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other jurisdictions does not warrant any inference that their citizens considered such restrictions unconstitutional. *See also supra* p. 20.

### C. Plaintiffs Have Not Established that They Are Likely to Succeed in Showing that the Parks Restriction Is Unconstitutional

The district court correctly concluded that Plaintiffs are unlikely to succeed on the merits of their Second Amendment challenge to the Parks Restriction. Applying *Bruen*'s principles, the Parks Restriction is part of a robust tradition of prohibiting firearms in parks and analogous sensitive places.

Even before reaching that historical inquiry, Plaintiffs must establish at *Bruen*'s first step that the Constitution's text protects their proposed conduct— carrying guns in local parks and playgrounds. They write:

> [A]s a matter of plain text, the Second Amendment has long been understood to secure for citizens "the right to keep and carry arms wherever they went." *Bruen*, 597 U.S. at 60 (cleaned up).

Appellants' Br. 13. The words Plaintiffs quote there are not those of the *Bruen* majority itself. They are from *Dred Scott v. Sandford*, 19 How. 393 (1857), and

Plaintiffs' effort to sanitize them—quite literally "cleaned up"—cannot disguise the fact that *Bruen* was not purporting to establish that the Second Amendment's text protects carrying arms *everywhere* ("wherever they went") when it quoted *Dred Scott*, but rather was observing that Chief Justice Taney, in "frett[ing]" about "what he thought was a parade of horribles," recognized "that public carry was a component of the right to keep and bear arms." *Bruen*, 597 U.S. at 60. To satisfy the textual step in this case, however, Plaintiffs must establish that the Second Amendment's text protects not just carrying guns in public *generally*, but carrying guns in parks and playgrounds *specifically*.[18] To do so, they must surmount the fact that nothing in the Order limits their ability to keep or bear arms so long as they do not choose to enter Albuquerque or Bernalillo County parks and playgrounds. *Cf. Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012) (Posner, J.) ("[W]hen a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places[.]"); *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (quoting same). The Order stands in stark contrast to the law struck down in *Bruen*—a carry regime that "prevent[ed] law-abiding citizens with ordinary self-defense needs from carrying arms in public

---

[18] *See, e.g.*, *United States v. Reyna*, No. 3:21-cr-00041, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022) ("For Step One to have any meaning, the regulated conduct must be defined specifically enough that it can [be] meaningfully compare[d] to Second Amendment's plain text—a plain text that is more complex than mere possession."), *appeal docketed*, No. 23-1231 (7th Cir. Feb. 7, 2023).

for that purpose," *Bruen*, 597 U.S. at 60. Thus, unlike in *Bruen*, Plaintiffs' textual burden is not just to establish that the Second Amendment's text protects carrying outside the home, but that it protects carrying in the specific sensitive places to which the Order applies. Stripped of their unsound citation to *Dred Scott*'s language, Plaintiffs have failed to do so, and so they have not met their burden.

Even if this Court concludes that Plaintiffs have carried their burden at the textual step, history defeats their claims, as the following sections will show.

### i. There is a robust historical tradition of prohibiting firearms in parks

Parks as we understand them today first appeared in the second half of the nineteenth century,[19] and for as long as these parks have existed, governments have prohibited guns in them. This tradition first manifested in the archetypal modern park, New York's Central Park, where the original 1858 rules forbade "[a]ll persons" to "carry fire-arms." *See* Attachment A, Tab 1. Five years later, a similar rule prohibited firearms in Brooklyn's Prospect Park. *See id.* Tab 3. More prohibitions followed: in 1868, the Pennsylvania legislature decreed that "[n]o person shall carry fire arms" in the newly-created Fairmount Park in Philadelphia "or within fifty yards thereof," *id.* Tab 4, and in the 1870s, laws prohibiting firearms in parks appeared in San Francisco, Chicago, Buffalo, Hyde Park, Illinois,

---

[19] *See infra* pp. 29-31.

and Phoenixville, Pennsylvania, *see id.* Tabs 5-9. In all, laws located to date

appeared in eight cities in the 1850s to 1870s, eight more cities in the 1880s, 19

more in the 1890s, another 26 in the 1900s, and many more throughout the 1910s

and 1920s. *See id.*, Tabs 1-92.[20] The late-19th and early-20th century also saw the

proliferation of state and national parks, which were also accompanied by firearms

prohibitions shortly after their creation. *See id.* Tabs 93-130.[21] Altogether, research

to date has identified *well over one hundred* historical laws prohibiting guns in parks.

---

[20] These historical laws establish that—to take one example in each of 28 states and the District of Columbia—firearms were prohibited in parks in New York, N.Y. (1858), Philadelphia, Pa. (1868), San Francisco, Cal. (1872), Chicago, Ill. (1873), St. Louis, Mo. (1881), New Haven, Conn. (1882), Boston, Mass. (1886), Salt Lake City, Utah (1888), Trenton, N.J. (1890), Grand Rapids, Mich. (1891), Milwaukee, Wis. (1891), Spokane, Wash. (1892), Cincinnati, Ohio (1892), Wilmington, Del. (1893), St. Paul, Minn. (1894), Indianapolis, Ind. (1896), Omaha, Neb. (1898), Boulder, Colo. (1899), Houston, Tex. (1904), Baltimore, Md. (1904), Washington, D.C. (1907), Portland, Or. (1907), Parsons, Kan. (1907), Memphis, Tenn. (1909), Paducah, Ky. (1909), Staunton, Va. (1910), Burlington, Vt. (1910), Oklahoma City, Okla. (1913), and Birmingham, Ala. (1917).

[21] In the district court, under the compressed preliminary-injunction briefing schedule, Defendants pointed to fourteen city-park regulations and three state-park regulations that *Maryland Shall Issue*, considering a similar county law, found sufficient to establish a "tradition of regulation of firearms in parks," *see* App. Vol. I at 131-32, and in a subsequent filing cited a decision refusing to enjoin a Maryland law, which relied on 1880s prohibitions from two additional cities. *See* Doc. 57 at 14-15; *Kipke*, 2023 WL 6381503, at *10.

Defendants cite additional laws in this brief because this Court has made clear that new legal authority may be cited for the first time on appeal. *See, e.g.*, *Baca v. Dep't of Army*, 983 F.3d 1131, 1140 (10th Cir. 2020) (stating that "we do allow a party to provide new legal authority on appeal for the position that he advanced below" (alterations adopted)). This rule applies equally to the submission of historical laws supporting the constitutionality of a challenged firearm restriction under *Bruen*. *See Alaniz*, 69 F.4th at 1129 n.1 (rejecting challenger's argument in a

Not only were parks restrictions numerous, but research has not revealed *any* instance of a court invalidating them. In other words, they "were not merely adopted by legislative bodies in the respective cities in which they applied—they were apparently accepted without any constitutional objection by anyone." *Antonyuk*, 89 F.4th at 359; s*ee also Bruen*, 597 U.S. at 30 (finding it "settled" that certain locations were "'sensitive places' where arms carrying could be prohibited" because there were "no disputes regarding the lawfulness of such prohibitions"). Thus, as the district court correctly concluded—and as the Second Circuit and multiple other district courts have confirmed—these park restrictions demonstrate an established historical tradition of prohibiting firearms in public parks. *See, e.g.*, *Antonyuk*, 89 F.4th at 359-60;[22] *Md. Shall Issue*, 2023 WL 4373260, at *11-12; *Kipke*,

---

Second Amendment case "that the government's analogues cannot be considered on appeal because they were not raised below," and affirming that "[b]ecause the constitutional claim was raised below, [the court] may consider the government's [*Bruen*] step two arguments and analogues put forward on appeal").

[22] Although *Antonyuk* expressed skepticism that the historical laws New York relied on at the preliminary-injunction stage would support a modern prohibition on firearms in "rural" parks, it found it unnecessary to resolve the issue on a facial challenge and noted the litigation was still in its early stages. *See* 89 F.4th at 362. Historical prohibitions on firearms in national and state parks (which New York did not present in *Antonyuk*) robustly support the constitutionality of prohibitions in "rural" parks, but this Court also need not decide that issue because none of the parks the Order covers—all of which are located in and around the City of Albuquerque—can plausibly be considered rural.

2023 WL 6381503, at *9-10.[23] The Parks Restriction fits soundly within this tradition.

Plaintiffs' principal response to this robust array of historical laws is to claim that they came too late. They argue that there is "nothing new about parks," and they fault Defendants for not pointing to "any relevant historical tradition from the Founding prohibiting carry in parks." Appellants' Br. at 29-30 (arguing places such as Boston Common and Bowling Green were founding-era parks). Their argument is mistaken, for three reasons.

To begin with, as explained above, the Reconstruction era is the most important period for determining the public understanding of the right to keep and bear arms. *See supra* Part II.B.ii. The continuous procession of laws prohibiting guns in parks from the mid- to late-19th century and beyond demonstrate that the public understood those prohibitions to be fully consistent with the right. Moreover, Plaintiffs have presented no cases, treatises, or other affirmative evidence suggesting that Americans in *any* historical period understood the right as precluding prohibitions on guns in parks—meaning that they have provided no

---

[23] The district court in *LaFave v. County of Fairfax*, No. 1:23-cv-01605 (E.D. Va. Jan. 24, 2024), Doc. 33, also denied a preliminary injunction against a restriction on firearms in parks in Fairfax County, Virginia, without a written opinion.

reason to doubt that the public understanding of the right was consistent throughout U.S. history and permits regulations like the Order.

In any event, Plaintiffs are wrong to draw significance from the absence of parks restrictions in the founding era because parks as we understand them today did not exist at that time. Addressing this very argument, the Second Circuit concluded that the "'modern idea of the park emerged in the nineteenth century,' before which 'open spaces that were not privately owned … consisted of grazing areas open to all, with Boston Common being the 'most famous example for this kind of [grazing] park space.'" *Antonyuk*, 89 F.4th at 361 (quoting Nadav Shoked, *Property Law's Search for a Public*, 97 Wash. U. L. Rev. 1517, 1556-57 (2020)) (alteration in *Antonyuk*)).

History supports the Second Circuit's conclusion. Early commons and greens were different in kind from modern-day parks, serving as, for instance, sites to grow crops, graze livestock, and harvest firewood and other resources. *See* Allan Greer, *Commons and Enclosure in the Colonization of North America*, 2 Am. Hist. Rev. 365, 370-73 (2012). Boston Common, for example, was primarily used as shared grazing land during its first two centuries and was also used for militia assembly and executions. *Bulletin of the Park and Outdoor Art Association* 3 (1901), bit.ly/3NPLSae (Boston Common was used for grazing and militia assembly "till a very recent date" and "not until 1859" was it "finally settled" that "Boston Common should be

a public park"). Thus, *Antonyuk* concluded, "though the history of firearm regulation in the 17th-century Boston Common might tell us about the National tradition of regulating firearms in militia mustering grounds and 'grazing areas open to all,' it tells us little about the history of firearm regulation in the public square." 89 F.4th at 361.[24]

Instead, as *Antonyuk* found, "the rise of public parks as municipal institutions [occurred] over the latter half of the 19th century," following "the success of New York's Central Park" in the 1850s. 89 F.4th at 359 (cleaned up) (quoting David Schuyler, *Summary of Parks in Urban America*, Oxford Rsch. Encyc. of Am. Hist. (Nov. 3, 2015)); *see also* Frederick Law Olmstead, *A Consideration of the Justifying Value of a Public Park* 7 (1881) ("Twenty-five years ago we had no parks, park-like or otherwise, which might not better have been called something else.").[25] Several

---

[24] Similarly, the early green spaces in New York City were unlike modern parks; they were described by late-18th century parks advocates as "little door-yards of space—mere grassplats of verdure, which form the squares of the city," David Schuyler, *The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America* 62 (1988). Places such as Bowling Green, the Battery, and City Hall Park even required permission from the mayor to "walk over, stand, or lie upon" the grass. *A Law to Amend the Law Relative to the Park, Battery, and Bowling-Green*, Passed April 13, 1818, The Evening Post (April 17, 1818).

[25] Several of Plaintiffs' own sources support this finding. *See, e.g.*, Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 1, 13 (2021) (stating that "[p]ublic parks did not appear in the United States until the second half of the nineteenth century," and referring to those earlier green spaces as "prepark landscapes"); Margaret Walls, *Parks and Recreation in the U.S.: Local Park Systems*, Resources for the Future, at 1 (June 2009) (explaining that the "urban park vision centered on

trial-level courts have concluded the same. *See, e.g.*, *Kipke*, 2023 WL 6381503, at *9 (noting that the few parks in existence at the time of the founding did not resemble modern parks, and that "Boston Common … was used primarily as a pasture, a place of execution, and site for the militia to muster and drill" (cleaned up)); *LaFave v. Cnty. of Fairfax*, No. CL2021-01569, 2023 Va. Cir. LEXIS 203, at *17 (Fairfax Cnty. Cir. Ct. June 23, 2023) ("Parks in the modern sense did not come into being until the mid-19th century[.]"). In sum, because earlier green spaces like Boston Common were not akin to modern parks, any absence of early firearms prohibitions there has no relevant bearing on the understanding of the Second Amendment right.[26]

The third reason why Plaintiffs are wrong to claim that the Reconstruction-era parks prohibitions came too late is that those laws are part of a broader historical tradition of prohibiting firearms in analogous places stretching back to the founding—as the following section will show.

_____

providing natural settings in an urban environment" arose in the "mid to late 1800s").

[26] Indeed, even if the earlier green spaces *were* parks, the absence of prohibitions "does not mean that anyone thought the States lacked the authority" to enact such prohibitions. *Dobbs*, 597 U.S. at 253 (stating principle in abortion context); *see also supra* Part II.B.iii.

### ii. Prohibitions on firearms in parks are analogous to historical prohibitions on firearms in public forums and gatherings and in schools

Even if this Court were to focus on the founding era, it should still conclude that the Parks Restriction is consistent with historical tradition. The absence of modern-style parks in that era means this Court must engage in a "more nuanced analysis" in looking to analogous historical principles. *Bruen*, 597 U.S. at 27. Here, the Parks Restriction is analogous to longstanding traditions of prohibiting firearms in public forums and gatherings and in schools.

### 1. Public forums and gatherings

As *Antonyuk* concluded with respect to New York's prohibition on firearms in parks, the Parks Restriction is consistent with the "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond." 89 F.4th at 356. These types of restrictions extend back to the 1328 Statute of Northampton in England, which stated that "no Man great nor small" shall "go [or] ride armed … in Fairs [or] Markets." 2 Edw. 3, 258, ch. 3 (1328), Attachment B, Tab 1. Founding-era laws in Virginia and North Carolina "replicated the medieval English law prohibiting firearms in fairs and markets, *i.e.*, the traditional, crowded public forum." *Antonyuk*, 89 F.4th at 357 (footnote omitted) (citing 1786 Va. Acts 35, ch. 49 and Collection of Statutes of the Parliament of

England in Force in the State of North Carolina 60-61, ch. 3 (F. Martin Ed. 1792));

Attachment B, Tabs 2-3; *see also State v. Huntly*, 25 N.C. 418, 420-23 (1843)

(observing that statutory text also reflected common law). Thus, "medieval law

survived to become our Founders' law." *Antonyuk*, 89 F.4th at 357 (quoting *Bruen*,

597 U.S. at 35).

Firearms restrictions in places of public assembly or gathering became

increasingly common in the latter half of the 19th century. Tennessee, Texas, and

Missouri "passed laws prohibiting weapons in public forums and crowded places

such as assemblies for 'educational, literary or scientific purposes, or into a ball

room, social party or other social gathering.'" *Antonyuk*, 89 F.4th at 357 (citation

omitted); *see also* 1869-70 Tenn. Pub. Acts 23-24, Attachment B, Tab 4; 1871 Tex.

Gen. Laws ch. 34 § 3, Attachment B, Tab 5; 1883 Mo. Sess. Laws 76, Attachment

B, Tab 8. Georgia also passed a law prohibiting carrying guns to courts, polling

places, places of worship, "or any other public gathering," R.H. Clark, *The Code of

the State of Georgia* 818 (1873), Attachment B, Tab 6, and the Oklahoma and

Arizona territories passed similar gathering-place laws, *see Antonyuk*, 89 F.4th at 357

(citing 1889 Ariz. Sess. Laws 17, 1890 Okla. Terr. Stats., art. 47); Attachment B,

Tabs 9-10.[27]  The state Supreme Courts of Texas, Tennessee, and Missouri

---

[27] Plaintiffs are wrong to suggest that *Bruen* foreclosed relying on territorial laws. Appellants' Br. 37. *Bruen* concluded that the territorial carry restrictions New York presented could not "overcome the overwhelming evidence" the Court had

"upheld this type of statute as constitutional." *Antonyuk*, 89 F.4th at 358 (discussing

*English v. State*, 35 Tex. 473, 478-79 (1871); *Andrews v. State*, 50 Tenn. 165, 181-82

(1871); *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886)).[28]

Thus, as the Second Circuit concluded in *Antonyuk*, the founding-era

prohibitions on firearms in fairs and markets, along with the 19th-century

prohibitions in places of public gatherings, demonstrate a "long, unbroken line" of

a "tradition of regulating firearms in often-crowded public forums." 89 F.4th at

358. And, as public parks emerged as "a new type of public forum" in the mid- and

late-19th century, "cities continued the tradition of regulating firearms in historical

---

already found supporting "an otherwise enduring American tradition permitting public carry." 597 U.S. at 67. There is no such contrary evidence (let alone "overwhelming evidence") of a right to carry at public gatherings. Thus, as *Antonyuk* observed, "there [i]s no reason … to discount territorial laws." 89 F.4th at 360.

[28] Plaintiffs argue that these laws are not "relevantly similar" to the Parks Restriction because they do not "reference parks specifically" and instead refer to places used for "educational, literary, or scientific" purposes, whereas parks are used for "recreation and leisure." Appellants' Br. 34. But *Bruen* does not require historical twins, and each of the historical laws contains broad language encompassing public gatherings generally, or gatherings for leisure. *See* 1869-70 Tenn. Pub. Acts 23-24 ("any fair, race course, or other public assembly"); 1871 Tex. Gen. Laws ch. 34 § 3 ("social gatherings"); Clark, *The Code of the State of Georgia* 818 ("public gathering"); 1883 Mo. Sess. Laws 76 ("where people are assembled for … social purposes"); 1889 Ariz. Sess. Laws 17 ("where persons are assembled for amusement"); 1890 Okla. Terr. Stats, art. 47 (1893) (same); *see also* Edwin L. Jewell, *The Laws and Ordinances of the City of New Orleans* 1 (1882) (prohibiting guns at "any … pic-nic ground … or other place of public entertainment or amusement"), Attachment B, Tab 7.

public forums, such as fairs and markets, to likewise keep these new public spaces, urban parks, peaceable." *Id.* at 359.

## 2. Schools

Separately, the Parks Restriction is constitutional because it is consistent with the well-accepted principle that the government may prohibit firearms in schools. *Heller* announced that its decision did not cast doubt on "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," calling those laws "presumptively lawful regulatory measures." 554 U.S. at 626-27, 627 n.26; *see also McDonald*, 561 U.S. at 786 (reiterating the same). *Bruen* repeated the first of those quotations, "assum[ing] it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *see* 597 U.S. at 30, and Justice Kavanaugh, joined by the Chief Justice—representing two votes necessary for the majority—reproduced the passage in full, *see id.* at 81 (Kavanaugh, J., concurring). Thus, schools are established sensitive places, *see Antonyuk*, 89 F.4th at 339 n.56, and so, as *Bruen* instructs, courts can analogize from restrictions in schools to approve restrictions in "*new* and analogous sensitive places." 597 U.S. at 30 (emphasis added).

The Parks Restriction is analogous to historical restrictions on firearms in schools. It places a "comparable burden" on the right to armed self-defense—like school restrictions, it prohibits carrying only in discrete locations. And its burden is

"comparably justified"—like school restrictions, it protects a vulnerable population (children), who make extensive use of Albuquerque and Bernalillo County parks.[29]

### iii. Plaintiffs' efforts to deny that the Parks Restriction is consistent with historical tradition are without merit

Plaintiffs' remaining arguments purporting to discredit the Order's place within a long tradition of firearms regulation are meritless.

### 1. Sensitive places are not limited to those with comprehensive, government-provided security

A subset of Plaintiffs contend that the only "sensitive" places where guns may be banned are "enclosed, securable locations protected by government-provided comprehensive security." Appellants' Br. 24-29.[30] Remarkably, three Plaintiffs refused to join that part of the consolidated brief, *see id.* at 24 n.7, which is itself a clear indication that the argument is untenable. Indeed, it contains numerous flaws.

*First*, the security-based argument is inconsistent with *Heller*, *Bruen*, and *Bonidy v. U.S. Postal Service*, 790 F.3d 1121 (10th Cir. 2015). Plaintiffs assert that the Supreme Court has only identified three locations as "presumptively sensitive

---

[29] *Antonyuk* relied on similar reasoning to uphold a prohibition on firearms at zoos. *See* 89 F.4th at 363-64. It did not address whether this analogy would extend to parks because it had already deemed parks restrictions consistent with the tradition of prohibiting guns in public-gathering spaces. *Id.* at 361 n.84.

[30] Plaintiffs do not explain precisely what they mean by "comprehensive security," but it appears they have in mind "guards and metal detectors," as featured "at entrances to courthouses or … at the airport." *Id.* at 28.

places" where firearms may be banned: courthouses, polling places, and legislative assemblies. Appellants' Br. 24. But that ignores the fact that *Heller* and *Bruen* confirmed that schools and government buildings are also sensitive places. *See supra* p. 35. Plaintiffs attempt to dismiss *Heller*'s passage regarding schools and government buildings as a "suggestion" in "dicta." Appellants' Br. 42. But this Court confronted precisely that argument in *Bonidy*, which involved a challenge to a prohibition on carrying firearms in post offices, and "reject[ed]" the "suggest[ion]" that *Heller*'s language "is mere dicta and … that we should disregard it." 790 F.3d at 1125; see also *Vincent*, 80 F.4th at 1201-02 (holding that a pre-*Bruen* decision of this Court, relying on other aspects of *Heller*'s "presumptively lawful" language, remains binding circuit precedent because "*Bruen* did not indisputably and pellucidly abrogate" it). Accordingly, *Bonidy* held, "the Second Amendment right to carry firearms does not apply to federal buildings, such as post offices." *Id.*

Post offices do not normally feature "government-provided comprehensive security"—indeed, *Bonidy* noted that the specific post office at issue "d[id] not regularly employ any security officers," *id.* at 1123, or have "security … devices," *id.* at 1133 (Tymkovich, J., concurring in part and dissenting in part); *see also Class*, 930 F.3d at 465 (describing post office as "an unsecured government building"). So *Bonidy*'s conclusion that post offices are sensitive places forecloses Plaintiffs' claim that only locations with comprehensive protection could be sensitive. Any number

of other government buildings similarly lack comprehensive security—public libraries, community recreation centers, and so on. And schools—which include not just buildings but also yards and playing fields—are neither "enclosed" nor routinely protected by comprehensive security. Thus, "because *Bruen* conclusively named schools among the other examples of sensitive places, … Plaintiffs' argument that sensitive places are limited to buildings with comprehensive, state-provided security is baseless." *Kipke*, 2023 WL 6381503, at *6; *see also Class*, 930 F.3d at 465 ("Many 'schools' and 'government buildings'—the paradigmatic 'sensitive places' identified in *[Heller]*—are open to the public, without any form of special security or screening.").

*Second*, even considering just the three sensitive places Plaintiffs do acknowledge, their argument fails. Government-provided, comprehensive security is generally not present at polling places. Indeed, law enforcement officers are often "barred from the vicinity of the polls to avoid any appearance of coercion in the electoral process." *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality op.) (describing Tennessee law); *see also, e.g.*, Luke Barr, *Trump Says He Wants Police at Polling Sites. Experts Say that's Unlawful*, ABC News (Aug. 21, 2020), tinyurl.com/fcv5x9xe (quoting Minnesota Secretary of State explaining that "you can't preemptively station or assign [police officers] to a polling place. You just can't do it. It's unlawful.").

*Third*, and in any event, Plaintiffs have failed to establish that the three sensitive places they acknowledge featured government-provided, comprehensive security historically. Space prevents a full analysis, but to provide one example, Plaintiffs' legislative-buildings laws, *see* Appellants' Br. 25-26, do not come close to proving that these buildings routinely had "comprehensive security." Almost all are—or are incorrectly presented as[31]—statutes providing for payment of "door-keepers," but Plaintiffs do not even try to show how this established comprehensive security. To the contrary, Plaintiffs' statutes provided, for example, for a single door-keeper, *id.* Ex. 2, p. 240 (New Jersey), or one for each legislative chamber, *see id.* Ex. 5, pp. 426-27 (South Carolina); *id.* Ex. 7, pp. 372-73 (Georgia: one individual in dual role of "messenger and door-keeper" for each chamber); *cf.* J. William Harris, *Portrait of a Small Slaveholder: The Journal of Benton Miller*, 74 Georgia Historical Quarterly 1, 14 (1990) (explaining that Benton Miller, who served as door-keeper in Georgia House from 1873 to 1888, had lost "more than four inches of his left leg" in Civil War and walked with crutch and cane).

For all these reasons, the Court should reject Plaintiffs' security-based argument.

---

[31] Two of the statutes Plaintiffs present are simply irrelevant. *See* Appellants' Br. Ex. 9 p. 532 (New York: militia law); *id.* Ex. 3 p. 77 (Virginia: no mention of door-keepers or legislative buildings).

## 2. **Plaintiffs cannot dismiss over a hundred historical laws as "outliers"**

Plaintiffs contend that the historical parks restrictions the district court concluded were sufficient to establish a historical tradition were "outliers" that appeared in a small percentage of municipalities. Appellants' Br. 36. To begin with, this argument misses the mark because there are many dozens of similar laws in addition to those the district court relied on. *See* Attachment A. As noted above, a party is entitled to rely on legal authorities on appeal beyond those it cited in the district court. *See supra* note 21.

In any event, *Antonyuk* correctly rejected this quantitative approach, explaining that "[d]isqualifying proffered analogues based only on strict quantitative measures such as population size absent any other indication of historical deviation would turn *Bruen* into the very 'regulatory straightjacket' the Court warned against." 89 F.4th at 339 (quoting *Bruen*, 597 U.S. at 30); *cf. Bruen*, 597 U.S. at 67-68 (discounting laws that governed "two-thirds of 1% of the population" because those laws also "'contradic[ted] the overwhelming weight' of other … historical evidence" (quoting *Heller*, 554 U.S. at 632)). Furthermore, even under a quantitative approach, the historical parks restrictions are sufficient to demonstrate a historical tradition of prohibiting guns in parks. *Antonyuk* examined only eight of the well over one hundred park restrictions Defendants present here and found them sufficiently representative because, "[b]y 1890, four of the five

most populous cities prohibited firearms in their urban parks," meaning "at least 37.7% of the urban population liv[ed] in cities where firearms were prohibited in their parks." *Id.* at 360.[32]

### 3. Plaintiffs' other arguments are meritless

Plaintiffs' remaining efforts to deflect the fact that restricting firearms in parks is part of a longstanding American regulatory tradition are equally unavailing.

*First*, Plaintiffs argue that some of the parks restrictions are "coupled with restrictions on shooting animals" and therefore are "not relevantly similar in 'how' and 'why' they burden … Second Amendment rights." Appellants' Br. 36; *see also id.* at 22-23. This argument contains multiple errors. To begin with, comparing the "how" and "why" is only necessary when analogizing historical and modern laws, whereas here, the historical parks restrictions and the Order's Parks Restriction are historical twins: simple, unambiguous prohibitions on carrying firearms in parks. Moreover, even if analogizing were required, *Bruen* asks only for *comparable* justifications, not identical justifications, see 597 U.S. at 29, and it cannot possibly

---

[32] Furthermore, even assuming 10,000 municipalities existed in 1900, as Plaintiffs argue, Appellants' Br. 36, this metric fails to account for (1) how many of these municipalities had public parks, such that a firearm prohibition in parks could have existed there, and (2) the relative populations of these municipalities, ignoring the fact that many of the most populous cities prohibited guns in their parks. *See Antonyuk*, 89 F.4th at 360.

have meant that an analogy would fail if the historical justification (protecting wildlife) was *less important* than the modern justification (protecting the people of Albuquerque and Bernalillo County).[33] In any event, the great majority of parks prohibitions were not enacted exclusively (or even primarily) to protect wildlife; instead, "it is clear that these laws were enacted in whole or in part to promote public safety and the ability of visitors to use the park for recreation without the potential for violence or other disturbances." *Maryland Shall Issue*, 2023 WL 4373260, at *14.

*Second*, Plaintiffs argue that three of the parks restrictions cannot be considered because they "barred the exercise of other constitutional rights." Appellants' Br. 36-37 (noting that several park rules prohibited "indecent language"). However, the fact that a separate provision in these park rules may touch on other constitutional rights is irrelevant to the historical analysis under *Bruen*, which requires courts to look to the "historical tradition of firearm

___

[33] As one court recently recognized, to assert that "historical hunting and poaching restrictions" are insufficient analogues for contemporary gun laws focused on public safety because (as Plaintiffs put it) these historical hunting laws aimed only to "reduce the taking of certain animals in certain places during certain seasons," *see* Appellants' Br. 22-23, "misses the point" of *Bruen*'s analogical test. *See Gonyo v. D.S.*, No. 2023-796, 2024 WL 296876, at *19 (N.Y. Sup. Ct. Jan. 19, 2024) (noting that if "the Second Amendment right can be constitutionally limited based on a danger of … the unauthorized taking of an animal," it "must certainly tolerate a restriction on a much more severe danger of future behavior—the threat of serious injury to a human being").

regulation" to determine the public understanding of the right to keep and bear arms. 597 U.S. at 17.

*Third*, Plaintiffs argue that pre-*Bruen* cases support their claims. *See* Appellants' Br. 31-32. However, the governments defending their laws did not engage in the detailed historical exposition that Defendants present here, because the pre-*Bruen* standard also permitted courts to apply tiered scrutiny. The Order easily would have satisfied that pre-*Bruen* standard, particularly in light of cases upholding prohibitions in parks and recreational areas that Plaintiffs ignore. *See, e.g.*, *United States v. Masciandaro*, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009) (upholding federal restriction on firearms in parks both under intermediate scrutiny and because national park area was a sensitive place), *aff'd*, 638 F.3d 458 (4th Cir. 2011); *see also GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318 (11th Cir. 2015) (U.S. Army Corps recreational areas); *Warden v. Nickels*, 697 F. Supp. 2d 1221 (W.D. Wash. 2010) (city parks where children are likely to be present); *People v. Bell*, 107 N.E.3d 1047 (Ill. App. Ct. 2018) (public parks).[34]

---

[34] Plaintiffs' pre-*Bruen* decisions are also distinguishable on their own terms. *Bridgeville Rifle & Pistol Club v. Small*, 176 A.3d 632 (Del. 2017), for example, applied Delaware's constitutional right, which is "intentionally broader than the Second Amendment." *Id.* at 636.

**D. Plaintiffs Have Not Established that They Are Likely to Succeed in Showing that the Playgrounds Restriction Is Unconstitutional**

The Playgrounds Restriction is also constitutional. For one, playgrounds are "sensitive places" where the government may restrict firearms because they are analogous to schools, which are settled as sensitive places. And separately, the historical traditions of regulating firearms in parks and other public-gathering places also support regulating firearms in playgrounds.[35]

**i. Playgrounds are sensitive places where the government may prohibit firearms because of their close relationship to schools**

For as long as the Supreme Court has recognized an individual right to bear arms, it has acknowledged the lawfulness of location-based limitations on that right, including restrictions on firearms in schools. *See Heller*, 554 U.S. at 626. The constitutionality of prohibiting firearms in schools is now settled doctrine. *See supra* p. 35; *Antonyuk*, 89 F.4th at 339 n.56; *see also Bonidy*, 790 F.3d at 1125 (rejecting argument that this Court should disregard *Heller*'s passage regarding prohibitions in schools and government buildings).

Playgrounds are sensitive places where New Mexico may regulate firearms because of their close relationship to schools. A place may be "sensitive" for Second

---

[35] As with the Parks Restriction, Plaintiffs have also failed to meet their textual burden here. *See supra* pp. 23-25.

Amendment purposes because of "the people found there or the activities that take place there." *Class*, 930 F.3d at 465 (quotation omitted). Schools are sensitive in part because they fall into the first category: The presence of firearms in schools "risks harm to great numbers of defenseless people (e.g., children)." *Nordyke v. King*, 563 F.3d 439, 459 (9th Cir. 2009), *vacated*, 611 F.3d 1015 (9th Cir. 2010); *see also Masciandaro*, 648 F. Supp. 2d at 790 (concluding that national park area is sensitive place by analogy to "schools and government buildings," as "public properties where large numbers of people, often strangers (and including children), congregate"). Like historical restrictions on firearms in schools, the Playgrounds Restriction protects a vulnerable population—children—who are less capable of defending themselves from an armed attack and more likely to be seriously injured by gunshots. *See* February Executive Order at 1 (finding that "children are particularly vulnerable to gun violence"). And the Playgrounds Restriction burdens the Second Amendment right in a similar manner as school restrictions, because both restrict the right to bear arms only in limited and well-defined locations.

For these reasons, courts have consistently rejected challenges to restrictions on carrying firearms in playgrounds. *See* App. Vol. 1 at 197 ("[P]laygrounds are 'sensitive places' and are excepted from the Second Amendment's commands. As other courts have noted, playgrounds are often associated with schools and therefore the inference that they are sensitive places under *Bruen* is appropriate.");

*see also Kipke*, 2023 WL 6381503, at *14 (finding prohibition on firearms on school grounds, including playgrounds, "comparably justified" to school restrictions due to shared goals of protecting vulnerable populations and enhancing public safety). Even courts that have broadly struck down other location-based restrictions have upheld prohibitions in playgrounds. *See Siegel v. Platkin*, 653 F. Supp. 3d 136, 152 (D.N.J. 2023) (upholding playgrounds restriction because "schools and playgrounds intersect, that is, playgrounds fall within the sphere of schools"); *Koons v. Platkin*, 2023 WL 3478604, at *82 (D.N.J. May 16, 2023) (reaffirming *Siegel*), *appeal docketed*, No. 23-1900 (3d Cir. May 17, 2023); *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 324 (N.D.N.Y. 2022) (ruling that playgrounds restrictions "find[] support in those historical analogues prohibiting firearms in schools given that, by their very nature, both places often contain children" and adults generally "do not frequent playgrounds as much as children do"), *aff'd in part and vacated in part on other grounds*, 89 F.4th 271. And Judge Riggs, who disagreed with the decision below as to the Parks Restriction, nevertheless agreed that the challenge to the Playgrounds Restriction was unlikely to succeed. *Springer*, 2023 WL 8436312, at *8 ("[P]laygrounds are 'sensitive places' where firearms may be restricted."). The one decision that has enjoined a playgrounds restriction, *May v. Bonta*, No. 8:23-cv-01696, 2023 WL 8946212, at *11 (C.D. Cal. Dec. 20, 2023), is not only an extreme outlier, but also appears to have based its rationale on a comprehensive-security

theory, which is mistaken for the reasons discussed above. *See supra* Part II.C.iii.1. Because the Playgrounds Restriction burdens the Second Amendment right to a similar extent and for similar reasons as well-accepted restrictions on firearms in schools, it is constitutional under *Bruen*.

Plaintiffs' efforts to attack the Playgrounds Restriction are unavailing. Those efforts principally involve trying to convince this Court that it should not follow *Heller*'s approval of restrictions in schools, *see* Appellants' Br. 38-43, which is an argument *Bonidy* already rejected, *see* 790 F.3d at 1125, and is irreconcilable with *Bruen*, *see supra* p. 35. Their one effort to sever the tight analogy between playgrounds and schools—stating that schools exercise *in loco parentis* authority over schoolchildren, whereas Defendants do not have such authority over adults in playgrounds, *see* Appellants' Br. 38-40—simply misses the point: *Heller* and *Bruen* approved laws prohibiting possessing firearms in schools, *period*, not just possession by the children over whom the school exercised *in loco parentis* authority.[36] Their argument that some colonial-era and founding-era laws "permitt[ed] (and sometimes require[ed]) firearm carry in public assemblies and religious services," and that "at least some" of those gatherings "presumably" included children, Appellants' Br. 40-42, fares no better. Those laws do nothing to show that *Heller*

---

[36] To the extent that Plaintiffs intended this argument as a version of their comprehensive-security argument, it is mistaken for the reasons discussed above. *See supra* Part II.C.iii.1.

and *Bruen* were wrong to approve firearms prohibitions in schools (or that this Court could disregard those decisions even if they were wrong), or that playgrounds are disanalogous to schools.[37]

Nor are Plaintiffs correct to suggest that upholding the Playgrounds Restriction by analogy to schools would "'eviscerate' the general right to carry for self-defense in public." Appellants' Br. 43. Nobody contends that typical "sidewalks" or the entire island of Manhattan are analogous to schools. Recognizing the analogy with respect to playgrounds would not change *Bruen*'s instruction that the constitutionality of other purported sensitive places must be assessed individually.

### ii. Prohibitions on firearms in playgrounds are analogous to historical prohibitions on firearms in parks and public gatherings

Alternatively, the Playgrounds Restriction is constitutional because it is supported by the same regulatory traditions that justify the Parks Restriction. Like parks, public playgrounds did not exist at the founding. Public playgrounds began to appear in the United States in the late-nineteenth and early-twentieth centuries.

---

[37] Moreover, founding-era laws requiring some men to carry guns to church "were not rooted in the Second Amendment's tradition," but rather were passed so that "militiamen or free white men" could "defend against potential attacks by Native Americans and Blacks during slave uprisings." *Goldstein v. Hochul*, No. 1:22-cv-08300, 2023 WL 4236164, at *14 (S.D.N.Y. June 28, 2023), *appeal docketed*, No. 23-995 (2d Cir. July 6, 2023).

Modeled after German sand gardens, the first American playgrounds appeared in Boston, New York, Chicago, Providence, and Philadelphia between 1885 and 1895. Clarence Elmer Rainwater, *The Play Movement in the United States: A Study of Community Recreation* 22, 45-46, 50-51 (1921). By the turn of the century, additional playgrounds appeared in Baltimore, Brooklyn, Cleveland, Denver, Milwaukee, Minneapolis, and Pittsburgh. *Id.* at 51. Playgrounds began to proliferate in parks and on school grounds throughout the country after formation of the Playground and Recreation Association of America in 1906. *See* Henry S. Curtis, *The Play Movement and its Significance* 12-13 (1917).

Because playgrounds did not exist in the founding era, a "nuanced," more flexible approach to analogizing is warranted. Under that approach, the Playgrounds Restriction is supported not only by the tradition of prohibiting firearms in schools, *see supra* Part II.D.i, but also by the Reconstruction-era and later tradition of prohibiting guns in parks, *see supra* Part II.C.i, which itself has roots in an earlier tradition of restricting guns in crowded public-gathering places, *see supra* Part II.C.ii.1.

These traditions of regulating in parks and public gatherings are apt analogies for the Playgrounds Restriction. For one, because playgrounds were often built in parks, many would have been encompassed by restrictions on firearms in parks. In New York, for instance, "the first permanent municipally-built

playground in the country opened in Seward Park" in 1903—the same year New York passed a general firearms prohibition in city parks. *See* NYC Parks, *History of Playgrounds in Parks*, https://www.nycgovparks.org/about/history/playgrounds; Attachment A, Tab 46. Moreover, the Playgrounds Restriction burdens Second Amendment rights in "relevantly similar" ways to historical park and gathering-place restrictions. *See Bruen*, 597 U.S. at 29. Each limits the right to bear arms only in discrete locations to protect against the physical harms and intimidating effect of gun violence.

## III. Plaintiffs Did Not Carry their Burden on the Non-Merits Factors

The remaining preliminary injunction factors also weigh in Defendants' favor. New Mexico "'suffers … irreparable injury'" whenever it is barred "'from effectuating statutes enacted by representatives of its people.'" *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted).[38] A preliminary injunction would undermine the judgment of New Mexico's democratic branches on how best to keep residents safe. That harm would be especially profound here, where an injunction would impose "an ongoing and concrete harm to" the State's "law enforcement and public safety interests." *Id.* Furthermore, the public, which has the right to enjoy public spaces, such as parks

---

[38] Although the Order is not a statute, it was issued pursuant to the statutory scheme the Legislature enacted to respond to public health emergencies. *See* N.M. Stat. Ann. §§ 12-10A-1 to -19 (2003, as amended through 2015).

and playgrounds, would also suffer irreparable harm, as allowing individuals to carry firearms into public parks and playgrounds where people and children gather increases the likelihood of shootings in those locations.[39] Sadly, the possibility of being shot in a park or playground is not just theoretical—there is a documented history of shootings in Albuquerque parks.[40] Firearm injuries and deaths "c[an]not be undone, thus rendering the[ir] consequences irreparable." *Uniformed Fire Officers Ass'n v. De Blasio*, 973 F.3d 41, 48 (2d Cir. 2020). The presence of guns in parks also has significant intimidating and chilling effects and reduces the public's use and enjoyment of parks.[41]

In contrast, the Order does not harm Plaintiffs. Plaintiffs' theory of harm is based entirely on the alleged denial of their Second Amendment rights, *see*

---

[39] *See, e.g.*, Paul M. Reeping et al., *The Effect of Gun-Free School Zones on Crimes Committed with a Firearm in Saint Louis, Missouri*, 100 J. Urb. Health 1118, 1123 (2023), https://bit.ly/3Rwvwqd (finding "statistically significant 13.7% fewer crimes committed with a firearm in gun-free school zones compared to gun-allowing zones"); *see also, e.g.*, John J. Donohue et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. Empirical Legal Stud. 198, 200 (2019), https://law.stanford.edu/wp-content/uploads/2017/06/Donohue_et_al-2019-JELS-RTC-Law-and-Viol-Crime.pdf (finding substantial increases in rates of violent crimes in states with lenient concealed carry licensing laws).

[40] *See* February Executive Order at 3 (noting "a recent rise of gun violence in [Albuquerque] parks, with at least five such shootings reported in 2023 and early 2024").

[41] *See* Darrell A.H. Miller et al., *Technology, Tradition, and "The Terror of the People*,*"* Notre Dame L. Rev. (forthcoming) (manuscript at 20-23), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4521030 (documenting these intimidating and chilling effects).

Appellants' Br. 46-48, but as discussed, the Order is constitutional, *see supra* Part II. And Plaintiffs have failed to show that their ability to carry firearms in covered parks and playgrounds would actually reduce their likelihood of injury should a shooting occur. *See, e.g.*, Steven E. Barkan & Michael Rocque, *Crime Prevention: Programs, Policies, and Practices* 65 (2021) (describing study finding "little evidence that self-defense gun use reduces the likelihood of victim injury during a crime" (quoting David Hemenway & Sara J. Solnick, *The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007-2011*, 79 Preventive Med. 22, 27 (2015))). Accordingly, the non-merits factors weigh in favor of Defendants, and affirmance, here.

## CONCLUSION

The Court should affirm the district court's denial of preliminary-injunctive relief.

March 1, 2024

Respectfully submitted,

/s/ Janet Carter
Janet Carter
William J. Taylor, Jr.
Carina Bentata Gryting
Everytown Law
450 Lexington Ave, P.O. Box 4184
New York, NY 10163
(646) 324-8174
jcarter@everytown.org

Freya Jamison
Everytown Law
P.O. Box 14780
Washington, DC 20044

Holly Agajanian
*Chief General Counsel to Gov. Lujan Grisham*
Kyle P. Duffy
*Deputy General Counsel to Gov. Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, NM 87501

Cody Rogers
Serpe Andrews
2540 El Paseo Road, Suite D
Las Cruces, NM 88001

## STATEMENT REGARDING ORAL ARGUMENT

Defendants respectfully request oral argument because these consolidated appeals involve constitutional questions about state policies and present complex methodological questions about the application of the Second Amendment under *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022).

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

This motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 12,981 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface (fourteen-point Baskerville font) using Microsoft Word.

Respectfully submitted,

/s/ Janet Carter
Janet Carter

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2024, I filed the foregoing via the CM/ECF filing system, which caused all counsel of record to be served by electronic means.

Respectfully submitted,

/s/ Janet Carter
Janet Carter