**23-2166, 23-2167, 23-2185**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

WE THE PATRIOTS USA, INC., et al.,

     Plaintiffs-Appellants,

v.

MICHELLE LUJAN GRISHAM, in her official capacity only, et al.,

     Defendants-Appellees.

No. 23-2166
(D.C. No. 1:23-CV-00773-
DHU-LF) (D.N.M.)

---

ZACHARY FORT, et al.,

     Plaintiffs-Appellants,

v.

MICHELLE LUJAN GRISHAM, in her official capacity only, et al.,

     Defendants-Appellees.

No. 23-2167
(D.C. No. 1:23-CV-00778-
DHU-LF) (D.N.M.)

---

**ORAL ARGUMENT REQUESTED**

RANDY DONK, et al.,

    Plaintiffs-Appellants,

v.

MICHELLE LUJAN GRISHAM, in her
official capacity only, et al.,

    Defendants-Appellees.

No. 23-2185
(D.C. No. 1:23-CV-00772-
DHU-LF) (D.N.M.)

On Appeal from the United States District Court, District of New Mexico

The Honorable David Herrera Urias

## CONSOLIDATED REPLY BRIEF OF PLAINTIFFS-APPELLANTS

Cameron Lee Atkinson
ATKINSON LAW, LLC
122 Litchfield Road
P.O. Box 340 St. 2
Harwinton, CT 06791
203-677-0782
catkinson@atkinsonlawfirm.com

*Attorney for Plaintiffs We the Patriots USA, Inc. et al.*

Jordon P. George
ARAGON MOSS GEORGE JENKINS, LLP
2201 Menaul Blvd NE
Albuquerque, NM 87107
505-872-3022
jordon@amgjlaw.com

David H. Thompson
Peter A. Patterson
Kate Hardiman
COOPER & KIRK, PLLC
1523 New Hampshire Ave NW
Washington, D.C. 20036
202-220-9600
dthompson@cooperkirk.com

*Attorneys for Plaintiffs Fort et al.*

Robert J. Olson
WILLIAM J. OLSON, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
(703) 356-5070
wjo@mindspring.com

Stephen Stamboulieh
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

*Attorneys for Plaintiffs Donk et al.*

**TABLE OF CONTENTS**

<u>Page</u>

TABLE OF AUTHORITIES.................................................................... ii

INTRODUCTION ...............................................................................1

ARGUMENT ......................................................................................2

I.   THE CHALLENGED PROVISIONS LIKELY VIOLATE PLAINTIFFS'
     SECOND AMENDMENT RIGHTS ...................................................2

     A.   Plaintiffs' Conduct Is Covered by the Second Amendment's
          Plain Text ................................................................................2

     B.   The Relevant Historical Period Centers on the Founding,
          Not 1868 or Much Later .............................................................3

     C.   The Historical Inquiry Requires Proof of Well-Established,
          Representative Analogues and Cannot Rest on Outliers .........................9

     D.   The Governor's Historical Evidence Is Insufficient to Meet
          Her Burden ...............................................................................12

          1. Firearms Were Historically Present in Places of Public
             Assembly ..............................................................................12

          2.  Schools ................................................................................17

          3. Government-Provided Security Is the Historical Feature
             Uniting Legislatures, Polling Places, and Courthouses .................19

          4. Parks ..................................................................................20

          5. Playgrounds .........................................................................24

II.  THE OTHER FACTORS FAVOR INJUNCTIVE RELIEF ...........................25

CONCLUSION ......................................................................................27

## TABLE OF AUTHORITIES

**Cases** **Page**

*Antonyuk v. Chiumento,*
89 F.4th 271 (2d Cir. 2023)...........................................................5, 11, 13, 14

*Bonidy v. U.S. Postal Serv.,*
790 F.3d 1121 (10th Cir. 2015)..............................................................19, 20

*Christian v. Nigrelli,*
642 F. Supp. 3d 393 (W.D.N.Y. 2022)...........................................................10

*District of Columbia v. Heller,*
554 U.S 570 (2008)..................................................................7, 9, 10, 20, 27

*Duncan v. Bonta,*
2023 WL 6180472 (S.D. Cal. Sept. 22, 2023)...................................................4

*Elrod v. Burns,*
427 U.S. 347 (1976)....................................................................................25

*Espinoza v. Mont. Dep't of Revenue,*
140 S. Ct. 2246 (2020)...............................................................................3, 5

*Fouts v. Bonta,*
2024 WL 751001 (S.D. Cal. Feb. 23, 2024).....................................................4

*Koons v. Platkin,*
673 F. Supp. 3d 515 (D.N.J. 2023).......................................................9, 10, 24

*Lara v. Comm'r Pa. State Police,*
91 F.4th 122 (3d Cir. 2024).............................................................3, 4, 6, 18

*May v. Bonta,*
2023 WL 8946212 (C.D. Cal. 2023) ........................................................10, 26

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022)... 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20, 22, 23, 25, 27

*Planned Parenthood Ass'n of Utah v. Herbert,*
828 F.3d 1245 (10th Cir. 2016).............................................................25, 26

*Ramos v. Louisiana,*
140 S. Ct. 1390 (2020)..................................................................................5

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
592 U.S. 14 (2020)......................................................................................25

*Siegel v. Platkin*,
    653 F. Supp. 3d 136 (D.N.J. 2023)................................................................10

*Springer v. Grisham*,
    2023 WL 8436312 (D.N.M. Dec. 5, 2023)...............................................4, 24

*State v. Huntley*,
    25 N.C. 418 (N.C. 1843) ................................................................................15

*Timbs v. Indiana*,
    139 S. Ct. 682 (2019)........................................................................................5

*Wolford v. Lopez*,
    2023 WL 5043805 (D. Haw. Aug. 8, 2023).......................................24, 25, 26

*Worth v. Harrington*,
    666 F. Supp. 3d 902 (D. Minn. 2023)........................................................4, 18

**<u>Other Authorities</u>**

A Collection of All the Public Acts of Assembly of the Province
    of North-Carolina 293 (Newbern: James Davis, 1752) ...........................15

*Boston Common*, Nat'l Park Serv.,
    https://bit.ly/3SGumtc (last visited Mar. 25, 2024).......................................21

*Bulletin of the American Park and Outdoor Art Association*
    (1901) bit.ly/3NPLSae...............................................................................21, 22

*Census Bulletin No. 65*, U.S. Census Bureau (June 8, 1901)
    https://bit.ly/3GkuFnm ..................................................................................22

Allan Greer, *Commons and Enclosure in the Colonization of North America*,
    2 Am. Hist. Rev. 365 (2012) ........................................................................22

Stephen P. Halbrook, *Faux Histoire of the Right to Bear Arms:*
    Young v. Hawaii, SSRN, https://bit.ly/3QyFZA5 .........................................14

James Iredell, Laws of the State of North-Carolina
    (Edenton: Hodge and Wills, 1791) ...............................................................15

Nicholas Johnson et al., Firearms Law & the Second Amendment
    (2d ed. 2017)..................................................................................................12

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*,
    13 Charleston L. Rev. 205 (2018) ..................................................12, 17, 18

François-Xavier Martin, *A Collection of the Statutes of the Parliament of*
    *England in Force in the State of North-Carolina*
    (Newbern: The Editor's Press, 1792) ...........................................................14

Pet. for a Writ of Cert., *Antonyuk v. James*, No. 23-910 (U.S.)...............................11

ROY ROSENZWEIG & ELIZABETH BLACKMAR, THE PARK AND THE PEOPLE:
   A HISTORY OF CENTRAL PARK (1992)............................................................21

Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted
   in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (2022),
   https://bit.ly/3TvZOJs...................................................................................6, 7

Trust for Public Land, *The 150 Largest City Parks*,
   https://bit.ly/47VJw1Q (Dec. 2010) .......................................................20, 21

iv

## INTRODUCTION

The Governor of New Mexico cannot escape the fact that her unilateral restrictions on public carry—issued with no input from the State legislature—"eviscerate the general right to publicly carry arms for self-defense," and therefore violate the Second Amendment. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 31 (2022). The Governor fights *Bruen* at every turn. She argues that the only relevant historical period is 1868 (and long after), while ignoring *Bruen*'s focus on 1791. She claims that only a few historical regulations can suffice, despite *Bruen*'s instruction that analogues must be well-established and representative of "this Nation's historical tradition," not outliers. And she invokes numerous laws from territories and localities, despite *Bruen*'s instruction that they carry little weight in the historical analysis. None of this analysis is sound.

The Governor begins by devoting pages to the problem she attempts to combat with her restriction: gun violence. Response Br. of Defs.-Appellees at 1–5 ("Br."). But if *Heller* and *Bruen* teach anything, it is that the government cannot simply point to gun violence as a basis for restricting the Second Amendment rights of law-abiding, responsible citizens. Indeed, whether the challenged restrictions further the Governor's view of the public interest is irrelevant. The Second Amendment's "unqualified command" must prevail unless the Governor can show that her "regulation is consistent with this Nation's historical tradition." *Bruen*, 597 U.S. at

1

17. *Bruen* could not have been clearer that any "interest balancing," whether overt or covert, is out of bounds. *See, e.g.*, *id.* at 25–28.

Most problematically, the Governor fails to show that any of the historical analogues she cites are representative or relevantly similar to the challenged restrictions on carry in parks and playgrounds. While the Governor touts her "hundred historical prohibitions on carrying firearms in parks," Br. at 1, nearly all of them come too late to be probative, and many are laws of a type that *Bruen* expressly held are unpersuasive. Neither the public interest nor the equities are served by the Governor enforcing an unconstitutional edict. The judgment below should be reversed.

## ARGUMENT

## I.  THE CHALLENGED PROVISIONS LIKELY VIOLATE PLAINTIFFS' SECOND AMENDMENT RIGHTS

### A.  Plaintiffs' Conduct Is Covered by the Second Amendment's Plain Text

For the first time, the Governor suggests that Plaintiffs' proposed conduct—firearms carry at public parks and playgrounds for self-defense—is not covered by the Second Amendment's plain text. Br. at 24–25. She is incorrect. Plaintiffs' burden—just as in *Bruen*—is met if they plan to "carry[] handguns publicly for self-defense." 597 U.S. at 32. Plaintiffs show that is the case when they explain their specific intent to carry firearms in parks and playgrounds for self-defense but for the

Governor's ban. App. Vol. 1 at 63; App. Vol. 2 at 46; App. Vol. 3 at 31–32. While the Governor takes issue with language from *Bruen* that Plaintiffs cite, Br. at 23–24, she ignores that *Bruen* repeatedly noted that the Second Amendment protects a general right to public carry absent *historically-grounded* restrictions, *see* 597 U.S. at 31–33 & n.8, 38. Thus, because Plaintiffs' conduct is presumptively protected by the Second Amendment's plain text, the burden shifts to the Governor to present sufficiently widespread, relevantly similar analogues supporting her bans.

### B. The Relevant Historical Period Centers on the Founding, Not 1868 or Much Later

The Governor errs in contending that "*Bruen* gave strong indications that the Reconstruction era should be the key focus." Br. at 13. Just the opposite. As Plaintiffs explain at length, the key focal point for this Court's historical analysis must be the Founding era, centering on 1791, when the Second Amendment was ratified. Pls.' Br. at 14–21 (collecting authorities and explaining theory). As Plaintiffs explain, decades of precedent from both the Supreme and lower courts interpreting the scope of incorporated rights cuts against the Governor's position. *See id.* (discussing *Bruen*'s reliance on *Ramos* and *Timbs*, both of which looked to the Founding in analyzing enumerated rights); *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258–59 (2020) (finding unpersuasive "more than 30" provisions of state law from the "second half of the 19th Century" because they were not grounded in Founding-era practices regarding the Free Exercise Clause); *see also Lara v. Comm'r Pa. State*

*Police*, 91 F.4th 122, 134 (3d Cir. 2024) (holding that, "to maintain consistency in our interpretation of constitutional provisions," 1791 is the most probative period when evaluating restrictions on carry by 18-to-20-year-olds); *Springer v. Grisham*, 2023 WL 8436312, at *7 (D.N.M. Dec. 5, 2023) (admonishing the government for providing "*no* citation to any relevant laws around the time of the enactment of the Second Amendment, and only two citations to laws before or around the enactment of the Fourteenth Amendment")[1]; *Duncan v. Bonta*, 2023 WL 6180472, at *20 (S.D. Cal. Sept. 22, 2023) ("*Bruen* teaches the most significant historical evidence comes from 1791[.]"); *Fouts v. Bonta*, 2024 WL 751001, at *5 (S.D. Cal. Feb. 23, 2024) (same); *Worth v. Harrington*, 666 F. Supp. 3d 902, 919 (D. Minn. 2023) (noting the "rather clear signs that the Supreme Court favors 1791 as the date for determining the historical snapshot of 'the people' whose understanding of the Second Amendment matters").

The Governor attacks Plaintiffs' wealth of precedent by arguing that, if it resolved the question, *Bruen* would not have left the issue of the correct time period open. Br. at 17. But the point is not that *Bruen* itself resolved the issue, but rather that *Bruen* did nothing to *disturb* the wealth of Supreme Court precedents prioritizing the Founding period in analyzing the scope of the Bill of Rights, *see,*

---

[1] The Tenth Circuit recently declined New Mexico's request to stay the district court's injunction of the parks restriction pending appeal. *See* Order, *Springer v. Grisham*, No. 23-2192 (Mar. 18, 2024).

4

*e.g.*, *Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020) (Seventh Amendment jury trial right); *Timbs v. Indiana*, 139 S. Ct. 682, 686–87 (2019) (Eighth Amendment excessive fines provision); *Espinoza*, 140 S. Ct. at 2258–59 (First Amendment free exercise clause), and the Governor provides no logical reason why the Second Amendment should receive different treatment, *cf. Bruen*, 597 U.S. at 70 (Second Amendment is not "subject to an entirely different body of rules than the other Bill of Rights guarantees").

The Governor primarily relies on the Second Circuit's recent opinion in *Antonyuk v. Chiumento*. Br. at 13–15. Though erroneous in other respects, *Antonyuk* did not go so far as to hold that the Reconstruction era controls to the *exclusion* of the Founding era. Rather, it noted that 1791 and 1868 are both "focal points" and "the farther we depart from these key dates, the greater the chance we stray from the original meaning of the constitutional text." 89 F.4th 271, 304 (2d Cir. 2023). Additionally, throughout its reasoning, the Second Circuit discussed both Founding *and* Reconstruction-era analogues. *See, e.g.*, *id.* at 356–57, 360, 365. *Antonyuk* does not endorse the Governor's blinkered focus on 1868 and evidence that long postdates it. While the Governor also cites a now-vacated Eleventh Circuit opinion and several

district court opinions, they are inconsistent with *Bruen* for the reasons already discussed. *See supra*; Pls.' Br. at 14–21.

Next, the Governor halfheartedly attempts to criticize the Third Circuit's holding in *Lara* that 1791 is the most probative period. Br. at 14 n.10. But *Lara* is highly persuasive because it recognized the long line of precedent looking to the Founding era to analyze the scope of incorporated rights. *See* 91 F.4th at 134; *see also Bruen*, 597 U.S. at 37 (noting the Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791" and collecting authorities). The Third Circuit's decision is consistent with both originalism and precedent; the Governor's theory comports with neither. Indeed, she is forced to adopt the counterintuitive position that 1868 is also "the correct touchstone" in cases involving *federal* restrictions even though the "Second Amendment has bound the federal government since 1791." Br. at 16–17.

While the Governor claims she has scholars on her side, Br. at 15 & n.12, it is by no means the accepted view that Reconstruction-era evidence is all that is relevant, *see* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, Harv. J. L. & Pub. Pol'y Per Curiam (2022),

https://bit.ly/3TvZOJs.[2] In any event, the precedent just discussed matters more than ongoing scholarly debates. The only logical view is that the Fourteenth Amendment simply changed *whether* the Second Amendment applied to the states, not what the Second Amendment means. Indeed, there is no more reason to think that applying the Second Amendment to the states in 1868 changed its meaning than adding a fifty-first state in 2024—and thus applying the Second Amendment to that state for the first time—would reset the Second Amendment to a 2024 meaning. There is one Second Amendment, and it will always carry its 1791 meaning, regardless of how far its reach expands.

Finally, the Governor makes points about indeterminate history, historical silence, and liquidation. Br. at 18–21 & n.15. *Bruen* provides explicit guidance about indeterminate history. When examining history subject to "multiple plausible interpretations," the Court "favor[ed] the one that is more consistent with the Second Amendment's command." 597 U.S. at 44 n.11. In other words, to the extent the historical record is indeterminate (and it is not, especially with respect to public

---

[2] One of her sources states that 1868 is the correct temporal framework if enumerated rights were to be incorporated via the Privileges or Immunities Clause, which would also entail upending decades of precedent. Br. at 15 n.12 (Blackman article). Moreover, several of the articles refer to Akhil Amar's book, which casts the Second Amendment as furthering federalism by protecting state militias rather than safeguarding an individual right—a theory the Supreme Court rejected in *District of Columbia v. Heller*, 554 U.S. 570 (2008). *See id.* (Bernick, Calabresi, Rappaport, and Siegel articles).

gatherings and parks), ambiguities should be resolved in Plaintiffs' favor. Historical silence compels a similar result. Because the Second Amendment "codified a pre-existing right," *id.* at 20 (emphasis deleted), the absence of laws regulating that right means that the right remains undisturbed, *see id.* at 26 (noting that if the "general societal problem"—such as gun violence—has persisted, the "*lack of a distinctly similar historical regulation addressing that problem is relevant evidence*" of its unconstitutionality (emphasis added)). Put differently, if the government fails to prove that restrictions on the right are consistent with the Nation's historical tradition, the "Second Amendment's unqualified command" prevails. *Id.* at 24 (cleaned up). The Governor's citation to *Dobbs v. Jackson Women's Health Organization* to support her claims about historical silence is misplaced. Br. at 20–21. Plaintiffs do not argue, as in *Dobbs*, that the absence of laws supports an unenumerated right that was not preexisting. *See id.* Rather, Plaintiffs observe that the constitutional default is carry, and the lack of regulation preserved that status quo. But this is largely a moot point because Plaintiffs provide affirmative evidence that carry was allowed in places of public assembly in early America, including around purportedly vulnerable people. *See infra* Part I.D.1.

Nor do the Governor's passing references to liquidation help her. Liquidation requires "disputed or indeterminate terms and phrases in the Constitution." *Bruen*, 597 U.S. at 35–36 (cleaned up). But, as the Supreme Court has explained, the Second

Amendment "codif[ied] a pre-existing right" that was "venerable" and "widely understood." *See Heller*, 554 U.S. at 603, 605. If even looking at the drafting history of the Second Amendment is "dubious" for these reasons, *see id.* at 603, applying the concept of liquidation to the Second Amendment cannot be correct.

### C.  The Historical Inquiry Requires Proof of Well-Established, Representative Analogues and Cannot Rest on Outliers

As described, Pls.' Br. at 21–23, the historical inquiry requires proof of "well-established and representative" historical analogues, *Bruen*, 597 U.S. at 30. While *Bruen* did not expressly define these terms, its reasoning reveals their meaning. Analogues are sufficiently well-established and representative if they were present in many states and therefore affect large swaths of the population. For example, *Bruen* dismissed one state statute and two state court decisions as not representative. *See id.* at 65. Similarly, the Supreme Court doubted that "*three* colonial regulations could suffice to show a tradition of public-carry regulation." *Id.* at 46. And in rejecting reliance on territorial restrictions, *Bruen* found them unpersuasive in part because "miniscule" populations would have lived under them. *Id.* at 67. Thus, after analyzing the relevant census data the Court stated: "Put simply, these western restrictions were irrelevant to more than 99% of the American population." *Id.* In other words, laws existing in only a few jurisdictions or applying to a small percentage of people do not suffice to establish a historical limitation on the scope of the Second Amendment right. *Id.* at 30; *see also Koons v. Platkin*, 673

F. Supp. 3d 515, 622 (D.N.J. 2023) (finding three Reconstruction-era laws non-representative); *see also id.* at 642 (finding one state law and 25 local ordinances, covering less than 10% of the nation's population, insufficient); *Christian v. Nigrelli*, 642 F. Supp. 3d 393, 407 (W.D.N.Y. 2022) ("[T]he notion of a 'tradition' is the opposite of one-offs, outliers, or novel enactments."); *Siegel v. Platkin*, 653 F. Supp. 3d 136, 153 (D.N.J. 2023) ("Six cities do not speak for, what was by 1893, 44 states"); *May v. Bonta*, 2023 WL 8946212, at *13 (C.D. Cal. 2023) (rejecting government's reliance on three late 19th century laws as not sufficiently representative). The Governor's suggestion that Plaintiffs' conclusion is not grounded in doctrine, Br. at 22, is simply false.

While the Governor contends that the possibly sensitive places *Bruen* identified were based on only a few Founding-era laws, Br. at 21–22, her reasoning is flawed. For starters, *Bruen* did not "recognize" courthouses, polling places, legislative assemblies, and schools as sensitive places based on "the historical record." *See id.* at 17–18, 21; *see also Heller*, 554 U.S. at 627 n.26 (noting that the locations it identified are "presumptively lawful" and conducting no historical analysis). Rather, *Bruen* "*assume[d]* it settled" (but did not decide) that the first three locations were sensitive at the Founding and thus could serve as analogues for modern-day carry restrictions. 597 U.S. at 30. It did not apply the analogical test that it just announced. *See id.* And *Bruen* in no way endorsed the notion that

schools are sensitive places where firearms can be banned altogether. *See infra* Part I.D.2.

Additionally, the Governor's argument that *Bruen* found all these locations sensitive based on a thin historical record, Br. at 21–22, would render the rest of *Bruen*'s reasoning about representative analogues self-defeating. If the Court truly believed that a few analogues were sufficient to uphold New York's proper-cause requirement, none of its thorough historical analysis would have been necessary. For *Bruen* recognized that New York *had* presented a few analogues that did tend to support its regulation. *See* 597 U.S. at 46 (noting that New York had identified three restrictions on public carry); *id.* at 65 (noting that New York had identified one statute and pair of state-court decisions). While the Governor again cites *Antonyuk*, Br. at 21–22, the Second Circuit's decision is not binding and is inconsistent with *Bruen* for all the reasons just discussed.[3] In fact, the Second Circuit went so far as to declare that it would not follow *Bruen*'s methodology too closely because of the purportedly "exceptional" nature of that case. 89 F.4th at 302, 338–39.

---

[3] The *Antonyuk* Plaintiffs filed a petition for writ of certiorari highlighting numerous errors. *See* Pet. for a Writ of Cert., *Antonyuk v. James*, No. 23-910 (U.S.).

### D.   The Governor's Historical Evidence Is Insufficient to Meet Her Burden

At the outset, the Governor errs by suggesting that it is Plaintiffs' burden to establish that the Second Amendment "forbade the government to prohibit guns in parks [and] playgrounds." Br. at 19–20, 28. *Bruen* places the burden squarely on the Governor, *see* 597 U.S. at 33–34, and she fails to carry it. Plaintiffs first unpack two threshold arguments about the history of public assemblies and schools—which the Governor invokes to justify both of her bans—before addressing the location-specific analogues.

#### 1.   Firearms Were Historically Present in Places of Public Assembly

The Governor relies on a purported "tradition" of restricting carry in public assemblies to support her carry restrictions in both parks and playgrounds. Br. at 32–35, 48–50. And she contends that this evidence "do[es] not contradict any earlier evidence." *Id.* at 19. But as Plaintiffs explain, firearm carry in crowded places of public assembly was permitted (and sometimes required) in early America, even where vulnerable groups were present. Pls.' Br. at 40–41 (collecting sources); David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 205, 233–34 & n.108, 244 (2018); NICHOLAS JOHNSON ET AL., FIREARMS LAW & THE SECOND AMENDMENT 183–85 (2d ed. 2017) (collecting sources). While the Governor attempts to cast these laws as only benefitting white

militiamen, Br. at 48 n.37, the laws' text is the best evidence of their contents and is not so limited.

The Governor's contrary evidence is both thin and flawed. She cites the 1328 Statute of Northampton, which she claims forbade the carrying of arms in fairs and markets. Br. at 32. But *Bruen* unequivocally held that that "the Statute of Northampton . . . has little bearing on the Second Amendment adopted in 1791." 597 U.S. at 41. First, the Court explained that it is too old to inform the meaning of the Second Amendment at the Founding. *See id*. Second, its prohibition on going or riding armed centered on large weapons used in combat because handguns were not yet invented. *See id.* at 41–42. Third, the Court reasoned that the Statute of Northampton confirmed and echoed the common law "affray" tradition that individuals cannot go armed with malicious intent to terrify others. *See id.* at 40. Fourth, by the Founding, this statute and those modeled on it were understood to bar carry in fairs, markets, and other public places only when individuals carried with intent to terrify others. *See id.* at 49–51. For all these reasons, the Statute of Northampton is not a viable analogue to laws prohibiting carry by the law-abiding.

The Governor also points to Virginia's Northampton analogue and a putative North Carolina restriction. Br. at 32–33. Neither are persuasive. Start with the 1786 Virginia law, which "replicated" the 1328 Statute of Northampton. *Id.* at 32. Because it is essentially a carbon copy of Northampton, which *Bruen* rejected as not probative

for many reasons, *see supra*, it can be quickly dismissed. Moreover, the Virginia law included an express "terror" element. *Antonyuk*, 89 F.4th at 357 n.74. *Bruen* conclusively dismissed this very same statute as "requir[ing] something more than merely carrying a firearm in public"—a specific intent to terrorize others—that Plaintiffs here, all law-abiding citizens, do not harbor. 597 U.S. at 50.[4]

Now consider the putative North Carolina law that the Governor cites. Br. at 32–33 (referencing 1792 compendium of North Carolina statutes). But the cited "law" was *never* passed by the North Carolina legislature. As the references to the King in the statute indicates, it is merely a copy of the 1328 Statute of Northampton. And it appears in a 1792 publication drafted by a private lawyer who was merely surmising what British laws remained in force in North Carolina. "Later compilers wrote that this work 'was utterly untrustworthy'" and inserted many laws that were never in force.[5] Stephen P. Halbrook, *Faux Histoire of the Right to Bear Arms: Young v. Hawaii* at 21, SSRN, https://bit.ly/3QyFZA5 (citation omitted). Indeed,

---

[4] The 1870 Tennessee law must be rejected for the same reason because it expressly included a terror requirement. Br. at 34 n. 28.

[5] The author also conceded in the preface that this work was neither edited by others nor approved by the legislature: "no act of Assembly afforded it, and . . . many, even among the most respectable, professors of the law disagree in regard to the applicability of a number of British statutes[.]" François-Xavier Martin, *A Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina* iii (Newbern: The Editor's Press, 1792).

when the North Carolina General Assembly passed an Act to enact English Statutes in 1749, it did not include Northampton. *See* A COLLECTION OF ALL THE PUBLIC ACTS OF ASSEMBLY OF THE PROVINCE OF NORTH-CAROLINA 293, 295 (Newbern: James Davis, 1752). Moreover, James Iredell (who later became a Supreme Court Justice) was commissioned by the North Carolina General Assembly to revise and compile all laws that remained in force in the state following the Declaration of Independence.[6] He too did not include the Statute of Northampton. *See id.* To the extent the cited statute was *ever* in effect in North Carolina, it ceased to have any force as of January 1838. *See State v. Huntley*, 25 N.C. 418, 420 (N.C. 1843) (noting that the Revised Statutes of England ceased to be of force and effect in North Carolina as of January 1, 1838, and questioning whether the Northampton copycat had ever been in force). Even if this law was ever in effect, it would still not be a probative analogue because the North Carolina Supreme Court held that Northampton codified the common law, which was understood to prohibit bearing arms *to the terror* of others. *See id.*

Bereft of any Founding era history banning carry in places of public assembly, and thus of any "long, unbroken . . . tradition[,]" Br. at 34 (citing *Antonyuk*, 89 F.4th at 358), the Governor turns to late 19th century laws from Tennessee, Texas, and

---

[6] JAMES IREDELL, LAWS OF THE STATE OF NORTH-CAROLINA 70 (Edenton: Hodge and Wills, 1791).

Missouri, plus two territorial restrictions. Br. at 33. These analogues can be dismissed for any (or all) of the following reasons. First, they come too late to be probative under *Bruen*. Pls.' Br. at 14–21 (collecting authorities and explaining why the analysis must start in, and focus on, the Founding era); *supra* Part I.B (same). The Governor cannot start her historical tradition decades removed from "when the people adopted" the Second Amendment, *Bruen*, 597 U.S. at 34 (emphases deleted)—i.e., the Founding era. To the extent the Governor presents history post-dating the Founding era, such evidence can serve only to confirm an existing tradition. Pls.' Br. at 14–15. And as discussed, the Colonial and Founding-era generations often permitted (and sometimes required) carry in places of public assembly such as churches and public meetings. Thus, to the extent Defendants' restrictions originate in the late 19th century, they are later history "that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense in public" and are not probative. *Bruen*, 597 U.S. at 65–66 (cleaned up).

Second, the Governor's late 19th-century laws are not sufficiently widespread. *Bruen* made clear that a smattering of regulations is not a "historical tradition" of regulation sufficient to inform the original public meaning of the right at the Founding. Pls.' Br. at 21–23. Third, the Governor cannot rely on territorial and local restrictions to form a tradition. *E.g.*, Br. at 34, n.28. *Bruen* afforded territorial laws—including the exact same 1889 and 1890 Oklahoma statutes cited here, Br. at

34 n.28—"little weight" because they were "localized," "rarely subject to judicial scrutiny," and "short lived." 597 U.S. at 67–69; *see also* Pls.' Br. at 22, 37. The same reasoning applies here.

### 2. Schools

The Governor also errs by arguing that both the parks and playground restrictions are consistent with restrictions on carry in schools. *Bruen* did not in any way endorse schools as sensitive places, as the Governor argues. Br. at 35, 44. *Bruen* noted *Heller*'s statements on this point, but went on to say that "the historical record yields relatively few 18th- and 19th-century 'sensitive places'" and mentioned only legislative assembles, polling places, and courthouses as the starting point for analogical reasoning. 597 U.S. at 30. Far from endorsing schools as sensitive places, *Bruen* approvingly referenced carry by black Americans at Freedmen's schools before the Fourteenth Amendment's ratification. *See id.* at 61.

*Bruen* was correct to decline to suggest that schools are sensitive places. For the historical record reveals that some early schools banned *students* (not faculty or visitors) from possessing firearms. *See, e.g.*, Kopel & Greenlee, *supra*, at 247–49 (describing the University of Virginia's ban on students carrying firearms as response to the students' "spoiled and violent behavior"); Amicus Br. of the Ctr. for Hum. Liberty at 20–22, *Antonyuk v. Nigrelli*, No. 22-2908, Doc. 313 (2d. Cir. Feb. 9, 2023) (summarizing various Colonial and Founding era bans on student

possession on campus). These bans were rooted not in students' vulnerability, but rather in the schools' ability to exercise *in loco parentis* authority over them. *See, e.g.*, *Worth*, 666 F. Supp. 3d at 921–22 (noting this historical fact); *Lara*, 91 F.4th at 144–45 (Restrepo, J., dissenting) (recognizing that Founding-era restrictions by schools on student firearm possession "w[ere] not predicated on or justified by the student's presence at a sensitive location," but rather on the schools' "authority standing *in loco parentis*.").

The problem for Defendants is that historical exercises of *in loco parentis* authority do not support restricting firearm carry by anyone not subject to that sort of authority. Thus, analogies from schools to places where other allegedly vulnerable people gather lack any historical grounding. Even assuming firearm restrictions on campuses could be probative, they are not relevantly similar to broader bans on carry by those not under *in loco parentis* authority. "How" they restricted the right is more limited because they disarmed only students, and "why" they did so was as an exercise of parent-like authority. *See, e.g.*, Kopel & Greenlee, *supra*, at 247–48. While the Governor cites several pre-*Bruen* cases discussing the risks firearms may pose to children in schools, Br. at 45, those considerations no longer matter under *Bruen*'s test, *see* 597 U.S. at 19–24. The Governor also claims that Plaintiffs' *in loco parentis* argument cannot be squared with *Heller* and *Bruen*'s "approval" of schools as sensitive places. But again, both opinions referenced schools only in dicta and

cited sources pointing to several of the same laws that Plaintiffs do, which indisputably burdened only *students*' carry rights. Finally, the early American tradition was to *require* the bearing of arms around vulnerable people, *see supra* Part I.D.1, because disarming the vulnerable and their caretakers makes them *more vulnerable*, not less, Pls.' Br. at 41.

### 3. Government-Provided Security Is the Historical Feature Uniting Legislatures, Polling Places, and Courthouses

As the *We the Patriots* and *Fort* Plaintiffs contend, the uniting historical feature behind the sensitive places *Bruen* assumed historically supported—courthouses, legislatures, and polling places—is that the government treated them as such by providing security. Pls.' Br. at 24–28.[7] While the Governor attempts to argue that the presence of doorkeepers at legislatures do not suffice to protect inhabitants, the point is that government *historically treated* these places as sensitive by taking steps to protect their inhabitants.

While the Governor claims that this theory "ignores" *Heller* and *Bruen*'s recognition of schools and government buildings as sensitive, this argument can be dismissed for the reasons already discussed. *See supra* Part I.D.2. The Governor's reliance on *Bonidy v. U.S. Postal Service*, Br. at 36–37, is similarly mistaken. While *Bonidy* explains that the Tenth Circuit considers itself bound by Supreme Court

---

[7] Plaintiffs do not contend that polling places currently have security. Br. at 38. The point is that they had such security *historically*.

dicta, that does not matter here. 790 F.3d 1121, 1125 (10th Cir. 2015). For *Bruen* expressly stated that it was not attempting to define the entire field of Second Amendment jurisprudence and left for another day closer analysis of the history supporting the exceptions it assumed. *See* 597 U.S. at 30–31. *Heller*'s reasoning confirms that it too expressly left open the contours of any permissible restrictions at sensitive places. *See Heller*, 554 U.S. at 626. To the extent there was any doubt about this fact, *Bruen* clarifies by endorsing a limited subset of Founding-era government buildings—legislative assemblies, polling places, and courthouses—as presumptively sensitive. Indeed, it is unlikely that *Bruen* would have specified these government buildings if the Court thought that *all* government buildings were presumptively sensitive. Nor would the Court have cited approvingly the example of carry by black Americans at Freedmen's schools before the Fourteenth Amendment's ratification. *See* 597 U.S. at 61. Finally, *Bonidy* can be dismissed because it predates *Bruen* and thus did not engage in the analogical reasoning now required. *See* 790 F.3d at 1125, 1128 (concluding, based only on *Heller*'s mention of "government buildings," that firearms could be banned in post offices, and alternatively, applying now-unavailable "intermediate scrutiny").

### 4. Parks

Turning to the specific locations at issue, the Governor leads with the ahistorical claim that parks first appeared in the second half of the 19th century. Br.

at 25. As Plaintiffs have explained, many parks existed before 1800. *See, e.g.*, Trust for Public Land, *The 150 Largest City Parks*, https://bit.ly/47VJw1Q (Dec. 2010) ("*Largest City Parks*"); Pls.' Br. at 29–31 (collecting sources). Crucially, the Governor presents *zero* historical analogues from the Founding era banning carry in such parks, and Plaintiffs are aware of no such restrictions. Pls.' Br. at 31. Instead, the Governor attempts to cast all early parks as grazing areas, Br. at 25–26, but that limited purpose is simply not supported by the sources describing such parks. Boston Common, for example, "was a place for recreation as early as the 1660s." *Boston Common*, Nat'l Park Serv., https://bit.ly/3SGumtc (last visited Mar. 25, 2024) ("[A]ctivities held on the Common stretched beyond relaxation and recreation to include public assembly . . . rallies . . . [and] protest[s.]"). So too various New York parks. Pls.' Br. at 30–31 (collecting sources).

The Governor's authorities, Br. at 29–30, are not to the contrary. The Shoked article does not support the claim that 18th century green spaces were not locations for public recreation. *See id.* at 29. Indeed, the primary source it cites for the proposition that Boston Common was a grazing area explains that early commons were also used for public assemblies, festivals, and protests. *See* Roy Rosenzweig & Elizabeth Blackmar, The Park and the People: A History of Central Park 4 (1992). In other words, these commons served many purposes beyond merely providing grazing spaces. Similarly, another of the Governor's

sources confirms that Boston Common "was the rallying ground for all public meetings, parades, picnics, celebrations and sports for children, even before the Revolution." *Bulletin of the American Park and Outdoor Art Association* 3 (1901), bit.ly/3NPLSae. Finally, the Greer article discusses early agricultural development on "common pastures," Allan Greer, *Commons and Enclosure in the Colonization of North America*, 2 AM. HIST. REV. 365, 373 (2012), and does not support the Governor's claim that early commons and greens differed from modern-day parks, Br. at 29. Even if the early green spaces are labeled pre-park spaces, Br. at 30 n.25, it is indisputable that green spaces where the public recreated were a fixture in early America, Pls.' Br. at 29–31.

The Governor's analogues are woefully deficient for other reasons. First, they are all too late in time for the reasons already discussed. *See supra* Part I.B; Pls.' Br. at 14–21. For the same reason, a lack of court opinions invalidating such restrictions, Br. at 27, is also not probative. Second, as for park-specific firearms bans, the Governor relies only on *local* restrictions from various cities, Br. at 25–27, which are insufficient to show a national historical tradition. Even assuming that restrictions stretching into the 1900s could be probative (they are not), there were more than 10,000 incorporated cities, towns, villages, and boroughs by 1900, *see Census Bulletin No. 65*, U.S. CENSUS BUREAU (June 8, 1901), https://bit.ly/3GkuFnm, so even 100 local laws would have governed less than 1%

of cities at the time. *See supra* Part I.C; *cf. Bruen*, 597 U.S. at 67–68 (refusing to credit territorial laws "enacted nearly a century after the Second Amendment's adoption [and] governed less than 1% of the American population").

Third, as Plaintiffs have explained, these municipal laws deserve skeptical treatment because they often barred the exercise of other constitutional rights. Pls.' Br. at 36–37. Just as the Supreme Court rejected various analogues in *Bruen* that were unconstitutional for other reasons, this Court should do the same here. *See* 597 U.S. at 127 (rejecting regulations "designed or enforced in a [racially] discriminatory manner"); *see also id.* at 63 n.26 (rejecting analogue because it violated the Constitutional right to a jury trial). The Governor does not meaningfully respond to this point, instead characterizing it as "irrelevant." Br. at 42. The Governor also makes the passing argument that *Bruen*'s analogical test is not required at all in this case because her parks restriction is a "historical twin" to various historical ordinances. Br. at 41. Not so. *Bruen* explained that assessing "how" and "why" a regulation burdens Second Amendment rights is key to guiding courts' evaluation of present-day regulations writ large. *See* 597 U.S. at 28–30. Nowhere did *Bruen* suggest that analogical reasoning would not be required if the regulation is a "historical twin," and the Governor's analogues are hardly that. Every other court to

evaluate carry restrictions in parks has conducted analogical reasoning when faced with many, if not all, of the same analogues here.[8]

Fourth, and finally, while the Governor cites cases rejecting post-*Bruen* challenges to carry restrictions in parks, Br. at 27, she fails to note that many other courts have enjoined parks restrictions based on her analogues, *see, e.g.*, *Springer*, 2023 WL 8436312, at *7–8 (enjoining the Governor's parks restriction based on these same analogues); *Wolford*, 2023 WL 5043805, at *21–24 (holding that there is no historical tradition of restricting carry in parks even accepting that parks first emerged during the Reconstruction era); *Koons*, 673 F. Supp. 3d at 643; *May*, 2023 WL 8946212, at *12–13.

### 5. Playgrounds

The Governor largely relies on playgrounds' alleged similarity to schools to support her carry restriction. Plaintiffs fully refute this argument above. *See supra* Part I.D.2. The Governor also claims that playgrounds did not appear until the late 19th and early 20th centuries, and thus a "more flexible" approach to analogic reasoning is necessary. Br. at 48–49. This is beside the point. For "*Bruen* does not direct courts to look at when a historical place became akin to the modern place being regulated. Rather, the focus is on 'determining whether a historical regulation

---

[8] The Governor no longer relies on the 20th-century analogues that Plaintiffs criticized as not having the same "how or why" as her restriction. *Compare* Pls.' Br. at 35–37, *with* Br. at 26–27 & n.20.

is a proper analogue[.]'" *Wolford*, 2023 WL 5043805, at *21 (cleaned up). Indeed, *Bruen* itself did not apply a different analogical test even though downtown Manhattan today (and other parts of New York State) have undergone great technological and societal change since the Founding. On the contrary, *Bruen* stated that the historical analogies "here and in *Heller* are relatively simple to draw," distinguishing those cases from others "implicating unprecedented societal concerns or dramatic technological changes." 597 U.S. at 27. The same should hold true for this case, especially because the presence of vulnerable individuals in a location is nothing new, and arms were expressly permitted around them in the Colonial and Founding eras so law-abiding individuals could defend themselves and others. *See supra* Part I.D.1–2.

## II.   THE OTHER FACTORS FAVOR INJUNCTIVE RELIEF

Because Plaintiffs show that they are likely to succeed on the merits of their claim that the Governor's carry ban violates their constitutional rights, they necessarily suffer ongoing, irreparable injury while it remains in force. *See Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1263 (10th Cir. 2016); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). And because the "citizens of [New Mexico] have an interest in ensuring that their elected public officials do not engage in conduct that violates the constitutional rights of another citizen," the public interest

favors Plaintiffs. *Herbert*, 828 F.3d at 1266. While the Governor claims that the State suffers injury when one of its laws is enjoined, Br. at 50, that cannot be true of *un*constitutional enactments. This is especially true where, as here, a *single* public official acted unilaterally to institute the bans, without any input from the people's representatives.

The Governor claims that an injunction would impede the State's safety goals and would hamper individuals' ability to enjoy public spaces. Br. at 50–51. Indeed, the Governor goes so far as to suggest that the mere *presence* of lawfully-carried firearms reduces the public's use and enjoyment of parks. *Id.* at 51 & n.41. But as explained above, using violent crime statistics to argue that the public interest supports disarming law-abiding citizens fails. Pls.' Br. at 45–50 & n.11; *accord Wolford*, 2023 WL 5043805, at \*32 (finding insufficient Hawaii's professed public safety concerns where "the challenged provisions only affect those individuals who have been granted a permit to carry firearms[.]"); *May*, 2023 WL 8946212, at \*18 ("[L]egislation regulating CCW permitholders—the most responsible of law-abiding citizens seeking to exercise their Second Amendment rights—seems an odd and misguided place to focus to address those safety concerns").

Finally, the Governor's approach inserts the same interest-balancing that *Bruen* rejected into balancing the injunctive relief factors, which is no more permissible than conducting means-end scrutiny on the merits. For it would allow

contested public safety assertions to override laws found to (or found likely to) violate the Second Amendment. Interest balancing at the equities stage is arguably even worse than the pre-*Bruen* regime because it is employed to *excuse* constitutional violations. And as *Bruen* noted, the Second Amendment "is the very *product* of an interest balancing by the people and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense.'" 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635).

## CONCLUSION

For all these reasons, this Court should reverse the judgment below.

<br>

/s/ Cameron L. Atkinson

Dated: March 26, 2024                    Cameron Lee Atkinson

ATKINSON LAW, LLC
122 Litchfield Road
P.O. Box 340 St. 2
Harwinton, CT 06791
203-677-0782
catkinson@atkinsonlawfirm.com

*Attorney for Plaintiffs We the Patriots USA, Inc. et al.*

Jordon P. George
ARAGON MOSS GEORGE JENKINS, LLP
2201 Menaul Blvd NE
Albuquerque, NM 87107
505-872-3022
jordon@amglaw.com

/s/ David H. Thompson
David H. Thompson
Peter A. Patterson
Kate Hardiman
COOPER & KIRK, PLLC
1523 New Hampshire Ave NW
Washington, D.C. 20036
202-220-9600
dthompson@cooperkirk.com

*Attorneys for Plaintiffs Fort et al.*

Robert J. Olson
WILLIAM J. OLSON, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
(703) 356-5070
wjo@mindspring.com

/s/ Stephen Stamboulieh
Stephen Stamboulieh
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

*Attorneys for Plaintiffs Donk et al.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,463 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface (fourteen-point Times New Roman font) using Microsoft Word.


Dated: March 26, 2024                    /s/ Cameron L. Atkinson
                                         Cameron L. Atkinson
                                         *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2024, I filed the foregoing via the CM/ECF

filing system, which caused all counsel of record to be served by electronic means.

/s/ Cameron L. Atkinson
Cameron L. Atkinson
*Counsel for Plaintiffs-Appellants*